**UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
HARRISBURG DIVISION**

|  |  |
|---|---|
| In re: | |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Chapter 11 |
| Debtor.[1] | Case No. 1:20-bk-00599 (HWV) |

## INFORMATIONAL BRIEF OF THE ROMAN CATHOLIC DIOCESE OF HARRISBURG

### INTRODUCTION[2]

1.    The Diocese of Harrisburg (the "***Diocese***") is the ecclesiastical district comprising a geographic area decreed by the Roman Catholic Church as the Diocese of Harrisburg.  Within the Diocese, Bishop Ronald W. Gainer ("***Bishop Gainer***") has been appointed as Bishop (the "***Bishop***")[3] to exercise authority and jurisdiction in assuring the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the Diocese with loyalty to the Holy Father.

2.    The Bishop carries out his canonical duties in accordance with the Code of Canon Law, which is the ecclesiastical law of the Roman Catholic Church ("***Canon Law***").

3.    The Bishop also has authority over the Roman Catholic Diocese of Harrisburg (the "***RCDH***"), which is a nonprofit religious institution and the civil law instrumentality through which the mission of the Roman Catholic Church is administered within the Diocese.

---

[1] The last four digits of the Debtor's federal tax identification number are: 4791. The Debtor's principal place of business is located at 4800 Union Deposit Road, Harrisburg, Pennsylvania 17111.
[2] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them in the body of this Informational Brief.
[3] All references to the defined term "Bishop" herein refer to the position within the Diocese, including Bishop Gainer and all of his predecessors and successors.

4825-2613-6746.8

4.     Bishop Gainer has had authority over the RCDH since he was installed as Bishop on March 19, 2014.

5.     As more fully set forth herein, the RCDH has faced and continues to face numerous claims by survivors of clergy sexual abuse.

6.     While the RCDH has settled many claims through a voluntary settlement program, the RCDH still faces potentially significant exposure from remaining claimants, including as a result of certain changes in law by the Commonwealth of Pennsylvania.

7.     The RCDH filed this chapter 11 proceeding:

    a.     to provide compensation for the unresolved claims of survivors of abuse, including those survivors who have not yet come forward;

    b.     to continue outreach to and support of survivors as an ongoing ministry;

    c.     to preserve the ability to carry on the essential ministries and services provided by the RCDH, so the RCDH can continue to meet the needs of the Catholic faithful within the Diocese, the Parishes, the Schools, the Related Entities, and others who rely on the foregoing for spiritual, pastoral, and human assistance; and

    d.     to fairly allocate the RCDH's remaining income and assets among the legitimate competing interests for such property, recognizing that it is not possible to pay all alleged claims in full.

8.     Based upon the experience of other dioceses around the country, the RCDH believes failure to commence this chapter 11 proceeding would have resulted in: (a) some survivors who have not yet brought claims failing to receive compensation or assistance; and (b) cessation of the RCDH's ministry, education, and charitable outreach, upon which so many within the Diocese rely.

9.     To assist in understanding the RCDH's need for bankruptcy protection, this informational brief is organized into six sections: (i) the first section describes the history of the RCDH and the Diocese; (ii) the second section details the work done by the RCDH within the Diocese; (iii) the third section describes the relationship between and property of the RCDH, the

Parishes (as defined herein), the Schools (as defined herein), and certain Related Entities (as defined herein); (iv) the fourth section details the clergy sexual abuse crisis and the RCDH's response thereto; (v) the fifth section describes the circumstances surrounding the commencement of this chapter 11 case; and (vi) the sixth section details the purpose of this chapter 11 case and the RCDH's goals for such case.

## HISTORY AND STRUCTURE OF THE RCDH AND THE DIOCESE[4]

### *The Church*

10. The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate and universal ordinary power in the Church.

11. The Pope exercises such power in concert with the College of Bishops of which he is the head.

12. In addition to moral persons (namely, the Church itself and the Pope) and physical persons (i.e., individuals), Canon Law recognizes "juridic persons," which are entities, comprised of physical persons, with corporate agency.

13. Public juridic persons are constituted either by prescript of Canon Law or by special grant of competent authority given through a decree, and they have perpetual existence unless extinguished in accordance with Canon Law.

14. Public juridic persons in the Church are either aggregates of persons or aggregates of things, ordered for a purpose which is in keeping with the mission of the Church and which transcends the purpose of the individuals.

15. A particular public juridic person "owns" all property it has acquired by valid means.

---

[4] All discussion of Canon Law and Church doctrines and belief is a general summary and is qualified in its entirety by the actual Code of Canon Law as interpreted and applied by the Church.
4825-2613-6746.8

16.     However, property owned by public juridic persons has the character of Church property and must be applied always to the purposes for which the Church is allowed to own property, namely: the organization of divine worship, the care and support of the clergy, and the works of the apostolate and of charity, especially for the needy.

17.     Property is thus held in trust by public juridic persons, who are represented by physical persons, the administrators of such property.

18.     Canonical administrators are stewards who are required to manage property "with the diligence of a good householder."

19.     In particular, Canonical administrators must seek specific approval under Canon Law for the alienation of such property other than for basic maintenance of the applicable public juridic person.

20.     Apart from requiring the ownership of property of a public juridic person to be protected by civilly valid means, Canon Law does not prescribe or limit the forms of secular legal entity that may be used to hold property or conduct the business of such public juridic person.

21.     A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy, so that, adhering to the bishop and gathered by him in the Holy Spirit through the gospel and the sacraments, it constitutes a particular church in which the Church is truly present and operative.

22.     As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds.

23.     A diocese is divided into "parishes," which are communities of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop.

24.     As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds.

25.     Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

**_The Diocese and the RCDH_**

26.     The territory of the Diocese has a rich history, extending back more than two hundred years to the seventeenth century.

27.     During the seventeenth century: (a) Jesuit missionaries under the jurisdiction of the Diocese of Quebec traveled south on the Susquehanna River—"the highway of the missionaries"—leaving evidence of their priestly activities; and (b) Jesuit and Franciscan missionaries under the jurisdiction of the Diocese of London traveled north on the river from Maryland and preached the Gospel to Native Americans.

28.     After the Revolutionary War, Father John Carroll was appointed superior of the American missions in 1784.

29.     In 1790, the first Catholic diocese in the United States was established in Baltimore, and Father Carroll was consecrated the first bishop and his diocese included the original thirteen colonies, until the dioceses of Boston, New York, and Philadelphia were established in 1808.

30.     From 1808 until 1868, the territory of the Diocese of Harrisburg was part of the Diocese of Philadelphia.

31.     On March 3, 1868, Pope Pius IX, accepting the recommendation of the Bishops of the Second Plenary Council of "the United States of North America" and having consulted the Cardinals of the Congregation of the Propagation of the Faith, decreed:

> Wherefore, in keeping with the counsel of the afore-mentioned
> Cardinals, and exercising our Full Apostolic Authority, we hereby

establish and constitute in the City of Harrisburg a new Episcopal see, under the care of its own Bishop, to be known henceforth as the "Diocese of Harrisburg."

32.     Today, the ecclesiastical district of the Diocese:

a.      has a single cathedral, the Saint Patrick Cathedral, Harrisburg, which is the mother church of the Diocese;

b.      has parishes named for three North American saints: (i) Saint Elizabeth Ann Seton Parish, Mechanicsburg, which was founded in 1977; (ii) Saint John Neumann Parish, Lancaster, which was founded in 1978; and (iii) Saint Katharine Drexel Parish, Mechanicsburg, which was established in 1988;

c.      has two minor basilicas: (i) Sacred Heart of Jesus Church (the Conewago Chapel) in McSherrystown, which was elevated to the rank of minor basilica in 1962 by Pope John XXIII; and (ii) the Motherhouse Chapel of the Sisters of Saints Cyril and Methodius in Danville, which was declared in 1989 by Pope John Paul II to be a minor basilica, in celebration of its 50th anniversary;

d.      includes a geographic encompassing approximately 7,660 square miles; and

e.      contains close to 245,000 Catholics served by eighty-nine (89) parishes (the "***Parishes***") and seven (7) missions throughout fifteen (15) counties of central Pennsylvania.

### THE WORK OF THE RCDH WITHIN THE DIOCESE

33.     The primary role of the RCDH is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development, and other services to individuals of the Roman Catholic faith, the Parishes, the Schools (as defined herein), and the Related Entities (as defined herein) within the Diocese.

34. The mission and ministry of the Roman Catholic Church within the Diocese, as administered by the RCDH, are extremely important to the people within the Diocese.

35. There are many within the Diocese, including non-Catholics, who depend on the services that the Roman Catholic Church, through the RCDH, delivers directly or otherwise supports, some of which services are material and monetary and others of which are purely spiritual.

36. The RCDH and the workers throughout the Diocese who minister to the Catholic faithful and promote and administer programs that benefit the people in south-central Pennsylvania are stable, enriching elements in the lives of all the people served in these communities.

37. Within the Diocese, there are ninety-eight (98) diocesan priests, thirty-three (33) retired Diocesan priests, and thirty-one (31) religious order priests working to minister and provide other services.

38. In addition, sixty-three (63) permanent deacons and twenty-three (23) seminarians serve within the Diocese, playing an important part within the Catholic community by augmenting the work of the priests.

39. Finally, additional Catholic entities operate within the Diocese, including five (5) secondary schools, two (2) K–12 schools, and thirty-three (33) elementary and middle schools (collectively, the "*Schools*"), and are supported by the RCDH but remain separate and independent entities from the RCDH.

### RELATIONSHIP BETWEEN AND PROPERTY OF THE RCDH, PARISHES, SCHOOLS, AND CERTAIN RELATED ENTITIES

40. As set forth above, there are many Roman Catholic ecclesiastical and civil entities that operate within the geographic territory of the Diocese (or any diocese), including the Parishes, the Schools, and other non-profit entities, funds, and trusts (collectively, the "*Related Entities*").

41.     Every administrator of the property of an ecclesiastical entity, such as the bishop of a diocese or the priest of a parish, is obligated to acquire, hold, administer, and alienate such property in accordance with Canon Law.

42.     Under Canon Law, certain property is entrusted to the bishop of a diocese for the exclusive use and benefit of the Roman Catholic Church in that diocese, within specific parishes within that diocese, or for other specific purposes.

43.     To ensure that these tenets of Canon Law are followed and recognized under civil law, the RCDH, parishes within the Diocese, and other related Catholic entities within the Diocese (like other similarly situated Catholic entities) have taken or caused to be taken certain legal structures to be put into place or otherwise implemented, to memorialize and reflect Canon Law's dictates in a form recognized under applicable civil law.

## I.     Roman Catholic Diocese of Harrisburg Charitable Trust

44.     In keeping with Canon Law, in each diocese, property is entrusted to the diocesan bishop for the exclusive use and benefit of the Roman Catholic Church in that diocese—in this case, property within the Diocese is held by the Bishop of the Diocese in trust for the benefit of the Roman Catholic Church to be used specifically within the geographic area of the Diocese.

45.     At all times and in all circumstances, Canon Law, as authoritatively interpreted and construed by the Holy See: (a) guides and controls the disposition of the property held in trust by the Bishop in the Diocese; and (b) assigns, guides, and controls the rights and responsibilities of the faithful clergy, religious and lay members of the Roman Catholic Church in the Diocese with respect to the property held in trust for the benefit of the Roman Catholic Church.

46.     The ability of the Roman Catholic Church to abide by its ecclesiastical laws (*i.e.*, Canon Law), as authoritatively interpreted and construed by the Holy See, is essential to the

practice of the Roman Catholic faith and is, therefore, essential to the exercise of its religious freedoms.

47. Accordingly, to ensure that the treatment of the property held in trust by the Bishop in the Diocese under Canon Law was afforded the same treatment under civil law, on or about November 13, 2009, the RCDH caused to be executed the Roman Catholic Diocese of Harrisburg Charitable Trust Declaration of Trust (the "*Charitable Trust Agreement*").

48. Pursuant to the Charitable Trust Agreement: (a) the Bishop serves as trustee so long as he serves as Bishop of the Diocese; and (b) the non-real estate assets within the Diocese previously held by the Bishop in trust pursuant to Canon Law were conveyed to the Roman Catholic Diocese of Harrisburg Charitable Trust (the "*Charitable Trust*"), to be held in trust for the benefit of, to perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out the mission and ministry of the Roman Catholic Church within the territorial confines of the Diocese.

49. The Charitable Trust is the primary source of funding of the RCDH.

50. Under the Charitable Trust Agreement, no assets of the Charitable Trust are assets of the RCDH, and assets of the Charitable Trust are to be used solely to further the religious, charitable, and educational purposes of the Charitable Trust and shall not be subject (in whole or in part) to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments, or claims of creditors of the Charitable Trust, the Trustee (as defined in the Charitable Trust Agreement), or Trust Administrators (as defined in the Charitable Trust Agreement), or Trust Advisors (as defined in the Charitable Trust Agreement), or any employee or agent of the Charitable Trust, or the creditors of any other trust or other entity held or administered by the same trustee, or affiliated in any way with the RCDH.

## II. Roman Catholic Diocese of Harrisburg Real Estate Trust

51.     In keeping with Canon Law, in each diocese, certain real property and other property is entrusted to the diocesan bishop for the exclusive use and benefit of the Roman Catholic Church in the applicable diocese—in this case, real property and other property within the Diocese are held by the Bishop of the Diocese in trust for the benefit of the Roman Catholic Church and to be used specifically within the geographic area of the Diocese.

52.     At all times, the ecclesiastical laws of the Roman Catholic Church, as authoritatively interpreted and construed by the Holy See, in all circumstances: (a) guide and control the disposition of the property held in trust by the Bishop; and (b) assign, guide, and control the rights and responsibilities of the faithful clergy, religious and lay members of the Roman Catholic Church in the Diocese with respect to the property held in trust for the benefit of the Roman Catholic Church to be used specifically within the Diocese.

53.     The ability of the Roman Catholic Church to abide by Canon Law, as authoritatively interpreted and construed by the Holy See, is essential to the practice of the Roman Catholic faith and is, therefore, essential to the exercise of its religious freedoms.

54.     Accordingly, to assure that the treatment of the real property and other property held in trust by the Bishop under ecclesiastical law was afforded the same treatment under civil law, on or about November 13, 2009, the RCDH caused to be executed the Roman Catholic Diocese of Harrisburg Real Estate Trust Declaration of Trust (the "***Real Estate Trust Agreement***").

55.     Pursuant to the Real Estate Trust Agreement: (a) the Bishop serves as trustee so long as he serves as Bishop of the Diocese; and (b) all real property, and the structures and fixtures appurtenant to such real property, within the Diocese previously held by the Bishop in trust

pursuant to Canon Law were conveyed to the Roman Catholic Diocese of Harrisburg Real Estate Trust (the "***Real Estate Trust***"), to be held in trust for the benefit of, to perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out Diocesan operations relating to real property within the Diocese.

56.     The RCDH uses certain of the real property held by the Real Estate Trust in furtherance of its mission.

57.     Under the Real Estate Trust Agreement, no assets of the Real Estate Trust are assets of the RCDH, and assets of the Real Estate Trust are to be used solely to further the religious, charitable, and educational purposes of the Real Estate Trust and shall not be subject (in whole or in part) to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments, or claims of creditors of the Real Estate Trust, the Trustee (as defined in the Real Estate Trust Agreement), or Trust Administrators (as defined in the Real Estate Trust Agreement), or Trust Advisors (as defined in the Real Estate Trust Agreement), or any employee or agent of the Real Estate Trust, or the creditors of any other trust or other entity held or administered by the same trustee, or affiliated in any way with the RCDH.

III.     **Parishes Within the Diocese**

58.     Under Canon Law, the parishes within a diocese are territorial, comprising of certain geographical area within the applicable diocese.

59.     Once established by the bishop of a diocese, parishes are ecclesiastical entities in their own right and consist of established stable communities of the Christian faithful whose pastoral care is entrusted to a priest.

60.     Within the Diocese, there are eighty-nine (89) Parishes whose priest is freely appointed by the Bishop.

4825-2613-6746.8

11

61.     Each priest appointed by the Bishop serves as the proper shepherd of the priest's applicable Parish, under the Bishop's authority.

62.     Each of the Parishes is a separate public juridic person within the Roman Catholic Church and has the right to acquire, retain, administer, and alienate ecclesiastical goods in its own name, with the priest for each Parish serving as the administrator of the ecclesiastical goods belonging to such Parish.

63.     While the priest of each Parish is the administrator of the goods belonging to such Parish, all such goods are held in trust by the Bishop of the Diocese for the exclusive use and benefit of the Roman Catholic Church in each Parish—that is, real property and other property is held by the Bishop of the Diocese in trust for the benefit of the Roman Catholic Church to be used within the geographic area of the applicable Parish.

64.     Like the RCDH (and other similarly situated Catholic entities), each Parish has established certain trusts to memorialize and have recognized under civil law the nature in which property is held under Canon Law.

65.     In particular, each Parish has established its own charitable trust (each a "***Parish Charitable Trust***"), containing:

> a.     all real property, and all of the structures, and fixtures appurtenant thereto that is shown in the records of the Recorder of Deeds of the particular county in which the property is located titled in the name of the Bishop of the Diocese or his predecessors or successors, as Trustee or in trust for the particular Parish, whether recorded or unrecorded and also including but not limited to any real estate which has been or is currently entrusted to and used under the authority of the particular Parish (in each instance, "***Parish Real Property***"); and

> b.     all and every other item of tangible and intangible property of the particular Parish, as determined by the competent ecclesiastical authority in accordance with Canon Law, including but not limited to all furniture and appliances, religious objects, materials, supplies, cash, securities, notes, funds, vehicles, equipment, and books and records (in each instance, the "***Parish Personal Property***" and together with Parish Real Property in each instance, the "***Parish Property***").

66. The Bishop is the trustee for each Parish Charitable Trust so long as he serves as Bishop of the Diocese.

67. The priest for each Parish serves as the trust administrator for the Parish Charitable Trust established for the parish in which such priest serves.

68. Each Parish Charitable Trust is to function and at all times be operated exclusively for charitable, religious, or educational purposes by conducting or supporting activities exclusively for the benefit of, to perform the function of, and to carry out the purposes of the Roman Catholic Church, specifically in connection with Diocesan operations within the territorial confines of the applicable Parish, including the advancement of religion within the applicable Parish under the pastoral care of the applicable Parish's own priest.

69. The assets of each Parish Charitable Trust are to remain the sole property of the applicable Parish Charitable Trust and may not be commingled with the assets of any other parish, trust, or other entity associated with the Diocese.

70. Further, assets of each Parish Charitable Trust may be used solely to further the religious, charitable, and educational purposes of the applicable Parish Charitable Trust and shall not be subject (in whole or in part) to voluntary or involuntary assignment, transfer, anticipation, legal process, or judgments or claims of creditors of the Trustee (as defined in each Parish Charitable Trust), or Trust Administrators (as defined in each Parish Charitable Trust), or Trust Advisors (as defined in each Parish Charitable Trust), or any employee or agent of the applicable Parish Charitable Trust, or the creditors of any other trust or other entity held or administered by the same Trustee or by the RCDH.

71.     In short, the assets of each Parish Charitable Trust are held in trust for religious, charitable, and educational purposes within the applicable Parish and do not constitute assets of the RCDH.

## IV.     Diocese of Harrisburg School and Parish Trust Fund

72.     As set forth above, there are numerous Parishes, Schools, and Related Entities within the Diocese.

73.     In accordance with Canon Law, the Parishes, Schools, and Related Entities (collectively, the "***Depositors***") have conveyed and continue to convey to the Bishop funds belonging to them, to enable (a) investment of those funds on a unified and more efficient basis and (b) funds to be loaned to Parishes, Schools, and Related Entities for development projects.

74.     Pursuant to Canon Law, the funds and other property belonging to the Depositors were held in trust in the Charitable Trust for the Depositors and such treatment was reflected in the books and records.

75.     To memorialize the relationship as recognized and established by Canon Law, and to assure such relationship was recognized by civil law, on or about February 27, 2018, RCDH and the Depositors caused to be executed the Roman Catholic Diocese of Harrisburg Irrevocable Trust Agreement (the "***Irrevocable Trust Agreement***").

76.     Pursuant to the Irrevocable Trust Agreement: (a) the Bishop serves as the trustee so long as he serves as Bishop of the Diocese; (b) all funds held by the RCDH in the Charitable Trust for the benefit of Depositors were retitled as the "***Diocese of Harrisburg School and Parish Trust Fund***"; and (c) all funds within the Diocese of Harrisburg School and Parish Trust Fund are governed by the Irrevocable Trust Agreement.

Case 1:20-bk-00599-HWV    Doc 2    Filed 02/19/20    Entered 02/19/20 12:50:56    Desc
Main Document    Page 14 of 29

77.     Under the Irrevocable Trust Agreement, no funds or other assets comprising the Diocese of Harrisburg School and Parish Trust Fund are property of RCDH, and neither RCDH nor any Depositor nor the Bishop may alienate or in any other manner, whether voluntary or involuntary, assign, transfer, pledge, or mortgage any property consisting of the Diocese of Harrisburg School and Parish Trust Fund, and no individual or entity may attach or otherwise reach any interest of any of them under the Irrevocable Trust Agreement to satisfy a claim against RCDH, any Depositor, or the Bishop, whether the claim is legal or equitable in nature.

## V.     Foundation of Catholics United in Service

78.     In 1988, the Most Reverend William H. Keeler, then Bishop of the Diocese ("***Bishop Keeler***"), recognized that it was imperative that the Diocese stabilize existing educational, charitable, and pastoral programs, improve and expand those programs, and initiate and develop urgently needed programs.

79.     As a result, in view of the inadequate ordinary operating financial resources of the Diocese to fund such programs, Bishop Keeler deemed the establishment of a permanent endowment fund the best method of attaining the foregoing goals.

80.     To that end, on July 1, 1988, Bishop Keeler, after consultation with his staff of advisors, signed a Declaration of Trust commonly referred to as FOCUS—Foundation of Catholics United in Service (the "***FOCUS Trust***").

81.     The Bishop serves as the trustee of the FOCUS Trust so long as he is Bishop of the Diocese.

82.     The assets of the FOCUS Trust are to be used exclusively to assist, encourage, support, or promote the stabilization of and improvement of diocesan educational, charitable, and

pastoral programs or the development of additional services and programs to meet the present and future needs of the Diocese.

83.     Similarly, the assets of the FOCUS Trust shall not be subject to assignment, pledge, attachment, or the claims of creditors of the RCDH, any Parish, any School, or any Related Entity or individual beneficiary.

84.     As with the assets of the Real Estate Trust, Charitable Trust, Diocese of Harrisburg School and Parish Trust Fund, and Parish Charitable Trusts, the assets of the FOCUS Trust are not assets of the RCDH.

## VI.     Harrisburg Catholic Administrative Services, Inc.

85.     Like other actions taken by the RCDH in 2009, Harrisburg Catholic Administrative Services, Inc. ("*HCAS*") was incorporated on or about March 19, 2009, to provide a separate civil entity through which the various management and other services could be administered on behalf of the RCDH, the Parishes, the Schools, and the Related Entities.

86.     The Bishop is the sole member of HCAS so long as he is the Bishop in the Diocese.

87.     The business and affairs of HCAS, however, are managed by a board of directors.

88.     Pursuant to certain services agreements, HCAS undertakes to use commercially reasonable efforts to provide the following services (among others) to the RCDH, the Parishes, the Schools, and the Related Entities (collectively, the "*Service Recipients*"):

    a.     accounting services, including (i) maintaining the applicable Service Recipient's general ledger and chart of accounts, (ii) producing the applicable Service Recipient's monthly financial reports and statements, and (iii) cash management services to include custody of excess cash and savings deposited by the applicable Service Recipient with the Bishop of the Diocese and payment of invoices submitted by such Service Recipient;

    b.     payroll services, including (i) processing and payment of approved wages for each Service Recipient's employees, (ii) filing of applicable payroll tax returns for the applicable Service Recipient, and (iii) preparation and distribution of required employee tax reporting forms;

Case 1:20-bk-00599-HWV    Doc 2    Filed 02/19/20    Entered 02/19/20 12:50:56    Desc
Main Document    Page 16 of 29

      c.     human resources services, including providing human resource consulting and assistance in maintaining compliance with applicable employment laws, regulations, and practices;

      d.     assisting each Service Recipient with general and targeted development initiatives to include fundraising and appeals; and

      e.     information technology services, including providing (i) a platform for each Service Recipient to access the Diocesan network and related applications and (ii) technology consulting and assistance in the maintenance and operational efficiencies of each Service Recipient's technology platform.

89.     In exchange for the foregoing services, each Service Recipient agrees to pay HCAS certain consideration, and each Service Recipient further agrees to abide by all policies and procedures issued by HCAS with respect to human resources administration, financial administration, and information technology management.

90.     At no time does HCAS take ownership of any assets of the RCDH, the Parishes, the Schools, or the Related Entities.[5]

91.     Similarly, at no time does HCAS serve as a partner or agent of the RCDH, the Parishes, the Schools, or the Related Entities.

92.     HCAS maintains separate bank accounts and assets in its own name, separate from the bank accounts and assets of the RCDH, the Parishes, the Schools, and the Related Entities.

93.     Similarly, at all times HCAS ensures that: (a) assets of the RCDH are not used to pay obligations of the Parishes, the Schools, or the Related Entities; (b) assets of the Parishes are not used to pay obligations of the RCDH, the Schools, or the Related Entities; (c) assets of the Schools are not used to pay obligations of the RCDH, the Parishes, or the Related Entities; and

---

[5] In order to make payments to third parties, the Debtor funds, or causes to be funded, payments to HCAS. As part of its administrative responsibilities pursuant to certain services agreements, HCAS, in turn, makes payments to such third parties on the Debtor's behalf using such funds.
4825-2613-6746.8

(d) assets of the Related Entities are not used to pay obligations of the RCDH, the Parishes, or the Schools.

**VII.    Schools and Other Educational Institutions Within the Diocese**

94.     As stated above, five (5) secondary schools, two (2) K–12 schools, and thirty-three (33) elementary and middle schools operate within the Diocese.

95.     A listing of the Schools may be located on the website maintained by the RCDH at https://www.hbgdiocese.org/catholic-schools/find-catholic-school/.

96.     While each School receives varying levels of support from, among others, the RCDH, each School is a distinct entity separate and apart from the RCDH.

97.     Accordingly, as with the Parishes, the assets of the Schools are not assets of the RCDH.

**VIII.   Other Related Catholic Entities, Funds, and Trusts Within the Diocese**

98.     As stated before, there are additional Related Entities within the Diocese.[6]

**A.      The Pennsylvania Catholic Conference**

99.     The Pennsylvania Catholic Conference (the "*PCC*") is the public affairs arm of Pennsylvania's Catholic bishops and the Catholic dioceses of Pennsylvania.

100.    The Board of Governors for the PCC comprises the local diocesan bishops of Pennsylvania—that is, the ecclesiastical superiors of each Pennsylvania diocese—and the chairman of the Board of Governors is the Archbishop of Philadelphia.

101.    The function of the Board of Governors is to establish the principles of the conference and determine its policies.

_____

[6] This section of the Informational Brief describes most of the Related Entities but may not describe every Related Entity. In particular, the RCDH holds and manages certain custodial funds for the benefit of the RCDH which are to be used for specific religious, educational, or other charitable purposes and which funds are not property of the RCDH.

4825-2613-6746.8

18

102.     Bishop Gainer is the president of the PCC.

103.     While PCC receives various types of support from the RCDH, no assets of PCC are assets of the RCDH.

**B.     Catholic Charities**

104.     Catholic Charities of the Diocese of Harrisburg, Pennsylvania Inc. ("*Catholic Charities*") is a faith-based agency, acting as a nondenominational social service provider affiliated with the RCDH and the Roman Catholic Church.

105.     Before the professional social service system in existence today, the government turned to religious as well as secular groups care for the orphaned, poor and marginalized.

106.     Catholic Charities is such a faith-based agency, serving a fifteen county region with programs ranging from maternity homes, adoption services, foster care, and counseling to the only homeless shelter in Central Pennsylvania.

107.     Most services provided by Catholic Charities are offered at minimal or no cost.

108.     While Catholic Charities receives various types of support from the RCDH, no assets of Catholic Charities are assets of the RCDH.

**C.     Kolbe Catholic Publishing, Inc.**

109.     Kolbe Catholic Publishing, Inc. ("*Kolbe*") is an in-house print brokerage office of the RCDH.

110.     Kolbe was formed in order to reduce printing expenses incurred by the RCDH in connection with printing needs related to religious and educational seminars and events and church and other religious services that the RCDH regularly conducts.

111.     Kolbe does not offer printing services to any individual or organization not affiliated with the RCDH and only provides printing services in connection with charitable, religious, and educational events.

4825-2613-6746.8

112.    Bishop Gainer is the president of Kolbe, and the two directors of Kolbe are Bishop Gainer and the Vicar General of the Diocese.

113.    No assets of Kolbe are assets of the RCDH.

**D.    Cemeteries**

114.    The RCDH maintains eight cemeteries (the "***Diocesan Cemeteries***") within the geographic boundaries of the Diocese.

115.    The land on which the Diocesan Cemeteries sit is owned by the Real Estate Trust.

116.    The Bishop is responsible for the operations of the Diocesan Cemeteries in consultation with the Cemetery Board of Diocese of Harrisburg.

117.    Under Canon Law and related guidelines, the Diocesan Cemeteries are not considered mere property but instead are sacred places of prayer, and, as such, the Bishop is entrusted with the perpetual care of the Diocesan Cemeteries.

118.    Accordingly, the RCDH has established a Perpetual Care Fund (the "***PCF***") containing funds, including funds from the sale of internment spaces, memorials, burial vaults, and crypt and niche spaces, to be held in trust for the sole purpose of caring for and maintaining the Diocesan Cemeteries.

119.    Bryn Mawr Trust Company administers and invests the funds the PCF on behalf of the RCDH.

120.    The PCF is separate and distinct from the RCDH, and no assets in the PCF are assets of the RCDH.

**E.    Catholic Witness**

121.    The Catholic Witness ("***Catholic Witness***") is the official Catholic newspaper within the Diocese.

4825-2613-6746.8

122.    Catholic Witness was established in 1966 and is published 24 times per year in print and online.

123.    Catholic Witness offers complimentary subscriptions to members of Parishes within the Diocese.

124.    Subscriptions to Catholic Witness are also offered to non-members for a nominal cost.

125.    No assets of Catholic Witness are assets of the RCDH.

**F.    Priest Pension Plan**

126.    Consistent with Canon Law and Church custom, the RCDH provides a pension plan for retired Diocesan priests (the "***Priest Pension Plan***").

127.    As of July 1, 2018, retired Diocesan priests receive pension benefits in the amount of $2,240.75 per month, which is increased from year-to-year in the discretion of the RCDH.

128.    In addition, the RCDH pays a portion of the retired Diocesan priests' medical insurance premiums.

129.    The market value of the assets in the Priest Pension Plan was approximately $16.5 million as of June 30, 2019.

130.    The RCDH estimates that the Priest Pension Plan was underfunded by approximately $26.5 million as of June 30, 2019.

131.    In addition, to fund the settlements reached as part of the SCP (as defined below), funds were borrowed by the RCDH from the Priest Pension Plan.

132.    In turn, the RCDH executed a promissory note in an amount equal to the funds borrowed from the Priest Pension Plan.

133.    A tragedy contrary to every teaching and tradition of the Roman Catholic Church has unfolded in the Roman Catholic Church as a whole and within the Diocese in particular—that is, a small number of clergy and others took advantage of positions of trust and respect to sexually abuse children.

134.    The Roman Catholic Church and the RCDH are committed to providing for all survivors of abuse, known and yet to be known, in a fair, just, and equitable manner.

135.    To that end, numerous steps and actions have been taken within the Roman Catholic Church and Diocese.

## I.    Charter for the Protection of Children and Young People

136.    In spring of 2002, the United States Bishops adopted the *Charter for the Protection of Children and Young People* (the "***Charter***"), adopting a "one strike" policy with regard to clergy serving in any active, public ministry.

137.    The Charter also included: (a) permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor; (b) requirement of criminal background checks for adults, including clergy, who work with children and youth; (c) implementation of educational programs for the prevention of child sexual abuse for both adults and children; (d) provision of behavioral guidelines and ethical standards for ministry; (e) establishing outreach for survivors; and (f) creation of review boards to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

138.    The RCDH has implemented and carries out the dictates of the Charter.

## II.  Diocese Voluntary Compensation Program

139.    In addition to the foregoing, the RCDH launched the Survivor Compensation Program (the "*SCP*") on February 12, 2019.

140.    Under the SCP, claimants who had reported alleged sexual abuse to the RCDH before February 2019 were entitled to make claims for compensation for alleged sexual abuse.

141.    While originally available only to claimants who had made such claims on or before February 12, 2019, the RCDH ultimately permitted claimants to participate who had alleged abuse by (a) a Diocesan priest, deacon, or seminarian, (b) a priest, deacon, or seminarian from another diocese who had faculties within the Diocese, or (c) a priest or brother from a religious order who had faculties in the Diocese at the time of the alleged abuse.

142.    The enrollment period for the SCP was open for ninety (90) days and ended on May 13, 2019.

143.    Once the enrollment process closed, an independent administrator of the SCP, Commonwealth Mediation & Conciliation, Inc. ("*CMCI*"), assessed the various claims and began making settlement offers.

144.    At all times, CMCI was solely responsible for determining how much and to whom settlements were offered.

145.    As a result of the SCP, the RCDH has entered into settlement agreements with more than one hundred ten (110) survivors, resulting in excess of $12.5 million being paid to survivors who participated in the SCP, with a portion of the settlement payments being funded by certain religious entities that also participated in the SCP.

## III.  Other and Continued Actions by the RCDH

146.    In addition to implementation of the dictates of the Charter and establishing the SCP, the RCDH has taken the following additional steps:

4825-2613-6746.8

a. removed from positions of honor within the Diocese the names of Bishops for failure to prevent childhood sexual abuse;

b. removed from positions of honor within the Diocese the names of priests, deacons, and seminarians identified by the RCDH as having been involved in the past wrongdoing within the Diocese or who were otherwise named in a 2018 Grand Jury Report;

c. conducted nine (9) listening sessions, allowing the faithful and survivors to express their concerns, frustrations, and feelings;

d. ensured that all survivors of childhood sexual abuse receive counseling services, at low or no cost to them and from a counselor of their choosing, regardless of their participation in the SCP (accepting or declining a compensation offer in no way impacts a survivor's access to such counseling); and

e. created an e-mail address to offer more access for parishioners and the public to communicate directly with Bishop Gainer.

147. The RCDH also has undertaken or is in the process of undertaking the following:

a. reporting of child abuse to Childline and the appropriate District Attorney (as has been the policy within the Diocese since the early 2000's);

b. reconstitution of the Diocesan Pastoral Counsel, which carefully investigates, prayerfully considers and, in consensus, recommends action to the Bishop of the Diocese regarding pastoral concerns within the Diocese;

c. restructuring of the Diocesan Review Board, which is made up almost entirely of lay members and which reviews every allegation of abuse once law enforcement has completed their investigation;

d. revision of youth protection policies within the Diocese;

e. maintenance and reformation of an intensive screening and education process for those in formation for the priesthood;

f. revision of the Safe Environment Program Lesson Plan for Catholic School and Religious Education students within the Diocese; and

g. revision of communications materials, including *The Catholic Witness*.

148. The RCDH has made—and continues to make—assistance to survivors and their families in their journey toward healing its top priority.

## EVENTS LEADING TO COMMENCEMENT OF THIS CHAPTER 11 CASE

149.    Like other similar situated Catholic dioceses across the country, the RCDH has struggled to remain financially viable while funding compensation for survivors and continued litigation by survivors with which the RCDH has not reached consensual settlements.

150.    Ongoing litigation has been necessary due to: (a) disagreement over the level of compensation that can or should be paid to survivors in the face of competing needs for a very limited assets; and (b) intervening changes in law resulting from decisions within the Commonwealth of Pennsylvania and neighboring jurisdictions.

151.    While the RCDH has made and continues to make significant effort to address the wrongs of the past, and notwithstanding the substantial number of survivors with which the RCDH has reached consensual settlements, the RCDH believes additional unsettled claims and liabilities remain outstanding.

152.    In particular, the RCDH is aware of: (a) five (5) civil actions against the RCDH, seeking monetary damages or other relief regarding childhood sexual abuse; (b) approximately two hundred (200) survivors or potential survivors of childhood abuse by persons associated with the RCDH; and (c) additional instances where allegations were made and either the alleged survivor is anonymous or otherwise unknown.

153.    Moreover, based upon the experiences of other diocese across the country, the RCDH believes additional unknown, unreported, or otherwise unasserted claims may exist against the RCDH.

154.    While the RCDH carried insurance during many periods in which abuse is alleged to have occurred, and while the RCDH believes such insurance provides coverage for the claims

4825-2613-6746.8

as they are asserted or likely would be asserted against the RCDH, to date, the RCDH has been largely unsuccessful in obtaining any coverage for claims asserted against the RCDH.

155.   As a result, the RCDH faces the prospect facing claims asserted in amounts exceeding the RCDH's economic ability to pay, in which circumstance (a) survivors of abuse could be left with no compensation or other support, and (b) those within the Diocese (including non-Catholics) who depend on the services of the Roman Catholic Church delivered through the RCDH would be left without the material, monetary, and spiritual support which has, to date, been a necessary, stable, and enriching element in their lives.

156.   Faced with this prospect, the RCDH concluded seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to assure: (a) equitable compensation to those harmed by the sins of the past within the Diocese; (b) continuation of the counseling and other services provided through the RCDH to those who have been harmed; (c) continuation of the essential programs for the protection of children; and (d) continuation of the mission and ministry of the Roman Catholic Church within the Diocese.

157.   Through this process, it is the intent and desire of the RCDH to be able to: (a) provide for the equitable and ratable compensation of those harmed by the sins of the past within this Diocese; (b) provide for the continuation of the counseling and other services provided to those who were harmed by the sins of the past within the Diocese; (c) provide for the continuation of the programs the RCDH has put into place to educate and screen people working within the Diocese, to ensure that the children in the Diocese are protected; and (d) maintain funding for the programs within the Diocese that are essential to the mission and ministry of the Roman Catholic Church and wellbeing of those within the Diocese who depend on the services of the Roman Catholic Church.

4825-2613-6746.8

## PURPOSE AND GOALS FOR THIS CHAPTER 11 CASE

158.    The RCDH commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of the RCDH to continue providing essential ministries and services within the Diocese.

159.    Absent the commencement of this chapter 11 case, the RCDH believes that some survivors would not receive compensation or assistance and that the RCDH may be forced to cease providing some or all of the services upon which so many within the Diocese rely.

160.    In order to achieve the goals set forth above, the RCDH expects to commence an adversary proceeding against its insurers (the "*Insurers*") as soon as possible following the filing of this chapter 11  case.

161.    In the adversary proceeding, the RCDH will seek (a) entry of a judgment declaring that claims related to clergy sexual abuse are covered by certain policies of insurance issued to the RCDH by the Insurers or their predecessors, and (b) entry of a money judgment against the Insurers for breach of contract.

162.    The Insurers have either generally reserved all rights with coverage of claims related to clergy sexual abuse or denied coverage outright.

163.    As in other bankruptcy cases of dioceses across the country, the ultimate goal of the adversary proceeding will be to obtain the maximum amount of proceeds possible from the insurance policies in order to fund a trust for survivors of clergy sexual abuse within the Diocese.

164.    After the adversary proceeding against the Insurers has concluded, the RCDH intends to file promptly seek confirmation of a plan of reorganization that will provide fair compensation to survivors of clergy sexual abuse pursuant to streamlined trust distribution procedures without the cost, uncertainty, and delay of litigation.

4825-2613-6746.8

165. Additionally, such a plan of reorganization would allow the RCDH to successfully emerge from bankruptcy and continue its charitable mission with the benefit of a full and final resolution of the claims related to clergy sexual abuse and the related savings in substantial defense costs.

## CONCLUSION

166. The piecemeal adjudication of the claims of survivors presents a significant risk that some survivors may not be compensated and that the at the RCDH may be forced to cease consistent with its mission and ministry.

167. In marked contrast to such piecemeal adjudication, filing this chapter 11 case and confirming a plan of reorganization is the best mechanism to fairly and equitably address the claims of survivors while ensuring that the mission and ministry of the RCDH continues.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 19, 2020
Nashville, Tennessee

Respectfully submitted,

WALLER LANSDEN DORTCH & DAVIS, LLP

/s/ Blake D. Roth

Blake D. Roth (State Bar No. 306951)
Tyler N. Layne (*pro hac vice* admission pending)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone: (615) 244-6380
Facsimile: (615) 244-6804
Email: blake.roth@wallerlaw.com
tyler.layne@wallerlaw.com

-and-

KLEINBARD, LLC

Matthew H. Haverstick (State Bar No. 85072)
Joshua J. Voss (State Bar No. 306853)
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
Telephone: (215) 568-2000
Facsimile: (215) 568-0140
Email: mhaverstick@kleinbard.com
jvoss@kleinbard.com

*Proposed Attorneys for the Debtor and Debtor In Possession*