# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

In re:

ROMAN CATHOLIC DIOCESE OF
HARRISBURG,

        Debtor.

Chapter 11

Case No. 1:20-bk-00599 (HWV)

---

### COMMITTEE'S MOTION TO FILE DOCUMENTS UNDER SEAL

---

The Official Committee of Tort Claimants (the "Committee" or "Plaintiff") of the Roman Catholic Diocese of Harrisburg (the "Diocese" or "Debtor"), the debtor and debtor in possession in the above-captioned case pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), hereby moves this Court for an order, pursuant to 11 U.S.C. §§ 105(a) and 107(b), Fed. R. Bankr. P. 9018-1, and L.R. 9018-1 authorizing the Committee to file, under seal, (i) an unredacted copy of *The Official Committee of Tort Claimants' Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* (the "Derivative Standing Motion"); and (ii) unredacted copies of certain exhibits attached to the *Declaration of Robert T. Kugler in Support of the Official Committee of Tort Claimants' Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* (the "Kugler Declaration"). In support of this motion (the "Motion to Seal"), the Committee respectfully states:

### BACKGROUND

1.     The Debtor filed its petition for Chapter 11 bankruptcy on February 19, 2020 (the "Petition Date"). The Debtor continues to operate as a debtor in possession pursuant to sections 1107 and 1008 of the Bankruptcy Code.

1

2.     The Committee and Debtor executed a confidentiality agreement (the "Confidentiality Agreement") on March 13, 2020,[1] in order to facilitate the transmission of certain Confidential Information (defined therein) including, among other things, the Debtor's business records.

3.     The Confidentiality Agreement provides that Confidential Information may be included in pleadings filed with this Court if such Confidential Information is filed with the Court's chambers marked "Confidential Information" and with the clerk of the Court under seal.

4.     In the Derivative Standing Motion, and the Kugler Declaration exhibits, the Committee cites and incorporates Confidential Information produced by the Debtor. In the Derivative Standing Motion and in the Kugler Declaration exhibits, the Committee has redacted all Confidential Information.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

6.     The Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court has authority to determine the Motion by final order.

7.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED AND COMPLIANCE WITH L.R. 9018-1

8.     By the Motion to Seal, the Committee respectfully requests entry of an order authorizing the Committee to file, under seal, (i) an unredacted copy of the Derivative Standing Motion; and (ii) unredacted copies of certain exhibits attached to the Kugler Declaration.

---

[1] Attached hereto as **Exhibit A** is a true and correct copy of the Confidentiality Agreement.

9.      The Committee makes this request not because it believes the Confidential Information included in the Derivative Standing Motion and Kugler Declaration Exhibits should be sealed from the public, but out of deference to the Confidentiality Agreement.

10.     The Committee will provide to the Debtor unredacted copies of the Derivative Standing Motion and Kugler Declaration exhibits.

11.     The Committee will retrieve from the clerk's office any documents filed under seal information as soon as such documents are no longer sealed or there is a final order on the Derivative Standing Motion.

12.     Contemporaneously herewith, the Committee has filed redacted copies of the Derivative Standing Motion and the Kugler Declaration exhibits.

13.     Contemporaneously herewith, the Committee has filed unredacted copies of the Derivative Standing Motion and Kugler Declaration exhibits with the clerk's office in accordance with L.R. 9018-1.

## **BASIS FOR RELIEF REQUESTED**

14.     The Committee seeks to file Confidential Information referenced in the Derivative Standing Motion and attached as exhibits to the Kugler Declaration under seal to comply with the Confidentiality Order.

15.     Section 107(b) of the Bankruptcy Code provides bankruptcy courts with the power to issue orders that will protect entities from the potential harm that may result from disclosing certain confidential information. This section provides, in relevant part:

> On request of a party in interest, the bankruptcy court shall . . . (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b). Similarly, Bankruptcy Rule 9018 states:

3

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires … (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code.

Fed. R. Bankr. P. 9018. 14.

16.    Local Rule 9018-1 requires that a motion to seal include the document to be sealed. See Local Rule 9018-1. The motion to seal must include:

> (1) the grounds for sealing; (2) the identity of any parties, other than the moving party, who will have access to the documents to be sealed; (3) the duration of the seal; (4) the time when the movant will either unseal the documents or retrieve the physical documents (if any) at the conclusion of the matter; (5) a redacted copy of the documents sought to be sealed with only those redactions necessary to preserve confidentiality, made in good faith; and (6) a proposed order that contains language indicating the order is without prejudice to the rights of any party in interest, or the United States Trustee, to seek to unseal the documents, or any part thereof.

*Id.* Further, upon filing the motion to seal, "the moving party must electronically file a copy of the unredacted documents sought to be sealed with the clerk's office." *Id.*

17.    To enforce the Confidentiality Agreement, this Court has authority to restrict access to certain papers and grant protective orders. See *In re Wells Fargo Bank, N.A.*, 2019 WL 642850, at *2 (Bankr. W.D. Pa. Feb. 14, 2019); *In re Owens Corning Armstrong World Indus., Inc.*, 560 B.R. 229, 237 (Bankr. D. Del. 2016) ("[A] court retains the authority to seal documents when justice so requires."). If the Court determines that the documents fall within the scope of section 107(b), "the court is required to protect a requesting interested party and has no discretion to deny the application." *In re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994).

18.    The information that the Committee is seeking to file under seal—Confidential Information included in the Derivative Standing Motion and Kugler Declaration exhibits—was produced by the Debtor to the Committee pursuant to the Confidentiality Agreement. As such, the Committee should be permitted to file such information under seal.

## **CONCLUSION**

19.     Therefore, the Committee respectfully requests that the Court enter an order, substantially in the form of the proposed order attached hereto as **Exhibit B**, authorizing the Committee to file unredacted copies of the Derivative Standing Motion and the Kugler Declaration Exhibits under seal.

Respectfully submitted,

Dated: December 23, 2021

/s/ *Robert T. Kugler*
Robert T. Kugler (MN #194116)
Edwin H. Caldie (MN #0388930)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
Email: robert.kugler@stinson.com
Email: edwin.caldie@stinson.com

**COUNSEL FOR THE OFFICIAL COMMITTEE OF TORT CLAIMANTS**

5

**EXHIBIT A**
**Confidentiality Agreement**

# CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement (the "***Agreement***") is made this [13th] day of March 2020, by and among the Roman Catholic Diocese of Harrisburg (the "***Debtor***") in the chapter 11 bankruptcy case being administered as case number 1:20-bk-00599 (the "***Bankruptcy Case***") in the United States Bankruptcy Court for the Middle District of Pennsylvania (the "***Bankruptcy Court***"), the Official Committee of Tort Claimants (the "***Committee***") appointed in the Bankruptcy Case, and the Authorized Recipients (as defined below).

## RECITALS

WHEREAS, on February 19, 2020 (the "***Petition Date***"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court, commencing the Bankruptcy Case.

WHEREAS, the Debtor continues to be in possession of its property and estate and manages its day-to-day business as a debtor in possession.

WHEREAS, on March 6, 2020, the Office of the United States Trustee for the Middle District of Pennsylvania appointed the Committee.

WHEREAS, the Debtor and the Committee desire to enter into this Confidentiality Agreement, in order to set forth their understandings and agreements with respect to the ability of the Committee, its designated representatives, and its counsel or other professional advisers to have access to confidential information as defined in this Agreement.

## DEFINITIONS

For purposes of this Agreement, the following terms have the given definitions:

A.     "***Confidential Information***" shall include all documents, agreements, records, reports, data, forecasts, projections, business plans, interpretations, audit reports, and all other written, visual, or oral information, regardless of the method of memorialization or transmission, concerning the Debtor and provided by or on behalf of the Debtor to the Committee in connection with the Bankruptcy Case, which are not available to the general public (including but not limited to, profit and loss statements, balance sheets, comparative results of operations, and explanations related to the foregoing). Notwithstanding the foregoing Confidential Information shall exclude: (i) information that is or becomes publicly available, other than as a result of acts in breach of either this Agreement or other confidentiality agreements by an Authorized Recipient; (ii) information that is in the Authorized Recipient's or its Representatives' possession or that of its Representatives (as defined below) prior to disclosure by the Debtor or its professionals but not obtained in violation of this Agreement; (iii) information that is disclosed to an Authorized Recipient or any of its Representatives by a third party and not, to an Authorized Recipient's or such Representative's knowledge, information or belief, in violation of any confidentiality agreement or undertaking with the Debtor or this Agreement; (iv) information that is independently developed, discovered, or arrived at by an Authorized Recipient or any of its Representatives without violating this Agreement; or (v) any information which the Bankruptcy Court orders not be protected as Confidential Information or as "trade secret or confidential research, development, or commercial information" under section 107(b)(1) of the Bankruptcy Code.

4815-0729-7718.1

B. *"**Authorized Recipient**"* shall mean a party that executes this Agreement. An Authorized Recipient may share Confidential Information with its agents, employees, directors, officers, members, managers, partners, affiliates, professionals, advisers, and other representatives who are informed of the confidential nature of such Confidential Information and instructed to keep it confidential in accordance with the terms of this Agreement (the "**Representatives**"). The Authorized Recipients agree to be responsible for their Representatives (other than those Representatives who execute an Agreement to Protect Confidential Information in substantially the form attached to this Agreement as **Exhibit A**).

## The Agreement

The Debtor and the Authorized Recipients, in consideration of the mutual undertakings set forth expressly in this Agreement and for good and valuable consideration, the receipt and sufficiency of which are expressly acknowledged, agree as follows:

1. **The Provision of Confidential Information.** The Debtor may, from time to time, provide Confidential Information to the Authorized Recipients. Except as may otherwise be expressly agreed to in writing by the Debtor, all Confidential Information is being provided without any representation or warranty, express or implied, on the part of the Debtor. Neither the Debtor nor the Authorized Recipients shall be under any obligation to the other by virtue of this Agreement, except for the matters specifically agreed to in this Agreement. Nothing in this Agreement shall be deemed to impose any obligation to provide Confidential Information upon the Debtor.

2. **The Treatment of Confidential Information.** The Authorized Recipients shall not disclose Confidential Information, directly or indirectly, to any person, other than their Representatives, unless: (i) such disclosure is authorized by this Agreement; or (ii) such disclosure is authorized, in advance, by an order of the Bankruptcy Court. In the event an Authorized Recipient challenges the designation of any Confidential Information by seeking an order of the Bankruptcy Court, the burden of establishing that such alleged Confidential Information is not entitled to protection as Confidential Information shall be on the Authorized Recipient.

3. **Authorized Uses of Confidential Information.** Authorized Recipients may use Confidential Information solely in connection with the Bankruptcy Case, as limited by this Agreement, and for no other purposes. Nothing contained in this Agreement shall prevent an Authorized Recipient from including Confidential Information in any pleading filed with the Bankruptcy Court or in any hearing held before the Bankruptcy Court; provided, however, that such inclusion of Confidential Information shall be done only if: (a) such Confidential Information is filed with the Bankruptcy Court chambers marked "Confidential Information" and with the Clerk of the Bankruptcy Court under seal; (b) counsel for the Debtor is notified in writing of the proposed use of such Confidential Information five (5) business days before such pleading is filed so that the Debtor may seek appropriate protective relief; (c) the Authorized Recipient obtains an order of the Bankruptcy Court, after notice and a hearing, allowing the proposed use of the Confidential Information; (d) the Authorized Recipient advises the Debtor that it intends to use such Confidential Information in a hearing and requests an in camera determination from the Bankruptcy Court, on notice to the Debtor, to permit the proposed use of Confidential Information; or (e) the Debtor agrees to the proposed use of Confidential Information.

2

4. **Subpoena or Court Order.** In the event that an Authorized Recipient receives a request to disclose all or any part of the Confidential Information under the terms of a subpoena or other order issued by a court of competent jurisdiction or by another governmental agency, the Authorized Recipient shall, unless prohibited by law, rule or regulation: (a) promptly notify the Debtor of the existence, terms and circumstances surrounding such a request; (b) consult with the Debtor on the advisability of taking steps to resist or narrow such request; (c) if disclosure of such Confidential Information is required, furnish only such portion of the Confidential Information as the Authorized Recipient is legally required to disclose; and (d) reasonably cooperate with the Debtor in its efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the Confidential Information that is required to be disclosed. Further, Confidential Information may be disclosed without notice to a regulator or self-regulatory authority in the course of such regulator's general examination or inspection.

5. **Compliance.** The Authorized Recipients shall employ reasonable measures to control, consistent with this Agreement, access to the Confidential Information. Consistent with that obligation, the Authorized Recipients shall ensure that any of their Representatives given access to the Confidential Information are informed of the obligations set forth herein.

6. **Adviser Eyes Only Confidential Information.** The Debtor may request, on a case-by-case basis, in writing, that certain Confidential Information be treated as "Adviser Eyes Only Information" if the Debtor determines in good faith that the disclosure of Adviser Eyes Only Information would pose a very high risk of competitive harm to the Debtor. Upon the consent of the Committee to such designation, Adviser Eyes Only Information may not be shared with any Authorized Recipient other than counsel and financial advisers to the Committee, as a whole, provided, however, that upon further review, the Committee or an Authorized Recipient, through Committee counsel, may later oppose or dispute the designation of certain Confidential Information as Adviser Eyes Only Information and immediately submit the dispute to the Bankruptcy Court for resolution if the parties are unable to resolve the dispute. Unless otherwise agreed by the Debtor and an Authorized Recipient or ordered by the Bankruptcy Court, Adviser Eyes Only Information shall be treated in the same manner as other Confidential Information as provided in this Agreement, except that Adviser Eyes Only Information may be shared only with counsel and financial advisers to the Committee, as a whole.

7. **Remedies.** The Authorized Recipients acknowledge that in the event of any breach of this Agreement, immediate, substantial, and irrevocable damage may result and the Debtor may not be made whole by monetary damages alone. Accordingly, the Debtor, in addition to any other remedy to which the Debtor may be entitled by law or in equity, shall be entitled to seek an injunction to prevent breaches of this Agreement, and to seek an order compelling specific performance of this Agreement. Such remedy and any and all other remedies provided for in this Agreement shall be cumulative and not exclusive and in addition to any other remedies which may exist under this Agreement or otherwise. No failure or delay by any party in exercising any right, power, defense or privilege hereunder shall operate as a waiver, nor shall any single or partial exercise or the exercise of any right, power, or privilege under this Agreement. The parties to this Agreement agree to meet and attempt to resolve in good faith any dispute that arises under this Agreement.

8. **Entire Agreement.** This Agreement contains the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersedes

all prior agreements, negotiations, representations, and proposals, written and oral, relating to the subject matter of this Agreement. This Agreement may be amended or modified only in a writing executed by the parties.

9. **Successors.** This Agreement shall inure to the benefit of, and shall be binding upon, the parties, their respective successors and permitted assigns.

10. **Waiver of Jury Trial.** The parties to this Agreement expressly agree to the waiver of a trial by jury in any suit, action, or other proceeding whatsoever relating to the enforcement or interpretation of this Agreement and/or the series of transactions contemplated by this Agreement.

11. **Parties to Bear Own Expenses.** Except as expressly set forth in this Agreement, each party shall bear its own costs, expenses, taxes, and other charges whatsoever incurred in connection with the execution and performance of this Agreement. Notwithstanding the foregoing, in the event of a willful breach of this Agreement, the non-breaching party shall be entitled to recover all reasonable costs, including reasonable attorneys' fees, incurred in enforcing the Agreement against such willfully breaching party.

12. **Legal Enforceability.** If for any reason any provision of this Agreement shall be deemed by a court of competent jurisdiction to be legally invalid or unenforceable, the validity, legality, and enforceability of the remainder of this Agreement shall not be affected and such provision shall be deemed modified to the minimum extent necessary to make such provision consistent with applicable law and, in its modified form, such provision shall then be enforceable and enforced.

13. **Termination of Agreement.** This Agreement shall survive the confirmation of any plan of reorganization or liquidation for the Debtor, and all Confidential Information provided by the Debtor shall remain subject to the terms and provisions of this Agreement until one (1) year after confirmation of such a Plan or the entry of an order converting or dismissing the Bankruptcy Case. Within thirty (30) days after the confirmation of a plan of reorganization or liquidation for the Debtor, upon written request of the Debtor, the Authorized Recipients shall destroy all copies in the possession of the Authorized Recipients of all documents, to the extent containing Confidential Information, without expense to the Debtor. Notwithstanding the foregoing, Confidential Information may be retained as required by law or regulation or bona fide document retention or electronic archiving policies or procedures.

14. **Choice of Law.** This agreement shall be governed by and construed and enforced in accordance with the laws of the Commonwealth of Pennsylvania, without giving effect to the provisions, policies or principles of the laws of the Commonwealth of Pennsylvania relating to choice or conflict of laws. Each of the undersigned expressly consents to the jurisdiction of the Bankruptcy Court, with respect to any dispute relating to or arising out of this Agreement.

15. **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original. In that event, in proving this Agreement, it shall only be necessary to produce or account for the counterpart signed by the party against whom the proof is being presented. Additional persons may execute this Agreement in the future and, as a result, become Authorized Recipients.

4

16.     **Authority of Signatories.** Each signature below constitutes an acknowledgment that the signer is the designated and authorized representative of the designated entity.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF**, the parties hereto have duly executed and delivered this Agreement as of the day and year first above written.

ON BEHALF OF THE DEBTOR:

Dated: MARCH 13, 2020        By: _J. David L. Danielson_
                                 _VICAR GENERAL_

Dated: March 13, 2020        _Robert Kugler_        LRK
                             Robert T. Kugler (MN # 194116) (*pro hac vice* admission pending)
                             **Stinson LLP**
                             50 South Sixth Street, Suite 2600
                             Minneapolis, MN 55402
                             Main: 612-335-1500
                             Facsimile:    612-335-1657
                             Email: robert.kugler@stinson.com

                             *Proposed Counsel to the Official Committee of Tort Claimants*

6

<u>EXHIBIT A</u>

**<u>AGREEMENT TO PROTECT CONFIDENTIAL INFORMATION</u>**

Name: _____

Address: _____

Employer: _____

            _____

            _____

1.      I have read the Confidentiality Agreement and a copy of it has been given to me. I understand the provisions of the Confidentiality Agreement and agree to comply with and to be bound by its provisions as a Representative (as defined in the Confidentiality Agreement).

2.      I further agree to submit to the jurisdiction of the United States Bankruptcy Court for the Middle District of Pennsylvania for adjudication of any dispute regarding my compliance with the terms of this Confidentiality Agreement.

Dated: _____     Name:_____

4815-0729-7718.1

**Exhibit B**
**(Proposed Order)**

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

## ORDER APPROVING COMMITTEE'S MOTION TO FILE DOCUMENTS UNDER SEAL

Upon consideration of the *Committee's Motion to File Documents Under Seal* (the "Motion to Seal"), filed by the Official Committee of Tort Claimants (the "Committee"), and the Court having considered any objections to the requested relief; and after due deliberation, and good and sufficient cause appearing therefor,

**IT IS ORDERED:**

1.     The Motion to Seal is GRANTED.

2.     The Committee may file unredacted copies of the Derivative Standing Motion and Kugler Declaration exhibits under seal.

3.     This Order is without prejudice to the rights of any party in interest, or the United States Trustee, to seek to unseal the sealed documents, or any part thereof.

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

## NOTICE OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S BANKRUPTCY ESTATE

**PLEASE TAKE NOTICE** that on December 23, 2021, the Official Committee of Tort Claimants filed the *Official Committee of Tort Claimant's Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate*.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider the relief sought in the Motion has been scheduled for **January 11, 2021, at 9:30 a.m. (E.T.),** before the Honorable Henry W. Van Eck, United States Bankruptcy Judge for the Middle District of Pennsylvania, Ronald Reagan Federal Building, 228 Walnut Street. In accordance with L.R. 9074-1, and the Court's Remote Appearance guide, hearing participants may appear for this hearing by videoconference. Instructions for appearing remotely are available at: http://www.pamb.uscourts.gov/remote-appearance-guide,

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the relief requested in the Motion: (i) must be made in writing; (ii) shall state with particularity the grounds therefor; (iii) shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Middle District of Pennsylvania.

CORE/3519315.0002/171700802.1

Dated: December 23, 2021

/s/ *Robert T. Kugler*

Robert T. Kugler (MN #194116)
Edwin H. Caldie (MN #0388930)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
Email: robert.kugler@stinson.com
Email: edwin.caldie@stinson.com

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF TORT CLAIMANTS**

## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

## THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S BANKRUPTCY ESTATE

## <u>INTRODUCTION</u>

Prior to filing for bankruptcy, and as the rate of claims asserted by survivors of childhood sexual abuse ("Survivors") escalated nationwide, the Roman Catholic Diocese of Harrisburg (the "Diocese") orchestrated a large-scale, fraudulent scheme to place its assets beyond the reach of its creditors—all while acting carefully to ensure that it would remain in control of such assets. The Diocese's scheme placed millions into two, self-settled trusts. The assets within these two trusts remain under the control of the Diocese and its Bishop, but the trusts wrongfully impose a thorough barrier to creditor claims against trust assets through their inclusion of broad spendthrift clauses.

The Diocese now, having sought the protections of bankruptcy due to Survivors' claims, disclaims any interest in the assets held in the trusts. It asserts instead that these assets are held in trust for the benefit of, and to perform the functions of, the Roman Catholic Church within the territorial confines of the Diocese. The Diocese maintains this position despite the fact that the trust assets continue to serve as the Diocese's primary source of operational funding.

If allowed to continue, the Diocese's scheme would fraudulently shelter over $80 million in assets from proper administration in this chapter 11 case. The Official Committee of Tort Claimants (the "Committee") thus moves for the exclusive and irrevocable authority to commence, prosecute, and settle two complaints against two separate trusts created by the Diocese, because the Diocese has refused to do so itself and—as the architect of the fraudulent scheme intended to remove its assets from the reach of creditors—the Diocese has a profound conflict of interest. The complaints include claims for:

(1) Avoidance and recovery of fraudulent transfers to the 2009 Trusts (defined herein) pursuant to 11 U.S.C. § 544(b)(1), 11 U.S.C. § 550, the Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), and 12 Pa. Cons. Stat. § 5104(a);

(2) Turnover and account of estate property held in the 2009 Trusts pursuant to 11 U.S.C. § 541, 11 U.S.C. § 542, and Pennsylvania's "Self-Settled Trust" Common Law Doctrine;

(3) Turnover and account of estate property held in the 2009 Trusts pursuant to 11 U.S.C. § 541, 11 U.S.C. § 542, 11 U.S.C. § 544(a) and 20 Pa. Cons. Stat. § 7745;

(4) Avoidance and recovery of transfers to the 2009 Trusts pursuant to 11 U.S.C. § 544(a), 11 U.S.C. § 550, and Pennsylvania's "Alter Ego" Common Law Doctrine;

(5) Declaratory relief that the 2009 Trusts are self-settled trusts containing unenforceable spendthrift provisions and, as a result, the 2009 Trusts are void and the 2009 Trusts' assets constitute property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541;[1]

---

[1] The Committee's proposed adversary complaints include claims for declaratory relief that certain assets are property of the estate. Although Court approval of derivative standing is required to pursue an action pursuant to Bankruptcy Code Sections 544 and 548, permission is not required to determine property of the estate under Section 541. *See Comm. of Tort Litigants v. Catholic Diocese of Spokane*, No. CV-05-0274, 2006 WL 211792 (E.D. Wash. Jan 24, 2006) (stating that committee was not required to obtain "specific permission…to bring an adversary action to determine the assets of the estate").

2

CORE/3519315.0002/171700803.1

(6)     Declaratory relief that the 2009 Trusts' assets are subject to the interests of the Diocese's creditors pursuant to 20 Pa. Cons. Stat. § 7745 and are property of the Debtor's bankruptcy estate pursuant to U.S.C. § 541; and

(7)     Injunctive relief compelling the Diocese to terminate the 2009 Trusts and turnover of the 2009 Trusts' assets to the Debtor's bankruptcy estate.

The Committee has demanded that the Diocese pursue the foregoing claims and the Diocese has refused. Because the Diocese's decision to forego these claims is unreasonable and unjustified, the Committee seeks Court approval to file two complaints in substantially the forms attached to the D*eclaration of Robert T. Kugler In Support* of the *Official Committee of Tort Claimant's Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* ("Kugler Decl.") as **Exhibit A** (the "Charitable Trust Complaint") and **Exhibit B** (the "Real Estate Trust Complaint", and together with the Charitable Trust Complaint, the "Complaints").

## FACTUAL BACKGROUND

### A.  The Diocese's Bankruptcy Case

1.      The Diocese filed its petition for Chapter 11 bankruptcy on February 19, 2020 (the "Petition Date"). The Diocese continues to operate as a debtor in possession pursuant to sections 1107 and 1008 of the Bankruptcy Code.

2.      The Diocese indicated that it filed for Chapter 11 bankruptcy "in order to fairly provide compensation for unresolved claims of survivor of abuse and preserve the ability of the [Diocese] to continue providing essential ministries and services within the Diocese."[2]

---

[2] ECF No. 2, Informational Br. ¶ 158. Attached to the Kugler Decl. as **Exhibit C is** the *Informational Brief of the Roman Catholic Diocese of Harrisburg* [ECF No. 2].

3

3.      The Diocese's Chapter 11 bankruptcy filing was precipitated by the "prospect [of the Diocese] facing claims asserted in amounts exceeding the [Diocese's] economic ability to pay."[3]

4.      In its bankruptcy schedules, as amended on May 12, 2020, the Diocese listed nearly one-hundred (100) "unsecured tort creditors" in an attachment to its list of creditors with nonpriority unsecured claims.[4]

## B. The 2009 Trusts

5.      On November 13, 2009, the Diocese, as sole settlor and grantor, transferred substantially all of its assets, including its real and non-real property, into two trusts, which effectively placed the Diocese's assets beyond the direct reach of its creditors.[5]

6.      In the Charitable Trust Declaration of Trust, then-Bishop Kevin Rhoades declared that he held all of the Diocese's non-real estate assets as trustee of the Roman Catholic Diocese of Harrisburg Charitable Trust (the "Charitable Trust").[6]

7.      In the Real Estate Trust Declaration of Trust, Bishop Rhoades declared that he held all of the Diocese's real estate assets as trustee of the Roman Catholic Diocese of Harrisburg Real Estate Trust (the "Real Estate Trust", and together with the Charitable Trust, the "2009 Trusts" or the "Trusts").[7]

---

[3] *See id.* at ¶ 155.
[4] *See* ECF No. 297, Amended Schedule A/B and E/F, at p. 30-35. Attached to the Kugler Decl. as **Exhibit D** is the Debtor's Amended Schedule A/B and E/F.
[5] *See Kugler Decl. at Ex. E and Ex. F.* Attached to the Kugler Decl. as **Exhibit E** is the Roman Catholic Diocese of Harrisburg Charitable Trust Declaration of Trust (the "Charitable Trust Declaration of Trust") and as **Exhibit F** is the "Roman Catholic Diocese Real Estate Trust Declaration of Trust (the "Real Estate Trust Declaration of Trust").
[6] *See* Kugler Decl. at Ex. E, § 3.1, § 3.8, and Exhibit C.
[7] *See id.* at Ex. F, § 3.1, § 3.8, and Exhibit C.

4

8.      The Trust Declarations[8] direct that any successors as trustee of the Charitable Trust and Real Estate Trust "shall be the then current Bishop as designated by the Pope."[9] The current Bishop of the Diocese is Bishop Ronald W. Gainer.

9.      At the time of creation, and since, the 2009 Trusts contained substantially all of the Diocese's assets.[10]

10.     As such, under the guise of the 2009 Trusts, the Diocese effectively has had no assets since the moment the 2009 Trusts were created on November 13, 2009.[11] The Diocese acknowledges that the "Charitable Trust is the primary source of funding of the [Diocese]," and that the Diocese has "very limited assets" and "operates on a break-even basis."[12]

11.                                                                                      , both trusts exist solely to carry out Diocesan operations, and therefore, benefit only the Diocese.[13]

12.     The Charitable Trust Declaration of Trust states that the purpose of the Charitable Trust is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, *specifically in carrying out Diocesan operations within the territorial confines of the Diocese*."[14]

13.     The Real Estate Trust Declaration of Trust similarly states that the purpose of the Real Estate Trust is to "carry[] out Diocesan operations relating to real property within the territorial confines of the Diocese."[15]

---

[8] For ease of reference, the Charitable Trust Declaration of Trust and Real Estate Trust Declaration of Trust are collectively referred to as the "Trust Declarations."
[9] *Id.* at Ex. E, § 3.1; Ex. F, § 3.1.
[10] *See id.* at Ex. E, § 1.2(a); Ex. F, § 1.2(a).
[11] *See id.*
[12] ECF No. 2, Informational Br. ¶¶ 49, 150; ECF No. 15, Linscott Decl. ¶ 2. Attached to the Kugler Decl. as **Exhibit G** is the *Declaration of Christopher G. Linscott In Support of First Day Motions* [ECF No. 15].
[13] *See* Kugler Decl. at Ex. E, § 1.1(a); Ex. F, § 1.1(a).
[14] *Id.* at Ex. E, § 1.1(a) (emphasis added).
[15] *Id.* at Ex. F, § 1.1(a).

CORE/3519315.0002/171700803.1

14.     In addition, the 2009 Trusts are each subject to spendthrift provisions. Specifically, the Trust Declarations state that trust assets "shall not be subject to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments or claims of creditors of . . . any other trust or other entity held or administered by the same Trustee, or affiliated in any way with the Diocese of Harrisburg."[16]

15.     The Diocese further maintains that "no assets" of either the Charitable Trust or the Real Estate Trust are assets of the estate.[17]

16.     The creation of the 2009 Trusts, and the conveyance of substantially all of the Diocese's real and non-real property, was intended to place the Diocese's assets beyond the reach of its creditors, including Survivors. Both the planning process leading to the creation of the 2009 Trusts, and the creation of the 2009 Trusts, exhibited multiple and obvious badges of fraud, including:

    a.  The Diocese retained possession and control of the real and non-real estate assets after the transfers were made to the 2009 Trusts as the Bishop continued to control the assets as trustee of the 2009 Trusts;[18]

    b.  Before the transfers were made, the Diocese faced the increasing threat of litigation based on widely-publicized reports of clergy sexual abuse throughout the United States;

    c.

---

[16] *Id.* at Ex. E, § 1.2(c); Ex. F, § 1.2(c).
[17] ECF No. 2, Informational Br. ¶¶ 50, 57.
[18] *See* Kugler Decl. at Ex. E, § 3.1, § 3.8, and Exhibit C; Ex. F, § 3.1, § 3.8, and Exhibit C.

6

; [19]

  d. The transfers included substantially all of the Diocese's real estate and non-real estate assets;

  e. The Diocese became insolvent as a result of the transfer of all of its non-real estate assets to the Charitable Trust and all of its real estate assets to the Real Estate Trust;

  f. The 2009 Trusts' assets must be used to benefit the Diocese; [20] and

  g. The Diocese did not receive any consideration, or consideration reasonably equivalent in value, to the assets transferred.

17. Notably, the creation of the 2009 Trusts mirrored restructuring efforts of other dioceses within the United States, all of which were undertaken in response to escalating claims of clergy sexual abuse and extended limitations periods for Survivors to bring suit.

[21]

18. The 2009 Trusts can be summarized as follows:

---

[19] Kugler Decl. at Ex. H. Attached to the Kugler Decl. as **Exhibit H**

[20] *Id.* at Ex. E, § 1.1; Ex. F, § 1.1.
[21] Kugler Decl. at Ex. I. Attached to the Kugler Decl. as **Exhibit I**

CORE/3519315.0002/171700803.1



**C. The Committee's Demands Upon the Diocese to Recover Estate Assets**

19. The Committee has been in communication with the Diocese since the filing of this bankruptcy case regarding the assets contained in the 2009 Trusts. Specifically, the Committee inquired with the Diocese as to whether it would pursue claims against the 2009 Trusts and affirmatively requested that the Diocese do so or agree to Committee standing to do so. On December 10, 2021, the Committee submitted a final written demand to the Diocese to pursue the claims identified in the Complaints against the 2009 Trusts.[22]

20. The Diocese has failed to respond to the Committee's demand that the Diocese pursue the claims identified in the Complaints or to stipulate to Committee standing to file and prosecute the Complaints on behalf of the estate.

## JURISDICTION AND VENUE

21. The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

22. The Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Court has authority to determine the Motion by final order.

---

[22] Attached to the Kugler Decl. as **Exhibit J** is the Committee's written demand to the Diocese to pursue the claims identified in the Complaints against the 2009 Trusts.

CORE/3519315.0002/171700803.1

23.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**RELIEF REQUESTED**

24.     By this Motion, the Committee requests an order granting it authority to commence, prosecute, and settle (with court approval) litigation against the 2009 Trusts. The Committee proposes to bring the Complaints attached as Exhibits A and B to the Kugler Declaration—each of which will increase the assets of the estate for the benefits of the Diocese's creditors.

25.     The statutory predicates for the relief requested in this Motion include 28 U.S.C. §§ 105, 541, 542, 544, 550, 1103, and 1109; 12 Pa. Cons. Stat. § 5104(a); and 20 Pa. Cons. Stat. § 7745.

**ARGUMENT**

**I.     Requirements for Derivative Standing.**

"Section 544(b) of the Bankruptcy Code gives the trustee—and by extension, a debtor-in-possession in Chapter 11 cases—both the power and the responsibility to bring fraudulent transfer actions so as to maximize the value of the bankruptcy estate." *In re Nat'l Forge Co.*, 326 B.R. 532, 542 (W.D. Pa. May 26, 2005); *see also Louisiana World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 249–50 (5th Cir. 1988). In *Cybergenics II*, the Third Circuit held that bankruptcy courts, pursuant to their equitable powers, can confer upon creditors' committees derivative standing to bring avoidance actions for the benefit of the estate when the debtor fails to do so in violation of its fiduciary duties. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.) ("Cybergenics II")*, 330 F.3d 548, 580 (3d Cir. 2003), *pet. for cert. dismissed*, 540 U.S. 1001 (2003) and 540 U.S. 1002 (2003).

9

CORE/3519315.0002/171700803.1

The ability of a creditors' committee to obtain derivative standing is often critical to the preservation of estate assets and serves important interests, particularly in the context of a Chapter 11 reorganization:

> …In Chapter 11 cases where no trustee is appointed, § 1107(a) provides that the debtor-in-possession, i.e., the debtor's management, enjoys the powers that would otherwise vest in the bankruptcy trustee. Along with those powers, of course, comes the trustee's fiduciary duty to maximize the value of the bankruptcy estate.
>
> This situation immediately gives rise to the proverbial problem of the fox guarding the henhouse. If no trustee is appointed, the debtor—really, the debtor's management—bears a fiduciary duty to avoid fraudulent transfers that it itself made. One suspects that if managers can devise any opportunity to avoid bringing a claim that would amount to reputational self-immolation, they will seize it . . . For that reason, courts and commentators have acknowledged that the debtor-in-possession "often acts under the influence of conflicts of interest." . . . These conflicts of interest can arise even in situations where there is no concern that a debtor's management is trying to save its own skin. For example, a debtor may be unwilling to pursue claims against individuals or businesses, such as critical suppliers, with whom it has an ongoing relationship that it fears damaging…. In any of these situations, the real losers are the unsecured creditors whose interests avoidance actions are designed to protect.

*Id.* at 573-74 (citations omitted).

To ensure that the Chapter 11 debtor's gate-keeping role is not arbitrarily usurped, courts have generally recognized derivative standing where: "(i) the creditor has alleged a colorable claim that would benefit the estate (ii) the debtor has unjustifiably refused to pursue the claim itself; and (iii) the creditors' committee has obtained permission from the bankruptcy court to initiate the action on behalf of the estate." *Nat'l Forge*, 326 B.R. at 543; *see also Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995); *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1397 (5th Cir. 1987) (collecting cases); *In re Tennessee*

10

*Valley Steel Corp.*, 183 B.R. 795, 800 (Bankr. E.D. Tenn. 1995); *In re First Capital Holdings Corp.*, 146 B.R. 7, 11 (Bankr. C.D. Cal. 1992); *In re Toledo Equipment Co., Inc.*, 35 B.R. 315, 320 (Bankr. N.D. Ohio 1983).

Here, the Committee satisfies each element for derivative standing as it has identified colorable claims that could recover over $80 million for the estate, and the Diocese has unjustifiably refused to pursue these claims. The Court should therefore permit the Committee to assert the Complaints on behalf of the estate in order to protect the estate's, and its creditors'' interest.

## II.     The Estate's Claims are Colorable.

"[A] creditor's claims are colorable if they would survive a motion to dismiss." *In re Rosenblum*, 545 B.R. 846, 863–64 (E.D. Pa. 2016) (quoting *In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008)). Therefore, to state a colorable claim,

> [A] complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Under this standard, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### A.     The Estate's Claims for Actual Fraud are Colorable under the Pennsylvania Uniform Voidable Transfers Act because the Transfers were made with the Intent to Hinder and Defraud Creditors and the Claims are Timely.

#### i.     *The Fraudulent Transfer Claims are Colorable because the Diocese Transferred the Assets to Hinder and Defraud the Survivors.*

11

The Committee has a colorable claim against the 2009 Trusts because the Diocese orchestrated the transfer of assets in order to hinder and defraud the Survivors and other creditors of the Diocese. Section 544(b)(1) authorizes the avoidance of "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim. 11 U.S.C. § 544(b). "Once avoidable pursuant to [11 U.S.C. § 544(b)], the transfer is avoided *in its entirety for the benefit of all creditors,* not just the extent necessary to satisfy the individual creditor actually holding the avoidance claim. *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery (In re Cybergenics Corp.) ("Cybergenics I")*, 226 F.3d 237, 243 (3d Cir. 2000) (emphasis added) (citing *Moore v. Bay (In re Sassard & Kimball, Inc.)*, 284 U.S. 4, 5 (1931)). Further, "it is not necessary . . . that there be more than one such creditor" able to bring avoidance action under applicable state law. 5 Collier on Bankruptcy ¶ 544.06 [1] (16th ed. 2021).

The PUVTA provides that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer "with actual intent to hinder, delay or defraud any creditor of the debtor." 12 Pa. Cons. Stat. § 5104(a). If the creditor establishes by a preponderance of the evidence that the debtor made a fraudulent transfer, "the creditor may, inter alia, avoid the transfer or obligation, attach the transferred assets or other property of the transferee, obtain an injunction barring further transfers, or seek appointment of a receiver over the transferred asset." *K-B Bldg. Co. v. Sheesley Constr., Inc.*, 833 A.2d 1132, 1135–36 (Pa. Super. Ct. 2003).

Since "individuals are rarely willing to admit intent, actual fraud is rarely proven by direct evidence." *In re Valley Building & Constr. Corp.,* 435 B.R. 276, 285 (Bankr. E.D. Pa. 2010) (quotation omitted). But courts consider factors, commonly referred to as "badges of fraud," in determining whether a party has proven fraud through circumstantial evidence. *Holber v. Dolchin*

CORE/3519315.0002/171700803.1

*Slotkin & Todd, P.C.* (*In re American Rehab & Physical Therapy, Inc.*), 2006 WL 1997431, at

*15–16 (Bankr. E.D. Pa. May 18, 2006).

The PUVTA provides a non-exhaustive list of such factors for use in determining whether

"actual intent" exists:

> (1)    the transfer or obligation was to an insider;
>
> (2)    the debtor retained possession or control of the property transferred after the transfer;
>
> (3)    the transfer or obligation was disclosed or concealed;
>
> (4)    before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5)    the transfer was of substantially all the debtor's assets;
>
> (6)    the debtor absconded;
>
> (7)    the debtor removed or concealed assets;
>
> (8)    the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9)    the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 Pa. Cons. Stat. § 5104(b). Courts differ in how they assess these "badges." *Compare In re*

*Valley Bldg. & Const. Corp.*, 435 B.R. 276, 285 (Bankr. E.D. Pa. 2010) (requiring a finding of

"goodly" number of these factors to establish fraudulent intent), *with In re Cohen*, 142 B.R. 720,

728 (Bankr. E.D. Pa. 1992) (stating that a "strong finding" as to just one badge will suffice); *see*

*also In re Cook*, 126 B.R. 261, 269 (Bankr. E.D. Tex. 1991) (stating that just one factor can support

CORE/3519315.0002/171700803.1

a finding of fraud and that "[t]he accumulation of several factors can lead inescapably to the conclusion that the debtor possessed a requisite intent." (quotation omitted)). However, courts review these factors qualitatively rather than quantitatively. *Knoll v. Uku*, 154 A.3d 329, 333 (Pa. Super. Ct. 2017). This list is not exclusive, and a court can find actual intent to defraud even in the absence of any of the enumerated badges. *In re C.F. Foods, L.P.*, 280 B.R. 103, 109 (Bankr. E.D. Pa. 2002).

The following badges of fraud related to the depletion of the Diocese's assets in connection with the creation of the 2009 Trusts are present:

(1)     the Diocese retained possession or control of the property transferred to the 2009 Trusts after the transfers because the Bishop served as Trustee—the Trust Declarations appointed the Bishop as trustee for the 2009 Trusts, and the Trust Declarations required the Bishop to use the trust assets for the exclusive benefit of the Diocese;[23]

(2)     before the Diocese made the transfers, the Diocese faced the threat of litigation based on widely publicized reports of clergy sexual abuse around the United States in the early- to mid-2000s—for example, as early as 2001 the Diocese could see an increasing number of claims as a grand jury began investigating the nearby Archdiocese of Philadelphia;

(3)     the transfers included substantially all of the Diocese's assets—after the transfers, the Diocese stated that it held virtually no assets, and the Diocese used the 2009 Trusts for hosting and funding its operations;[24]

---

[23] *See* Kugler Decl. at Ex. E, § 3.1, § 3.8, and Exhibit C; Ex. F, § 3.1, § 3.8, and Exhibit C.
[24] *Id.* at Ex. E, § 1.2(a); Ex. F, § 1.2(a).

14

(4)     the Diocese became insolvent shortly after making the transfers;[25] and

(5)     the Diocese did not receive consideration—much less consideration that was reasonably equivalent in value—for the transferred assets.

*See* 12 Pa. Cons. Stat. § 5104(b). Accordingly, colorable actual fraud claims plainly exist that would permit creditors with allowable unsecured claims—and by extension the Committee—to recover over $80 million to pay Survivors.

### ii.     The Fraudulent Transfer Claims are Timely Under the PUVTA and the Bankruptcy Code

The Survivors, and other creditors of the Diocese, could not have known about the 2009 Trusts when they occurred. A claim to avoid a transfer made with actual intent to defraud is extinguished unless it is brought "not later than four years after the transfer was made or the obligation was incurred or, if later, *not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant*." 12 Pa. Cons. Stat. § 5109(1) (emphasis added). The discovery rule tolls the statute of limitations when "a plaintiff 'despite the exercise of due diligence, is unable to know of the existence of the injury and its cause.'" *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 306 (E.D. Pa. 2011) (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)). The applicable limitations period therefore begins to run when the plaintiff discovers "the alleged fraudulent nature of the transfer at issue." *Santander Bank, N.A. v. Branch Banking & Tr. Co.*, No. 1:17-CV-01669, 2018 WL 8368857, at *3 (M.D. Pa. Feb. 5, 2018).

To determine when the discovery rule is triggered, a court must determine the point when the plaintiff knew or reasonably should have known that it was injured, and that its injury was caused by another's conduct. *Cordua*, 834 F. Supp. 2d at 306. "The relevant inquiry then is not plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise

---

[25] *Id.*

CORE/3519315.0002/171700803.1

of diligence, knowable to the plaintiff." *Id.* (quotation omitted). Fact issues pertaining to a plaintiff's notice and diligence are typically reserved for the jury. *See Nicolaou v. Martin*, 195 A.3d 880, 893 (Pa. 2018); *see also Rice v. Altoona*-Johnstown, 255 A.3d 237, 258 n.2 (Pa. 2021) (Wecht, J., dissenting).

In an analogous case, *In re Archdiocese of Milwaukee*, the court analyzed the discovery rule in a case involving a diocese's transfer of funds to a trust. 483 B.R. 855 (Bankr. E.D. Wis. 2012). There, the Archdiocese of Milwaukee transferred $35 million from the "Parish Deposit Fund" to a trust fund seven years prior to filing for bankruptcy. *Id.* at 858. The Committee of Unsecured Creditors asserted that the diocese made the transfer with actual intent to defraud creditors based on the minutes of a 2003 finance committee meeting, in which the committee discussed creating a trust to "shelter" the fund. *Id.* In its analysis, the court rejected the diocese's argument that the public disclosure of the transfer put creditors on inquiry notice when the diocese disclosed its financial statements on its website. *Id.* at 866. Instead, the court concluded that the mere publicity of the financial statements, without more, did not clearly disclose the transfer. *Id.* Although the court acknowledged that the disappearance of a large "noncurrent asset" was available for investigation, the diocese's brief statement that the fund was closed did not suggest that millions of dollars were transferred. The court further noted that the committee minutes stating that the purpose of the trust was to "shelter" the Parish Deposit Fund was not revealed until discovery in the bankruptcy case. *Id.* Accordingly, the court found that the Committee stated a plausible claim that a creditor reasonably could not have discovered the transfer. *Id.*

Like the survivors in the *Archdiocese of Milwaukee*, the Survivors, and the Diocese's other creditors, had no knowledge of the creation of the 2009 Trusts and could not have reasonably discovered the existence, or the fraudulent nature, of the 2009 Trusts. The Diocese did not make

CORE/3519315.0002/171700803.1

any public announcements of the creation of the 2009 Trusts, and the Diocese's creditors further lacked access to its books and financial records. The creation of the 2009 Trusts, and the depletion of the Diocese's assets, was not reasonably knowable to any creditor until after the Diocese filed for bankruptcy and provided the Trust Declarations to the Committee. Consequently, the Committee's fraudulent transfer claims are timely under the PUVTA and applicable bankruptcy law. *See* 11 U.S.C. 108 (a).

### B. The Committee Has Colorable Claims that the 2009 Trusts are Property of the Estate, and for Turnover of the 2009 Trusts' assets, because the 2009 Trusts are Self-Settled, Spendthrift Trusts.

The Committee has colorable claims that the 2009 Trusts are property of the estate pursuant to 11 U.S.C. § 541(a)(1), and for turnover of the 2009 Trusts' assets pursuant to 11 U.S.C. § 542, because the 2009 Trusts are improper, self-settled trusts with spendthrift provisions purporting to shield assets from creditors, including Survivors, rendering them void.[26] Under Pennsylvania law, a spendthrift trust exists when there is an express provision in the trust instrument that forbids alienation of a beneficiary's interest by creditors. *In re Keeler's Estate*, 3 A.2d 413, 415 (Pa. 1939); *Wilson v. United States*, 372 F.2d 232, 234 (3d Cir. 1967). An owner may create a trust to give the beneficiary the beneficial interest of the property, while also protecting the property from the beneficiary's creditors. *C.I.T. Corp. v. Flint*, 5 A.2d 126, 128 (Pa. 1939).

It is against public policy, however, for the creator of the spendthrift trust and the beneficiary to be one and the same. A person may not establish a trust in which it retains the beneficial interest in the trust property, while at the same time placing that property beyond the

---

[26] The Committee can also recover the assets transferred to the 2009 Trusts because although they are designated as irrevocable trusts, they are in effect revocable and self-settled trusts. "Whether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors." 20 Pa. Cons. Stat. § 7745.
then the 2009 Trusts are revocable and subject to the claims of the Diocese's creditors.

CORE/3519315.0002/171700803.1

reach of its creditors. *In re Mogridge's Estate*, 20 A.2d 307 (Pa. 1941). And such a provision barring a creditor from reaching the interest of the settlor-beneficiary is therefore not enforceable under the common law of Pennsylvania. *Morton v. Morton*, 147 A.2d 150, 151–52 (Pa. 1959). Bankruptcy courts in Pennsylvania have acknowledged that such a trust does not fall within the scope of 11 U.S.C. § 541(c)(2). *Walsh v. Hendrickson (In re Hendrickson)*, 274 B.R. 138, 148 (Bankr. W.D. Pa. 2002) (holding that anti-assignment language in structured settlement agreement did not create a trust under Pennsylvania law).

Here, the Diocese is the settlor of both the Charitable Trust and the Real Estate Trust. Under Pennsylvania law, a settlor is "[a] person, including a testator, who creates or contributes property to a trust." 20 Pa. Cons. Stat. § 7703. "If more than one person creates or contributes property to a trust, each person is a settlor of the portion of the trust property attributable to that person's contribution except to the extent another person has the power to revoke or withdraw that portion." *Id.* The plain terms of the Trust Declarations indicate that the Diocese is the settlor as each indicates that the 2009 Trusts' res consist of real estate or non-real estate assets "of the Diocese."[27]

Next,

the 2009 Trusts operate solely to benefit the Diocese, and therefore, the Diocese is the beneficiary. The general rule is that the beneficiary of a charitable trust is the general public "to whom the social and economic advantages of the trust[] accrue[s]." *In re Pruner's Estate*, 136 A.2d 107, 109 (Pa. 1957). It is also well-established that "[t]he essential part of the definition of a charity is that the persons who are to receive it must be indefinite and uncertain; in other words, they must be of a class; for

---

[27] *See* Kugler Decl. at Ex. E., Ex. A (listing assets as "[a]ll and every item of tangible and intangible property of the Diocese, other than real property"); Ex. F, § 1.2(a) (listing assets as "all of the real property, and the structures and fixtures appurtenant thereto, belonging to the Diocese").

if a gift be made to individuals by name or description, so that they may be selected and set apart, although they are of a class, the gift is not a charity, but a legacy." *Case of Apprentices' Fund*, 2 Pa. D. 435, 437 (C. P. 1893).

Under this definition, the Diocese is the beneficiary as it receives the social and economic advantages of the trust. Although the 2009 Trusts purport to function solely for the benefit of the Roman Catholic Church, this benefit is explicitly limited to "carrying out Diocesan operations within the territorial confines of the Diocese."[28] Thus, rather than benefitting the general public, the 2009 Trusts operate to fund the Diocese's own operations. Both the Charitable Trust and the Real Estate Trust instruments provide that the Diocese is not a beneficiary thereof, yet each plainly function to benefit the Diocese—and only the Diocese. As such, the spendthrift provisions in the 2009 Trusts, barring creditors from reaching the assets of the settlor-beneficiary, are unenforceable, void, and, as a result, the Committee has colorable claims that the 2009 Trusts' assets are property of the Debtor's bankruptcy estate and for turnover of the 2009 Trusts' assets to the Debtor's bankruptcy estate. By disregarding the improper trust structure, the estate could receive more than $80 million to pay creditors and Survivors.

**C.  The Alter Ego Claims are Colorable.**

The 2009 Trusts act as alter egos of the Diocese, and therefore, the Court should disregard the veil of the 2009 Trusts and allow the Committee to avoid transfers to the 2009 Trusts pursuant to 11 U.S.C. 544(a). *See In re David X. Manners Co.*, 2018 WL 6271603 at *2 (Bankr. D. Ct. Nov. 27, 2018) (holding that a trustee had standing under section 544(a) to pursue reverse veil-piercing claims). Pennsylvania law imposes a strong presumption against piercing the corporate veil. *Lumax Indus. Inc. v. Aultman*, 669 A.2d 893 (Pa. 1995). Nevertheless, "a court will not hesitate to

---

[28] Kugler Decl. at Ex. E, § 1.1(a); Ex. F, § 1.1(a).

treat as identical the corporation and the individuals owning all its stock and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Kellytown Co. v. Williams*, 426 A.2d 663, 668 (Pa. Super. Ct. 1981). "[T]he corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 604 (Pa. Super. Ct. 1991) (quotation omitted).

An alter ego claim requires proof that: (1) the party exercised sufficient domination and control over the corporation; and (2) injustice will result if the corporate fiction is maintained despite a unity of interests between the corporation and its principal. *Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. Ct. 2012).[29] For the second element, no single test has been enunciated. Rather, courts will look to whether the totality of the circumstances warrants piercing the corporate veil. *See Ragan v. Tri–County Excavating, Inc.*, 62 F.3d 501, 516 (3d Cir. 1995) (identifying factors to be relied upon when determining alter ego liability); *In re Diloreto*, 2006 WL 2974156, at *3 (E.D. Pa. Oct. 13, 2006) ("Under Pennsylvania law, courts apply a 'totality of the circumstances' test when determining whether to pierce the corporate veil and impose alter ego liability."). Pennsylvania courts consider "undercapitalization, failure to

---

[29] Pennsylvania state courts have not addressed whether veil-piercing principles apply to trusts. *Rosenberg v. DVI Receivables, XIV, LLC*, 400 F. Supp. 3d 236, 250 (E.D. Pa. 2019) ("The question of whether the theory of veil-piercing applies to trusts is a matter of state law, and Pennsylvania courts have not resolved this issue."). Other jurisdictions, however, routinely apply alter ego theories to pierce the veil of trusts. *See In re Maghezah*, 310 B.R. 5, 18 (E.D.N.Y. 2004) (piercing veil of estate planning trust where debtor treated the trust "as his own personal vehicle to shield assets from his creditors and to perpetrate a fraud"); *see also Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 91 (2d Cir. 2003) (recognizing that New York courts have allowed trust piercing where the "respective parties used trusts to conceal assets or engage in fraudulent conveyances to shield funds from adverse judgments); *Limbright v. Hofmeister*, 688 F. Supp. 2d 679, 686 (E.D. Ky. 2010) (applying alter ego theory to family trusts); *In re Gillespie*, 269 B.R. 383 (Bankr. E.D. Ark. 2001) (concluding that trust was debtor's alter ego making entire trust property of bankruptcy estate); *Bracken v. Earl*, 40 S.W.3d 499, 503 (Tenn. Ct. App. 2000) (concluding that individual was alter ego of "so-called trust" which was created as a "means for defendant to protect himself from liability when investing in other people's money in risky ventures"); *In re Bellardita*, No. 05-60471-A-7, 2008 WL 4296554 (Bankr. E.D. Cal. Sept. 19, 2008) (concluding that trust was alter ego of debtor because debtor treated trust assets as her own and disregarded formalities).

CORE/3519315.0002/171700803.1

adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetuate a fraud." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004) (quotation omitted).

In this case, the 2009 Trusts are the alter egos of the Diocese. First, the Diocese exerts sufficient control over the 2009 Trusts because the Bishop is the Trustee and controls all Trust assets.[30] Second, the 2009 Trusts are used for a singular purpose—to fund and carry out Diocesan operations.[31] In practice, nothing has changed from the day before the Trusts were created to the present. At all times, the Bishop used the same assets for the same purpose: the change in title is in name only. Third, the Diocese claims to have limited assets of its own, thus suggesting that it is undercapitalized.[32] Finally, allowing the Diocese to shield itself under a fraudulent scheme from the liabilities to Survivors of sexual abuse plainly constitutes an injustice. The Diocese now claims it has insufficient assets to compensate Survivors even though the Diocese has access to over $80 million in assets not listed in its Schedules or otherwise included in the estate. As such, the Committee's claim for alter ego liability is colorable.

### III. Prosecution of the Complaints Will Increase the Bankruptcy Estate by Over $80 Million, and the Diocese's Refusal to Prosecute Such Claims is Not Justified.

Finally, the Court should grant the Committee derivate standing because the Diocese unjustifiably refused to pursue the claims against the 2009 Trusts. The derivative standing analysis requires a determination as to whether the Diocese unjustifiably declined to pursue the claims at issue. *In re Racing Servs.*, 540 F.3d at 900–01. Whether a refusal to pursue litigation is "unjustifiable" depends on the facts and circumstances of each case, and more specifically whether there is likely to be a real benefit to the estate. *Id.* at 900. "At one end of the spectrum, a trustee

---

[30] Kugler Decl. at Ex. E, § 3.1, § 3.8, and Exhibit C; Ex. F, § 3.1, § 3.8, and Exhibit C.
[31] *Id.* at Ex. E, § 1.1(a); Ex. F, § 1.1(a).
[32] *See* ECF No. 297, Amended Schedule A/B and E/F, at p. 8 and 17.

CORE/3519315.0002/171700803.1

almost certainly abuses his discretion by refusing to bring a creditor's claim that, if successful, would *clearly* benefit the estate. At the other end, a trustee certainly does not abuse his discretion by refusing to bring a claim that would yield insignificant benefits to the estate." *Id.* (emphasis in original).

If the foregoing actions are not commenced, creditors will forever lose the ability to seek recovery of more than $80 million in fraudulent transfers made by the Diocese. This amount plainly benefits the estate. The Committee believes that the Diocese's hesitancy to prosecute the above-mentioned claims arises from its inherent conflict of interest—namely, its reluctance to undo the very fraudulent scheme that it enacted to place substantially all of its assets beyond the reach of its creditors, including Survivors. To allow the Diocese to control the claims set forth in the Complaints is to affirmatively "give[] rise to the proverbial problem of the fox guarding the henhouse." *Cybergenics II*, 330 F.3d at 574. Because the Diocese will not pursue the claims to recover the millions of dollars available to compensate Survivors, the Court should grant the Committee derivative standing.

## CONCLUSION

At the center of this bankruptcy are Survivors, and the Diocese's long history of abuse, cover-ups, and lies. Permitting the Diocese to continue to guard its assets in fraudulent trusts only serves to further prevent Survivors from obtaining partial justice for the harm the Diocese caused. For the foregoing reasons, the Committee respectfully requests that the Court enter an order, substantially in the form of **Exhibit 1** to this Motion, granting the Committee derivative standing to commence, prosecute, and settle the claims detailed in the Complaints on behalf of the Debtor's estate.

[Signature page follows]

CORE/3519315.0002/171700803.1

Respectfully submitted,

Dated: December 23, 2021

/s/ *Robert T. Kugler*
Robert T. Kugler (MN #194116)
Edwin H. Caldie (MN #0388930)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
Email: robert.kugler@stinson.com
Email: edwin.caldie@stinson.com

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF TORT CLAIMANTS**

23

**Exhibit 1**
**(Proposed Order)**

CORE/3519315.0002/171700803.1

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

## ORDER GRANTING THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S BANKRUPTCY ESTATE

Upon consideration of the *Official Committee of Tort Claimant's Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* (the "Motion"), after proper notice of the Motion was made by the Official Committee of Tort Claimants (the "Committee"), and upon consideration of all responses to the Motion, and upon consideration of the Motion at a hearing on January 11, 2021 at 9:30 a.m. (E.T.),

**IT IS ORDERED**:

1.      The Motion is GRANTED.

2.      The Committee shall have standing to commence, prosecute, and settle the causes of action identified in the Complaints.

CORE/3519315.0002/171700803.1

## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

## DECLARATION OF ROBERT T. KUGLER IN SUPPORT OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S BANKRUPTCY ESTATE

Robert T. Kugler, Esq., makes this declaration (the "Declaration"), in support of the *Official Committee of Tort Claimant's Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* (the "Motion").

1.      I am a partner at the law firm of Stinson LLP, which maintains offices for the practice of law at, among other locations, 50 South 6th Street, Minneapolis, Minnesota, 55402. I am duly admitted to practice law in the State of Minnesota, the United States Court of Appeals for the Eighth Circuit, United States District Court for the District of Minnesota, the United States District Court for the Northern District of California, and the United States District Court for the Western District of Wisconsin.

2.      Except as otherwise indicated, the facts set forth in this Declaration are personally known to me and, if called as a witness, I could and would testify thereto.

3.      I submit this Declaration in order to provide documentation supporting the Motion.

4.      Attached hereto as **Exhibit A** is a copy of the Committee's Charitable Trust Complaint.

5.      Attached hereto as **Exhibit B** is a copy of the Committee's Real Estate Trust Complaint.

6.      Attached hereto as **Exhibit C** is the *Informational Brief of the Roman Catholic Diocese of Harrisburg* [ECF No. 2].

7.      Attached hereto as **Exhibit D** is the Debtor's Amended Schedule A/B and E/F.

8.      Attached hereto as **Exhibit E** is the Roman Catholic Diocese of Harrisburg Charitable Trust Declaration of Trust.

9.      Attached hereto as **Exhibit F** is the Roman Catholic Diocese of Harrisburg Real Estate Trust Declaration of Trust.

10.     Attached hereto as **Exhibit G** is the *Declaration of Christopher G. Linscott In Support of First Day Motions* [ECF No. 15].

11.     Attached hereto as **Exhibit H**

12.     Attached hereto as **Exhibit I**

13.     Attached hereto as **Exhibit J** is the Committee's written demand to the Diocese to pursue the claims identified in the Complaints against the 2009 Trusts.

I declare under the penalty of perjury that the foregoing is true and correct.


Dated: December 23, 2021                                    */s/ Robert T. Kugler*
                                                            Robert T. Kugler

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC DIOCESE OF HARRISBURG,<br><br>　　　　　Debtor. | Chapter 11<br><br>Case No. 1:20-bk-00599 (HWV) |
| OFFICIAL COMMITTEE OF TORT CLAIMANTS,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>THE ROMAN CATHOLIC DIOCESE OF HARRISBURG, and BISHOP RONALD W. GAINER, AS TRUSTEE OF THE ROMAN CATHOLIC DIOCESE OF HARRISBURG CHARITABLE TRUST,<br><br>　　　　　Defendants. | Adv. P. No. _____ |

## COMPLAINT TO AVOID FRAUDULENT TRANSFERS, FOR TURNOVER AND ACCOUNT OF PROPERTY OF THE BANKRUPTCY ESTATE, FOR DECLARATORY RELIEF, AND FOR INJUNCTIVE RELIEF

The Official Committee of Tort Claimants (the "Committee" or "Plaintiff") of the Roman Catholic Diocese of Harrisburg (the "Diocese" or "Debtor"), the debtor and debtor in possession in the above-captioned case pending under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), by and through its undersigned counsel, brings this adversary proceeding against the above-captioned defendants (the "Defendants") pursuant to the authority granted to the Committee by the *Order Granting the Official Committee of Tort Claimant's Motion for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankruptcy Estate* entered on ____ [ECF No. ___ ] (the "Committee Standing Order").

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 105l and Federal Rule of Bankruptcy Procedure 7001. This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal) and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b).

## PARTIES

4.      The Plaintiff is the Official Committee of Tort Claimants appointed in the Debtor's bankruptcy case by the United States Trustee appointed on March 9, 2020. The United States Trustee appointed the Committee to represent the Debtor's unsecured creditors pursuant to 11 U.S.C. § 1102(a)(1).

5.      On _____, the Court entered the Committee Standing Order.

6.      The Diocese is the debtor and debtor-in-possession, and, as set forth below, the sole settlor and beneficiary of the Roman Catholic Diocese of Harrisburg Charitable Trust (the "Charitable Trust").

7.      Bishop Ronald W. Gainer is the trustee of the Charitable Trust, as well as the Bishop of the Diocese—the sole settlor and beneficiary of the Charitable Trust.

## BACKGROUND

### I.      The Diocese's Bankruptcy Case

8.     The Diocese filed its petition for Chapter 11 bankruptcy on February 19, 2020 (the "Petition Date"). The Diocese continues to operate as a debtor in possession pursuant to U.S.C. §§ 1107 and 1008.

9.     The Diocese's commencement of the above-captioned bankruptcy case of created an "estate" as defined in 11 U.S.C. § 541(a) as of the Petition Date.

## II.     Creation of the Charitable Trust

10.     On November 13, 2009, the Diocese, as sole settlor and grantor, transferred substantially all of its non-real estate assets, into the Charitable Trust, via that Roman Catholic Diocese of Harrisburg Charitable Trust Declaration of Trust (the "Charitable Trust Declaration of Trust").[1]

11.     In the Charitable Trust Declaration of Trust, at § 3.1, § 3.8, and Exhibit C, then-Bishop Kevin Rhoades declared that he held all of the Diocese's non-real estate assets as trustee of the Charitable Trust.

12.     The Charitable Trust Declaration of Trust, § 3.1, directs that any successors as trustee of the Charitable Trust "shall be the then current Bishop as designated by the Pope." The current Bishop of the Diocese is Bishop Ronald W. Gainer. As such Bishop Ronald W. Gainer is the current trustee of the Charitable Trust (the "Trustee").

13.     The Charitable Trust Declaration of Trust, at § 1.1(a),  states that the purpose of the Charitable Trust is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out Diocesan operations within the territorial confines of the Diocese." As a result,

---

[1] Attached hereto as **Exhibit A** is a copy of the Roman Catholic Diocese of Harrisburg Charitable Trust Declaration of Trust.

, the Charitable Trust exists solely to carry out Diocesan operations, and therefore, benefits only the Diocese.

14.    The Charitable Trust Declaration of Trust, at § 1.2(c), states that the Charitable Trust's assets "shall not be subject to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments or claims of creditors of . . . any other trust or other entity held or administered by the same Trustee, or affiliated in any way with the Diocese of Harrisburg." (the "Charitable Trust Spendthrift Provision").

15.

### III.    The Diocese's Transfers to the Charitable Trust and Use of Charitable Trust Funds

16.    The Diocese, from November 13, 2009 and continuously to the Petition Date, transferred substantially all of its non-real estate assets to the Charitable Trust (the "Charitable Trust Transfers").

17.    Insofar as the Committee has been able to ascertain, the Charitable Trust Transfers include the transfer of investment account assets currently worth approximately $45 million.

18.    Upon information and belief, the creation of the Charitable Trust, and the conveyance of substantially all of the Diocese's non-real estate assets to the Charitable Trust, was intended to place the Diocese's assets beyond the reach of its creditors, including sexual abuse survivors having claims against the Diocese ("Survivors").

19.    Both the planning process leading to the creation of the Charitable Trust, and the creation of the Charitable Trust, exhibited multiple and obvious badges of fraud, including:

a. The Diocese retained possession and control of its non-real estate assets after the Charitable Trust Transfers were made as the Bishop continued to control the Charitable Trust's assets as Trustee of the Charitable Trust;

b. Before the Charitable Trust Transfers were made, the Diocese faced the increasing threat of litigation based on widely-publicized reports of clergy sexual abuse throughout the United States;

c. Following the commencement of a grand jury investigation of the Diocese,


;

d. The transfers included all of the Diocese's non-real estate assets;

e. The Diocese became insolvent as a result of the transfer of all of its non-real estate assets to the Charitable Trust and all of its real estate assets to the Roman Catholic Diocese of Harrisburg Real Estate Trust;

f. The assets in the Charitable Trust must be used to benefit the Diocese; and

g. The Diocese did not receive any consideration, or consideration reasonably equivalent in value, to the assets transferred.

20. Notably, the creation of the Charitable Trust and the Roman Catholic Diocese of Harrisburg Real Estate Trust mirrored restructuring efforts of other dioceses within the United States, which were, upon information and belief, all undertaken in response to escalating claims of clergy sexual abuse and extended limitations periods for Survivors to bring suit.

21.

22.     The Diocese's creditors, including Survivors, could not have known about the creation of the Charitable Trust or the Charitable Trust Transfers, let alone their fraudulent nature, at the time the Charitable Trust was created and the Charitable Trust Transfers were made because there were no public announcements regarding the creation of the Charitable Trust or the Charitable Trust Transfers, they lacked access to the Diocese's financial records, and there were no other facts, conditions, or circumstances knowable to the Diocese's creditors that would have caused a reasonable person in their position to inquire regarding the creation of the Charitable Trust or the fraudulent nature of the Charitable Trust Transfers.

## **RESERVATION OF RIGHTS**

23.     During the course of this adversary proceeding, the Committee may learn (through discovery or otherwise), of additional facts or circumstances that augment the facts or support the claims asserted in this Complaint.

24.     The Committee thus expressly reserves all available rights to amend this Complaint to include: (i) further information regarding the creation of the Charitable Trust; (ii) further information regarding the Charitable Trust Transfers; (iii) claims related to recovering Charitable Trust assets; (iv) modifications of and/or revisions to the Defendants' names; (v) additional defendants; and (vi) additional causes of action (collectively, the "Amendments"), that may become known to the Committee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

25.    The Committee reserves all rights and arguments necessary to ensure that any and all Amendments relate back to the date of this original Complaint and the Committee does, in fact, intend any and all Amendments to relate back to the date of this original Complaint.

## FIRST CLAIM FOR RELIEF
### Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. § 544(b)(1), 11 U.S.C. § 550, and 12 Pa. Cons. Stat. § 5104(a)

26.    The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

27.    The Diocese made the Charitable Trust Transfers with the intent to hinder, delay, or defraud the Diocese's creditors, including Survivors.

28.    The Charitable Trust Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(1) and 12 Pa. Cons. Stat. § 5104(a).

29.    The Charitable Trust was the initial transferee of the Charitable Trust Transfers.

30.    As a result, the Committee, on behalf of the Debtor's bankruptcy estate, is entitled to recover the Charitable Trust Transfers, or the value thereof, pursuant to 11 U.S.C. § 550.

## SECOND CLAIM FOR RELIEF
### Turnover and Account of Estate Property Pursuant to 11 U.S.C. § 541(a), 11 U.S.C. § 542, and Pennsylvania's "Self-Settled Trust" Common Law Doctrine

31.    The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

32.    The Diocese was the settlor of the Charitable Trust and made the Charitable Trust Transfers.

33.    The Diocese is the sole beneficiary of the Charitable Trust because the Charitable Trust Declaration of Trust, at § 1.1(a), states that the purpose of the Charitable Trust is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in

CORE/3519315.0002/171700806.1

carrying out Diocesan operations within the territorial confines of the Diocese." As a result, the Charitable Trust exists solely to carry out Diocesan operations, and therefore, benefits only the Diocese.

34.     The Charitable Trust is therefore a self-settled trust.

35.     Under Pennsylvania common law, a settlor may not establish a trust in which it retains the beneficial interest in the trust property, while at the same time placing that property beyond the reach of its creditors.

36.     Thus, the Charitable Trust's Spendthrift Provision is unenforceable, the Charitable Trust is void, and all of the Charitable Trust's assets, and the income derived therefrom, should be deemed property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a) and should be turned over to the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542.

37.     Accordingly, the Committee prays for an order compelling Bishop Gainer, as Trustee, to turn over all of the Charitable Trust's assets, and the income derived therefrom, to the Debtor's bankruptcy estate.

**THIRD CLAIM FOR RELIEF**
**Turnover and Account of Estate Property Pursuant to 11**
**U.S.C. § 541(a), 11 U.S.C. § 542, 11 U.S.C. § 544(a), and 20 Pa.**
**Cons. Stat. § 7745**

38.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

39.     Although the Charitable Trust is designated an irrevocable trust, it is actually revocable since the Diocese is both the settlor and,

40.     Under 20 Pa. Cons. Stat. § 7745, "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

41.     As a result, the Charitable Trust is subject to the interests of the Diocese's creditors.

42.     11 U.S.C. § 544(a), and the Committee Standing Order, give the Committee, on behalf of the Debtor's bankruptcy estate, all the rights and powers of creditors, including the creditors referred to in 20 Pa. Cons. Stat. § 7745.

43.     All of the Charitable Trust's assets, and the income derived therefrom, should be deemed to be subject to the claims of the Diocese's creditors, constitute property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a), and should be turned over to the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542.

44.     Accordingly, the Committee prays for an order compelling Bishop Gainer, as Trustee, to turn over all of the Charitable Trust's assets, and the income derived therefrom, to the Debtor's bankruptcy estate.

### FOURTH CLAIM FOR RELIEF
**Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §
544(a), 11 U.S.C. § 550, and Pennsylvania's "Alter Ego"
Common Law Doctrine**

45.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

46.     The Charitable Trust is completely controlled by the Diocese through the Bishop. The Charitable Trust was funded and is used for a singular purpose—to carry out the Diocese's operations.

47.     The creation of the Charitable Trust and Charitable Trust Transfers have resulted in a grave injustice to the Diocese's creditors, including Survivors, as the Diocese has effectively shielded its assets from the claims of individuals who suffered sexual abuse as children.

48.     11 U.S.C. § 544(a), and the Committee Standing Order, give the Committee, on behalf of the Debtor's bankruptcy estate, all the rights and powers of creditors,

49.     Under Pennsylvania law, the creation of a trust may be disregarded when the settlor of a trust exercises sufficient domination and control over the trust and injustice will result if the trust structure is maintained despite a unity of interests between the trust and the settlor.

50.     Because the Diocese exerts complete dominion and control over the Charitable Trust, and because the creation of the Charitable Trust and the Charitable Trust Transfers were designed to shield the Diocese's assets from the claims of individuals who suffered sexual abuse as children, the Charitable Trust Transfers are avoidable pursuant to 11 U.S.C. § 544(a) and Pennsylvania's "Alter Ego" Common Law Doctrine.

51.     As a result, the Committee, on behalf of the Debtor's bankruptcy estate, is entitled to recover the Charitable Trust Transfers, or the value thereof, pursuant to 11 U.S.C. § 550.

**<u>FIFTH CLAIM FOR RELIEF</u>**
**Declaratory Relief: The Charitable Trust is a Self-Settled**
**Trust Containing an Unenforceable Spendthrift Provision,**
**and, as a result, the Charitable Trust is Void and the**
**Charitable Trust Assets are Property of the Debtor's Estate**
**Pursuant to 11 U.S.C. § 541(a)(1)**

52.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

53.     The Diocese was the settlor of the Charitable Trust and made the Charitable Trust Transfers.

54.     The Diocese is the sole beneficiary of the Charitable Trust because the Charitable Trust Declaration of Trust, at § 1.1(a), states that the purpose of the Charitable Trust is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out Diocesan operations within the territorial confines of the Diocese." As a result, the Charitable Trust exists solely to carry out Diocesan operations, and therefore, benefits only the Diocese.

55.     The Charitable Trust is therefore a self-settled trust.

56.     Under Pennsylvania common law, a settlor may not establish a trust in which it retains the beneficial interest in the trust property, while at the same time placing that property beyond the reach of its creditors.

57.     Thus, the Charitable Trust's Spendthrift's Provision is unenforceable, the Charitable Trust is void, and all of the Charitable Trust's assets, and the income derived therefrom, should be deemed property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. §541(a).

58.     The Diocese contends that the Debtor's estate has no rights to the Charitable Trust's assets or the income derived therefrom and that those assets and income are not available to pay the claims of the Diocese's creditors, including Survivors.

59.     An actual and justiciable controversy exists as to whether the Charitable Trust is void as a result of the Charitable Trust being a self-settled trust containing an unenforceable spendthrift provision.

60.     Accordingly, the Committee prays for a judgment declaring that the Charitable Trust is void and that the Charitable Trust's assets are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1).

## SIXTH CLAIM FOR RELIEF

**Declaratory Relief: The Charitable Trust' Assets are Subject
to the Interests of the Diocese's Creditors and are Property of
the Debtor's Estate Pursuant to 20 Pa. Cons. Stat. § 7745 and
11 U.S.C. § 541(a)(1)**

61. The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

62. Although the Charitable Trust is designated an irrevocable trust, it is actually revocable since the Diocese is both the settlor and,

63. Under 20 Pa. Cons. Stat. § 7745, "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

64. As a result, the Charitable Trust is subject to the interests of the Diocese's creditors.

65. 11 U.S.C. §544(a), and the Committee Standing Order, give the Committee, on behalf of the Debtor's bankruptcy estate, all the rights and powers

66. The Diocese contends that the Debtor's estate has no rights to the assets in the Charitable Trust or the income derived therefrom and that those assets and income are not available to pay the claims of the Diocese's creditors, including Survivors.

67. An actual and justiciable controversy exists as to whether the Charitable Trust is subject to the claims of the Diocese's creditors, including Survivors, under 20 Pa. Cons. Stat. § 7745, and whether the Charitable Trust's assets, and income derived therefrom, are property of the Diocese's estate.

68. Accordingly, the Committee prays for a judgment declaring that the Charitable Trust is subject to the claims of the Dioceses creditors and that the Charitable Trust's assets, and

the income derived therefrom, are property of the Debtor's bankruptcy estate pursuant 11 U.S.C. § 541(a)(1).

## SEVENTH CLAIM FOR RELIEF
### Injunctive Relief: Compelling the Trustee to Terminate the Charitable Trust and Turnover the Charitable Trust's Assets to the Debtor Pursuant to 20 Pa. Cons. Stat. § 7745

69.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

70.     Although the Charitable Trust is designated an irrevocable trust, it is actually revocable since the Diocese is both the settlor and,

71.     Under 20 Pa. Cons. Stat. § 7745, "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

72.     As a result, the Charitable Trust is subject to the interests of the Diocese's creditors.

73.     No adequate remedy at law exists for the Diocese's ongoing failure to honor its fiduciary duties to its creditors, including Survivors, by refusing to exercise its right to terminate the Charitable Trust.

74.     Irreparable harm will result to the Debtor's estate and its creditors, including Survivors, if an injunction is not issued to compel the Trustee to terminate the Charitable Trust and turn over the Charitable Trust's assets, including the income derived therefrom, to the Debtor's bankruptcy estate.

WHEREFORE, the Committee prays for judgment as follows:

1.      The Charitable Trust Transfers are avoidable by the Debtor's bankruptcy estate as fraudulent transfers;

2. The Debtor's bankruptcy estate is entitled to recover the Charitable Trust Transfers or the value thereof, in an amount to be determined, pursuant to 11 U.S.C. § 550;

3. For turnover of the Charitable Trust's assets, and the income derived therefrom, to the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542;

4. That the Charitable Trust Transfers are avoidable by the Debtor's bankruptcy estate as the Charitable Trust is the alter ego of the Diocese;

5. Declaring that the Charitable Trust a self-settled trust containing an unenforceable spendthrift provision and, as a result, the Charitable Trust is void and Charitable Trust's assets, and the income derived therefrom, are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1);

6. Declaring that the Charitable Trust's assets are subject to the interests of creditors are property of the Debtor's bankruptcy estate pursuant to 20 Pa. Cons. Stat. § 7745 and 11 U.S.C. § 541(a)(1);

7. Ordering the Trustee to terminate the Charitable Trust and to turn over the Charitable Trust's assets to the Debtor's bankruptcy estate pursuant to 20 Pa. Cons. Stat. § 7745;

8. For prejudgment interest; and

9. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: _____ /s/ _____
Robert T. Kugler (MN #194116)
Edwin H. Caldie (MN #0388930)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
Email: robert.kugler@stinson.com
Email: edwin.caldie@stinson.com

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF TORT CLAIMANTS**

# EXHIBIT B

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

| | |
|---|---|
| OFFICIAL COMMITTEE OF TORT CLAIMANTS, | Adv. P. No. _____ |
| Plaintiff, | |
| vs. | |
| THE ROMAN CATHOLIC DIOCESE OF HARRISBURG, and BISHOP RONALD W. GAINER, AS TRUSTEE OF THE ROMAN CATHOLIC DIOCESE OF HARRISBURG REAL ESTATE TRUST, | |
| Defendants. | |

## COMPLAINT TO AVOID FRAUDULENT TRANSFERS, FOR TURNOVER AND ACCOUNT OF PROPERTY OF THE BANKRUPTCY ESTATE, FOR DECLARATORY RELIEF, AND FOR INJUNCTIVE RELIEF

The Official Committee of Tort Claimants (the "Committee" or "Plaintiff") of the Roman

Catholic Diocese of Harrisburg (the "Diocese" or "Debtor"), the debtor and debtor in possession

in the above-captioned case pending under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"), by and through its undersigned counsel, brings this adversary proceeding

against the above-captioned defendants (the "Defendants") pursuant to the authority granted to the

Committee by the *Order Granting the Official Committee of Tort Claimant's Motion for Standing*

*and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's*

*Bankruptcy Estate* entered on ____ [ECF No. ___ ] (the "Committee Standing Order").

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C. § 105l and Federal Rule of Bankruptcy Procedure 7001. This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal) and is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.     Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §§ 157(b).

## PARTIES

4.     The Plaintiff is the Official Committee of Tort Claimants appointed in the Debtor's bankruptcy case by the United States Trustee appointed on March 9, 2020. The United States Trustee appointed the Committee to represent the Debtor's unsecured creditors pursuant to 11 U.S.C. § 1102(a)(1).

5.     On _____, the Court entered the Committee Standing Order.

6.     The Diocese is the debtor and debtor-in-possession, and, as set forth below, the sole settlor and beneficiary of the Roman Catholic Diocese of Harrisburg Real Estate Trust (the "Real Estate Trust").

7.     Bishop Ronald W. Gainer is the trustee of the Real Estate Trust, as well as the Bishop of the Diocese—the sole settlor and beneficiary of the Real Estate Trust.

## BACKGROUND

**I.      The Diocese's Bankruptcy Case**

8.    The Diocese filed its petition for Chapter 11 bankruptcy on February 19, 2020 (the "Petition Date"). The Diocese continues to operate as a debtor in possession pursuant to U.S.C. §§ 1107 and 1008.

9.    The Diocese's commencement of the above-captioned bankruptcy case of created an "estate" as defined in 11 U.S.C. § 541(a) as of the Petition Date.

## II.    Creation of the Real Estate Trust

10.    On November 13, 2009, the Diocese, as sole settlor and grantor, transferred substantially all of its real estate assets, into the Real Estate Trust, via that Roman Catholic Diocese of Harrisburg Real Estate Trust Declaration of Trust (the "Real Estate Trust Declaration of Trust").[1]

11.    In the Real Estate Trust Declaration of Trust, at § 3.1, § 3.8, and Exhibit C, then-Bishop Kevin Rhoades declared that he held all of the Diocese's real estate assets as trustee of the Real Estate Trust.

12.    The Real Estate Trust Declaration of Trust, § 3.1, directs that any successors as trustee of the Real Estate Trust "shall be the then current Bishop as designated by the Pope." The current Bishop of the Diocese is Bishop Ronald W. Gainer. As such Bishop Ronald W. Gainer is the current trustee of the Real Estate Trust (the "Trustee").

13.    The Real Estate Trust Declaration of Trust, at § 1.1(a), states that the purpose of the Real Estate Trust is to "carry[] out Diocesan operations relating to real property within the territorial confines of the Diocese." As a result,

the Real Estate Trust exists solely to carry out Diocesan operations, and therefore, benefits only the Diocese.

---

[1] Attached hereto as **Exhibit A** is a copy of the Roman Catholic Diocese of Harrisburg Real Estate Trust Declaration of Trust.

14. The Real Estate Trust Declaration of Trust, at § 1.2(c), states that the Real Estate Trust's assets "shall not be subject to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments or claims of creditors of . . . any other trust or other entity held or administered by the same Trustee, or affiliated in any way with the Diocese of Harrisburg." (the "Real Estate Trust Spendthrift Provision").

15.


III.   **The Diocese's Transfers to the Real Estate Trust and Use of Real Estate Trust Funds**

16. The Diocese, from November 13, 2009 and continuously to the Petition Date, transferred substantially all of its real estate assets to the Real Estate Trust (the "Real Estate Trust Transfers").

17. Insofar as the Committee has been able to ascertain, the Real Estate Transfers include the transfer of real property currently worth in excess of $50 million.

18. Upon information and belief, the creation of the Real Estate Trust, and the conveyance of substantially all of the Diocese's real estate to the Real Estate Trust, was intended to place the Diocese's assets beyond the reach of its creditors, including sexual abuse survivors having claims against the Diocese ("Survivors").

19. Both the planning process leading to the creation of the Real Estate Trust, and the creation of the Real Estate Trust, exhibited multiple and obvious badges of fraud, including:

    a.   The Diocese retained possession and control of its real estate assets after the Real Estate Trust Transfers were made as the Bishop continued to control the Real Estate Trust's assets as Trustee of the Real Estate Trust;

b.  Before the Real Estate Trust Transfers were made, the Diocese faced the increasing threat of litigation based on widely-publicized reports of clergy sexual abuse throughout the United States;

c.  Following the commencement of a grand jury investigation of the Diocese,

;

d.  The transfers included all of the Diocese's real estate assets;

e.  The Diocese became insolvent as a result of the transfer of all of its non-real estate assets to the Roman Catholic Diocese of Harrisburg Charitable Trust and all of its real estate assets to the Real Estate Trust;

f.  The assets in the Real Estate Trust must be used to benefit the Diocese; and

g.  The Diocese did not receive any consideration, or consideration reasonably equivalent in value, to the assets transferred.

20.  Notably, the creation of the Roman Catholic Diocese of Harrisburg Charitable Trust and the Real Estate Trust mirrored restructuring efforts of other dioceses within the United States, which were, upon information and belief, all undertaken in response to escalating claims of clergy sexual abuse and extended limitations periods for Survivors to bring suit.

21.

22.     The Diocese's creditors, including Survivors, could not have known about the creation of the Real Estate Trust or the Real Estate Trust Transfers, let alone their fraudulent nature, at the time the Real Estate Trust was created and the Real Estate Trust Transfers were made because there were no public announcements regarding the creation of the Real Estate Trust or the Real Estate Trust Transfers, they lacked access to the Diocese's financial records, and there were no other facts, conditions, or circumstances knowable to the Diocese's creditors that would have caused a reasonable person in their position to inquire regarding the creation of the Real Estate Trust or the fraudulent nature of the Real Estate Trust Transfers.

## **RESERVATION OF RIGHTS**

23.     During the course of this adversary proceeding, the Committee may learn (through discovery or otherwise), of additional facts or circumstances that augment the facts or support the claims asserted in this Complaint.

24.     The Committee thus expressly reserves all available rights to amend this Complaint to include: (i) further information regarding the creation of the Real Estate Trust; (ii) further information regarding the Real Estate Trust Transfers; (iii) claims related to recovering Real Estate Trust assets; (iv) modifications of and/or revisions to the Defendants' names; (v) additional defendants; and (vi) additional causes of action (collectively, the "Amendments"), that may become known to the Committee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this original Complaint.

25.     The Committee reserves all rights and arguments necessary to ensure that any and all Amendments relate back to the date of this original Complaint and the Committee does, in fact, intend any and all Amendments to relate back to the date of this original Complaint.

## FIRST CLAIM FOR RELIEF
### Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. § 544(b)(1), 11 U.S.C. § 550, and 12 Pa. Cons. Stat. § 5104(a)

26.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

27.     The Diocese made the Real Estate Trust Transfers with the intent to hinder, delay, or defraud the Diocese's creditors, including Survivors.

28.     The Real Estate Trust Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(1) and 12 Pa. Cons. Stat. § 5104(a).

29.     The Real Estate Trust was the initial transferee of the Real Estate Trust Transfers.

30.     As a result, the Committee, on behalf of the Debtor's bankruptcy estate, is entitled to recover the Real Estate Trust Transfers, or the value thereof, pursuant to 11 U.S.C. § 550.

## SECOND CLAIM FOR RELIEF
### Turnover and Account of Estate Property Pursuant to 11 U.S.C. § 541(a), 11 U.S.C. § 542, and Pennsylvania's "Self-Settled Trust" Common Law Doctrine

31.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

32.     The Diocese was the settlor of the Real Estate Trust and made the Real Estate Trust Transfers.

33.     The Diocese is the sole beneficiary of the Real Estate Trust because the Real Estate Trust Declaration of Trust, at § 1.1(a), states that the purpose of the Real Estate Trust is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out Diocesan operations within the territorial confines of the Diocese." As a result, the Real Estate Trust exists solely to carry out Diocesan operations, and therefore, benefits only the Diocese.

34.     The Real Estate Trust is therefore a self-settled trust.

35.     Under Pennsylvania common law, a settlor may not establish a trust in which it retains the beneficial interest in the trust property, while at the same time placing that property beyond the reach of its creditors.

36.     Thus, the Real Estate Trust's Spendthrift Provision is unenforceable, the Real Estate Trust is void, and all of the Real Estate Trust's assets, and the income derived therefrom, should be deemed property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. §541(a) and should be turned over to the Debtor's bankruptcy estate pursuant to 11 U.S.C. §542.

37.     Accordingly, the Committee prays for an order compelling Bishop Gainer, as Trustee, to turn over all of the Real Estate Trust's assets, and the income derived therefrom, to the Debtor's bankruptcy estate.

**THIRD CLAIM FOR RELIEF**
**Turnover and Account of Estate Property Pursuant to 11**
**U.S.C. § 541(a), 11 U.S.C. § 542, 11 U.S.C. § 544(a), and 20 Pa.**
**Cons. Stat. § 7745**

38.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

39.     Although the Real Estate Trust is designated an irrevocable trust, it is actually revocable since the Diocese is both the settlor and,

40.     Under 20 Pa. Cons. Stat. § 7745, "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

41.     As a result, the Real Estate Trust is subject to the interests of the Diocese's creditors.

42.     11 U.S.C. § 544(a), and the Committee Standing Order, give the Committee, on behalf of the Debtor's bankruptcy estate, all the rights and powers of creditors, including the creditors referred to in 20 Pa. Cons. Stat. § 7745.

43.     All of the Real Estate Trust's assets, and the income derived therefrom, should be deemed to be subject to the claims of the Diocese's creditors, constitute property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a), and should be turned over to the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542.

44.     Accordingly, the Committee prays for an order compelling Bishop Gainer, as Trustee, to turn over all of the Real Estate Trust's assets, and the income derived therefrom, to the Debtor's bankruptcy estate.

**FOURTH CLAIM FOR RELIEF**
**Avoidance and Recovery of Transfers Pursuant to 11 U.S.C. §**
**544(a), 11 U.S.C. § 550, and Pennsylvania's "Alter Ego"**
**Common Law Doctrine**

45.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

46.     The Real Estate Trust is completely controlled by the Diocese through the Bishop. The Real Estate Trust was funded and is used for a singular purpose—to carry out the Diocese's operations.

47.     The creation of the Real Estate Trust and Real Estate Trust Transfers have resulted in a grave injustice to the Diocese's creditors, including Survivors, as the Diocese has effectively shielded its assets from the claims of individuals who suffered sexual abuse as children.

48.     11 U.S.C. § 544(a), and the Committee Standing Order, give the Committee, on behalf of the Debtor's bankruptcy estate, all the rights and powers of creditors.

49.     Under Pennsylvania law, the creation of a trust may be disregarded when the settlor of a trust exercises sufficient domination and control over the trust and injustice will result if the trust structure is maintained despite a unity of interests between the trust and the settlor.

50.     Because the Diocese exerts complete dominion and control over the Real Estate Trust, and because the creation of the Real Estate Trust and the Real Estate Trust Transfers were designed to shield the Diocese's assets from the claims of individuals who suffered sexual abuse as children, the Real Estate Trust Transfers are avoidable pursuant to 11 U.S.C. § 544(a) and Pennsylvania's "Alter Ego" Common Law Doctrine.

51.     As a result, the Committee, on behalf of the Debtor's bankruptcy estate, is entitled to recover the Real Estate Trust Transfers, or the value thereof, pursuant to 11 U.S.C. § 550.

**FIFTH CLAIM FOR RELIEF**
**Declaratory Relief: The Real Estate Trust is a Self-Settled**
**Trust Containing an Unenforceable Spendthrift Provision,**
**and, as a result, the Real Estate Trust is Void and the Real**
**Estate Trust Assets are Property of the Debtor's Estate**
**Pursuant to 11 U.S.C. § 541(a)(1)**

52.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

53.     The Diocese was the settlor of the Real Estate Trust and made the Real Estate Trust Transfers.

54.     The Diocese is the sole beneficiary of the Real Estate Trust because the Real Estate Trust Declaration of Trust, at § 1.1(a), states that the purpose of the Real Estate Trust is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out Diocesan operations within the territorial confines of the Diocese." As a result, the Real Estate Trust exists solely to carry out Diocesan operations, and therefore, benefits only the Diocese.

55. The Real Estate Trust is therefore a self-settled trust.

56. Under Pennsylvania common law, a settlor may not establish a trust in which it retains the beneficial interest in the trust property, while at the same time placing that property beyond the reach of its creditors.

57. Thus, the Real Estate Trust's Spendthrift's Provision is unenforceable, the Real Estate Trust is void, and all of the Real Estate Trust's assets, and the income derived therefrom, should be deemed property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a).

58. The Diocese contends that the Debtor's estate has no rights to the Real Estate Trust's assets or the income derived therefrom and that those assets and income are not available to pay the claims of the Diocese's creditors, including Survivors.

59. An actual and justiciable controversy exists as to whether the Real Estate Trust is void as a result of the Real Estate Trust being a self-settled trust containing an unenforceable spendthrift provision.

60. Accordingly, the Committee prays for a judgment declaring that the Real Estate Trust is void and that the Real Estate Trust's assets are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1).

### SIXTH CLAIM FOR RELIEF
**Declaratory Relief: The Real Estate Trust' Assets are Subject
to the Interests of the Diocese's Creditors and are Property of
the Debtor's Estate Pursuant to 20 Pa. Cons. Stat. § 7745 and
11 U.S.C. § 541(a)(1)**

61. The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

62.     Although the Real Estate Trust is designated an irrevocable trust, it is actually revocable since the Diocese is both the settlor and,

63.     Under 20 Pa. Cons. Stat. § 7745, "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

64.     As a result, the Real Estate Trust is subject to the interests of the Diocese's creditors.

65.     11 U.S.C. § 544(a), and the Committee Standing Order, give the Committee, on behalf of the Debtor's bankruptcy estate, all the rights and powers of creditors, including the creditors referred to in 20 Pa. Cons. Stat. § 7745.

66.     The Diocese contends that the Debtor's estate has no rights to Real Estate Trust's assets or the income derived therefrom and that those assets and income are not available to pay the claims of the Diocese's creditors, including Survivors.

67.     An actual and justiciable controversy exists as to whether the Real Estate Trust is subject to the claims of the Diocese's creditors, including Survivors, under 20 Pa. Cons. Stat. § 7745, and whether the Real Estate Trust's assets, and income derived therefrom, are property of the Diocese's estate.

68.     Accordingly, the Committee prays for a judgment declaring that the Real Estate Trust is subject to the claims of the Dioceses creditors and that the Real Estate Trust's assets, and the income derived therefrom, are property of the Debtor's bankruptcy estate pursuant 11 U.S.C. § 541(a)(1).

## SEVENTH CLAIM FOR RELIEF
### Injunctive Relief: Compelling the Trustee to Terminate the
### Real Estate Trust and Turnover the Real Estate Trust's Assets
### to the Debtor Pursuant to 20 Pa. Cons. Stat. § 7745

69.     The Committee reasserts and incorporates by reference each and every assertion set contained in this Complaint as if though set forth fully here.

70.     Although the Real Estate Trust is designated an irrevocable trust, it is actually revocable since the Diocese is both the settlor and,


71.     Under 20 Pa. Cons. Stat. § 7745, "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors."

72.     As a result, the Real Estate Trust is subject to the interests of the Diocese's creditors.

73.     No adequate remedy at law exists for the Diocese's ongoing failure to honor its fiduciary duties to its creditors, including Survivors, by refusing to exercise its right to terminate the Real Estate Trust.

74.     Irreparable harm will result to the Debtor's estate and its creditors, including Survivors, if an injunction is not issued to compel the Trustee to terminate the Real Estate Trust and turn over the Real Estate Trust's assets, including the income derived therefrom, to the Debtor's bankruptcy estate.

WHEREFORE, the Committee prays for judgment as follows:

1.      The Real Estate Trust Transfers are avoidable by the Debtor's bankruptcy estate as fraudulent transfers;

2.      The Debtor's bankruptcy estate is entitled to recover the Real Estate Trust Transfers or the value thereof, in an amount to be determined, pursuant to 11 U.S.C. § 550;

3.      For turnover of the Real Estate Trust's assets, and the income derived therefrom, to the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 542;

4.      That the Real Estate Trust Transfers are avoidable by the Debtor's bankruptcy estate as the Real Estate Trust is the alter ego of the Diocese;

5.      Declaring that the Real Estate Trust a self-settled trust containing an unenforceable spendthrift provision and, as a result, the Real Estate Trust is void and Real Estate Trust's assets, and the income derived therefrom, are property of the Debtor's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1);

6.      Declaring that the Real Estate Trust's assets are subject to the interests of creditors are property of the Debtor's bankruptcy estate pursuant to 20 Pa. Cons. Stat. § 7745 and 11 U.S.C. § 541(a)(1);

7.      Ordering the Trustee to terminate the Real Estate Trust and to turn over the Real Estate Trust's assets to the Debtor's bankruptcy estate pursuant to 20 Pa. Cons. Stat. § 7745;

8.      For prejudgment interest; and

9.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: _____

/s/_____

Robert T. Kugler (MN #194116)
Edwin H. Caldie (MN #0388930)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
Email: robert.kugler@stinson.com
Email: edwin.caldie@stinson.com

**COUNSEL FOR THE OFFICIAL
COMMITTEE OF TORT CLAIMANTS**

CORE/3519315.0002/171700807.1

# EXHIBIT C

In re:

ROMAN CATHOLIC DIOCESE OF
HARRISBURG,

                    Debtor.[1]

Chapter 11

Case No. 1:20-bk-00599 (HWV)

## INFORMATIONAL BRIEF OF THE ROMAN CATHOLIC DIOCESE OF HARRISBURG

### INTRODUCTION[2]

1.      The Diocese of Harrisburg (the "***Diocese***") is the ecclesiastical district comprising a geographic area decreed by the Roman Catholic Church as the Diocese of Harrisburg. Within the Diocese, Bishop Ronald W. Gainer ("***Bishop Gainer***") has been appointed as Bishop (the "***Bishop***")[3] to exercise authority and jurisdiction in assuring the authentic teaching of the Catholic faith, the proper and regular celebration of the sacraments and other acts of devotion, the fostering of vocations to the priesthood and religious life, and the governing of the Diocese with loyalty to the Holy Father.

2.      The Bishop carries out his canonical duties in accordance with the Code of Canon Law, which is the ecclesiastical law of the Roman Catholic Church ("***Canon Law***").

3.      The Bishop also has authority over the Roman Catholic Diocese of Harrisburg (the "***RCDH***"), which is a nonprofit religious institution and the civil law instrumentality through which the mission of the Roman Catholic Church is administered within the Diocese.

---

[1] The last four digits of the Debtor's federal tax identification number are: 4791. The Debtor's principal place of business is located at 4800 Union Deposit Road, Harrisburg, Pennsylvania 17111.
[2] Capitalized terms used but not defined in this Introduction shall have the meanings ascribed to them in the body of this Informational Brief.
[3] All references to the defined term "Bishop" herein refer to the position within the Diocese, including Bishop Gainer and all of his predecessors and successors.

4. Bishop Gainer has had authority over the RCDH since he was installed as Bishop on March 19, 2014.

5. As more fully set forth herein, the RCDH has faced and continues to face numerous claims by survivors of clergy sexual abuse.

6. While the RCDH has settled many claims through a voluntary settlement program, the RCDH still faces potentially significant exposure from remaining claimants, including as a result of certain changes in law by the Commonwealth of Pennsylvania.

7. The RCDH filed this chapter 11 proceeding:

    a.    to provide compensation for the unresolved claims of survivors of abuse, including those survivors who have not yet come forward;

    b.    to continue outreach to and support of survivors as an ongoing ministry;

    c.    to preserve the ability to carry on the essential ministries and services provided by the RCDH, so the RCDH can continue to meet the needs of the Catholic faithful within the Diocese, the Parishes, the Schools, the Related Entities, and others who rely on the foregoing for spiritual, pastoral, and human assistance; and

    d.    to fairly allocate the RCDH's remaining income and assets among the legitimate competing interests for such property, recognizing that it is not possible to pay all alleged claims in full.

8. Based upon the experience of other dioceses around the country, the RCDH believes failure to commence this chapter 11 proceeding would have resulted in: (a) some survivors who have not yet brought claims failing to receive compensation or assistance; and (b) cessation of the RCDH's ministry, education, and charitable outreach, upon which so many within the Diocese rely.

9. To assist in understanding the RCDH's need for bankruptcy protection, this informational brief is organized into six sections: (i) the first section describes the history of the RCDH and the Diocese; (ii) the second section details the work done by the RCDH within the Diocese; (iii) the third section describes the relationship between and property of the RCDH, the

Parishes (as defined herein), the Schools (as defined herein), and certain Related Entities (as defined herein); (iv) the fourth section details the clergy sexual abuse crisis and the RCDH's response thereto; (v) the fifth section describes the circumstances surrounding the commencement of this chapter 11 case; and (vi) the sixth section details the purpose of this chapter 11 case and the RCDH's goals for such case.

## HISTORY AND STRUCTURE OF THE RCDH AND THE DIOCESE[4]

*The Church*

10.     The supreme authority of the Church is vested in the Pope, who, by virtue of his office, possesses supreme, full, immediate and universal ordinary power in the Church.

11.     The Pope exercises such power in concert with the College of Bishops of which he is the head.

12.     In addition to moral persons (namely, the Church itself and the Pope) and physical persons (i.e., individuals), Canon Law recognizes "juridic persons," which are entities, comprised of physical persons, with corporate agency.

13.     Public juridic persons are constituted either by prescript of Canon Law or by special grant of competent authority given through a decree, and they have perpetual existence unless extinguished in accordance with Canon Law.

14.     Public juridic persons in the Church are either aggregates of persons or aggregates of things, ordered for a purpose which is in keeping with the mission of the Church and which transcends the purpose of the individuals.

15.     A particular public juridic person "owns" all property it has acquired by valid means.

---

[4] All discussion of Canon Law and Church doctrines and belief is a general summary and is qualified in its entirety by the actual Code of Canon Law as interpreted and applied by the Church.

4825-2613-6746.8

3

16. However, property owned by public juridic persons has the character of Church property and must be applied always to the purposes for which the Church is allowed to own property, namely: the organization of divine worship, the care and support of the clergy, and the works of the apostolate and of charity, especially for the needy.

17. Property is thus held in trust by public juridic persons, who are represented by physical persons, the administrators of such property.

18. Canonical administrators are stewards who are required to manage property "with the diligence of a good householder."

19. In particular, Canonical administrators must seek specific approval under Canon Law for the alienation of such property other than for basic maintenance of the applicable public juridic person.

20. Apart from requiring the ownership of property of a public juridic person to be protected by civilly valid means, Canon Law does not prescribe or limit the forms of secular legal entity that may be used to hold property or conduct the business of such public juridic person.

21. A "diocese" is a portion of the Christian faithful which is entrusted to a bishop for him to shepherd with the cooperation of the ordained clergy, so that, adhering to the bishop and gathered by him in the Holy Spirit through the gospel and the sacraments, it constitutes a particular church in which the Church is truly present and operative.

22. As a general rule, a diocese is territorial and encompasses all the Christian faithful within its geographical bounds.

23. A diocese is divided into "parishes," which are communities of the Christian faithful stably constituted in a particular church, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop.

24.     As a general rule, each parish is territorial and encompasses all the Christian faithful within its geographical bounds.

25.     Under Canon Law, dioceses and parishes are public juridic persons having separate and distinct canonical legal existence from each other and from the Church.

### The Diocese and the RCDH

26.     The territory of the Diocese has a rich history, extending back more than two hundred years to the seventeenth century.

27.     During the seventeenth century: (a) Jesuit missionaries under the jurisdiction of the Diocese of Quebec traveled south on the Susquehanna River—"the highway of the missionaries"—leaving evidence of their priestly activities; and (b) Jesuit and Franciscan missionaries under the jurisdiction of the Diocese of London traveled north on the river from Maryland and preached the Gospel to Native Americans.

28.     After the Revolutionary War, Father John Carroll was appointed superior of the American missions in 1784.

29.     In 1790, the first Catholic diocese in the United States was established in Baltimore, and Father Carroll was consecrated the first bishop and his diocese included the original thirteen colonies, until the dioceses of Boston, New York, and Philadelphia were established in 1808.

30.     From 1808 until 1868, the territory of the Diocese of Harrisburg was part of the Diocese of Philadelphia.

31.     On March 3, 1868, Pope Pius IX, accepting the recommendation of the Bishops of the Second Plenary Council of "the United States of North America" and having consulted the Cardinals of the Congregation of the Propagation of the Faith, decreed:

> Wherefore, in keeping with the counsel of the afore-mentioned
> Cardinals, and exercising our Full Apostolic Authority, we hereby

establish and constitute in the City of Harrisburg a new Episcopal see, under the care of its own Bishop, to be known henceforth as the "Diocese of Harrisburg."

32.     Today, the ecclesiastical district of the Diocese:

a.      has a single cathedral, the Saint Patrick Cathedral, Harrisburg, which is the mother church of the Diocese;

b.      has parishes named for three North American saints: (i) Saint Elizabeth Ann Seton Parish, Mechanicsburg, which was founded in 1977; (ii) Saint John Neumann Parish, Lancaster, which was founded in 1978; and (iii) Saint Katharine Drexel Parish, Mechanicsburg, which was established in 1988;

c.      has two minor basilicas: (i) Sacred Heart of Jesus Church (the Conewago Chapel) in McSherrystown, which was elevated to the rank of minor basilica in 1962 by Pope John XXIII; and (ii) the Motherhouse Chapel of the Sisters of Saints Cyril and Methodius in Danville, which was declared in 1989 by Pope John Paul II to be a minor basilica, in celebration of its 50th anniversary;

d.      includes a geographic encompassing approximately 7,660 square miles; and

e.      contains close to 245,000 Catholics served by eighty-nine (89) parishes (the "*Parishes*") and seven (7) missions throughout fifteen (15) counties of central Pennsylvania.

### THE WORK OF THE RCDH WITHIN THE DIOCESE

33.     The primary role of the RCDH is to provide resources, spiritual leadership, direction, support, planning, programming, leadership development, and other services to individuals of the Roman Catholic faith, the Parishes, the Schools (as defined herein), and the Related Entities (as defined herein) within the Diocese.

34.     The mission and ministry of the Roman Catholic Church within the Diocese, as administered by the RCDH, are extremely important to the people within the Diocese.

35.     There are many within the Diocese, including non-Catholics, who depend on the services that the Roman Catholic Church, through the RCDH, delivers directly or otherwise supports, some of which services are material and monetary and others of which are purely spiritual.

36.     The RCDH and the workers throughout the Diocese who minister to the Catholic faithful and promote and administer programs that benefit the people in south-central Pennsylvania are stable, enriching elements in the lives of all the people served in these communities.

37.     Within the Diocese, there are ninety-eight (98) diocesan priests, thirty-three (33) retired Diocesan priests, and thirty-one (31) religious order priests working to minister and provide other services.

38.     In addition, sixty-three (63) permanent deacons and twenty-three (23) seminarians serve within the Diocese, playing an important part within the Catholic community by augmenting the work of the priests.

39.     Finally, additional Catholic entities operate within the Diocese, including five (5) secondary schools, two (2) K–12 schools, and thirty-three (33) elementary and middle schools (collectively, the "*Schools*"), and are supported by the RCDH but remain separate and independent entities from the RCDH.

### RELATIONSHIP BETWEEN AND PROPERTY OF
### the RCDH, PARISHES, SCHOOLS, AND CERTAIN RELATED ENTITIES

40.     As set forth above, there are many Roman Catholic ecclesiastical and civil entities that operate within the geographic territory of the Diocese (or any diocese), including the Parishes, the Schools, and other non-profit entities, funds, and trusts (collectively, the "*Related Entities*").

4825-2613-6746.8

7

41.     Every administrator of the property of an ecclesiastical entity, such as the bishop of a diocese or the priest of a parish, is obligated to acquire, hold, administer, and alienate such property in accordance with Canon Law.

42.     Under Canon Law, certain property is entrusted to the bishop of a diocese for the exclusive use and benefit of the Roman Catholic Church in that diocese, within specific parishes within that diocese, or for other specific purposes.

43.     To ensure that these tenets of Canon Law are followed and recognized under civil law, the RCDH, parishes within the Diocese, and other related Catholic entities within the Diocese (like other similarly situated Catholic entities) have taken or caused to be taken certain legal structures to be put into place or otherwise implemented, to memorialize and reflect Canon Law's dictates in a form recognized under applicable civil law.

I.     **Roman Catholic Diocese of Harrisburg Charitable Trust**

44.     In keeping with Canon Law, in each diocese, property is entrusted to the diocesan bishop for the exclusive use and benefit of the Roman Catholic Church in that diocese—in this case, property within the Diocese is held by the Bishop of the Diocese in trust for the benefit of the Roman Catholic Church to be used specifically within the geographic area of the Diocese.

45.     At all times and in all circumstances, Canon Law, as authoritatively interpreted and construed by the Holy See: (a) guides and controls the disposition of the property held in trust by the Bishop in the Diocese; and (b) assigns, guides, and controls the rights and responsibilities of the faithful clergy, religious and lay members of the Roman Catholic Church in the Diocese with respect to the property held in trust for the benefit of the Roman Catholic Church.

46.     The ability of the Roman Catholic Church to abide by its ecclesiastical laws (*i.e.*, Canon Law), as authoritatively interpreted and construed by the Holy See, is essential to the

practice of the Roman Catholic faith and is, therefore, essential to the exercise of its religious freedoms.

47. Accordingly, to ensure that the treatment of the property held in trust by the Bishop in the Diocese under Canon Law was afforded the same treatment under civil law, on or about November 13, 2009, the RCDH caused to be executed the Roman Catholic Diocese of Harrisburg Charitable Trust Declaration of Trust (the "*Charitable Trust Agreement*").

48. Pursuant to the Charitable Trust Agreement: (a) the Bishop serves as trustee so long as he serves as Bishop of the Diocese; and (b) the non-real estate assets within the Diocese previously held by the Bishop in trust pursuant to Canon Law were conveyed to the Roman Catholic Diocese of Harrisburg Charitable Trust (the "*Charitable Trust*"), to be held in trust for the benefit of, to perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out the mission and ministry of the Roman Catholic Church within the territorial confines of the Diocese.

49. The Charitable Trust is the primary source of funding of the RCDH.

50. Under the Charitable Trust Agreement, no assets of the Charitable Trust are assets of the RCDH, and assets of the Charitable Trust are to be used solely to further the religious, charitable, and educational purposes of the Charitable Trust and shall not be subject (in whole or in part) to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments, or claims of creditors of the Charitable Trust, the Trustee (as defined in the Charitable Trust Agreement), or Trust Administrators (as defined in the Charitable Trust Agreement), or Trust Advisors (as defined in the Charitable Trust Agreement), or any employee or agent of the Charitable Trust, or the creditors of any other trust or other entity held or administered by the same trustee, or affiliated in any way with the RCDH.

## II.  Roman Catholic Diocese of Harrisburg Real Estate Trust

51.   In keeping with Canon Law, in each diocese, certain real property and other property is entrusted to the diocesan bishop for the exclusive use and benefit of the Roman Catholic Church in the applicable diocese—in this case, real property and other property within the Diocese are held by the Bishop of the Diocese in trust for the benefit of the Roman Catholic Church and to be used specifically within the geographic area of the Diocese.

52.   At all times, the ecclesiastical laws of the Roman Catholic Church, as authoritatively interpreted and construed by the Holy See, in all circumstances: (a) guide and control the disposition of the property held in trust by the Bishop; and (b) assign, guide, and control the rights and responsibilities of the faithful clergy, religious and lay members of the Roman Catholic Church in the Diocese with respect to the property held in trust for the benefit of the Roman Catholic Church to be used specifically within the Diocese.

53.   The ability of the Roman Catholic Church to abide by Canon Law, as authoritatively interpreted and construed by the Holy See, is essential to the practice of the Roman Catholic faith and is, therefore, essential to the exercise of its religious freedoms.

54.   Accordingly, to assure that the treatment of the real property and other property held in trust by the Bishop under ecclesiastical law was afforded the same treatment under civil law, on or about November 13, 2009, the RCDH caused to be executed the Roman Catholic Diocese of Harrisburg Real Estate Trust Declaration of Trust (the "***Real Estate Trust Agreement***").

55.   Pursuant to the Real Estate Trust Agreement: (a) the Bishop serves as trustee so long as he serves as Bishop of the Diocese; and (b) all real property, and the structures and fixtures appurtenant to such real property, within the Diocese previously held by the Bishop in trust

pursuant to Canon Law were conveyed to the Roman Catholic Diocese of Harrisburg Real Estate Trust (the "**Real Estate Trust**"), to be held in trust for the benefit of, to perform the functions of, and to carry out the purposes of the Roman Catholic Church, specifically in carrying out Diocesan operations relating to real property within the Diocese.

56.     The RCDH uses certain of the real property held by the Real Estate Trust in furtherance of its mission.

57.     Under the Real Estate Trust Agreement, no assets of the Real Estate Trust are assets of the RCDH, and assets of the Real Estate Trust are to be used solely to further the religious, charitable, and educational purposes of the Real Estate Trust and shall not be subject (in whole or in part) to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments, or claims of creditors of the Real Estate Trust, the Trustee (as defined in the Real Estate Trust Agreement), or Trust Administrators (as defined in the Real Estate Trust Agreement), or Trust Advisors (as defined in the Real Estate Trust Agreement), or any employee or agent of the Real Estate Trust, or the creditors of any other trust or other entity held or administered by the same trustee, or affiliated in any way with the RCDH.

## III.     Parishes Within the Diocese

58.     Under Canon Law, the parishes within a diocese are territorial, comprising of certain geographical area within the applicable diocese.

59.     Once established by the bishop of a diocese, parishes are ecclesiastical entities in their own right and consist of established stable communities of the Christian faithful whose pastoral care is entrusted to a priest.

60.     Within the Diocese, there are eighty-nine (89) Parishes whose priest is freely appointed by the Bishop.

61.     Each priest appointed by the Bishop serves as the proper shepherd of the priest's applicable Parish, under the Bishop's authority.

62.     Each of the Parishes is a separate public juridic person within the Roman Catholic Church and has the right to acquire, retain, administer, and alienate ecclesiastical goods in its own name, with the priest for each Parish serving as the administrator of the ecclesiastical goods belonging to such Parish.

63.     While the priest of each Parish is the administrator of the goods belonging to such Parish, all such goods are held in trust by the Bishop of the Diocese for the exclusive use and benefit of the Roman Catholic Church in each Parish—that is, real property and other property is held by the Bishop of the Diocese in trust for the benefit of the Roman Catholic Church to be used within the geographic area of the applicable Parish.

64.     Like the RCDH (and other similarly situated Catholic entities), each Parish has established certain trusts to memorialize and have recognized under civil law the nature in which property is held under Canon Law.

65.     In particular, each Parish has established its own charitable trust (each a "***Parish Charitable Trust***"), containing:

> a.     all real property, and all of the structures, and fixtures appurtenant thereto that is shown in the records of the Recorder of Deeds of the particular county in which the property is located titled in the name of the Bishop of the Diocese or his predecessors or successors, as Trustee or in trust for the particular Parish, whether recorded or unrecorded and also including but not limited to any real estate which has been or is currently entrusted to and used under the authority of the particular Parish (in each instance, "***Parish Real Property***"); and

> b.     all and every other item of tangible and intangible property of the particular Parish, as determined by the competent ecclesiastical authority in accordance with Canon Law, including but not limited to all furniture and appliances, religious objects, materials, supplies, cash, securities, notes, funds, vehicles, equipment, and books and records (in each instance, the "***Parish Personal Property***" and together with Parish Real Property in each instance, the "***Parish Property***").

66. The Bishop is the trustee for each Parish Charitable Trust so long as he serves as Bishop of the Diocese.

67. The priest for each Parish serves as the trust administrator for the Parish Charitable Trust established for the parish in which such priest serves.

68. Each Parish Charitable Trust is to function and at all times be operated exclusively for charitable, religious, or educational purposes by conducting or supporting activities exclusively for the benefit of, to perform the function of, and to carry out the purposes of the Roman Catholic Church, specifically in connection with Diocesan operations within the territorial confines of the applicable Parish, including the advancement of religion within the applicable Parish under the pastoral care of the applicable Parish's own priest.

69. The assets of each Parish Charitable Trust are to remain the sole property of the applicable Parish Charitable Trust and may not be commingled with the assets of any other parish, trust, or other entity associated with the Diocese.

70. Further, assets of each Parish Charitable Trust may be used solely to further the religious, charitable, and educational purposes of the applicable Parish Charitable Trust and shall not be subject (in whole or in part) to voluntary or involuntary assignment, transfer, anticipation, legal process, or judgments or claims of creditors of the Trustee (as defined in each Parish Charitable Trust), or Trust Administrators (as defined in each Parish Charitable Trust), or Trust Advisors (as defined in each Parish Charitable Trust), or any employee or agent of the applicable Parish Charitable Trust, or the creditors of any other trust or other entity held or administered by the same Trustee or by the RCDH.

4825-2613-6746.8

71. In short, the assets of each Parish Charitable Trust are held in trust for religious, charitable, and educational purposes within the applicable Parish and do not constitute assets of the RCDH.

## IV. Diocese of Harrisburg School and Parish Trust Fund

72. As set forth above, there are numerous Parishes, Schools, and Related Entities within the Diocese.

73. In accordance with Canon Law, the Parishes, Schools, and Related Entities (collectively, the "**Depositors**") have conveyed and continue to convey to the Bishop funds belonging to them, to enable (a) investment of those funds on a unified and more efficient basis and (b) funds to be loaned to Parishes, Schools, and Related Entities for development projects.

74. Pursuant to Canon Law, the funds and other property belonging to the Depositors were held in trust in the Charitable Trust for the Depositors and such treatment was reflected in the books and records.

75. To memorialize the relationship as recognized and established by Canon Law, and to assure such relationship was recognized by civil law, on or about February 27, 2018, RCDH and the Depositors caused to be executed the Roman Catholic Diocese of Harrisburg Irrevocable Trust Agreement (the "**Irrevocable Trust Agreement**").

76. Pursuant to the Irrevocable Trust Agreement: (a) the Bishop serves as the trustee so long as he serves as Bishop of the Diocese; (b) all funds held by the RCDH in the Charitable Trust for the benefit of Depositors were retitled as the "**Diocese of Harrisburg School and Parish Trust Fund**"; and (c) all funds within the Diocese of Harrisburg School and Parish Trust Fund are governed by the Irrevocable Trust Agreement.

77. Under the Irrevocable Trust Agreement, no funds or other assets comprising the Diocese of Harrisburg School and Parish Trust Fund are property of RCDH, and neither RCDH nor any Depositor nor the Bishop may alienate or in any other manner, whether voluntary or involuntary, assign, transfer, pledge, or mortgage any property consisting of the Diocese of Harrisburg School and Parish Trust Fund, and no individual or entity may attach or otherwise reach any interest of any of them under the Irrevocable Trust Agreement to satisfy a claim against RCDH, any Depositor, or the Bishop, whether the claim is legal or equitable in nature.

## V.    Foundation of Catholics United in Service

78. In 1988, the Most Reverend William H. Keeler, then Bishop of the Diocese ("**Bishop Keeler**"), recognized that it was imperative that the Diocese stabilize existing educational, charitable, and pastoral programs, improve and expand those programs, and initiate and develop urgently needed programs.

79. As a result, in view of the inadequate ordinary operating financial resources of the Diocese to fund such programs, Bishop Keeler deemed the establishment of a permanent endowment fund the best method of attaining the foregoing goals.

80. To that end, on July 1, 1988, Bishop Keeler, after consultation with his staff of advisors, signed a Declaration of Trust commonly referred to as FOCUS—Foundation of Catholics United in Service (the "**FOCUS Trust**").

81. The Bishop serves as the trustee of the FOCUS Trust so long as he is Bishop of the Diocese.

82. The assets of the FOCUS Trust are to be used exclusively to assist, encourage, support, or promote the stabilization of and improvement of diocesan educational, charitable, and

Case 1:20-bk-00599-MWV   Doc 840   Filed 02/19/21   Entered 02/19/21 17:40:59   Desc
Main Document    Page 92 of 256

pastoral programs or the development of additional services and programs to meet the present and future needs of the Diocese.

83. Similarly, the assets of the FOCUS Trust shall not be subject to assignment, pledge, attachment, or the claims of creditors of the RCDH, any Parish, any School, or any Related Entity or individual beneficiary.

84. As with the assets of the Real Estate Trust, Charitable Trust, Diocese of Harrisburg School and Parish Trust Fund, and Parish Charitable Trusts, the assets of the FOCUS Trust are not assets of the RCDH.

## VI. Harrisburg Catholic Administrative Services, Inc.

85. Like other actions taken by the RCDH in 2009, Harrisburg Catholic Administrative Services, Inc. ("**HCAS**") was incorporated on or about March 19, 2009, to provide a separate civil entity through which the various management and other services could be administered on behalf of the RCDH, the Parishes, the Schools, and the Related Entities.

86. The Bishop is the sole member of HCAS so long as he is the Bishop in the Diocese.

87. The business and affairs of HCAS, however, are managed by a board of directors.

88. Pursuant to certain services agreements, HCAS undertakes to use commercially reasonable efforts to provide the following services (among others) to the RCDH, the Parishes, the Schools, and the Related Entities (collectively, the "**Service Recipients**"):

> a. accounting services, including (i) maintaining the applicable Service Recipient's general ledger and chart of accounts, (ii) producing the applicable Service Recipient's monthly financial reports and statements, and (iii) cash management services to include custody of excess cash and savings deposited by the applicable Service Recipient with the Bishop of the Diocese and payment of invoices submitted by such Service Recipient;

> b. payroll services, including (i) processing and payment of approved wages for each Service Recipient's employees, (ii) filing of applicable payroll tax returns for the applicable Service Recipient, and (iii) preparation and distribution of required employee tax reporting forms;

c.       human resources services, including providing human resource consulting and assistance in maintaining compliance with applicable employment laws, regulations, and practices;

d.       assisting each Service Recipient with general and targeted development initiatives to include fundraising and appeals; and

e.       information technology services, including providing (i) a platform for each Service Recipient to access the Diocesan network and related applications and (ii) technology consulting and assistance in the maintenance and operational efficiencies of each Service Recipient's technology platform.

89.       In exchange for the foregoing services, each Service Recipient agrees to pay HCAS certain consideration, and each Service Recipient further agrees to abide by all policies and procedures issued by HCAS with respect to human resources administration, financial administration, and information technology management.

90.       At no time does HCAS take ownership of any assets of the RCDH, the Parishes, the Schools, or the Related Entities.[5]

91.       Similarly, at no time does HCAS serve as a partner or agent of the RCDH, the Parishes, the Schools, or the Related Entities.

92.       HCAS maintains separate bank accounts and assets in its own name, separate from the bank accounts and assets of the RCDH, the Parishes, the Schools, and the Related Entities.

93.       Similarly, at all times HCAS ensures that: (a) assets of the RCDH are not used to pay obligations of the Parishes, the Schools, or the Related Entities; (b) assets of the Parishes are not used to pay obligations of the RCDH, the Schools, or the Related Entities; (c) assets of the Schools are not used to pay obligations of the RCDH, the Parishes, or the Related Entities; and

---

[5] In order to make payments to third parties, the Debtor funds, or causes to be funded, payments to HCAS. As part of its administrative responsibilities pursuant to certain services agreements, HCAS, in turn, makes payments to such third parties on the Debtor's behalf using such funds.

4825-2613-6746.8

(d) assets of the Related Entities are not used to pay obligations of the RCDH, the Parishes, or the Schools.

## VII.    Schools and Other Educational Institutions Within the Diocese

94.    As stated above, five (5) secondary schools, two (2) K–12 schools, and thirty-three (33) elementary and middle schools operate within the Diocese.

95.    A listing of the Schools may be located on the website maintained by the RCDH at https://www.hbgdiocese.org/catholic-schools/find-catholic-school/.

96.    While each School receives varying levels of support from, among others, the RCDH, each School is a distinct entity separate and apart from the RCDH.

97.    Accordingly, as with the Parishes, the assets of the Schools are not assets of the RCDH.

## VIII.    Other Related Catholic Entities, Funds, and Trusts Within the Diocese

98.    As stated before, there are additional Related Entities within the Diocese.[6]

### A.    The Pennsylvania Catholic Conference

99.    The Pennsylvania Catholic Conference (the "**PCC**") is the public affairs arm of Pennsylvania's Catholic bishops and the Catholic dioceses of Pennsylvania.

100.    The Board of Governors for the PCC comprises the local diocesan bishops of Pennsylvania—that is, the ecclesiastical superiors of each Pennsylvania diocese—and the chairman of the Board of Governors is the Archbishop of Philadelphia.

101.    The function of the Board of Governors is to establish the principles of the conference and determine its policies.

---

[6] This section of the Informational Brief describes most of the Related Entities but may not describe every Related Entity.  In particular, the RCDH holds and manages certain custodial funds for the benefit of the RCDH which are to be used for specific religious, educational, or other charitable purposes and which funds are not property of the RCDH.

4825-2613-6746.8

102.    Bishop Gainer is the president of the PCC.

103.    While PCC receives various types of support from the RCDH, no assets of PCC are assets of the RCDH.

**B.      Catholic Charities**

104.    Catholic Charities of the Diocese of Harrisburg, Pennsylvania Inc. ("*Catholic Charities*") is a faith-based agency, acting as a nondenominational social service provider affiliated with the RCDH and the Roman Catholic Church.

105.    Before the professional social service system in existence today, the government turned to religious as well as secular groups care for the orphaned, poor and marginalized.

106.    Catholic Charities is such a faith-based agency, serving a fifteen county region with programs ranging from maternity homes, adoption services, foster care, and counseling to the only homeless shelter in Central Pennsylvania.

107.    Most services provided by Catholic Charities are offered at minimal or no cost.

108.    While Catholic Charities receives various types of support from the RCDH, no assets of Catholic Charities are assets of the RCDH.

**C.      Kolbe Catholic Publishing, Inc.**

109.    Kolbe Catholic Publishing, Inc. ("*Kolbe*") is an in-house print brokerage office of the RCDH.

110.    Kolbe was formed in order to reduce printing expenses incurred by the RCDH in connection with printing needs related to religious and educational seminars and events and church and other religious services that the RCDH regularly conducts.

111.    Kolbe does not offer printing services to any individual or organization not affiliated with the RCDH and only provides printing services in connection with charitable, religious, and educational events.

112.     Bishop Gainer is the president of Kolbe, and the two directors of Kolbe are Bishop Gainer and the Vicar General of the Diocese.

113.     No assets of Kolbe are assets of the RCDH.

**D.     Cemeteries**

114.     The RCDH maintains eight cemeteries (the "***Diocesan Cemeteries***") within the geographic boundaries of the Diocese.

115.     The land on which the Diocesan Cemeteries sit is owned by the Real Estate Trust.

116.     The Bishop is responsible for the operations of the Diocesan Cemeteries in consultation with the Cemetery Board of Diocese of Harrisburg.

117.      Under Canon Law and related guidelines, the Diocesan Cemeteries are not considered mere property but instead are sacred places of prayer, and, as such, the Bishop is entrusted with the perpetual care of the Diocesan Cemeteries.

118.     Accordingly, the RCDH has established a Perpetual Care Fund (the "***PCF***") containing funds, including funds from the sale of internment spaces, memorials, burial vaults, and crypt and niche spaces, to be held in trust for the sole purpose of caring for and maintaining the Diocesan Cemeteries.

119.     Bryn Mawr Trust Company administers and invests the funds the PCF on behalf of the RCDH.

120.     The PCF is separate and distinct from the RCDH, and no assets in the PCF are assets of the RCDH.

**E.     Catholic Witness**

121.     The Catholic Witness ("***Catholic Witness***") is the official Catholic newspaper within the Diocese.

122. Catholic Witness was established in 1966 and is published 24 times per year in print and online.

123. Catholic Witness offers complimentary subscriptions to members of Parishes within the Diocese.

124. Subscriptions to Catholic Witness are also offered to non-members for a nominal cost.

125. No assets of Catholic Witness are assets of the RCDH.

**F.** **Priest Pension Plan**

126. Consistent with Canon Law and Church custom, the RCDH provides a pension plan for retired Diocesan priests (the "***Priest Pension Plan***").

127. As of July 1, 2018, retired Diocesan priests receive pension benefits in the amount of $2,240.75 per month, which is increased from year-to-year in the discretion of the RCDH.

128. In addition, the RCDH pays a portion of the retired Diocesan priests' medical insurance premiums.

129. The market value of the assets in the Priest Pension Plan was approximately $16.5 million as of June 30, 2019.

130. The RCDH estimates that the Priest Pension Plan was underfunded by approximately $26.5 million as of June 30, 2019.

131. In addition, to fund the settlements reached as part of the SCP (as defined below), funds were borrowed by the RCDH from the Priest Pension Plan.

132. In turn, the RCDH executed a promissory note in an amount equal to the funds borrowed from the Priest Pension Plan.

## THE CLERGY SEX ABUSE CRISIS AND THE RCDH'S RESPONSE

133.     A tragedy contrary to every teaching and tradition of the Roman Catholic Church has unfolded in the Roman Catholic Church as a whole and within the Diocese in particular—that is, a small number of clergy and others took advantage of positions of trust and respect to sexually abuse children.

134.     The Roman Catholic Church and the RCDH are committed to providing for all survivors of abuse, known and yet to be known, in a fair, just, and equitable manner.

135.     To that end, numerous steps and actions have been taken within the Roman Catholic Church and Diocese.

## I.     Charter for the Protection of Children and Young People

136.     In spring of 2002, the United States Bishops adopted the *Charter for the Protection of Children and Young People* (the "***Charter***"), adopting a "one strike" policy with regard to clergy serving in any active, public ministry.

137.     The Charter also included: (a) permanent removal from active ministry of any priest or deacon with a substantiated allegation of sexual abuse of a minor; (b) requirement of criminal background checks for adults, including clergy, who work with children and youth; (c) implementation of educational programs for the prevention of child sexual abuse for both adults and children; (d) provision of behavioral guidelines and ethical standards for ministry; (e) establishing outreach for survivors; and (f) creation of review boards to make recommendations to the diocesan bishop about substantiation of accusations against clergy and to oversee policy implementation.

138.     The RCDH has implemented and carries out the dictates of the Charter.

Case 1:20-bk-00599-MJC    Doc 840    Filed 02/28/21    Entered 02/28/21 12:50:59    Desc
Main Document    Page 99 of 256

## II. Diocese Voluntary Compensation Program

139. In addition to the foregoing, the RCDH launched the Survivor Compensation Program (the "**SCP**") on February 12, 2019.

140. Under the SCP, claimants who had reported alleged sexual abuse to the RCDH before February 2019 were entitled to make claims for compensation for alleged sexual abuse.

141. While originally available only to claimants who had made such claims on or before February 12, 2019, the RCDH ultimately permitted claimants to participate who had alleged abuse by (a) a Diocesan priest, deacon, or seminarian, (b) a priest, deacon, or seminarian from another diocese who had faculties within the Diocese, or (c) a priest or brother from a religious order who had faculties in the Diocese at the time of the alleged abuse.

142. The enrollment period for the SCP was open for ninety (90) days and ended on May 13, 2019.

143. Once the enrollment process closed, an independent administrator of the SCP, Commonwealth Mediation & Conciliation, Inc. ("**CMCI**"), assessed the various claims and began making settlement offers.

144. At all times, CMCI was solely responsible for determining how much and to whom settlements were offered.

145. As a result of the SCP, the RCDH has entered into settlement agreements with more than one hundred ten (110) survivors, resulting in excess of $12.5 million being paid to survivors who participated in the SCP, with a portion of the settlement payments being funded by certain religious entities that also participated in the SCP.

## III. Other and Continued Actions by the RCDH

146. In addition to implementation of the dictates of the Charter and establishing the SCP, the RCDH has taken the following additional steps:

     a.     removed from positions of honor within the Diocese the names of Bishops for failure to prevent childhood sexual abuse;

     b.     removed from positions of honor within the Diocese the names of priests, deacons, and seminarians identified by the RCDH as having been involved in the past wrongdoing within the Diocese or who were otherwise named in a 2018 Grand Jury Report;

     c.     conducted nine (9) listening sessions, allowing the faithful and survivors to express their concerns, frustrations, and feelings;

     d.     ensured that all survivors of childhood sexual abuse receive counseling services, at low or no cost to them and from a counselor of their choosing, regardless of their participation in the SCP (accepting or declining a compensation offer in no way impacts a survivor's access to such counseling); and

     e.     created an e-mail address to offer more access for parishioners and the public to communicate directly with Bishop Gainer.

147.     The RCDH also has undertaken or is in the process of undertaking the following:

     a.     reporting of child abuse to Childline and the appropriate District Attorney (as has been the policy within the Diocese since the early 2000's);

     b.     reconstitution of the Diocesan Pastoral Counsel, which carefully investigates, prayerfully considers and, in consensus, recommends action to the Bishop of the Diocese regarding pastoral concerns within the Diocese;

     c.     restructuring of the Diocesan Review Board, which is made up almost entirely of lay members and which reviews every allegation of abuse once law enforcement has completed their investigation;

     d.     revision of youth protection policies within the Diocese;

     e.     maintenance and reformation of an intensive screening and education process for those in formation for the priesthood;

     f.     revision of the Safe Environment Program Lesson Plan for Catholic School and Religious Education students within the Diocese; and

     g.     revision of communications materials, including *The Catholic Witness*.

148.     The RCDH has made—and continues to make—assistance to survivors and their families in their journey toward healing its top priority.

149.    Like other similar situated Catholic dioceses across the country, the RCDH has struggled to remain financially viable while funding compensation for survivors and continued litigation by survivors with which the RCDH has not reached consensual settlements.

150.    Ongoing litigation has been necessary due to: (a) disagreement over the level of compensation that can or should be paid to survivors in the face of competing needs for a very limited assets; and (b) intervening changes in law resulting from decisions within the Commonwealth of Pennsylvania and neighboring jurisdictions.

151.    While the RCDH has made and continues to make significant effort to address the wrongs of the past, and notwithstanding the substantial number of survivors with which the RCDH has reached consensual settlements, the RCDH believes additional unsettled claims and liabilities remain outstanding.

152.    In particular, the RCDH is aware of: (a) five (5) civil actions against the RCDH, seeking monetary damages or other relief regarding childhood sexual abuse; (b) approximately two hundred (200) survivors or potential survivors of childhood abuse by persons associated with the RCDH; and (c) additional instances where allegations were made and either the alleged survivor is anonymous or otherwise unknown.

153.    Moreover, based upon the experiences of other diocese across the country, the RCDH believes additional unknown, unreported, or otherwise unasserted claims may exist against the RCDH.

154.    While the RCDH carried insurance during many periods in which abuse is alleged to have occurred, and while the RCDH believes such insurance provides coverage for the claims

Case 1:20-bk-00599-HWV Doc 840 Filed 02/28/01 Entered 02/28/011 17:40:59 Desc
Main Document Page 102 of 296

as they are asserted or likely would be asserted against the RCDH, to date, the RCDH has been largely unsuccessful in obtaining any coverage for claims asserted against the RCDH.

155.    As a result, the RCDH faces the prospect facing claims asserted in amounts exceeding the RCDH's economic ability to pay, in which circumstance (a) survivors of abuse could be left with no compensation or other support, and (b) those within the Diocese (including non-Catholics) who depend on the services of the Roman Catholic Church delivered through the RCDH would be left without the material, monetary, and spiritual support which has, to date, been a necessary, stable, and enriching element in their lives.

156.    Faced with this prospect, the RCDH concluded seeking relief through chapter 11 of the United States Bankruptcy Code was the best solution to assure: (a) equitable compensation to those harmed by the sins of the past within the Diocese; (b) continuation of the counseling and other services provided through the RCDH to those who have been harmed; (c) continuation of the essential programs for the protection of children; and (d) continuation of the mission and ministry of the Roman Catholic Church within the Diocese.

157.    Through this process, it is the intent and desire of the RCDH to be able to: (a) provide for the equitable and ratable compensation of those harmed by the sins of the past within this Diocese; (b) provide for the continuation of the counseling and other services provided to those who were harmed by the sins of the past within the Diocese; (c) provide for the continuation of the programs the RCDH has put into place to educate and screen people working within the Diocese, to ensure that the children in the Diocese are protected; and (d) maintain funding for the programs within the Diocese that are essential to the mission and ministry of the Roman Catholic Church and wellbeing of those within the Diocese who depend on the services of the Roman Catholic Church.

## PURPOSE AND GOALS FOR THIS CHAPTER 11 CASE

158.    The RCDH commenced this chapter 11 case in order to fairly provide compensation for unresolved claims of survivors of abuse and preserve the ability of the RCDH to continue providing essential ministries and services within the Diocese.

159.    Absent the commencement of this chapter 11 case, the RCDH believes that some survivors would not receive compensation or assistance and that the RCDH may be forced to cease providing some or all of the services upon which so many within the Diocese rely.

160.    In order to achieve the goals set forth above, the RCDH expects to commence an adversary proceeding against its insurers (the "***Insurers***") as soon as possible following the filing of this chapter 11 case.

161.    In the adversary proceeding, the RCDH will seek (a) entry of a judgment declaring that claims related to clergy sexual abuse are covered by certain policies of insurance issued to the RCDH by the Insurers or their predecessors, and (b) entry of a money judgment against the Insurers for breach of contract.

162.    The Insurers have either generally reserved all rights with coverage of claims related to clergy sexual abuse or denied coverage outright.

163.    As in other bankruptcy cases of dioceses across the country, the ultimate goal of the adversary proceeding will be to obtain the maximum amount of proceeds possible from the insurance policies in order to fund a trust for survivors of clergy sexual abuse within the Diocese.

164.    After the adversary proceeding against the Insurers has concluded, the RCDH intends to file promptly seek confirmation of a plan of reorganization that will provide fair compensation to survivors of clergy sexual abuse pursuant to streamlined trust distribution procedures without the cost, uncertainty, and delay of litigation.

4825-2613-6746.8

27

165. Additionally, such a plan of reorganization would allow the RCDH to successfully emerge from bankruptcy and continue its charitable mission with the benefit of a full and final resolution of the claims related to clergy sexual abuse and the related savings in substantial defense costs.

## CONCLUSION

166. The piecemeal adjudication of the claims of survivors presents a significant risk that some survivors may not be compensated and that the at the RCDH may be forced to cease consistent with its mission and ministry.

167. In marked contrast to such piecemeal adjudication, filing this chapter 11 case and confirming a plan of reorganization is the best mechanism to fairly and equitably address the claims of survivors while ensuring that the mission and ministry of the RCDH continues.

*[Remainder of Page Intentionally Left Blank]*

Dated: February 19, 2020
Nashville, Tennessee

Respectfully submitted,

W ALLER L ANSDEN D ORTCH & D AVIS, LLP

*/s/ Blake D. Roth*

Blake D. Roth (State Bar No. 306951)
Tyler N. Layne (*pro hac vice* admission pending)
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    (615) 244-6380
Facsimile:    (615) 244-6804
Email:    blake.roth@wallerlaw.com
        tyler.layne@wallerlaw.com

-and-

K LEINBARD, LLC

Matthew H. Haverstick (State Bar No. 85072)
Joshua J. Voss (State Bar No. 306853)
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
Telephone:    (215) 568-2000
Facsimile:    (215) 568-0140
Email:    mhaverstick@kleinbard.com
        jvoss@kleinbard.com

*Proposed Attorneys for the Debtor and Debtor In Possession*

# EXHIBIT D

| Fill in this information to identify the case: |
| --- |

Debtor name  Roman Catholic Diocese of Harrisburg

United States Bankruptcy Court for the: Middle _____  District of _PA_
(State)

Case number (If known):  1:20-00599 HWV

☑ Check if this is an
amended filing

## Official Form 206A/B

# Schedule A/B: Assets — Real and Personal Property     12/15

Disclose all property, real and personal, which the debtor owns or in which the debtor has any other legal, equitable, or future interest. Include all property in which the debtor holds rights and powers exercisable for the debtor's own benefit. Also include assets and properties which have no book value, such as fully depreciated assets or assets that were not capitalized. In Schedule A/B, list any executory contracts or unexpired leases. Also list them on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G).

Be as complete and accurate as possible. If more space is needed, attach a separate sheet to this form. At the top of any pages added, write the debtor's name and case number (if known). Also identify the form and line number to which the additional information applies. If an additional sheet is attached, include the amounts from the attachment in the total for the pertinent part.

For Part 1 through Part 11, list each asset under the appropriate category or attach separate supporting schedules, such as a fixed asset schedule or depreciation schedule, that gives the details for each asset in a particular category. List each asset only once. In valuing the debtor's interest, do not deduct the value of secured claims. See the instructions to understand the terms used in this form.

| Part 1: | Cash and cash equivalents |
| --- | --- |

1. Does the debtor have any cash or cash equivalents?

   ☐ No. Go to Part 2.
   ☑ Yes. Fill in the information below.

   All cash or cash equivalents owned or controlled by the debtor

   Current value of debtor's interest

2. **Cash on hand**                                          $ 0.00

3. **Checking, savings, money market, or financial brokerage accounts** *(Identify all)*

   | Name of institution (bank or brokerage firm) | Type of account | Last 4 digits of account number | |
   | --- | --- | --- | --- |
   | 3.1. See Exhibit A/B.1.3 | | | $ 6,056,517.34 |
   | 3.2. | | | $ |

4. **Other cash equivalents** *(Identify all)*

   | 4.1. First National Bank - Certificate of Deposit - 101465891 - Unemployment | $ 262,102.05 |
   | --- | --- |
   | 4.2. S&T Bank  - Certificate of Deposit - 2004024016 - Bishop McDevitt High School | $ 517,176.13 |

5. **Total of Part 1**                                        $ 6,835,795.52
   Add lines 2 through 4 (including amounts on any additional sheets). Copy the total to line 80.

| Part 2: | Deposits and prepayments |
| --- | --- |

6. Does the debtor have any deposits or prepayments?

   ☐ No. Go to Part 3.
   ☑ Yes. Fill in the information below.

   Current value of
   debtor's interest

7. **Deposits, including security deposits and utility deposits**

   Description, including name of holder of deposit

   | 7.1. Self-Insured Retention Program, Catholic Mutual Group, 10843 Old Mill Rd., Omaha, NE  68154-2600 | $ 15,000 |
   | --- | --- |
   | 7.2. | $ |

8. **Prepayments, including prepayments on executory contracts, leases, insurance, taxes, and rent**

Description, including name of holder of prepayment

8.1. See Exhibit A/B 2.8        $ 332,403

8.2. _____    $ _____

9. **Total of Part 2.**

Add lines 7 through 8. Copy the total to line 81.      $ 347,403

---

## Part 3:   Accounts receivable

10. **Does the debtor have any accounts receivable?**

☐ No. Go to Part 4.

☑ Yes. Fill in the information below.

                 **Current value of debtor's interest**

11. **Accounts receivable**

| | | | |
|---|---|---|---|
| 11a. 90 days old or less: | _____ − _____ = → | | $ _____ |
| | face amount   doubtful or uncollectible accounts | | |
| 11b. Over 90 days old: | 233,718.23 − (39,240.54) = → | | $ 194,477.69 |
| | face amount   doubtful or uncollectible accounts | | |

12. **Total of Part 3**

Current value on lines 11a + 11b = line 12. Copy the total to line 82.      $ 194,477.69

---

## Part 4:   Investments

13. **Does the debtor own any investments?**

☐ No. Go to Part 5.

☑ Yes. Fill in the information below.

       **Valuation method used for current value**     **Current value of debtor's interest**

14. **Mutual funds or publicly traded stocks not included in Part 1**

Name of fund or stock:

14.1. _____    _____    $ _____

14.2. _____    _____    $ _____

15. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture**

Name of entity:                  % of ownership:

15.1. See Exhibit A/B.4.15      _____ %    _____    $ 17,773.51

15.2. _____   _____ %    _____    $ _____

16. **Government bonds, corporate bonds, and other negotiable and non-negotiable instruments not included in Part 1**

Describe:

16.1. _____    _____    $ _____

16.2. _____    _____    $ _____

17. **Total of Part 4**

Add lines 14 through 16. Copy the total to line 83.      $ 17,773.51

---

## Part 5:  Inventory, excluding agriculture assets

18.  **Does the debtor own any inventory (excluding agriculture assets)?**

☐ No. Go to Part 6.

☑ Yes. Fill in the information below.

| General description | Date of the last physical inventory | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 19.  **Raw materials** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 20.  **Work in progress** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |
| 21.  **Finished goods, including goods held for resale** | | | | |
| See Exhibit A/B 5.21 | 1/31/2019 MM / DD / YYYY | $ 474,179 | Cost | $ 474,179 |
| 22.  **Other inventory or supplies** | | | | |
| _____ | _____ MM / DD / YYYY | $_____ | _____ | $_____ |

23.  **Total of Part 5**

Add lines 19 through 22. Copy the total to line 84.

| | $ 474,179 |
|---|---|

24.  **Is any of the property listed in Part 5 perishable?**

☑ No

☐ Yes

25.  **Has any of the property listed in Part 5 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☑ Yes. Book value  $10,369.99    Valuation method  cost    Current value $10,369.99

26.  **Has any of the property listed in Part 5 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 6:  Farming and fishing-related assets (other than titled motor vehicles and land)

27.  **Does the debtor own or lease any farming and fishing-related assets (other than titled motor vehicles and land)?**

☑ No. Go to Part 7.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 28.  **Crops—either planted or harvested** | | | |
| _____ | $_____ | _____ | $_____ |
| 29.  **Farm animals** Examples: Livestock, poultry, farm-raised fish | | | |
| _____ | $_____ | _____ | $_____ |
| 30.  **Farm machinery and equipment**  (Other than titled motor vehicles) | | | |
| _____ | $_____ | _____ | $_____ |
| 31.  **Farm and fishing supplies, chemicals, and feed** | | | |
| _____ | $_____ | _____ | $_____ |
| 32.  **Other farming and fishing-related property not already listed in Part 6** | | | |
| _____ | $_____ | _____ | $_____ |

33. **Total of Part 6.**

Add lines 28 through 32. Copy the total to line 85.

$ _____

34. **Is the debtor a member of an agricultural cooperative?**

☑ No

☐ Yes. Is any of the debtor's property stored at the cooperative?

    ☐ No

    ☐ Yes

35. **Has any of the property listed in Part 6 been purchased within 20 days before the bankruptcy was filed?**

☐ No

☐ Yes. Book value $_____  Valuation method _____  Current value $_____

36. **Is a depreciation schedule available for any of the property listed in Part 6?**

☐ No

☐ Yes

37. **Has any of the property listed in Part 6 been appraised by a professional within the last year?**

☐ No

☐ Yes

**Part 7:  Office furniture, fixtures, and equipment; and collectibles**

38. **Does the debtor own or lease any office furniture, fixtures, equipment, or collectibles?**

☐ No. Go to Part 8.

☑ Yes. Fill in the information below.

| General description | Net book value of debtor's interest (Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| 39. **Office furniture** <br> See Schedule G | $_____ | _____ | $_____ |
| 40. **Office fixtures** <br> See Schedule G | $_____ | _____ | $_____ |
| 41. **Office equipment, including all computer equipment and communication systems equipment and software** <br> See Schedule G | $_____ | _____ | $_____ |
| 42. **Collectibles** *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; china and crystal; stamp, coin, or baseball card collections; other collections, memorabilia, or collectibles | | | |
| 42.1 N/A | $_____ | _____ | $_____ |
| 42.2 | $_____ | _____ | $_____ |
| 42.3 | $_____ | _____ | $_____ |

43. **Total of Part 7.**

Add lines 39 through 42. Copy the total to line 86.

$ _____

44. **Is a depreciation schedule available for any of the property listed in Part 7?**

☑ No

☐ Yes

45. **Has any of the property listed in Part 7 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 8: Machinery, equipment, and vehicles

**46. Does the debtor own or lease any machinery, equipment, or vehicles?**

☐ No. Go to Part 9.

☑ Yes. Fill in the information below.

| General description<br>Include year, make, model, and identification numbers (i.e., VIN, HIN, or N-number) | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|

**47. Automobiles, vans, trucks, motorcycles, trailers, and titled farm vehicles**

| | | | |
|---|---|---|---|
| 47.1 See Schedule G | $ | | $ |
| 47.2 | $ | | $ |
| 47.3 | $ | | $ |
| 47.4 | $ | | $ |

**48. Watercraft, trailers, motors, and related accessories** Examples: Boats, trailers, motors, floating homes, personal watercraft, and fishing vessels

| | | | |
|---|---|---|---|
| 48.1 N/A | $ | | $ |
| 48.2 | $ | | $ |

**49. Aircraft and accessories**

| | | | |
|---|---|---|---|
| 49.1 N/A | $ | | $ |
| 49.2 | $ | | $ |

**50. Other machinery, fixtures, and equipment (excluding farm machinery and equipment)**

| | | | |
|---|---|---|---|
| See Schedule G | $ | | $ |

**51. Total of Part 8.**

Add lines 47 through 50. Copy the total to line 87.      $_____

**52. Is a depreciation schedule available for any of the property listed in Part 8?**

☑ No

☐ Yes

**53. Has any of the property listed in Part 8 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 9:    Real property

**54. Does the debtor own or lease any real property?**

☐ No. Go to Part 10.

☑ Yes. Fill in the information below.

**55. Any building, other improved real estate, or land which the debtor owns or in which the debtor has an interest**

| Description and location of property<br>Include street address or other description such as Assessor Parcel Number (APN), and type of property (for example, acreage, factory, warehouse, apartment or office building), if available. | Nature and extent of debtor's interest in property | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|---|
| 55.1 See Schedule G | _____ | $_____ | _____ | $_____ |
| 55.2 _____ | _____ | $_____ | _____ | $_____ |
| 55.3 _____ | _____ | $_____ | _____ | $_____ |
| 55.4 _____ | _____ | $_____ | _____ | $_____ |
| 55.5 _____ | _____ | $_____ | _____ | $_____ |
| 55.6 _____ | _____ | $_____ | _____ | $_____ |

**56. Total of Part 9.**

Add the current value on lines 55.1 through 55.6 and entries from any additional sheets. Copy the total to line 88.

$_____

**57. Is a depreciation schedule available for any of the property listed in Part 9?**

☑ No

☐ Yes

**58. Has any of the property listed in Part 9 been appraised by a professional within the last year?**

☑ No

☐ Yes

## Part 10:    Intangibles and intellectual property

**59. Does the debtor have any interests in intangibles or intellectual property?**

☑ No. Go to Part 11.

☐ Yes. Fill in the information below.

| General description | Net book value of debtor's interest<br>(Where available) | Valuation method used for current value | Current value of debtor's interest |
|---|---|---|---|
| **60. Patents, copyrights, trademarks, and trade secrets** | $_____ | _____ | $_____ |
| **61. Internet domain names and websites** | $_____ | _____ | $_____ |
| **62. Licenses, franchises, and royalties** | $_____ | _____ | $_____ |
| **63. Customer lists, mailing lists, or other compilations** | $_____ | _____ | $_____ |
| **64. Other intangibles, or intellectual property** | $_____ | _____ | $_____ |
| **65. Goodwill** | $_____ | _____ | $_____ |

**66. Total of Part 10.**

Add lines 60 through 65. Copy the total to line 89.

$_____

67. **Do your lists or records include personally identifiable information of customers (as defined in 11 U.S.C. §§ 101(41A) and 107)?**
- ☐ No
- ☐ Yes

68. **Is there an amortization or other similar schedule available for any of the property listed in Part 10?**
- ☐ No
- ☐ Yes

69. **Has any of the property listed in Part 10 been appraised by a professional within the last year?**
- ☐ No
- ☐ Yes

## Part 11: All other assets

70. **Does the debtor own any other assets that have not yet been reported on this form?**
Include all interests in executory contracts and unexpired leases not previously reported on this form.
- ☐ No. Go to Part 12.
- ☑ Yes. Fill in the information below.

                            **Current value of debtor's interest**

71. **Notes receivable**
Description (include name of obligor)
N/A

Total face amount − doubtful or uncollectible amount = ➔ $ N/A

72. **Tax refunds and unused net operating losses (NOLs)**

Description (for example, federal, state, local)
N/A

Tax year _____   $ N/A
Tax year _____   $_____
Tax year _____   $_____

73. **Interests in insurance policies or annuities**
N/A      $ N/A

74. **Causes of action against third parties (whether or not a lawsuit has been filed)**
See Exhibit A/B 11.74/75      $ Unknown

Nature of claim   Unknown

Amount requested   $ Unknown

75. **Other contingent and unliquidated claims or causes of action of every nature, including counterclaims of the debtor and rights to set off claims**
See Exhibit A/B 11.74/75      $ Unknown

Nature of claim   Unknown

Amount requested   $ Unknown

76. **Trusts, equitable or future interests in property**
Note for 76: The Debtor is not typically advised of the nature and extent of such gifts until the donor either gives notice to the Debtor or the donor (in the case of testamentary gifts) dies and the Debtor is notified by the donor's estate representative. At this time, the Debtor is not aware of the nature, extent or value of any such gifts. To the extent the Debtor learns of such gifts that may have existed as of the Petition Date, the Schedules will be amended.   $ Unknown

77. **Other property of any kind not already listed** *Examples:* Season tickets, country club membership
N/A      $ N/A

     $_____

78. **Total of Part 11.**
Add lines 71 through 77. Copy the total to line 90.      $ Unknown

79. **Has any of the property listed in Part 11 been appraised by a professional within the last year?**
- ☑ No
- ☐ Yes

| Part 12: | Summary |
| --- | --- |

In Part 12 copy all of the totals from the earlier parts of the form.

| Type of property | Current value of personal property | Current value of real property |
| --- | --- | --- |
| 80. **Cash, cash equivalents, and financial assets.** *Copy line 5, Part 1.* | $ 6,835,795.52 | |
| 81. **Deposits and prepayments.** *Copy line 9, Part 2.* | $ 347,403 | |
| 82. **Accounts receivable.** *Copy line 12, Part 3.* | $ 194,477.69 | |
| 83. **Investments.** *Copy line 17, Part 4.* | $ 17,773.51 | |
| 84. **Inventory.** *Copy line 23, Part 5.* | $ 474,179 | |
| 85. **Farming and fishing-related assets.** *Copy line 33, Part 6.* | $ 0.00 | |
| 86. **Office furniture, fixtures, and equipment; and collectibles.** *Copy line 43, Part 7.* | $ 0.00 | |
| 87. **Machinery, equipment, and vehicles.** *Copy line 51, Part 8.* | $ 0.00 | |
| 88. **Real property.** *Copy line 56, Part 9.* .................. ➜ | | $ 0.00 |
| 89. **Intangibles and intellectual property.** *Copy line 66, Part 10.* | $ 0.00 | |
| 90. **All other assets.** *Copy line 78, Part 11.* | + $ Unknown | |
| 91. **Total.** Add lines 80 through 90 for each column. ................... 91a. | $ Unknown | 91b. $ 0.00 |

92. **Total of all property on Schedule A/B.** Lines 91a + 91b = 92. .................................................... $ Unknown

**3. Checking, savings, money market, or financial brokerage accounts**

| Bank Name | Account Name | Account Number | Current Value of Debtor's Interest |
|---|---|---|---|
| First National Bank | Roman Catholic Diocese of Harrisburg | xxxx5731 | $ 3,199,962.00 |
| First National Bank | Credit Card Deposit | xxxxx7898 | 76,269.32 |
| First National Bank | Reserve Account | xxxx1834 | 670,099.20 |
| PNC Bank | Cemetery Deposit Account | xxxx1660 | 362.42 |
| PNC Bank | Operating Account | xxxxxx0537 | 627,985.75 |
| PNC Bank | Payroll Account (ZBA) | xxxxxx3375 | (37,111.20) |
| PNC Bank | Collateral Account | xxxxxx2348 | 1,500,001.63 |
| PNC Bank | Catholic Campus Ministry - Millersville | xxxxxx9327 | 5,086.81 |
| PNC Bank | Catholic Campus Ministry - Millersville | xxxxxx6552 | 265.59 |
| PNC Bank | Catholic Campus Ministry - Millersville | xxxxx8014 | 1,542.28 |
| PNC Bank | Insurance Acct | xxxx2616 | - |
| PNC Bank | Catholic Campus Ministry - F & M College | xxxxxx1215 | 3,442.59 |
| Orrstown Bank | Catholic Campus Ministry - Shippensburg | xxxxxx9187 | 565.00 |
| M & T Bank | Catholic Campus Ministry - Bucknell | xxxxxx4877 | 1,873.32 |
| M & T Bank | Catholic Campus Ministry - Bucknell Mass Account | xxxxxx8656 | 1,163.61 |
| M & T Bank | Catholic Campus Ministry - Gettysburg | xxxx2156 | 933.72 |
| First National Bank | Society for the Propagation of the Faith | xxxxxx8932 | ** |
| First National Bank | St. Thomas More Society of Central PA | xxxxxx9832 | ** |
| Fulton Bank | Catholic Campus Ministry - York College | xxxx3023 | 452.25 |
| First Columbia Bank | Catholic Campus Ministry - Bloomsburg | xx9923 | 1,769.93 |
| First Columbia Bank | Catholic Campus Ministry - Bloomsburg | xx9934 | 1,853.12 |
| | | | |
| Total | | | 6,056,517.34 |

Notes:
Note: Some of the foregoing amounts include funds that are restricted by donor and are not available for general use by the Debtor.

Note: Included above are custodial funds which the Debtor holds and administers for the benefit of third parties. The Debtor is a trustee or a conduit for transfer of the funds and, therefore, such custodial funds are not property of the estate pursuant to 11 U.S.C. § 541. Custodial funds total $26,941.97 as of the petition date.

Note: PNC Bank advised the Debtor that there are accounts not listed above that utilize the tax ID# of the Debtor. The Debtor has subsequently reached out to other financial institutions to identify any additional bank accounts that may be utilizing the tax ID# of the Debtor. The Debtor understands that certain non-Debtor entities historically used the Debtor's EIN to establish bank accounts and as a result there are numerous accounts that are not property of the Debtor where the Debtor tax ID# is used. The accounts are titled in the name and/or the address of the non-Debtor entity, the Debtor is not a signer on the accounts, and the accounts are addressed directly to the account owner. The Debtor has been working with the non-Debtor entities to correct the improper use of the Debtor's EIN. To the extent identified as of the date of filing these Schedules, these accounts are listed in the Statement of Financial Affairs (Section 11). The bank accounts noted on Statement of Financial Affairs Exhibit 11.21.2 are Trust Property held for another and are not property of the estate pursuant to 11 U.S.C. §541. To the extent the Debtor identifies additional accounts that need to be disclosed in Schedule A/B or the Statement of Financial Affairs, the Debtor will file amended information.

** In the original filing of the Schedules, this account was incorrectly listed as a Debtor account. The account is an asset of a third party religious organization which was using the EIN of the Debtor. This account should have been listed as Property Held for Others in the Statement of Financial Affairs.

**Roman Catholic Diocese of Harrisburg**
**Case No.: 1:20-00599 HWV**

SCHEDULE A/B
Part 2 Question 8
PREPAYMENTS

**AMENDED**
**EXHIBIT A/B.2.8**

| Prepayments Schedule | | |
|---|---|---|
| **Description** | **Holder of Prepayment** | **Current Value** |
| Retainer for Professional Services | Epiq Corporate Restructuring, LLC | $ 30,000 |
| Retainer for Professional Services | Waller Lansden Dortch & Davis, LLP | 163,744 |
| Retainer for Professional Services | Keegan, Linscott, and Associates, P.C. | 85,866 |
| Retainer for Professional Services | Kleinbard, LLC | 52,793 |
| | | |
| **Total Prepayments** | | $ 332,403 |
| | | |

| | 15. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including any interest in an LLC, partnership, or joint venture | | |
|---|---|---|---|

| Bank Name | Account Name | Account Number | Current Value of Debtor's Interest |
|---|---|---|---|
| JP Morgan | Select Asset Management<br>The Roman Catholic Diocese of Harrisburg Irrevocable Trust<br>Growth Fund & Fixed Income Fund | B52896002<br>B52897000 | |
| | Family Life Ministry - Retrouvaille Program Account | | $ 1,653.37 |
| | Mildred J & Harold B Heiss Flowers Fund - St. Joseph's Cemetery | | 6,067.14 |
| | Gettysburg College - Campus Ministry | | 1,476.23 |
| | Bucknell University - Campus Ministry | | 7,760.50 |
| | C.L.E.V.- Young Adult Ministry | | 816.27 |
| Total | | | $ 17,773.51 |
| | | | |

**Note:**
Some of the foregoing amounts may include amounts that are restricted by donors or third parties
and not available for general use by the debtor. In addition, the above may include custodial amounts
which the debtor holds and administers for other parties.

| Inventory Counts Schedule | | | | |
|---|---|---|---|---|
| Description | Date of Last Count | Net Book Value | Valuation Method Used | Current Value of Debtors Interest |
| Cemetery Inventory  - Crypts | 1/31/2020 | $          336,704.56 | Cost | $          336,704.56 |
| | | | | |
| Cemetery Inventory  - Foundations | 1/31/2020 | 53,567.98 | Cost | 53,567.98 |
| | | | | |
| Cemetery Inventory  - Niches | 1/31/2020 | 74,257.63 | Cost | 74,257.63 |
| | | | | |
| Cemetery Inventory  - Vaults | 1/31/2020 | 4,965.41 | Cost | 4,965.41 |
| | | | | |
| Cemetery Inventory  - Urns | 1/31/2020 | 4,683.05 | Cost | 4,683.05 |
| | | | | |
| Total Book Value of Inventory | | $          474,178.63 | | $          474,178.63 |
| | | | | |

| 74. Causes of action against third parties (whether or not a lawsuit has been filed) 75. Other contingent and unliquidated claims or causes of action of every nature | | | |
|---|---|---|---|
| **Named** | **Nature of Claim** | **Amount Requested** | **Current Value Of Debtor's Interest** |
| THE TRAVELERS COMPANIES, INC. | Insurance Coverage | Unknown | Unknown |
| ZURICH NORTH AMERICAN INSURANCE COMPANY | Insurance Coverage | Unknown | Unknown |
| UNDERWRITERS AT LLOYD'S LONDON; | Insurance Coverage | Unknown | Unknown |
| THE NATIONAL CATHOLIC RISK RETENTION GROUP | Insurance Coverage | Unknown | Unknown |
| INTERSTATE FIRE & CASUALTY COMPANY | Insurance Coverage | Unknown | Unknown |
| COLONIAL PENN LIFE INSURANCE COMPANY | Insurance Coverage | Unknown | Unknown |
| CATHOLIC MUTUAL GROUP | Insurance Coverage | Unknown | Unknown |
| ADORERS OF THE BLOOD OF CHRIST | Tort Liability | Unknown | Unknown |
| ARCHDIOCESE OF NEWARK | Tort Liability | Unknown | Unknown |
| ARCHDIOCESE OF NEW YORK | Tort Liability | Unknown | Unknown |
| SOCIETY OF THE PRECIOUS BLOOD, CINCINNATI PROVINCE, INC. | Tort Liability | Unknown | Unknown |
| CONGREGATION OF THE HOLY SPIRIT, PROVINCE OF THE UNITED STATES | Tort Liability | Unknown | Unknown |
| THE REDEMPTORIST FATHERS OF THE STATE OF PENNSYLVANIA | Tort Liability | Unknown | Unknown |
| DIOCESE OF MEMPHIS | Tort Liability | Unknown | Unknown |
| DIOCESE OF RICHMOND | Tort Liability | Unknown | Unknown |
| DIOCESE OF ALLENTOWN | Tort Liability | Unknown | Unknown |
| OBLATES OF ST. FRANCIS DESALES, INC. | Tort Liability | Unknown | Unknown |
| THE PROVINCE OF SAINT AUGUSTINE OF THE CAPUCHIN ORDER | Tort Liability | Unknown | Unknown |
| MISSIONARY OBLATES OF MARY IMMACULATE EASTERN PROVINCE, INC. | Tort Liability | Unknown | Unknown |
| SISTERS OF SAINT JOSEPH | Tort Liability | Unknown | Unknown |
| THE MARYLAND PROVINCE OF THE SOCIETY OF JESUS AND ITS CIVIL LAW COUNTERPART CORPORATION OF THE ROMAN CATHOLIC CLERGYMEN | Tort Liability | Unknown | Unknown |
| | | | |
| **Total** | | Unknown | Unknown |
| | | | |

Note: The Debtor may have claims against certain third parties who are or have been co-defendants in certain litigation alleging abuse claims against the Debtor or who have not been named in such suits but may still be liable to the Debtor for contribution or indemnification arising out of such claims. Such claims also include any other insurance coverage which may be discovered. All parties and amounts which the Debtor might recover are not known at this time.

Fill in this information to identify the case:

Debtor    Roman Catholic Diocese of Harrisburg

United States Bankruptcy Court for the:   Middle     District of   PA
                                                       (State)

Case number   1:20-00599 HWV
(if known)

☑ Check if this is an
   amended filing

## Official Form 206E/F

# Schedule E/F: Creditors Who Have Unsecured Claims

          12/15

Be as complete and accurate as possible. Use Part 1 for creditors with PRIORITY unsecured claims and Part 2 for creditors with NONPRIORITY unsecured claims. List the other party to any executory contracts or unexpired leases that could result in a claim. Also list executory contracts on *Schedule A/B: Assets - Real and Personal Property* (Official Form 206A/B) and on *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G). Number the entries in Parts 1 and 2 in the boxes on the left. If more space is needed for Part 1 or Part 2, fill out and attach the Additional Page of that Part included in this form.

### Part 1:   List All Creditors with PRIORITY Unsecured Claims

1. **Do any creditors have priority unsecured claims?** (See 11 U.S.C. § 507).
   ☐ No. Go to Part 2.
   ☑ Yes. Go to line 2.

2. **List in alphabetical order all creditors who have unsecured claims that are entitled to priority in whole or in part.** If the debtor has more than 3 creditors with priority unsecured claims, fill out and attach the Additional Page of Part 1.

|  |  | Total claim | Priority amount |
|---|---|---|---|
| **2.1** Priority creditor's name and mailing address<br>Employees of the Roman Catholic Diocese of Harrisburg<br><br>Individual employee data withheld - provided on request. | As of the petition filing date, the claim is: $ 182,609.18<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $ 182,609.18 | $ 182,609.18 |
| Date or dates debt was incurred<br>Various | Basis for the claim:<br>Accrued Paid Time Off | | |
| Last 4 digits of account number  __ __ __ __ | Is the claim subject to offset?<br>☐ No<br>☑ Yes | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( ____ ) | | | |
| **2.2** Priority creditor's name and mailing address<br><br> | As of the petition filing date, the claim is: $_____<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $_____ | |
| Date or dates debt was incurred | Basis for the claim: | | |
| Last 4 digits of account number  __ __ __ __ | Is the claim subject to offset?<br>☐ No<br>☐ Yes | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( ____ ) | | | |
| **2.3** Priority creditor's name and mailing address<br><br> | As of the petition filing date, the claim is: $_____<br>*Check all that apply.*<br>☐ Contingent<br>☐ Unliquidated<br>☐ Disputed | $_____ | |
| Date or dates debt was incurred | Basis for the claim: | | |
| Last 4 digits of account number  __ __ __ __ | Is the claim subject to offset?<br>☐ No<br>☐ Yes | | |
| Specify Code subsection of PRIORITY unsecured claim: 11 U.S.C. § 507(a) ( ____ ) | | | |

| Part 1. | Additional Page |
| --- | --- |

Copy this page if more space is needed. Continue numbering the lines sequentially from the previous page. If no additional PRIORITY creditors exist, do not fill out or submit this page.

**Total claim**    **Priority amount**

---

2._   Priority creditor's name and mailing address

$_____    $_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

_____

_____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

---

2._   Priority creditor's name and mailing address

$_____    $_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

_____

_____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

---

2._   Priority creditor's name and mailing address

$_____    $_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

_____

_____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

---

2._   Priority creditor's name and mailing address

$_____    $_____

_____

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

_____

_____

Date or dates debt was incurred

_____

Basis for the claim:

_____

Last 4 digits of account
number   ___ ___ ___ ___

Is the claim subject to offset?
☐ No
☐ Yes

Specify Code subsection of PRIORITY unsecured
claim: 11 U.S.C. § 507(a) (_____)

| **Part 2:** | **List All Creditors with NONPRIORITY Unsecured Claims** |

3. List in alphabetical order all of the creditors with nonpriority unsecured claims. If the debtor has more than 6 creditors with nonpriority unsecured claims, fill out and attach the Additional Page of Part 2.

**Amount of claim**

**3.1** Nonpriority creditor's name and mailing address
See E/F.2.3.1

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ 12,648,029.33

Basis for the claim: _____

Date or dates debt was incurred _____

Is the claim subject to offset?
☐ No
☐ Yes

Last 4 digits of account number ___ ___ ___ ___

**3.2** Nonpriority creditor's name and mailing address
See Exhibit E/F.2.3.2

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ Unknown

Basis for the claim: _____

Date or dates debt was incurred _____

Is the claim subject to offset?
☐ No
☐ Yes

Last 4 digits of account number ___ ___ ___ ___

**3.3** Nonpriority creditor's name and mailing address
See Exhibit E/F.2.3.3

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ Unknown

Basis for the claim: _____

Date or dates debt was incurred _____

Is the claim subject to offset?
☐ No
☐ Yes

Last 4 digits of account number ___ ___ ___ ___

**3.4** Nonpriority creditor's name and mailing address
Sealed Exhibit E/F.2.3.4

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ Unknown

Basis for the claim: _____

Date or dates debt was incurred _____

Is the claim subject to offset?
☐ No
☐ Yes

Last 4 digits of account number ___ ___ ___ ___

**3.5** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred _____

Is the claim subject to offset?
☐ No
☐ Yes

Last 4 digits of account number ___ ___ ___ ___

**3.6** Nonpriority creditor's name and mailing address

As of the petition filing date, the claim is:
*Check all that apply.*
☐ Contingent
☐ Unliquidated
☐ Disputed

$ _____

Basis for the claim: _____

Date or dates debt was incurred _____

Is the claim subject to offset?
☐ No
☐ Yes

Last 4 digits of account number ___ ___ ___ ___

| Part 4: | Total Amounts of the Priority and Nonpriority Unsecured Claims |
|---|---|

5. Add the amounts of priority and nonpriority unsecured claims.

|  |  | Total of claim amounts |
|---|---|---|
| 5a. Total claims from Part 1 | 5a. | $ 182,609.18 |
| 5b. Total claims from Part 2 | 5b. + | $ Unknown |
| 5c. Total of Parts 1 and 2<br>Lines 5a + 5b = 5c. | 5c. | $ Unknown |

## Unsecured Creditors

| Name | Address | Address 2 | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid- ated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Roman Catholic Diocese of Harrisburg Priest Pension Plan | 4800 Union Deposit Rd | | Harrisburg | PA | 17111-3710 | 2987 | 43647 | No | | | | Unsecured Loan | 12,500,000.00 |
| Ahold Financial Services | 3213 Payphere Circle | | Chicago | IL | 60674 | 66 | Various | No | | | | Trade Payables | 341.81 |
| Angela Theresa Gennaria | 146 West Third Street | | Bloomsburg | PA | 17815 | N/A | Various | No | | | | Trade Payables | 1,978.80 |
| Best Line Equipment | 6700 Allentown Blvd | | Harrisburg | PA | 17112 | N/A | Various | No | | | | Trade Payables | 44.62 |
| Browns Landscaping, LLC | 235 West 4th Street | | Bloomsburg | PA | 17815 | 3112 | Various | No | | | | Trade Payables | 425.00 |
| Brubaker, Inc. | PO Box 4334 | | Lancaster | PA | 17604-4334 | 4412 | Various | No | | | | Trade Payables | 727.44 |
| C F Acri And Son, Inc. | 3601 N. Sixth St. (Rear) | | Harrisburg | PA | 17110 | N/A | Various | No | | | | Trade Payables | 4,604.00 |
| Cathedral Corporation | 632 Ellsworth Road | | Rome | NY | 13441 | N/A | Various | No | | | | Trade Payables | 30,473.25 |
| Capital Business Systems | 2708 Commerce Dr Ste 100 | | Harrisburg | PA | 17110 | 953C | Various | No | | | | Trade Payables | 586.60 |
| Catholic Engaged Encounter | 124 Chatham Drive | | Oakdale | NY | 11769-1436 | 0304 | Various | No | | | | Trade Payables | 80.00 |
| Catholicphilly.com | 222 N 17th St, 9th Floor | | Philadelphia | PA | 19103 | N/A | Various | No | | | | Trade Payables | 950.00 |
| Chiedozie F Ononuju | 16300 Old Emmitsburg Rd. | | Emmitsburg | MD | 21727 | 4449 | Various | No | | | | Trade Payables | 304.00 |
| Crystal Springs | PO Box 660579 | | Dallas | TX | 75266-0579 | 1250 | Various | No | | | | Trade Payables | 12.47 |
| Dempsey | 1200 Mid Valley Drive | | Jessup | PA | 18434 | 286 | Various | No | | | | Trade Payables | 127.38 |
| Dominican Province St. Joseph | PO Box 5087 | | West Hyattsville | MD | 20782 | 8149 | Various | No | | | | Trade Payables | 517.88 |
| D'Vinci Interactive, Inc. | 28 S Potomac St, 4th Floor | | Hagerstown | MD | 21740 | 1010 | Various | No | | | | Trade Payables | 1,210.00 |
| EP Sports Officiating | 2410 Walnut Bottom Road | | Carlisle | PA | 17015 | N/A | Various | No | | | | Trade Payables | 160.00 |
| Evans Burial Vaults, Inc. | 15 Graybill Road | | Leola | PA | 17540 | N/A | Various | No | | | | Trade Payables | 1,120.00 |
| Felicia Obrien | 3 King Ave | | Shamokin Dam | PA | 17876 | N/A | Various | No | | | | Trade Payables | 2,473.50 |
| Filson Water, LLC | 11 Roadway Drive, STE A | | Carlisle | PA | 17015-8836 | 1016 | Various | No | | | | Trade Payables | 19.90 |
| Fletchers Services | 106 S York Rd | | Dillsburg | PA | 17019 | N/A | Various | No | | | | Trade Payables | 165.00 |
| Forever Media, Inc. | 275 Radio Road | | Hanover | PA | 17331 | 4737 | Various | No | | | | Trade Payables | 480.00 |
| Fr Javed Kashif | 68 Center Street | | Danville | PA | 17821 | N/A | Various | No | | | | Trade Payables | 49.47 |
| Fr John A Szada Jr | 430 Monastery Road | | Elysburg | PA | 17824 | N/A | Various | No | | | | Trade Payables | 298.47 |
| Fr Olusola Adewole | 4504 21 St. | | Mount Rainier | MD | 20712-2408 | N/A | Various | No | | | | Trade Payables | 107.98 |
| Francis C Gorman | 19 Kensington Square | | Mechanicsburg | PA | 17050 | N/A | Various | No | | | | Trade Payables | 395.76 |

## Unsecured Creditors

| Name | Address | Address 2 | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid-ated | Disputed | Basis for Claim | Amount Due |
|------|---------|-----------|------|-------|------------------|--------------------------|---------------|--------------------|------------|---------------|----------|-----------------|------------|
| Franciscan Friars | PO Box 188 | | Loretto | PA | 5940 | 1951 | Various | No | | | | Trade Payables | 4,706.00 |
| Guernsey Office Products, Inc. | PO Box 61770 | | Harrisburg | PA | 17106 | 6100 | Various | No | | | | Trade Payables | 387.09 |
| HB McClure Company | 600 S 17th St., PO Box 1745 | | Harrisburg | PA | 17104 | 742M | Various | No | | | | Trade Payables | 1,468.17 |
| Hornungs Family Home Center, Inc. | 6005 Bluebird Ave. | | Linglestown | PA | 17112 | 54 | Various | No | | | | Trade Payables | 103.47 |
| Hughes Awards & Sporting | 6 West Main St. | | Hummelstown | PA | 17036 | N/A | Various | No | | | | Trade Payables | 710.00 |
| IHeart Media, Inc. | PO Box 406372 | | Atlanta | GA | 30384-6372 | 1714 | Various | No | | | | Trade Payables | 1,900.00 |
| Jeffrey'S Flowers | 5217 Simpson Ferry Rd | | Mechanicsburg | PA | 17050 | N/A | Various | No | | | | Trade Payables | 210.45 |
| Joseph C Carolin | 4276 Spring Rd | | Chambersburg | PA | 17201 | N/A | Various | No | | | | Trade Payables | 1,155.62 |
| Keeton Lockwood | 4800 Union Deposit Road | | Harrisburg | PA | 17111-3710 | N/A | Various | No | | | | Trade Payables | 131.10 |
| Kelsi J Graff | 109 Middle Road | | Halifax | PA | 17032 | 5276 | Various | No | | | | Trade Payables | 160.00 |
| Kerrys Lawn And Garden | 641 N Mountain Road | | Harrisburg | PA | 17112 | 4804 | Various | No | | | | Trade Payables | 700.88 |
| Law And Grace Consulting | 810 Trolley Rd | | York Springs | PA | 17372 | N/A | Various | No | | | | Trade Payables | 13,000.00 |
| Lebanon Building Supply | 225 N 10th Street | | Lebanon | PA | 17046-4898 | 1907 | Various | No | | | | Trade Payables | 43.18 |
| Lowes | PO Box 530970 | | Atlanta | GA | 30353 | 9383 | Various | No | | | | Trade Payables | 308.55 |
| Maria Elizabeth Erling | 723 Springs Ave | | Gettysburg | PA | 17325 | N/A | Various | No | | | | Trade Payables | 250.00 |
| Mount St. Mary's University - Acct & Fin | 16300 Old Emmitsburg Road | | Emmitsburg | MD | 21727 | 9952 | Various | No | | | | Trade Payables | 48,843.49 |
| North Haven Ag Center, LLC | 853 Elysburg Rd. | | Danville | PA | 17821 | N/A | Various | No | | | | Trade Payables | 44.93 |
| Olivers Cleaning Service | 180 Homestead Lane | | Mifflinburg | PA | 17844 | N/A | Various | No | | | | Trade Payables | 320.00 |
| Pennsylvania Catholic Conference | 214 State St, PO Box 2835 | | Harrisburg | PA | 17105 | N/A | Various | No | | | | Trade Payables | 12,195.76 |
| Price Rite | 236 Raritan Center Pkwy | | Edison | NJ | 8837 | 1373 | Various | No | | | | Trade Payables | 433.25 |
| R F Faeer Company | 3901 Derry St. | | Harrisburg | PA | 17111 | 4659 | Various | No | | | | Trade Payables | 1,046.07 |
| Rozema Printing, LLC | 4790 Derry Street | | Harrisburg | PA | 17111 | N/A | Various | No | | | | Trade Payables | 912.07 |
| Saint John Vianney Center | 151 Woodbine Road | | Downingtown | PA | 19335 | 1914 | Various | No | | | | Trade Payables | 640.00 |
| Sisters-Saints Cyril & Mtheds | 580 Railroad St | | Danville | PA | 17821 | N/A | Various | No | | | | Trade Payables | 4,345.11 |
| Shred-It USA, LLC | 595 East Oregon Rd | | Lititz | PA | 17543 | N/A | Various | No | | | | Trade Payables | 48.60 |
| Standard Concrete Products Company | 700 N Shermans Street | | York | PA | 17402 | 9150 | Various | No | | | | Trade Payables | 185.81 |

## Unsecured Creditors

| Name | Address | Address 2 | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliqui- dated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stauffers of Kissel Hill | PO Box 1500 | | Lititz | PA | 17543 | 1440 | Various | No | | | | Trade Payables | 89.97 |
| Sunbury Broadcasting Corp | PO Box 1070 | | Sunbury | PA | 17801 | N/A | Various | No | | | | Trade Payables | 896.00 |
| Susquehanna Fire Equipment Company | PO Box 209 | | Dewart | PA | 17730 | 4500 | Various | No | | | | Trade Payables | 44.15 |
| Talley Petroleum Enterprises Inc | 10046 Allentown Blvd | | Grantville | PA | 17028 | 2190 | Various | No | | | | Trade Payables | 1,816.00 |
| The Master Teacher | PO Box 1207 | | Manhattan | KS | 66505 | N/A | Various | No | | | | Trade Payables | 357.22 |
| The Sherwin Williams Company | 4919 Jonestown Road | | Harrisburg | PA | 17109-1705 | 465-8 | Various | No | | | | Trade Payables | 31.16 |
| Tulpehocken Moutain Spring Water | 750 Point Township Drive | | Northumberland | PA | 17857-8789 | 3785 | Various | No | | | | Trade Payables | 53.50 |
| Two Gals' Catering | 1020 Orange Street | | Steelton | PA | 17113 | N/A | Various | No | | | | Trade Payables | 428.00 |
| Tyler M Shanabrook | 212 Barley Field Cir | | Carlisle | PA | 17015 | N/A | Various | No | | | | Trade Payables | 95.40 |
| Vital Sources, LLC | 116 Record Street | | Frederick | MD | 21701-5418 | K-MW | Various | No | | | | Trade Payables | 350.00 |
| William O Robin | 1623 Josephine Ann Drive | | Lebanon | PA | 17046 | N/A | Various | No | | | | Trade Payables | 1,250.00 |
| WXPN | PO Box 8419 | | Philadelphia | PA | 19101 | 2092 | Various | No | | | | Trade Payables | 715.00 |
| | | | | | | | | | | | | | |
| **TOTAL** | | | | | | | | | | | | | **12,648,029.33** |

Note 1: Amounts listed above are liquidated amounts owed to creditor for current prepetition claims and reflect those liquidated amounts are not disputed, contingent or unliquidated.

Note 2: The sex abuse claims which are Schedule F claims have been listed and redacted in accordance with the "Debtor's Emergency Motion For An Order Authorizing The Debtor To File Under Seal Portions Of Schedule E/F, The Creditor Matrix, and Other Pleadings And Documents." In the situation where a multiple confidential claimants are represented by one law firm, the number of confidential claimants represented by a law firm is noted and only one entry appears on Schedule F. In all other instances, there is a separate redacted entry for each potential claimant/creditor.

## Unsecured Creditors - Insurance Claims (Non-Abuse Claims)

| Name | Address | City | State | Postal / Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid-ated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saramia Matos-Rodriquez - A MINOR | 3405 Hillcrest Road | Harrisburg | PA | 17109 | 8492 | 4/9/2019 | No | X | X | X | Insurance Claim | Unknown |
| David Schaeffer | 510 N 2Nd St. | Shamokin | PA | 17872 | 6168 | 9/25/2019 | No | X | X | X | Insurance Claim | Unknown |
| Tim Yashur | 36 Washington Rd. | New Freedom | PA | 17402 | 0249 | 1/19/2020 | No | X | X | X | Insurance Claim | Unknown |
| Mary Crosman | 105 Pheasant Run Ln | Hanover | PA | 17331 | 0420 | 1/27/2020 | No | X | X | X | Insurance Claim | Unknown |
| Melissa Guy | 34 Tyler Drive | Hanover | PA | 17331 | 7431 | 11/8/2019 | No | X | X | X | Insurance Claim | Unknown |
| Patricia Vetovich | 4280 Upper Rd. | Shamokin | PA | 17872 | 0444 | 1/24/2020 | No | X | X | X | Insurance Claim | Unknown |
| Christine Leibig | 111 Fishburn St. | Harrisburg | PA | 17109 | 0573 | 2/3/2020 | No | X | X | X | Insurance Claim | Unknown |
| Joseph Brlansky | 144 Weldon Drive | York | PA | 17404 | 0614 | 1/27/2020 | No | X | X | X | Insurance Claim | Unknown |
| Janice Albright | 394 Dermudian Creek Rd | East Berlin | PA | 17316 | 0631 | 2/5/2020 | No | X | X | X | Insurance Claim | Unknown |
| Angela Heinick | 4 W Schoolside Drive | Mechanicsburg | PA | 17055 | 0742 | 2/12/2020 | No | X | X | X | Insurance Claim | Unknown |
| Kateri Bright | 254 Huntington Dr. | Mountville | PA | 17554 | 0791 | 2/13/2020 | No | X | X | X | Insurance Claim | Unknown |
| Michelle Pieters | 605 Woodhall Dr | Willow Street | PA | 17584 | 0904 | 2/19/2020 | No | X | X | X | Insurance Claim | Unknown |
| Deborah Miehl | 417 Rabbit Hill Lane | Lancaster | PA | 17603 | 5696 | 9/9/2019 | No | X | X | X | Insurance Claim | Unknown |
| Skylar Banks | C/O Silvers Langsam & Weitzman 2 Penn Center Plaza, Suite 1410 | Philadelphia | PA | 19102 | 7057 | 9/17/2016 | No | X | X | X | Insurance Claim | Unknown |
| Nancy Barbour | 130 Longview Blvd | Gettysburg | PA | 17325 | 6309 | 9/29/2019 | No | X | X | X | Insurance Claim | Unknown |
| Eileen Woolen | 78 Courtyards Dr | Shrewsburg | PA | 17361 | 7012 | 10/30/2019 | No | X | X | X | Insurance Claim | Unknown |
| Leslie Wilsbach | 4436 Saybrook Lane | Harrisburg | PA | 17110 | 7116 | 10/31/2019 | No | X | X | X | Insurance Claim | Unknown |
| Nathan Delp | 6597 Mifflin Ave | Harrisburg | PA | 17111 | 7219 | 8/23/2019 | No | X | X | X | Insurance Claim | Unknown |
| Ronald Kline | 70 Dubbers Drive | Etters | PA | 17319 | 7366 | 11/13/2019 | No | X | X | X | Insurance Claim | Unknown |
| Saramia Matos-Rodriquez | 3405 Hillcrest Road | Harrisburg | PA | 17109 | 7424 | 4/9/2019 | No | X | X | X | Insurance Claim | Unknown |
| Kayden Parris | C/O Valerie Parris  1335 Karens Way | York | PA | 17402 | 7796 | 12/18/2018 | No | X | X | X | Insurance Claim | Unknown |
| Hollingshead, David | 2089 Stetler Dr. | Coal Township | PA | 17866 | 9559 | 6/12/2013 | No | X | X | X | Insurance Claim | Unknown |
| Fayock, Vincent | 550 Burner Ave | Hazleton | PA | 18201 | 5508 | 8/5/2016 | No | X | X | X | Insurance Claim | Unknown |

## Unsecured Creditors - Insurance Claims (Non-Abuse Claims)

| Name | Address | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid-ated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Meagher, Elizabeth | 229 Walton St. | Lemoyne | PA | 17043 | 0051 | 1/5/2017 | No | X | X | X | Insurance Claim | Unknown |
| Finegan Mickenzie | 617 Mnr St | Columbia | PA | 17512 | 1363 | 3/20/2017 | No | X | X | X | Insurance Claim | Unknown |
| Elizabeth Rodriquez | 26 1/2 South Prince St. | Lancaster | PA | 17602 | 1759 | 3/26/2018 | No | X | X | X | Insurance Claim | Unknown |
| St Philip The Apostle | 2111 Millersville Pike | Lancaster | PA | 17603 | 2342 | 4/25/2018 | No | X | X | X | Insurance Claim | Unknown |
| Sherry Koons | 203 Hummel St. | Hummelstown | PA | 17036 | 3189 | 5/4/2018 | No | X | X | X | Insurance Claim | Unknown |
| Ian Black | 107 Overlook Ave. | Lancaster | PA | 17601 | 7378 | 11/26/2018 | No | X | X | X | Insurance Claim | Unknown |
| Beverly Dorsey | 122 Curvin Dr | Harrisburg | PA | 17112 | 0418 | 1/26/2019 | No | X | X | X | Insurance Claim | Unknown |
| Elizabeth Baak | 100 Pond Vista Land Apt P | Manheim | PA | 17545 | 0657 | 2/1/2019 | No | X | X | X | Insurance Claim | Unknown |
| Kerry Neiderer | 506 Poplar St | Hanover | PA | 17331 | 1022 | 2/16/2019 | No | X | X | X | Insurance Claim | Unknown |
| Dorothea Parrish | 138 Deerfield Dr | Pequea | PA | 17565 | 3333 | 5/19/2019 | No | X | X | X | Insurance Claim | Unknown |
| Steven Harkins | 407 West King St. | Lancaster | PA | 17603 | 3414 | 5/30/2019 | No | X | X | X | Insurance Claim | Unknown |
| Barry Heberling | 345 Cedar Lane | Mount Joy | PA | 17552 | 6474 | 10/8/2019 | No | X | X | X | Insurance Claim | Unknown |
| Jessica Goetze | 1118 Kochenderfer Rd | Lebanon | PA | 17046 | 6568 | 10/3/2019 | No | X | X | X | Insurance Claim | Unknown |
| Nadiad Reich | 1645 West Lynn Street | Coal Township | PA | 17866 | 6914 | 2/1/2019 | No | X | X | X | Insurance Claim | Unknown |
| Lisa Pantano | 865 Oakwood Dr. | Red Lion | PA | 17356 | 7430 | 11/16/2019 | No | X | X | X | Insurance Claim | Unknown |
| Barbara Campbell | 8405 Bull Rd. | Lewisberry | PA | 17339 | 7658 | 11/23/2019 | No | X | X | X | Insurance Claim | Unknown |
| St Theresa Parish | 1300 Bridge St. | New Cumberland | PA | 17070 | 7669 | 12/1/2019 | No | X | X | X | Insurance Claim | Unknown |
| Thomas Wagner | 827 Spruce St | Kulpmont | PA | 17834 | 7685 | 12/1/2019 | No | X | X | X | Insurance Claim | Unknown |
| Karen Mclaughlin | 136 W Main St. | Elizabethville | PA | 17023 | 7819 | 12/6/2019 | No | X | X | X | Insurance Claim | Unknown |
| Carlos Rojas | 565 Poplar Church Rd | Camp Hill | PA | 17011 | 0448 | 1/21/2020 | No | X | X | X | Insurance Claim | Unknown |

## Unsecured Creditors - Insurance Claims (Non-Abuse Claims)

| Name | Address | City | State | Postal/Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ferdinand Caraballo | 110 Oakleigh Ave | Harrisburg | PA | 17111 | 0060 | 1/8/2020 | No | X | X | X | Insurance Claim | Unknown |
| Saint Anthony of Padua Parish Charitable Trust | 501 East Orange Street | Lancaster | PA | 17602 | 3396 | 5/30/2019 | No | X | X | X | Insurance Claim | Unknown |
| Saint Benedict the Abbot Parish Charitable Trust | 1300 Lehman Street | Lebanon | PA | 17046 | 7437 | 11/17/2019 | No | X | X | X | Insurance Claim | Unknown |
| Saint John The Baptist Parish And School Charitable Trust | 315 North Constitution Avenue | New Freedom | PA | 17349 | 7012 | 10/30/2019 | No | X | X | X | Insurance Claim | Unknown |
| Sacred Heart of Jesus Parish and School Charitable Trust | 558 West Walnut Street | Lancaster | PA | 17603 | 7803 | 12/3/2019 | No | X | X | X | Insurance Claim | Unknown |
| Annunciation B.V.M. Parish Charitable Trust | 26 North Third Street | McSherrystown | PA | 17344 | 8102 | 11/28/2019 | No | X | X | X | Insurance Claim | Unknown |
| Annunciation B.V.M. Parish Charitable Trust | 26 North Third Street | McSherrystown | PA | 17344 | 8194 | 12/28/2019 | No | X | X | X | Insurance Claim | Unknown |
| Saint Catherine Laboure Parish And School Charitable Trust | 4000 Derry Street | Harrisburg | PA | 17111 | 8352 | 12/26/2019 | No | X | X | X | Insurance Claim | Unknown |
| Saint Joseph Parish Charitable Trust | 721 Monroe Street | Berwick | PA | 18603 | 8439 | 11/2/2014 | No | X | X | X | Insurance Claim | Unknown |
| Our Lady of Mercy Parish Charitable Trust | 304 Slabtown Road | Catawissa | PA | 17820 | 3432 | 4/15/2019 | No | X | X | X | Insurance Claim | Unknown |
| Sacred Heart of Jesus Parish and School Charitable Trust | 558 West Walnut Street | Lancaster | PA | 17603 | 5857 | 9/14/2019 | No | X | X | X | Insurance Claim | Unknown |
| Bucknell University, Catholic Campus Ministry | 610 St George St. | Lewisburg | PA | 17837 | 0023 | 1/1/2018 | No | X | X | X | Insurance Claim | Unknown |
| TOTAL | | | | | | | | | | | | Unknown |

**Note 1:** Amounts listed above are related to insurance claims and are disputed, contingent or unliquidated.

**Note 2:** The sex abuse claims which are Schedule F claims have been listed and redacted in accordance with the "Debtor's Emergency Motion For An Order Authorizing The Debtor To File Under Seal Portions Of Schedule E/F, The Creditor Matrix, and Other Pleadings And Documents." In the situation where a multiple confidential claimants are represented by one law firm, the number of confidential claimants represented by a law firm is noted and only one entry appears on Schedule F. In all other instances, there is a separate redacted entry for each potential claimant/creditor.

## Unsecured Creditors – Affiliated Religious Organizations

| Name | Address | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliqui-dated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Catholic Charities, Inc. | 939 East Park Drive Suite 201 | Harrisburg | PA | 171111 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Roman Catholic Diocese Charitable Trust | 4800 Union Deposit Rd | Harrisburg | PA | 17111-3710 | N/A | Unknown | No | X | X | X | PNC Debt | Unknown |
| Bishop McDevitt High School of Harrisburg | 1 Crusader Way | Harrisburg | PA | 17111 | N/A | Unknown | No | X | X | X | PNC Debt, Tort, Other | Unknown |
| Saint Andrew Parish and School Charitable Trust | 12 N. Broad Street | Waynesboro | PA | 17268 | N/A | Unknown | No | X | X | X | LOC, Tort | Unknown |
| Saint Benedict the Abbot Parish Charitable Trust | 1300 Lehman Street | Lebanon | PA | 17046 | N/A | Unknown | No | X | X | X | LOC, Tort | Unknown |
| Saint Francis Xavier Parish and School Charitable Trust | 455 Table Rock Road | Gettysburg | PA | 17325 | N/A | Unknown | No | X | X | X | LOC, Tort | Unknown |
| Saint Leo the Great Parish and School Charitable Trust | 2427 Marietta Avenue | Lancaster | PA | 17601 | N/A | Unknown | No | X | X | X | LOC, Tort | Unknown |
| Annunciation B.V.M. Parish Charitable Trust | 26 North Third Street | McSherrystown | PA | 17344 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Assumption BVM Parish Charitable Trust | 119 South Prince Street | Lancaster | PA | 17603 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Assumption BVM Parish Charitable Trust | 2 North Eighth Street | Lebanon | PA | 17046 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Basilica of the Sacred Heart Parish Charitable Trust | 30 Basilica Drive | Hanover | PA | 17331 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Christ the King Parish Charitable Trust | P.O. Box 297 | Benton | PA | 17814 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Corpus Christi Parish and School Charitable Trust | 320 Philadelphia Avenue | Chambersburg | PA | 17201 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Delone Catholic High School McSherrystown | 140 South Oxford Avenue | McSherrystown | PA | 17344 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Divine Redeemer Parish Charitable Trust | 438 West Avenue | Mount Carmel | PA | 17851 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Good Shepherd Parish and School Charitable Trust | 3435 Trindle Road | Camp Hill | PA | 17011 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Harrisburg Catholic Elementary School | 212 State Street | Harrisburg | PA | 17101 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Angels Parish Charitable Trust | 855 Scott Street | Kulpmont | PA | 17834 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Family Consolidated School Charitable Trust | 728 Washington Street | Berwick | PA | 18603-1719 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Family Parish Charitable Trust | 555 25th Street | Harrisburg | PA | 17104 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Infant Parish Charitable Trust | 535 Conewago Creek Road | Manchester | PA | 17345 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Name of Jesus Parish and School Charitable Trust | 6150 Allentown Boulevard | Harrisburg | PA | 17112 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |

## Unsecured Creditors – Affiliated Religious Organizations

| Name | Address | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid-ated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Holy Spirit Parish Charitable Trust | 300 West Pine Street | Palmyra | PA | 17078 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Trinity Catholic School | 231 South Beaver Street | York | PA | 17403 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Holy Trinity Parish Charitable Trust | 409 Cherry Street | Columbia | PA | 17512 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Immaculate Conception B.V.M. Parish Charitable Trust | 1730 Fowler Avenue | Berwick | PA | 18603 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Immaculate Conception B.V.M. Parish Charitable Trust | 106 Carlisle Street | New Oxford | PA | 17350 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Immaculate Conception BVM Parish Charitable Trust | 256 Tract Road | Fairfield | PA | 17320 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Immaculate Conception BVM Parish Charitable Trust | 309 South George Street | York | PA | 17403 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Immaculate Heart of Mary Parish Charitable Trust | 6084 West Canal Road | Abbottstown | PA | 17301-9051 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Lancaster Catholic High School of Diocese of Harrisburg | 650 Juliette Avenue | Lancaster | PA | 17601-4360 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Lebanon Catholic School of Diocese of Harrisburg | 1400 Chestnut Street | Lebanon | PA | 17042-4522 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Mary, Gate of Heaven Parish Charitable Trust | 188 West McKinley Avenue | Myerstown | PA | 17067 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Mary, Mother of the Church Parish Charitable Trust | 625 Union School Road | Mount Joy | PA | 17552 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Mater Dei Latin Mass Community Charitable Trust | 110 State Street | Harrisburg | PA | 17101 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Mother Cabrini Parish Charitable Trust | 214 North Shamokin Street | Shamokin | PA | 17872 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady Help of Christians Parish Charitable Trust | 732 East Main Street | Lykens | PA | 17048 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Fatima Parish Charitable Trust | C/O 2 North Eighth Street | Lebanon | PA | 17046 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Good Counsel Parish Charitable Trust | 121 William Street | Marysville | PA | 17053 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Hope Parish Charitable Trust | 863 West Chestnut Street | Coal Township | PA | 17866 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Lourdes Parish Charitable Trust | 225 Salt Road | Enola | PA | 17025 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Lourdes Parish Charitable Trust | 150 Water Street | New Holland | PA | 17557 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Lourdes Regional School | 2001 Clinton Avenue | Coal Township | PA | 17866-1660 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Mercy Parish Charitable Trust | 304 Slabtown Road | Catawissa | PA | 17820 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Mount Carmel Parish Charitable Trust | 47 South Market Street | Mount Carmel | PA | 17851 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |

## Unsecured Creditors - Affiliated Religious Organizations

| Name | Address | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid- ated | Disputed | Basis for Claim | Amount Due |
|------|---------|------|-------|------------------|--------------------------|---------------|--------------------|-----------|----------------|----------|-----------------|------------|
| Our Lady of Refuge Parish Charitable Trust | 21169 Cross Road | Doylesburg | PA | 17219 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of the Angels School | 404 Cherry Street | Columbia | PA | 17512 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of The Blessed Sacrament Parish Charitable Trust | 2121 North Third Street | Harrisburg | PA | 17110 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Lady of Visitation Parish Charitable Trust | 305 North Prince Street | Shippensburg | PA | 17257 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Our Mother of Perpetual Help Parish Charitable Trust | 320 Church Avenue | Ephrata | PA | 17522 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Prince of Peace Parish Charitable Trust | 815 South Second Street | Steelton | PA | 17113 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Queen of Peace Parish Charitable Trust | 202 Zimmerman Road | Millersburg | PA | 17061 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Queen of the Most Holy Rosary Parish Charitable Trust | 599 West Center Street | Elysburg | PA | 17824 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Resurrection School | 521 East Orange Street | Lancaster | PA | 17602-3033 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Sacred Heart of Jesus Parish and School Charitable Trust | 558 West Walnut Street | Lancaster | PA | 17603 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Sacred Heart of Jesus Parish and School Charitable Trust | 9 N. Brown Street | Lewistown | PA | 17044 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Sacred Heart of Jesus Parish Charitable Trust | P.O. Box 136 | Cornwall | PA | 17016 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Sacred Heart of Jesus Parish Charitable Trust | 814 Saint Louis Street | Lewisburg | PA | 17837 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Sacred Heart of Jesus Parish Charitable Trust | 1031 Sprenkle Road | Spring Grove | PA | 17362 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Sacred Heart of Jesus Parish Charitable Trust | C/O 732 East Main Street | Lykens | PA | 17048 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Aloysius Parish Charitable Trust | 29 South Queen Street | Littlestown | PA | 17340 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Anne Parish and School Charitable Trust | 929 North Duke Street | Lancaster | PA | 17602 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Anthony of Padua Parish Charitable Trust | 501 East Orange Street | Lancaster | PA | 17602 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Bernadette Parish Charitable Trust | C/O 121 William Street | Duncannon | PA | 17020 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Bernard Parish Charitable Trust | P.O. Box 25 | New Bloomfield | PA | 17068 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Catherine Laboure Parish and School Charitable Trust | 4000 Derry Street | Harrisburg | PA | 17111 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Catherine of Siena Parish Charitable Trust | 955 Robert Fulton Highway | Quarryville | PA | 17566 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Cecilia Parish Charitable Trust | 120 East Lehman Street | Lebanon | PA | 17046 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Name** | **Address** | **City** | **State** | **Postal / Zip Code** | **Last 4 of Account Number** | **Date Incurred** | **Subject to Setoff?** | **Contingent** | **Unliqui-dated** | **Disputed** | **Basis for Claim** | **Amount Due** |
| Saint Columba Parish and School Charitable Trust | P. O. Box 829 | Bloomsburg | PA | 17815 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Elizabeth Ann Seton Parish Charitable Trust | 310 Hertzler Road | Mechanicsburg | PA | 17055 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Francis of Assisi Parish Charitable Trust | 1439 Market Street | Harrisburg | PA | 17103 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Ignatius Loyola Parish Charitable Trust | 1095 Church Road | Orrtanna | PA | 17353 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint James Parish Charitable Trust | 505 Woodcrest Avenue | Lititz | PA | 17543 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joan of Arc Parish and School Charitable Trust | 359 West Areba Avenue | Hershey | PA | 17033 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint John Neumann Parish Charitable Trust | 601 East Delp Road | Lancaster | PA | 17601 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint John the Baptist Parish and School Charitable Trust | 315 North Constitution Avenue | New Freedom | PA | 17349 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish and School Charitable Trust | 68 Center Street | Danville | PA | 17821 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish and School Charitable Trust | 5055 Grandview Road | Hanover | PA | 17331 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish and School Charitable Trust | 410 E. Simpson Street | Mechanicsburg | PA | 17055 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish and School Charitable Trust | 2935 Kingston Road | York | PA | 17402 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish Charitable Trust | 721 Monroe Street | Berwick | PA | 18603 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish Charitable Trust | 251 East Main Street | Dallastown | PA | 17313 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish Charitable Trust | 440 Saint Joseph Street | Lancaster | PA | 17603 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph Parish Charitable Trust | 109 Broadway | Milton | PA | 17847 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Joseph the Worker Parish Charitable Trust | 12 East Hanover Street | Gettysburg | PA | 17325 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Jude Thaddeus Parish Charitable Trust | P O Box 187 | Mifflintown | PA | 17059 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Katharine Drexel Parish Charitable Trust | 1 Peter Drive | Mechanicsburg | PA | 17050 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Luke the Evangelist Parish Charitable Trust | 395 South Ridge Avenue | Greencastle | PA | 17225 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Margaret Mary Alacoque Parish and School Charitable Trust | 2848 Herr Street | Harrisburg | PA | 17103 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Mark the Evangelist Parish Charitable Trust | 395 South Ridge Avenue | Greencastle | PA | 17225 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Matthew the Apostle and Evangelist Parish Charitable Trust | 607 Storey Creek Drive | Dauphin | PA | 17018 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |

Unsecured Creditors - Affiliated Religious Organizations

| Name | Address | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid- ated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Saint Monica Parish Charitable Trust | 109 Market Street | Sunbury | PA | 17801 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Patrick Cathedral Parish Charitable Trust | 212 State Street | Harrisburg | PA | 17101 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Patrick Parish and School Charitable Trust | 152 East Pomfret Street | Carlisle | PA | 17013 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Patrick Parish Charitable Trust | 331 West Shamokin Street | Trevorton | PA | 17881 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Paul the Apostle Parish Charitable Trust | 125 South Spruce Street | Annville | PA | 17003 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Peter Parish Charitable Trust Columbia | 121 South Second Street | Columbia | PA | 17512 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Peter Parish Charitable Trust Elizabethtown | 1840 Marshall Drive | Elizabethtown | PA | 17022 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Phillip the Apostle Parish Charitable Trust | 2111 Millersville Pike | Lancaster | PA | 17603 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Pius X Parish Charitable Trust | 112 Fairview Drive | Selinsgrove | PA | 17870 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Richard Parish Charitable Trust | 201 Adele Avenue | Manheim | PA | 17545 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Rita's Parish Charitable Trust | C/O 256 Tract Road | Fairfield | PA | 17320 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Rose of Lima Parish and School Charitable Trust | 950 West Market Street | York | PA | 17404 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Theresa of the Infant Jesus Parish and School Charitable Trust | 1300 Bridge Street, | New Cumberland | PA | 17070 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Saint Vincent de Paul Parish Charitable Trust | 220 Third Street | Hanover | PA | 17331 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| San Juan Bautista Parish Charitable Trust | 425 South Duke Street | Lancaster | PA | 17602 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Seven Sorrows B.V.M. Parish and School Charitable Trust | 280 North Race Street | Middletown | PA | 17057 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| St Teresa of Calcutta School | 316 North Street | McSherrystown | PA | 17344-1402 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| St. George Roman Catholic Church | 775 Forest Hill Rd | Mifflinburg | PA | 17844 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| St. Patrick Church | 219 S Beaver St | York | PA | 17401 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| St. Peter Son Korean Catholic Community Charitable Trust | 571 Valley Road | Enola | PA | 17025 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| Trinity High School | 3601 Simpson Ferry Road | Camp Hill | PA | 17011-6475 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| York Catholic Junior-Senior High School of Diocese of Harrisburg | 601 East Springettsbury Avenue | York | PA | 17403-2896 | N/A | Unknown | No | X | X | X | Tort and Other | Unknown |
| TOTAL | | | | | | | | | | | | ========= Unknown |

## Unsecured Creditors – Affilated Religious Organizations

| Name | Address | City | State | Postal/ Zip Code | Last 4 of Account Number | Date Incurred | Subject to Setoff? | Contingent | Unliquid- ated | Disputed | Basis for Claim | Amount Due |
|------|---------|------|-------|------------------|--------------------------|---------------|--------------------|-----------|----------------|----------|-----------------|------------|
| | | | | | | | | | | | | |

**Note 1:** Amounts listed above are claims related to torts and other potential liabilities that are disputed, contingent or unliquidated. However, those creditors listed may also have claims for contribution or indemnification which may arise or result from any currently pending or to be filed litigation and any such claims were, as of the petition date, contingent and unliquidated and the amounts unknown at this time.

**Note 2:** The sex abuse claims which are Schedule F claims have been listed and redacted in accordance with the "Debtor's Emergency Motion For An Order Authorizing The Debtor To File Under Seal Portions Of Schedule E/F, The Creditor Matrix, and Other Pleadings And Documents." In the situation where a multiple confidential claimants are represented by one law firm, the number of confidential claimants represented by a law firm is noted and only one entry appears on Schedule F. In all other instances, there is a separate redacted entry for each potential claimant/creditor.

**Unsecured Tort Creditors**

| Name | Care of | Address | Address 2 | City | State | Postal/Zip Code | Telephone Number | Email Address | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C/O RICHARD M. SERBIN | JANET, JANET & SUGGS, LLC | 1522 N. 6TH AVENUE | ALTOONA | PA | 16601 | | rmsl@serbinlaw.net | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BENJAMIN J. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O MITCHELL A. TOUPS | WELLS, GREEN, TOUPS & TERRELL, LLP | BANK OF AMERICA TOWER | BEAUMONT | TX | 77702 | | matoups@wgttlaw.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BEN ANDREOZZI | ANDREOZZI & ASSOCIATES, PC | 111 N. FRONT STREET | HARRISBURG | PA | 17101 | | ben@vktimaciviliattorneys.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O RICHARD M. SERBIN | JANET, JANET & SUGGS, LLC | 1522 N. 6TH AVENUE | ALTOONA | PA | 16601 | | rmsl@serbinlaw.net | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BEN ANDREOZZI | ANDREOZZI & ASSOCIATES, PC | 111 N. FRONT STREET | HARRISBURG | PA | 17101 | | ben@vktimaciviliattorneys.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O STEVEN STAMBAUGH | STAMBAUGH LAW PC | 2121 SOUTH QUEEN STREET | YORK | PA | 17403 | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BEN ANDREOZZI | ANDREOZZI & ASSOCIATES, PC | 111 N. FRONT STREET | HARRISBURG | PA | 17101 | | ben@vktimaciviliattorneys.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BEN ANDREOZZI | | 111 N. FRONT STREET | HARRISBURG | PA | 17101 | | ben@vktimaciviliattorneys.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BENJAMIN J. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BENJAMIN J. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |

## Unsecured Tort Creditors

| Name | Care of | Address | Address 2 | City | State | Postal/ Zip Code | Telephone Number | Email Address | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▮ | | | | | | | | ▮ | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | ▮ | | | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | C/O JOSEPH H. SAUNDERS | SAUNDERS & WALKER P.A. | 3491 GANDY BLVD. NORTH, STE. 200 | PINELLAS PARK | FL | 33781 | | joe@saunderslawyers.com | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | | | ▮ | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | | | ▮ | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | C/O BENJAMIN D. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | C/O DANIEL MONAHAN | MONAHAN LAW PRACTICE, PC | 300 N. POTTSTOWN PIKE, STE. 210 | EXTON | PA | 19341 | | dmonahan@pjlfm.com | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | ▮ | | ▮ | nknown | N/A | X | X | X | Tort | Unknown |
| ▮ | C/O BENJAMIN D. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | C/O RICHARD M. SERBIN | JANET, JANET & SUGGS, LLC | 1522 N. 6TH AVENUE | ALTOONA | PA | 16601 | | rms@serbinlaw.net | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| ▮ | C/O BENJAMIN D. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |

Unsecured Tort Creditors

| Name | Care of | Address | Address 2 | City | State | Postal/ Zip Code | Telephone Number | Email Address | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C/O BENJAMIN J. SWEET | THE SWEET LAW FIRM P.C. | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@sweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |

**Unsecured Tort Creditors**

| Name | Care of | Address | Address 2 | City | State | Postal/ Zip Code | Telephone Number | Email Address | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BEN ANDREOZZI | ANDREOZZI & ASSOCIATES, PC | 111 N. FRONT STREET | HARRISBURG | PA | 17101 | | ben@victimsciviIattorneys. com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O ADAM D. HOROWITZ | 110 EAST BROWARD BLVD., STE. 1850 | | FORT LAUDERDALE | FL | 33301 | | adam@adamhorowitzlaw.c om | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O ADAM D. HOROWITZ | 110 EAST BROWARD BLVD., STE. 1850 | | FORT LAUDERDALE | FL | 33301 | | adam@adamhorowitzlaw.c om | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O MITCHELL GARABEDIAN | LAW OFFICES OF MITCHELL GARABEDIAN | 100 STATE STREET, 6TH FLOOR | BOSTON | MA | 02109 | | magarabedian@garabedia nlaw.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O ERMA ROMAZERO | MATTHEWS & ASSOCIATES | 2905 SACKETT STREET | HOUSTON | TX | 77098 | | eboxador-ol@hemathewsl awfirm.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BETH G. COLE, ESQ. | WILLIAMS CEDAR LLC | 1515 MARKET STREET, SUITE 1300 | PHILADELPHIA | PA | 19102 | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BETH G. COLE, ESQ. | WILLIAMS CEDAR LLC | 1515 MARKET STREET, SUITE 1300 | PHILADELPHIA | PA | 19102 | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |

**Unsecured Tort Creditors**

| Name | Care of | Address | Address 2 | City | State | Postal/Zip Code | Telephone Number | Email Address | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C/O RICHARD A. SERBIN | JANET, JANET & SUGGS, LLC | 1522 N. 6TH AVENUE | ALTOONA | PA | 16601 | | rns@serbinlaw.net | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O JORDAN MERSON | MERSON LAW, PLLC | 150 E 58TH ST, 34TH FLOOR | NEW YORK | NY | 10155 | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BENJAMIN D. SWEET | THE SWEET LAW FIRM, P.C. | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | ben@bsweetlawpc.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BENJAMIN D. ANDREOZZI, ESQ. | ANDREOZZI & ASSOCIATES, P.C. | 111 NORTH FRONT STREET | HARRISBURG | PA | 17101 | | ben@victimscivilattorneys.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | C/O BENJAMIN D. ANDREOZZI, ESQ. | ANDREOZZI & ASSOCIATES, P.C. | 111 NORTH FRONT STREET | HARRISBURG | PA | 17101 | | ben@victimscivilattorneys.com | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | X | X | X | Tort | Unknown |

## Unsecured Tort Creditors

| Name | Care of | Address | Address 2 | City | State | Postal / Zip Code | Telephone Number | Email Address | Date Incurred | Subject to Setoff? | Contingent | Unliquidated | Disputed | Basis for Claim | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | C/O RICHARD M. SERBIN | JANET, JANET & SUGGS, LLC | 1522 N. 6TH AVENUE | ALTOONA | PA | 16601 | | rms@serbinlaw.net | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | C/O BENJAMIN D. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | bens@sweetlawpc.com | Unknown | N/A | x | x | x | Tort | Unknown |
| | C/O BENJAMIN D. SWEET | THE SWEET LAW FIRM, PC | 1145 BOWER HILL ROAD, SUITE 104 | PITTSBURGH | PA | 15243 | | bens@sweetlawpc.com | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| | | | | | | | | | Unknown | N/A | x | x | x | Tort | Unknown |
| **TOTAL** | | | | | | | | | | | | | | | **UNKNOWN** |

Note 1: The sex abuse claims which are Schedule F claims have been listed and redacted in accordance with the "Debtor's Emergency Motion For An Order Authorizing The Debtor To File Under Seal Portions Of Schedule E/F, The Creditor Matrix, And Other Pleadings And Documents." In the situation where a multiple confidential claimants are represented by one law firm, the number of confidential claimants represented by one law firm, the name is noted and only one entry appears on Schedule F. In all other instances, there is a separate redacted entry for each potential claimant/creditor.

Debtor Name __Roman Catholic Diocese of Harrisburg__

United States Bankruptcy Court for the: __Middle__ District of __PA__
                                                                    (State)

Case number (If known): __1:20-bk-00599__

## Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors     12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date. Bankruptcy Rules 1008 and 9011.

WARNING -- Bankruptcy fraud is a serious crime. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐ *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐ *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐ *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐ *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐ *Schedule H: Codebtors* (Official Form 206H)

☐ *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☑ Amended *Schedule* __A/B__; E/F

☐ *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☐ *Other document that requires a declaration*_____

I declare under penalty of perjury that the foregoing is true and correct.

Executed on __05/12/2020__          ✗ _____
             MM / DD / YYYY                Signature of individual signing on behalf of debtor

                                    Christopher G. Linscott
                                    Printed name

                                    CRO / Financial Advisor
                                    Position or relationship to debtor

Official Form 202            Declaration Under Penalty of Perjury for Non-Individual Debtors

# EXHIBIT E

2

3

4

5

6

7

8

9

10

11

12

14

15

16

16

B-1

C-1

C- 2

C- 3

C- 4

C- 5

C- 6

# EXHIBIT F

2

3

Main Document      Page 179 of 256

4

5

6

7

8

9

10

11

12

13

14

Case 1:20-bk-00599-HWV    Doc 840    Filed 12/23/21    Entered 12/23/21 17:42:59    Desc
Main Document    Page 190 of 256

15

16

B-1

C-1

C- 2

Case 1:20-bk-00599-HWV   Doc 840   Filed 12/23/21   Entered 12/23/21 17:42:59   Desc
Main Document      Page 200 of 256

C- 3

C- 4

C- 5

C- 6

# EXHIBIT G

**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**HARRISBURG DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor.[1] | |

**DECLARATION OF CHRISTOPHER G. LINSCOTT**
**IN SUPPORT OF FIRST DAY MOTIONS**

I, Christopher G. Linscott, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am an adult person of sound mind and a resident of Tucson, Pima County, Arizona.

2.      I am a certified public accountant licensed in the State of Arizona and a shareholder of Keegan Linscott & Associates, PC ("*KLA*"), located at 3443 North Campbell Avenue, Suite 115, Tucson, Arizona 85719.

3.      I hold a Master's degree in Accounting from New York University and have more than thirty (30) years of experience in the public accounting field.

4.      Prior to forming KLA, I worked at the firms of Coopers & Lybrand (now PricewaterhouseCoopers) and Peat Marwick (now KPMG).

5.      In addition to being a Certified Public Accountant, I am a Certified Fraud Examiner and a Certified Insolvency and Restructuring Advisor.

---

[1] The last four digits of the Debtor's federal tax identification number are: 4791. The Debtor's principal place of business is located at 4800 Union Deposit Road, Harrisburg, Pennsylvania 17111.

6. Both KLA and I have substantial experience in representing and performing services for non-profit corporations.

7. In addition, I have substantial experience with respect to corporations sole and religious non-profit corporations.

8. Specifically, KLA was retained as the financial advisor and I was the primary person responsible for KLA's services, in the chapter 11 reorganization cases for: (a) the Roman Catholic Diocese of Tucson; (b) the Roman Catholic Diocese of Gallup; (c) the Catholic Bishop of Northern Alaska, and (d) the Roman Catholic Bishop of San Diego.

9. The chapter 11 cases for (a) the Roman Catholic Diocese of Tucson, (b) the Roman Catholic Diocese of Gallup, and (c) the Catholic Bishop of Northern Alaska resulted in successfully confirmed chapter 11 plans of reorganization.

10. The chapter 11 case for the Roman Catholic Bishop of San Diego resulted in the settlement of a large portion of abuse claims and consensual dismissal of the chapter 11 case.

11. I have also served as a trustee in chapter 11 cases and have extensive experience in all aspects of chapter 11 cases.

12. In addition to the foregoing, prior to the commencement of this case, Waller Lansden Dortch & Davis, LLP, proposed counsel to the Roman Catholic Diocese of Harrisburg (the "***RCDH***") in this case, engaged KLA and me to assist in analyzing RCDH's financial affairs and to otherwise assist in the commencement of this chapter 11 case.

13. As part of the services provided prior to the commencement of this case, KLA and I assisted in compiling financial and other information necessary for the filing of the chapter 11 petition on behalf of RCDH and the motions filed contemporaneously with the chapter 11 petition (collectively, the "***First Day Motions***").

14. As a result, I have become familiar with RCDH's accounting systems and operations.

15. I am submitting this declaration in support of the chapter 11 petition filed in this case and the First Day Motions.

16. This declaration is based upon my personal knowledge, the books and records of the RCDH, publicly available information, information obtained from persons with the RCDH, and information obtained from persons within KLA upon which I regularly rely in the ordinary course of business and to whom I have delegated certain responsibilities.

17. If called upon to testify, I could and would testify competently to the facts set forth herein.

18. This declaration is organized into two sections: (i) the first section describes the financial position of the RCDH and details the circumstances surrounding the commencement of this chapter 11 case; and (ii) the second section sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

### Corporate Form and Financial Position of the RCDH

19. The RCDH is nonprofit religious institution and maintains its principal place of business at 4800 Union Deposit Road, Harrisburg, Pennsylvania 17111.

20. The structure of the RCDH is detailed in the *Informational Brief of the Roman Catholic Diocese of Harrisburg* (the "***Informational Brief***").[2]

21. The RCDH has very limited assets and generally operates on a break-even basis.

22. All of the non-real estate assets used by the RCDH are held in the Charitable Trust, while all real estate assets used by the RCDH are held in the Real Estate Trust.

---

[2] Capitalized terms used by not defined herein, other than in the section hereof named "Evidentiary Support for First Day Motions" shall have the meanings ascribed to them in the Informational Brief.

23.     Certain assets are made available from the Charitable Trust and the Real Estate Trust to allow the RCDH to fulfill its mission and ministry, and the RCDH relies on distributions from the Charitable Trust from time to time to pay its expenses.

24.     The RCDH also holds and manages certain custodial funds for the benefit of Parishes, Schools, and Related Entities which are to be used for specific religious, educational, or other charitable purposes and which funds are not property of the RCDH.

### Events Leading to this Chapter 11 Case

25.     For years, the RCDH has been faced with a steady decline in church attendance and the reality of dwindling revenues.

26.     In addition to the decline in attendance and revenues, the RCDH has borne increased expenses in connection with confronting the past and issues regarding clergy sexual abuse.

27.     Among those issues, the RCDH received a Grand Jury Subpoena in 2016. Responding to that subpoena forced the RCDH to incur extraordinary legal costs, which exacerbated the RCDH's pre-existing financial trend.

28.     Coupled with the extraordinary legal expenses arising from the Grand Jury Subpoena, the RCDH has undertaken several initiatives to provide compensation and care for survivors of clergy sexual abuse. And at the same time, the RCDH continues to face an increasing amount of formal and informal legal claims arising from sexual abuse—by clergy or otherwise.

29.     All of the foregoing, together with recent changes in the law in the Commonwealth of Pennsylvania and neighboring states, has left the RCDH with no other path forward to ensure the financial ability to both provide fair and equitable compensation for survivors and ensure the

future of the missions and ministries of the Roman Catholic Church within the territorial diocese for all of those who depend on it today.

## The PNC Indebtedness

30.     The RCDH is party to that certain Financing and Security Agreement, dated as of December 30, 2009 (as amended, restated, supplemented, or otherwise modified from time to time, the "***PNC Financing Agreement***"), by and among PNC Bank, National Association, in its capacity as agent (the "***Agent***") for the banks signatory to the PNC Financing Agreement (the "***Banks***"), the Pennsylvania Economic Development Financing Authority (the "***Authority***"), and the RCDH, the Charitable Trust, and Bishop McDevitt High School of Harrisburg, each as borrowers (the "***Borrowers***").

31.     On account of its obligations under the PNC Financing Agreement, each of the Borrowers executed a promissory note in favor of the Authority, which promissory notes were, in turn, assigned to the Agent on behalf of the Banks.

32.     While the Agent is secured by certain assets of Bishop McDevitt, the obligations of the RCDH and the Charitable Trust under the PNC Financing Agreement and related promissory notes are unsecured.

33.     As of the Petition Date, the RCDH owes $30,711,813.13 on account of its obligations under the PNC Financing Agreement and related promissory note.

34.     In addition, PNC Bank, National Association (the "***Letter of Credit Bank***") extended standby letters of credit (the "***Letters of Credit***") to the RCDH in an amount not to exceed $3,000,000.

35.     The Letters of Credit secure certain self-insurance obligations of the RCDH and are secured by a cash deposit posted by the RCDH with the Letter of Credit Bank.

## Evidentiary Support for the First Day Motions[3]

36.     The RCDH has filed the First Day Motions seeking various forms of relief on an emergency bases. The First Day Motions seek relief aimed at, among other things, facilitating a smooth transition in this chapter 11 case, maintaining employee compensation, maintaining the good will and morale of priests, lay employees, and others who rely on the programs and services provided by the RCDH, and preserving and maximizing the property available to satisfy the RCDH's creditors. All of the First Day Motions are vital to the RCDH's reorganization efforts, and expedited approval of the First Day Motions is important to the RCDH's success in this chapter 11 case.

37.     I have reviewed the First Day Motions, including the exhibits and other attachments to the First Day Motions.

38.     I believe the RCDH has satisfied the applicable standards for the relief requested in each of the First Day Motions and this Court's grant of the requested relief is in the best interests of the RCDH, the RCDH's estate, its creditors, and other parties in interest.

39.     Moreover, in the absence of expedited approval of the First Day Motions and relief sought in same, the RCDH and its estate could suffer immediate and irreparable harm.

40.     A description of the relief sought and the facts supporting each of the First Day Motions is set forth below. Based upon the foregoing and the facts below, I respectfully submit that the First Day Motions should be granted.

---

[3] Capitalized terms used in this section of the declaration and not otherwise defined shall have the meanings ascribed to them in the applicable First Day Motion.

## I. Debtor's Emergency Application for Order Appointing Epiq Corporate Restructuring, LLC as Claims, Noticing, Solicitation, and Administrative Agent (the "*Epiq Retention Application*").

41.     Pursuant to the Epiq Retention Application, the RCDH seeks entry of an order appointing Epiq Corporate Restructuring, LLC ("***Epiq***") as the claims agent (the "***Claims Agent***") for the RCDH in the Chapter 11 Case, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim in the Chapter 11 Case. The RCDH submits that Epiq's rates are competitive and reasonable given Epiq's quality of services and expertise.

42.     Although the RCDH has not filed its schedules of assets and liabilities, the RCDH anticipates there will be in excess of 500 entities to be noticed.

43.     Further, this Chapter 11 Case presents unique issues related to the confidential nature of many claimants' identities. Epiq will be able to provide the services as described in the Epiq Agreement[4] while ensuring that the confidentiality of survivors is maintained.

44.     In view of the foregoing and the complexity of the RCDH's business, I submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the RCDH and the Office of the Clerk of the Bankruptcy Court of the administrative burden of, noticing, administering claims, and soliciting and balloting votes and is in the best interests of the RCDH, the RCDH's estate, its creditors, and other parties in interest.

45.     I, therefore, believe appointing Epiq as the claims, noticing, and balloting agent in the Chapter 11 Case will maximize the value of the RCDH's estate for all stakeholders and should be approved by the Court.

---

[4] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the underlying First Day Motions.

## II. Debtor's Emergency Motion for Entry of an Order (I) Extending the Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs and (II) Granting Related Relief (the "*Schedules/SOFAs Extension Motion*").

46. Pursuant to the Schedules/SOFAs Extension Motion, the RCDH requests entry of an order (a) granting the RCDH thirty (30) days from the Petition Date (the "***Extension Period***") to file the Schedules and Statements, without prejudice to the RCDH's ability to request an additional extension of time should it become necessary and (b) granting such other and further relief as is just and proper.

47. I anticipate that there will be many more creditors and interested parties involved in this Chapter 11 Case, including a multitude of individuals whose claims relate to alleged instances of abuse and whose names and other identifying information will be filed under seal to protect their privacy, pursuant to the relief sought in the *Motion for an Order Authorizing the Debtor to File Under Seal Portions of Schedule F, the Creditor Matrix, and Other Pleadings and Documents* filed contemporaneously herewith. Given the need for confidentiality, preparing the Schedules and Statements accurately and with sufficient detail and adherence to confidentiality requires significant attention from the Debtor's professionals and advisors.

48. In addition to the reasons set forth above, I respectfully submit that the size and complexity of the Debtor's operations, the limited staff available to perform the required internal review of financial records and affairs, the numerous critical operational and mission stabilization matters that the Debtor's personnel must address in the early days of this Chapter 11 Case, and the pressure incident to the commencement of this Chapter 11 Case provide ample cause justifying the requested extension of the deadline to file the Schedules and Statements. Although the Debtor and its professionals have been working diligently on completing the Schedules and Statements, it

would be extremely challenging to complete this undertaking prior to the expiration of the Initial Deadline.

49.     I submit that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of this Chapter 11 Case will help the Debtor make a smoother transition into bankruptcy and, therefore, will ultimately maximize the value of the Debtor's estate for the benefit of creditors and all parties in interest. Consequently, I believe that it is in the best interests of the Debtor and its creditors to obtain an extension of the filing deadline set forth under Bankruptcy Rule 1007(c), which would provide the Debtor with a total of thirty (30) days from the Petition Date to file the Schedules and Statements.

50.     Therefore, on behalf of the RCDH, I submit the Schedules/SOFAs Extension Motion should be granted.

### III.     Debtor's Emergency Motion for an Order Authorizing the Debtor to File under Seal Portions of Schedule E/F, the Creditor Matrix, and Other Pleadings and Documents (the "*Schedule and Matrix Sealing Motion*").

51.     Many of the unsecured creditors in this Chapter 11 Case are individuals whose claims against the Debtor are premised on allegations of childhood sexual abuse ("*Abuse Claimants*"). Some Abuse Claimants have filed tort claims against the Debtor in their individual capacities, while some have elected to file a class action lawsuit. One of these Abuse Claimants has elected to file their litigation against the Debtor pseudonymously, with their actual identity to be revealed to the defendants in the course of litigation and with the understanding that their identity would not be publicly disclosed. Additionally, the Debtor has previously entered into out-of-court settlements with some Abuse Claimants, either through the confidential Survivor Compensation Program undertaken by the Debtor in 2019 or through independent negotiations, Furthermore, while the Debtor is currently unaware of any Abuse Claimants who are minors, in

other similar cases there have been instances in which minors asserted claims or otherwise had claims asserted on their behalf. The Debtor expects more individuals who are not currently Abuse Claimants to come forward with claims of abuse that have not previously settled out of court in any manner.

52.     Further, the pleadings in this Chapter 11 Case will have personally identifiable information of individual creditors who are also employees of the Debtor (the "***Employee Creditors***") who wish to remain anonymous for security purposes related to identity theft, but not for purposes related to concealment of any alleged perpetrator of abuse.

53.     In light of the delicate nature of the claims of the Abuse Claimants and others who may come forward with similar claims during the Chapter 11 Case, to avoid causing unnecessary additional anguish or embarrassment, to encourage such individuals to feel safe and secure in advancing their claims without fear of retribution or reprisal, to guard against potential identity theft, and, with regard to minors, as required by Bankruptcy Rule 9037, I submit that it would be inappropriate and potentially harmful to require the public disclosure of: (i) identifying information relating to individuals who have notified or who will notify, either informally, formally, or through filing a lawsuit, the Debtor of allegations of abuse by clergy members or other persons employed by Catholic entities or otherwise subject to Diocesan supervision; (ii) information relating to the specific allegations of abuse asserted by any of the Abuse Claimants; (iii) information relating to confidential settlements of abuse claims; or (iv) any personal, identifying information of Employee Creditors (collectively, the "***Confidential Information***").

54.     Therefore, on behalf of the RCDH, I submit the Schedule and Matrix Sealing Motion should be granted.

**IV.  Debtor's Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor's Proposed Form of Adequate Assurance of Payment to Utility Companies under Section 366 of the Bankruptcy Code, (II) Establishing Procedures for Resolving Objections by Utility Companies, (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service, and (IV) Granting Related Relief (the "*Utilities Motion*").**

55.     The Debtor's ongoing operations require the Debtor to maintain uninterrupted utility services from myriad utility service providers (each, a "***Utility Company***" and collectively, the "***Utility Companies***"), for electricity, natural gas, telephone, water, waste removal, internet, and other services (the "***Utility Services***"). The Utility Companies include, without limitation, the entities set forth on the list attached to the Utilities Motion as **Exhibit C** (the "***Utility Companies List***"). The Debtor has consistently made payments to the Utility Companies on a regular and timely basis. To my knowledge, there are no material defaults or arrearages with respect to the Debtor's undisputed invoices for Utility Services, other than the payment interruptions that may be caused by the commencement of the Chapter 11 Case.

56.     Uninterrupted Utility Services are essential to the continued operation of the Debtor and, consequently, to the success of the Chapter 11 Case. Should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtor's operations could be severely disrupted, and such disruption would jeopardize the Debtor's reorganization efforts. Accordingly, the Debtor seeks to establish an orderly process for providing adequate assurance to its Utility Companies without hindering the Debtor's ability to function as a going concern.

57.     The Debtor receives Utility Services from the Utility Companies for multiple facilities. On average, the Debtor pays approximately $16,919.04 each month for the Utility Services, calculated as a historical average for fiscal year 2018–2019. The Debtor estimates, and I concur, that the cost for the Utility Services during the next two (2) weeks (not including any deposits to be paid) will be approximately $8,459.52, based upon the historical average.

58.     As of the Petition Date, the Debtor has cash sufficient to make postpetition payments to the Utility Companies.

59.     The Debtor intends to pay its undisputed postpetition obligations to the Utility Companies on a timely basis, in accordance with its prepetition practices, and has the ability to do so.

60.     The Debtor proposes to deposit an amount equal to two (2) weeks of Utility Services, calculated as a historical average for fiscal year 2018–2019 (each, an "***Adequate Assurance Deposit***"), into a segregated bank account designated for the Adequate Assurance Deposit (the "***Adequate Assurance Deposit Account***"), within twenty (20) days of the Petition Date. The Adequate Assurance Deposit will be held in the Adequate Assurance Deposit Account for the duration of the Chapter 11 Case and may be applied to any postpetition defaults with respect to payments to the Utility Companies.

61.     I submit that the Adequate Assurance Deposit, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business (collectively, the "***Proposed Adequate Assurance***") and any deposits held by the Utility Companies, constitutes sufficient adequate assurance of future payment to the Utility Companies, to satisfy the requirements of section 366 of the Bankruptcy Code. Nonetheless, if any Utility Company believes additional assurance is required, the Debtor requests that the Court approve the Adequate Assurance Procedures and Objection Procedures as described in the Utilities Motion.

62.     Therefore, on behalf of the RCDH, I submit the Utilities Motion should be granted.

## V.    Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs; and (II) Granting Related Relief (the "*Wage Motion*").

63.     The Debtor currently employs approximately 177 employees, 13 of whom are

seasonal, 49 of whom are part-time, hourly employees and 72 of whom are salaried full-time employees, and 43 of whom are clergy (the "***Employees***"). In addition to its own Employees, Related Entities (excluding schools and parishes) employ approximately 59 individuals (the "***Non-Debtor Employees***"), 18 of which are shared with the Debtor. Harrisburg Catholic Administrative Services, Inc. (the "***Payroll Processor***" or "***HCAS***"), processes payroll for both the Debtor's Employees as well as the Non-Debtor Employees. The Debtor and Related Entities consolidate all payroll funds into a single account (the "***Payroll Account***") in the Debtor's name. HCAS, as the Payroll Processor, then disperses payment to all Employees and Non-Debtor Employees. By centralizing the payroll processing services and maintaining a single relationship with HCAS for payment of payroll, the Debtor is able to provide a streamlined payment system for all wages as well as administrative cost savings to the Related Entities.[5]

64.     In addition to a centralized payroll system, the Employees and Non-Debtor Employees are enrolled into consolidated benefit plans (as more fully described below) in order to take advantage of economies of scale. Similar to the payroll system described above, the Debtor and Related Entities fund all amounts due for all Employee and Non-Debtor Employee benefit plans to a deposit account maintained by the Debtor (the "***Payroll Account***") at which point HCAS administers the funds and disburses them to the appropriate third parties.

65.     The Debtor's Employees perform a variety of critical functions for the Debtor. They work in numerous ministries and other operations, providing ecclesiastical, managerial, financial, clerical, religious, and pastoral services to individuals and families living within the Debtor's territorial jurisdiction. The Employees' knowledge, skills and understanding of the Debtor's

---

[5] In order to make payments to third parties, the Debtor funds, or causes to be funded, payments to HCAS. As part of its administrative responsibilities pursuant to certain services agreements, HCAS, in turn, makes payments to such third parties on the Debtor's behalf using such funds.

ministries, mission, business operations and relationships are essential to the success of the Debtor and this Chapter 11 Case. Without the continued service and dedication of the Employees, it will be difficult, if not impossible, to effectively implement the Debtor's chapter 11 strategy.

66.     Thus, to successfully accomplish the foregoing, minimize the personal hardship that the Employees—and ultimately, the beneficiaries of the services provided by such Employees—will suffer if prepetition employee-related obligations are not paid when due or as otherwise expected, and to maintain employee morale and a focused workforce during this critical time, I believe it is necessary and in the best interest of the Debtor's estate and all stakeholders to seek the relief requested by the Wage Motion.

67.     The Debtor's aggregate monthly compensation for the Employees, including wages and salaries, is approximately $241,520. Most of the Debtor's payroll payments are made by direct deposit through the electronic transfer of funds directly to the Employees, while the remaining payments are made via check. The Debtor's Employees are paid on a bi-weekly basis.[6]

68.     On February 12, 2020, the Debtor issued payroll to the Employees for the pay period ending January 31, 2020. Since that date and prior to the Petition Date, the Employees have continue to provide services to the Debtor and are thus entitled to receive pre-petition wages and benefits payable during that interim period prior to the Petition Date. Additionally, compensation may be due and owing as of the Petition Date because:

> (a)     some discrepancies may exist between the amounts paid and the amounts Employees or others believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees; and
>
> (b)     some payroll checks issued to Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and,

---

[6] The Debtor employs the Payroll Processor to administer its payroll. The Payroll Processor's services are crucial to the smooth functioning of the Debtor's payroll system and, therefore, to the Debtor's operations generally. As of the Petition Date, the Debtor believes that no amount is owed to Payroll Processor. The Debtor requests authority to continue to pay Payroll Processor in the ordinary course of business as routinely done prior to the Petition Date.

accordingly, have not yet been honored and paid as of the Petition Date.

69.     As of the Petition Date, the aggregate amount of accrued wages, salaries, overtime pay, commissions, and other compensation (excluding, without limitation, the amounts owed in connection with Deductions, Payroll Taxes, Employee Benefits, and the Debtor's Workers' Compensation Program (each as defined below)) earned prior to the Petition Date that remains unpaid to the Debtor's Employees is approximately $154,603 (the "**Unpaid Compensation**"). By this Motion, the Debtor requests authority to pay all such Unpaid Compensation to the Employees in the ordinary course of business in an amount not to exceed $175,000. The Debtor submits, and I concur, that no Employee is owed more than $13,650 for Unpaid Compensation or Employee Benefits (as defined below).[7]

70.     In the ordinary course of its business and pursuant to its obligations under Canon Law, the Debtor maintains a home on the Debtor's campus that is owned by the Roman Catholic Diocese of Harrisburg Real Estate Trust and in which the Bishop of the Diocese of Harrisburg resides. The average monthly costs to maintain this property (the "**Housing Costs**") is approximately $4,750, which includes regular maintenance, utilities, and landscaping.

71.     During each applicable pay period, the Debtor routinely deducts certain amounts from the Employees' paychecks, including pre-tax and after-tax deductions payable pursuant to certain of the Employee benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums) and charitable contributions (collectively, the "**Deductions**") and forwards those amounts, through HCAS, to various third-party recipients. For the pay period ending February 14, 2020, these Deductions were approximately $16,400. The Debtor believes

---

[7] To the extent that the Debtor discovers that an Employee does have a section 507(a)(4) claim for Unpaid Compensation that exceeds the $13,650 cap, the Debtor, by this Motion, only seeks authority to honor such claim up to the $13,650 statutory cap. However, the Debtor reserves the right to request authority to honor any such section 507(a)(4) claims that exceed the $13,650 cap after notice and a hearing.

4832-9565-9953.4

Case 1:20-bk-00599-HWV    Doc 45    Filed 02/28/20    Entered 02/28/20 16:14:59    Desc
Main Document    Page 222 of 256

that these Deductions were remitted to the various third party recipients prior to the Petition Date, however, in the event that such amounts have not been remitted, the Debtor seeks authority to continue to forward these prepetition Deductions, in an amount not to exceed $20,000, to the applicable third party recipients on a postpetition basis in the ordinary course of business, as routinely done prior to the Petition Date. The Debtor also seeks authority to forward Deductions that have accrued between February 14, 2020 and the Petition Date, in an amount not to exceed $20,000, to the applicable third party recipients in the ordinary course of business.

72.     Further, the Debtor is required by law to withhold from an Employee's wages amounts related to, among other things, federal, state and local income taxes, social security and Medicare taxes (collectively, the "***Withheld Amounts***") for remittance to the appropriate taxing authorities. The Debtor must then make matching payments from its own funds for social security and Medicare taxes (the "***Employer Payroll Taxes***," and together with the Withheld Amounts, the "***Payroll Taxes***"). The Debtor's Payroll Taxes for the pay period ending February 14, 2020 was approximately $30,000. The Debtor believes, and I concur, that these Payroll Taxes were remitted to the various taxing authorities before the Petition Date, however, in the event that such amounts were not remitted, the Debtor seeks authority to continue to forward these prepetition Payroll Taxes, in an amount not to exceed $40,000, to the applicable taxing authorities on a postpetition basis in the ordinary course of business, as routinely done prior to the Petition Date.

73.     Between February 15, 2020 and the Petition Date, the Debtor's Employees have continued to provide services to the Debtor and are thus entitled to receive prepetition wages upon which Payroll Taxes have been withheld. As of the Petition Date, the Debtor's accrued and outstanding prepetition obligations with respect to the Payroll Taxes on those wages are approximately $10,000, which represents approximately four (4) days of accrued Payroll Taxes.

74.     In the ordinary course of business, the Employees are provided with a number of employee benefits, including, but not limited to (a) health, dental, and vision insurance, (b) paid time off, and (c) group long-term disability insurance, described in greater detail below (collectively, the "***Employee Benefits***").

75.     The Debtor offers: (i) a health insurance program (the "***Plan***") for the benefit of Debtor's Employees and the Related Entities. The Plan is administered by Highmark Blue Shield ("***Blue Shield***"); (ii) prescription drug insurance (the "***Prescription Drug Insurance***") through Express Scripts; and (iii) access to an employee assistance program (the "***Employee Assistance Program***") through Integrated Behavioral Health ("***IBH***").

76.     By covering their employees under a single plan, the Debtor the Related Entities benefit from significant cost savings as a result of the pooled risk and allocation of the Plan, Prescription Drug Insurance, and Employee Assistance Program. The Debtor believes, and I concur, that a health insurance plan, prescription drug plan, and employee assistance program for most of these entities alone would be prohibitively expensive (and possibly unavailable), due to the small number of employees that would be covered. Historically, premiums collected from the Parish Corporations and Related Entities have covered the cost of claims made by their employees.

77.     The premium cost of the Plan, Prescription Drug Insurance, and Employee Assistance Program is funded in part by the Debtor and in part through Employee paycheck deductions. Employees who work thirty (30) or more hours per week are eligible to participate in the Plan.

78.     HCAS deducts the premium payments from the Employee's payroll and remits the payments to Blue Shield on behalf of the Debtor and Employees. As of the Petition Date, the Debtor estimates that approximately $5,000 has been withheld from its Employees but is yet to be

remitted to Blue Shield, Express Scripts, and IBH.

79.     The Debtor offers a health savings account program (the "**HSA**") for the benefit of Debtor's Employees and the Related Entities. The HSA is administered by HCAS.

80.     The HSA allows eligible Employees to contribute tax-deferred wages towards the future cost of healthcare expenses. The Debtor deducts the Employees' contributions from the Employee's payroll and remits the contributions to HCAS on behalf of its Employees. As of the Petition Date, the Debtor estimates that approximately $2,200 has been withheld from its Employees but is yet to be remitted to HCAS.

81.     The Employees and the employees of the Related Entities are provided with dental insurance (the "**Dental Insurance**") through United Concordia. Generally, employees working thirty (30) hours or more per week are automatically enrolled in the Dental Insurance program at no cost to the employee. The Dental Insurance provides coverage for preventative and basic dental services.

82.     By covering Employees and Non-Debtor Employees under a single plan, the Debtor and the Related Entities benefit from significant cost savings as a result of the pooled risk and the allocation with the Dental Insurance program. The Debtor believes, and I concur, that a dental insurance plan for most of these entities alone would be prohibitively expensive and possible unavailable due to the small number of employees that would be covered.

83.     The Employees and the employees of the Related Entities are provided with vision insurance (the "**Vision Insurance**") through National Vision Administrators ("**NVA**"). Generally, employees working thirty (30) hours or more a week are automatically enrolled in the Vision Insurance program at no cost to the employee. The Vision Insurance provides coverage for examinations, frames, lens, and contact lenses.

84. By covering Employees and Non-Debtor Employees under a single plan, the Debtor and the Related Entities benefit from significant cost savings as a result of the pooled risk and the allocation with the Vision Insurance program. The Debtor believes, and I concur, that a dental insurance plan for most of these entities alone would be prohibitively expensive and possible unavailable due to the small number of employees that would be covered.

85. The Employees and the employees of the Related Entities are provided with term life insurance (the "*Term Life Insurance*") through Principal Life Insurance Company, as well as universal life insurance (the "*Universal Life Insurance*" and together with the Term Life Insurance, the "*Life Insurance Programs*") through Trustmark Insurance Company. Generally, employees working thirty (30) hours or more a week are automatically enrolled in the Life Insurance Programs at no cost to the employee. For the fiscal year ended in 2019, the Debtor's expense for Life Insurance Programs was $11,657.

86. By covering Employees and Non-Debtor Employees under a single plan, the Debtor and the Related Entities benefit from significant cost savings as a result of the pooled risk and the allocation with the Life Insurance Programs. The Debtor believes, and I concur, that a life insurance plan for most of these entities alone would be prohibitively expensive and possible unavailable due to the small number of employees that would be covered.

87. The Employees and the employees of the Related Entities are provided with group long-term disability insurance (the "*Group Long-Term Disability Insurance*") through Trustmark Insurance Company. Generally, employees working thirty (30) hours or more a week are automatically enrolled in the Group Long-Term Disability Insurance program at no cost to the employee. The Group Long-Term Disability Insurance is designed to replace an employee's take-home pay in the event that a disability due to accident or sickness prevents an employee from

earning a salary for an extended period of time. The Group Long-Term Disability Insurance is 100% Employee funded.

88.     The Employees and the employees of the Related Entities are also provided with accident insurance (the "***Accident Insurance***") through Chubb. Generally, employees working thirty (30) hours or more a week are automatically enrolled in the Accident Insurance program at no cost to the employee. The Accident Insurance is designed to provide cash assistance that help pay for covered treatments required due to injury. The Accident Insurance is 100% Employee funded.

89.     By covering Employees and Non-Debtor Employees under a single plan, the Debtor and the Related Entities benefit from significant cost savings as a result of the pooled risk and the allocation with the Group Long-Term Disability Insurance and Accident Insurance programs. The Debtor believes, and I concur, that a long-term disability insurance plan or accident insurance plan for most of these entities alone would be prohibitively expensive and possible unavailable due to the small number of employees that would be covered. As of the Petition Date, HCAS, on behalf of the Debtor, has withheld approximately $3,000 for the payment of Group Long-Term Disability Insurance and Accident Insurance.

90.     The Debtor offers a 401(k) program (the "***401(k) Plan***") for the benefit of Debtor's Employees and the Related Entities. The 401(k) Plan is administered by Fidelity.

91.     The 401(k) Plan allows eligible Employees to contribute tax-deferred wages towards retirement. The Debtor makes contributions to eligible Employee's 401(k) Plans equivalent to 4% of the Employee's annual wages. The Debtor deducts the Employees' contributions from the Employee's payroll and remits the contributions to Fidelity on behalf of its Employees. As of the Petition Date, the Debtor estimates that approximately $10,000 has been

withheld from its Employees but is yet to be remitted to Fidelity.

92. The Employees are provided with paid time off ("**PTO**" or "**Leave Pay**"). PTO encompasses holidays, vacation, sick leave, personal leave, court duty, bereavement, military leave, and office closure.

93. The Employees are provided with paid holidays. Employees are entitled to approximately sixteen (16) paid holidays each year.

94. The Debtor's vacation pay policy is based primarily on length of service. An Employee must have ninety (90) days' continuous service as a regular salaried employee before being entitled to use paid vacation, although Employees begin accruing PTO immediately. In most instances, an Employee is entitled to receive compensation for unused vacation days upon termination.

95. The Debtor's sick leave policy for full-time employees is accumulated at a rate of 5.5 hours per pay period. Sick leave is cumulative to 640 working hours. For regular part-time employees, sick leave is calculated on a prorated basis. Unused sick days are not paid out upon an Employee's resignation or termination.

96. The Employees are provided with one (1) paid personal days per calendar year. Personal days taken are deducted from accrued sick time and must be approved in advance. Additionally, the Employees are permitted to utilize their accrued PTO for other reasons including court duty, bereavement, military leave, and office closures.

97. The cost to the Debtor for the Leave Pay is included in gross payroll. Accordingly, and with the exception of amounts owing in connection with accrued but unused vacation, all prepetition amounts related to the Leave Pay should be included in the aggregate amount of Unpaid Compensation.

98.     The Debtor utilizes a self-insured workers' compensation program as well as excess coverage through Catholic Mutual Relief Society of America (the "**Workers' Compensation Program**") for itself and the Related Entities. The Debtor's average annual claims under the Workers' Compensation Program are approximately $22,700 per year. For the activity period ending February 14, 2020, the total amount paid for claims was approximately $2,000.

99.     By covering their employees under a single workers' compensation program, the Debtor and the Related Entities benefit from significant cost savings as a result of the pooled risk and the allocation of plan overhead. Indeed, obtaining workers' compensation insurance for any one of these entities alone would be more expensive due to the small number of employees that would be covered.

100.    Pursuant to that certain Employee Benefits Consulting Services Agreement (the "**Agreement**") dated July 1, 2017, by and between the Debtor and McConkey Benefits & Financial Services, LLC ("**McConkey**"), McConkey provides assistance with strategic benefit planning, design, funding, enrollment, administration, and communication with respect to the Employee Benefits. The services provided by McConkey are for the benefit of both the Debtor and its Employees as well as the benefit of the Related Entities and the Non-Debtor Employees. Through the services provided by McConkey pursuant to the Agreement, the Debtor and its Employees, as well as the Related Entities and the Non-Debtor Employees, are able to enroll in more cost effective Employee Benefits than any one of these entities and its employees would be afforded on their own.

101.    As compensation for its services under the Agreement, McConkey is paid $156,000 annually, billed to the Debtor in monthly installments. HCAS collects the Debtor's and each Related Entities pro rata share of the fees owed to McConkey through the collection of premium

payments for the Plan, Prescription Insurance, and Employee Assistance Program. HCAS made a payment to McConkey in the amount of $13,000 on January 2, 2020.

102.     Therefore, on behalf of the RCDH, I submit the Wage Motion should be granted.

## VI.     Debtor's Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (II) Renew, Amend, Supplement, Extend, or Purchase Insurance Policies, and (III) Granting Related Relief (the "*Insurance Motion*").

103.     In the ordinary course of business, the Debtor maintains insurance policies that are administered by Catholic Mutual Relief Society of America and The National Catholic Risk Retention Group, among others (collectively, the "**Insurance Carriers**"). These policies provide coverage for, among other things, the Debtor's property, general liability, automobile liability and excess umbrella liability (collectively, the "**Insurance Policies**"). A schedule of the Insurance Policies is attached to the Insurance Motion as **Exhibit C**.[8] The Debtor requests authority to continue honoring all obligations under the Insurance Policies on a postpetition basis, in the ordinary course of business.

104.     Continuation of the Debtor's Insurance Policies, and entry into new insurance policies, is essential to the preservation of the value of the Debtor's operations and property of the estate. Further, related non-debtor Catholic entities, such as Catholic schools and ministry outreach centers are additional insureds under the Insurance Policies and contribute amounts to the Debtor for such coverage. The inclusion of additional insureds under the Insurance Policies and coinciding contributions by those additional insureds reduces the cost of the Insurance Policies for the Debtor.

---

[8] In addition to the Insurance Policies listed on **Exhibit C**, the Debtor maintains numerous insurance policies with respect to, among other things, employee health, dental, disability and life insurance benefits, and worker's compensation. These programs are described, and relief is requested with respect to such programs, in the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Employee Benefits Programs; and (II) Granting Related Relief* filed contemporaneously with this Motion.

If the Debtor failed to maintain the Insurance Policies, (a) additional insureds may cease making contributions to the Debtor or otherwise withdraw their participation from the Insurance Policies, thereby unnecessarily increasing the cost of insurance for the Debtor, and (b) additional insureds may have claims against the Debtor and the Debtor's estate, as a result of any nonpayment or resulting cancellation of insurance. Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtor's activities, including the Office of the United States Trustee's (the "*U.S. Trustee*") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, to ensure uninterrupted coverage and continuation of payment plans and schedules between the Debtor and non-debtor Catholic related entities covered by the Insurance Policies, the Debtor requests authority to maintain its existing Insurance Policies, pay any prepetition obligations related to the Insurance Policies, and enter into new Insurance Policies, in the ordinary course of business.

105. Pursuant to the Insurance Policies, the Debtor may be required to pay various deductibles or retention amounts (the "*Insurance Deductibles*"), depending upon the type of claim and insurance policy involved. Under certain policies, the Insurance Carriers may pay claimants and then invoice the Debtor for any Insurance Deductible. In such situations, the Insurance Carriers may have prepetition claims against the Debtor. While the Debtor nor I are aware of any Insurance Deductibles that are due and owing as of the Petition Date, the Debtor seeks authority to honor any amounts owed to the Insurance Carriers, to ensure uninterrupted coverage under its Insurance Policies.

106. The Debtor utilizes an insurance broker, The Graham Company (collectively, the "*Insurance Broker*") to obtain its Insurance Policies. The Insurance Broker primarily assists the Debtor with the procurement and negotiation of the Insurance Policies, enabling the Debtor to

obtain the Insurance Policies on advantageous terms and at competitive rates. The Debtor pays

fees (the "***Brokerage Fees***") to the Insurance Broker in an annual amount of Two Hundred

Thousand Dollars ($200,000). The Brokerage Fees are paid to the Insurance Broker in equal

monthly payments. While the Debtor nor I are aware of any Brokerage Fees that are due and owing

as of the Petition Date, the Debtor seeks authority to honor any amounts owed to the Insurance

Broker, to ensure uninterrupted coverage under its Insurance Policies.

107.    Therefore, on behalf of the RCDH, I submit the Insurance Motion should be

granted.

**VII.    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Continued Use of Existing Cash Management System and Bank Accounts; (II) Extending the Time to Comply with, or Seek a Waiver of, Certain United States Trustee Requirements and Section 345(b) of the Bankruptcy Code; (III) Authorizing the Debtor to Continue Existing Deposit Practices; (IV) Authorizing the Debtor to Maintain Investment Practices; and (V) Granting Related Relief (the "*Cash Management Motion*").**

108.    By the Cash Management Motion, the Debtor requests authority to continue to use

its Cash Management System in the ordinary course and granting related relief.

109.    To maintain the efficient operation of the Cash Management System during this

case, the Debtor also requests its Banks be authorized and directed to continue to administer,

service, and maintain the Bank Accounts and Investment Accounts, as the Banks were prepetition,

without interruption and in the Debtor's ordinary course of business. In that regard, the Debtor

seeks to continue to receive, process, honor, and pay (or to reissue, as may be necessary) all

checks, drafts, wires, ACH transfers, electronic fund transfers, or other items presented, issued,

or drawn on the Bank Accounts (collectively, the "***Disbursements***") on account of any claim this

Court grants the Debtor approval to pay arising before, on, or after the Petition Date, and in

reliance on the Debtor's representations of such authority, subject to the applicable Bank

Accounts containing sufficient funds.

110.     Both in the Cash Management Motion and in other first-day motions, the Debtor seeks authority to pay certain prepetition obligations. For some of these obligations, the Debtor issued Disbursements before the Petition Date that have yet to clear. For others, the Debtor will issue a Disbursement once it has Court authority to do so. The Debtor requests that the Banks be authorized to accept and honor all representations from the Debtor as to which of these Disbursements should be honored. If any Banks nevertheless dishonor Court-approved Disbursements, the Debtor requests authority to issue replacement Disbursements consistent with the orders of this Court.

111.     Continuity of the Cash Management System is critical to the Debtor's operations, but so is flexibility. To that end, the Debtor also requests authority to implement reasonable changes to the Cash Management System that the Debtor may deem necessary or appropriate in the ordinary course, including closing any Bank Account and establishing new bank accounts, and that the applicable Banks be authorized to honor such changes.

112.     The Debtor maintains certain Bank Accounts that do not comply with the requirements of section 345(b) of the Bankruptcy Code and are maintained at a Bank that is not and authorized depository. Specifically, the Debtor maintains an account with Orrstown Bank (the "**Unapproved Bank**").[9] The Unapproved Bank is a highly-rated financial institution that is well-capitalized and financially stable, and is insured by the Federal Deposit Insurance Corporation (the "**FDIC**"). Requiring the Debtor to transfer these Bank Accounts to a designated authorized depository so early in the case would place a needless administrative burden on the Debtor that would unnecessarily divert the attention of the Debtor's management and advisors at a critical

---

[9] As of February 18, 2020, the account at Orrstown Bank contained $565.00.

juncture in the Chapter 11 Case.

113.     The Debtor maintains a credit card account solely in its name with PNC Bank (the "*Credit Card*"). The Debtor and certain Related Entities each have possession of a Credit Card and are permitted to make purchases with the Credit Card. At the closing of each billing cycle, HCAS pays one consolidated bill and bills each Related Entity for its charges to the Credit Card during the previous billing cycle. The Credit Card has an aggregate limit of $500,000 with each individual Credit Card limit ranging from $150 to $75,000. The Credit Card is unsecured. The Debtor wishes to continue using the Credit Card in the ordinary course of business.

114.     The Cash Management System is an integrated network of bank accounts that is critical to the Debtor's operations during this case and, in turn, maximizing the value of the Debtor's estate. The Debtor has designed the Cash Management System to meet its operating needs, enable management to control and monitor funds, reduce administrative expenses by facilitating the movement of funds, and enhance the development of accurate account balances. The Debtor has maintained its Cash Management System for many years, and the cash management system has served as the primary funds flow mechanism for the Debtor's ordinary, usual, and essential business operations.

115.     As of the Petition Date, the Cash Management System includes seventeen (17) bank accounts listed on **Exhibit C** to the Cash Management Motion located at four (4) commercial banks used in the ordinary course of the Debtor's business. The Debtor routinely deposits, withdraws, and otherwise transfers money to, from, and between the Bank Accounts by various methods (collectively, the "*Ordinary Transfer Methods*"), including by checks, drafts, ACH transfers, and other electronic funds transfers.

116.     The Debtor's primary operating accounts are held at PNC Bank. These include an

operating account, payroll disbursement account, and insurance disbursement account. The Debtor also maintains operating accounts at First National Bank of Pennsylvania. These include a credit card, operating account, payroll, deposit account, money market account, and survivors compensation account. The Debtor also has one cemetery deposit account at M&T Bank.

117.    In order to take advantage of the economies of scale and to reduce the costs associated with administrative and benefit program expenses, the Debtor and its non-debtor related entities (the "**Related Entities**") participate in a consolidated payroll disbursement as well consolidated employee benefit plans (as more fully described in the *Debtor's Emergency Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtor to (A) Pay Certain Prepetition Wages, Benefits, and Other Compensation and (B) Continue Employee Compensation and Benefits Programs; and (II) Granting Related Relief* filed contemporaneously herewith) that are processed by Harrisburg Catholic Administrative Services, Inc. ("**HCAS**"). The Debtor and participating Related Entities each fund the costs associated with their own employees' payroll and benefits to the Debtor's payroll Bank Account. HCAS then disperses payments from the Bank Account to the appropriate parties on behalf of the Debtor and Related Entities, respectively.

118.    The majority of the Related Entities maintain their own bank accounts registered under separate employer identification numbers (each, an "**EIN**"). However, some Related Entities maintain accounts for their day-to-day operations in bank accounts registered under the Debtor's EIN. Although these accounts are registered under the Debtor's EIN, they are not the Debtor's Bank Accounts and the funds held in them are not the property of the Debtor's estate. The list of Bank Accounts designated on **Exhibit C** attached to the Cash Management Motion does not include any Related Entities' bank accounts registered under the Debtor's EIN.

119.    In the ordinary course of business, the Debtor uses a variety of checks, correspondence, and business forms. To minimize expenses to the Debtor's estate and avoid unnecessarily confusing the Debtor's employees and creditors, the Debtor believes it is appropriate to continue to use the existing stock of checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "**Business Forms**") as such forms were in existence immediately before the Petition Date— without reference to the Debtor's status as debtor-in-possession—rather than disposing of the existing forms and delaying operations until new Business Forms are obtained, or requiring the Debtor to include a legend on Business Forms that would cause unnecessary confusion. After existing Business Forms are depleted, but no later than forty-five (45) days from the Petition Date, the Debtor's Business Forms will identify the Debtor's status as debtor-in-possession.

120.    The Debtor incurs periodic service charges and other fees in connection with the maintenance of the Cash Management System, which fees and services are generally paid each month (the "**Bank Fees**"). The Debtor has historically incurred Bank Fees of approximately $4,300 per month, which are debited from the respective Bank Account for which the Bank Fee was incurred. As of the Petition Date, the Debtor estimates that approximately $4,300 in Bank Fees have accrued and remain unpaid and seeks permission to pay these Bank Fees and continue paying the Bank Fees in accordance with past practices.

121.    The Debtor maintains a bank account at Orrstown Bank which is not on the list of approved depository banks in this District.  As set forth below, the Debtor seeks an extension of the time to comply with certain U.S. Trustee guidelines and section 345(b) of the Bankruptcy Code with respect to the Bank Accounts held at the Unapproved Bank to forty-five (45) days from the Petition Date.

122.     In addition to its Bank Accounts, as of the Petition Date the Debtor, in the ordinary course of business, maintains twelve (12) investment accounts (the "***Investment Accounts***") listed on __**Exhibit D**__ to the Cash Management Motion with Select Asset Management, Bryn Mawr Trust, ISI Financial Group, and S&T Bank (the "***Investment Banks***"). While maintained by the Debtor, the Investment Accounts are custodial funds held in trust by the Debtor, which include, among other things, perpetual care funds and funds held on behalf of the FOCUS Trust, the Priest Pension Plan (as defined in the Informational Brief), Diocese of Harrisburg School and Parish Trust Fund (as defined in the Informational Brief), and Charitable Trust (as defined in the Informational Brief) for investment purposes. While maintained by the Debtor for purposes of improved investing, the Debtor holds only bare legal title to the funds, with the funds and use of the funds being governed exclusively by the respective trust documents (*i.e.*, the Charitable Trust Agreement (as defined in the Informational Brief), Irrevocable Trust Agreement (as defined in the Informational Brief), and declaration of trust with respect to the FOCUS Trust). Because the funds in the Investment Accounts are custodial funds held in trust by the Debtor, the Debtor respectfully requests authorization to maintain the Investment Accounts at the Investment Banks.

123.     The Debtor and PNC Bank are parties to a credit card agreement for the Credit Card (the "***Credit Card Agreement***") with an aggregate charge limit of $500,000. The Debtor has issued 262 Credit Cards to key staff and personal of the Debtor as well as certain Related Entities for their use in the ordinary course of business.

124.     Therefore, on behalf of the RCDH, I submit the Cash Management Motion should be granted.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on February 19, 2020

/s/ Christopher G. Linscott
Christopher G. Linscott

4832-9565-9953.4

# EXHIBIT H

# EXHIBIT I

# EXHIBIT J



Edwin Caldie
**PARTNER**

DIRECT: 612.335.1404
OFFICE: 612.335.1500

ed.caldie@stinson.com

December 10, 2021

***VIA EMAIL***

Blake D. Roth
Waller Lansden Dortch & Davis, LLP
511 Union Street, Suite 2700
Nashville, TN 37219

Re:     **In re: Roman Catholic Diocese of Harrisburg (Bankr. M.D. Pa., Case No. 1-20-bk-00599 (HWV)) – Demand to Prosecute Claims or Stipulate to Committee Standing to Prosecute Claims**

Dear Blake,

The Official Committee of Unsecured Creditors for the Roman Catholic Diocese of Harrisburg (the "Committee") has concluded that the bankruptcy estate (the "Estate") of the Roman Catholic Diocese of Harrisburg (the "Debtor") has claims against the Roman Catholic Diocese of Harrisburg Charitable Trust and the Roman Catholic Diocese of Harrisburg Real Estate Trust under the Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), 12 Pa. Cons. Stat. §§ 5101-5110 and 11 U.S.C. 544 and 550 (the "Claims") that it must pursue to maximize its value and fulfill its fiduciary and other duties to the Estate and its creditors. The Claims are summarized in the attached document titled "Analysis of Trust Transfer Claims." Given your previous statements dating back to at least September 2020, and your failure to respond to the e-mail sent to you on December 1, 2021, which requested that the Debtor stipulate to an order granting the Committee derivative standing to pursue the Claims, the Committee does not believe that the Debtor has any intention of prosecuting the Claims or stipulating to Committee standing to prosecute the Claims. Nonetheless, the Committee hereby demands that the Debtor prosecute the Claims available to its estate under 12 Pa. Cons. Stat. §§ 5101-5110 and 11 U.S.C. 544.

Please let me know no later than 4:30 p.m. prevailing eastern time on **December 22, 2021**, whether the Debtor agrees or declines to prosecute the Claims and, if it declines, whether the Debtor will stipulate to allow the Committee standing to prosecute the Claims. If we do not hear back from you by 4:30 p.m. prevailing eastern time on **December 22, 2021**, we will assume that the Debtor both declines to prosecute the Claims on behalf of the estate and that it will not stipulate to allow the Committee to prosecute the Claims and will proceed by filing a motion for derivative standing to allow the Committee to prosecute the Claims in order to protect the Estate's, and its creditors' interests.

Please be advised that the Committee does not concede that it must obtain derivative standing to bring one or more of the Claims and that the Committee reserves all rights to take a contrary position. This demand is being made in an abundance of caution to avoid timing issues. Specifically, given that the Debtor filed its bankruptcy case on February 19, 2020, the Claims likely must be asserted by February 19, 2022. 11 U.S.C. 546(a).

50 South Sixth Street, Suite 2600, Minneapolis, MN 55402

December 10, 2021
Page 2

Sincerely,

**Stinson LLP**

Edwin H. Caldie

EHC:lrk

## Analysis of Trust Transfer Claims

### Background

On November 13, 2009, the Roman Catholic Diocese of Harrisburg ("the Diocese") transferred substantially all of its assets into two charitable trusts. In one trust instrument, then-Bishop Kevin Rhoades declared that he held all the Diocese's non-real estate assets as Trustee of the Roman Catholic Diocese of Harrisburg Charitable Trust ("Charitable Trust"). *See* Charitable Trust § 1.2(a). In another, Bishop Rhoades declared that he held all the Diocese's real estate as Trustee of the Roman Catholic Diocese of Harrisburg Real Estate Trust ("Real Estate Trust"). *See* Real Estate Trust § 1.2(a). For ease of reference, we refer to the Charitable Trust and Real Estate Trust as the "2009 Trusts."

The 2009 Trusts are significant for three reasons. First, at the moment of their creation, they contained all (or substantially all) of the Diocese's assets. Thus, as of November 13, 2009, the Diocese purported to have *no assets whatsoever*. The Diocese's informational brief embraces this scenario, claiming that the "Charitable Trust is the primary source of funding of the [Diocese]" and that the Diocese has "very limited assets." Informational Br. ¶¶ 49, 150.

both Trusts exist solely to carry out Diocesan operations. The Charitable Trust states that its purpose is to "perform the functions of, and to carry out the purposes of the Roman Catholic Church, *specifically in carrying out Diocesan operations within the territorial confines of the Diocese.*" *E.g.*, Charitable Trust § 1.1(a) (emphasis added). Similarly, the Real Estate Trust states that its purpose is to "carry[] out Diocesan operations relating to real property within the territorial confines of the Diocese." Real Estate Trust § 1.1(a).

Third, the 2009 Trusts both contain spendthrift clauses. Each Declaration of Trust states that Trust assets "shall not be subject to voluntary or involuntary assignment, transfer, anticipation, legal process, judgments or claims of creditors of . . . any other trust or other entity held or administered by the same Trustee, or affiliated in any way with the Diocese of Harrisburg." Charitable Trust § 1.2(c); Real Estate Trust § 1.2(c). The Diocese goes a step further in its informational brief, stating that "no assets" of either 2009 Trust are assets of the estate. Informational Br. ¶¶ 50, 57.

The Diocese has likely commingled Charitable Trust assets with other Diocese-related funds. The informational brief acknowledges that, until February 2018, the Diocese

---

[1] These figures are from the account statements for the period ending January 31, 2020.

50 South Sixth Street, Suite 2600, Minneapolis, MN 55402

STINSON LLP \ STINSON.COM

CORE/9990000.2173/171463570.1

held "funds and other property" belonging to parishes and schools in the Charitable Trust. Informational Br. ¶ 73-74. The Diocese purported to fix this problem in 2018 by creating yet another trust, the "Roman Catholic Diocese of Harrisburg Irrevocable Trust," for purposes of holding funds deposited by parishes and schools. *Id.* ¶¶ 75-76.

This program resulted in $12.5 million in payments to survivors. Informational Br. ¶ 145. The Diocese's website states that funding came from the priest pension plan and "other existing Diocesan assets." The informational brief does not provide any more detail, stating only that the Diocese borrowed a portion of the settlement funds from the pension plan—which was underfunded at the time—while another portion came from "certain religious entities that also participated in the SCP." Informational Br. ¶¶ 131, 145. This lack of specificity appears intentional, thus calling into question whether the Diocese tapped into Charitable Trust, or Irrevocable Trust, or both to fund the settlements.

In any event, since the Diocese has no other source of funds from which it could repay the pension plan, it follows that the Charitable Trust, at a minimum, is an *indirect* source of funding for the voluntary settlements.

Lastly, there does not appear to be contemporaneous local media coverage discussing the creation of the 2009 Trusts. Indeed, we found no media coverage of the Trusts at all until after the Diocese filed its bankruptcy petition. We are also unaware of any facts that would have put a reasonable survivor on notice that the Diocese had transferred all (or nearly all) of its assets into the 2009 Trusts until after the petition date.

## Analysis

This analysis addresses whether viable legal claims exist to unwind the 2009 Trusts or otherwise bring their assets into the bankruptcy estate. Three principle theories of recovery are addressed: fraudulent transfer, the rule against self-settled spendthrift trusts, and alter ego liability. Based on this analysis, strong claims exist to bring the 2009 Trusts into the bankruptcy estate under each theory.

1. **A strong claim exists for actual fraud under Pennsylvania fraudulent transfer law.**

The Pennsylvania Uniform Voidable Transactions Act (PUVTA) includes a cause of action for actual fraud. 12 Pa. C.S. §§ 5101-5110. A creditor may assert a claim for "actual fraud" if the debtor made the transfer or incurred the obligation with "actual intent to hinder, delay, or defraud any creditor of the debtor." 12 Pa. C.S. § 5104(a)(1). The

Diocese's informational brief outlines sufficient information to assert claims for actual fraud.[2]

A claim to avoid a transfer made with actual intent to defraud is extinguished unless it is brought "not later than four years after the transfer was made or the obligation was incurred or, if later, *not later than one year after the transfer or obligation was or could reasonably have been discovered by the claimant.*" 12 Pa. C.S. § 5109(1) (emphasis added).[3] Under the discovery rule, the statute of limitations is tolled when "a plaintiff, 'despite the exercise of due diligence, is unable to know of the existence of the injury and its cause.'" *Cordua*, 834 F. Supp. 2d at 306 (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)). The applicable limitations period therefore begins to run when the plaintiff discovers "the alleged fraudulent nature of the transfer at issue." *Santander Bank, N.A. v. Branch Banking & Tr. Co.,* No. 1:17-CV-01669, 2018 WL 8368857, at *3 (M.D. Pa. Feb. 5, 2018).

To determine when the discovery rule is triggered, a court must determine the point when the plaintiff knew or reasonably should have known that it was injured and that its injury was caused by another's conduct. *State Farm*, 834 F. Supp. 2d at 306. "The relevant inquiry then is not plaintiff's actual knowledge, but rather whether the knowledge was known, or through the exercise of diligence, knowable to the plaintiff." *Id.* (quotation omitted). Fact issues pertaining to a plaintiff's notice and diligence are typically reserved for the jury. *See, e.g., Rice v. Diocese of Altoona-Johnstown*, 212 A.3d 1055, 1066 (Pa. Super. Ct. 2019) (holding that whether abuse survivors exercised diligence in investigating tort claims was jury question), *review granted* (Pa. Mar. 2, 2020).

In *State Farm v. Cordua*, the court determined that the defendants failed to establish that the plaintiffs knew or should have known about the fraudulent nature of the transfers, "[a]lthough the underlying claim reeked of fraudulent activity." *Cordua*, 834 F. Supp. 2d at 308. Stating that an "action for fraudulent transfers requires money to be transferred to a third party," the court concluded that "checks alone would not reasonably lead Plaintiffs to assume that Defendants were involved in a fraudulent check cashing scheme...." *Id.*; *see also Santander Bank, N.A. v. Branch Banking & Trust Co.*, No. 1:17-CV-01669, 2020 WL 42724, at *6 (M.D. Pa. Jan. 3, 2020) (holding that summary judgment was inappropriate where defendant argued that plaintiff should have noticed

---

[2] The informational brief explains that, as part of the Diocese's restructuring in 2009, it transferred all its assets into the 2009 Trusts. These transfers likely rendered the Diocese insolvent, supporting a claim for constructive fraud. *See* 12 Pa. C.S. § 5104(a)(2). As to actual fraud, at least five "badges of fraud" appear to exist based on the informational brief: (i) the Diocese retained possession or control of the property transferred after the transfers; (ii) before the transfers were made, the Diocese had been sued or threatened with suit; (iii) the transfers included substantially all of the Diocese's assets; (iv) the Diocese likely became insolvent shortly after the transfers were made; and (v) the Diocese did not receive any consideration, much less consideration that was reasonably equivalent in value to the assets transferred. 12 Pa. C.S. § 5014(b).

[3] As a threshold issue, a "transfer" under the PUVTA includes "[e]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset." 12 Pa. C.S. § 5101(b). This definition includes transfers to a trust. *In re Ezra*, 537 B.R. 924 (B.A.P. 9th Cir. 2015) (affirming district court's judgment avoiding two deeds of trust as fraudulent transfers under California law and the Bankruptcy Code).

numerous red flags indicating fraud, but plaintiff maintained that a reasonably diligent banker would not have discovered the fraud before it actually did so).

In a more analogous case, *In re Archdiocese of Milwaukee*, the court analyzed the discovery rule in a case involving a diocese's transfer of funds to a trust. 483 B.R. 855 (Bankr. E.D. Wis. 2012). There, the Archdiocese of Milwaukee transferred $35 million from the "Parish Deposit Fund" to a trust fund seven years prior to filing for bankruptcy. *Id.* at 858. The Committee of Unsecured Creditors asserted that the diocese made the transfer with actual intent to defraud creditors based on the minutes of a 2003 finance committee meeting, in which the committee discussed creating a trust to "shelter" the fund. *Id.* Noting that more than four years had passed since the date of the transfer, the court applied the discovery rule. *Id.* at 863.

The diocese argued that the public disclosure of the transfer put creditors on inquiry notice. *Id.* at 864. In support of its argument, the diocese submitted the affidavit of an employee, who stated that the diocese disclosed the parish fund in financial statements on its website. *Id.* at 863. And after the diocese closed the fund, the employee explained that the diocese sent a letter to the Parishes advising them of the option to have their funds returned or to participate in the new trust. *Id.* at 864.

The court disagreed, reasoning that the publicity of the financial statements, without more, did not clearly disclose the transfer. *Id.* at 866. Although the court acknowledged that the disappearance of a large "noncurrent asset" was available for investigation, the diocese's brief statement that the fund was closed did not suggest that millions of dollars were transferred. The court further noted that the committee minutes stating that the purpose of the trust was to "shelter" the Parish Deposit Fund was not revealed until discovery in the bankruptcy case. *Id.* Accordingly, the court found that the Committee stated a plausible claim that a creditor reasonably could not have discovered the transfer. *Id.* at 866.

Here, the Committee could survive a motion to dismiss a claim that the Diocese created the 2009 Trusts with actual intent to defraud creditors. We are not aware of anything that would have put a reasonable unsecured creditor (including an abuse survivor) on notice that the Diocese transferred all of its assets in November 2009. We found no local press coverage surrounding the creation of the Trusts, and nothing on the Diocese's website informs readers that it transferred all of its assets into the Trusts (and thus would be unable to pay its creditors). This situation is analogous to the facts in the *Milwaukee* decision, where the court held that publication of financial statements alone is insufficient to place creditors on inquiry notice.

## 2. A strong claim exists under Pennsylvania trust law.

A strong claim also can be asserted on grounds that the spendthrift provisions in the 2009 Trusts, which purport to bar claims against Trust assets by creditors of the Diocese, are unenforceable under Pennsylvania law. Specifically, the spendthrift provisions in each Trust are likely void because the Trusts are, in effect, self-settled. Further, the 2009 Trusts are legally unenforceable to the extent they were created for an

improper purpose—namely, to shield the Diocese's assets from liability to abuse survivors or other unsecured creditors.

### a. The spendthrift provision in each trust instrument is invalid because both trusts are self-settled.

, yet each plainly functions to benefit the Diocese and only the Diocese. Under these facts, there is a strong argument that the 2009 Trusts are self-settled, such that their spendthrift provisions are unenforceable.

Under Pennsylvania law, a spendthrift trust exists when there is an express provision in the trust instrument that forbids alienation of a beneficiary's interest by creditors. *In re Keeler's Estate*, 3 A.2d 413, 415 (Pa. 1939); *Wilson v. United States*, 372 F.2d 232, 234 (3d Cir. 1967). An owner may create a trust to give the beneficiary the beneficial interest of the property, while also protecting the property from the beneficiary's creditors. *C.I.T. Corp. v. Flint*, 5 A.2d 126, 128 (Pa. 1939).

It is against public policy, however, for the creator of a spendthrift trust and the beneficiary to be one and the same. A person may not establish a trust in which she retains the beneficial interest in the trust property, while at the same time placing the property beyond the reach of her creditors. *In re Mogridge's Estate*, 20 A.2d 307 (Pa. 1941). A provision barring a creditor from reaching the interest of the settlor-beneficiary is therefore not enforceable under the common law of Pennsylvania. *Morton v. Morton*, 147 A.2d 150, 151–52 (Pa. 1959). Bankruptcy courts in Pennsylvania have acknowledged that such an alleged trust does not fall within the scope of 11 U.S.C. § 542(c)(2) and should not be excluded from the bankruptcy estate. *Walsh v. Hendrickson (In re Hendrickson)*, 274 B.R. 138, 148 (Bankr. W.D. Pa. 2002) (holding that anti-assignment language in structured settlement agreement did not create a trust under Pennsylvania law).

The Trusts are very likely self-settled. First, the Diocese appears to be the settlor of both Trusts. Under Pennsylvania law, a settlor is "[a] person, including a testator, who creates or contributes property to a trust." 20 Pa. C.S. § 7703. "If more than one person creates or contributes property to a trust, each person is a settlor of the portion of the trust property attributable to that person's contribution except to the extent another person has the power to revoke or withdraw that portion." *Id.* Here, the plain terms of the trust instruments suggest the Diocese is the settlor: each Declaration of Trust states
"

Second,

the Trusts operate solely to benefit the diocese. The general rule is that the beneficiary of a charitable trust is the general public "to whom the social and economic advantages of the trust[] accrue[s]." *In re Pruner's Estate*, 136 A.2d 107, 109 (Pa. 1957). It

is also well-established that "[t]he essential part of the definition of a charity is that the persons who are to receive it must be indefinite and uncertain; in other words, they must be of a class; for if a gift be made to individuals by name or description, so that they may be selected and set apart, although they are of a class, the gift is not a charity, but a legacy." *Case of Apprentices' Fund*, 2 Pa. D. 435, 437 (C. P. 1893). Although the 2009 Trusts purport to function solely for the benefit of the Roman Catholic Church, this benefit is limited to "carrying out Diocesan operations within the territorial confines of the Diocese." Charitable Trust § 1.1(a). Thus, rather than benefitting the general public, the 2009 Trusts operate to fund the Diocese's own operations or otherwise benefit the Diocese.

If the court finds that the Diocese is both the settlor and beneficiary of the 2009 Trusts, then the spendthrift provisions will be unenforceable, and creditors of the Diocese will be allowed to reach the Trust assets. In other words, they will become part of the Diocese's bankruptcy estate.

### b. The Charitable Trust is invalid because it has an improper purpose.

Under Pennsylvania law, "a trust may be created only to the extent its purposes are lawful and not contrary to public policy." 20 Pa. C.S. § 7734. Generally, a trust has an illegal purpose if: (1) its performance involves the commission of a criminal or tortious act by the trustee; (2) the settlor's purpose in creating the trust was to defraud creditors; or (3) the consideration for the creation of the trust was illegal. 20 Pa. C.S. § 7734 cmt. An assertion that the Diocese transferred the funds to the trusts with actual intent to hinder, delay, or defraud creditors under 12 Pa. Cons. Stat. § 5104(a)(1), would therefore also invalidate the 2009 Trusts as a matter of trust law.

### 3. Creditors of the Diocese can pierce the 2009 Trusts under a theory of alter ego liability.

Finally, a strong and viable claim exists that the 2009 Trusts are the alter egos of the Diocese.

Pennsylvania law imposes a strong presumption against piercing the corporate veil. *Lumax Indus. Inc. v. Aultman*, 543 Pa. 38, 669 A.2d 893 (1995). The general rule is that a corporation will be regarded as an independent entity even if its stock is owned entirely by one person. *Id.* Nevertheless, "a court will not hesitate to treat as identical the corporation and the individuals owning all its stock and assets whenever justice and public policy demand and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Kellytown Co. v. Williams*, 426 A.2d 663, 668 (Pa. Super. Ct. 1981). "[T]he corporate form will be disregarded only when the entity is used to defeat public convenience, justify wrong, protect fraud or defend crime." *First Realvest, Inc. v. Avery Builders, Inc.*, 600 A.2d 601, 604 (Pa. Super. Ct. 1991) (quotation omitted).

An alter ego claim requires proof that: (1) the party exercised sufficient domination and control over the corporation; and (2) injustice will result if the corporate fiction is

maintained despite a unity of interests between the corporation and its principal. *Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. Ct. 2012). For the second element, no single test has been enunciated. Rather, courts will look to whether the totality of the circumstances warrants piercing the corporate veil. *See Ragan v. Tri–County Excavating, Inc.*, 62 F.3d 501, 516 (3d Cir. 1995) (identifying factors to be relied upon when determining alter ego liability); *In re Diloreto*, 2006 WL 2974156, at *3 (E.D. Pa. Oct.13, 2006) ("Under Pennsylvania law, courts apply a 'totality of the circumstances' test when determining whether to pierce the corporate veil and impose alter ego liability."). Pennsylvania courts consider "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetuate a fraud." *Advanced Tel. Sys., Inc. v. Com-Net Prof'l Mobile Radio, LLC*, 846 A.2d 1264, 1278 (Pa. Super. Ct. 2004) (quotation omitted).

Pennsylvania state courts have not yet addressed whether veil-piercing principles apply to trusts. *Rosenberg v. DVI Receivables, XIV, LLC*, 400 F. Supp. 3d 236, 250 (E.D. Pa. 2019) ("The question of whether the theory of veil-piercing applies to trusts is a matter of state law, and Pennsylvania courts have not resolved this issue."). In other jurisdictions, however, courts routinely apply alter ego theories to the veil of trusts. In *In re Maghezah*, for example, the court pierced the veil of an estate planning trust where the debtor treated the trust "as his own personal vehicle to shield his assets from his creditors and to perpetrate a fraud." 310 B.R. 5, 18 (Bankr. E.D.N.Y. 2004). Applying the badges of fraud, the court found that the debtor intended to conceal his assets from creditors, thus permitting creditors to reach the trust assets. *Id.*; *see also Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 91 (2d Cir. 2003) (recognizing that New York courts have allowed trust piercing where the "respective parties used trusts to conceal assets or engage in fraudulent conveyances to shield funds from adverse judgments); *Limbright v. Hofmeister*, 688 F. Supp. 2d 679, 686 (E.D. Ky. 2010) (applying alter ego theory to family trusts*); In re Gillespie*, 269 B.R. 383 (Bankr. E.D. Ark. 2001) (concluding that trust was debtor's alter ego making entire trust property of bankruptcy estate*); Bracken v. Earl*, 40 S.W.3d 499, 503 (Tenn. Ct. App. 2000) (concluding that individual was alter ego of "so-called trust" which was created as a "means for defendant to protect himself from liability when investing in other people's money in risky ventures"); *In re Bellardita*, No. 05-60471-A-7, 2008 WL 4296554 (Bankr. E.D. Cal. Sept. 19, 2008) (concluding that trust was alter ego of debtor because debtor treated trust assets as her own and disregarded formalities).[4]

A strong claim exists that the 2009 Trusts are the alter egos of the Diocese and thus property of the bankruptcy estate. *See Mass v. Bell Atlantic Tricon Leasing Corp. (In re Mass)*, 178 B.R. 626, 631 (M.D. Pa. 1995) (holding that debtors' corporation was an alter ego of the individual debtors and therefore assets were included in bankruptcy estate). First, the Diocese exerts sufficient control over the Trusts, because the Bishop is Trustee and controls all Trust assets. Second, the 2009 Trusts are used for one purpose—to fund and carry out the Diocese's operations. Nothing appears to have change between November 12, 2009, the day before the Trusts were created, and present. At all times, the

---

[4] One court has noted that nearly every court to have addressed the issue…has concluded that alter ego liability should apply to trusts to the same extent it applies to other legally created fictions." *Bash v. Williams*, No. 5:16 CV 257, 2016 WL 1592445, at *3 (N.D. Ohio Apr. 20, 2016).

Bishop used the same assets for the same purpose; the change in title was in name only. Third, the Diocese claims to have no assets of its own, thus suggesting the Diocese is undercapitalized. And fourth, allowing the Diocese to avoid liabilities to survivors of sexual abuse would plainly constitute an injustice.

## Conclusion

We believe the estate has at least three potential avenues for bringing the 2009 Trusts into the bankruptcy estate: the law of fraudulent transfers, the rule against self-settled spendthrift trusts, and equitable principles of veil-piercing. Each of these claims is promising (i.e., far more likely than not to succeed on the merits) and could permit the estate to recover tens of millions of dollars for survivors of clergy abuse and other creditors. Either the estate must assert these Claims or the Committee must take the actions necessary to do so itself.