| | |
|---|---|
| In re: | Chapter 11 |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Case No. 1:20-bk-00599 (HWV) |
| Debtor. | |

**REPLY IN SUPPORT OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING AND AUTHORITY TO COMMENCE, PROSECUTE, AND SETTLE CAUSES OF ACTION ON BEHALF OF THE DEBTOR'S BANKRUPTCY ESTATE**

## INTRODUCTION

The Diocese has elected to deploy more of the estate's limited resources to continue defending a fraudulent scheme that placed nearly all of its assets beyond the reach of creditors—including the Survivors.[1] The Diocese refuses to pursue claims that could be worth over $80 million to the estate and, even as it does so, argues that the factual context of its 2009 transfers should insulate them from legal attack by any other party in interest. The Committee should be permitted to commence prosecution of the claims outlined in its Motion to test the veracity of the Diocese's self-serving assertions of fact and to preserve the viability of the most valuable assets of this estate.

"[A] creditor's claims are colorable if they would survive a motion to dismiss." *In re Rosenblum*, 545 B.R. 846, 863–64 (E.D. Pa. 2016) (quoting *In re Racing Servs., Inc.*, 540 F.3d 892, 900 (8th Cir. 2008)). The Motion supplies factual assertions that are more than sufficient to support several colorable claims to recover the Diocese's transfers to the 2009 Trusts. In sum, the

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

172305027

Diocese fraudulently transferred the property at issue with the actual intent to defraud creditors, including survivors of clergy sexual abuse, the Diocese created self-settled trusts with spendthrift clauses in violation of Pennsylvania law, and the Trusts were created as alter egos of the Diocese.

In its opposition, the Diocese attempts to distract attention from the glaring need for the relief sought by the Committee's Motion as well as its own glaringly-obvious conflict of interest. The Diocese raises five central arguments. First, the Diocese offers a treatise on the history of unincorporated associations under Pennsylvania law to argue that the Diocese, as an unincorporated religious association, cannot hold title to property. Because the Diocese could not hold property in 2009, the Diocese asserts, it is not possible that a voidable transfer occurred when the Diocese moved virtually all of its assets into two trusts expressly insulated from the reach of its creditors. Second, the Diocese maintains that the Committee's claims for fraudulent transfer are barred by the statute of limitations because the existence of the Trusts was public knowledge. Third, the Diocese argues that the Committee failed to plead adequately that it transferred all of its real-estate and other material assets to the Trusts with actual intent to hinder, delay, or defraud its creditors. Fourth, the Diocese contends that the 2009 Trusts are not self-settled, and therefore invalid spendthrift trusts, because again the Diocese could not own property in its name as an unincorporated association. Finally, the Diocese points to several purported factual disputes to argue that the Committee's alter ego claims are not colorable as a matter of law.

The Diocese's objections rely heavily on irrelevant factual assertions, attempt to impose pleading standards that the Committee is not required to satisfy, and assert legal arguments that lack substantive merit. For these reasons, and others stated below, the Diocese's objections should each be overruled and the Committee's Motion should be granted.

# ARGUMENT

## I. The Claims Would Survive a Motion to Dismiss.

Each cause of action identified in the Committee's Motion remains legally viable, the Committee has pleaded facts sufficient to support a claim(s) for each viable cause of action identified, and all facts alleged by the Committee must be accepted as true at this stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[A]complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (quotation omitted)). As a result, each of the claims identified by the Committee would survive a motion to dismiss and the Motion must be granted.

### A. The Claims Based on Actual Fraud are Colorable.

The Diocese argues that any fraudulent transfer claim arising under 12 Pa.C.S. § 5104(a) is inviable as a matter of law because (i) no transfer actually occurred, (ii) the Committee cannot identify any creditor entitled to bring an action for fraudulent transfer, (iii) any claim for fraud is barred by a statute of limitations, and (iv) the Committee failed to plead fraud with particularity.

#### *i. The Diocese held assets and transferred virtually all of them.*

The Diocese argues that no actual transfer took place when it quietly and carefully took all steps necessary to move tens of millions of dollars into two separate, self-settled trusts in 2009. Specifically, the Diocese argues (i) that the creation of the 2009 Trusts "merely" formalized a trust relationship already in place at the time pursuant to Canon Law, and (ii) that the Diocese was not legally capable of holding property in 2009, so it would have been impossible for the Diocese to transfer anything. Roman Catholic Diocese of Harrisburg's Objection to the Official Comm. of Tort Claimants' Mot. for Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the Debtor's Bankr. Estate ("Objection"), ECF No. 913, at 23.

3

172305027

Case 1:20-bk-00599-HWV    Doc 1059    Filed 01/26/22    Entered 01/26/22 10:19:01    Desc
Main Document    Page 3 of 17

As an initial matter, the Diocese may not establish the existence of an unwritten trust relationship by reference to the internal rules of its religion.[2] Denying the Motion through the application of Canon Law would violate the Establishment Clause of the First Amendment, contradict relevant Supreme Court precedent, and run contrary to decisions issued by every bankruptcy court that has reviewed this question to date.[3] The existence of a pre-transfer trust *that is recognized by civil law* could theoretically give rise to an affirmative defense to claims against the 2009 Trusts. The defendants would presumably bear the burden of proof on such an issue, however, and the related inquiry would likely require a great deal of factual development and have

---

[2] The Diocese's Objection impermissibly invites the Court to defer to Canon Law. Other Catholic entities have extended the same invitation under similar circumstances, but bankruptcy courts have refused, instead applying the neutral-principles approach. *See, e.g., In re Roman Catholic Archbishop of Portland in Oregon*, 335 B.R. 842, 853 (Bankr. D. Or. 2005) ("Debtor, as religious organization, is free to organize its internal affairs in accordance with its internal church law. It has choices about how to organize itself under civil law in a way that recognizes and implements its internal organization with relation to the secular world. A court's enforcement of the consequences of those choices, whether or not they accurately reflect the church's internal property ownership view, neither rearranges the church's polity in violation of the First Amendment nor interferes with the church's right to make those choices."); *In re Catholic Bishop of Spokane*, 329 B.R. 304, 321 (Bankr. E.D. Wash. 2005), *aff'd in part sub nom. Comm. of Tort Litigants v. Catholic Diocese of Spokane*, CV-05-0274-JLQ, 2006 WL 211792 (E.D. Wash. Jan. 24, 2006), *and rev'd in part sub nom. Comm. of Tort Litigants v. Catholic Diocese of Spokane*, 364 B.R. 81 (E.D. Wash. 2006); *Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 750 (7th Cir. 2015).

[3] The First Amendment's Establishment Clause states that "Congress shall make no law respecting an establishment of religion." U.S. Const. Amend. I. In order to avoid Establishment Clause violations, the Supreme Court developed the "neutral-principles of law" approach. The doctrine is applied to certain religious-entity disputes, such as those pertaining to requirements for incorporation or property ownership. *See, e.g., Jones v. Wolf*, 443 U.S. 595, 603 (1979). "The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity." *Id.* The approach requires that courts exclusively apply "objective, well-established concepts of trust and property law" rather than delving into the perilous realm of "religious doctrine, polity, and practice." *Id.* Therefore, a neutral-principles analysis "shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties." *Id.*; *see also Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969) ("Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded…[T]he [First] Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions."); *Maktab Tarighe Oveyssi Shah Maghsoudi, Inc. v. Kianfar*, 179 F.3d 1244, 1249 (9th Cir. 1999) ("[S]ecular principles of property, trust and corporate law when the instruments upon which those principles operate are at hand. Thus no First Amendment issues arises when a court resolves a church property dispute by relying on state statutes concerning the holding of religious property, the language in the relevant deeds, and the terms of corporate charters of religious organizations."). To apply the neutral-principles of law approach properly, a court must rely solely on the same civil laws and documents that it would utilize in resolving a dispute between purely non-religious entities. *Id.*

to be addressed either at the summary judgment stage or at trial. *Masgai v. Masgai*, 333 A.3d 861, 865 (Pa. 1975) (stating "[o]ne who seeks to establish the existence of a resulting trust bears a heavy burden of proof; the evidence must be 'clear, direct, precise, and convincing.'" (quoting *Policarpo v. Policarpo*, 189 A.2d 171, 172 (Pa. 1973)). In any event, the Committee had no obligation to plead the non-existence of affirmative defenses in support of its Motion. The Committee was not obligated to plead, in other words, that a Canon Law trust *did not already exist* when the Diocese transferred tens of millions into the 2009 Trusts. The Committee was required only to assert factual allegations for which it had a reasonable basis and that, when taken as true, are sufficient to allege a claim for fraudulent transfer. The Committee has satisfied this requirement and its Motion should be granted.

The Diocese's assertion that it could not have made the transfers at issue in 2009 because it could not legally hold property at that time also fails. Unincorporated religious associations may hold title to property under Pennsylvania law. 10 P.S. § 81; *see also St. Michael & Archangel Russian Orthodox Greek Catholic Church v. Uhniat*, 301 A.2d 655, 661 (Pa. 1973) (concluding unincorporated religious association was capable of taking take to property). In *Phipps v. Jones*, 20 Pa. 260 (1853), the Pennsylvania Supreme Court acknowledged unincorporated religious associations as having "been recognized as having an associate and quasi-corporate existence in law, **with the power to hold land and build appropriate houses**, and of course with power to acquire rights by contract, and to vindicate them." *Id.* (emphasis added). In *Chester Hous. Auth. v. Ritter*, 25 A.2d 72, 73 (Pa. 1942), the Court reiterated its perspective: "There can be no doubt whatever that the unincorporated congregation was competent to contract to buy the land and to build the church…."

Moreover, the Diocese's reliance on *Canovaro v. Brs. Of Order of Hermits of St. Augustine*, 191 A.140 (Pa. 1937) is misplaced. In *Canovaro*, the Archbishop of the Diocese of Philadelphia issued a decree dismembering the Parish of the Church of Our Lady of Good Counsel. *Id.* at 142-43. Former church members, claiming to be an unincorporated association independent of the Roman Catholic Church, filed suit, alleging that the church and school properties were impressed with a trust for their benefit. *Id.* After the lower court dismissed their claims, the plaintiffs conceded on appeal that they were members of the Roman Catholic faith. *Id.* at 143-44. The Supreme Court of Pennsylvania relied upon a recently-enacted statute to hold that plaintiffs, as former church members, had no property rights in the church property. *Id.* at 146-47. As such, *Canovaro* stands for the proposition that a member of a parish has no property right in church property after dismemberment. *Id.* at 145. The case does not, however, provide guidance as to whether an unincorporated religious association may hold property. And notably, legal title to the church property at issue in *Canovaro* was held in the name of the Brothers of the Order of St. Augustine, which plainly demonstrates the ability of unincorporated religious associations to hold property and directly undermines the Diocese's argument. *Id.* at 143.

The Diocese's contention that it is—and has always been—incapable of holding title to property thus fails as a matter of Pennsylvania law. As an unincorporated religious association capable of holding property, the Diocese was able to hold and convey property to the 2009 Trusts. As such, the Committee's claims for fraudulent transfer are colorable and the Motion should be granted.

### ii. The Debtor has creditors.

In its Objection, the Diocese asserts that the Committee failed to identify a specific creditor upon whose behalf the Committee seeks relief. Objection, at 21. But as the Diocese admitted at the inception of this bankruptcy proceeding, "the [Diocese] has faced and continues to face

6

172305027

numerous claims by survivors of clergy sex abuse." Informational Br. of the Roman Catholic Diocese of Harrisburg ("Informational Br."), ECF No. 2, at ¶¶ 5-6. In its schedules of assets and liabilities, the Diocese also identified numerous tort claimants, in addition to tens of other creditors. *See* Global Notes, Methodology and Specific Disclosures Regarding the Debtor's Schedules of Assets and Liabilities and Statement of Fin. Affairs ("Schedules"), ECF No. 142.

The Diocese is not hiding its exposure to claims from survivors of clergy sex abuse; rather, it has expressly acknowledged such claims exist, even stating that the Diocese "still faces potentially significant exposure from remaining claimants, including as a result of certain changes in law by the Commonwealth of Pennsylvania." Informational Br., ¶ 6. Indeed, the Diocese claims to have filed for the protections of bankruptcy in order to, in part, "provide compensation for the unresolved claims of survivors of abuse, including those survivors who have not yet come forward." Informational Br., ¶ 7(a). As the Diocese notes in its Objection, 59 Survivors have filed proofs of claim. Objection, at 14. But neither the Diocese nor any other party with proper standing has asserted substantive objections to these claims seeking their disallowance. The Diocese cannot now ignore the very claims that it admits drove it into bankruptcy. Consequently, the Diocese's argument that the Committee has not identified any creditors entitled to bring an action under PUVTA is wholly without merit.

> iii. *The Committee has asserted a colorable argument that the fraudulent transfer Claims are timely.*

As the Committee established in its opening brief, the Survivors could not have known about the transfers to the 2009 Trusts when they occurred. A claim to avoid a transfer made with actual intent to defraud remains viable if asserted "not later than four years after the transfer was made or the obligation was incurred or, if later, not later than one year *after the transfer or obligation* was or could reasonably have been discovered by the claimant." 12 Pa. Cons. Stat.

§ 5109(1). The discovery rule tolls the statute of limitations when "a plaintiff 'despite the exercise of due diligence, is unable to know of the existence of the injury and its cause.'" *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 306 (E.D. Pa. 2011) (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)).

The Diocese maintains that the Survivors should have known of the fraudulent nature of the transfers because (1) all persons are charged with knowledge of the law; (2) the ownership status of the Diocese's real estate assets are publicly recorded; and (3) the Diocese's financials are accessible to the public. The Diocese's arguments miss the point. The applicable limitations period begins to run when the plaintiff discovers "*the <u>fraudulent nature</u> of the transfer*, rather than the plaintiff's mere knowledge of the transfer itself." *Santander Bank, N.A. v. Branch Banking & Tr. Co.*, No. 1:17-CV-01669, 2018 WL 8368857, at *3 (M.D. Pa. Feb. 5, 2018) (emphasis added); *SEC v. Forte*, Civ. Nos. 09-63, 09-64, 2012 WL 1719145, at *8 (E.D. Pa. May 16, 2012) (reasoning that a party's objection with respect to § 5109(1), analogous to arguments made by the Diocese, which asked the court to "look to the date the transfer—not its fraudulent nature—could have been discovered" was "absurd").

Even if each Survivor were charged with an obligation to know the relevant law, access and analyze the ownership status of the Diocese's real estate assets, and review and comprehend the Diocese's financials, meeting such obligations still would not place a Survivor on notice of the *fraudulent nature* of the Diocese's transfers. The deeds conveying property to the Real Estate Trust simply memorialize how certain parcels were titled and the occurrence of certain transfers. By reviewing such records, Survivors could not have learned that the Diocese transferred *all* of its real estate assets into the Real Estate Trust to shield assets from its creditors.

Similarly, the availability of financial information on the Diocese's website is insufficient to demonstrate the Survivors were on notice of the fraudulent nature of the transfer of *all* the Diocese's non-real estate assets to the Charitable Trust. In the bankruptcy case filed by the Archdiocese of Milwaukee, the court rejected the diocese's argument that the public disclosure of a similar transfer put creditors on inquiry notice when the diocese disclosed its financial statements on its website. 483 B.R. 855, 866 (Bankr. E.D. Wis. 2012). Instead, the court concluded that the mere publicity of the financial statements, without more, did not clearly disclose the transfer. *Id.*

The Diocese maintains that this case is distinguishable from *In re Archbishop of Milwaukee* because more financial information was purportedly accessible on the Diocese's website than was made available by the Archdiocese of Milwaukee. The sufficiency of information provided by the Diocese on its website is, of course, once again, a factual issue that requires development and would require consideration at the summary judgment stage or at trial. That fact alone warrants the granting of the Committee's Motion over this basis for the Diocese's objection. Even setting that dispositive, threshold fact aside, however, none of the financial information offered by the Diocese disclosed the most relevant fact: that the Diocese transferred *all* of its assets to the 2009 Trusts. Like the survivors in the *Archdiocese of Milwaukee*, the Survivors here had no knowledge of the creation of the 2009 Trusts—or the Diocese's motivations in creating the Trusts—and could not have reasonably discovered the existence, or the fraudulent nature, of the 2009 Trusts.

    *iv. **The Committee Adequately Pleaded that the Diocese Transferred its Assets with Actual Intent to Hinder and Defraud the Survivors.***

Seeking to impose a hyper-heightened pleading standard, the Diocese misconstrues the allegations contained in the Complaints. It is true that claims under PUVTA § 5104(a)(1) are subject to Fed. R. Civ. P. 9(b), and the Complaint must therefore "plead the circumstances constituting the alleged [actually] fraudulent conveyances with particularity." *Image Masters, Inc.,*

9

172305027

Case 1:20-bk-00599-HWV Doc 1059 Filed 01/26/22 Entered 01/26/22 10:19:01 Desc
Main Document Page 9 of 17

*v. Chase Home Fin.*, 489 B.R. 375, 393 (E.D. Pa. 2013) (quotation omitted). In other words, the "who, what, when, where, and how" of the claim must be pleaded. *In re Covenant Partners, L.P.*, 531 B.R. 84, 89 (Bankr. E.D. Pa., 2015) (quotation omitted). That said, "intent need only be alleged generally." *Image Masters, Inc.*, 489 B.R. at 395 (citing Fed. R. Civ. P. 9(b)).

Here, the Committee's proposed Complaints state plausible claims under the actual intent standard. First, the Complaints satisfy the applicable standard that intent be pleaded generally. Kugler Decl., Ex. A, ¶ 18. Second, as conceded by the Diocese, the Complaints allege very significant badges of fraud:

(1) the Diocese retained possession or control of the property after the transfers because the Bishop served as Trustee. Kugler Decl., Ex. A, ¶ 19(a).

(2) before the Diocese made the transfers, the Diocese faced the threat of litigation based on widely publicized reports of clergy sexual abuse around the United States in the early- to mid-2000s. Kugler Decl., Ex. A, ¶ 19(b).

(3) the transfers included substantially all of the Diocese's assets. Kugler Decl., Ex. A, ¶ 19(d).

(4) the Diocese became insolvent shortly after making the transfer of its non-real estate assets to the Charitable Trust and all of its real estate assets to the Charitable Trust. Kugler Decl., Ex. A, ¶ 19(e).

(5) the Diocese did not receive consideration, or consideration reasonably equivalent in value, in exchange for the assets transferred. Kugler Decl., Ex. A, ¶ 19(g).

Accepting these factual allegations as true, which the Court properly does at this stage, the Complaints contain more than sufficient factual support to state plausible claims against the Diocese under the actual intent standard.

10

172305027

Case 1:20-bk-00599-HWV    Doc 1059    Filed 01/26/22    Entered 01/26/22 10:19:01    Desc
Main Document    Page 10 of 17

In addition to the foregoing, the Complaints provide sufficiently-particular details regarding the fraud to satisfy the heightened pleading standard of Rule 9(b). The allegations provide substantial detail regarding the 2009 Trusts, the property transferred, the identities of the transferees, and identify with particularity at least five badges of fraud. The Diocese has all of the detail it needs, as it has for many months, to understand and evaluate the bases for claims of fraud identified by the Committee. The Committee's allegations notify the Diocese of the "who, what, when, where, and how" of the misconduct with which they are charged. *Cf. Image Masters, Inc.*, 489 B.R. at 393-95 (concluding that a trustee's complaint satisfied Rule 9(b) because it "alleged in detail the nature and scope" of the fraudulent scheme "as well as the dates and amounts of each transfer she sought to avoid"); *River Rd. Dev. Corp. v. Carlson Corp.-Ne.*, CIV. A. No. 89-7037, 1990 WL 69085, at *10 (E.D. Pa. May 23, 1990) (concluding that the plaintiff's complaint satisfied Rule 9(b) because it identified not just the "plan and scheme" of the fraud, but also the "conveyances in question," even if it did not "identify [the] specific dates and amounts of these conveyances…because this information is peculiarly within the knowledge of [the] defendants").

The Diocese's contention that the Committee failed to "include [] statements or information, either from the time the Trusts were documented in the written declarations or from the subsequent twelve years, to reasonably support its claim" is misleading. Despite the Committee's repeated requests for documents relating to all meeting minutes of the Diocesan Financial counsel, or any related sub-committee or sub-council, from 2009 to the present, the Diocese declined to produce documents from the time of the creation of the 2009 Trusts. The Diocese should not be rewarded for failing to provide this critical, contextual information (information that has been similarly unavailable to Survivors since 2009) and, if the Committee's

Motion is granted, the production of all such information will almost certainly be secured and its probative value can be analyzed by the Court and all parties at that time.

The Committee adequately pleaded that, when the Diocese transferred all of its assets into two trusts in 2009, it did so with the actual intent to hinder, delay, or defraud its creditors. As a result, the Committee's claims for actual fraud are colorable, and the Court should grant the Committee's Motion.

### B. The Committee's Claims to Set Aside or Disregard the 2009 Trusts are Colorable Because the Trusts are Self-Settled, Spendthrift Trusts.

The Diocese's Objection to the Committee's Trust avoidance claims are premised, again, on the erroneous theory that the Diocese cannot hold property as an unincorporated association. Under Pennsylvania law, a person may not establish a trust in which it retains the beneficial interest in the trust property, while at the same time placing that property beyond the reach of its creditors. *In re Mogridge's Estate*, 20 A.2d 307 (Pa. 1941). And such a provision barring a creditor from reaching the interest of the settlor-beneficiary is therefore not enforceable under the common law of Pennsylvania. *Morton v. Morton*, 147 A.2d 150, 151–52 (Pa. 1959).

As explained above, the Diocese, as a religious unincorporated association, may hold property in Pennsylvania. The Diocese is thus the "settlor" of both the Charitable Trust and the Real Estate Trust. Under Pennsylvania law, a settlor is "[a] person, including a testator, who creates or contributes property to a trust." 20 Pa. Cons. Stat. § 7703. The plain terms of the trust declarations indicate that the Diocese is the settlor as each Declaration of Trust states that the trust res consists of real or non-real assets "of the *Diocese*." *See* Kugler Decl. Ex. C., Ex. A (listing assets as "[a]ll and every item of tangible and intangible property of the Diocese, other than real property"); Kugler Decl. Ex. D, § 1.2(a) (listing assets as "all of the real property, and the structures and fixtures appurtenant thereto, belonging to the Diocese").

The Diocese did not dispute that it is the beneficiary of the 2009 Trusts in its Objection. Accordingly, because the Diocese is both settlor and beneficiary of the 2009 Trusts, the spendthrift provisions contained in each of the Trusts, which seek to bar creditors from reaching the assets of the settlor-beneficiary, are unenforceable and void as a matter of applicable law. Colorable claims therefore exist that the assets of the 2009 Trusts are property of the Diocese's bankruptcy estate.[4]

### C. The Alter Ego Claims are Colorable.

#### i. Alter Ego Theories Apply to Trusts.

Although Pennsylvania courts have not addressed whether veil-piercing principles apply to trusts,[5] other jurisdictions routinely apply alter ego theories to pierce corporate forms in the trust context. *See In re Maghezah*, 310 B.R. 5, 18 (E.D.N.Y. 2004) (piercing veil of estate planning trust where debtor treated the trust "as his own personal vehicle to shield assets from his creditors and to perpetrate a fraud"); *see also Babitt v. Vebeliunas (In re Vebeliunas)*, 332 F.3d 85, 91 (2d Cir. 2003) (recognizing that New York courts have allowed trust piercing where the "respective parties used trusts to conceal assets or engage in fraudulent conveyances to shield funds from adverse judgments); *Limbright v. Hofmeister*, 688 F. Supp. 2d 679, 686 (E.D. Ky. 2010) (applying alter ego theory to family trusts); *In re Gillespie*, 269 B.R. 383 (Bankr. E.D. Ark. 2001) (concluding that a trust was a debtor's alter ego making the entire trust property of bankruptcy estate); *Bracken v. Earl*, 40 S.W.3d 499, 503 (Tenn. Ct. App. 2000) (concluding that an individual was the alter ego of a "so-called trust" which was created as a "means for defendant to protect himself from liability when investing in other people's money in risky ventures"); *In re Bellardita*, No. 05-

---

[4] As the Committee noted in its Motion, the Court's approval of the Motion is not required to determine property of the estate under Section 541. *See Comm. of Tort Litigations v. Catholic Diocese of Spokane*, No. CV-05-0274, 2006 WL 211792 (E.D. Wash. Jan. 24, 2006) (stating that committee was not required to obtain "specific permission…to bring an adversary action to determine the assets of the estate.").

[5] *Rosenberg v. DVI Receivables, XIV, LLC*, 400 F. Supp. 3d 236, 250 (E.D. Pa. 2019) ("The question of whether the theory of veil-piercing applies to trusts is a matter of state law, and Pennsylvania courts have not resolved this issue.")

60471-A-7, 2008 WL 4296554 (Bankr. E.D. Cal. Sept. 19, 2008) (concluding that a trust was the alter ego of a debtor because the debtor treated trust assets as her own and disregarded formalities).

The Diocese argues that alter ego remedies are not applicable to trusts under Pennsylvania law and, in so doing, relies on *Mark Hershey Farms, Inc. v Robinson*, 171 A.3d 810 (Pa. Super. 2017). Objection, at 33. *Robinson* is not applicable in this case. In *Robinson*, a creditor sought to hold the defendant liable for the debts of a corporation. *Id.* at 813. The defendant was not, however, a shareholder, but rather the executor and beneficiary of an estate that held all of the corporation's stock. *Id.* Despite ample evidence that the defendant misused the corporate form, the court ultimately rejected the veil-piercing claim because the defendant was not a shareholder. *Id.* at 817.

Unlike in *Robinson*, the Committee seeks to assert a *reverse* piercing claim. In other words, the Committee is seeking to hold the 2009 Trusts liable for the debts of the beneficiary, not the other way around as was the case in *Robinson*. *Robinson* is therefore neither persuasive nor instructive and, in any event, does not stand for the broad proposition that alter ego claims are unavailable to pierce the corporate veil of a trust under Pennsylvania law. The Court should thus follow the vast weight of uncontroverted, relevant authority and permit the Committee to assert alter ego theories against the 2009 Trusts.

      *ii.*    ***The Committee Sufficiently Pleaded the Elements to Impose Alter Ego Liability.***

In its Objection, the Diocese takes issue with the Committee's allegations with respect to alter ego liability. Objection, at 34-38. The Diocese argues that the Committee's allegations in support of alter ego claims constitute legal conclusions and that such allegations are irrelevant and factually inaccurate. At best, these arguments by the Diocese either reference or create factual disputes and, in each case, do not constitute a basis to deny the Committee's Motion.

14
172305027

Case 1:20-bk-00599-HWV    Doc 1059    Filed 01/26/22    Entered 01/26/22 10:19:01    Desc
Main Document    Page 14 of 17

"Given the complex, fact-specific questions related to the alter ego issue, the question whether one corporation is an alter ego of another is typically treated as a question of fact." *Castle Cheese, Inc. v. MS Produce, Inc.*, No. 04-878, WL 4372856 (W.D. Pa. Sept. 19, 2008) (citing *Crane v. Green & Freedman Baking Co., Inc.,* 134 F.3d 17, 22-23 (1st Cir. 1998)). To plead a claim based on an alter ego theory, the Committee needed only to allege: (1) that the party exercised domination and control over [the] corporation; and (2) that injustice will result if corporation fiction is maintained despite unity of interests between [the] corporation and its principal." *Allegheny Energy Supply Co., LLC v. Wolf Run Min. Co.*, 53 A.3d 53, 58 n.7 (Pa. Super. Ct. 2012).

The Committee adequately pleaded that the 2009 Trusts are the alter egos of the Diocese. Specifically, the Committee pleaded that (i) the Diocese exerts sufficient control over the 2009 Trusts because the Bishop is the Trustee and controls all Trust assets; (ii) the 2009 Trusts are singularly utilized to fund and carry out Diocesan operations; (iii) the Diocese's schedules claim that it has limited assets, which would render it undercapitalized; and (iv) allowing the Diocese to shield itself under a fraudulent scheme from the liabilities to Survivors of sexual abuse would plainly constitute an injustice. These allegations are sufficient to state a claim under Pennsylvania law. *See Galgay v. Gangloff*, 677 F. Supp. 295, 300 (M.D. Pa. 1987) (holding multiemployer plan stated claim against enterprises for alter ego liability where plan alleged enterprises conducted same or similar business, operated out of same office and shared equipment, assets, and employees and each enterprise was controlled by the same individual). The Diocese's arguments to the contrary cannot be resolved without discovery and are irrelevant to the standard applicable to the present Motion.

15

**D. The Debtor Unjustifiably Refused to Pursue the Claims Against the 2009 Trusts.**

The Diocese's unwillingness to pursue claims against the 2009 Trusts undoubtedly stems from its involvement and inherent interest relating to the fraudulent scheme to shield assets from creditors—most notably, the Survivors. Whether a refusal to pursue litigation is "unjustifiable" depends on the facts and circumstances of each case, and more specifically whether pursuit of the claims at issue is likely to materially benefit the estate. *In re Racing Servs.*, Inc. 540 F.3d 892, 900 (8th Cir. 2008). The potential benefit to the estate could not be more salient. If the claims identified by the Committee are not asserted against the 2009 Trusts, creditors will forever lose the ability to pursue more than $80 million in fraudulent transfers made by the Diocese as part of a fraudulent scheme. Because the Diocese refuses to bring the fraudulently-transferred assets back into the estate on its own initiative, the Court should grant the Committee derivative standing to pursue the claims to ensure that this substantial, potential opportunity for closure and fairness is not permanently placed beyond the reach of parties in interest, including Survivors.

## CONCLUSION

For the foregoing reasons, and the reasons outlined in the Committee's Motion, the Committee respectfully requests that the Court enter an order granting the Committee derivative standing to assert, litigate, and settle avoidance actions on behalf of the Debtor's estate.

Dated: January 26, 2022

*/s/ Robert T. Kugler*
Robert T. Kugler (#194116)
Edwin H. Caldie (#0388930)
**STINSON LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
Facsimile: (612) 335-1657
Email: robert.kugler@stinson.com
Email: edwin.caldie@stinson.com

**COUNSEL FOR THE OFFICIAL COMMITTEE OF TORT CLAIMANTS**