**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

IN RE:                                :
                                      :          CASE NO. 1:20-bk-00599 (HWV)
ROMAN CATHOLIC DIOCESE                :
OF HARRISBURG,                        :          CHAPTER 11
                    Debtor.           :

## <u>OPINION</u>

This matter came before the Court for hearing on February 3, 2022 (the "Hearing")

regarding the Motion of the Official Committee of Tort Claimants (the "Committee") for

Standing and Authority to Commence, Prosecute, and Settle Causes of Action on Behalf of the

Debtor's Bankruptcy Estate (the "Motion for Derivative Standing" or "Mot") (Doc. No. 841), the

Objection filed thereto (the "Objection" or "Obj.") (Doc. No. 913) by the Roman Catholic

Diocese of Harrisburg (the "Debtor"), and the Committee's Reply in Support its Motion for

Derivative Standing (the "Reply") (Doc. No. 1059).

## I.       Jurisdiction

This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(b).

This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  Venue is proper pursuant to 28

U.S.C. §1409.

## II.      Factual Background and Procedural History

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on

February 19, 2020. The statute of limitations for pursuing avoidance claims such as preferences

and fraudulent transfers will therefore expire on February 19, 2022. *See* 11 U.S.C. § 546(a). On

May 25, 2012, the Committee filed the Derivative Standing Motion seeking an order granting it

the exclusive and irrevocable authority to commence, prosecute, and settle two fraudulent

1

transfer complaints against two separate trusts created by the Diocese (individually the "RE Complaint" or "RE Comp." and the "CH Complaint" or "CH Compl."; collectively the "Complaints" or "Compls."). The alleged fraudulent transfers identified by the Committee occurred on November 13, 2009, when the Debtor transferred substantially all its assets, including its real and non-real property, into the Roman Catholic Diocese of Harrisburg Charitable Trust (the "Charitable Trust" or "CH Trust") and the Roman Catholic Diocese of Harrisburg Real Estate Trust (the "Real Estate Trust" or "RE Trust", and together with the Charitable Trust, the "Trusts").

The Committee contends the transfers were made with actual intent to hinder, delay, or defraud creditors because they were made at a time when the Debtor faced increasing threats of litigation due to widely publicized reports of clergy sexual abuse throughout the United States. (Compls., ¶19b). In the Complaints, the Committee seeks to recover the transfers pursuant to 11 U.S.C. §§ 541(a), 542, 544(a), 544(b)(1), 550(a), 12 PA. CONS. STAT. § 5104(a), 20 PA. CONS. STAT. § 7745, and the Pennsylvania common law doctrines of "Self-Settled Trust" and "Alter Ego." The Committee also seeks Declaratory Judgements on some of those same theories and an injunction compelling termination of the Trusts and turnover of its assets to the Debtor. The Debtor has objected to the Motion for Derivative Standing. The parties have fully briefed the issues and the Court conducted a hearing as described above. This Decision sets forth the Court's findings of fact and conclusions of law.

## III.     Findings of Fact and Conclusions of Law

Section 544[1] vests the bankruptcy trustee with the power to undo or "avoid" certain voluntary or involuntary transfers of the debtor's interests in property. 11 U.S.C. § 544. In a Chapter 11 case, the debtor in possession generally exercises these § 544 avoidance powers. 11 U.S.C. § 1107. If a debtor in possession unjustifiably refuses to bring an avoidance action, the creditors' committee may seek "derivative standing" from the bankruptcy court to do so on behalf of the debtor. See, e.g., *Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 553 (3d Cir. 2003) ("We believe that Sections 1109(b), 1103(c)(5), and 503(b)(3)(B) of the Bankruptcy Code evince Congress's approval of derivative avoidance actions by creditors' committees, and that bankruptcy courts' equitable powers enable them to authorize such suits as a remedy in cases where a debtor-in-possession unreasonably refuses to pursue an avoidance claim."). The parties agree that, to obtain derivative standing to pursue these claims, the Committee must establish (1) that the avoidance claims are colorable and (2) that the Debtor unjustifiably refuses to pursue them. Mot. at 10; Obj. at 19. The Court begins its analysis by considering whether the claims advanced by the Committee are colorable.

### A.     Are the Claims Colorable?

A claim is colorable if it would survive a motion to dismiss brought under Bankruptcy Rule 7012(b), which incorporates Federal Rule 12(b)(6). *In re Rosenblum*, 545 B.R. 846, 864 (Bankr. E.D. Pa. 2016) (citing *In re Racing Servs., Inc.,* 540 F.3d 892, 900 (8th Cir. 2008) (additional citations omitted)). Rule 12(b)(6) authorizes a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P.

---

[1]Except where stated otherwise, all statutory references are to Title 11 of the U.S. Code (hereinafter "the Bankruptcy Code" or "the Code." The Federal Rules of Civil Procedure will be cited as "Federal" or simply "Rule," while the Federal Rules of Bankruptcy Procedure will be cited as "Bankruptcy Rule."

12(b)(6). The legal standards governing pleading practice in federal court require a plaintiff to "plead more than the possibility of relief to survive a motion to dismiss." *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

To avoid dismissal, a claim must set out "sufficient factual matter" to show that it is facially plausible. *Id.* The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct. Indeed, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not show[n] – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citing Fed. R. Civ. P. 8(a)(2)) (internal quotation marks omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

The Third Circuit has identified the following steps a district court must take when evaluating the sufficiency of a complaint's allegations as tested against a Rule 12(b)(6) motion: (1) identify the elements a plaintiff must plead to state a claim; (2) discard any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (citation and quotation marks omitted).

In evaluating whether a complaint fails to state a claim upon which relief may be granted, the court must accept as true all factual allegations in the complaint and construe all reasonable inferences to be drawn therefrom in the light most favorable to the plaintiff. See *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010). A court "need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss," *Morse v.*

4

*Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997), and must disregard any "formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion, a court may consider, in addition to the facts alleged on the face of the complaint, any exhibits attached to the complaint, "any matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (citation and quotation marks omitted). With the foregoing principles in mind, the Court now considers the allegations made by the Committee to determine whether the Committee has stated colorable claims.

### 1. Section 544(b)(1) Strong Arm Power and § 5104(a) of the Pennsylvania Uniform Voidable Transactions Act

The Committee's opening argument asserts a fraudulent transfer claim under 11 U.S.C. § 544(b)(1) and 12 PA. CONS. STAT. § 5104(a) of the Pennsylvania Uniform Voidable Transactions Act" (hereinafter, "PUVTA"). Section 544(b)(1) of the Bankruptcy Code allows the trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim...." 11 U.S.C. § 544(b). The language of § 544(b)(1) plainly contains four elements: (1) a transfer of an interest of the debtor in property; (2) that is voidable under applicable [state] law; (3) by a creditor; (4) holding an allowable unsecured claim. See *In re Forbes*, 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007) (citation omitted). As the party seeking to avoid the transfer, the Committee in this case bears the burden of proving all elements of a fraudulent transfer claim by a preponderance of the evidence. *Shubert v. Stranahan (In re Pennsylvania Gear Corp.),* 2008 WL 2370169, at *9 (Bankr. E.D. Pa. Apr. 22, 2008); *Burtch v. Harris (In re Harris),* 2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003).

5

The Debtor contends that the Committee has failed to demonstrate colorable claims pursuant to § 544(b)(1) of the Bankruptcy Code and § 5104(a) of PUVTA because: (1) no transfer of an interest of the Debtor in property occurred; (2) the Committee did not adequately plead a cause of action under PUVTA; (3) no creditor holding an allowed unsecured claim was identified; and (4) any claim under PUVTA is barred by the statute of limitations. The Committee disagrees with each of the Debtor's contentions.

a.      *Was there a "Transfer of an Interest of the Debtor in Property?"*

The Debtor declares that the Committee has failed to demonstrate the existence of any "transfer of an interest of the Debtor in property" as required by § 544(b). They argue this is so because "the written declaration of the [Trusts] did not effectuate or otherwise result in a transfer of any property from the Debtor to the [Trusts]; but, rather, it merely recognized in written form the trust relationship created by the state statute that historically existed since the Debtor was in existence—i.e., property was initially held in trust by laypersons and, thereafter, by the diocesan bishop." Obj. at 11–14. The Debtor maintains that this arrangement was necessary because "the Debtor was wholly unable to own property as an unincorporated association in 2009."[2] Obj. at 20. Since it was wholly unable to own property, the Debtor argues it was likewise "wholly unable to have transferred any interest of the Debtor in property" as required to sustain an action pursuant to § 544(b).

---

[2] The Court does not fully agree with the Debtor on this point. *See* 10 P.S. §§ 21, 81. From a civil standpoint, unincorporated religious societies "have always, and especially since the Act of 1731, been recognized as having an associate and quasi corporate existence in law, *with power to hold land and build appropriate houses*, and of course with power to acquire rights by contract, and to vindicate them." *Phipps v. Jones*, 20 Pa. 260 (1853) (emphasis added); *see also Michael & Archangel Russian Orthodox Greek Cath. Church v. Uhniat*, 451 Pa. 176, 186-187, 301 A.2d 655, 661 (1973); *Chester Hous. Auth. V. Ritter*, 344 Pa. 653, 657, 25 A.2d 72, 73–74 (1942); *Brendle v. German Reformed Congregation*, 33 Pa. 415, 424–25 (1859). The Court acknowledges that exactly *how* unincorporated religious societies own property has been a point of contention that has developed over the years. However, nothing in the ownership scheme set forth in 10 P.S. § 81 suggests that taking ownership as set forth therein somehow insulates the Debtor from the applicability of civil trust law.

6

The Committee disputes the existence of this pre-transfer trust arrangement (hereinafter, the "Pre-Transfer Trust), though it acknowledges that the existence of such an arrangement "could theoretically give rise to an affirmative defense to claims against the 2009 Trusts," so long as it is recognized by civil law. Reply at 4. Ultimately, however, the Committee responds to the Debtor's position by claiming that it "had no obligation to plead the non-existence of affirmative defenses in support of its Motion." *Id*. at 5. Rather, it "was required only to assert factual allegations for which it had a reasonable basis and that, when taken as true, are sufficient to allege a claim for fraudulent transfer. The Committee has satisfied this requirement and its Motion should be granted." *Id*.

The Committee's position is correct. *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014). "Technically, the Federal Rules of Civil Procedure require a defendant to plead an affirmative defense, like a statute of limitations defense, in the answer, not in a motion to dismiss." *Robinson v. Johnson*, 313 F.3d 128, 134–35 (3d Cir.2002). "Under Federal Rule of Civil Procedure 8, a complaint need not anticipate or overcome affirmative defenses; thus, a complaint does not fail to state a claim simply because it omits facts that would do so." *Id*. (citing *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir.2004) (citing *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir.2003) ("[L]itigants need not try to plead around defenses"))).

Accordingly, the Court finds that the Committee was not required to anticipate or overcome the affirmative defense raised by the Debtor here (*i.e.*, that there was no "transfer of an interest of the Debtor in property" as required by § 544(b)), and the Motion for Derivative Standing will not be denied because of its failure to do so. That said, because **"**a complaint may be subject to dismissal under Rule 12(b)(6) when an affirmative defense appears on its face" *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994), the Court will examine whether a

7

colorable transfer of an interest of the Debtor in property could have occurred if the property allegedly transferred was entirely held in a Pre-Transfer Trust as the Debtor has alleged.

The Court begins this analysis by identifying the nature of the alleged Pre-Transfer Trust, which has all the hallmarks of a self-settled trust under Pennsylvania trust law. A self-settled trust is "a trust in which the settlor is also the person who is to receive the benefits from the trust [and] is usually set up to protect the trust assets from creditors." Trust, BLACK'S LAW DICTIONARY (11th ed. 2019). The Complaints allege that the Debtor enjoyed "the exclusive use and benefit" from the Pre-Transfer Trust. (*See* Compls. Ex. A at 1). Consequently, the Committee has plausibly pleaded that the Debtor is the party who received the benefits from the trust.

Next, the Court notes that a settlor is a person who creates or contributes property to a trust. 20 PA. CONS. STAT. § 7703. Setting aside who created the alleged Pre-Transfer Trust, an assertion that the Debtor never contributed property (or directed property under its control to be contributed) to the Pre-Transfer Trust strains credulity.[3] While the Complaints do not plead facts directly on point here (and, indeed, the Committee was not required to so), they do establish "enough facts to raise a reasonable expectation that discovery will reveal evidence of" this element. See *Trzaska v. L'Oreal USA, Inc.,* 865 F.3d 155, 162 (3d Cir. 2017), *as amended* (Aug. 22, 2017) (quoting *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 789 (3d Cir. 2016)). Regarding the alleged Pre-Transfer Trust, then, the Court finds that the Debtor has *at least the appearance* of being both a settlor and a beneficiary—and plausibly more than just the

---

[3] Though time constraints prevent this Court from locating a Pennsylvania case directly on point, *comment f* to § 156 of the Restatement (Second) of Trusts provides: "*f. Under what circumstances beneficiary is settlor.* In order that a trust shall come within the terms of this Section, it is not necessary that the beneficiary shall have himself conveyed the property held in trust. It is sufficient that he paid the purchase price for a conveyance upon a trust, of which he is the beneficiary or one of the beneficiaries." Restatement (Second) of Trusts § 156 (1959).

8

appearance. This is enough to find that the Pre-Transfer Trust arrangement described by the Debtor above has all the hallmarks of a self-settled trust. This finding is significant.

In Pennsylvania, self-settled trusts are invalid as a matter of public policy and will not protect the trust assets from creditors to the extent of the settlor's beneficial interest. *In re Holbrook's Est.*, 213 Pa. 93, 94–95, 62 A. 368 (1905) ("[A] man may not settle his own property on himself, so as to keep it out of the reach of his creditors, for that would lead directly to fraud."); *In re Mogridge's Est.*, 342 Pa. 308, 311, 20 A.2d 307, 309 (1941) (It is "the settled law of [Pennsylvania] that, as to creditors whether present or subsequent, it is against public policy for one so to limit his property in trust that he retains to himself the beneficial incidents of ownership therein and yet places it beyond the reach of those to whom he is or may become indebted.") (additional citations omitted). Also, pursuant to § 7745(2) of the Pennsylvania Uniform Trust Act ("PUTA"), whether a trust contains a spendthrift provision or not, a creditor of the settlor may reach the maximum amount that the trustee could have paid to the settlor-beneficiary. *See comment to* 20 PA. CONS. STAT. § 7745(2). Further, if the trustee has discretion to distribute the entire income and principal to the settlor, the effect of § 7745(2) is to place the settlor's creditors in the same position as if the trust had not been created. *Id.*

The Committee has properly pleaded the foregoing Pennsylvania trust law principles and arguments as a basis to challenge the enforceability of the Trusts.[4] More importantly, the Committee has also asserted that the Debtor is the settlor[5] of the Trusts and that it also receives benefits under the Trusts.[6] Recall that the Debtor asserts that the Trusts are no more than a

---

[4] *See* Complaints at ¶¶ 6, 7, 10–13, 16–19, 32–36, 39–42, 46–50, 53–60, 62–68, 70–74; *see also* Motion, Pages 17–19; Reply, 12–13).

[5] *See fn* 4, *supra*; *see also* Reply at 12 (the trust declarations plainly indicate that the Debtor is the settlor of both Trusts as each declaration states that the trust res consists of real or non-real estate assets "belonging to" or "of the Diocese." (citing Kugler Decl. Ex. C., Ex. A)).

[6] *See fn* 4, *supra*.

written memorialization of the Pre-Transfer Trust. Logically, then, since the Committee has properly pleaded the foregoing Pennsylvania trust law principles and arguments as a basis to challenge the enforceability of the Trusts, and the Debtor asserts that the Trusts are no more than a written memorialization of the Pre-Transfer Trust, the Court reasonable infers that the foregoing Pennsylvania trust law principles and arguments plead by the Committee should apply with equal force to challenge the enforceability of the Pre-Transfer Trust alleged by the Debtor.

Having determined that the Pre-Transfer Trust has all the colorable hallmarks of a self-settled trust under Pennsylvania law, the Court must now complete its analysis of the Pre-Transfer Trust by turning to section 544(b). The Supreme Court has instructed that the phrase "property of the debtor" is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings." *In re Montreal, Maine & Atl. Ry., Ltd.*, 888 F.3d 1, 9 (1st Cir. 2018) (citing *Begier v. IRS*, 496 U.S. 53, 58, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990) (citations omitted). Also, it is recognized that "the principal determinant of whether the debtor has 'an interest' in the property" is "the degree of control a debtor exercises over the property transferred." *Id.* (citing *MBNA Am. Bank, N.A. v. Meoli (In re Wells)*, 561 F.3d 633, 635 (6th Cir. 2009) (quoting *McLemore v. Third Nat'l Bank (In re Montgomery)*, 983 F.2d 1389, 1395 (6th Cir. 1993)); *accord Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111, 1116–17 & n. 16–17 (5th Cir. 1995). "So, for example, a bank account used by a debtor to pay general creditors of its own choosing may be avoidable, even if the bank account is in another person's name." *Id.* (citing *Riley v. Nat'l Lumber Co. (In re Reale)*, 584 F.3d 27, 31 (1st Cir. 2009)). Thus, if a debtor has a sufficient level of control over property of an ineffective self-settled trust, as plausibly is the case here regarding

the Debtor and the alleged Pre-Transfer Trust, then a trustee (or in this case, the Committee) may well be able to avoid the prepetition transfer of property into that trust.[7]

In sum, this Court finds: (1) the Pre-Transfer Trust arrangement described by the Debtor has all the colorable hallmarks of a self-settled trust; (2) Pennsylvania trust law may well declare such a self-settled trust to be ineffective (at least to the extent of the settlor's beneficial interest); (3) the effect of such a declaration is to place the settlor's creditors in the same position as if the Pre-Transfer Trust had not been created; (4) a colorable claim has been made that the level of control the Debtor could have exercised over property of the Pre-Transfer Trust was such that the Debtor's interest in the property therein qualifies as an interest of the Debtor in property under § 544(b) and § 541(a); and (5) as such, the Committee has pleaded a colorable claim to avoid the transfer of any property into the Pre-Transfer Trust or to set aside or disregard same, if state law allows.

In view of the foregoing, and for purposes of clarity, the Court concludes that the Committee was not required to anticipate or overcome the affirmative defense raised by the Debtor here (*i.e.*, that there was no "transfer of an interest of the Debtor in property" as required by § 544(b)), and the Motion for Derivative Standing will not be denied because of its failure to do so. Moreover, even if the Committee was required to anticipate or overcome the defense raised here, this Court finds that it has met that burden and the Motion for Derivative Standing will not be denied on these grounds.

---

[7] So far as the Court is aware, the only possible restriction on the Debtor's exclusive use and benefit of the property allegedly subject to the Pre-Transfer Trust was that "control and disposition" of the property was to "be exercised in accordance with and subject to the rules and regulations, usages, canons, discipline and requirements of the" Debtor. *See* 10 P.S. § 81. This is insufficient to overcome the Court's findings here and reinforces the need for additional discovery to develop this element. An assumption that the Pre-Transfer Trust contained similar restrictions to those contained in the Trusts would not alter this Court findings.

11

#### b. Did the Committee Identify a "Triggering Creditor?"

The Debtor alleges that the Committee has failed to identify "a single creditor upon whose behalf the Committee seeks relief. Because the Committee has failed to identify any creditors(s) that could pursue an action pursuant to 12 PA. CONS. STAT. § 5104(a), the Committee has failed to demonstrate a colorable claim exists." Obj. at 21. There is support for the Debtor's position. *See e.g. In re Rollaguard Sec., LLC*, 570 B.R. 859, 881 (Bankr. S.D. Fla. 2017) (holding that it is necessary for the Trustee to "identify by name at least one creditor with an allowable unsecured claim that could have sought avoidance of the transfer in question under [State] law" to survive motion to dismiss actions based on §544(b)(1)).

There is, however, considerable support for the contrary position that identification of a triggering creditor is not required to survive a motion to dismiss at the pleading stage. See e.g. *In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 267, n. 38 (Bankr. D. Del. 2019) (holding that "[a]t the pleading stage, the Trustee does not need to allege the existence of or name an unsecured creditor" though he must ultimately prove such a creditor exists). A split in the courts on this point has long been recognized. *See Musicland Holding Corp. v. Best Buy Co., (In re Musicland Holding Corp.),* 398 B.R. 761, 778 (Bankr. S.D.N.Y.2008) (collecting cases identifying the split); see also *In re David Cutler Indus., Ltd.*, 471 B.R. 110, 114 n8 (Bankr. E.D. Pa. 2012) (same).

In this instance, the Court takes direction from the Third Circuit decision in *Trzaska v. L'Oreal USA, Inc.*, 865 F. 3d at 162. There, the Circuit Court held that in deciding a 12(b)(6) motion, courts are to "consider no more than whether the complaint establishes 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements' of the cause of action." *Id.* The position advanced by the Debtor on this issue appears to be

inconsistent with the above guidance as it compels dismissal of all cases where the triggering creditor is not specifically identified, even those where there is "a reasonable expectation that discovery will reveal evidence of" the identity of a triggering creditor. The Court finds *Trzaska* to be controlling and holds that a trustee is not required under the pleading requirements of Rule 8 to specifically identify a qualifying unsecured creditor in a complaint for derivative standing under section 544. *Accord In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011) (citing *In re Musicland Holding Corp.,* 398 B.R. at 780). Rather, a trustee need only plead enough facts to raise a reasonable expectation that discovery will reveal evidence of the identity of the unsecured creditor in whose shoes standing is being asserted.

The Committee has met that standard. The Complaints each identify a group of creditors known as "Survivors" and defines them as "sexual abuse survivors having claims against the Diocese." The term "Diocese," in turn, is defined as the Roman Catholic Diocese of Harrisburg and is synonymous with the Debtor in this case. The Complaints also make subsequent references to Survivors in the context of (i) escalating claims of clergy sexual abuse, (ii) the timing of the statute of limitations, (iii) their ability or intention to "bring suit" prior to the transfers complained of, and (iv) as a specific group of creditors harmed by the alleged transfers. Complaints at ¶¶ 18, 20, 22, and 27. This information, when considered as a whole, is sufficient to "raise a reasonable expectation that discovery will reveal evidence of the identity of the unsecured creditor in whose shoes standing is being asserted." Accordingly, the Committee has properly pleaded this element and the Motion for Derivative Standing will not be denied on these grounds.

### c. Is Fraud Adequately Pleaded Under 12 PA. CONS. STAT. § 5104(a)?

To adequately plead a claim for avoidance of a transfer based upon actual fraud under §

5104(a)(1) of PUVTA, a plaintiff must allege that the debtor made the transfer with the actual

intent to hinder, delay or defraud a creditor. 12 PA. CONS. STAT. § 5104(a)(1); *see Image*

*Masters, Inc. v. Chase Home Fin.*, 489 B.R. 375, 393 (E.D. Pa. 2013). The pleading

requirements for such claims are set out by Rule 9(b), which requires a trustee to "plead the

circumstances constituting the alleged fraudulent conveyances with particularity." *Id.*

(quoting *Bratek v. Beyond Juice, LLC*, 2005 WL 3071750, at *6 (E.D. Pa. Nov. 14, 2005)).

Nevertheless, a trustee may plead intent generally under the second sentence of the rule. *Id.*

(citing *River Road Dev. Corp. v. Carlson Corp.–Ne.*, 1990 WL 69085, at *10 (E.D. Pa. May 23,

1990)). The requirements of Rule 9(b) are generally relaxed and interpreted liberally where a

trustee is asserting the fraudulent transfer claims. *In re APF Co.*, 308 B.R. 183, 188 (Bankr. D.

Del. 2004).

Also, since "individuals are rarely willing to admit intent, actual fraud is rarely proven by

direct evidence." *In re Pennsylvania Gear Corp.*, 2008 WL 2370169, at *9 (Bankr. E.D. Pa.

April 22, 2008). However, there are factors, commonly referred to as "badges of fraud," which

courts consider in determining whether fraud has been proven by circumstantial evidence. *In re*

*Carbone*, 615 B.R. 76, 80 (Bankr. E.D. Pa. 2020), *reconsideration denied*, No. 18-13852 (JKF),

2020 WL 1680728 (Bankr. E.D. Pa. Mar. 31, 2020) (citing *Holber v. Dolchin Slotkin & Todd,*

*P.C. (In re American Rehab & Physical Therapy, Inc.)*, 2006 WL 1997431, at *15 (Bankr. E.D.

Pa. May 18, 2006)). These badges can include, but are not limited to:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;

14

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

12 PA. CONS. STAT. § 5104(b). The presence or absence of any single badge of fraud is not conclusive. *In re PennySaver USA Publ'g, LLC*, 602 B.R. at 271. "Although the presence of a single . . . badge of fraud may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud." *In re AgFeed USA, LLC,* 546 B.R. 318, 337 (Bankr. D. Del. 2016). The Trustee must also allege that the Debtors made the alleged transfer with the actual intent to deceive those to whom they were indebted.

The real estate transfers in question occurred on November 13, 2009 when the Debtor allegedly transferred substantially all of its real estate assets into the Real Estate Trust. RE Compl. at ¶10. The non-real estate asset transfers at issue also occurred beginning on November 13, 2009 and continued through the Petition Date when the Debtor transferred (according to the Committee) substantially all of its non-real estate assets into the Charitable Trust. CH Compl. at ¶10. Each Complaint adequately identifies (i) the alleged transferor and transferee (Compls. at ¶16), (ii) the alleged assets being transferred and their approximate value (Compls. at ¶¶17-18; see also Exhibit "A" to each Complaint), (iii) the date of the alleged transfer (Compls. at ¶16), and (iv) how the alleged transfer was accomplished (see Exhibit "A" to each Complaint). In

15

other words, it contains a sufficient information to establish the "who, what, when, where, and how" of the alleged transfer in question. *In re Covenant Partners, L.P.*, 531 B.R. 84, 89 (Bankr. E.D. Pa. 2015) (citing *In re Dulgerian,* 388 B.R. 142, 147 (Bankr. E.D. Pa. 2008); *In re Rockefeller Center Properties, Inc. Sec. Litig.,* 311 F.3d 198, 217 (3d Cir. 2002)). Nevertheless, the Debtor and the Committee disagree as to whether the Committee has sufficiently pleaded "actual intent" under Fed. R. Civ. Pro. 9(b)'s particularity requirements. The Court will thus analyze the badges of fraud.

The first badge of fraud asserted by the Committee relates to possession or control of the property allegedly transferred into the Trusts. The Committee has alleged that the Debtor retained possession and control of the real estate and non-real estate assets after the alleged transfers were made "as the Bishop continued to control the Charitable Trust's assets [and the Real Estate Trust's] assets as trustee of the [Trusts]." Compls. at ¶ 19(a). This is sufficient to establish the badge of fraud relating to possession or control of the property allegedly transferred. The second badge of fraud claimed involves the existence or threat of suit at the time of or prior to the alleged transfers. The Committee has alleged that "[b]efore the [Trusts] Transfers were made, the Diocese faced the increasing threat of litigation based on widely-publicized report of clergy sexual abuse throughout the United States." Compls. at ¶ 19(b). This is sufficient to establish the badge of fraud involving the existence or threat of suit at the time of or prior to the alleged transfers.

The third badge of fraud declared is how much of the Debtors' estate was allegedly transferred. The Committee avers that "[t]he transfers included all of the Diocese's real estate [and non-real estate] assets." Compls. at ¶ 19(d). Indeed, the Debtor does not challenge the assertion that substantially all its assets were subject to the Trusts after November 13, 2009. The

Committee allegations are sufficient to establish the badge of fraud involving how much of the estate was transferred. The fourth badge of fraud concerns the solvency or insolvency of the Debtor shortly after the transfer was made. The Committee asserts that "the Diocese became insolvent as a result of the transfer of all of its non-real estate assets to the Charitable Trust and all of its real estate assets to the . . . Real Estate Trust." Compls. at ¶ 19(e). The Committee also alleges the estimated dollar value of the assets transferred ($80 million, representing approximately 100% of the Debtor's estate) and that the transfer left the Debtor with essentially no assets. Compls. at ¶¶ 10, 16, 17, 18, 19(d)-(e). The Committee's allegations are sufficient to establish that the amount transferred was most likely more than the Debtor could financially bear and that the Debtor was thus insolvent or became insolvent shortly after the transfer was made. This badge of fraud is adequately pleaded by the Committee. The fifth badge of fraud relates to consideration in exchange for the conveyance. The Committee has alleged that "[t]he Diocese did not receive any consideration, or consideration reasonably equivalent in value, to the assets transferred." Complaints at ¶ 19(g). The declarations of trusts attached as Exhibit A to each Complaint support this assertion. The Committee has pleaded sufficiently that there was no consideration given in exchange for the assets transferred into the Trusts.

The Committee has alleged sufficiently at least five out of the eleven badges of fraud referenced in § 5401(b). "The confluence of several [badges of fraud] in one transaction generally provides conclusive evidence of an actual intent to defraud." *In re PennySaver USA Publ'g, LLC*, 602 B.R. at 273 (quoting *In re AgFeed USA, LLC,* 546 B.R. at 337). Accordingly, notwithstanding the Debtor's protests[8] to the contrary, the Committee has properly pleaded the

---

[8]The Debtor asserts that the Committee has failed to meet it burden here because (i) no transfer occurred, and (ii) the Committee fails to plead any "statements or information . . . to reasonably support its claim or from which any reasonable person could infer that the Trusts were documented with malicious or fraudulent intent." (Obj. Page 23). The Debtor's first argument has been considered by the Court, *supra* and *infra*. The second argument is

requisite fraudulent intent required to sustain a cause of action under 12 PA. CONS. STAT. §
5104(a).

### d.  Are the Claims Barred by the Statute of Limitations?

To timely bring a cause of action pursuant to § 544(b) and under § 5104(a)(1), it must be
brought "within four years after the transfer was made or the obligation was incurred or, if later,
within one year after the transfer or obligation was or could reasonably have been discovered by
the claimant." 12 PA. CONS. STAT. § 5109.[9] The alleged fraudulent transfer forming the basis for
the Committee's claim against the Debtor occurred on November 13, 2009, approximately ten
(10) years before the Debtor initiated the above-captioned case. Doc. No. 12. Because the
Committee is seeking to bring its cause of action more than four years after the allegedly
fraudulent transfer occurred, the Court must address whether the Committee's claim was brought
"within one year after the transfer or obligation was or could reasonably have been
discovered."[10] See id. § 5109(1).

The parties disagree as to the proper interpretation of the above statutory language. The
Debtor claims that pursuant to § 5109 of PUVTA and based upon information available since as
early as 2009 and no later than 2018, the Committee's § 5104(a)(1) claims are time-barred
because they were not brought within four years after the alleged transfer was incurred or within
one year after the alleged transfer was or could reasonably have been discovered by the
claimants. Obj. at 24, 28.  The Committee responds that "[t]he creation of the 2009 Trusts, and

---

likewise rejected by this Court as unpersuasive.  As discussed at length in this section, the Committee has met the
well-defined and uncontroversial standard developed by various courts in this circuit (including the Third Circuit
Court) regarding the adequacy of pleading fraud under § 5104(a) of PUVTA.

[9]There is no question that under § 544(b) the applicable Pennsylvania statute of limitations binds the trustee. However,
the trustee's statute of limitations (and thus the Committee's statute of limitations here) is extended for another two
years if the state statute of limitations has not expired by the petition date. 11 U.S.C. § 546(a).

[10]This language invokes the discovery rule, which tolls a statute of limitations when "a plaintiff 'despite the exercise
of due diligence, is unable to know of the existence of the injury and its cause.'" *State Farm Mut. Auto. Ins. Co. v.
Cordua*, 834 F. Supp. 2d 301, 306 (E.D. Pa. 2011) (quoting *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991)).

the depletion of the Diocese' assets, was not reasonably knowable to any creditor until after the Diocese filed for bankruptcy and provided the Trust Declarations to the Committee." Regarding application of the discovery rule, the Committee also asserts that it does not begin to run until the plaintiff discovers "*the underlined fraudulent nature of the transfer*, rather than the plaintiff's mere knowledge of the transfer itself." Reply at 8 (emphasis in original).

Obviously, these arguments represent two conflicting interpretations of § 5901(1) which, in turn, reflect the current split in the circuits (and, indeed, *within* the Third Circuit) on this issue. Under the "majority approach," the one-year period begins when Plaintiff becomes aware of the *fraudulent nature of the transfer*. Under the "minority approach," the one-year period begins to run when a party becomes aware of the transfer itself, *regardless* of whether the party is aware of the transfer's fraudulent nature at that time. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Cordua*, 834 F. Supp. 2d 301, 307 (E.D. Pa. 2011) (identifying majority and minority approaches).

The Court finds persuasive the holding of District Court Judge Yvette Kane in *Santander Bank, N.A. v. Branch Banking & Tr. Co.* which is directly on point:

> After careful review of the relevant authorities, the Court concludes that the appropriate interpretation of § 5109(1) is the majority approach because: (1) an overwhelming majority of courts have employed this interpretation to comparable fraudulent transfer statutes, and (2) this construction of § 5109(1) is consistent with PUFTA's underlying purpose of preventing fraud by providing plaintiffs in fraudulent transfer cases with an avenue through which to seek relief.

No. 1:17-CV-01669, 2018 WL 8368857, at *3 (M.D. Pa. Feb. 5, 2018). This Court concurs with Judge Kane's assessment. The one-year period provided for by § 5104(a) does not begin until a claimant becomes aware of the fraudulent nature of the transfer rather than when he becomes aware of the transfer itself, regardless of whether he is aware of the transfer's fraudulent nature at that time.

19

Next, the Court must determine when the claimants in this matter, through the exercise of due diligence, were first able to know of the fraudulent nature of the alleged transfers as pleaded by the Committee. The Debtor did not argue this point directly, though it did proclaim that "**all facts** the Committee alleges justify its asserted fraudulent transfer claim" were "reasonably knowable with reasonable diligence" to claimants as early as 2009, since at least 2011, and in any event no later than 2018. Obj. at 26–28 (bold and underline in original). In support of this assertion, the Debtor argues three points: "(a) all persons are charged with knowledge of the law; (b) the ownership status of all assets in the Real Estate Trust are a matter of public record; and (c) the Debtor has regularly and consistently made its financials accessible." Obj. at 25.

Unpacking these points one-by-one, the Debtor argues that the claimants were "imputed with the knowledge that the Debtor could not generally hold property and was only permitted, as a religious organization, to have property held in trust for its benefit." Obj. at 26. Next, the Debtor argues that since "the manner in which the real property is titled [is] a matter of public record[;]" and because "each deed to property within the Real Estate Trust demonstrates that it is **not** held in the name of the Debtor [but] rather . . . is held in trust[;]" then it follows that "all creditors of the Debtor had knowledge that the Debtor did not own any of the assets in the Real Estate Trust." *Id*. (bold and underline in original).

A similar argument is advanced by the Debtor regarding the non-real estate assets in the Charitable Trust. Here, the Debtor argues that "since at least 2018, audited financials of the 'Roman Catholic Diocese of Harrisburg Charitable Trust and Affiliates' have been made available on Diocese of Harrisburg's website for the public access and review." *Id*. In addition, the Debtor notes that "financial information is annually published in . . . the official Catholic newspaper within the Debtor's geographic area—published twenty-four (24) time per year in

20

print and online—and which is offered on a complimentary basis to all members of Parishes within the Debtor's geographic area." *Id*. at 27. The Debtor also notes that "[s]ince at least 2011, the information provided in the [Catholic newspaper] was also posted directly to the Diocese of Harrisburg's website. *Id*. at 28. Finally, the Debtor avers that the foregoing information also "**<u>expressly</u>** offers to provide more information upon request" and that "any creditor of the Debtor [thus] had **<u>full access</u>** to the financials of the various entities within the diocese of Harrisburg, including the Debtor." *Id*. (bold and underline in original).

The Debtor completes its argument here with the assertion that "[t]he foregoing information discloses or makes reasonably knowable with reasonable diligence all facts the Committee alleges justify its asserted fraudulent transfer claim." *Id*. According to the Debtor, the information discloses that: "(i) the assets of the Charitable Trust were within the 'control' of the diocesan bishop; (ii) the Charitable Trust contained significant assets; and (iii) the assets in the Charitable Trust were benefitting, directly or indirectly, the Debtor (in addition to other entities within the Diocese of Harrisburg)." *Id*. Upon the strength of these suppositions, the Debtor concludes that because the information disclosed by the Debtor as early as 2009 (and in any event no later than 2018) demonstrate facts "adequate to support a cause of action" under § 5104(a), and because "all those facts were known or reasonably knowable[,]" it follows that the "discovery rule built into [] § 5109 does not save the Committee's alleged claims from being time-barred." *Id*. at n.18.

The Committee responds that "[t]he Diocese's arguments miss the point." Reply at 8. The Court agrees. As the Committee correctly notes, the applicable limitations period does not begin to run until the plaintiff discovers the fraudulent nature of the transfer rather than just the transfer itself. Next, the Committee asserts that even if the Debtor is entirely correct in each of its

21

arguments, such would still "not place a Survivor on notice of the *fraudulent nature* of the Diocese's transfers." Reply at 8 (emphasis in original). The Committee further argues (and the Court agrees) that, because any deeds conveying the property to the Real Estate Trust simply memorialize how certain parcels were titled and the occurrence of certain transfers, the Survivors could not have learned that the Debtor "transferred *all of* its real estate assets" into the Real Estate Trust to shield assets from its creditors simply by reviewing the deeds. *Id.* (emphasis in original). Regarding the non-real estate assets, the Committee likewise asserts that "the availability of financial information on the Diocese's website is insufficient to demonstrate the Survivors were on notice of the fraudulent nature of the transfer of *all* the Diocese's non-real estate assets to the Charitable Trust." *Id.* at 9 (emphasis and underline in original). Consequently, the creation of the 2009 Trusts, and the alleged depletion of the Diocese's assets, were not reasonably knowable to any creditor until after the Diocese filed for bankruptcy.

Both parties point to *In re Archdiocese of Milwaukee ("Archdiocese of Milwaukee")*, 483 B.R. 855 (Bankr. E.D. Wis. 2012) in support of their positions. In that case, the diocese transferred $35 million from a "Parish Deposit Fund" to a "Southeastern Parish Trust" seven years prior to filing for bankruptcy.[11] The committee sought derivative standing to pursue a fraudulent transfer claim against the diocese pursuant to § 544(b)(1) and Wisconsin's Uniform Fraudulent Transfer Act.  As in the  instant case, the committee in *Archdiocese of Milwaukee* asserted that the diocese made the transfer with actual intent to defraud survivors and that survivors could not have known of the transfer until after the bankruptcy was filed, and the diocese argued that the transfer was knowable because the Parish Deposit Fund's existence, beginning in 2002 and ending in 2005, was fully disclosed in the Debtor's audited financial

---

[11] Unless otherwise noted, all facts relayed here are taken from *Archdiocese of Milwaukee*, 483 B.R. at 863–866.

statements which were regularly published on the diocese's website. According to the diocese in *Archbishop of Milwaukee*, a note to the June 30, 2005 financial statement said, in relevant part: "The Archdiocese served as a fiduciary to a fund known as the [Parish Deposit Fund] . . . The fund had been shown as a non-current asset in the statement of financial position with an offsetting noncurrent liability to the other Catholic organizations. The fund was closed in June 2005." *In re Archdiocese of Milwaukee*, 483 B.R. at 864.

The bankruptcy court in *Archdiocese of Milwaukee* began it analysis by acknowledging that the diocese's financial statements "were readily available on the internet" and that "arguably there was something 'fishy' about the transfer [since] over $35 million was removed from the Debtor's balance sheet in 2005 when the Debtor was being sued for priest sex abuse and it had publicly started a mediation program for sex abuse victim/survivors." *In re Archdiocese of Milwaukee*, 483 B.R. at 865. However, "the bald statement" that the Parish Deposit Fund had been closed was not enough to put creditors on notice that millions of dollars in church assets were transferred out of the church's control. *Id.* Ultimately, the court in *Archdiocese of Milwaukee* held that "[a]lthough an extremely close case is presented, the Court concludes that the Committee has stated a plausible claim that a creditor reasonably could not have discovered the transfer." *In re Archdiocese of Milwaukee*, 483 B.R. at 866. The same conclusion is warranted here.

The Court acknowledges that information regarding the ownership interests of the Trusts is readily available in the public record and through the Debtor's website and Catholic newspaper. Based on the available information, the Court even allows that one might fairly argue that the creation of the Real Estate Trust and the Charitable Trust at a time when "the Diocese faced the increasing threat of litigation based on widely-publicized reports of clergy sexual abuse

throughout the United States" is "fishy." That said, public information regarding Trusts that contain significant assets under the control of the diocesan bishop and used for the Debtor's benefit is inadequate to put others on notice that the Debtor may have transferred *all* its assets to the Trusts for no or inadequate consideration or that its intention for doing so may have been to hinder, delay or defraud creditors, including Survivors.

Thus, since the applicable limitations period does not begin to run until the plaintiff discovers the fraudulent nature of the transfer, and because the information available to the Survivors prior to the filing of this case was insufficient to place the Survivors on notice of the potential fraudulent nature of the transfers in question, this Court concludes that the Committee has made a colorable claim that a creditor reasonably could not have discovered the fraudulent nature of the alleged transfers.

2. ***Section 544(a) Strong Arm Power and §7745 of PUTA; Pennsylvania's "Alter Ego" Doctrine; § 541(a) Property and § 542 Turnover Claims***

The Committee's second argument seeks to set aside or otherwise disregard the Trusts under Bankruptcy Code § 544(a) and 20 PA. CONS. STAT. § 7745 of the Pennsylvania Uniform Trust Act (hereinafter, "PUTA"). It also seeks an order declaring the property in the Trusts to be "property of the estate" pursuant to §541(a) and compelling turnover of same pursuant to § 542. Compls. ¶¶ 38–68.

Typically, the strong-arm power is used when a transferee claims title to or an interest in the debtor's real or personal property, and the trustee tries to attack the claim because of inadequate or incomplete documentation or for some other failure in completing the formalities of the transfer. *In re Archdiocese of Milwaukee,* 483 B.R. at 859–60. Although more commonly used to attack unperfected security interests or defective mortgages or deeds, the strong-arm

24

power of § 544(a) can be used to set aside or otherwise disregard a trust, assuming state law would permit that.[12]

The Debtor contends that the Committee has failed to demonstrate colorable claims pursuant to Bankruptcy Code § 544(a) and PUTA § 7745 because: "(i) the Debtor is not—and legally could not be—the settlor of the Trusts; (ii) each Trust contains valid spendthrift provisions; (iii) even if the spendthrift provisions were invalidated, creditors cannot compel distributions from discretionary trusts; and (iv) the Trusts are not revocable." The Committee disagrees.

### (1) Is the Debtor the Settlor of the Trusts?"

The Debtor asserts that the Committee's claims as described above each fail because "the Debtor was not the settlor of the Trusts." Obj. at 30. In support of this assertion, the Debtor again argues that "the Debtor was wholly incapable of owning property in its own name" at the time the Trusts were documented. *Id*. According to the Debtor, since it was "unable to own property at the time the Trusts were documented, it follows by necessity that the Debtor could not have contributed property to the Trusts." *Id*. The Committee disagrees and avers that the Diocese can hold title to property under Pennsylvania law. Reply at 6. Because of this, "the Diocese was able to hold and convey property to the 2009 Trusts." *Id*. This Court has already indicated that it agrees with the Committee's belief that the Debtor, as an unincorporated religious association, may hold title to property under Pennsylvania law. *See fn 1, supra*. The Court thus turns to the issue of whether the Committee has made a colorable claim that the Debtor was both the settlor and the beneficiary of the Trusts.

---

[12] The Committee appears to be proceeding under Section 544(a)(1) or (2), which provide that "the trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor . . . that is voidable by" a hypothetical judgment lien or execution lien creditor at the time of the commencement of the case. 11 U.S.C. § 544(a)(2).

The Court has already found that the Pre-Transfer Trust arrangement described by the Debtor has all the hallmarks of a self-settled trust because the Debtor has the plausible appearance of being both a settlor and a beneficiary of same. Because of that finding, and for many of the reasons supporting it, the Court now likewise finds that the Committee has made a colorable claim that the Debtor was both the settlor and the beneficiary of the 2009 Trusts.

Three concepts are important here. First, a settlor is a person who creates or contributes property to a trust. 20 Pa. Cons. Stat. § 7703. Second, the Pre-Transfer Trust contributed all its property to the 2009 Trusts. Finally, recall that this Court has determined that the level of control the Debtor could have exercised over property of the Pre-Transfer Trust was plausibly such that the Debtor's interest in the property therein qualifies as an interest of the Debtor in property under § 544(b) and § 541(a). Since it is plausible that the Debtor's interest in the property of the Pre-Transfer Trust qualifies as an interest of the Debtor in property under § 544(b) and § 541(a), and the Pre-Transfer Trust contributed all its property to the 2009 Trusts, then a claim that the Debtor contributed significant property to the 2009 Trusts and qualifies as a settlor thereof pursuant to § 7703 of PUTA is colorable. These facts are sufficient for this Court to find that the Committee has made a colorable claim that the Debtor is a settlor of the 2009 Trusts.

### *(2)* *Are the Trusts Revocable?*

The Committee's next argument seeks to recover the assets transferred to the Trusts because the Trusts are revocable. The issue here is whether the Trusts are revocable, even though the trust declarations pronounce them to be irrevocable trusts. The PUTA defines revocable trust as follows:

> "Revocable trust." A trust is revocable to the extent the settlor, immediately before the time as of which the determination is made, had the power, acting without the consent of the trustee or any person holding an interest adverse to revocation, to

26

prevent the transfer of the trust property at the settlor's death by revocation or amendment of or withdrawal of property from the trust.

20 Pa.Const.Stat. § 7703.

The Committee asserts that although the Trusts are designated as irrevocable, they are "actually revocable since the Diocese is both the settlor and, through its Bishop, the only party with the power to terminate" the Trusts. Mot. at 52; Compls. at 39. In support of its theory, the Committee oddly cites PUTA § 7745 for the proposition that "[w]hether or not a trust instrument contains a spendthrift provision and notwithstanding section 7744 . . . (1) During the lifetime of the settlor, the property of a revocable trust is subject to claims of the settlor's creditors." 20 Pa. Cons. Stat. § 7745(1).

The Committee's reliance on PUTA 7745(1) is misplaced because this section assumes the existence of a revocable trust, which is not established here. Here, the Trusts are styled as irrevocable trusts. It is the Committee's burden to plausibly plead facts to the contrary if they wish to pursue a theory of revocable trust. They have not done so. The Committee has provided no authority for its assertion that the Trusts, although claiming to be irrevocable on their face, should nonetheless be deemed revocable simply because the Debtor is a settlor and the bishop may have the power to terminate the Trusts. Further, the Committee has not factually pleaded that the Bishop, as Trustee, has the power to terminate the Trusts at the direction of the Debtor. These facts are not sufficient for this Court to find that the Committee has made a colorable claim that the Trusts are revocable under § 7745 of PUTA and are thus property of the Debtor's estate pursuant to § 541.

### (3)    Does the Common Law "Alter Ego Doctrine" Apply?

The Committee argues that the Trusts may be set aside under "Pennsylvania's 'Alter

Ego' Common Law Doctrine." This doctrine typically applies to efforts to pierce the corporate

veil rather than in the context of trust law:

> It fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his own personal business, and such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. The corporate form may be disregarded only where equity requires the action to assist a third party**.**

*In re Reuter*, 499 B.R. 655, 680 (Bankr. W.D. Mo. 2013) (quoting *In re Ozark Restaurant*

*Equipment Co.*, 816 F.2d 1222, 1225 (8th Cir. 1987)). The Committee candidly admits that

Pennsylvania state courts have never applied the alter ego doctrine to trusts. Mot. at 20, fn. 29.

In *Reuter*, a Missouri bankruptcy court considered a declaratory judgment brought by a

Chapter 7 trustee who argued that the debtor's power over trust property was so complete that

the trust's assets should be considered estate property under an alter ego theory. *Reuter*, 499 B.R.

655, 679. The *Reuter* court rejected the trustee's arguments on the grounds that the alter ego

theory had not been properly pled. *Id*. at 680. The court then went on to hold that even if the

trustee were given leave to amend the complaint and properly plead alter ego, it would be futile

because "allegations of control over a trust are not enough to pierce such a trust" and the

trustee's proposed amendment made no allegations about actual wrongdoing. *Id*. at 681.

While *Reuters* turned on Missouri state law rather than that of Pennsylvania, the Court

finds that the analysis holds true here as it did there. In the context of using the alter ego doctrine

to pierce the corporate veil, Pennsylvania law holds that the theory only applies "where the

individual or corporate owner controls the corporation to be pierced and the controlling owner is

to be held liable." *Miners, Inc. v. Alpine Equip. Corp.*, 722 A.2d 691, 695 (Pa. Super. Ct. 1998).

28

Even assuming an alter ego analysis is applicable to trusts, the Court finds that the Committee, like the trustee in *Reuter*, has failed to properly plead it. As an aside, and just like the *Reuter* court found under Missouri law, this Court is not persuaded that the facts as alleged in the Complaint could ever give rise to an alter ego action under Pennsylvania law.

### (4) Is there a Colorable Claim for Turnover of Property of the Estate Pursuant to 11 U.S.C. § 541, § 542, and § 550?

Under bankruptcy law, as of the commencement of the bankruptcy case, the Debtors' interest in the Property, whether a legal or an equitable interest, became property of their bankruptcy estate as provided by § 541(a)(1). Property of the estate also includes any interest that a trustee recovers under § 550. 11 U.S.C. § 541(a)(3). Section 550 provides, as applicable here, that "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred[.]" 11 U.S.C. § 550(a). Therefore, any property that is recoverable because of a transfer that is voidable pursuant to § 544(a) or (b) is recoverable by the trustee for the benefit of the estate and becomes property of the estate.

The Committee has properly pleaded claims pursuant to § 541(a) in its Complaints. It has also properly pleaded claims to recover, for the benefit of the estate, any transfer that this Court avoids under §544. Sections 541 and 550 are linked to the Trustee's strong-arm powers and it is thus appropriate for the Committee to seek formal approval from the Court to invoke those provision as part of its Motion for Derivative Standing. For this reason and for the purpose clarity, this Court finds that the Committee has plausibly pleaded claims under §§ 541 and 550 in its Complaints.

A properly pleaded complaint asserting a claim for turnover pursuant to § 542 must allege an undisputed right to recover the property claimed. *American Home Mortg. Corp. v.*

29

*Showcase of Agents, LLC* (*In re Am. Home Mortg. Holding*), 458 B.R. 161, 169 (Bankr. D. Del. 2011). An action for turnover is not appropriate where there is a legitimate dispute about the ownership of property the movant seeks to recover. *In re Welded Constr., L.P.*, 609 B.R. 101, 125–26 (Bankr. D. Del. 2019) (additional citations omitted). Third Circuit precedent establishes that a bona fide dispute exists "[i]f there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Assoc's Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir. 1989). "Under [the analysis for deciding whether there is a bona fide dispute], the bankruptcy court must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of the debt." *Lexington Healthcare*, 363 B.R. at 716 (quoting *In re Busick*, 831 F.2d 745, 750 (7th Cir. 1987)).

The Committee has alleged the Bishop of the Harrisburg Roman Catholic Diocese, as trustee for the Trusts, possesses or has control of the real estate and non-real estate assets of the Trusts. Compls. ¶¶ 10—12, 19a, 46. Debtor further alleges that those real estate and non-real estate assets constitute property of Debtor's estate under § 541. In response, the Harrisburg Roman Catholic Diocese contends (according to the Debtor) that the Debtor's estate has no rights to the Trusts' assets, or the income derived therefrom and that those assets and income are not available to pay the claims of the Diocese's creditors, including Survivors. Compls. ¶58.

At its heart, this action involves a dispute over the enforceability of two Trusts under the PUTA and recovery of a voidable transfer under PAVTA. To conclude there is not a bona fide dispute as to the enforceability of the Trusts or the recovery of the assets found therein would be to summarily resolve the entire matter on the merits. Because the PAVTA claim is one that is made in Count I of the Complaint and the PUTA Claims are made in Counts III, V, and VI, and

Case 1:20-bk-00599-HWV    Doc 1179    Filed 02/17/22    Entered 02/17/22 14:05:09    Desc
Main Document    Page 30 of 37

thus must be decided by the Court on the merits during this litigation, the Court declines to make those determinations at this early stage. As a result, because the ownership of the assets in question is subject to a bona fide dispute, the action for turnover is premature and thus is not properly pleaded by the Committee at this stage. *Hechinger Inv. Co. of Delaware, Inc. v. Allfirst Bank (In re Hechinger Inv. Co. of Delaware Inc.)*, 282 B.R. 149, 62 (Bankr. D. Del. 2002); *Miller v. Greenwich Capital Fin. Prods., Inc.* (*In re Am. Bus. Fin. Servs., Inc.*), 361 B.R. 747, 761 (Bankr. D. Del. 2007); *IPC Int'l Corp. v. Milwaukee Golf Shopping Ctr.* (*In re IPC Int'l Corp.*), No. 13-12050, 2014 WL 5544692, at *3 (Bankr. D. Del. Nov. 3, 2014).

### c) *Request for Injunctive Relief Compelling the Trustee to Terminate the Real Estate Trust and Turnover the Real Estate Trusts' Assets to the Debtor Pursuant to 20 PA. CONS. STAT. § 7745*

In the Committee's seventh and last claim, the Movant requests injunctive relief compelling the Debtor to terminate the Trusts and to recover its assets for the estate. As a threshold matter, the relief sought in this count appears duplicative of the relief requested elsewhere by the Committee. Furthermore, the Court has serious doubts as to whether this relief as presented properly falls within the scope of the trustee's strong arm powers conferred by § 544(a) and (b) of the Code. Ultimately, however, these questions are moot.

While the Committee alleges in this count that "no adequate remedy at law" exists at law that can cure the Diocese's purportedly wrongful conduct in relation to the Charitable Trust, this is belied by the other claims brought by the Committee which do, in fact, posit adequate remedies that may be granted by the Court if the Committee is ultimately successful. Furthermore, this claim asserts that irreparable harm will result if an injunction is not issued by the Court. However, no such harm has actually been identified by the Committee, let alone harm of such nature to justify injunctive relief. *Pierre & Carlo, Inc. v. Premier Salons, Inc.*, 713 F.

31

Supp. 2d 471, 481 (E.D. Pa. 2010) ("An irreparable harm is a 'harm which cannot be redressed by a legal or an equitable remedy following a trial.'") Likewise, the Committee generally did not advance any arguments about irreparable harm or about this claim during the Hearing.

The Court finds that granting injunctive relief as requested by the Committee is premature at this juncture. Accordingly, the Court finds that the claim for injunctive relief is not properly pleaded. As this case proceeds, if the Committee finds that some form of injunctive relief is warranted and wishes to seek it in the context of a properly brought adversary proceeding, the Court may revisit the issue depending on the quality of evidence brought forth by the Movant at that time.

### 2. Did the Debtor Unjustifiably Refuse to Bring Claims

Thus far, the Third Circuit has not adopted a uniform test for determining whether a trustee or debtor-in-possession has unjustifiably refused to bring claims. And so, the Court looks to other jurisdictions and, especially, those cases which also deal with derivative standing in the context of Catholic dioceses undergoing Chapter 11 reorganization.

In *In re Roman Cath. Bishop of Great Falls, Montana ("Bishop of Great Falls")*, 584 B.R. 335 (Bankr. D. Mont. 2018), a Montana bankruptcy court identified four factors often identified by courts in derivative standing cases:

1. Whether a demand has been made upon the statutorily-authorized party to take action;
2. Whether the demand is declined;
3. Whether a colorable claim that would benefit the estate if successful exists, based on a cost-benefit analysis performed by the court; and
4. Whether the inaction is justified in light of the debtor-in-possession's duties in a chapter 11 case.

*Bishop of Great Falls*, 584 B.R. at 338–39.

Similarly, in the Sixth Circuit, the relevant test is as follows:

32

> [A] creditor or creditors' committee may have derivative standing to initiate an avoidance action where: 1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists, based upon a cost-benefit analysis performed by the court, and 4) the inaction is an abuse of discretion ("unjustified") in light of the debtor-in-possession's duties in a Chapter 11 case.

*In re Cath. Bishop of N. Alaska ("Bishop of N. Alaska")*, No. F08-00110-DMD, 2009 WL 8412174, at *5 (Bankr. D. Alaska Sept. 11, 2009)(citing *Canadian Pac. Forest Prod. Ltd. V. J.D. Irving, Ltd. (In re The Gibson Group, Inc.)*, 66 F.3d 1436, 1446 (6th Cir. 1995)). *See also In re Archdiocese of Milwaukee ("Archdiocese of Milwaukee"),* 483 B.R. 855, 858 (Bankr. E.D. Wis. 2012)(holding that Committee should be granted derivative standing if two tests are met: (1) claim is colorable; and (2) Debtor unjustifiably refuses to pursue it); *In re STN Enterprises,* 779 F.2d 901, 905 (2d Cir. 1985)(requiring cost benefit analysis including assessment of probable attorneys' fees award as factor in whether trustee's refusal to bring action was unjustifiable such that derivative standing was warranted for committee).

Viewing these authorities holistically, the Court concludes that to warrant derivative standing to attack the Trusts, the Committee must demonstrate the following:

1.  That the Committee made demand upon the Diocese to pursue actions against the Trusts to recover assets for the estate;
2.  That the Diocese declined to do so;
3.  That the actions proposed by the Committee present claims that are at least colorable;
4.  That these claims, if pursued to a successful resolution, would recover enough assets for the estate to justify such pursuit under a cost-benefit analysis performed by the Court; and
5.  That the Diocese's refusal to pursue such claims is unjustified.

In practice, there will often be some overlap between the third, fourth, and fifth elements. For example, even if the proposed actions represent colorable and beneficial claims against the Trusts, the Debtor might well be justified in declining to bring them if a claim was colorable but seemed unlikely to result in a favorable resolution. Likewise, the Debtor might be justified in

declining to bring a claim that was likely to achieve a favorable resolution but not one favorable enough to justify the time and expense of litigation and a concomitant delay in plan confirmation.

Applying these standards to the case at bar, the Court first notes that the Committee unquestionably made demand upon the Diocese to pursue avoidance actions against the Trusts and that the Diocese declined to do so. The Committee's *Motion for Derivative Standing* states that:

> The Committee has been in communication with the Diocese since the filing of this bankruptcy case regarding the assets contained in the 2009 Trusts. Specifically, the Committee inquired with the Diocese as to whether it would pursue claims against the 2009 Trusts and affirmatively requested that the Diocese do so or agree to Committee standing to do so. On December 10, 2021, the Committee submitted a final written demand to the Diocese to pursue the claims identified in the Complaints against the 2009 Trusts.

Doc. #840 (Committee's *Motion for Standing* at pg. 8; Committee's *Motion for Standing* at Exhibit J ("Committees Written Demand Letter")). The Diocese has never challenged or denied the Committee's demand nor its refusal of same, and so, the Court finds that those two elements are met.

Moreover, the Court has already found the many of the Committee's claims to be colorable, and thus, colorable claims exist to pursue. The only questions that still remain, then, are (i) whether pursuit of the colorable claims appear to be beneficial to the estate under a cost-benefit analysis, and (ii) whether the Debtor's refusal to bring these claims is nevertheless justifiable. For purposes of the instant motion, the Court will combine these questions as the Debtor provided few arguments to justify its refusal not based on a cost-benefit analysis.

34

### a) *The cost-benefit analysis and justifiability.*

The Court now turns to the question of whether the Committee's proposed actions (which the Court has already found to be both colorable and declined by the trustee) would benefit the estate if successful such that the refusal of the Diocese to pursue them was unjustifiable. Even having found a colorable claim which the trustee declined to bring, the Court must still determine whether the trustee's decision was justifiable or not, considering (among other factors) a cost-benefit analysis of the anticipated results of the derivative actions going forward.

In making this determination, a comparison of the facts before the Court with those addressed in *Archdiocese of Milwaukee* is instructive. There, the court outlined the test to be applied and the factors to be considered under 8th Circuit precedent:

> While by no means exhaustive, among the factors the court should consider in conducting [the justifiable "cost-benefit"] analysis are: (1) the probabilities of legal success and financial recovery in event of success; (2) the creditor's proposed fee arrangement; and (3) the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.

*Archdiocese of Milwaukee*, 483 B.R. at 869 (quoting *PW Enters. v. N.D. Racing Comm'n (In re Racing Servs.*), 540 F.3d 892, 901 (8th Cir. 2008).

The court in *Archdiocese of Milwaukee* found that the anticipated attorneys' fees in the proposed litigation were expected to meet or exceed $1 million with a potential reward of $35 million. *Id.* at 870. However, despite extensive discovery, the Committee had not yet found any "smoking gun" likely to prove their case if the litigation were to proceed. *Id.* More importantly, in that case, the Archdiocese had conveyed funds to various trusts and then later dissolved them before conveying the trust funds to a different trust and/or directly to the many individual parishes within the church territory. *Id.* at 858. As a result, the court anticipated that the litigation, if allowed to proceed under derivative standing, would probably result in over 100

separate trials and a substantial delay in confirming a plan in a case that had already been pending for nearly two years. *Id.* at 870. Furthermore, even if the litigation was successful, it was far from clear whether the individual parishes, schools, and other entities to whom the trust funds had been conveyed would be able to collectively come up with $35 million to turnover to the estate. *Id.*

The situation before this Court is quite different. All the assets appear to be contained within two Trusts, which means recovery from third parties should not be an issue. There would be, at most, two initial trials[13], and likely just one, as the actions against the Charitable Trust and the Real Estate Trust could easily be consolidated since they involve the same parties and largely the same core of operative facts. The potential payout is $80 million rather than $35 million, and counsel for the Committee have stated that they will voluntarily limit their attorneys' fees to just five percent of the recovery. In any case, this Court, like the Montana court which oversaw *Bishop of Great Falls*, "has an independent obligation to review the fee applications of counsel for both the Diocese and the Committee and to evaluate the propriety and reasonableness of payment of any compensation requested from the assets of the bankruptcy estate." 584 B.R. at 340 (citing *In re Busy Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 841 (3rd Cir. 1994)). Considering the willingness of Movant's counsel to limit their fees and the Court's oversight of fee applications, the Debtor's arguments regarding expensive litigation eating up any recovery from the avoidance actions (if they are successful) are not persuasive.

Beyond the cost-benefit analyses outlined above, the Diocese has presented little argument for justification of its decision not to pursue the actions. Indeed, other than those arguments already addressed and rejected by the Court, the Diocese's only response on this topic

---

[13] The Court acknowledges that other trials addressing transfers to and/or from the Trusts after their formation may be necessary in the future, but the Court has not been provided with any specific information in this regard.

consists of a brief and conclusory suggestion that a grant of derivative standing "threats [sic] the 'stable patrimony' of the Diocese (*i.e.*, the juridic entity) and correspondingly significantly threatens the Debtor's ability to reorganize as a going concern." To the extent that this argument is based on anything other than the prior cost-benefit analysis, the Court finds it unpersuasive and unsupported by the record.

## IV. Conclusion

Based on the foregoing analysis, the Court finds that the Committee has met its burden for approval of the Motion for Derivative Standing. A demand has been made upon the Diocese to act regarding the trust transfers. That demand has been declined. The Court finds that the Movant's claims are colorable to a degree sufficient to pass the scrutiny required by *Iqbal* and *Twombly*. The Committee has satisfied the cost-benefit analysis to the necessary extent of persuading the Court that the estate will benefit if the avoidance action is successful. And finally, the Court finds that the Diocese's inaction is not justified considering its duties as debtor-in-possession. Accordingly, the *Motion for Derivative Standing* is GRANTED.

An appropriate Order will follow.

By the Court,

_____
Henry W. Van Eck, Chief Bankruptcy Judge
Dated: February 17, 2022