**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**HARRISBURG DIVISION**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC DIOCESE OF HARRISBURG,<br><br>                        Debtor.[1] | Chapter 11<br><br>Case No. 1:20-bk-00599 (HWV) |

## MOTION FOR AN ORDER APPROVING SETTLEMENT AGREEMENTS WITH THE ROMAN CATHOLIC DIOCESE OF HARRISBURG'S INSURERS

The Roman Catholic Diocese of Harrisburg (the "***Debtor***"), by and through its undersigned counsel, moves this Court for entry of an order, pursuant to 11 U.S.C. §§ 105(a) and 363 and Bankruptcy Rule 9019, approving certain settlement agreements (the "***Settlement Agreements***") between the Debtor and the following insurers (collectively and as more specifically identified in the Settlement Agreements, the "***Settling Insurers***"): (a) Travelers Indemnity Company and certain of its affiliates ("***Travelers***"); The National Catholic Risk Retention Group ("***TNCRRG***"); The Catholic Mutual Relief Society of America ("***Catholic Mutual***"); Interstate Fire & Casualty Company ("***Interstate***"); Zurich American Insurance Company, as successor by merger to Maryland Casualty Company ("***Zurich***"); and certain Underwriters at Lloyd's, London subscribing to Policies 74/16553, SL 3042, SL 3235, SL 3711, ISL 3108, ISL 3580, ISL 3869, 74-16553-2, SL 3238, ISL 3109, SL 3439, SL 3873, ISL 3110, ISL 3582, and all others issued prior to July 25, 1993, and Solvent London Market Companies: Catalina Worthing Insurance Ltd. f/k/a HFPI (as Part VII transferee of Excess Insurance Co Ltd.), RiverStone Insurance (UK) Limited (successor in interest to Terra Nova Insurance Company Limited), Sompo Japan Nipponkoa

---

[1] The last four digits of the Debtor's federal tax identification number are: 4791. The Debtor's principal place of business is located at 4800 Union Deposit Road, Harrisburg, Pennsylvania 17111.

036905-08024/4885-6378-2723.9

Insurance Company of Europe Limited (formerly known as the Yasuda Fire & Marine Insurance Company (U.K.) Ltd.), Dominion Ins. Co. Ltd., St. Katherine Insurance Co., Assicurazioni Generali T.S., Taisho Marine & Fire Insurance Co., and Allianz International Insurance Co. (collectively, "*LMI*").

In support of this motion and foregoing relief sought, Debtor respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Middle District of Pennsylvania.

2.      This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtor consents to the entry of a final judgment or order with respect to this motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1408 and 1409.

## GENERAL BACKGROUND

4.      On February 19, 2020 (the "*Petition Date*"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 the United States Code (the "*Bankruptcy Code*"). The Debtor is operating its business and managing its property as debtor in possession, pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      General background about the Debtor is set forth in the *Informational Brief of the Roman Catholic Diocese of Harrisburg* (Dkt. No. 2) and *Declaration of Christopher G. Linscott in Support of First Day Motions* (Dkt. No. 15).

6.      On March 6, 2020, the Office of the United States Trustee appointed three members to the Official Committee of Tort Claimants (the "*Committee*").

7.	On December 21, 2022, the Debtor and Committee filed the *Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Harrisburg* (Dkt. No. 1470) (the "**Plan**") and *Disclosure Statement in Support of Amended Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Harrisburg* (Dkt. No. 1471) (the "***Disclosure Statement***").[2]

8.	On December 27, this Court entered the *Order (I) Approving Disclosure Statement and Form and Manner of Notice; (II) Approving Plan Solicitation and Voting Procedures; (III) Approving Ballot Forms; (IV) Approving Form, Manner, and Scope of Confirmation Notices; (V) Establishing Certain Deadlines in Connection With Approval of the Disclosure Statement and Confirmation of the Plan; (VI) Approving Procedures for Vote Tabulation; and (VII) Granting Related Relief* (Dkt. No. 1486) (the "***Disclosure Statement Order***").

9.	Pursuant to the Disclosure Statement Order, among other things, this Court approved the Disclosure Statement, the Debtor's proposed solicitation of votes to accept or reject the Plan, and scheduled a hearing to consider confirmation of the Plan for **February 15, 2023 at 11:00 a.m. (prevailing Eastern time)**.

<u>RELEVANT BACKGROUND TO MOTION</u>

10.	One of the paramount goals of this bankruptcy proceeding, as more fully detailed in the Plan and Disclosure Statement, is to provide compensation for unresolved Survivor Claims while also preserving the ability of the Debtor to continue providing essential ministries and services within the Diocese.

---

[2] Capitalized terms used in this motion and not otherwise defined shall have the meanings ascribed to them in the Plan or Disclosure Statement, as applicable.

036905-08024/4885-6378-2723.9

11. To that end, on the Petition Date, the Debtor caused to be filed a *Complaint*, commencing adversary proceeding number 1:20-ap-00018-HWV styled as *Roman Catholic Diocese of Harrisburg v. The Travelers Companies Inc., et al.* (the "**Adversary Proceeding**").

12. As set forth in the Adversary Proceeding, the Debtor believes it owns or otherwise holds an interest in certain insurance policies and certificates of coverage provided by the Settling Insurers that would require the Settling Insurers to indemnify or otherwise reimburse the Debtor for any judgment or settlement of the Survivor Claims that occurred during the time periods covered by the Settling Insurer Policies. The Settling Insurers generally dispute that they are legally obligated to indemnify the Debtor under the Settling Insurer Policies.

13. In order to resolve the coverage disputes with the Settling Insurers, pursuant to order of this Court, the Debtor, Committee, and Settling Insurers engaged in multiple formal and informal mediation sessions.

14. As a result of the multiple mediation sessions and further settlement discussions, the Debtor, Committee, and Settling Insurers have conferred and reached agreements in principle that are formalized in final or near final forms of the Settlement Agreements. True and correct forms of the Settlement Agreements in final or near final form are attached to this motion as **Exhibit A** through **Exhibit F** and are incorporated in this paragraph by reference.

15. The Settlement Agreements have been heavily negotiated between the parties or are otherwise in the process of being finalized, and the Debtor anticipates that fully executed Settlement Agreements with each respective Settling Insurer will be filed with the Court prior to the hearing on this Motion.[3]

---

[3] In the event that any Settlement Agreement is not finalized and fully executed prior to the hearing to consider this motion, the Debtor will not seek approval of that Settlement Agreement at that hearing, but reserves the right to continue the hearing with respect to any such Settlement Agreement to a later date.

16.     Pursuant to the Settlement Agreements, the Settling Insurers will, collectively (but not jointly and severally), pay to the Trust a total of Ten Million Seven Hundred Fifty Thousand Dollars ($10,750,000) for purposes of making distributions to Survivors pursuant to the Plan:

| **Settling Insurer** | **Amount** |
|---|---|
| Travelers | $750,000 |
| LMI | $2,500,000 |
| TNCRRG | $850,000 |
| Catholic Mutual | $200,000 |
| Interstate | $4,000,000 |
| Zurich | $2,450,000 |

17.     In addition to the contributions by the Settling Insurers, (a) the Debtor will make or cause to be made a contribution to the Trust in the amount of Five Million Five Hundred Thousand Dollars ($5,500,000),[4] and (b) the Parishes, Schools, and Related Non-Debtor Entities will make or cause to be made contributions in the aggregate amount of Two Million Dollars ($2,000,000), resulting in total funding to the Trust in the amount of Eighteen Million Two Hundred Fifty Thousand Dollars ($18,250,000).

18.     As more specifically set forth in the Settlement Agreements: (a) with respect to each of Travelers, Zurich, Interstate, and LMI, the Debtor will sell, convey, transfer and assign any and all interests the Debtor holds in the respective Settling Insurer Policies to the applicable Settling Insurer free and clear of all Liens, Claims and Interests of all Persons, pursuant to section 363 of the Bankruptcy Code; and (b) with respect to TNCRRG and Catholic Mutual, each

---

[4] The Debtor has also agreed to contribute up to Six Hundred Thousand Dollars ($600,000) with respect to Unknown Survivor Claims, all as more specifically set forth in the Plan.

036905-08024/4885-6378-2723.9

Settlement Agreement provides for the amendment of the applicable certificates of insurance and retroactive dates of coverage provided to the Debtor, Parishes, Schools, and Related Non-Debtor Entities.

19.     In addition, all Settling Insurers will be provided certain protections under the Plan, including, but not limited to, the Channeling Injunction, Supplemental Settling Insurer Injunction, exculpation, and certain releases, covenants not to sue, and indemnification rights, all as more specifically set forth in the Settlement Agreements and Plan.

20.     The additional protections provided under and pursuant to the Plan are integral terms and conditions of each Settlement Agreement.

21.     Upon approval of each Settlement Agreement and confirmation of the Plan, all claims asserted by the Debtor in the Adversary Proceeding will be dismissed.

22.     Each settlement is contingent and conditioned upon: (a) entry of a Final Order confirming the Plan, as currently proposed or as revised, modified or amended in accordance with the Settlement Agreements; and (b) the payment of the settlement amount due from the applicable Settling Insurer in accordance with and pursuant to each applicable Settlement Agreement.

23.     The consummation of the settlements set forth in each of the Settlement Agreements is a condition precedent to the occurrence of the Effective Date of the Plan.

## RELIEF REQUESTED

24.     The Debtor requests that the court approve: (a) the Settlement Agreements; and (b) the sale of the Settling Insurer Policies relating to Travelers, Zurich, Interstate, and LMI free and clear of all Liens, Claims, and Interests pursuant to section 363 of the Bankruptcy Code, in accordance with the Settlement Agreements with those Settling Insurers.

25.     In the Debtor's business judgment, the Settlement Agreements are in the best interest of the Debtor, Debtor's estate, and all other parties in interest.

**I.** **The Settlement Agreements should be approved pursuant to Bankruptcy Rule 9019.**

26. Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1102 (3d Cir. 1979) ("'administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims . . . .'" (quoting *In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

27. In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court apprise itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimate the complexity, expense, and likely duration of such litigation, and other factors relevant to a full and fair assessment of the claims. *In re Penn Cent. Transp. Co.*, 596 F.2d at 1114; *see also In re Marvel Entm't Group, Inc.*, 222 B.R. 243 (D. Del. 1998) (describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'" (quoting *In re Louise's Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).

28. The United States Court of Appeals for the Third Circuit Court has enumerated four factors that should be considered in determining whether a settlement should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006).

29.    In analyzing the foregoing factors, the decision to approve a settlement "is within the sound discretion of the bankruptcy court." *World Health Alternatives, Inc.*, 344 B.R. at 296; *see also In re Neshaminy Office Bldg. Assoc.*, 62 B.R. 798, 803 (E.D. Pa. 1986), cited with approval in *In re Martin*, 91 F.3d at 389. The bankruptcy court should not substitute its judgment for that of the trustee. *See In re Neshaminy Office Bldg. Assoc.*, 62 B.R. at 803. The court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvas the issues to see whether the settlement falls above the lowest point in the range of reasonableness. *See In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also World Health Alternatives, Inc.*, 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

30.    The Debtor believes each of the Settlement Agreements reflects a compromise of the various claims and disputes among the Debtor, on the one hand, and each respective Settling Insurer, on the other hand, that is fair and in the best interests of the Debtor and the Debtor's estate.

31.    Each of the Settlement Agreements is the result of multiple years of mediation and arm's length negotiations and permits the global resolution of myriad factually intense disputes and claims relating to Survivor Claims, the Settling Insurers, and the Settling Insurer Policies.

32.    Accordingly, the Settlement Agreements will: (a) permit the Debtor to avoid the uncertainty, delay, and cost involved in further litigation regarding Survivor Claims and applicability of coverage under the various Settling Insurer Policies; and (b) preserve the value of the Debtor's estate and maximize the amounts available to Survivors and other parties in interest.

33.     For these reasons and as set forth in more particularity below, the Debtor believes each Settlement Agreement satisfies the standard for approval under Bankruptcy Rule 9019 and should be approved.

### A.  *The probability of success in litigation weighs in favor of approval.*

34.     While the Debtor believed and continues to believe in the merit of the Debtor's position regarding coverage under the Settling Insurer Policies, any litigation with the Settling Insurers would have carried significant risk.

35.     In all instances, questions would have been raised and burdens of proof and persuasion would have to have been met regarding, among other things, evidence of coverage, conduct underlying and related to each Survivor Claim, specific coverage terms, and damages.

36.     In the case of each Survivor Claim, each Settling Insurer, each Settling Insurer Policy, and each policy period, opportunities for success and failure would be present to varying degrees.

37.     Approval of the Settlement Agreements removes the uncertainty surrounding each and every Survivor Claim, Settling Insurer, and Settling Insurer Policy. Professionals for the Debtor and the Committee have exhaustively analyzed the coverage situation and believe that each Settlement Agreement yields a recovery for the Trust that is well within the range of potential litigation outcomes for the applicable Settling Insurer.

38.     The certainty thus provided weighs in favor of approving each Settlement Agreement.

### B.  *The ability to collect favors approval.*

39.     While each of the Settling Insurers is seemingly solvent, to the extent the Debtor prevailed in litigation, there would undoubtedly follow years of very complex and factually distinct appeals.

40.     The sheer volume of potential appeals and time consuming nature of each would hinder the Debtor's ability to efficiently and timely effect any recovery in favor of Survivors.

41.     Approval of the Settlement Agreements removes any chance of appeals by the Debtor, Committee, and Settling Insurers and provides certainty in collection.

42.     Equally important, the Settlement Agreements avoid the substantial cost to the estate of litigating coverage issues through trial and appeal. Those litigation expenses would erode the Debtor's ability to make its agreed contributions to the Trust and, therefore, negatively affect the recovery to Survivors.

43.     Therefore, this factor supports approval of the Settlement Agreements.

### C.   *Potential litigation would have been extremely complex, favoring approval.*

44.     As alluded to above, the litigation relating to the Settling Insurers and Settling Insurer Policies would have been overly complex, likely involving an individual trial with respect to each Survivor Claim for which coverage was sought.

45.     The volume of litigation, factually sensitive nature of the claims, and complexity of the issues presented by the claims is all avoided by way of the Settlement Agreements.

46.     Accordingly, this factor favors approval of the Settlement Agreements.

### D.   *Approval of the Settlements Agreements is in the best interests of creditors.*

47.     The Settlement Agreements provide significant value for Survivors and provide that significant value to Survivors in a timely manner.

48.     The Settlement Agreements also enable the Debtor to bring this chapter 11 proceeding to a conclusion, resulting in distributions of contributions from the Debtor, Parishes, Schools, and Related Non-Debtor Entities to be made to the Survivors, in addition to contributions resulting from the Settlement Agreements. The Survivors deserve compensation as soon as possible. They are aging and have waited years already. Further delay to accommodate litigation

instead of settlement with the Settling Insurers implicates the maxim "justice delayed is justice denied." The Committee took the lead in negotiating the final settlement amounts and no doubt considered the human cost of the litigation alternative.

49.    Moreover, with respect to other creditors and the Debtor, approval of the Settlement Agreements permits this chapter 11 proceeding to reach a conclusion, permitting distributions to other classes of creditors. Resolving this Chapter 11 Case also allows the Debtor to again focus on its religious and charitable missions without the financial and administrative burdens of being a debtor. Recent years have been challenging for the communities served by those missions and ongoing economic challenges and uncertainty will be better addressed without such burdens.

50.    Therefore, approval of the Settlement Agreements is in the best interests of the Survivors and other parties in interest and should be granted.

## II.    The sale of certain of the Settling Insurer Policies is a sound exercise of the Debtor's business judgment and should be approved.

51.    The Settlement Agreements with each of Travelers, Zurich, LMI, and Interstate propose to sell the applicable Settling Insurer Policies to each respective Settling Insurer, because such Settling Insurer Policies are occurrence based policies.

52.    The sale of policies similar to the Settling Insurer Policies of Travelers, Zurich, LMI, and Interstate: (a) is customary in cases similar to this chapter 11 proceeding; and (b) was a required condition of any settlement with each of Travelers, Zurich, LMI, and Interstate, given the nature of the applicable Settling Insurer Policies.

53.    Pursuant to section 363(b)(1) of the Bankruptcy Code, the Debtor is authorized to sell property of the estate outside the ordinary course of business. *See* 11 U.S.C. § 363(b)(1).

54.    For a court to approve a sale outside the ordinary course of business under section 363(b)(1) of the Bankruptcy Code, the Debtor must demonstrate a "sound business purpose" and

that the sale aids the debtor's reorganization. *See In re Encore Healthcare Assocs.*, 312 B.R. 52, 55 (Bankr. E.D. Pa. 2004).

55.     And, when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).

56.     In assessing the "good faith" of the purchaser, the focus of the inquiry is upon the integrity of the purchaser's conduct in the course of the sale proceeding—*e.g.*, did the purchaser engage in fraud, collusion, or an attempt to take grossly unfair advantage of the process. *See Id.* at 147-148.

57.     Given consideration to (a) the reasons supporting approval of the Settlement Agreements under Bankruptcy Rule 9019 and (b) that the Settlement Agreements would not have been entered into without the proposed sale of the applicable Settling Insurer Policies, the Debtor has a sound business purpose for the sale of the Settling Insurer Policies relating to Travelers, Zurich, LMI, and Interstate, and such sale is an integral and material part of the Plan.

58.     In addition, the Settlement Agreements with each of Travelers, Zurich, LMI, and Interstate is the product of extensive mediation and arms' length negotiations involving each of the Settling Insurers, the Debtor, the Committee, and a mediator with extensive experience mediating these types of disputes.

59.     At no time did the Debtor, Committee, or Settling Insurers collude or engage in any other similar conduct in connection with the Settlement Agreements with Travelers, Zurich, LMI, or Interstate.

60. Accordingly, the Debtor submits that the sales contemplated by the Settlement Agreements with each of Travelers, Zurich, LMI, and Interstate should be approved pursuant to section 363(b)(1) of the Bankruptcy Code.

<u>**NOTICE**</u>

61. In accordance with Bankruptcy Rule 2002(b), notice of this motion was provided to: (a) the Office of the United States Trustee for the Middle District of Pennsylvania; (b) counsel to the Committee; (c) counsel to the Ad Hoc Committee; (d) the Unknown Claimants' Representative; and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002.

62. The Debtor submits that no other or further notice need be given under the circumstances.

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

63.    For the reasons set forth in this motion, the Debtor respectfully requests this Court enter an order, substantially in the form attached to this motion as **Exhibit G**, granting the relief requested in this motion and such other and further relief as this Court deems just and proper.

Dated: January 13, 2023
      Nashville, Tennessee

Respectfully submitted,

   _/s/ Blake D. Roth_
Blake D. Roth (State Bar No. 306951)
Tyler N. Layne (admitted *pro hac vice*)
**WALLER LANSDEN DORTCH & DAVIS, LLP**
511 Union Street, Suite 2700
Nashville, TN 37219
Telephone:    (615) 244-6380
Facsimile:    (615) 244-6804
Email:    blake.roth@wallerlaw.com
        tyler.layne@wallerlaw.com

-and-

KLEINBARD, LLC

Matthew H. Haverstick (State Bar No. 85072)
Joshua J. Voss (State Bar No. 306853)
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
Telephone:    (215) 568-2000
Facsimile:    (215) 568-0140
Email:    mhaverstick@kleinbard.com
        jvoss@kleinbard.com

*Attorneys for the Debtor and Debtor in Possession*

# EXHIBIT A

## TRAVELERS SETTLEMENT AGREEMENT

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter the "Agreement") is made this ____ day of _____, 2023, by and between the Diocese of Harrisburg ("**DOH**")[1] and the other "**DOH Entities**", on the one hand, and Travelers (as defined below). (The aforementioned parties are referred to hereinafter collectively as the "**Parties**" or individually as a "**Party**").

## WITNESSETH THAT:

WHEREAS, certain "**Persons**", alleging injuries from "**Abuse**", asserted "**Survivor Claims**" against certain DOH Entities;

WHEREAS, certain DOH Entities incurred, and may incur in the future, liabilities, expenses, and losses arising out of the Survivor Claims;

WHEREAS, Travelers issued or allegedly issued the "**Subject Insurance Policies**", providing insurance to the DOH Entities;

WHEREAS, the Subject Insurance Policies listed on Attachment A are property of DOH's bankruptcy estate;

WHEREAS, certain DOH Entities tendered "**Coverage Claims**" to Travelers to seek insurance coverage for the Survivor Claims;

WHEREAS, Travelers disputes the Coverage Claims;

WHEREAS, to address potential liabilities arising out of the Survivor Claims, on the "**Petition Date**," DOH filed the "**Bankruptcy Case**" in the "**Bankruptcy Court**";

WHEREAS, on February 19, 2020, DOH filed the "**Insurance Coverage Adversary Proceeding**," as an adversary proceeding in the Bankruptcy Court;

WHEREAS, Travelers is a named defendant in the Insurance Coverage Adversary Proceeding, and disputes the substantive allegations and Coverage Claims asserted against Travelers in the Insurance Coverage Adversary Proceeding;

WHEREAS, on April 2, 2020, DOH filed the "**Mediation Request**";

WHEREAS, the Bankruptcy Court (i) entered the "**Mediation Order**" approving the Mediation Request, appointing the "**Mediator**"; and (ii) ordered the "**Mediation Parties**" to mediate the Survivor Claims and the Coverage Claims;

WHEREAS, pursuant to the Bankruptcy Court's order, no defendant filed an Answer or otherwise responded in the Insurance Coverage Adversary Proceeding;

---

[1] Terms in bold, inside quotation marks, are defined in Section 1, Definitions.

4885-5226-2217.2
US_ACTIVE\122348083\V-5

Case 1:20-bk-00599-HWV Doc 1492 Filed 01/13/23 Entered 01/13/23 17:14:22 Desc
Main Document Page 16 of 260

WHEREAS, whether or not they (i) were subject to the Survivor Claims; or (ii) asserted Coverage Claims against Travelers, the DOH Entities are settling with and releasing **Travelers** pursuant to this Agreement;

WHEREAS, it is the intention of the Parties that the DOH Entities shall sell, assign, and transfer the Subject Insurance Policies to Travelers, and Travelers shall buy back the Subject Insurance Policies and pay the "**Settlement Amount**" to the "**Trust**", which shall be administered and distributed as provided in the "**Plan**", the "**Trust Agreement**", and the "**Trust Distribution Plan**", including to make payments to the "**Channeled Claimants**";

WHEREAS, upon the "**Settlement Amount Payment Date**", Travelers shall pay the "**Settlement Amount**" to the Trust for the benefit of the "**Channeled Claimants**";

WHEREAS, it is the intention of the Parties that any and all "**Interests**" in or to the Subject Insurance Policies be extinguished, ended, and forever terminated;

WHEREAS, it is the intention of the Parties that (i) the DOH Entities shall (a) not retain any right, title, or Interest in or to the "**Subject Insurance Policies**"; and (b) release Travelers from all "**Released Claims**"; and (ii) Travelers shall have no remaining duty or obligation of any nature whatsoever to any DOH Entity;

WHEREAS, DOH agrees to use commercially reasonable efforts to obtain the Supplemental Settling Insurer Injunction for the benefit of the "**Settling Insurers**," pursuant to the "**Plan**"; and

WHEREAS, subject to the Court entering the orders contemplated by this Agreement, upon the Trust's receipt of the Settlement Amount, Travelers will be protected by the "**Supplemental Settling Insurer Injunction**" and the "**Channeling Injunction**";

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without Travelers' admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates all Interests of Travelers, and the DOH Entities, with respect to the Subject Insurance Policies, including all rights, obligations, and liabilities relating to the "**Barred Claims**" and the "**Enjoined Claims**," without prejudice to their respective positions on policy wordings or any other issues relating to the Insurance Coverage Adversary Proceeding, the Coverage Claims, or otherwise.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

1.  **Definitions**

     The following definitions and the definitions used above apply to this Agreement as well as any exhibits or attachments hereto. Where the listed terms are further defined in the body of

this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms.

a.　Each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other.

b.　The words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation," and the phrase "relating to" means "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with." (The words "include," "includes," and "including," and the phrase "relating to" are not capitalized herein.)

c.　This Agreement incorporates all attachments hereto to the same extent as if fully set forth herein.

d.　All references to "Sections" are references to sections of this Agreement unless otherwise specified.

e.　Unless the context of this Agreement otherwise requires: the terms "hereto," "herein," "hereby," and derivatives of similar words refer to this entire Agreement.

f.　References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

g.　The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Agreement when the stated intent is not achieved.

h.　**Abuse**

The term "**Abuse**" means any (i) actual, alleged, or threatened, sexual conduct, misbehavior, misconduct, abuse, or molestation, including "Sexual Abuse" as defined in 42 Pa.C.S. § 5533(b)(2)(ii); (ii) any sexual offense as laid out in Chapter 31 of Title 18 of the Pennsylvania Statutes; (iii) any other sexually related act, contact, or interaction, indecent assault and/or battery, rape, indecent or lascivious behavior, undue familiarity, harassment, pedophilia, or ephebophilia; (iv) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a non-consenting adult and another adult; (v) contacts or interactions of a sexual nature; or (vi) assault, battery, corporal punishment, or any other act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the person.

i.     **Action**

The term "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

j.     **Affiliates**

The term "**Affiliates**" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

k.     **Agents**

The term "**Agents**" means all past and present employees; officers; directors; managing agents or other agents; shareholders; principals; teachers; staff; members; board members; administrators; priests; deacons; brothers, sisters, nuns, or other members of a religious order; clergy; Persons bound by a monastic vow; volunteers; attorneys; claims handling administrators; and representatives of a Person, in each case in their capacities as such.

l.     **Approval Order**

The term "**Approval Order**" means an order entered by the Court, upon a hearing following Bankruptcy Notice, containing all of the following provisions but no provision that is contrary to or inconsistent with the following provisions. The wording of the Approval Order shall be mutually acceptable to DOH and Travelers. The Approval Order shall contain provisions:

(i)     finding that due and adequate notice of DOH's request for approval of this Agreement has been provided to all creditors and parties in interest in the Bankruptcy Case, including by finding that the Bankruptcy Notice described in Section 1.p. of this Agreement is reasonable and provides due process to all potential known and unknown holders of Claims;

(ii)    approving this Agreement in its entirety, pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy Rules 6004 and 9019;

(iii)   authorizing, subject to the occurrence of the Settlement Payment Date, the sale of the Subject Insurance Policies to Travelers, free and clear of all Interests of all Persons, with all Interests in and to, and Claims against, the Subject Insurance Policies being fully extinguished without reservation as to the Settling Insurers;

(iv)   ordering that, as of the date the Trust receives the Settlement Amount, all Claims against, and Interests in and to, the Subject Insurance Policies be fully extinguished without reservation as to Travelers and the DOH Entities;

(v)    ordering that, as of the date the Trust receives the Settlement Amount, all Barred Claims and other Interests that any Person, including "**CMS**" (as defined herein), might have in, or against, the Subject Insurance Policies, attach to the Settlement Amount;

(vi)    authorizing and directing the Parties to perform their respective obligations under this Agreement; and

(vii)   issuing the Bar Order, subject to, and effective upon, the occurrence of the Settlement Payment Date.

The Approval Order shall be accompanied by the separately entered Settlement Approval Findings and Conclusions.

m.    **Bankruptcy Case**

The term "**Bankruptcy Case**" means the bankruptcy case filed by DOH in the Bankruptcy Court, entitled *In re Roman Catholic Diocese of Harrisburg*, Case Number 20-00599-HWV.

n.    **Bankruptcy Code**

The term "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

o.    **Bankruptcy Court**

The term "**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Pennsylvania or such other court of competent jurisdiction that properly exercises jurisdiction over part or all of the Bankruptcy Case, to the extent that the reference of part or all of the Bankruptcy Case is withdrawn.

p.    **Bankruptcy Notice**

The term "**Bankruptcy Notice**" means notice as required under Bankruptcy Rules 2002, 6004(a), and (c), and applicable local rules, sent to (i) all holders of Claims against the DOH Entities, including Survivor Claims, or their attorneys, if any, who are known to the DOH Entities; (ii) the Official Committee of Unsecured Creditors; (iii) the "**Unknown Claims Representative**" (once appointed by the Court); (iv) all insurers of the DOH Entities that provide coverage for or are alleged to provide coverage for Survivor Claims; (v) the Secretary of the Department of Health and Human Services; (vi) CMS; (vii) the United States Attorney for the Middle District of Pennsylvania; (viii) all Persons who, in the opinion of any Party to this Agreement, might reasonably be expected to be affected by the transactions contemplated herein; and (ix) all other Persons as directed by the Court.  Notice shall also be given by publication (a) in the national editions of (i) *USA Today*; (ii) *National Catholic Reporter;* and (iii) *The National Catholic Register;* and (b) locally in (i) *The Catholic Witness* (ii) *Gettysburg Times*; (iii) *Press Enterprise;* (iv) *The Sentinel;* (v) *Patriot-News;* (vi) *Public Opinion;* (vii) *LNP-Lancaster Online;* (viii) *Lebanon Daily News;* (ix) *The Sentinel;* (x) *The Daily Item;* (xi) *Perry County Times;* and (xiv) *York Daily Record*, or as the Court may otherwise direct.

q.    **Bankruptcy Rules**

The term "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

r.   **Bar Order**

The term "**Bar Order**" means an order, which shall automatically become effective on the Settlement Payment Date, barring, estopping, and permanently enjoining all Persons from asserting any Barred Claims against Travelers.

s.   **Business Day**

The term "**Business Day**" means any day that is not a Saturday, Sunday, or legal holiday in the United States or the Commonwealth of Pennsylvania.

t.   **Channeling Injunction**

The term "**Channeling Injunction**" means an order of the Court, effective as of the date the Trust receives the Settlement Amount, requiring all Channeled Claimants to assert their Channeled Claims against the Trust, and barring and permanently enjoining such claims against the DOH Entities and the Settling Insurers, pursuant to § 105 of the Bankruptcy Code, which states, *verbatim*.

**Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.**

(a)   **In consideration of the undertakings of the Protected Parties and the Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor, and to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as provided in sections 524 and 1141 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:**

1.   **any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims;**

2.   **any and all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:**

(i)   **commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;**

(ii).    enforcing, attaching, collecting or recovering, or seeking to accomplish any of the preceding, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers;

(iii).    creating, perfecting, or enforcing, or seeking to accomplish any of the preceding, any lien of any kind relating to any Channeled Claim against any of the Protected Parties or Settling Insurers, or the property of the Protected Parties or Settling Insurers;

(iv).    asserting, implementing, or effectuating, any Channeled Claim of any kind against:  (A) any obligation due any of the Protected Parties or Settling Insurers; (B) any of the Protected Parties or Settling Insurers; or (C) the property of any of the Protected Parties or Settling Insurers;

(v).    taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; or

(vi).    asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of the Protected Parties or Settling Insurers.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation.  It is intended that the channeling of the Channeled Claims provided in this section shall inure to the benefit of the Protected Parties and Settling Insurers.  The Channeling Injunction will become effective with respect to each applicable Settling Insurer as of the date that the Trust receives the Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement.  In a successful Action to enforce the injunctive provisions of this Section 12.3 in response to a willful violation thereof, the moving party shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, from the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

u.    **Claim**

The term "Claim" (a)  has the meaning ascribed in § 101(5) of the Bankruptcy Code; and also means any past, present or future (b) claim, Action, Cause of Action, suit, debt, dues, sum of money, account, reckonings, bond, bill, specialty, assertion of right, complaint, cross-complaint, counterclaim, liability, obligation, right, request, allegation, mediation, litigation, direct action, administrative proceeding, lien, encumbrance, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution,

exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect, derivative or otherwise consequential, whether in law, equity, admiralty or otherwise, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise.  A Person who alleges or alleged a Claim is a **"Claimant"**.  The term "Claim" includes all of the following:

**(i)    Barred Claims**

The term "**Barred Claims**" means all Claims enjoined by the Bar Order, which shall include all Direct Action, Indirect, Medicare, Released, and Survivor Claims.

**(ii)    Channeled Claims**

The term "**Channeled Claims**" means all of the Claims that shall be channeled to the Trust, including: (a) Survivor Claims; (b) Indirect Claims; (c) Direct Action Claims; (d) Contribution Claims; (e) Medicare Claims; and (f) Extra-Contractual Claims relating to the Claims listed in subsection (a)–(e) of this sentence; *provided, however*, that "**Channeled Claims**" shall not include (i) a Claim against an individual who perpetrated an act of Abuse; or (ii) a Claim against any religious order, diocese (other than the Reorganized Debtor), or archdiocese.

**(iii)    Contribution Claims**

The term "**Contribution Claims**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or  reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Survivor Claim.

**(iv)    Coverage Claims**

The term "**Coverage Claims**" means all Claims against Travelers under or relating to the Subject Insurance Policies or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

### (v)  Direct Action Claims

The term "**Direct Action Claims**" means the same as Survivor Claims, except that they are asserted against any Settling Insurer, instead of any DOH Entity or the Trust, for the recovery of insurance proceeds.

### (vi)  Enjoined Claims

The term "**Enjoined Claims**" means all Claims enjoined by the Supplemental Settling Insurer Injunction, which shall include all Direct Action, Indirect, Released, Survivor, Contribution Claims, and Extra Contractual Claims that are not Channeled Claims.

### (vii)  Extra-Contractual Claims

The term "**Extra-Contractual Claims**" means all Claims against Travelers, in its capacity as Insurer, seeking any type of relief other than coverage or benefits under the Subject Insurance Policies.  "**Extra-Contractual Claims**" include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs, or any other type of relief, alleging, with respect to (i) any of the Subject Insurance Policies; (ii) any Claim allegedly or actually covered under the Subject Insurance Policies; or (iii) the conduct of Travelers with respect to (i) and/or (ii) any of the following: (a) bad faith; (b) failure to provide insurance coverage under any Subject Insurance Policy; (c) failure or refusal to compromise and settle any Claim insured under any Subject Insurance Policy; (d) failure to act in good faith; (e) violation of any covenant or duty of good faith and fair dealing; (f) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (g) violation of any unfair claims practices act or similar statute, regulation or code; (h) any type of misconduct; or (i) any other act or omission of any type for which the Claimant seeks relief other than coverage or benefits under a Subject Insurance Policy.  The term "**Extra-Contractual Claims**" includes all Claims relating to Travelers' (i) handling of any Coverage Claim under the Subject Insurance Policies; (ii) conduct relating to the negotiation of this Agreement and the Plan; or (iii) conduct relating to the settlement of any Coverage Claim.

### (viii)  Indirect Claims

The term "**Indirect Claims**" means Claims against a DOH Entity or a Settling Insurer, asserted by any Person that is not an Insurer (an "**Indirect Claim Claimant**"), for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any actual or alleged liability for any Claim relating to Abuse that took place in whole or in part prior to the Plan Effective Date that a DOH Entity would have had, but for the entry of the bankruptcy discharge, the Channeling Injunction or the Supplemental Settling Insurer Injunction.

### (ix)  Medicare Claims

The term "**Medicare Claims**" means any and all Claims against the Trust, any Settling Insurer, or any DOH Entity, brought or asserted by CMS, and/or any other agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA and pursuing Claims under MSP, relating to any payments in respect of any Survivor Claims, including Claims for reimbursement of payments made to Survivor Claimants, who recover or receive any distribution from the Trust, and Claims relating to reporting obligations.

**(x)    Released Claims**

The term "**Released Claims**" means any and all of the DOH Entities' Coverage Claims and Extra-Contractual Claims.

**(xi)    Survivor Claims**

(A) The term "**Survivor Claims**" means all Claims, allowed or disallowed, for which any of the DOH Entities is or may be liable, relating to, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Plan Effective Date. For the avoidance of doubt, the term "**Survivor Claims**" includes any Known Survivor Claim, Unknown Survivor Claim, and Late-Filed Survivor Claim, regardless of whether such Survivor Claim is barred by any applicable statute of limitations as of the Filing Date or Effective Date, but does not include Contribution Claims, Indirect Claims, or Medicare Claims.

(B) The term "**Unknown Survivor Claim**" means any Survivor Claim relating to, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Plan Effective Date, but neither filed nor deemed filed in the Bankruptcy Case, nor otherwise allowed by the Court by the Plan Effective Date, and is held by an individual who was at the time of the Filing Date under a disability or other condition recognized by Pennsylvania law, or other applicable law suspending the running of the statute of limitation period, that would toll the statute of limitations on such Survivor Claim.

v.    **CMS**

The term "**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any other Agent or successor Person responsible for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

w.    **Committee**

The term "**Committee**" means the Official Committee of Tort Claimants appointed in the Bankruptcy Case, as such committee may be constituted from time to time.

x.    **Confirmation Findings and Conclusions**

The term "**Confirmation Findings and Conclusions**" means the findings of fact and conclusions of law required under §§ 1129(a), and, if applicable, 105(a) and 1129(b), of the

Bankruptcy Code, which are to be entered concurrently with the Confirmation Order, as necessary to confirm the Plan, including the following:

(i)     This Agreement is the fruit of long-term negotiations amongst the Parties, which began in July 2020, following the Bankruptcy Court's entry of the Mediation Order;

(ii)     The Settlement Amount provides good and valuable consideration to DOH's bankruptcy estate, and enables distributions to the Channeled Claimants;

(iii)     Potential liability for the Survivor Claims precipitated the filing of the Bankruptcy Case;

(iv)     This Agreement is therefore necessary to the Plan because it provides significant funding for the Plan;

(v)     The Subject Insurance Policies are property of DOH's bankruptcy estate and are therefore subject to the *in rem* jurisdiction of the Court;

(vi)     The Channeled Claims are within the jurisdiction of the Court because they seek property of DOH's bankruptcy estate;

(vii)     Because it would be impractical to divide the Subject Insurance Policies amongst DOH and the other DOH Entities, it was necessary for DOH to obtain the participation of the other DOH Entities in this Agreement;

(viii)     The DOH Entities, other than DOH, would not release their Interests in the Subject Insurance Policies unless they obtained the benefits of the Channeling Injunction, because to do so would have left them exposed to Survivor Claims, whether or not such Claims be valid, and whether or not coverage exists under the Subject Insurance Policies for such Claims;

(ix)     Therefore, the Channeling Injunction is necessary to this Agreement;

(x)     The Channeling Injunction is narrowly tailored because it only requires Channeled Claims to be brought against the Trust;

(xi)     The Settlement Amount is reasonable and fair consideration for the injunction of the Enjoined Claims, and for Travelers' liability for Survivor Claims;

(xii)     The Coverage Claims are within the jurisdiction of the Bankruptcy Court because such Claims could enhance the estate;

(xiii)     Travelers required that DOH obtain the benefits of the Supplemental Settling Insurer Injunction, as a condition of entering into this Agreement and contributing the Settlement Amount;

(xiv)     Therefore, the Supplemental Settling Insurer Injunction is necessary to this Agreement and the Plan; and

(xv)   The Supplemental Settling Insurer Injunction is narrowly tailored because it only enjoins the Enjoined Claims against the Settling Insurers;

y.      **Confirmation Order**

The term "**Confirmation Order**" means an order entered by the Bankruptcy Court after a confirmation hearing upon Bankruptcy Notice confirming the Plan, in a form and substance as required by this Agreement, which order is a Final Order.  The wording of the Confirmation Order shall be mutually acceptable to DOH and Travelers.  The Confirmation Order shall contain all of the following provisions but no provision that is contrary to or inconsistent with this Agreement:

(i)      confirming the Plan;

(ii)     specifically, and individually, ordering all Persons, as set forth in the Plan, to act or refrain from acting as specified in the Plan;

(iii)    incorporating, as of the date the Trust receives the Settlement Amount, the terms and provisions of the Bar Order as though fully set forth therein;

(iv)    ordering the Trustee to perform the obligations, if any, imposed upon the Trustee by this Agreement;

(v)     issuing the Channeling Injunction and the Supplemental Settling Insurer Injunction;

(vi)    discharging DOH from all Claims, including all Channeled Claims;

(vii)   ordering all Channeled Claimants with pending state court Actions against any DOH Entity to dismiss such Actions and assert them against the Trust for resolution pursuant to the Trust Agreement; and

(viii)  including the Reduction Clause set forth in Section 7, below.

The Confirmation Order shall be accompanied by the separately entered Confirmation Findings and Conclusions.

z.      **DOH**

"**DOH**" means The Diocese of Harrisburg, which is the diocesan corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5301, together with the public juridic person of the Roman Catholic Diocese of Harrisburg, as now constituted or as it may have been constituted. The term "**DOH**" also applies anywhere the term "**Reorganized Debtor**" is used, and "**Reorganized Debtor**" applies anywhere the term "**DOH**" is used, as is necessary to effectuate the terms of the Agreement.  Furthermore, in the event of any Action naming any Affiliate or Agent of DOH, such Action shall be considered an Action against DOH, the insurance coverage for which is released pursuant to Section 3 hereof.

aa. **DOH Entities**

The term "**DOH Entities**" means, in their capacity as such, DOH and its Entities.

The "**DOH Entities**" include each of the Persons set forth on Attachment B to this Agreement. An individual who perpetrated an act of Abuse that forms the basis for a Survivor Claim is not a DOH Entity with respect to that Survivor Claim.

bb. **DOH Entity Insurer Policy**

The term "**DOH Entity Insurer Policy**" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Plan Effective Date, which actually, allegedly, or potentially, insures any DOH Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Survivor Claim.

cc. **DOH Parishes**

The term "**DOH Parishes**" means all past and present parishes of or in DOH, in their capacity as public juridic persons, together with each corresponding parish corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5511.

dd. **Effective Date**

The term "**Effective Date**" means the day following the date on which all of the following have occurred: (i) all Parties have executed this Agreement; (ii) the Court has issued the Approval Order and the Settlement Approval Findings and Conclusions, and the Approval Order has become a Final Order; and (iv) the Court has issued the Confirmation Order and the Confirmation Findings and Conclusions, and the Confirmation Order has become a Final Order

ee. **Entities**

The term "**Entities**" means with respect to a specified Person: (i) its Affiliates; (ii) each of the foregoing Person's Agents; and (iii) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, administrators, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

ff. **Entities' Release**

The term "**Entities' Release**" means the following: The remising, release, covenant not to sue, and permanent discharge by the DOH Entities and any subsequently appointed trustee or representative acting for any DOH Entity, without further act by any Person, from and against all Released Claims that any DOH Entity ever had, now has, or hereafter may have, from the beginning of time to the Effective Date, of: (1) Travelers; and (2) the respective heirs, executors, administrators, and reinsurers (as such) of any of the Persons identified in clause (1) hereof, in their capacities as such.

gg.  **Filing Date**

The term "**Filing Date**" means February 19, 2020.

hh.  **Final Order**

The term "**Final Order**" means an order or judgment of the Bankruptcy Court that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or as to which any right to appeal, petition for *certiorari*, review, reargue, or rehear shall have been waived in writing in form and substance satisfactory to DOH and Travelers, and their counsel or, (b) in the event that an appeal, *writ of certiorari*, new trial, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order. For the avoidance of doubt, if the Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("**Substantial Consummation**"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order.

ii.  **Insurance Coverage Adversary Proceeding**

The term "**Insurance Coverage Adversary Proceeding**" means the case entitled *The Roman Catholic Diocese of Harrisburg v. The Travelers Companies, et al.*, filed in the Bankruptcy Court, as Adversary Proceeding Number 20-00018.

jj.  **Insurer**

The term "Insurer" means a Person (including all of its predecessors in interest, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, a DOH Entity Insurer Policy, whether or not a regulated insurance company.

kk.  **Interests**

The term "**Interests**" means all Claims, including any "interests" as that term is used in 11 U.S.C. § 363, and other rights of any nature, whether at law or in equity, including all interests or other rights under Pennsylvania or other applicable law.

4885-5226-2217.2

US_ACTIVE\122348083\V-5

ll.     **Mediation**

The term "**Mediation**" means the mediation by the Mediation Parties, as ordered by the Bankruptcy Court.

mm.     **Mediation Parties**

The term "**Mediation Parties**" means, collectively: (a) DOH; (b) each insurer named as a Defendant in the Insurance Coverage Adversary Proceeding; (c) the Committee; (d) state court counsel for Survivor Claimants; and (e) the *ad hoc* committee of parishes and other parties-in-interest, including schools or other non-debtor Catholic entities located within the territorial area decreed by the Roman Catholic Church as the "Diocese of Harrisburg," to the extent permitted or required by the Mediator.

nn.     **Mediation Order**

The term "**Mediation Order**" means the Agreed Order Referring Adversary Proceeding to Mediation, entered by the Bankruptcy Court in the Insurance Coverage Adversary Proceeding, on July 10, 2020, Doc. No. 84.

oo.     **Mediation Request**

The term "**Mediation Request**" means the Request for Mediation filed by the DOH in the Insurance Coverage Adversary Proceeding.

pp.     **Mediator**

The term "**Mediator**" means the Honorable Gregg W. Zive, United States Bankruptcy Judge.

qq.     **Medicare**

The term "**Medicare**" means Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, enacted July 1, 1966, including all subsequent amendments thereto.

rr.     **Medicare Beneficiary**

The term "**Medicare Beneficiary**" means any individual who has received or is eligible to receive benefits under Medicare and is the holder of a Channeled Claim.

ss.     **Medicare Secondary Payor Act**

The term "**Medicare Secondary Payor Act**" or "**MSP**" means 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules, regulations or guidance issued in connection therewith or amendments thereto.

tt. **MMSEA**

The term "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSP.

uu. **Non-Settling Insurer**

The term "**Non-Settling Insurer**" means any Insurer that is not a Settling Insurer by the Plan Effective Date.

vv. **Person**

The term "**Person**" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof; and any other individual or entity within the definitions of (i) "person" in Section 101(41) of the Bankruptcy Code or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

ww. **Petition Date**

The term "**Petition Date**" means February 19, 2020.

xx. **Plan**

The term "**Plan**" means a plan of reorganization proposed by DOH, after good-faith consultation with Travelers, which (a) contains all of the following provisions, but no provision that is contrary to or inconsistent with this Agreement; (b) allows all of the acts and transactions under, and envisioned by, this Agreement to occur with binding legal effect; (c) does not materially and adversely affect the rights, duties, or interests of the DOH Entities or Travelers under this Agreement; (d) includes all papers, exhibits, attachments, appendices, or other documents filed with or in support of the Plan and necessary for its implementation, and any documents relating to the establishment and operation of the Trust; and (e) shall include the following provisions:

(i)     specifying the terms of this Agreement shall control in the event of any conflict with the Plan or the Confirmation Order;

(ii)     prohibiting DOH or the Trust from continuing to pursue the Insurance Coverage Adversary Proceeding against Travelers, requiring DOH and the Trust to dismiss all Claims against Travelers, in the Insurance Coverage Adversary Proceeding, with prejudice, within fourteen (14) days after the Plan Effective Date, and prohibiting any DOH Entity from asserting any Coverage Claims against Travelers;

(iii)    specifying that, as of the date the Trust receives the Settlement Amount, the Channeling Injunction and the Supplemental Settling Insurer Injunction shall be effective;

(iv)    establishing the Trust, appointing the Trustee, and binding both of them to perform those requirements imposed upon them by this Agreement;

(v)    describing the role of the Unknown Claims Representative and seeking the continued appointment of the Unknown Claims Representative to continue in his duties;

(vi)    specifying that, as of the date the Trust receives the Settlement Amount, the Channeled Claims shall be channeled to the Trust;

(vii)    denominating, as of the date the Trust receives the Settlement Amount, Travelers as a Settling Insurer;

(viii)    requiring, as of the date the Trust receives the Settlement Amount, each Channeled Claimant receiving a payment from the Trust to sign a release of all Claims against Travelers and the DOH Entities;

(ix)    and providing, *verbatim*:

> (A)    It is the position of DOH that none of DOH Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("**HHS**") that none of the Trust, DOH Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the DOH Entities or Settling Insurers or payments by the Trust to Claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or written confirmation from HHS that none of the DOH Entities or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the DOH Entities and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the DOH Entities and Settling Insurers, and shall timely submit all reports that would be required to be made by any DOH Entity or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by a DOH Entity or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or any DOH Entity or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the DOH Entities and Settling Insurers, shall follow all applicable guidance published

Case 1:20-bk-00599-HWV    Doc 1492    Filed 01/13/23    Entered 01/13/23 17:14:22    Desc
Main Document    Page 32 of 260

by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(B)     If the Trust is required to act as a reporting agent for any DOH Entity or Settling Insurer pursuant to Section 1.xx.(ix)(A), the Trust shall provide a written certification to each DOH Entity and Settling Insurer within twenty-one (21) days following the end of each calendar quarter, confirming that all reports to CMS required by Section 1.xx.(ix)(A) have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

(C)     With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however,* that the Trust may redact from such copies the Redacted Information. With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by any DOH Entity or Settling Insurer, provide each DOH Entity and Settling Insurer copies of such resubmissions; *provided, however,* that the Trust may redact the Redacted Information. If the Trust is unable to remedy its noncompliance, the provisions of Section 1.xx.(ix)(G) shall apply.

(D)     If the Trust is required to act as a reporting agent for a DOH Entity or Settling Insurer pursuant to the provisions of Section 1.xx.(ix)(A), with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information in the possession or control of the Trust that may be necessary in the reasonable judgment of any DOH Entity or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event any DOH Entity or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS. All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

(E)     If the Trust is required to act as a reporting agent for any DOH Entity, or Settling Insurer pursuant to the provisions of Section 1.xx.(ix)(A), the Trust shall make the reports and provide the certifications required by Sections 1.xx.(ix)(A) and (B) until such time as such DOH Entity or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust. Furthermore,

following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 1.xx.(ix)(A), and if any DOH Entity or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 1.xx.(ix)(A) and (B).

(F) Section 1.xx.(ix)(A) is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the DOH Entities and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any acts undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(G) If CMS concludes that reporting done by the Trust in accordance with Section 1.xx.(ix)(A) is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any DOH Entity or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any DOH Entity or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 1.xx.(ix)(B), (C) or (D), or other credible information, then each DOH Entity and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information in its possession or control as the electing party may reasonably require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 1.xx.(ix)(A), without any redactions. The DOH Entities and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 1.xx.(ix) confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

(H) Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 1. xx.(ix) until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under this Section 1. xx.(ix) to such Person for any penalty, interest, or sanction with respect to a Claim that may arise on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each DOH Entity and Settling Insurer for any failure to report payments to Medicare eligible Survivor Claimants on behalf of Persons who have timely supplied Medicare Reporting Numbers, if any exists.

(I) Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trustee shall obtain in respect of any Channeled Claim a certification from the

Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. If the Trust receives no such certification, the Trust may withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Survivor Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 1. xx.(ix) to each DOH Entity and Settling Insurer, and permit reasonable audits by such Persons, no more often than annually, to confirm the Trust's compliance with this Section 1. xx.(ix). For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 1. xx.(ix) regardless of whether any DOH Entity or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 1. xx.(ix)(G).

(J) Compliance with the provisions of this Section 1. xx.(ix) shall be a material obligation of the Trust under the Plan, in favor of the DOH Entities and Settling Insurers under the Plan.

(K) The Trust shall defend, indemnify, and hold harmless the DOH Entities and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under Section 1. xx.(ix).

(x) The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing. The Trustee shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

yy. **Plan Effective Date**

The term "**Plan Effective Date**" means the effective date of the Plan, as noticed on the Bankruptcy Case docket.

zz. **Redacted Information**

The term "**Redacted Information**" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Survivor Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

aaa. **Reorganized Debtor**

The term "**Reorganized Debtor**" means DOH, on and after the Plan Effective Date.

bbb. **Settlement Amount**

The term "**Settlement Amount**" means the net sum of Seven Hundred and Fifty Thousand Dollars ($ 750,000.00). Travelers shall pay the Travelers Settlement Amount pursuant to the terms of Section 2.

ccc. **Settlement Approval Findings and Conclusions**

The term "**Settlement Approval Findings and Conclusions**" means findings of fact and conclusions of law pursuant to 11 U.S.C. §§ 363(b), (f), and (m) and Bankruptcy Rule 9019, entered concurrently with, but separately from,[BB1] the Approval Order, as necessary for the Court to approve this Agreement, including the following:

(i)     DOH demonstrated sound business reasons for the settlement of its Claims against Travelers in the Insurance Coverage Adversary Proceeding and the implementation of such settlement through the sale of the Subject Insurance Policies to Travelers;

(ii)    The Parties mediated their disputes over the Survivor Claims and the Coverage Claims pursuant to the Mediation Order, beginning in July 2020;

(iii)   In the Mediation, the Parties negotiated extensively, at arms-length, and in good faith. Travelers is a purchaser in good faith of the Subject Insurance Policies, within the meaning of Bankruptcy Code § 363(m), and is entitled to all of the protections of that statute;

(iv)    Travelers is a *bona fide* good faith purchaser of the Subject Insurance Policies, for value;

(v)     The terms of the transactions contemplated by this Agreement, as well as the genesis and background of this Agreement, have been adequately disclosed to the Court;

(vi)    The terms and conditions of this Agreement (including the consideration to be realized by DOH's bankruptcy estate) are fair and reasonable;

(vii)   The transactions contemplated by this Agreement are in the best interests of the DOH's bankruptcy estate, its creditors and other stakeholders;

(viii)  The only potential holders of Interests in or against the Subject Insurance Policies are the DOH Entities and Persons who hold Claims against the DOH Entities, whose Claims might be covered by the Subject Insurance Policies;

(ix)    The DOH Entities are parties to this Agreement, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

(x)     The Barred Claims are subject to *bona fide* dispute, hence the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

(xi)    All holders of Claims against the Subject Insurance Policies could be compelled, in a legal or equitable Action, to accept a money satisfaction of such Claims, therefore the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

(xii)    The compromises and settlements embodied in the Agreement have been negotiated in good faith, and are reasonable, fair, and equitable;

(xiii)    In light of:

> (A)    the probability of success in litigation;
>
> (B)    the likely difficulties in collection;
>
> (C)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
>
> (D)    the paramount interest of the creditors;

this Agreement is fair and equitable and within the range of reasonable settlement terms;

(xiv)    The Settlement Amount is fair, adequate, and reasonable consideration for (a) the sale by the DOH Entities and the buy-back by Travelers of the Subject Insurance Policies; (b) the Entities' Release; and (c) the Supplemental Settling Insurer Injunction;

(xv)    This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies, an admission concerning the amount of a reasonable settlement of any claim, an admission concerning the liability or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages, nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the positions with respect to the interpretation and application of the Subject Insurance Policies.  This Agreement does not reflect to upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to the positions taken by Travelers with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers;

(xvi)    DOH provided due and adequate notice of the (a) sale of the Subject Insurance Policies; (b) terms and conditions of this Agreement; and (c) the hearing before the Court to approve this Agreement and the sale of the Subject Insurance Policies, in accordance with Bankruptcy Rules 2002 and 6004 to all known and unknown Claimants, including by providing notice by publication to any Unknown Survivor Claimants;

(xvii) It would be impractical to divide the Subject Insurance Policies amongst the DOH Entities and the Survivor Claimants, therefore, to realize the value of the Subject Insurance Policies for DOH's bankruptcy estate and the Survivor Claimants requires the sale of the Subject Insurance Policies;

(xviii) The sale of the Subject Insurance Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b);

(xix) The sale of the Subject Insurance Policies free and clear of the Interests of all Persons satisfies the requirements of Bankruptcy Code § 363(f);

(xx) Travelers is repurchasing the Subject Insurance Policies, pursuant to this Agreement. Travelers is not purchasing any other assets of the DOH Entities and is not a continuation of the DOH Entities, nor engaging in a continuation of the DOH Entities' businesses. Travelers shall not have any responsibility or liability with respect to any of the DOH Entities' other assets;

(xxi) Travelers is not, and shall not be deemed to be, a successor to the DOH Entities, or any of them, by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in this Agreement, the Plan, or otherwise. Travelers shall not assume, or be deemed to have assumed, any liabilities or other obligations of the DOH Entities.

(xxii) To the extent any Claimant may have any legal or equitable right to assert a Claim either directly against the Subject Insurance Policies, which policies are being acquired by Travelers pursuant to this Agreement, or indirectly by asserting such Claim against any DOH Entity, such Claims are deemed to be (a) "interests" as that term is used in Bankruptcy Code § 363(f); and (b) "Interests" herein; and

(xxiii) The Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

ddd. **Settlement Payment Date**

The term "**Settlement Payment Date**" means the day that is the later of (a) the Plan Effective Date; and (b) sixty (60) days after the Confirmation Order becomes a Final Order, *provided, however*, that if such date is not a Business Day, the Settlement Payment Date shall be the next Business Day.

eee. **Supplemental Settling Insurer Injunction**

The term "**Supplemental Settling Insurer Injunction**" means an order of the Bankruptcy Court, effective as of the date the Trust receives the Settlement Amount, which states, *verbatim*:

> **Supplemental Settling Insurer Injunction. Pursuant to sections 105(a) and 363 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including certain Settling Insurers' purchase of the applicable Settling Insurer Policies free and clear of all Claims and Interests pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Claims or Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Survivor Claimants, perpetrators, and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the**

Insurance Settlement Agreements) against any of the Settling Insurers, including (i) Claims relating to the Settling Insurer Policies, including Survivor Claims, Direct Action Claims, Indirect Claims, and Released Claims, (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims, and (iii) Extra-Contractual Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against the Settling Insurers or Settling Insurer Policies, including:**

      **a.     commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise, against the Settling Insurers or the property of the Settling Insurers;**

      **b.     enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;**

      **c.     creating, perfecting, or enforcing, or seeking to do any of the preceding, any lien of any kind against the Settling Insurers or the property of the Settling Insurers;**

      **d.     asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Settling Insurers or the property of the Settling Insurers; and**

      **e.     taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.**

      **The Supplemental Settling Insurer Injunction will be effective with respect to a Settling Insurer only as of the date that the Trust receives the Insurance Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. The Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Settling Insurer Policies, but against no other person or thing; provided, however, nothing in this Supplemental Settling Insurer Injunction shall limit, or be deemed or otherwise interpreted to limit, the scope of the discharge or Channeling Injunction in favor of the Protected Parties. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.**

fff.    **<u>Settling Insurers</u>**

The term "**Settling Insurers**" means, collectively, Travelers, and all other insurers of the DOH Entities, which, after the Petition Date, settled Claims for insurance coverage brought against them by DOH, and which obtain the protection of the Supplemental Settling Insurer Injunction.

ggg.    **Subject Insurance Policies**

The term "**Subject Insurance Policies**" means, collectively, (i) all insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies to the extent issued by Travelers on or before _____, and providing insurance to any DOH Entity; *provided, however*, if a Subject Insurance Policy that is not listed in Attachment A was not issued to a DOH Entity (or such Person's Affiliates) but provides coverage to a DOH Entity, then it is a Subject Insurance Policy only to the extent it insures the DOH Entity.

hhh.    **Termination Event**

The term "**Termination Event**" means

(i)    the Court has not entered the Approval Order by [DATE];

(ii)    the Court has not entered the Confirmation Order by [DATE];

(iii)    the Court has not entered the Bar Order by [DATE];

(iv)    the Approval Order, the Confirmation Order or the Bar Order fails to become a Final Order by [DATE];

(v)    the Court denies approval of this Agreement;

(vi)    the Court enters an order or grants such other relief that is inconsistent with this Agreement;

(vii)    the DOH files any plan of reorganization other than the Plan;

(viii)    the appointment of a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers in the Bankruptcy Case; or

(ix)    the Plan is amended in any manner that is inconsistent with the terms of this Agreement; *provided, however*, the deadlines set forth in (i) through (iv) of the foregoing may be extended by mutual written consent of the Parties.

iii.    **Travelers**

The term "**Travelers**" means Travelers Indemnity Company and each of its past, present, and future parents, subsidiaries, Affiliates, and divisions; each of the foregoing Persons' or Entities' respective past, present, and future parents, subsidiaries, Affiliates, holding companies, merged companies, related companies, divisions, and acquired companies; each of the foregoing Persons' or Entities' respective past, present, and future directors, officers, shareholders, employees, partners, principals, managers, agents, attorneys, joint ventures, joint venturers, representatives, and claims handling administrators; and each of the foregoing Persons' or Entities' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons or Entities acting on behalf of, by, through, or in concert with them.

jjj.    **Travelers Bill of Sale**

The term "**Travelers Bill of Sale**" means a fully executed bill of sale evidencing the sale, assignment, and transfer of the Subject Insurance Policies to Travelers free and clear of all Interests of all Persons, including the Abuse Claimants and the DOH Entities.

kkk.    **Trust**

The term "**Trust**" means the trust to be established under the Plan, which will assume liability for, and be established, pursuant to the Plan and, if applicable, Bankruptcy Code § 105, to make distributions pursuant to the Plan, the Trust Agreement, and the Trust Distribution Plan, including payments to Survivor Claimants.

lll.    **Trust Agreement**

The term "**Trust Agreement**" means any agreement establishing the Trust and the requirements for its administration.

mmm.    **Trust Distribution Plan**[BB2]

The term "**Trust Distribution Plan**" means the Trust Distribution Plan established under the Trust Agreement and attached to the Plan, which governs the payment of Trust Distributions.

nnn.    **Trustee**

The term "**Trustee**" means the Person appointed as Trustee to administer the Trust, in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

ooo.    **Unknown Claims Representative**

The term "**Unknown Claims Representative**" means Michael R. Hogan, who has been appointed by the Court to represent the interests of Unknown Survivor Claimants.

2.    **Payment of the Settlement Amount**

a.    This Agreement is effective on the Effective Date.  The occurrence of the Settlement Payment Date is a condition precedent to Travelers' obligation to pay the Settlement Amount.

b.    On the Settlement Payment Date, in full and final settlement of all obligations under and relating to the Subject Insurance Policies, and in consideration of the sale of the Subject Insurance Policies to Travelers, free and clear of all Interests of any Person, and the releases provided herein, Travelers shall pay the Settlement Amounts in accordance with the payment instructions provided by the Trust.

c.      Upon the Trust's receipt of Travelers' Settlement Amount, the sale, assignment, and transfer of the Subject Insurance Policies to Travelers, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies.

d.      If, before the occurrence of the Settlement Payment Date, a DOH Entity other than DOH becomes a debtor in a bankruptcy case or insolvency Action, under the Bankruptcy Code or otherwise, and Travelers has not satisfied its payment obligation arising hereunder, then Travelers shall be excused from performance under this Agreement until such time as either (i) such DOH Entity obtains, subject to the limitations imposed by the Bankruptcy Code, and subject to the equitable powers of the court in which such Action is pending, an order from such court approving this Agreement under Bankruptcy Code § 363(b), (f), and (m), and Bankruptcy Rule 9019, authorizing the assumption by such DOH Entity (or any successor thereto) of this Agreement under Bankruptcy Code § 365 ("**Assumption**"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof; (ii) DOH obtains an order in the Action compelling the Assumption; or (iii) DOH obtains an order from the Court determining the equitable portion of the Settlement Amount allocable to any interest the DOH Entity subject to such bankruptcy case or insolvency Action may have in the Subject Insurance Policies.  Each DOH Entity agrees that in the event it files a bankruptcy or other insolvency Action, it will not present any Claim for payment under this Agreement or the Subject Insurance Policies to Travelers, until the Assumption has been approved by an order of the applicable court and such order has become a Final Order or until its equitable share in the Settlement Amount has been established by order of the Court pursuant to clause (iii) above, and such order has become a Final Order.  Travelers agrees to cooperate fully and provide commercially reasonable assistance to DOH and any DOH Entity in obtaining any of the orders contemplated in this Section 2(d).

## 3.    **Mutual Releases**

a.      **By DOH Entities**

(i)      Upon the Trust's receipt of the Settlement Amount, the Entities' Release shall become immediately effective. Those Travelers Affiliates entitled to the Entities' Release but not identified on Attachment […] to this Agreement, namely, those Travelers Affiliates that subscribed a Travelers Policy either not presently known, or known but to which the identity of the subscribers is not presently known, shall be entitled to all of the terms of the Entities' Release and to the Indemnity set forth in Section 4 upon the Trust's receipt of the Settlement Amount.[BB3]

(ii)     It is the intention of the DOH Entities to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies and to assure Travelers its peace and freedom from such Interests and from all assertions of rights in connection with such Interests, *provided, however,* the Entities' Release does not release, and nothing in this Agreement shall affect the right of the DOH Entities, or the Trust, as applicable, to assert and pursue Claims against and to collect from Insurers other than those released under the Entities Release, and no Claims are released with respect to such Persons.

(iii)  Upon the Trust's receipt of the Settlement Amount, any and all rights, duties, responsibilities, and obligations of Travelers created by or in connection with the Subject Insurance Policies, are terminated.  As of the Settlement Payment Date, the DOH Entities shall have no insurance coverage under the Subject Insurance Policies.  The Entities' Release shall operate as though Travelers had never issued the Subject Insurance Policies.

(iv)  Each DOH Entity signing this Agreement, is, among other things, (a) releasing all Released Claims, including Claims that it does not know or suspect to exist in its favor, which, if known by such DOH Entity, might have materially affected its settlement with Travelers, and (b) expressly waiving all rights it might have under any federal, state, local, or other law or statute that would in any way limit, restrict, or prohibit such general release.

(v)  Except with respect to any material breach of any representation, warranty or covenant by Travelers set forth in this Agreement, each DOH Entity expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist.  To the fullest extent permitted by applicable law, each DOH Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

(vi)  Nothing in the foregoing shall release Travelers from its obligations under this Agreement, including the obligation to pay the Settlement Amount.

b.  **By Travelers**

(i)  At the same time the Entities' Release becomes effective, Travelers, and any subsequently appointed trustee or representative acting for Travelers, shall be deemed to remise, release, covenant not to sue, and forever discharge each DOH Entity from and against all Claims relating to the Subject Insurance Policies, which Travelers ever had, now have or hereinafter may have, from the beginning of time to the Settlement Payment Date.

(ii)  Each Person released under the Entities' Release shall reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies.

(iii)  Except with respect to any material breach of any representation, warranty or covenant by any DOH Entity set forth in this Agreement, Travelers expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist.  To the fullest extent permitted by applicable law, Travelers hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

## 4.      Indemnification

a.      This Section 4 is effective upon the Trust's receipt of the Settlement Amount. The Trust shall indemnify and hold harmless Travelers from and against any and all Channeled Claims; and the Reorganized Debtor shall indemnify Travelers from and against all Enjoined Claims except for the Channeled Claims.  These indemnifications include Claims made by Persons over whom the Trust and/or the Reorganized Debtor does not have control, including the DOH Entities, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who holds a Claim that the Trust and/or the Reorganized Debtor is indemnifying.

b.      Travelers shall have the right to defend, with counsel of their choice, all Claims identified under Section 4.a.  Travelers may begin the defense of any Claim upon receipt of such a Claim.  Travelers agrees to notify the Trust and/or the Reorganized Debtor, as applicable, promptly of Claims identified under Section 4.a. and of its choice of counsel.

c.      The Trust and/or Reorganized Debtor, as applicable, shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by Travelers in defending such Claims identified under Section 4.a.  Travelers shall defend any such Claim in good faith. The indemnity obligations set forth in Section 4.a, hereof, to indemnify Travelers shall not exceed the Settlement Amount actually paid by Travelers. In defense of any such Claim, Travelers may settle or otherwise resolve a Claim with the prior consent of the Trust and/or Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.

## 5.      Bankruptcy Obligations

a.      DOH shall provide to Travelers an initial draft of the proposed form of Approval Order, Settlement Approval Findings and Conclusions, and Bar Order at least fourteen (14) days before DOH submits the foregoing for approval of this Agreement to the Court, so that Travelers may provide comments and suggestions.  In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to Travelers.  Travelers reserves the right to object to, *inter alia*, (i) any proposed order that does not satisfy all of the requirements of the definition of Approval Order set forth in Section 1.l, or (ii) any proposed findings and conclusions that do not satisfy all of the requirements of the definition of Settlement Approval Findings and Conclusions set forth in Section 1.ccc, or the definition of Bar Order set forth in Section 1.r.

b.      DOH shall provide to Travelers an initial draft of the proposed form of Confirmation Order, and Confirmation Findings and Conclusions, at least fourteen (14) days before DOH submits the foregoing to the Court, so that Travelers may provide comments and suggestions.  In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to Travelers. Travelers reserves the right to object to, *inter alia*, any proposed order that does not satisfy all of the requirements of the definition of Confirmation Order set forth in Section 1.y, or any proposed findings of fact and conclusions of law that do not satisfy all the requirements of the definition of Confirmation Findings and Conclusions in Section 1.x.

Case 1:20-bk-00599-HWV    Doc 1492    Filed 01/13/23    Entered 01/13/23 17:14:22    Desc
Main Document    Page 44 of 260

c.     DOH provided Travelers a copy of the *Joint Chapter 11 Plan of Reorganization for the Diocese of Harrisburg* (the "**Joint Plan**") upon the filing of the Joint Plan. To the extent that the Joint Plan does not meet the requirements set forth in the definition of "Plan" set forth in Section 1.xx above, DOH shall modify such Joint Plan to assure that the filed plan of reorganization submitted to Court for confirmation comports with such definition, and Travelers shall have the right to approve all modifications that affects its rights or obligations under this Agreement. In the event that DOH makes material revisions to the filed plan of reorganization, then, as soon as possible, DOH shall provide a copy of such material revisions to Travelers. Travelers reserves the right to object to, *inter alia*, any proposed plan of reorganization that does not satisfy all of the requirements of the definition of Plan set forth in Section 1.xx. (a "**Non-Compliant Plan**"). If DOH proposes a Non-Compliant Plan, then Travelers may contest such plan, and DOH shall not request a hearing date on confirmation of a Non-Compliant Plan less than thirty (30) days after the date such plan is filed in the Court.

d.     DOH will seek entry of the Confirmation Order, as set forth in Section 1.y., together with the Confirmation Findings and Conclusions, as set forth in Section 1.x., including any required findings and conclusions under the Bankruptcy Code.

e.     DOH shall serve Bankruptcy Notice of the initial hearing to approve this Agreement and on confirmation of the Plan and the time for filing objections thereto. The proposed form of notice shall be submitted to Travelers for its review and comment no later than seven (7) days prior to the actual service of notice. If the initial hearing to approve this Agreement or to confirm the Plan is adjourned, DOH shall not be required to provide Bankruptcy Notice of such adjourned hearing and shall only be required to file a notice of such adjournment on the docket in the Bankruptcy Case and provide such other and further notice as the Court may direct.

f.     In the event that any Person attempts to prosecute a Barred Claim, before the Effective Date, against Travelers, then promptly following notice from Travelers, DOH shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code §§ 105(a) and/or 362(b), as applicable, staying such Claims until the date that the Approval Order and Confirmation Order have each become a Final Order, or, alternatively, this Agreement is terminated under Section 8. However, if DOH is unable to obtain a stay of such Claim then Travelers may, to the extent feasible, and subject to the terms, conditions, and any applicable limits and retentions of the Subject Insurance Policies, defend such Claims and either settle them or litigate them to judgment, and the applicable DOH Entities shall fully assist and cooperate with Travelers in such defense. If after such a Claim is brought, and if:

(i)     the Effective Date occurs, then any payment by Travelers to resolve such Barred Claim, including defense costs paid to an insured's counsel, shall be deducted from the Settlement Amount, and Travelers shall pay the balance of the Settlement Amount; if the payments by Travelers to resolve such Barred Claim equal or exceed the Settlement Amount, then Travelers shall automatically, and without further action by any Person, be relieved of any further obligations under this Agreement and entitled to all the benefits hereunder, including the Entities Release; or, alternatively,

(ii)     the Effective Date does not occur, before this Agreement is terminated under Section 8, then any amounts paid by Travelers shall be credited against its obligations, if any exist, under the Subject Insurance Policies.

## 6.     **Representations and Warranties**

a.      DOH represents and warrants that the notice required under the definition of Bankruptcy Notice includes all Claimants whose names and addresses are known to, or are readily ascertainable by any Party.

b.      Each DOH Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation, subject in the case of DOH, to receiving Court approval of this Agreement.

c.      Travelers represents and warrants to DOH that (i) it has, and at all times prior to payment in full of the Settlement Amount will have, sufficient assets to pay the Settlement Amount in full; and (ii) it is not now, nor has it ever been, the subject of any bankruptcy or insolvency proceeding in any jurisdiction.

d.      Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

e.      Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity, and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

## 7.     **Reduction Clause.**

The Confirmation Order shall provide include the following, *verbatim*:

a.      **Litigation/Settlement Between an Alleged Insured or Abuse Claimant and Non-Settling Insurers**

(i)      The Channeling Injunction shall channel all Contribution Claims to the Trust.

(ii)      If, for any reason any court does not recognize the channeling of the Contribution Claims of Non-Settling Insurers to the Trust, or such Claims are not channeled for any reason, then the following shall apply:

(A)      Travelers shall retain its Contribution Claims, subject to the following provisions; provided, however, that:

(I)      Travelers shall not pursue any Contribution Claims against any Non-Settling Insurer: (A) that asserts a Contribution Claim solely against the Trust; (B) whose Contribution Claim is satisfied and extinguished entirely by the application of this paragraph 7.a.(ii)(A); or (C) that does not assert a Contribution Claim against them;

(II)     If a Non-Settling Insurer asserts its Contribution Claim only against the Trust, then Travelers shall assign any Contribution Claims it may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Contribution Claims against such Non-Settling Insurer;

(III)    If a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against Travelers, then Travelers shall release its Contribution Claims against such releasing Non-Settling Insurer.

(IV)    If a Non-Settling Insurer asserts a Contribution Claim against Travelers, and

(1)     the Trust fully indemnifies Travelers, then Travelers shall assign its Contribution Claims to the Trust; or

(2)     the Trust partially, but not fully, indemnifies Travelers for such Claim, then Travelers shall retain its Contribution Claims and may assert them against the Non-Settling Insurer asserting the Contribution Claim against Travelers.  Any recovery by Travelers exceeding the amount necessary to satisfy the Trust's full indemnity obligation plus litigation costs shall be turned over to the Trust.

(B)     In any Action, including the Insurance Coverage Adversary Proceeding, involving a DOH Entity, the Reorganized Debtor, or the Trust (collectively, "**Alleged Insured**") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against Travelers, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that Travelers is liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("**Reduction Amount**").  In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where Travelers is not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, of the Reduction Amount before entry of judgment against such Non-Settling Insurer.  In the event that such a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against Travelers shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed.  Travelers shall be required to cooperate in good faith with DOH and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim.  In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse Travelers its costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Court.

(C)  If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Claims relating to Abuse, such agreement shall provide that such Non-Settling Insurer releases Contribution Claims against Travelers so long as Travelers releases its Contribution Claims against such Non-Settling Insurer.  If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer has asserted, asserts, or could assert a Contribution Claim against Travelers, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount.  In such event, the settling parties shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount.  If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Contribution Claim by any Non-Settling Insurer against Travelers shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed.  Travelers shall be required to cooperate in good faith with DOH and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim by a Non-Settling Insurer.  In the event that the reduction eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse Travelers its costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Court.

b.  **Application of the Reduction**

(i)  To ensure that the reduction contemplated in this Section 7 is accomplished, Travelers shall be entitled to: (i) notice, pursuant to Section 19, within a reasonable time of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer that could give rise to the possibility of a Contribution Claim against Travelers, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations without objection by any party thereto, but only to the extent necessary to accomplish the reduction contemplated in this Section 7; (iii) the cooperation of the applicable Alleged Insured so that Travelers can assert this Section as a defense in any Action against any of them for any Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect Travelers from any Contribution Claim.  The notice required above shall be given by (A) the Alleged Insured that is a party to such Action or settlement negotiations; or (B) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (C) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Survivor Claimant bound by the Plan.

(ii)  The Trust shall use commercially reasonable efforts to obtain, from all Settling Insurers, agreements similar to those contained in Section 7(a)(ii)(A)(III).

## 8.    Termination of Agreement

a.    The Parties may terminate this Agreement in writing upon mutual assent.

b.    Any Party may terminate this Agreement upon thirty (30) days' notice, pursuant to Section 19 hereof, to the other Parties if a Termination Event occurs.

c.    In the event of termination pursuant to this Section 8, unless the Parties agree otherwise in writing, this Agreement shall be void *ab initio* and all Parties shall retain all of their Interests relating to the Subject Insurance Policies as if this Agreement never existed; provided, however, that any amounts expended by Travelers pursuant to Section 5.f. of this Agreement shall be credited against their obligations, if any, under the Subject Insurance Policies pursuant to their terms.

d.    If Travelers does not pay the Settlement Amount, DOH, at its option, may by written notice, in accordance with Section 19 hereof, to other parties to this Agreement, terminate this Agreement in its entirety. In the event of a termination, (i) Travelers shall not be a Settling Insurer; (ii) Travelers shall not receive the benefit of the Entities' Release, the Channeling Injunction, or the Supplemental Settling Insurer Injunction; (iii) this Agreement shall be void *ab initio*; and (v) the Parties shall retain all of their Interests relating to that portion of any insurance policies to the extent issued or subscribed by Travelers, as if this Agreement never existed.

## 9.    Treatment of Perpetrators

Nothing in this Agreement overrides the treatment in the Plan of individuals who perpetrated an act of Abuse that forms the basis for a Survivor Claim.

## 10.    Reasonably Equivalent Value

a.    This Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations;

b.    Based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of maintaining the Insurance Coverage Adversary Proceeding, the payments received by the DOH Entities pursuant to this Agreement constitute a fair and reasonable settlement of the Released Claims;

c.    The payments and other benefits received under this Agreement by the DOH Entities constitute reasonably equivalent value for the Entities' Release, indemnity, and other benefits received by Travelers under this Agreement; and

d.    Subject to the Trust's receipt of the Settlement Amount, this Agreement constitutes a full and final resolution of all issues in the Insurance Coverage Adversary Proceeding.

11. **Confidentiality**

    a.    Except as necessary to obtain approval of this Agreement in the Court, the Parties agree that all matters relating to the negotiation of this Agreement shall be confidential and are not to be disclosed except by order of court, or written agreement of the Parties, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of Travelers directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future, including any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons acting for such insurer. This Agreement may also be disclosed, as required, to the Inland Revenue, the Internal Revenue Service or other U.S. or U.K. governmental authority that properly requires disclosure, or as otherwise required by law. The Parties acknowledge and agree that a copy of this Agreement will be publicly filed on the docket and provided to parties in interest in the Bankruptcy Case, without obligation of confidentiality or restrictions on further disclosure.

    b.    In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this section from a Party, such Party shall decline to provide the requested information on the ground that this Agreement restricts such disclosure. In the event such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue or Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall promptly give written notice to the other Parties, and shall promptly provide copies of all notice papers, orders, requests, or other documents in order to allow each Party to take such protective steps as may be appropriate. Notice shall be made under this paragraph to the persons identified in Section 19.

    c.    Material protected by this section shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

12. **Co-operation**

    a.    The DOH Entities will undertake all reasonable actions to co-operate with Travelers in connection with their respective reinsurers, including responding to reasonable requests for information and meeting with representatives of reinsurers. Furthermore, the Parties shall use their commercially reasonable efforts and cooperate as necessary or appropriate to effect the objectives of this Agreement.

    b.    If any action or proceeding of any type whatsoever is commenced or prosecuted by any person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

**13.** **Non-Prejudice and Construction of Agreement**

a.      This Agreement is intended to be and is a compromise between the Parties and neither this Agreement nor any provision hereof shall be construed as (i) an admission of coverage under the Subject Insurance Policies; (ii) an admission concerning the amount of a reasonable settlement of any Claim; (iii) an admission concerning the liability of or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages); or (iv) a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies.

b.      This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions.  Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement.  This Agreement is without prejudice to positions taken by Travelers with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers.  The Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

c.      This Agreement is the jointly drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed.  As such, no Party will assert that any ambiguity in this Agreement shall be construed against another Party.

d.      If any provision of the Plan, the Trust Agreement, or trust distribution procedures proposed thereunder conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence. Neither the Plan nor the Trust Agreement shall be construed or interpreted to modify or affect any rights or obligations of Travelers under this Agreement.

**14.** **No Modification**

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties. Any change or modification of this Agreement that affects the rights of the Survivor Claimants or Trust shall require the consent of the Committee or Trustee, as applicable, which consent shall not be unreasonably withheld.  Any attempted change or modification in violation of this Section shall be void *ab initio*.

**15.** **Waiver**

No waiver of any provision of this Agreement or of a breach thereof shall be valid unless it is made in writing and signed by the Parties. The waiver by any Party of any of the provisions

of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

16. **Non-Assignment**

Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties.

17. **Execution**

There will be three signed originals of this Agreement.

18. **Governing Law**

This Agreement shall be governed by and shall be construed in accordance with the laws of Pennsylvania.

19. **Notices**

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent in writing to the Persons listed on Attachment F.

20. **Integration**

This Agreement, including the attachments, constitutes the entire Agreement amongst Travelers and the DOH Entities, with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, amongst the Parties with respect thereto. The Parties intend that this Agreement and the Plan shall be consistent in all respects, with no conflict or discrepancies between them.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

[Signature Pages Follow]

Signed: _____

The Roman Catholic Diocese of Harrisburg

Name Printed: _____

Title: _____

Date: _____ 2023

Signed: _____

Travelers Indemity Company

Name Printed: _____

Title: _____

Date: _____ 2023

**<u>SCHEDULE OF ATTACHMENTS TO</u>**

**<u>SETTLEMENT AGREEMENT AND RELEASE</u>**

| Attachment A | List of Subject Insurance Policies |
|---|---|
| Attachment B | List of DOH Entities |
| Attachment C | Notice Names and Addresses |

# ATTACHMENT A

## **Known Subject Insurance Policies**

**ATTACHMENT B**

**LIST OF DOH ENTITIES**

4885-5226-2217.2
US_ACTIVE\122348083\V-5

**ATTACHMENT C**

**<u>NOTICE NAMES AND ADDRESSES</u>**

DOH:

With copies to:

-and-

DOH Parishes:

TRAVELERS

For Company Leader:

With copies to:

# EXHIBIT B

**TNCRRG S**ETTLEMENT **A**GREEMENT

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (this "Settlement Agreement") is hereby made by, between, and among the Diocese, the Diocesan Associated Parties, and The National Catholic Risk Retention Group Inc. ("National Catholic").

## RECITALS

WHEREAS, numerous individuals have asserted certain Survivor Claims against the Diocese and the Diocesan Associated Parties;

WHEREAS, National Catholic issued, allegedly issued, or may have issued certain policies providing coverage to the Dioceseand the Diocesan Associated Parties;

WHEREAS, certain Coverage Disputes exist between the Diocese and the Diocesan Associated Partieson the one hand, and National Catholic, on the other hand;

WHEREAS, the Diocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Filing Date, commencing the Chapter 11 Case;

WHEREAS, the Diocese commenced the Insurance Coverage Adversary Proceeding on February 19, 2020, seeking a judicial determination to resolve the Coverage Disputes among the Diocese, National Catholic, and certain other insurers;

WHEREAS, the Diocese, the Diocesan Associated Parties, and National Catholic, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Disputes and all other disputes between and among them;

WHEREAS, through this Settlement Agreement, the Diocese and the Diocesan Associated Parties intend to provide National Catholic with the broadest possible release of all Survivor Claims, including all Unknown Survivor Claims and Late-Filed Survivor Claims, that arose prior to the Plan Effective Date; and

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

# ARTICLE I
## DEFINITIONS

As used in this Settlement Agreement, the following terms shall have the meanings set forth below. Capitalized terms not defined below or in this Settlement Agreement shall have the meanings stated in Plan to the extent defined therein, or in the Bankruptcy Code.

1.1     The following terms shall have the meaning ascribed to them in the Plan: "Abuse", "Bankruptcy Code", "Bankruptcy Court", "Channeled Claim", "Channeling Injunction", "Chapter 11 Case", "Claim", "Claim Filing Deadline", "Committee", "Confirmation Order", "Contribution Claim", "Debtor", "Diocese", "Direct Action Claim", "Disclosure Statement", "Effective Date", "Extra-Contractual Claim", "Filing Date", "Final Order", "Indirect Claim", "Insurance Coverage Adversary Proceeding", "Insurance Settlement Agreement", "Insurer", "Interest", "Joint Tortfeasor", "Known Survivor Claim", "Late-Filed Survivor Claim", "Medicare Claim", "MMSEA", "MSPA", "Other Insured Entities", "Parishes", "Person", "Proof of Claim", "Protected Parties", "Related Non-Debtor Entities", "Released Claims", "Reorganized Debtor", "Schools", "Settling Insurer", "Supplemental Settling Insurer Injunction", "Survivor Claim", "Survivor Claimant", "Survivor Claimant Release", "Trust", "Trust Agreement", "Trustee", "Unknown Survivor Claim".

1.2     "Approval Motion" means the motion filed in the Chapter 11 Case seeking approval of this Settlement Agreement and authorization for the Parties to enter into, and perform pursuant to, this Settlement Agreement, including the transactions contemplated in this Settlement Agreement.

1.3     "Approval Order" means an order of the Bankruptcy Court granting the Approval Motion and approving this Settlement Agreement.

1.4     "Bankruptcy Orders" means, collectively, the Approval Order, the Procedures Order, and the Confirmation Order.

1.5     "National Catholic" means, collectively, The National Catholic Risk Retention Group Inc. (a) each of its past, present, and future parents, subsidiaries, affiliates, and divisions, (b) each of such Persons' respective past, present, and future parents, subsidiaries, affiliates, reinsurers, retrocessionaires, holding companies, merged companies, related companies, divisions, and acquired companies, (c) each of such Persons' respective past, present, and future directors, trustees, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claim handling administrators, and (d) each of such Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, though, or in concert with them.

2

1.6 "National Catholic Policies" means all known and unknown binders and policies in effect before this Settlement Agreement Effective Date that were issued, or allegedly issued, by National Catholic to the Diocese that actually, allegedly, or might afford coverage with respect to any Survivor Claim, including, without limitation all policies listed on Exhibit A attached to this Settlement Agreement. The term "National Catholic Policies" does not include any binder or policy that was issued to any archdiocese, any diocese (other than the Diocese), any religious order, or other Person besides the Diocese, as the policy holder and that also provides coverage to the Diocese and the Diocesan Associated Parties or other "Protected Persons" as defined and identified therein as covered parties.

1.7 "Coverage Disputes" means certain disputes that have arisen and/or may arise in the future concerning National Catholic's position regarding the nature and scope of its responsibilities, if any, to provide coverage (indemnity and defense) to the Diocese and Diocesan Associated Parties under the National Catholic Policies in connection with the Survivor Claims.

1.8 "Diocesan Associated Parties" means the Parishes, the Schools, the Related Non-Debtor Entities and the Other Insured Entities. For the avoidance of doubt, any such Person is only a Diocesan Associated Party to the extent of, and in the capacity in which, they satisfy the corresponding definitions in the Plan.

1.9 "Exculpation" means the exculpation and limitation on the liability of National Catholic as a Settling Insurer (as defined in the Plan) in substantially the form contained in Section 12.6 of the Plan, with only such modifications as are acceptable to the Parties, pursuant to Section 105 of the Bankruptcy Code.

1.10 "Known Survivor Claimant" means the holder of a Known Survivor Claim.

1.11 "Parties" means the Diocese, the Diocesan Associated Parties and National Catholic.

1.12 "Plan" means the Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Harrisburg filed as D.I. 1470 on December 21, 2022, as it may be revised, modified, or amended.

1.13 "Plan Effective Date" means the date on which the conditions to the occurrence of the Effective Date have been satisfied as set forth in the Plan.

1.14 "Preserved Coverage" means the coverage of the Diocese and the Protected Parties referred to in the National Catholic Policies, subject to the limits, declarations, terms and conditions of the National Catholic Policies, as amended hereby; *provided, however,* that Preserved Coverage shall not include coverage for (i) any and all Direct Action Claims or Survivor

3

Claims, or (ii) any and all other Channelled Claims, which coverage is settled, extinguished and excluded by this Settlement Agreement.

1.15    "Procedures Order" means one or more orders approving certain solicitation procedures for voting on the Plan and providing the relief described in Section 2.5 of this Settlement Agreement in form and substance acceptable to the Parties.

1.16    "Retroactive Date" means the provision found in Endorsement No 2 of the National Catholic Policies which sets forth a retroactive date of 7/25/1988 for Sexual Misconduct claims.

1.17    "Settlement Agreement" means this Settlement Agreement and Release, as revised, modified, or amended.

1.18    "Settlement Agreement Effective Date" means the date on which all conditions precedent to this Settlement Agreement identified in Section 3.1 are satisfied.

1.19    "Settlement Amount" means the sum of $850,000 to be paid to the Trust by National Catholic after this Settlement Agreement Effective Date pursuant to Section 3.3.

1.20    "Solicitation Procedures Motion" means the motion filed in the Chapter 11 Case seeking approval of certain solicitation procedures in connection with voting on the Plan.

1.21    "Unknown Survivor Claimant" means the holder of an Unknown Survivor Claim.

The Exhibits to this Settlement Agreement include the following:

| | |
|---|---|
| Exhibit A | National Catholic Policies |
| Exhibit B | Form of Survivor Claimant Release |

ARTICLE II
THE CHAPTER 11 CASE AND PLAN

2.1    Approval Motion.  Not later than 15 days after the last Party signs this Settlement Agreement, the Diocese shall file the Approval Motion in form and substance acceptable to the Parties.

2.1.1    The Diocese shall provide written notice of the Approval Motion to (a) all Known Survivor Claimants, (b) counsel for the Committee, (c) all Persons who have filed notices of appearance in the Chapter 11 Case, and (d) all Persons known to have provided general or professional liability insurance or coverage to the Diocese, the Diocesan Associated Parties or the other Protected Parties.  The Diocese shall serve the Approval Motion on all Persons identified above at the address shown on their proofs of claim or to their counsel of record or, if no proof of claim was filed, then at the address on the Diocese's schedules.  The Diocese shall also serve the Approval Motion on the attorney

4

for each Known Survivor Claimant (to the extent applicable). To the extent the Diocese knows of, or may ascertain after reasonable investigation, the identity of Survivor Claimants that are not Known Survivor Claimants, including Unknown Survivor Claimants, the Diocese shall serve the Approval Motion on those Survivor Claimants and their counsel of record (to the extent applicable). The Diocese shall also serve the Approval Motion on any and all co-defendants and their counsel (to the extent of record) in any pre-petition litigation brought by Survivor Claimants at the last address shown on any filed appearance or, if such co-defendant is proceeding *pro se*, then to the last address of record for such *pro se* co-defendant.

2.1.2    If any Person files an objection to the Approval Motion, the Diocese shall consult and cooperate with National Catholic and take all reasonable steps to respond to the objection and argue in favor of the Approval Motion before the Bankruptcy Court.

2.1.3    The Diocese shall take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.

2.1.4    National Catholic and the Diocesan Associated Parties shall cooperate with the Diocese with respect to the Approval Motion and any proceedings on appeal from entry of the Approval Order, including making all appropriate submissions.

2.2    Plan. The Diocese shall diligently prosecute the confirmation of the Plan, and the approval of all exhibits, schedules, and related documents, which shall be in all respects consistent with this Settlement Agreement and shall not be amended to deprive National Catholic of any right or benefit under this Settlement Agreement or otherwise adversely affect the Interests of National Catholic under this Settlement Agreement. The Plan shall include, without limitation, the following provisions:

2.2.1    The Plan shall create a Trust which shall be responsible for making any and all payments to Survivor Claimants entitled to receive payments under the Plan. The Settlement Amount shall be contributed to the Trust pursuant to the conditions of Sections 3.1 and 3.3 of this Settlement Agreement.

2.2.2    The Plan shall provide that, on the Plan Effective Date, the Trust shall assume all liability, if any, of the Protected Parties and National Catholic for Channeled Claims. The Trust shall (a) have the right and obligation to defend, resolve, and satisfy the Survivor Claims with respect to any liability of the Protected Parties and National Catholic, and (b) assume any obligations relating to Medicare Claims. All payment obligations to a Survivor Claimant shall be funded from the assets of the Trust, and the Trustee shall be the fiduciary and/or administrator as that term is defined in the MMSEA.

2.2.3    The Plan shall provide that the Trust shall defend, indemnify, and hold harmless the Protected Parties and National Catholic from any Medicare Claims, including any reporting and payment obligations and obligations owing or potentially owing under MMSEA or MSPA, and any other Medicare Claims arising from the Plan, the Trust Documents (as defined in the Plan), and the Plan Documents (as defined in the Plan). The Trust shall not be obligated to create a reserve for this potential obligation.

2.2.4    The Plan shall include the Channeling Injunction in substantially the form and substance set forth in Section 12.3 of the Plan, with only such modifications that are acceptable to the Parties.

2.2.5    The Plan shall include that the Trust shall defend, indemnify, and hold harmless National Catholic with respect to all Channeled Claims, subject to any limitations contained in Section 7.2 of this Settlement Agreement.  The Reorganized Debtor shall defend, indemnify, and hold harmless National Catholic with respect to any Survivor Claims and other claims released under Section 4.1 of this Settlement Agreement, subject to any limitations contained in Section 7.2 of this Settlement Agreement.

2.2.6    The Plan shall include the Supplemental Settling Insurer Injunction in substantially the form and substance set forth in Section 12.4 of the Plan, with only such modifications that are acceptable to the Parties.

2.2.7    The Plan shall include Exculpation in substantially the form and substance set forth in Section 12.6 of the Plan, with only such modifications that are acceptable to the Parties.

2.2.8    The Plan and Trust agreement shall require each holder of a Survivor Claim (including each holder of an Unknown Survivor Claim who subsequently becomes known) to execute and deliver a Survivor Claimant Release in the form of <u>Exhibit B</u>, with only such modifications that are acceptable to the Parties.

2.2.9    The Plan shall provide for *Charles v. Giant Eagle Markets* releases in favor of the Diocese, the Diocesan Associated Parties, and National Catholic from all holders of Survivor Claims as a condition for receiving a payment from the Trust, in form and substance satisfactory to the Parties.

2.2.10    The Plan shall incorporate this Settlement Agreement and the release contained in Section 4.1 of this Settlement Agreement by reference and make this Settlement Agreement part of the Plan as if set forth fully within the Plan, and shall provide that this Settlement Agreement is binding on National Catholic, the Trust, the Diocese, the Diocesan Associated Parties, the other Protected Parties, the Reorganized Debtor, the parties in interest in the Chapter 11 Case (including, but not limited to, any holder of a

6

Survior Claim or an Unknown Survivor Claim), and any of the foregoing Persons' successors and assigns.

2.3     Confirmation Order.  The Diocese shall seek and obtain entry of the Confirmation Order.

2.3.1     The Confirmation Order shall: (a) approve the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code, (b) contain the Channeling Injunction, (c) contain the Supplemental Settling Insurer Injunction, (d) approve the Exculpation of National Catholic as a Settling Insurer, (e) approve the form of release to be provided by holders of Survivor Claims, and (f) provide that this Settlement Agreement is binding on National Catholic, the Trust, the Diocese, the Reorganized Debtor, the Diocesan Associated Parties, the other Protected Parties, the parties in interest in the Chapter 11 Case (including, but not limited to, any holder of a Survivor Claim or an Unknown Survivor Claim), and any of the foregoing Persons' successors and assigns.

2.3.2     The Plan and the Confirmation Order shall be in all respects consistent with this Settlement Agreement and contain no provisions that diminish or impair the benefit of this Settlement Agreement to National Catholic.

2.3.3     In seeking to obtain the Confirmation Order, the Diocese shall (a) seek a confirmation hearing on an appropriately timely basis, (b) urge the Bankruptcy Court to overrule any objections that would affect the rights and benefits afforded National Catholic under this Settlement Agreement and to confirm the Plan, and (c) take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Confirmation Order.

2.3.4     Prior to entry of the Confirmation Order, the Diocese shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Survivor Claim.  If the Bankruptcy Court lifts the stay as to any Survivor Claim prior to entry of the Confirmation Order, the Diocese shall defend itself against the Survivor Claim and comply with the terms of the stay relief order.  If the Diocese fails to defend that Survivor Claim, then National Catholic shall have the right, but not the duty, to defend and/or indemnify the Diocese and its Protected Parties against the Survivor Claim and any fees, expenses and costs incurred by National Catholic in such defense and/or indemnity shall be deducted from the Settlement Amount.  In such event, the Diocese shall cooperate with National Catholic in the defense and/or indemnification of such Survivor Claims.

2.4     Insurance Coverage Adversary Proceeding.  The Parties shall cease all litigation activities against each other in the Insurance Coverage Adversary Proceeding; *provided, however*,

7

that each Party may take whatever steps that, in its sole judgment, are necessary to defend its interests as long as it remains a party in the Insurance Coverage Adversary Proceeding.

2.4.1 The Diocese shall use its reasonable efforts to obtain the dismissal of other Claims, if any, against National Catholic by any other Insurer in the Insurance Coverage Adversary Proceeding.

2.4.2 The Parties covenant not to sue each other until (a) the Bankruptcy Orders become Final Orders, at which time this covenant is superseded by the releases provided in Article IV of this Settlement Agreement or (b) the date on which this Settlement Agreement is terminated. As of this Settlement Agreement Effective Date, the Protected Parties (a) shall withdraw all outstanding tenders of Claims to National Catholic for defense and indemnity, (b) shall not tender any Claims to National Catholic, and (c) shall not request that National Catholic fund any judgments, settlements, or defense costs.

2.5 Solicitation Procedures Order. In connection with the filing of the Plan and the Disclosure Statement, the Diocese shall file the Solicitation Procedures Motion seeking the entry of a Procedures Order that approves (a) the adequacy of the Disclosure Statement, (b) the content and form of the confirmation hearing notice, (c) the content and form of the ballots for classes eligible to vote under the Plan, (d) the procedures for voting to accept or reject the Plan, (e) the voting deadline, (f) the tabulation procedures, and (g) the publication notice and publication procedures, in each case in form and substance reasonably satisfactory to National Catholic.

2.6 Claim Treatment. National Catholic shall have no obligation to pay, handle, object to, or otherwise respond to any Claim, unless this Settlement Agreement is terminated under Article V. Prior to the entry of the Confirmation Order, the Diocese shall object to any Proof of Claim alleged to be covered by a National Catholic Policy that the Diocese determines to be subject to objection under the Bankruptcy Code or applicable law. National Catholic may, but shall not be required to join in any such objection by the Diocese or file its own objection to any such Claim.

<div align="center">
ARTICLE III<br>
PAYMENT OF THE SETTLEMENT AMOUNT, AMENDMENT OF CURRENT<br>
POLICY, AND DISMISSAL OF INSURANCE COVERAGE ADVERSARY<br>
PROCEEDING
</div>

3.1 Conditions Precedent. This Settlement Agreement shall become effective and binding on the Parties and National Catholic shall pay the Settlement Amount to the Trust only after the following conditions have first been satisfied:

3.1.1 This Settlement Agreement has been executed by all Parties in form and substance acceptable to the Parties;

<div align="center">8</div>

3.1.2     The Bankruptcy Court has entered the Approval Order, granting the Approval Motion in its entirety, and the Approval Order becomes a Final Order;

3.1.3     The Bankruptcy Court has entered the Procedures Order, and the Procedures Order becomes a Final Order; and

3.1.4     The Bankruptcy Court has entered the Confirmation Order, approving the Plan consistent with the terms of this Settlement Agreement, including approving the Channeling Injunction, Supplemental Settling Insurer Injunction, the Exculpation and the form of Survivor Claimant releases in favor of the Protected Parties and National Catholic, and the Confirmation Order becomes a Final Order.

3.2     Notice of this Settlement Agreement Effective Date.  Within three days after all of the conditions precedent contained in Section 3.1 are satisfied, the Diocese or Reorganized Debtor (as applicable) shall provide the Parties with notice of this Settlement Agreement Effective Date.

3.3     Payment of Settlement Amount.  In full and final settlement of all responsibilities for any and all Survivor Claims and Direct Action Claims, National Catholic shall pay the Settlement Amount to the Trust within 10 days after receiving (i) notice from the Diocese that all conditions to the Plan Effective Date other than the payment of the Settlement Amount have been satisfied or waived and (ii) directions as to transmission of the payment.  National Catholic shall have the option to pay the Settlement Amount by check, ACH or wire transfer.

3.3.1     The Parties agree that the Settlement Amount is the total amount National Catholic is obligated to pay on account of (a) any and all Direct Action Claims, Survivor Claims and other Channeled Claims that directly or indirectly arise under, arise out of, relate to, or are in connection with the National Catholic Policies, and (b) any and all Claims and Interests, whether known or unknown, past, present, or future, that directly or indirectly arise under, arise out of, relate to, or are in connection with the National Catholic Policies; *provided, however*, that this section shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

3.3.2     The Parties further agree that (a) under no circumstance will National Catholic ever be obligated to make any additional payments in excess of the Settlement Amount to, or on behalf of, anyone in connection with any and all Direct Action Claims, Survivor Claims and other Channeled Claims, and (b) under no circumstance shall National Catholic ever be obligated to make any additional payments to, or on behalf of, the Diocese or any Diocesan Associated Parties on account of any and all Direct Action Claims, Survivor Claims and other Channeled Claims in connection with any coverage under any of the National Catholic Policies, regardless of how the National Catholic Policies identify or describe the limits of liability under the National Catholic Policies, all such limits,

9

including all per person, per occurrence, per claim, and aggregate limits, shall be deemed fully and properly exhausted.

3.3.3       The Parties agree and jointly represent that (a) the consideration to be provided by National Catholic pursuant to this Settlement Agreement (including the Settlement Amount and the releases set forth below) constitutes fair and reasonable exchanges for consideration granted to National Catholic in this Settlement Agreement and (b) the consideration to be provided by the Diocese, the Diocesan Associated Parties and their respective Protected Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable exchange for the consideration granted to the Diocese, the Diocesan Associated Parties and their respective Protected Parties in this Settlement Agreement (including the Settlement Amount). National Catholic is not acting as a volunteer in paying the Settlement Amount, and National Catholic's payment of the Settlement Amount reflects potential liabilities and obligations to the Diocese, the Diocesan Associated Parties and their respective Protected Parties of amounts National Catholic allegedly is obligated to pay on account of any and all Claims.

3.4       Amendment of Current Policy and Preserved Coverage. Upon the Settlement Agreement Effective Date with no further action being required, the Retroactive Date in National Catholic policy RRG 10209-23and all renewals thereof is hereby further amended to be the Plan Effective Date.

3.5       Insurance Coverage Adversary Proceeding. Within 10 days after National Catholic pays the Settlement Amount to the Trust, the Diocese shall sign and file any necessary papers to dismiss the Insurance Coverage Adversary Proceeding as to National Catholic with prejudice and with each party to bear its own costs. To the extent any other pending action exists between the Parties in connection with the Coverage Disputes, the Diocese shall dismiss those pending actions with prejudice and with each party to bear its own costs within 10 days after National Catholic pays the Settlement Amount to the Trust.

ARTICLE IV
RELEASES

4.1       Diocese's and Diocesan Associated Parties' Release of National Catholic. Upon payment by National Catholic of the Settlement Amount to the Trust, the Diocese and all of the Diocesan Associated Parties, for themselves and their respective Protected Parties, hereby fully, finally, and completely release, remise, acquit, and forever discharge National Catholic and any of its reinsurers or retrocessionaires from any and all past, present, future, known and unknown Claims that occurred or may have arisen prior to the Plan Effective Date and that directly or indirectly arise out of, relate to, or are in connection with: (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however*, that this release

10

shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.2     National Catholic Release of Diocese and Diocesan Associated Parties.  Upon payment by National Catholic of the Settlement Amount, National Catholic hereby fully, finally, and completely remises, releases, acquits, and forever discharges the Diocese and the Diocesan Associated Parties, and their respective Protected Parties, from any and all past, present, future, known and unknown Claims that occurred or may have arisen prior to the Plan Effective Date that directly or indirectly arise out of, relate to, or are in connection with: (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however*, that this release shall not affect the obligations of the Diocese and Diocesan Associated Parties under any National Catholic Policy with respect to the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.3     General Release Provisions.

4.3.1     Unless otherwise provided in the Plan, the releases contained in this Article IV shall be pursuant to the principles set forth in pursuant to the principles set forth in 42 Pa. C.S. § 8326 and *Charles v. Giant Eagle Markets*, 522 A.2d 1, 10 (Pa. 1987).  This Settlement Agreement in no way releases any Claims held by Survivor Claimants against religious orders and all Persons who are not Protected Parties, who will remain severally liable on any Claims.

4.3.2     From and after this Settlement Agreement Effective Date, the Diocese and its Protected Parties shall not assert any Claim against National Catholic that directly or indirectly arises from, relates to or in connection with the National Catholic Policies and acts, omissions or events occurring prior to the Plan Effective Date, including (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however*, that this release shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.3.3     From and after this Settlement Agreement Effective Date, the Diocesan Associated Parties and their respective Protected Parties shall not assert any Claim against National Catholic that directly or indirectly arises from, relates to or in connection with the National Catholic Policies and acts, omissions or events occurring prior to the Plan Effective Date, including (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however*, that this release shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.4     Waiver of Surviving Claims.  If, contrary to the intent of the Parties, any Claims released pursuant to this Article IV of this Settlement Agreement are deemed to survive this

11

Settlement Agreement, even though they are encompassed by the terms of the releases set forth in this Article IV of this Settlement Agreement, the Parties hereby forever, expressly, and irrevocably waive entitlement to and agree not to assert any and all such Claims; *provided, however*, that such waiver shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.5     Comparative Releases.   All of the releases and other benefits provided in this Settlement Agreement by the Diocese, the Diocesan Associated Parties and their respective Protected Parties to National Catholic are at least as favorable as the releases and other benefits that the Diocese has provided to any other one of the Diocese's insurers in the Chapter 11 Case. If the Diocese or the Diocesan Associated Parties enter into any Insurance Settlement Agreement with any other Settling Insurer in the Chapter 11 Case that provides that Settling Insurer with releases or other benefits that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide National Catholic with those more favorable releases and/or benefits.  However, the provision at Section 7.2.1 of this Settlement Agreement that the duty to defend, indemnify, and hold harmless National Catholic does not extend to, and does not include, claims that are, or may be, made against National Catholic by other Insurers shall not be modified.  The Diocese shall notify National Catholic promptly of the existence of such more favorable releases or benefits.

4.6     Reinsurance.   Neither the releases set forth in this Article IV nor any other provisions in this Settlement Agreement are intended to apply to, or have any effect on, National Catholic's right to seek or obtain reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the National Catholic Policies, or any other binder, certificate, or policy of insurance issued, or allegedly issued, by National Catholic.  The Diocese and the Diocesan Associated Parties shall undertake all reasonable actions and cooperate with National Catholic in connection with its reinsurers.

4.7     No Release of Settlement Agreement Obligations.  This Article IV is not intended to, and shall not be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement.

<div align="center">

ARTICLE V
TERMINATION OF THIS SETTLEMENT AGREEMENT

</div>

5.1     Termination Conditions.  Any of the Parties may terminate its participation in this Settlement Agreement prior to this Settlement Agreement Effective Date if any of the following conditions occur:

5.1.1   The Bankruptcy Orders do not become Final Orders within one year after the date on which this Settlement Agreement is executed by all the Parties;

<div align="center">12</div>

5.1.2    The Diocese files a chapter 11 plan that is inconsistent with this Settlement Agreement or fails to object to the confirmation of a chapter 11 plan by another Person, that is inconsistent with the terms of this Settlement Agreement or the provisions of the Plan referenced herein; or

5.1.3    The Bankruptcy Court confirms a plan of reorganization for the Diocese in lieu of the Plan that is inconsistent with this Settlement Agreement without the consent of National Catholic.

5.1.4    The Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

5.2    Effect of Termination.  Upon termination of this Settlement Agreement by any party, this Settlement Agreement shall be null and void and of no force or effect, including the obligation to pay the Settlement Amount and the releases provided in Article IV of this Settlement Agreement, and the Parties shall retain all of their rights, defenses, and obligations with respect to the National Catholic  Policies as if this Settlement Agreement never existed.  In the event of such termination after National Catholic shall have paid the Settlement Amount to the Trust, the Trust shall return the Settlement Amount to National Catholic, with accrued interest thereon, within 10 days of the termination.

ARTICLE VI
REPRESENTATION AND WARRANTIES OF THE PARTIES

6.1    Representations of All Parties.  The Parties separately represent and warrant as follows:

6.1.1    Each of the Parties has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement, subject only to approval of the Bankruptcy Court in the Chapter 11 Case.

6.1.2    This Settlement Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

6.1.3    The Parties have completed a reasonable search for evidence of any policies issued by National Catholic to the Diocese or the Diocesan Associated Parties that would afford coverage with respect to any Survivor Claim.  Other than the National Catholic Policies identified in Exhibit A, no such policies  and acknowledgements of coverage have been identified.  Notwithstanding the foregoing, nothing in this Settlement Agreement, including the schedules or exhibits thereto, shall be construed as, or deemed to be, an admission or evidence that any binder, certificate, or policy was in fact issued and/or affords coverage in connection with the Survivor Claims.

13

6.2     Representations of Diocese and Diocesan Associated Parties.  The Diocese and the Diocesan Associated Parties each represent and warrant as follows:

6.2.1    The Diocese and the Diocesan Associated Parties have not assigned, and shall not assign, any Interests in the National Catholic  Policies or any other binder or policy issued by National Catholic.

6.2.2    The Diocese and the Diocesan Associated Parties have not in any way assisted, and shall not in any way assist, any Person in the establishment of any Claim against National Catholic.

6.2.3    The Diocese is the owner of the National Catholic  Policies and no other Person has legal title to the National Catholic  Policies.

ARTICLE VII
ACTIONS INVOLVING THIRD PARTIES

7.1     Other Insurer Claims.  For purposes of supporting the releases granted in Article IV and the extinguishment of any and all rights under the National Catholic  Policies, the Diocese and Diocesan Associated Parties hereby agree as follows:

7.1.1      After this Settlement Agreement Effective Date, if any other Insurer of the Diocese, the Diocesan Associated Parties or their respective Protected Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from National Catholic as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for National Catholic's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation of National Catholic for any Claims released or resolved pursuant to this Settlement Agreement, the Diocese, Diocesan Associated Parties, or Trust, as applicable, shall voluntarily reduce its judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against National Catholic.  To ensure that such a reduction is accomplished, National Catholic shall be entitled to assert this Article VII as a defense to any action or Claim against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect National Catholic from any liability for the judgment or Claim.  Moreover, if an Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against National Catholic, such Claim may be asserted as a defense against a Claim by the Diocese, the Diocesan Associated Parties, or Trust, as applicable, in any coverage litigation, and the Diocese, the Diocesan Associated Parties, or Trust, as applicable, may assert the legal and equitable rights of National Catholic in response thereto.  To the extent such a Claim is determined to be valid by the court or appropriate tribunal presiding over such action, the liability of such other Insurer

14

to the Diocese, the Diocesan Associated Parties, or Trust, as applicable, shall be reduced dollar for dollar by the amount so determined.

7.1.2    National Catholic shall not seek reimbursement (other than from a reinsurer or retrocessionaire, as such) for any payments it was obligated to make under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Insurer of the Diocese or Diocesan Associated Parties unless that other Insurer first seeks contribution, subrogation, indemnification, or similar relief from National Catholic.  The Diocese and Diocesan Associated Parties shall use their respective reasonable best efforts to obtain from all insurers with which it settles agreements similar to those contained in this Article VII.

7.2    Indemnification.  After this Settlement Agreement Effective Date and the Plan Effective Date, pursuant to the terms of the Plan, the Trust shall defend, indemnify, and hold harmless National Catholic with respect to any and all Channeled Claims.  The Reorganized Debtor shall defend, indemnify, and hold harmless National Catholic with respect to any and all Channeled Claims and Claims released under Section 4.1 of this Settlement Agreement.

7.2.1    These indemnification obligations of the Trust and the Reorganized Debtor to National Catholic include Survivor Claims made by Persons over whom the Diocese or Diocesan Associated Parties do not have control, including any other Person who asserts Survivor Claims against or rights to coverage under the National Catholic  Policies.  The obligation of the Trust or Reorganized Debtor to indemnify National Catholic shall not exceed the Settlement Amount. The duty to defend, indemnify, and hold harmless National Catholic does not extend to, or include Contribution Claims that are, or may be, made against National Catholic by other Insurers.

7.2.2    National Catholic may, but is not obligated to, undertake the defense of any Claim upon receipt of such Claim without affecting such indemnification obligations. National Catholic agrees to notify the Trust or Reorganized Debtor, as applicable, as soon as practicable of any Claims identified in Section 7.2 of this Settlement Agreement and of their choice of counsel.  National Catholic's defense of any Claims shall have no effect on the obligation of the Trust, the Reorganized Debtor or the Diocesan Associated Parties, as applicable, to indemnify National Catholic for such Claims and defense fees, costs and expenses, as set forth in Section 7.2 of this Settlement Agreement.

7.2.3    The Trust or Reorganized Debtor, as applicable, subject to the limitations above regarding the maximum amounts the Trust or Reorganized Debtor must pay, shall reimburse all reasonable attorneys' fees, expenses, costs, and amounts incurred by National Catholic in defending such Claims.  In defense of any such Claims, National Catholic may settle or otherwise resolve a Claim only with the prior consent of the Trust or Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.  To the extent

15

Section 7.2 of this Settlement Agreement may give rise to pre-Plan Effective Date administrative claims which have not been provided for in the Plan, such claims shall pass through the Plan unimpaired.

7.3     Stay of Prosecution of Channeled Claim.  If any Person attempts to prosecute a Channeled Claim against National Catholic before this Settlement Agreement Effective Date, then promptly following notice to do so from National Catholic, the Diocese shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to sections 362 and 105(a) of the Bankruptcy Code, protecting National Catholic from any such Claims until the Bankruptcy Orders become Final Orders or, alternatively, this Settlement Agreement is terminated under Article V of this Settlement Agreement.

ARTICLE VIII
MISCELLANEOUS

8.1     If any proceedings are commenced to invalidate or prevent the enforcement or implementation of any of the provisions of this Settlement Agreement, the Parties agree to cooperate fully to oppose such proceedings.  In the event that any action or proceeding of any type whatsoever is commenced or prosecuted, by any Person not a Party to this Settlement Agreement, to invalidate, interpret, or prevent the validation or enforcement of all or any of the provisions of this Settlement Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

8.2     The Parties shall take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Confirmation Order, the Procedures Order, and the Chapter 11 Case.  Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

8.4     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.5     This Settlement Agreement may be modified only by written amendment signed by the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

16

8.6     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement. No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement. All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

8.7     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession of liability, culpability, wrongdoing, or coverage. All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions. Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.7, in (a) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Article VII or (b) any possible action or proceeding between National Catholic and any of its reinsurers. This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret National Catholic's obligations under any of the National Catholic Policies or any other binder or policy of coverage or any acknowledgement of coverage issued by National Catholic with respect to any Claims against National Catholic.

8.8     None of the Parties shall make any public statements or disclosures (a) regarding each other's rationale or motivation for negotiating or entering into this Settlement Agreement or (b) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the National Catholic Policies or any other binder or policy of coverage issued by National Catholic, including handling of, or involvement in connection with, the Survivor Claims or Direct Action Claims or the resolution of the Survivor Claims or Direct Action Claims.

8.9     Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.10    The Parties have received the advice of counsel in the preparation, drafting, and execution of this Settlement Agreement, which was negotiated at arm's length.

17

8.11     Section titles and/or headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.12     All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the Diocese or the Reorganized Debtor (as applicable) or the Diocesan Associated Parties:

Roman Catholic Diocese of Harrisburg
Attn: Vicar General
4800 Union Deposit Road
Harrisburg, Pennsylvania 17111

with a copy to:

Waller Lansden Dortch & Davis, LLP
Attn: Blake D. Roth & Tyler N. Layne
511 Union Street, Suite 2700
Nashville, Tennessee 37219
blake.roth@wallerlaw.com
tyler.layne@wallerlaw.com

-and-

Kleinbard LLC
Attn: Matthew H. Haverstick & Joshua J. Voss
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
mhaverstick@kleinbard.com
jvoss@kleinbard.com

If to National Catholic:

Tony McLaughlin
VP, Claims & Shareholder Initiatives
801 Warrenville Road, Suite 620
Lisle, IL  60532
tmclaughlin@tncrrg.org

With a copy to:

18

Johnson & Bell
Attn: Glenn F. Fencl
33 West Monroe Street, Suite 2700
Chicago, Illinois 60603-5404
fenclg@jbltd.com

8.13    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument. This Settlement Agreement may be executed and delivered by facsimile or other electronic image, which facsimile or other electronic image counterparts shall be deemed to be originals.

8.14    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (a) an admission by National Catholic that the Diocese, Diocesan Associated Parties, or any other Person was or is entitled to any coverage under the National Catholic Policies or any other binder or policy of coverage issued or allegedly issued by National Catholic or as to the validity of any of the positions that have been or could have been asserted by the Diocese or Diocesan Associated Parties, (b) an admission by the Diocese or Diocesan Associated Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by National Catholic or any Claims that have been or could have been asserted by the Diocese or Diocesan Associated Parties against National Catholic, or (c) an admission by the Diocese, Diocesan Associated Parties, or National Catholic of any liability whatsoever with respect to any of the Survivor Claims.

8.15    All of the Persons included in the definition of National Catholic, Protected Parties, and the Trust and Trustee are intended beneficiaries of this Settlement Agreement. Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.16    The Diocese, Diocesan Associated Parties, and National Catholic shall be responsible for their own fees and costs incurred in connection with the Chapter 11 Case, this Settlement Agreement, and the implementation of this Settlement Agreement.

8.17    The following rules of construction shall apply to this Settlement Agreement:

8.17.1    Unless the context of this Settlement Agreement otherwise requires: (a) words of any gender include each gender, (b) words using the singular or plural number also include the plural or singular number, respectively, (c) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement, and (d) the words "include", "includes," or "including" shall be deemed to be followed by the words "without limitation."

19

8.17.2    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.17.3    The wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunity to propose and negotiate changes prior to its execution.  The wording of this Settlement Agreement shall not be construed in favor of or against any Party.

8.17.4    The use of the terms "intend", "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.17.5    Requirements that the form of motions, orders, and other pleadings be acceptable to all or some of the Parties shall include the requirement that such acceptances shall not be unreasonably withheld.

8.18    The Bankruptcy Court in the Chapter 11 Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Pennsylvania law.

8.19    This Settlement Agreement and the obligations under this Settlement Agreement shall be binding on the Parties and shall survive the entry of the Confirmation Order unless this Settlement Agreement is terminated pursuant to Article V of this Settlement Agreement.

8.20    This Settlement Agreement shall be effective on this Settlement Agreement Effective Date.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned Party has duly executed this Settlement Agreement as of the date indicated below.

**The The National Catholic Risk Retention Group Inc.**

By: _____

Its: _____

Date: _____

Witness: _____

[Signature Pages Continue on Following Pages]

4854-0016-7240.1

IN WITNESS WHEREOF, the undersigned Party has duly executed this Settlement Agreement as of the date indicated below.

**The Roman Catholic Diocese of Harrisburg**

By: _____

Its: _____

Date: _____

Witness: _____

[Signature Pages Continue on Following Pages]

4854-0016-7240.1

IN WITNESS WHEREOF, the undersigned Party has duly executed this Settlement Agreement as of the date indicated below.

**[Diocesan Associated Party Name]**

By: _____

Its: _____

Date: _____

Witness: _____

4854-0016-7240.1

# Exhibit A– National Catholic Policies

1. RRG 10209-23     (7/25/2018 - 7/25/2019)
2. RRG 10209-23     (7/25/2019 - 7/25/2020)
3. RRG 10209-23     (7/25/2020 - 7/25/2021)

**Exhibit B - Survivor Claimant Release**

4854-0016-7240.1

## Survivor Claimant Release

This Survivor Claimant Release (the "***Release***") is executed this ___ day of _____, 20__, by _____ in connection with the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Harrisburg*, dated [__], 2022 (the "***Plan***"), filed by the Roman Catholic Diocese of Harrisburg (the "***Debtor***") and Official Committee of Tort Claimants in the Debtor's chapter 11 case pending before the United States Bankruptcy Court for the Middle District of Pennsylvania (the "***Bankruptcy Court***"), which is docketed as case number 1:20-bk-00599 (HWV) (the "***Chapter 11 Case***"), and the receipt of distributions from the Settlement Trust, which is known as the Roman Catholic Diocese of Harrisburg Settlement Trust, as compensation for Survivor Claims.

      1.      All capitalized terms in this Release are defined in the Plan and have the meanings stated in the Plan.

      2.      In consideration of the treatment under the Plan and the Trust Distribution Plan, and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and representatives:

      a.      fully, finally, and completely release, remise, acquit, and forever discharge the Settling Insurers from any and all past, present and future Claims that, directly or indirectly, arise out of, relate to, or are connected with the (i) Survivor Claims; (ii) Contribution Claims; (iii) Direct Action Claims; (iv) Extra-Contractual Claims; (v) Settling Insurer Policies; (vi) Indirect Claims, and (vii) all Claims that, directly or indirectly, arise from, relate to, or are connected with the Debtor's Chapter 11 case.

      b.      fully, finally, and completely release, remise, acquit, and forever discharge the Protected Parties with respect to their portion or share of liability for my Claims.

      c.      With respect to any Claims that are released under paragraph 2(a) or paragraph 2(b) of this release, I covenant (i) not to sue or seek recovery or relief of any kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably discharge that fraction, portion or percentage of damages I claim to have suffered in connection with the Abuse which is by trial or other disposition determined to be the causal fault or responsibility, if any, of any Protected Party with respect to released Survivor Claims; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person relating to the same Abuse at issue in the released Survivor Claims and Direct Action Claims in an amount reflecting that fraction, portion or percentage of damage or injury that I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that filing of this Release with any court by any Protected Party will satisfy that fraction, portion or percentage of any judgment that may be rendered in my favor attributable to any Protected Party's causal fault or responsibility relating to the Abuse at issue in the released Survivor Claims and Direct Action Claims; (v) that I will not seek a reallocation of the causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Survivor Claims and Direct Action Claims; and (vi) I understand the Plan extinguishes any

potential liability of any Protected Party for contribution or indemnity to any Person who may be held liable to me for any released Survivor Claim or Direct Action Claim.

3. I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release.

4. I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as provided in this Release and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Survivor Claim(s) and Direct Action Claim(s).

5. I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust, any Settling Insurer, or any Protected Party.

6. I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Article XII for the benefit of the Settling Insurers and Protected Parties. I also approve of the Insurance Settlement Agreements referenced in and incorporated into the Plan.

7. I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

8. I represent and warrant that I have not assigned or otherwise transferred any interest in my Survivor Claim(s) and Direct Action Claim(s).

9. I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**") and its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my Survivor Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeks or obtains access to records about another person under false pretenses is punishable by a fine of up to $5,000.

10. This Release shall be binding upon my successors, heirs, assigns, agents, and representatives.

TO BE COMPLETED BY SURVIVOR CLAIMANT OR
AUTHORIZED REPRESENTATIVE OF SURVIVOR
CLAIMANT'S ESTATE:


Name of Survivor Claimant: _____

By: _____

Signature: _____

Dated: _____

Claim Number(s): _____

Social Security Number: _____

Date of Birth: _____

# EXHIBIT C

**CATHOLIC MUTUAL SETTLEMENT AGREEMENT**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (this "Settlement Agreement") is hereby made by, between, and among the Diocese, the Diocesan Associated Parties, and Catholic Mutual.

## RECITALS

WHEREAS, numerous individuals have asserted certain Survivor Claims against the Diocese and the Diocesan Associated Parties;

WHEREAS, Catholic Mutual issued, allegedly issued, or may have issued the Catholic Mutual Certificates providing certain coverage to the Diocese and the Diocesan Associated Parties;

WHEREAS, certain Coverage Disputes exist between the Diocese and the Diocesan Associated Parties, on the one hand, and Catholic Mutual, on the other hand;

WHEREAS, the Diocese filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on the Filing Date, commencing the Chapter 11 Case;

WHEREAS, the Diocese commenced the Insurance Coverage Adversary Proceeding on February 19, 2020, seeking a judicial determination to resolve the Coverage Disputes among the Diocese, Catholic Mutual, and certain other insurers;

WHEREAS, the Diocese, the Diocesan Associated Parties, and Catholic Mutual, without any admission of liability or concession of the validity of the positions or arguments advanced by each other, now wish to compromise and resolve fully and finally any and all Coverage Disputes and all other disputes between and among them;

WHEREAS, through this Settlement Agreement, the Diocese and the Diocesan Associated Parties intend to provide Catholic Mutual with the broadest possible release of all Survivor Claims, including all Unknown Survivor Claims and Late-Filed Survivor Claims, that arose prior to the Plan Effective Date; and

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual covenants contained in this Settlement Agreement, the sufficiency of which is hereby acknowledged, and intending to be legally bound subject to the approval of the Bankruptcy Court, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

As used in this Settlement Agreement, the following terms shall have the meanings set forth below. Capitalized terms not defined below or in this Settlement Agreement shall have the meanings stated in Plan to the extent defined therein, or in the Bankruptcy Code.

1.1 The following terms shall have the meaning ascribed to them in the Plan: "Abuse", "Bankruptcy Code", "Bankruptcy Court", "Channeled Claim", "Channeling Injunction", "Chapter 11 Case", "Claim", "Claim Filing Deadline", "Committee", "Confirmation Order", "Contribution Claim", "Debtor", "Diocese", "Direct Action Claim", "Disclosure Statement", "Effective Date", "Extra-Contractual Claim", "Filing Date", "Final Order", "Indirect Claim", "Insurance Coverage Adversary Proceeding", "Insurance Settlement Agreement", "Insurer", "Interest", "Joint Tortfeasor", "Known Survivor Claim", "Late-Filed Survivor Claim", "Medicare Claim", "MMSEA", "MSPA", "Other Insured Entities", "Parishes", "Person", "Proof of Claim", "Protected Parties", "Related Non-Debtor Entities", "Released Claims", "Reorganized Debtor", "Schools", "Settling Insurer", "Supplemental Settling Insurer Injunction", "Survivor Claim", "Survivor Claimant", "Survivor Claimant Release", "Trust", "Trust Agreement", "Trustee", "Unknown Survivor Claim".

1.2 "Approval Motion" means the motion filed in the Chapter 11 Case seeking approval of this Settlement Agreement and authorization for the Parties to enter into, and perform pursuant to, this Settlement Agreement, including the transactions contemplated in this Settlement Agreement.

1.3 "Approval Order" means the order granting the Approval Motion and providing the relief described in Section 2.1 of this Settlement Agreement in form and substance acceptable to the Parties.

1.4 "Bankruptcy Orders" means, collectively, the Approval Order, the Procedures Order, and the Confirmation Order.

1.5 "Catholic Mutual" means, collectively, The Catholic Mutual Relief Society of America and (a) each of its past, present, and future parents, subsidiaries, affiliates, and divisions, (b) each of such Persons' respective past, present, and future parents, subsidiaries, affiliates, reinsurers, retrocessionaires, holding companies, merged companies, related companies, divisions, and acquired companies, (c) each of such Persons' respective past, present, and future directors, trustees, officers, shareholders, employees, subrogees, partners, principals, agents, attorneys, joint ventures, joint venturers, representatives, and claim handling administrators, and (d) each of such Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, and all Persons acting on behalf of, by, though, or in concert with them.

1.6     "Catholic Mutual Certificates" means all known and unknown binders, policies and certificates in effect before this Settlement Agreement Effective Date that were issued, or allegedly issued, by Catholic Mutual to the Diocese that actually, allegedly, or might afford coverage with respect to any Survivor Claim, including, without limitation all certificates listed on <u>Exhibit A</u> attached to this Settlement Agreement.  The term "Catholic Mutual Certificates" does not include any binder, policy or certificate that was issued to any archdiocese, any diocese (other than the Diocese), any religious order, or other Person besides the Diocese, as the certificate holder and that also provides coverage to the Diocese and the Diocesan Associated Parties or other "Protected Persons" as defined and identified therein as covered parties.

1.7     "Coverage Disputes" means certain disputes that have arisen and/or may arise in the future concerning Catholic Mutual's position regarding the nature and scope of its responsibilities, if any, to provide coverage (indemnity and defense) to the Diocese and Diocesan Associated Parties under the Catholic Mutual Certificates in connection with the Survivor Claims.

1.8     "Diocesan Associated Parties" means the Parishes, the Schools, the Related Non-Debtor Entities and the Other Insured Entities. For the avoidance of doubt, any such Person is only a Diocesan Associated Party to the extent of, and in the capacity in which, they satisfy the corresponding definitions in the Plan.

1.9     "Exculpation" means the exculpation and limitation on the liability of Catholic Mutual as a Settling Insurer (as defined in the Plan) in substantially the form contained in Section 12.6 of the Plan, with only such modifications as are acceptable to the Parties, pursuant to Section 105 of the Bankruptcy Code.

1.10     "Known Survivor Claimant" means the holder of a Known Survivor Claim.

1.11     "Parties" means the Diocese, the Diocesan Associated Parties and Catholic Mutual.

1.12     "Plan" means the Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Harrisburg filed as D.I. 1470 on December 21, 2022, as revised, modified, or amended in accordance with this Settlement Agreement.

1.13     "Plan Effective Date" means the date on which the conditions to the occurrence of the Effective Date have been satisfied as set forth in the Plan.

1.14     "Preserved Coverage" means the coverage of the Diocese and the Protected Parties referred to in the Catholic Mutual Certificates, subject to the limits, declarations, terms and conditions of the Catholic Mutual Certificates, as amended hereby; *provided, however, that* Preserved Coverage shall not include coverage for (i) any and all Direct Action Claims or Survivor Claims, or (ii) any and all other Channeled Claims, which coverage is settled, extinguished and excluded by this Settlement Agreement.

1.15 "Procedures Order" means one or more orders approving certain solicitation procedures for voting on the Plan and providing the relief described in Section 2.5 of this Settlement Agreement in form and substance acceptable to the Parties.

1.16 "Retroactive Date" means the provision found in Section XI (Sexual Misconduct) claims-made coverage of Catholic Mutual Certificate No. 9095 in effect on the Settlement Agreement Effective Date and any renewal thereof that eliminates coverage for "Sexual Misconduct Claims" and "Interrelated Sexual Misconduct Claims" produced by "Incidents", as those terms are defined in such certificate, which took place in whole or in part prior to a specified date, even if the Claim is first made during the certificate period.

1.17 "Settlement Agreement" means this Settlement Agreement and Release, as revised, modified, or amended.

1.18 "Settlement Agreement Effective Date" means the date on which all conditions precedent to this Settlement Agreement identified in Section 3.1 are satisfied.

1.19 "Settlement Amount" means the sum of $200,000 to be paid to the Trust by Catholic Mutual after this Settlement Agreement Effective Date pursuant to Section 3.3.

1.20 "Solicitation Procedures Motion" means the motion filed in the Chapter 11 Case seeking approval of certain solicitation procedures in connection with voting on the Plan.

1.21 "Unknown Survivor Claimant" means the holder of an Unknown Survivor Claim.

The Exhibits to this Settlement Agreement include the following:

| | |
|---|---|
| Exhibit A | Catholic Mutual Certificates |
| Exhibit B | Form of Confirmation Order |
| Exhibit C | Form of Survivor Claimant Release |

## ARTICLE II
## THE CHAPTER 11 CASE AND PLAN

2.1 Approval Motion.  Not later than 15 days after the last Party signs this Settlement Agreement, the Diocese shall file the Approval Motion in form and substance acceptable to the Parties.

2.1.1 The Diocese shall provide written notice of the Approval Motion to (a) all Known Survivor Claimants, (b) counsel for the Committee, (c) all Persons who have filed notices of appearance in the Chapter 11 Case, and (d) all Persons known to have provided general or professional liability insurance or coverage to the Diocese, the Diocesan Associated Parties or the other Protected Parties.  The Diocese shall serve the Approval Motion on all Persons identified above at the address shown on their proofs of claim or to

their counsel of record or, if no proof of claim was filed, then at the address on the Diocese's schedules. The Diocese shall also serve the Approval Motion on the attorney for each Known Survivor Claimant (to the extent applicable). To the extent the Diocese knows of, or may ascertain after reasonable investigation, the identity of Survivor Claimants that are not Known Survivor Claimants, including Unknown Survivor Claimants, the Diocese shall serve the Approval Motion on those Survivor Claimants and their counsel of record (to the extent applicable). The Diocese shall also serve the Approval Motion on any and all co-defendants and their counsel (to the extent of record) in any pre-petition litigation brought by Survivor Claimants at the last address shown on any filed appearance or, if such co-defendant is proceeding *pro se*, then to the last address of record for such *pro se* co-defendant.

2.1.2    If any Person files an objection to the Approval Motion, the Diocese shall consult and cooperate with Catholic Mutual and take all reasonable steps to respond to the objection and argue in favor of the Approval Motion before the Bankruptcy Court.

2.1.3    The Diocese shall take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Approval Order.

2.1.4    Catholic Mutual and the Diocesan Associated Parties shall cooperate with the Diocese with respect to the Approval Motion and any proceedings on appeal from entry of the Approval Order, including making all appropriate submissions.

2.2    Plan.    The Diocese shall diligently prosecute the confirmation of the Plan, and the approval of all exhibits, schedules, and related documents, which shall be in all respects consistent with this Settlement Agreement and shall not be amended to deprive Catholic Mutual of any right or benefit under this Settlement Agreement or otherwise adversely affect the Interests of Catholic Mutual under this Settlement Agreement. The Plan shall include, without limitation, the following provisions:

2.2.1    The Plan shall create a Trust which shall be responsible for making any and all payments to Survivor Claimants entitled to receive payments under the Plan. The Settlement Amount shall be contributed to the Trust pursuant to the conditions of Sections 3.1 and 3.3 of this Settlement Agreement.

2.2.2    The Plan shall provide that, on the Plan Effective Date, the Trust shall assume all liability, if any, of the Protected Parties and Catholic Mutual for Channeled Claims. The Trust shall have the right and obligation to defend, resolve, and satisfy the Survivor Claims with respect to any liability of the Protected Parties and Catholic Mutual and shall assume any obligations relating to Medicare Claims. All payment obligations to a Survivor Claimant shall be funded from the assets of the Trust, and the Trustee shall be the fiduciary and/or administrator as that term is defined in the MMSEA.

2.2.3    The Plan shall provide that the Trust shall defend, indemnify, and hold harmless the Protected Parties and Catholic Mutual from any Medicare Claims, including any reporting and payment obligations and obligations owing or potentially owing under MMSEA or MSPA, and any other Medicare Claims arising from the Plan, the Trust Documents (as defined in the Plan), and the Plan Documents (as defined in the Plan). The Trust shall not be obligated to create a reserve for this potential obligation.

2.2.4    The Plan shall include the Channeling Injunction in substantially the form and substance set forth in Section 12.3 of the Plan, with only such modifications that are acceptable to the Parties.

2.2.5    The Plan shall include that the Trust shall defend, indemnify, and hold harmless Catholic Mutual with respect to all Channeled Claims, subject to any limitations contained in Section 7.2 of this Settlement Agreement.  The Reorganized Debtor shall defend, indemnify, and hold harmless Catholic Mutual with respect to any Survivor Claims and other claims released under Section 4.1 of this Settlement Agreement, subject to any limitations contained in Section 7.2 of this Settlement Agreement.

2.2.6    The Plan shall include the Supplemental Settling Insurer Injunction in substantially the form and substance set forth in Section 12.4 of the Plan, with only such modifications that are acceptable to the Parties.

2.2.7    The Plan shall include Exculpation in substantially the form and substance set forth in Section 12.6 of the Plan, with only such modifications that are acceptable to the Parties.

2.2.8    The Plan and Trust agreement shall require each holder of a Survivor Claim (including an Unknown Survivor Claim) to execute and deliver a Survivor Claimant Release in the form of <u>Exhibit C</u>, with only such modifications that are acceptable to the Parties.

2.2.9    The Plan shall provide for *Charles v. Giant Eagle Markets* releases in favor of the Diocese, the Diocesan Associated Parties, and Catholic Mutual from all holders of Survivor Claims as a condition for receiving a payment from the Trust, in form and substance satisfactory to the Parties.

2.2.10    The Plan shall incorporate this Settlement Agreement and the release contained in Section 4.1 of this Settlement Agreement by reference and make this Settlement Agreement part of the Plan as if set forth fully within the Plan, and shall provide that this Settlement Agreement is binding on Catholic Mutual, the Trust, the Diocese, the Diocesan Associated Parties, the other Protected Parties, the Reorganized Debtor, the

parties in interest in the Chapter 11 Case, and any of the foregoing Persons' successors and assigns.

2.3     Confirmation Order.  The Diocese shall seek and obtain entry of the Confirmation Order.

2.3.1     The Confirmation Order shall be substantially in form and substance as the Confirmation Order attached as <u>Exhibit B</u> attached to this Settlement Agreement.  For the avoidance of doubt, the Confirmation Order shall: (a) approve the Plan pursuant to section 1129 of the Bankruptcy Code and any other applicable provision of the Bankruptcy Code, (b) contain the Channeling Injunction, (c) contain the Supplemental Settling Insurer Injunction, (d) approve the Exculpation of Catholic Mutual as a Settling Insurer, (e) approve the form of release to be provided by holders of Survivor Claims, and (f) provide that this Settlement Agreement is binding on Catholic Mutual, the Trust, the Diocese, the Reorganized Debtor, the Diocesan Associated Parties, the other Protected Parties, the parties in interest in the Chapter 11 Case, and any of the foregoing Persons' successors and assigns.

2.3.2     The Plan and the Confirmation Order shall be in all respects consistent with this Settlement Agreement and contain no provisions that diminish or impair the benefit of this Settlement Agreement to Catholic Mutual.

2.3.3     In seeking to obtain the Confirmation Order, the Diocese shall (a) seek a confirmation hearing on an appropriately timely basis, (b) urge the Bankruptcy Court to overrule any objections that would affect the rights and benefits afforded Catholic Mutual under this Settlement Agreement and to confirm the Plan, and (c) take all reasonable steps to defend against any appeal, petition, motion, or other challenge to the Bankruptcy Court's entry of the Confirmation Order.

2.3.4     Prior to entry of the Confirmation Order, the Diocese shall oppose any motion to lift any stay pursuant to section 362 of the Bankruptcy Code as to any Survivor Claim.  If the Bankruptcy Court lifts the stay as to any Survivor Claim prior to entry of the Confirmation Order, the Diocese shall defend itself against the Survivor Claim and comply with the terms of the stay relief order.  If the Diocese fails to defend that Survivor Claim, then Catholic Mutual shall have the right, but not the duty, to defend and/or indemnify the Diocese and its Protected Parties against the Survivor Claim and any fees, expenses, and costs incurred by Catholic Mutual in such defense and/or indemnity shall be deducted from the Settlement Amount.  In such event, the Diocese shall cooperate with Catholic Mutual in the defense and/or indemnification of such Survivor Claims.

2.4     Insurance Coverage Adversary Proceeding.  The Parties shall cease all litigation activities against each other in the Insurance Coverage Adversary Proceeding; *provided, however*,

that each Party may take whatever steps that, in its sole judgment, are necessary to defend its interests as long as it remains a party in the Insurance Coverage Adversary Proceeding.

2.4.1    The Diocese shall use its reasonable efforts to obtain the dismissal of other Claims, if any, against Catholic Mutual by any other Insurer in the Insurance Coverage Adversary Proceeding.

2.4.2    The Parties covenant not to sue each other until (a) the Bankruptcy Orders become Final Orders, at which time this covenant is superseded by the releases provided in Article IV of this Settlement Agreement or (b) the date on which this Settlement Agreement is terminated.  As of this Settlement Agreement Effective Date, the Protected Parties (a) shall withdraw all outstanding tenders of Claims to Catholic Mutual for defense and indemnity, (b) shall not tender any Claims to Catholic Mutual, and (c) shall not request that Catholic Mutual fund any judgments, settlements, or defense costs.

2.5    Solicitation Procedures Order.  In connection with the filing of the Plan and the Disclosure Statement, the Diocese shall file the Solicitation Procedures Motion seeking the entry of a Procedures Order that approves (a) the adequacy of the Disclosure Statement, (b) the content and form of the confirmation hearing notice, (c) the content and form of the ballots for classes eligible to vote under the Plan, (d) the procedures for voting to accept or reject the Plan, (e) the voting deadline, (f) the tabulation procedures, and (g) the publication notice and publication procedures, in each case in form and substance reasonably satisfactory to Catholic Mutual.

2.6    Claim Treatment.  Catholic Mutual shall have no obligation to pay, handle, object to, or otherwise respond to any Claim, unless this Settlement Agreement is terminated under Article V.  Prior to the entry of the Confirmation Order, the Diocese shall object to any Proof of Claim alleged to be covered by a Catholic Mutual Certificate that the Diocese determines to be subject to objection under the Bankruptcy Code or applicable law.  Catholic Mutual may, but shall not be required to join in any such objection by the Diocese or file its own objection to any such Claim.

ARTICLE III
PAYMENT OF THE SETTLEMENT AMOUNT, AMENDMENT OF CERTIFICATE,
AND DISMISSAL OF INSURANCE COVERAGE ADVERSARY PROCEEDING

3.1    Conditions Precedent.  This Settlement Agreement shall become effective and binding on the Parties and Catholic Mutual shall pay the Settlement Amount to the Trust only after the following conditions have first been satisfied:

3.1.1    This Settlement Agreement has been executed by all Parties in form and substance acceptable to the Parties;

3.1.2    The Bankruptcy Court has entered the Approval Order, granting the Approval Motion in its entirety, and the Approval Order becomes a Final Order;

3.1.3    The Bankruptcy Court has entered the Procedures Order, and the Procedures Order becomes a Final Order; and

3.1.4    The Bankruptcy Court has entered the Confirmation Order, approving the Plan consistent with the terms of this Settlement Agreement, including approving the Channeling Injunction, Supplemental Settling Insurer Injunction, the Exculpation and the form of Survivor Claimant releases in favor of the Protected Parties and Catholic Mutual, and the Confirmation Order becomes a Final Order.

3.2    Notice of this Settlement Agreement Effective Date.  Within three days after all of the conditions precedent contained in Section 3.1 are satisfied, the Diocese or Reorganized Debtor (as applicable) shall provide the Parties with notice of this Settlement Agreement Effective Date.

3.3    Payment of Settlement Amount.  In full and final settlement of all responsibilities for any and all Survivor Claims and Direct Action Claims, Catholic Mutual shall pay the Settlement Amount to the Trust within 10 days after receiving (i) notice from the Diocese that all conditions to the Plan Effective Date other than the payment of the Settlement Amount have been satisfied or waived and (ii) directions as to transmission of the payment.  Catholic Mutual shall have the option to pay the Settlement Amount by check, ACH or wire transfer.

3.3.1    The Parties agree that the Settlement Amount is the total amount Catholic Mutual is obligated to pay on account of (a) any and all Direct Action Claims, Survivor Claims and other Channeled Claims that directly or indirectly arise under, arise out of, relate to, or are in connection with the Catholic Mutual Certificates, and (b) any and all Claims and Interests, whether known or unknown, past, present, or future, that directly or indirectly arise under, arise out of, relate to, or are in connection with the Catholic Mutual Certificates; *provided, however,* that this section shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

3.3.2    The Parties further agree that (a) under no circumstance will Catholic Mutual ever be obligated to make any additional payments in excess of the Settlement Amount to, or on behalf of, anyone in connection with any and all Direct Action Claims, Survivor Claims and other Channeled Claims, and (b) under no circumstance shall Catholic Mutual ever be obligated to make any additional payments to, or on behalf of, the Diocese or any Diocesan Associated Parties on account of any and all Direct Action Claims, Survivor Claims and other Channeled Claims in connection with any coverage under any of the Catholic Mutual Certificates, regardless of how the Catholic Mutual Certificates identify or describe the limits of liability under the Catholic Mutual Certificates, all such

limits, including all per person, per occurrence, per claim, and aggregate limits, shall be deemed fully and properly exhausted.

3.3.3    The Parties agree and jointly represent that (a) the consideration to be provided by Catholic Mutual pursuant to this Settlement Agreement (including the Settlement Amount and the releases set forth below) constitutes fair and reasonable exchanges for consideration granted to Catholic Mutual in this Settlement Agreement and (b) the consideration to be provided by the Diocese, the Diocesan Associated Parties and their respective Protected Parties pursuant to this Settlement Agreement (including the releases set forth below) constitutes a fair and reasonable exchange for the consideration granted to the Diocese, the Diocesan Associated Parties and their respective Protected Parties in this Settlement Agreement (including the Settlement Amount).  Catholic Mutual is not acting as a volunteer in paying the Settlement Amount, and Catholic Mutual's payment of the Settlement Amount reflects potential liabilities and obligations to the Diocese, the Diocesan Associated Parties and their respective Protected Parties of amounts Catholic Mutual allegedly is obligated to pay on account of any and all Claims.

3.4    Amendment of Current Certificate and Preserved Coverage.  Upon the Settlement Agreement Effective Date with no further action being required, the Retroactive Date in Catholic Mutual Certificate No. 9095 and all renewals thereof is hereby further amended to be the Plan Effective Date.

3.5    Insurance Coverage Adversary Proceeding.  Within 10 days after Catholic Mutual pays the Settlement Amount to the Trust, the Diocese shall sign and file any necessary papers to dismiss the Insurance Coverage Adversary Proceeding as to Catholic Mutual with prejudice and with each party to bear its own costs.  To the extent any other pending action exists between the Parties in connection with the Coverage Disputes, the Diocese shall dismiss those pending actions with prejudice and with each party to bear its own costs within 10 days after Catholic Mutual pays the Settlement Amount to the Trust.

ARTICLE IV
RELEASES

4.1    Diocese's and Diocesan Associated Parties' Release of Catholic Mutual.  Upon payment by Catholic Mutual of the Settlement Amount to the Trust, the Diocese and all of the Diocesan Associated Parties, for themselves and their respective Protected Parties, hereby fully, finally, and completely release, remise, acquit, and forever discharge Catholic Mutual and any of its reinsurers or retrocessionaires from any and all past, present, future, known and unknown Claims that occurred or may have arisen prior to the Plan Effective Date and that directly or indirectly arise out of, relate to, or are in connection with: (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however,* that this release

shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.2     Catholic Mutual Release of Diocese and Diocesan Associated Parties.  Upon payment by Catholic Mutual of the Settlement Amount, Catholic Mutual hereby fully, finally, and completely remises, releases, acquits, and forever discharges the Diocese and the Diocesan Associated Parties, and their respective Protected Parties, from any and all past, present, future, known and unknown Claims that occurred or may have arisen prior to the Plan Effective Date that directly or indirectly arise out of, relate to, or are in connection with any of the Catholic Mutual Certificates or any other binder, certificate, or policy of insurance issued or allegedly issued by Catholic Mutual to the Diocese, and any of the following: (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however,* that this release shall not affect the obligations of the Diocese and Diocesan Associated Parties under any Catholic Mutual Certificate with respect to the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.3     General Release Provisions.

4.3.1     Unless otherwise provided in the Plan, the releases contained in this Article IV shall be pursuant to the principles set forth in pursuant to the principles set forth in 42 Pa. C.S. § 8326 and *Charles v. Giant Eagle Markets*, 522 A.2d 1, 10 (Pa. 1987).  This Settlement Agreement in no way releases any Claims held by Survivor Claimants against religious orders and all Persons who are not Protected Parties, who will remain severally liable on any Claims.

4.3.2     From and after this Settlement Agreement Effective Date, the Diocese and its Protected Parties shall not assert any Claim against Catholic Mutual that directly or indirectly arises from, relates to or in connection with the Catholic Mutual Certificates and acts, omissions or events occurring prior to the Plan Effective Date, including (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however,* that this release shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.3.3     From and after this Settlement Agreement Effective Date, the Diocesan Associated Parties and their respective Protected Parties shall not assert any Claim against Catholic Mutual that directly or indirectly arises from, relates to or in connection with the Catholic Mutual Certificates and acts, omissions or events occurring prior to the Plan Effective Date, including (a) any and all Direct Action Claims or Survivor Claims, or (b) any and all other Channeled Claims; *provided, however,* that this release shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.4    Waiver of Surviving Claims.  If, contrary to the intent of the Parties, any Claims released pursuant to this Article IV of this Settlement Agreement are deemed to survive this Settlement Agreement, even though they are encompassed by the terms of the releases set forth in this Article IV of this Settlement Agreement, the Parties hereby forever, expressly, and irrevocably waive entitlement to and agree not to assert any and all such Claims; *provided, however,* that such waiver shall not affect the Preserved Coverage and any Claim that directly or indirectly arises out of, relates to, or is in connection with the Preserved Coverage.

4.5    Comparative Releases.  All of the releases and other benefits provided in this Settlement Agreement by the Diocese, the Diocesan Associated Parties and their respective Protected Parties to Catholic Mutual are at least as favorable as the releases and other benefits that the Diocese has provided to any other one of the Diocese's insurers in the Chapter 11 Case.  If the Diocese or the Diocesan Associated Parties enter into any Insurance Settlement Agreement with any other Settling Insurer in the Chapter 11 Case that provides that Settling Insurer with releases or other benefits that are more favorable than those contained in this Settlement Agreement, then this Settlement Agreement shall be deemed to be modified to provide Catholic Mutual with those more favorable releases and/or benefits.  However, the provision at Section 7.2.1 of this Settlement Agreement that the duty to defend, indemnify, and hold harmless Catholic Mutual does not extend to, and does not include, claims that are, or may be, made against Catholic Mutual by other Insurers shall not be modified.  The Diocese shall notify Catholic Mutual promptly of the existence of such more favorable releases or benefits.

4.6    Reinsurance.  Neither the releases set forth in this Article IV nor any other provisions in this Settlement Agreement are intended to apply to, or have any effect on, Catholic Mutual's right to seek or obtain reinsurance recoveries under any reinsurance treaties, certificates, or contracts that cover losses arising under or in connection with the Catholic Mutual Certificates or any other binder, certificate, or policy of insurance issued, or allegedly issued, by Catholic Mutual.  The Diocese and the Diocesan Associated Parties shall undertake all reasonable actions and cooperate with Catholic Mutual in connection with its reinsurers.

4.7    No Release of Settlement Agreement Obligations.  This Article IV is not intended to, and shall not be construed to, release, waive, relinquish, or otherwise affect the Parties' rights and obligations under this Settlement Agreement.

ARTICLE V
TERMINATION OF THIS SETTLEMENT AGREEMENT

5.1    Termination Conditions.  Any of the Parties may terminate its participation in this Settlement Agreement prior to this Settlement Agreement Effective Date if any of the following conditions occur:

5.1.1    The Bankruptcy Orders do not become Final Orders within one year after the date on which this Settlement Agreement is executed by all the Parties;

4887-5923-1050.1

12

5.1.2    The Diocese files a chapter 11 plan that is inconsistent with this Settlement Agreement or fails to object to the confirmation of a chapter 11 plan by another Person, that is inconsistent with the terms of this Settlement Agreement or the provisions of the Plan referenced herein; or

5.1.3    The Bankruptcy Court confirms a plan of reorganization for the Diocese in lieu of the Plan that is inconsistent with this Settlement Agreement without the consent of Catholic Mutual.

5.1.4    The Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

5.2    Effect of Termination.  Upon termination of this Settlement Agreement by any party, this Settlement Agreement shall be null and void and of no force or effect, including the releases provided in Article IV of this Settlement Agreement, and the Parties shall retain all of their rights, defenses, and obligations with respect to the Catholic Mutual Certificates as if this Settlement Agreement never existed.  In the event of such termination after Catholic Mutual shall have paid the Settlement Amount to the Trust, the Trust shall return the Settlement Amount to Catholic Mutual, with accrued interest thereon.

ARTICLE VI
REPRESENTATION AND WARRANTIES OF THE PARTIES

6.1    Representations of All Parties.  The Parties separately represent and warrant as follows:

6.1.1    Each of the Parties has the requisite power and authority to enter into this Settlement Agreement and to perform the obligations contemplated by this Settlement Agreement, subject only to approval of the Bankruptcy Court in the Chapter 11 Case.

6.1.2    This Settlement Agreement has been thoroughly negotiated and analyzed by counsel to the Parties and executed and delivered in good faith, pursuant to arm's length negotiations and for value and valuable consideration.

6.1.3    The Parties have completed a reasonable search for evidence of any policies or certificates issued by Catholic Mutual to the Diocese or the Diocesan Associated Parties that would afford coverage with respect to any Survivor Claim.  Other than the Catholic Mutual Certificates identified in <u>Exhibit A</u>, no such policies or certificates and acknowledgements of coverage have been identified.  Notwithstanding the foregoing, nothing in this Settlement Agreement, including the schedules or exhibits thereto, shall be construed as, or deemed to be, an admission or evidence that any binder, certificate, or policy was in fact issued and/or affords coverage in connection with the Survivor Claims.

6.2     Representations of Diocese and Diocesan Associated Parties.  The Diocese and the Diocesan Associated Parties each represent and warrant as follows:

6.2.1   The Diocese and the Diocesan Associated Parties have not assigned, and shall not assign, any Interests in the Catholic Mutual Certificates or any other binder or certificate issued by Catholic Mutual.

6.2.2   The Diocese and the Diocesan Associated Parties have not in any way assisted, and shall not in any way assist, any Person in the establishment of any Claim against Catholic Mutual.

6.2.3   The Diocese is the owner of the Catholic Mutual Certificates and no other Person has legal title to the Catholic Mutual Certificates.

ARTICLE VII
ACTIONS INVOLVING THIRD PARTIES

7.1     Other Insurer Claims.  For purposes of supporting the releases granted in Article IV and the extinguishment of any and all rights under the Catholic Mutual Certificates, the Diocese and Diocesan Associated Parties hereby agree as follows:

7.1.1   After this Settlement Agreement Effective Date, if any other Insurer of the Diocese, the Diocesan Associated Parties or their respective Protected Parties obtains a judicial determination or binding arbitration award that it is entitled to obtain a sum certain from Catholic Mutual as a result of a claim for contribution, subrogation, indemnification, or other similar Claim for Catholic Mutual's alleged share or equitable share, or to enforce subrogation rights, if any, with respect to the defense and/or indemnity obligation of Catholic Mutual for any Claims released or resolved pursuant to this Settlement Agreement, the Diocese, Diocesan Associated Parties, or Trust, as applicable, shall voluntarily reduce its judgment or Claim against, or settlement with, such other insurers to the extent necessary to satisfy such contribution, subrogation, indemnification, or other Claims against Catholic Mutual.  To ensure that such a reduction is accomplished, Catholic Mutual shall be entitled to assert this Article VII as a defense to any action or Claim against it brought by any other Insurer for any such portion of the judgment or Claim and shall be entitled to request that the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Catholic Mutual from any liability for the judgment or Claim.  Moreover, if an Insurer asserts that it has a Claim for contribution, indemnity, subrogation, or similar relief against Catholic Mutual, such Claim may be asserted as a defense against a Claim by the Diocese, the Diocesan Associated Parties, or Trust, as applicable, in any coverage litigation, and the Diocese, the Diocesan Associated Parties, or Trust, as applicable, may assert the legal and equitable rights of Catholic Mutual in response thereto.  To the extent such a Claim is determined to be valid by the court or appropriate tribunal presiding over such action, the liability of such other Insurer to the

Diocese, the Diocesan Associated Parties, or Trust, as applicable, shall be reduced dollar for dollar by the amount so determined.

7.1.2    Catholic Mutual shall not seek reimbursement (other than from a reinsurer or retrocessionaire, as such) for any payments it was obligated to make under this Settlement Agreement under theories of contribution, subrogation, indemnification, or similar relief from any other Insurer of the Diocese or Diocesan Associated Parties unless that other Insurer first seeks contribution, subrogation, indemnification, or similar relief from Catholic Mutual.  The Diocese and Diocesan Associated Parties shall use their respective reasonable best efforts to obtain from all insurers with which it settles agreements similar to those contained in this Article VII.

7.2    Indemnification.  After this Settlement Agreement Effective Date and the Plan Effective Date, pursuant to the terms of the Plan, the Trust shall defend, indemnify, and hold harmless Catholic Mutual with respect to any and all Channeled Claims.  The Reorganized Debtor shall defend, indemnify, and hold harmless Catholic Mutual with respect to any and all Channeled Claims and Claims released under Section 4.1 of this Settlement Agreement.

7.2.1    These indemnification obligations of the Trust and the Reorganized Debtor to Catholic Mutual include Survivor Claims made by Persons over whom the Diocese or Diocesan Associated Parties do not have control, including any other Person who asserts Survivor Claims against or rights to coverage under the Catholic Mutual Certificates.  The obligation of the Trust or Reorganized Debtor to indemnify Catholic Mutual shall not exceed the Settlement Amount.  The duty to defend, indemnify, and hold harmless Catholic Mutual does not extend to, or include Contribution Claims that are, or may be, made against Catholic Mutual by other Insurers.

7.2.2    Catholic Mutual may, but is not obligated to, undertake the defense of any Claim upon receipt of such Claim without affecting such indemnification obligations.  Catholic Mutual agrees to notify the Trust or Reorganized Debtor, as applicable, as soon as practicable of any Claims identified in Section 7.2 of this Settlement Agreement and of their choice of counsel.  Catholic Mutual's defense of any Claims shall have no effect on the obligation of the Trust, the Reorganized Debtor or the Diocesan Associated Parties, as applicable, to indemnify Catholic Mutual for such Claims and defense fees, costs and expenses, as set forth in Section 7.2 of this Settlement Agreement.

7.2.3    The Trust or Reorganized Debtor, as applicable, subject to the limitations above regarding the maximum amounts the Trust or Reorganized Debtor must pay, shall reimburse all reasonable attorneys' fees, expenses, costs, and amounts incurred by Catholic Mutual in defending such Claims.  In defense of any such Claims, Catholic Mutual may settle or otherwise resolve a Claim only with the prior consent of the Trust or Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.  To the extent

Section 7.2 of this Settlement Agreement may give rise to pre-Plan Effective Date administrative claims which have not been provided for in the Plan, such claims shall pass through the Plan unimpaired.

7.3     Stay of Prosecution of Channeled Claim.  If any Person attempts to prosecute a Channeled Claim against Catholic Mutual before this Settlement Agreement Effective Date, then promptly following notice to do so from Catholic Mutual, the Diocese shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to sections 362 and 105(a) of the Bankruptcy Code, protecting Catholic Mutual from any such Claims until the Bankruptcy Orders become Final Orders or, alternatively, this Settlement Agreement is terminated under Article V of this Settlement Agreement.

ARTICLE VIII
MISCELLANEOUS

8.1     If any proceedings are commenced to invalidate or prevent the enforcement or implementation of any of the provisions of this Settlement Agreement, the Parties agree to cooperate fully to oppose such proceedings.  In the event that any action or proceeding of any type whatsoever is commenced or prosecuted, by any Person not a Party to this Settlement Agreement, to invalidate, interpret, or prevent the validation or enforcement of all or any of the provisions of this Settlement Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

8.2     The Parties shall take such steps and execute any documents as may be reasonably necessary or proper to effectuate the purpose and intent of this Settlement Agreement and to preserve its validity and enforceability.

8.3     The Parties shall cooperate with each other in connection with the Approval Motion, the Approval Order, the Plan, the Confirmation Order, the Procedures Order, and the Chapter 11 Case.  Such cooperation shall include consulting with each other upon reasonable request concerning the status of proceedings and providing each other with copies of reasonably requested pleadings, notices, proposed orders, and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court.

8.4     This Settlement Agreement constitutes a single integrated written contract that expresses the entire agreement and understanding between and among the Parties.

8.5     This Settlement Agreement may be modified only by written amendment signed by the Parties, and no waiver of any provision of this Settlement Agreement or of a breach thereof shall be effective unless expressed in a writing signed by the waiving Party.  The waiver by any Party of any of the provisions of this Settlement Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

8.6     By entering into this Settlement Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Settlement Agreement.  No part of this Settlement Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Settlement Agreement.  All actions taken and statements made by the Parties or by their representatives relating to this Settlement Agreement or participation in this Settlement Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

8.7     This Settlement Agreement represents a compromise of disputed Claims and shall not be deemed an admission or concession of liability, culpability, wrongdoing, or coverage.  All related discussions, negotiations, and all prior drafts of this Settlement Agreement shall be deemed to fall within the protection afforded to compromises and to offers to compromise by Rule 408 of the Federal Rules of Evidence and any parallel state law provisions.  Any evidence of the negotiations or discussions associated with this Settlement Agreement shall be inadmissible in any action or proceeding for purposes of establishing any rights, duties, or obligations of the Parties, except that they shall be admissible to the extent they would have otherwise been admissible, absent this Section 8.7, in (a) an action or proceeding to enforce the terms of this Settlement Agreement, including any use as set forth in Article VII or (b) any possible action or proceeding between Catholic Mutual and any of its reinsurers.  This Settlement Agreement shall not be used as evidence or in any other manner, in any court or dispute resolution proceeding, to create, prove, or interpret Catholic Mutual's obligations under any of the Catholic Mutual Certificates or any other binder or certificate of coverage or any acknowledgement of coverage issued by Catholic Mutual with respect to any Claims against Catholic Mutual.

8.8     None of the Parties shall make any public statements or disclosures (a) regarding each other's rationale or motivation for negotiating or entering into this Settlement Agreement or (b) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, relating to, or in connection with the Catholic Mutual Certificates or any other binder or certificate of coverage issued by Catholic Mutual, including handling of, or involvement in connection with, the Survivor Claims or Direct Action Claims or the resolution of the Survivor Claims or Direct Action Claims.

8.9     Neither this Settlement Agreement nor the rights and obligations set forth in this Settlement Agreement shall be assigned without the prior written consent of the other Parties.

8.10    The Parties have received the advice of counsel in the preparation, drafting, and execution of this Settlement Agreement, which was negotiated at arm's length.

8.11    Section titles and/or headings contained in this Settlement Agreement are included only for ease of reference and shall have no substantive effect.

8.12    All notices, demands, or other communication to be provided pursuant to this Settlement Agreement shall be in writing and sent by e-mail and Federal Express or other overnight delivery service, costs prepaid, to the Parties at the addresses set forth below, or to such other person or address as any of them may designate in writing from time to time:

If to the Diocese or the Reorganized Debtor (as applicable) or the Diocesan Associated Parties:

Roman Catholic Diocese of Harrisburg
Attn: Vicar General
4800 Union Deposit Road
Harrisburg, Pennsylvania 17111

with a copy to:

Waller Lansden Dortch & Davis, LLP
Attn: Blake D. Roth & Tyler N. Layne
511 Union Street, Suite 2700
Nashville, Tennessee 37219
blake.roth@wallerlaw.com
tyler.layne@wallerlaw.com

-and-

Kleinbard LLC
Attn: Matthew H. Haverstick & Joshua J. Voss
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, Pennsylvania 19103
mhaverstick@kleinbard.com
jvoss@kleinbard.com

If to Catholic Mutual:

Michael Lee
Catholic Mutual Group
Director of Specialty Claims
10843 Old Mill Road
Omaha, NE 68154
mlee@catholicmutual.org

with a copy to:

Everett J. Cygal
Schiff Hardin LLP
233 S. Wacker Drive, Suite 6600
Chicago, IL 60606
ecygal@schiffhardin.com

8.13    This Settlement Agreement may be executed in multiple counterparts, all of which together shall constitute one and the same instrument.  This Settlement Agreement may be executed and delivered by facsimile or other electronic image, which facsimile or other electronic image counterparts shall be deemed to be originals.

8.14    Nothing contained in this Settlement Agreement shall be deemed or construed to constitute (a) an admission by Catholic Mutual that the Diocese, Diocesan Associated Parties, or any other Person was or is entitled to any coverage under the Catholic Mutual Certificates or any other binder or certificate of coverage issued or allegedly issued by Catholic Mutual or as to the validity of any of the positions that have been or could have been asserted by the Diocese or Diocesan Associated Parties, (b) an admission by the Diocese or Diocesan Associated Parties as to the validity of any of the positions or defenses to coverage that have been or could have been asserted by Catholic Mutual or any Claims that have been or could have been asserted by the Diocese or Diocesan Associated Parties against Catholic Mutual, or (c) an admission by the Diocese, Diocesan Associated Parties, or Catholic Mutual of any liability whatsoever with respect to any of the Survivor Claims.

8.15    All of the Persons included in the definition of Catholic Mutual, Protected Parties, and the Trust and Trustee are intended beneficiaries of this Settlement Agreement.  Except as set forth in the preceding sentence or otherwise set forth in this Settlement Agreement, there are no third-party beneficiaries of this Settlement Agreement.

8.16    The Diocese, Diocesan Associated Parties, and Catholic Mutual shall be responsible for their own fees and costs incurred in connection with the Chapter 11 Case, this Settlement Agreement, and the implementation of this Settlement Agreement.

8.17    The following rules of construction shall apply to this Settlement Agreement:

8.17.1    Unless the context of this Settlement Agreement otherwise requires: (a) words of any gender include each gender, (b) words using the singular or plural number also include the plural or singular number, respectively, (c) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Settlement Agreement, and (d) the words "include", "includes," or "including" shall be deemed to be followed by the words "without limitation."

8.17.2    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and

regulatory provisions regardless of whether specifically referenced in this Settlement Agreement.

8.17.3 The wording of this Settlement Agreement was reviewed by legal counsel for each of the Parties and each of them had sufficient opportunity to propose and negotiate changes prior to its execution. The wording of this Settlement Agreement shall not be construed in favor of or against any Party.

8.17.4 The use of the terms "intend", "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Settlement Agreement when the stated intent is not achieved.

8.17.5 Requirements that the form of motions, orders, and other pleadings be acceptable to all or some of the Parties shall include the requirement that such acceptances shall not be unreasonably withheld.

8.18 The Bankruptcy Court in the Chapter 11 Case shall retain jurisdiction to interpret and enforce the provisions of this Settlement Agreement, which shall be construed in accordance with Pennsylvania law.

8.19 This Settlement Agreement and the obligations under this Settlement Agreement shall be binding on the Parties and shall survive the entry of the Confirmation Order unless this Settlement Agreement is terminated pursuant to Article V of this Settlement Agreement.

8.20 This Settlement Agreement shall be effective on this Settlement Agreement Effective Date.

[Signature Pages Follow]

IN WITNESS WHEREOF, the undersigned Party has duly executed this Settlement Agreement as of the date indicated below.

**The Catholic Mutual Relief Society of America**

By: _____

Its: _____

Date: _____

Witness: _____

[Signature Pages Continue on Following Pages]

4887-5923-1050.1-8458-4263.1-0174-3175.2

IN WITNESS WHEREOF, the undersigned Party has duly executed this Settlement Agreement as of the date indicated below.

**The Roman Catholic Diocese of Harrisburg**


By: _____

Its: _____

Date: _____


Witness: _____


[Signature Pages Continue on Following Pages]

IN WITNESS WHEREOF, the undersigned Party has duly executed this Settlement Agreement as of the date indicated below.

**[Diocesan Associated Party Name]**

By: _____

Its: _____

Date: _____

Witness: _____

4887-5923-1050.1

**Exhibit A– Catholic Mutual Certificate**

**Certficiate No. 9095, commencing July 25, 2011 with annual renewals thereafter**

**Exhibit B – Form of Confirmation Order**

4887-5923-1050.1

**Exhibit C**
**Survivor Claimant Release**

This Survivor Claimant Release (the "***Release***") is executed this ___ day of
_____, 20__, by _____ in connection
with the *Joint Chapter 11 Plan of Reorganization for the Roman Catholic Diocese of Harrisburg*,
dated [__], 2022 (the "***Plan***"), filed by the Roman Catholic Diocese of Harrisburg (the "***Debtor***") and
Official Committee of Tort Claimants in the Debtor's chapter 11 case pending before the United
States Bankruptcy Court for the Middle District of Pennsylvania (the "***Bankruptcy Court***"), which is
docketed as case number 1:20-bk-00599 (HWV) (the "***Chapter 11 Case***"), and the receipt of
distributions from the Settlement Trust, which is known as the Roman Catholic Diocese of
Harrisburg Settlement Trust, as compensation for Survivor Claims.

<div style="border:1px solid black; padding:8px; text-align:center;">

**TO BE ENTITLED TO RECEIVE ANY COMPENSATION UNDER THE PLAN,
YOU MUST EXECUTE AND DELIVER THIS RELEASE.**

</div>

1.     All capitalized terms in this Release are defined in the Plan and have the meanings
stated in the Plan.

2.     In consideration of the treatment under the Plan and the Trust Distribution Plan,
and other valuable consideration, I, for myself and my heirs, successors, assigns, agents, and
representatives:

     a.     fully, finally, and completely release, remise, acquit, and forever discharge
the Settling Insurers from any and all past, present and future Claims that, directly or
indirectly, arise out of, relate to, or are connected with the (i) Survivor Claims; (ii)
Contribution Claims; (iii) Direct Action Claims; (iv) Extra-Contractual Claims; (v) Settling
Insurer Policies; (vi) Indirect Claims, and (vii) all Claims that, directly or indirectly, arise
from, relate to, or are connected with the Debtor's Chapter 11 case.

     b.     fully, finally, and completely release, remise, acquit, and forever discharge
the Protected Parties with respect to their portion or share of liability for my Claims.

     c.     With respect to any Claims that are released under paragraph 2(a) or
paragraph 2(b) of this release, I covenant (i) not to sue or seek recovery or relief of any
kind from the Protected Parties or Settling Insurers; (ii) to forever and irrevocably
discharge that fraction, portion or percentage of damages I claim to have suffered in
connection with the Abuse which is by trial or other disposition determined to be the causal
fault or responsibility, if any, of any Protected Party with respect to released Survivor
Claims; (iii) to voluntarily reduce any judgment that I may ever obtain against any Person
relating to the same Abuse at issue in the released Survivor Claims and Direct Action
Claims in an amount reflecting that fraction, portion or percentage of damage or injury that
I suffered due to the causal fault or responsibility, if any, of any Protected Party; (iv) that
filing of this Release with any court by any Protected Party will satisfy that fraction, portion
or percentage of any judgment that may be rendered in my favor attributable to any
Protected Party's causal fault or responsibility relating to the Abuse at issue in the released
Survivor Claims and Direct Action Claims; (v) that I will not seek a reallocation of the

causal fault or causal responsibility of any Protected Party to any other Person, whether assessed by reason of judgment or settlement, relating to the Abuse at issue in the released Survivor Claims and Direct Action Claims; and (vi) I understand the Plan extinguishes any potential liability of any Protected Party for contribution or indemnity to any Person who may be held liable to me for any released Survivor Claim or Direct Action Claim.

3.      I have been provided with copies of the Disclosure Statement, the Plan, and the exhibits thereto and have been given an opportunity to review such documents and to consult with counsel of my choice regarding those documents and this Release.

4.      I expressly reserve and retain my rights to recover from any Person for liability for any Abuse except as provided in this Release and do not intend that payment by the Trust constitutes full compensation for the damage alleged in my Survivor Claim(s) and Direct Action Claim(s).

5.      I understand and agree that any payment by the Trust to me does not constitute an admission of liability of any kind or nature by the Trust, any Settling Insurer, or any Protected Party.

6.      I consent to, and agree to be bound by, the injunctions set forth in the Plan, including those injunctions contained in Article XII for the benefit of the Settling Insurers and Protected Parties. I also approve of the Insurance Settlement Agreements referenced in and incorporated into the Plan.

7.      I understand that payment from the Trust constitutes damages on account of personal physical injuries or sickness arising from an occurrence within the meaning of section 104(a)(2) of the Internal Revenue Code of 1986, as amended.

8.      I represent and warrant that I have not assigned or otherwise transferred any interest in my Survivor Claim(s) and Direct Action Claim(s).

9.      I hereby authorize the Center for Medicare & Medicaid Services ("**CMS**") and its agents and/or contractors to release, upon request, information related to my injury/illness and/or settlement since my date of birth to the Trust and/or its agents. I understand that I may revoke this "consent to release information" at any time, in writing. I consent to the release of information relating to my lifetime Medicare entitlement from the Social Security Administration and CMS to the Trustee and all other professionals retained by the Trust, and further authorize the Trustee and other Trust professionals to execute on my behalf any requests, including consents for release of information, for information relating to my Medicare entitlement and any obligations owing or potentially owing under the Medicare Secondary Payer Statute relating to my Survivor Claim(s), from the Social Security Administration and CMS. I affirm that I am the individual to whom the requested information or record applies or the authorized representative of the individual's estate. I declare under penalty of perjury (28 CFR § 16.41(d)(2004)) that I have examined all the information on this form and it is true and correct to the best of my knowledge. I understand that anyone who knowingly or willfully seeks or obtains access to records about another person under false pretenses is punishable by a fine of up to $5,000.

4887-5923-1050.1-8458-4263.1-0174-3175.2

10.     This Release shall be binding upon my successors, heirs, assigns, agents, and representatives.

TO BE COMPLETED BY SURVIVOR CLAIMANT OR AUTHORIZED REPRESENTATIVE OF SURVIVOR CLAIMANT'S ESTATE:

Name of Survivor Claimant: _____

By: _____

Signature: _____

Dated: _____

Claim Number(s): _____

Social Security Number: _____

Date of Birth: _____

CH2:25604063.22

# EXHIBIT D

## INTERSTATE SETTLEMENT AGREEMENT

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter the "**Agreement**") is made this ____ day of ____, 2023, by and between the Diocese of Harrisburg ("**DOH**")[1] and the other "**DOH Entities**" and Interstate Fire & Casualty Company (**"Interstate"**). (The aforementioned parties are referred to hereinafter collectively as the **"Parties"** or individually as a "**Party**").

## WITNESSETH THAT:

WHEREAS, certain "**Persons**", alleging injuries from "**Abuse**", asserted "**Survivor Claims**" against certain DOH Entities;

WHEREAS, certain DOH Entities incurred, and may incur in the future, liabilities, expenses, and losses arising out of the Survivor Claims;

WHEREAS, Interstate issued several "**Subject Insurance Policies**", allegedly providing insurance to the DOH Entities;

WHEREAS, the Subject Insurance Policies listed on Attachment A are property of DOH's bankruptcy estate;

WHEREAS, certain DOH Entities tendered "**Coverage Claims**" to Interstate to seek insurance coverage for the Survivor Claims;

WHEREAS, Interstate disputes the Coverage Claims;

WHEREAS, to address potential liabilities arising out of the Survivor Claims, on the "**Petition Date**," DOH filed the "**Bankruptcy Case**" in the "**Bankruptcy Court**";

WHEREAS, on February 19, 2020, DOH filed the "**Insurance Coverage Adversary Proceeding**," as an adversary proceeding in the Bankruptcy Court, and thereafter on February 27, 2020, DOH filed an amended complaint in the Insurance Coverage Adversary Proceeding;

WHEREAS, Interstate, which DOH named as a defendant in the amended complaint in the Insurance Coverage Adversary Proceeding, disputes the substantive allegations and Coverage Claims DOH asserted against them in the Insurance Coverage Adversary Proceeding;

WHEREAS, on April 2, 2020, DOH filed the "**Mediation Request**";

WHEREAS, the Bankruptcy Court (i) entered the "**Mediation Order**" approving the Mediation Request, appointing the "**Mediator**"; and (ii) ordered the "**Mediation Parties**" to mediate the Survivor Claims and the Coverage Claims;

WHEREAS, pursuant to the Bankruptcy Court's order, no defendant filed an Answer or otherwise responded in the Insurance Coverage Adversary Proceeding;

---

[1] Terms in bold, inside quotation marks, are defined in Section 1, Definitions.

4893-8844-5002.1

WHEREAS, whether or not it (i) was subject to the Survivor Claims; or (ii) asserted Coverage Claims against Interstate, the DOH Entities are settling with and releasing **"Interstate"** pursuant to this Agreement;

WHEREAS, it is the intention of the Parties that the DOH Entities shall sell, assign, and transfer the Subject Insurance Policies to Interstate, and Interstate shall buy back the Subject Insurance Policies and pay the **"Settlement Amount"** to the **"Trust"**, which shall be administered and distributed as provided in the **"Plan"**, the **"Trust Agreement"**, and the **"Trust Distribution Plan"**, including to make payments to the **"Channeled Claimants"**;

WHEREAS, it is the intention of the Parties that any and all **"Interests"** in or to the Subject Insurance Policies be extinguished, ended, and forever terminated;

WHEREAS, it is the intention of the Parties that (i) the DOH Entities shall (a) not retain any right, title, or Interest in or to the **"Subject Insurance Policies"**; and (b) release Interstate from all **"Released Claims"**; and (ii) Interstate shall not have any remaining duty or obligation of any nature whatsoever to any DOH Entity;

WHEREAS, DOH agrees to use commercially reasonable efforts to obtain the Supplemental Settling Insurer Injunction for the benefit of the **"Settling Insurers,"** pursuant to the **"Plan"**; and

WHEREAS, subject to the Court entering the orders contemplated by this Agreement, upon the Trust's receipt of the Settlement Amount, Interstate will be protected by the **"Supplemental Settling Insurer Injunction"** and the **"Channeling Injunction"**;

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without Interstate's admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates all Interests of Interstate and the DOH Entities, with respect to the Subject Insurance Policies, including all rights, obligations, and liabilities relating to the **"Barred Claims"** and the **"Enjoined Claims,"** without prejudice to their respective positions on policy wordings or any other issues relating to the Insurance Coverage Adversary Proceeding, the Coverage Claims, or otherwise.

<u>**AGREEMENTS:**</u>

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

1.    <u>**Definitions**</u>

The following definitions and the definitions used above apply to this Agreement as well as any exhibits or attachments hereto. Where the listed terms are further defined in the body of this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms. Each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other. The words "include,"

"includes," or "including" shall be deemed to be followed by the words "without limitation," and the phrase "relating to" means "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with." (The words "include," "includes," and "including," and the phrase "relating to" are not capitalized herein.) This Agreement incorporates all attachments hereto to the same extent as if fully set forth herein. All references to "Sections" are references to sections of this Agreement unless otherwise specified.

### a.    <u>Abuse</u>

The term "**Abuse**" means any (i) actual, alleged, or threatened, sexual conduct, misbehavior, misconduct, abuse, or molestation, including "Sexual Abuse" as defined in 42 Pa.C.S. § 5533(b)(2)(ii); (ii) any sexual offense as laid out in Chapter 31 of Title 18 of the Pennsylvania Statutes; (iii) any other sexually related act, contact, or interaction, indecent assault and/or battery, rape, indecent or lascivious behavior, undue familiarity, harassment, pedophilia, or ephebophilia; (iv) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a non-consenting adult and another adult; (v) contacts or interactions of a sexual nature; or (vi) assault, battery, corporal punishment, or other act of physical, psychological, or emotional abuse, humiliation, or intimidation.. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the person.

### b.    <u>Action</u>

The term "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

### c.    <u>Affiliates</u>

The term "**Affiliates**" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

### d.    <u>Agents</u>

The term "**Agents**" means all past and present employees, officers, directors, agents, shareholders, principals, teachers, staff, members, boards, administrators, priests, deacons, brothers, sisters, nuns, other clergy, Persons bound by monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in their capacities as such.

### e.    <u>Approval Order</u>

The term "**Approval Order**" means an order entered by the Court, upon a hearing following Bankruptcy Notice, containing all of the following provisions but no provision that is contrary to or inconsistent with the following provisions. The wording of the Approval Order shall be mutually acceptable to DOH and Interstate. The Approval Order shall contain provisions:

(i)    finding that due and adequate notice of DOH's request for approval of this Agreement has been provided to all creditors and parties in interest in the Bankruptcy Case, including by finding that the Bankruptcy Notice described in Section 1.i. of this Agreement is reasonable and provides due process to all potential known and unknown holders of Claims;

(ii)    approving this Agreement in its entirety, pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy Rules 6004 and 9019;

(iii)    authorizing, subject to the occurrence of the Settlement Payment Date, the sale of the Subject Insurance Policies to Interstate, free and clear of all Interests of all Persons, with all Interests in and to, and Claims against, the Subject Insurance Policies being fully extinguished without reservation as to the Settling Insurers;

(iv)    ordering that, as of the date the Trust receives the Settlement Amount, all Claims against, and Interests in and to, the Subject Insurance Policies be fully extinguished without reservation as to Interstate and the DOH Entities;

(v)    ordering that, as of the date the Trust receives the Settlement Amount, all Barred Claims and other Interests that any Person, including CMS (as defined herein), might have in, or against, the Subject Insurance Policies, attach to the Settlement Amount;

(vi)    authorizing and directing the Parties to perform their respective obligations under this Agreement; and

(vii)    issuing the Bar Order, subject to, and effective upon, the occurrence of the Settlement Payment Date.

The Approval Order shall be accompanied by the separately entered Settlement Approval Findings and Conclusions.

**f.    Bankruptcy Case**

The term "**Bankruptcy Case**" means the bankruptcy case filed by DOH in the Bankruptcy Court, entitled *In re the Diocese of Harrisburg*, Case Number 20-00599-HWV.

**g.    Bankruptcy Code**

The term "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

**h.    Bankruptcy Court**

The term "**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Pennsylvania.

### i.    Bankruptcy Notice

The term "**Bankruptcy Notice**" means notice as required under Bankruptcy Rules 2002, 6004(a), and (c), and applicable local rules, sent to (i) all holders of Claims against the DOH Entities, including Survivor Claims, or their attorneys, if any, who are known to the DOH Entities; (ii) the Official Committee of Unsecured Creditors; (iii) the "**Unknown Claims Representative**" (once appointed by the Court); (iv) all insurers of the DOH Entities that provide coverage for or are alleged to provide coverage for Survivor Claims; (v) the Secretary of the Department of Health and Human Services; (vi) CMS; (vii) the United States Attorney for the Middle District of Pennsylvania; (viii) all Persons who, in the opinion of any Party to this Agreement, might reasonably be expected to be affected by the transactions contemplated herein; and (ix) all other Persons as directed by the Court.  Notice shall also be given by publication (a) in the national editions of (i) *USA Today*; (ii) *National Catholic Reporter;* and (iii) *The National Catholic Register;* and (b) locally in (i) *The Catholic Witness*; (ii) *Gettysburg Times;* (iii) *Press Enterprise*; (iv) *The Sentinel*; (v) *Patriot-News*; (vi) *Public Opinion*; (vii) *LNP-Lancaster Online*; (viii) *Lebanon Daily News*; (ix) *The Sentinel*; (x) *The Daily Item*; (xi) *Perry County Times*; and (xiv) *York Daily Record*, or as the Court may otherwise direct.

### j.    Bankruptcy Rules

The term "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

### k.    Bar Order

The term "**Bar Order**" means an order, which shall automatically become effective on the Settlement Payment Date, barring, estopping, and permanently enjoining all Persons from asserting any Barred Claims against Interstate.

### l.    Business Day

The term "**Business Day**" means any day that is not a Saturday, Sunday, or legal holiday in the State of Pennsylvania.

### m.    Channeling Injunction

The term "**Channeling Injunction**" means an order of the Court, effective as of the date the Trust receives the Settlement Amount, requiring all Channeled Claimants to assert their Channeled Claims against the Trust, which states, *verbatim*:

**Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.**

**In consideration of the undertakings of the Protected Parties and the Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor, and to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as**

provided in sections 524 and 1141 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:

a. any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims;

b. any and all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

(i). commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;

(ii). enforcing, attaching, collecting or recovering, or seeking to accomplish any of the preceding, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers;

(iii). creating, perfecting, or enforcing, or seeking to accomplish any of the preceding, any lien of any kind relating to any Channeled Claim against any of the Protected Parties or Settling Insurers, or the property of the Protected Parties or Settling Insurers;

(iv). asserting, implementing, or effectuating, any Channeled Claim of any kind against: (A) any obligation due any of the Protected Parties or Settling Insurers; (B) any of the Protected Parties or Settling Insurers; or (c) the property of any of the Protected Parties or Settling Insurers;

(v). taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; or

(vi). asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of the Protected Parties or Settling Insurers.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims provided in this section shall inure to the benefit of the Protected Parties and Settling Insurers. The Channeling Injunction will become

**effective with respect to each applicable Settling Insurer as of the date that the Trust receives the Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. In a successful Action to enforce the injunctive provisions of this Section 12.3 in response to a willful violation thereof, the moving party shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, from the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

    **n.**    <u>**Claim**</u>

The term "Claim" means (a) a claim as that term is defined in § 101(5) of the Bankruptcy Code; or (b) any claim, interest, Action, assertion of right, complaint, cross-complaint, counterclaim, liabilities, obligations, rights, request, allegation, mediation, litigation, direct action, administrative proceeding, cause of action, lien, encumbrances, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, whether past, present or (to the extent it arises prior to the Effective Date) future, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect or otherwise consequential, whether in law, equity, admiralty or otherwise, whether currently known or unknown, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise. A Person who alleges or alleged a Claim is a **"Claimant"**. The term "Claim" includes all of the following:

    **(i)**    **Barred Claims**

The term "**Barred Claims**" means all Claims enjoined by the Bar Order, which shall include all Direct Action, Indirect, Medicare, Released, and Survivor Claims.

    **(ii)**    **Channeled Claims**

The term "**Channeled Claims**" means all of the Claims that shall be channeled to the Trust, including: (a) Survivor Claims; (b) Indirect Claims; (c) Direct Action Claims; (d) Contribution Claims; (e) Medicare Claims; and (f) Extra-Contractual Claims related to the Claims listed in subsection (a)-(e) of this sentence; *provided however*, that "**Channeled Claims**" shall not include: (i) a Claim against an individual who perpetrated an act of

Abuse; or (ii) a Claim against any religious order, diocese (other than the Reorganized Debtor), or archdiocese.

**(iii) Contribution Claims**

The term "**Contribution Claims**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against Interstate for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Claim.

**(iv) Coverage Claims**

The term "**Coverage Claims**" means all Claims against Interstate under or relating to the Subject Insurance Policies or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

**(v) Direct Action Claims**

The term "**Direct Action Claims**" means the same as Survivor Claims, except that they are asserted against Interstate, instead of any DOH Entity or the Trust, for the recovery of insurance proceeds.

**(vi) Enjoined Claims**

The term "**Enjoined Claims**" means all Claims enjoined by the Supplemental Settling Insurer Injunction, which shall include all Direct Action, Indirect, Released, Survivor, and Contribution Claims.

**(vii) Extra-Contractual Claims**

The term "**Extra-Contractual Claims**" means all Claims against Interstate, in its capacity as Insurer, seeking any type of relief other than coverage or benefits under the Subject Insurance Policies. "**Extra-Contractual Claims**" include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs, or any other type of relief, alleging, with respect to (i) any of the Subject Insurance Policies; (ii) any Claim allegedly or actually covered under the Subject Insurance Policies; or (iii) the conduct of Interstate with respect (i) and/or (ii): bad faith; failure to provide insurance coverage under any Subject Insurance Policy; failure or refusal to compromise and settle any Claim alleged to be insured under any Subject Insurance Policy; failure to act in good faith; violation of any covenant or duty of good faith and fair dealing; violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; violation of any unfair claims practices act or similar statute, regulation or code; any type of misconduct or any other act or omission of any type. The term "**Extra-Contractual Claims**" includes all Claims relating to Interstate's (i) handling of any request for insurance coverage for any Claim; (ii) conduct relating to the negotiation of this Agreement; or (iii) conduct relating to the settlement of any Coverage Claim.

**(viii) Indirect Claims**

The term "**Indirect Claims**" means Claims against a DOH Entity or a Settling Insurer, asserted by any Person that is not a DOH Entity or Insurer, for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any DOH Entity's actual or alleged liability, for any Claim alleging Abuse that is not a Survivor Claim.

**(ix) Medicare Claims**

The term "**Medicare Claims**" means any and all Claims by CMS, and/or any other agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA and pursuing Claims under MSP, relating to any payments in respect of any Survivor Claims, including Claims for reimbursement of payments made to Survivor Claimants who recover or receive any distribution from the Trust, and Claims relating to reporting obligations.

**(x) Released Claims**

The term "**Released Claims**" means Coverage Claims and Extra-Contractual Claims.

**(xi) Survivor Claims**

(A) The term "**Survivor Claims**" means all Claims, allowed or disallowed, relating to Abuse that occurred before the Plan Effective Date, for which a DOH Entity is allegedly responsible, including any such Claim asserted against any DOH Entity in connection with the Bankruptcy Case. The term "**Survivor Claims**" includes Unknown Survivor Claims.

(B) The term "**Unknown Survivor Claim**" means any Survivor Claim that was (i) neither filed, nor deemed filed, in the Bankruptcy Case, by the Claims Filing Deadline, nor otherwise allowed by the Court prior to the Plan Effective Date; and (ii) is held by an individual who, at the time of the Claims Filing Deadline, was under a disability recognized by Pennsylvania law, or other applicable law suspending the running of the limitation period, if any.

**o.    CMS**

The term "**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any other Agent or successor Person responsible for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

**p.    Committee**

The term "**Committee**" means the Official Committee of Tort Claimants appointed in the Bankruptcy Case.

4893-8844-5002.1

9

## q.     Confirmation Findings and Conclusions

The term "**Confirmation Findings and Conclusions**" means the findings of fact and conclusions of law required under §§ 1129(a), and, if applicable, 105(a) and 1129(b), of the Bankruptcy Code, which are to be entered concurrently with, but separately from, the Confirmation Order, as necessary to confirm the Plan, including the following:

(i)     This Agreement is the fruit of long-term negotiations amongst the Parties, which began in July 2020, following the Bankruptcy Court's entry of the Mediation Order;

(ii)    The Settlement Amount provides good and valuable consideration to DOH's bankruptcy estate, and enables distributions to the Channeled Claimants;

(iii)   Potential liability for the Survivor Claims precipitated the filing of the Bankruptcy Case;

(iv)    This Agreement is therefore necessary to the Plan because it provides significant funding for the Plan;

(v)     The Subject Insurance Policies are property of DOH's bankruptcy estate and are therefore subject to the *in rem* jurisdiction of the Court;

(vi)    The Channeled Claims are within the jurisdiction of the Court because they seek property of DOH's bankruptcy estate;

(vii)   Because it would be impractical to divide the Subject Insurance Policies amongst DOH and the other DOH Entities, it was necessary for DOH to obtain the participation of the other DOH Entities in this Agreement;

(viii)  The DOH Entities, other than DOH, would not release their Interests in the Subject Insurance Policies unless they obtained the benefits of the Channeling Injunction, because to do so would have left them exposed to Survivor Claims, whether or not such Claims be valid, and whether or not coverage exists under the Subject Insurance Policies for such Claims;

(ix)    Therefore, the Channeling Injunction is necessary to this Agreement;

(x)     The Channeling Injunction is narrowly tailored because it only requires Channeled Claims to be brought against the Trust;

(xi)    The Settlement Amount is reasonable and fair consideration for the injunction of the Enjoined Claims, and for Interstate's liability for Survivor Claims;

(xii)   The Coverage Claims are within the jurisdiction of the Bankruptcy Court because such Claims could enhance the estate;

Case 1:20-bk-00599-HWV    Doc 1492    Filed 01/13/23    Entered 01/13/23 17:14:22    Desc
Main Document    Page 127 of 260

(xiii)   Interstate required that DOH obtain the benefits of the Supplemental Settling Insurer Injunction, as a condition of entering into this Agreement and contributing the Settlement Amount;

(xiv)   Therefore, the Supplemental Settling Insurer Injunction is necessary to this Agreement and the Plan; and

(xv)   The Supplemental Settling Insurer Injunction is narrowly tailored because it only enjoins the Enjoined Claims against the Settling Insurers;

### r.   **Confirmation Order**

The term "**Confirmation Order**" means an order entered by the Bankruptcy Court after a confirmation hearing upon Bankruptcy Notice confirming the Plan, in a form and substance as required by this Agreement, which order is a Final Order. The wording of the Confirmation Order shall be mutually acceptable to DOH and Interstate. The Confirmation Order shall contain all of the following provisions but no provision that is contrary to or inconsistent with this Agreement:

(i)      confirming the Plan;

(ii)     specifically, and individually, ordering all Persons, as set forth in the Plan, to act or refrain from acting as specified in the Plan;

(iii)    incorporating, as of the date the Trust receives the Settlement Amount, the terms and provisions of the Bar Order as though fully set forth therein;

(iv)    ordering the Trustee to perform the obligations, if any, imposed upon the Trustee by this Agreement;

(v)     issuing the Channeling Injunction and the Supplemental Settling Insurer Injunction;

(vi)    discharging DOH from all Claims, including all Channeled Claims; and

(vii)   ordering all Channeled Claimants with pending state court Actions against any DOH entity to dismiss such Actions and assert them against the Trust for resolution pursuant to the Trust Agreement

(viii)  including the Reduction Clause set forth in Section 7, below.

The Confirmation Order shall be accompanied by the separately entered Confirmation Findings and Conclusions.

### s.   **DOH**

(i)      The term "**DOH**" means The Diocese of Harrisburg, which is the diocesan corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5301, together with the public juridic person of the Roman Catholic Diocese of Harrisburg, as now constituted or as it may have been constituted.   The term "DOH" also applies anywhere the term

"Reorganized Debtor" is used, and "Reorganized Debtor" applies anywhere the term "DOH" is used, as is necessary to effectuate the terms of the Agreement. Furthermore, in the event of any Action naming any Affiliate or Agent of DOH, such Action shall be considered an Action against DOH, the insurance coverage for which is released pursuant to Section 3 hereof.

t.  **DOH Entities**

The term "**DOH Entities**" means, in their capacity as such, DOH and its Entities.

The "**DOH Entities**" include each of the Persons set forth on Attachment B to this Agreement. An individual who perpetrated an act of Abuse that forms the basis for a Survivor Claim is not a DOH Entity with respect to that Survivor Claim.

u.  **DOH Entity Insurer Policy**

The term "**DOH Entity Insurer Policy**" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Plan Effective Date, which actually, allegedly, or potentially, insures any DOH Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Survivor Claim.

v.  **DOH Parishes**

The term "**DOH Parishes**" means all past and present parishes of or in DOH, in their capacity as public juridic persons, together with each corresponding parish corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5511.

w.  **Effective Date**

The term "**Effective Date**" means the day following the date on which all of the following have occurred: (i) all Parties have executed this Agreement; (ii) the Court has issued the Approval Order and the Settlement Approval Findings and Conclusions, and the Approval Order has become a Final Order; and (iv) the Court has issued the Confirmation Order and the Confirmation Findings and Conclusions, and the Confirmation Order has become a Final Order

x.  **Entities**

The term "**Entities**" means with respect to a specified Person: (i) its Affiliates; (ii) each of the foregoing Person's Agents; and (iii) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, administrators, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

y.  **Entities' Release**

The term "**Entities' Release**" means the following: The remising, release, covenant not to sue, and permanent discharge by the DOH Entities and any subsequently appointed trustee or representative acting for any DOH Entity, without further act by any Person, from and against all Released Claims that any DOH Entity ever had, now has, or hereafter may have, from the

beginning of time to the Effective Date, of: (1) Interstate; and (2) the respective heirs, executors, administrators, and reinsurers (as such) of any of the Persons identified in clause (1) hereof, in their capacities as such.

**z.**     **Filing Date**

The term "**Filing Date**" means February 19, 2020.

**aa.**     **Final Order**

The term "**Final Order**" means an order or judgment of the Bankruptcy Court that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, *certiorari*, review, reargue, or rehear shall have been waived in writing in form and substance satisfactory to DOH and Interstate, and their counsel or, (b) in the event that an appeal, *writ of certiorari*, new trial, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order. For the avoidance of doubt, if the Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("**Substantial Consummation**"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order.

**bb.**     **Insurance Coverage Adversary Proceeding**

The term "**Insurance Coverage Adversary Proceeding**" means the case entitled *The Roman Catholic Diocese of Harrisburg v. The Travelers Companies, et al.*, filed in the Bankruptcy Court, as Adversary Proceeding Number 20-00018.

**cc.**     **Insurer**

The term "Insurer" means a Person (including all of its Affiliates, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, a DOH Entity Insurer Policy.

**dd.**     **Interests**

The term "**Interests**" means all Claims, including any "interests" as that terms is used in 11 U.S.C. § 363, and other rights of any nature, whether at law or in equity, including all interests or other rights under Pennsylvania or other applicable law.

ee.     **Interstate**

The term **"Interstate"** means:

(i)     Interstate Fire & Casualty Company;

(ii)    All of the Agents of the Persons set forth in Section 1.gg.(i), and their respective predecessors and successors, if any, solely in such capacity; and

(iii)   All the respective heirs, executors, successors identified in Section 1.gg.(i) with respect to the subject matter of this Agreement), assigns (including any administrator, receiver, trustee, personal representative, or equivalent appointee(s) under relevant insolvency law), reinsurers, and retrocessionaires (as such), of any of the Persons identified in Section 1.gg.(i), if any, solely in their capacity as such.

ff.     **Mediation**

The term "**Mediation**" means the mediation by the Mediation Parties, as ordered by the Bankruptcy Court.

gg.     **Mediation Parties**

The term "**Mediation Parties**" means, collectively: (a) DOH; (b) each insurer named as a Defendant in the Insurance Coverage Adversary Proceeding; (c) the Committee; (d) state court counsel for Survivor Claimants; and (e) the *ad hoc* committee of parishes and other parties-in-interest, including schools or other non-debtor Catholic entities located within the territorial area decreed by the Roman Catholic Church as the "Diocese of Harrisburg", to the extent permitted or required by the Mediator.

hh.     **Mediation Order**

The term "**Mediation Order**" means the Agreed Order Referring Adversary Proceeding to Mediation, entered by the Bankruptcy Court in the Insurance Coverage Adversary Proceeding, on July 10, 2020, Doc. No. 84.

ii.     **Mediation Request**

The term "**Mediation Request**" means the Request for Mediation filed by the DOH in the Insurance Coverage Adversary Proceeding.

jj.     **Mediator**

The term "**Mediator**" means the Honorable Gregg W. Zive, United States Bankruptcy Judge.

kk.     **Medicare**

The term "**Medicare**" means Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., enacted July 1, 1966, including all subsequent amendments thereto.

4893-8844-5002.1

ll.     **Medicare Beneficiary**

The term "**Medicare Beneficiary**" means any individual who has received or is eligible to receive benefits under Medicare and is the holder of a Channeled Claim.

mm.     **Medicare Secondary Payor Act**

The term "**Medicare Secondary Payor Act**" or "**MSP**" means 42 U.S.C. § 1395y *et seq*., or any other similar statute or regulation, and any related rules, regulations or guidance issued in connection therewith or amendments thereto.

nn.     **MMSEA**

The term "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSP.

oo.     **Non-Settling Insurer**

The term "Non-Settling Insurer" means any Insurer that is not a Settling Insurer by the Plan Effective Date.

pp.     **Person**

The term "**Person**" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof; and any other individual or entity within the definitions of (i) "person" in Section 101(41) of the Bankruptcy Code or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

qq.     **Petition Date**

The term "**Petition Date**" means February 19, 2020.

rr.     **Plan**

The term "**Plan**" means a plan of reorganization proposed by DOH, after good-faith consultation with Interstate, which (a) contains all of the following provisions, but no provision that is contrary to or inconsistent with this Agreement; (b) allows all of the acts and transactions under, and envisioned by, this Agreement to occur with binding legal effect; (c) does not materially and adversely affect the rights, duties, or interests of the DOH Entities or Interstate under this Agreement; (d) includes all papers, exhibits, attachments, appendices, or other documents filed with or in support of the Plan and necessary for its implementation, and any documents relating to the establishment and operation of the Trust; and (e) shall include the following provisions:

(i)     specifying the terms of this Agreement shall control in the event of any conflict with the Plan or the Confirmation Order;

(ii)    prohibiting DOH or the Trust from continuing to pursue the Insurance Coverage Adversary Proceeding against Interstate, requiring DOH and the Trust to dismiss all Claims against Interstate in the Insurance Coverage Adversary Proceeding, with prejudice, within fourteen (14) days after the Plan Effective Date, and prohibiting any DOH Entity from asserting any Coverage Claims against Interstate;

(iii)   specifying that, as of the date the Trust receives the Settlement Amount, the Channeling Injunction and the Supplemental Settling Insurer Injunction shall be effective;

(iv)    establishing the Trust, appointing the Trustee, and binding both of them to perform those requirements imposed upon them by this Agreement;

(v)     describing the role of the Unknown Claims Representative and seeking the continued appointment of the Unknown Claims Representative to continue in his duties;

(vi)    specifying that, as of the date the Trust receives the Settlement Amount, the Channeled Claims shall be channeled to the Trust;

(vii)   denominating, as of the date the Trust receives the Settlement Amount, Interstate as one of the Settling Insurers;

(viii)  requiring, as of the date the Trust receives the Settlement Amount, each Channeled Claimant receiving a payment from the Trust to sign a release of all Claims against Interstate and the DOH Entities;

(ix)    and providing, *verbatim*:

> (A)     It is the position of DOH that none of DOH Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("**HHS**") that none of the Trust, DOH Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the DOH Entities or Settling Insurers or payments by the Trust to Claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or written confirmation from HHS that none of the DOH Entities or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the DOH Entities and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the DOH Entities and Settling Insurers, and shall timely submit all reports that

would be required to be made by any DOH Entity or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by a DOH Entity or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or any DOH Entity or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the DOH Entities and Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(B) If the Trust is required to act as a reporting agent for any DOH Entity or Settling Insurer pursuant to Section 1.tt.(ix)(A), the Trust shall provide a written certification to each DOH Entity and Settling Insurer within twenty-one (21) days following the end of each calendar quarter, confirming that all reports to CMS required by Section 1.tt.(ix)(A). have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

(C) With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however,* that the Trust may redact from such copies the Redacted Information. With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by any DOH Entity or Settling Insurer, provide each DOH Entity and Settling Insurer copies of such resubmissions; *provided, however,* that the Trust may redact the Redacted Information. If the Trust is unable to remedy its noncompliance, the provisions of Section 1.tt.(ix)(G) shall apply.

(D) If the Trust is required to act as a reporting agent for a DOH Entity or Settling Insurer pursuant to the provisions of Section 1.tt.(ix)(A), with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information in the possession or control of the Trust that may be necessary in the reasonable judgment of any DOH Entity or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event any DOH Entity or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS. All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

(E)     If the Trust is required to act as a reporting agent for any DOH Entity, or Settling Insurer pursuant to the provisions of Section 1.tt.(ix)(A), the Trust shall make the reports and provide the certifications required by Sections 1.tt.(ix)(A) and (B) until such time as such DOH Entity or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust. Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 1.tt.(ix)(A), and if any DOH Entity or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 1.tt.(ix)(A) and (B).

(F)     Section 1.tt.(ix)(A) is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the DOH Entities and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any acts undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(G)     If CMS concludes that reporting done by the Trust in accordance with Section 1.tt.(ix)(A) is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any DOH Entity or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any DOH Entity or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 1.tt.(ix)(B), (C) or (D), or other credible information, then each DOH Entity and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information in its possession or control as the electing party may reasonably require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 1.tt.(ix)(A), without any redactions. The DOH Entities and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 1.tt.(ix) confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

(H)     Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 1.tt.(ix) until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under this Section 1.tt.(ix) to such Person for any penalty, interest, or sanction with respect to a Claim that may arise on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who

provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each DOH Entity and Settling Insurer for any failure to report payments to Medicare eligible Survivor Claimants on behalf of Persons who have timely supplied Medicare Reporting Numbers, if any exists.

(I) Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trustee shall obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. If the Trust receives no such certification, the Trust may withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Survivor Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 1.tt.(ix) to each DOH Entity and Settling Insurer, and permit reasonable audits by such Persons, no more often than annually, to confirm the Trust's compliance with this Section 1.tt.(ix). For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 1.tt.(ix) regardless of whether any DOH Entity or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 1.tt.(ix)(G).

(J) Compliance with the provisions of this Section 1.t.(ix) shall be a material obligation of the Trust under the Plan, in favor of the DOH Entities and Settling Insurers under the Plan.

(K) The Trust shall defend, indemnify, and hold harmless the DOH Entities and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under Section 1.tt.(ix).

(x) The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing. The Trustee shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

ss. **Plan Effective Date**

The term "**Plan Effective Date**" means the effective date of the Plan, as noticed on the Bankruptcy Case docket.

tt. **Redacted Information**

The term "**Redacted Information**" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Survivor Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

4893-8844-5002.1

19

uu. **Reorganized Debtor**

The term "**Reorganized Debtor**" means DOH, on and after the Plan Effective Date.

vv. **Settlement Amount**

The term "**Settlement Amount**" means the net sum of Four Million Dollars ($4,000,000.00).

yy. **Settlement Approval Findings and Conclusions**

The term "**Settlement Approval Findings and Conclusions**" means findings of fact and conclusions of law pursuant to 11 U.S.C. §§ 363(b), (f), and (m) and Bankruptcy Rule 9019, entered concurrently with, the Approval Order, as necessary for the Court to approve this Agreement, including the following:

(i)     DOH demonstrated sound business reasons for the settlement of its Claims against Interstate in the Insurance Coverage Adversary Proceeding and the implementation of such settlement through the sale of the Subject Insurance Policies to Interstate;

(ii)    The Parties mediated their disputes over the Survivor Claims and the Coverage Claims pursuant to the Mediation Order, beginning in July 2020;

(iii)   In the Mediation, the Parties negotiated extensively, at arms-length, and in good faith. Interstate is a purchaser in good faith of the Subject Insurance Policies, within the meaning of Bankruptcy Code § 363(m), and it is entitled to all of the protections of that statute;

(iv)    Interstate is a *bona fide* good faith purchaser of the Subject Insurance Policies, for value;

(v)     The terms of the transactions contemplated by this Agreement, as well as the genesis and background of this Agreement, have been adequately disclosed to the Court;

(vi)    The terms and conditions of this Agreement (including the consideration to be realized by DOH's bankruptcy estate) are fair and reasonable;

(vii)   The transactions contemplated by this Agreement are in the best interests of the DOH's bankruptcy estate, its creditors and other stakeholders;

(viii)  The only potential holders of Interests in or against the Subject Insurance Policies are the DOH Entities and Persons who hold Claims against the DOH Entities, whose Claims might be covered by the Subject Insurance Policies;

(ix)    The DOH Entities are parties to this Agreement, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

(x)     The Barred Claims are subject to *bona fide* dispute, hence the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

(xi)    All holders of Claims against the Subject Insurance Policies could be compelled, in a legal or equitable Action, to accept a money satisfaction of such Claims, therefore the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

(xii)   The compromises and settlements embodied in the Agreement have been negotiated in good faith, and are reasonable, fair, and equitable;

(xiii)  In light of:

> (A)     the probability of success in litigation;
>
> (B)     the likely difficulties in collection;
>
> (C)     the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and
>
> (D)     the paramount interest of the creditors;

this Agreement is fair and equitable and within the range of reasonable settlement terms;

(xiv)   The Settlement Amount is fair, adequate, and reasonable consideration for (a) the sale by the DOH Entities and the buy-back by Interstate of the Subject Insurance Policies; (b) the Entities' Release; and (c) the Supplemental Settling Insurer Injunction;

(xv)    This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies, an admission concerning the amount of a reasonable settlement of any claim, an admission concerning the liability or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages, nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the positions with respect to the interpretation and application of the Subject Insurance Policies.  This Agreement does not reflect to upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to the positions taken by Interstate with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers;

(xvi)   DOH provided due and adequate notice of the (a) sale of the Subject Insurance Policies; (b) terms and conditions of this Agreement; and (c) the hearing before the Court to approve this Agreement and the sale of the Subject Insurance Policies, in accordance with Bankruptcy Rules 2002 and 6004 to all known and unknown Claimants, including by providing notice by publication to any Unknown Survivor Claimants;

(xvii) It would be impractical to divide the Subject Insurance Policies amongst the DOH Entities and the Survivor Claimants, therefore, to realize the value of the Subject Insurance Policies for DOH's bankruptcy estate and the Survivor Claimants requires the sale of the Subject Insurance Policies;

(xviii) The sale of the Subject Insurance Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b) and (f);

(xix) Interstate is repurchasing the Subject Insurance Policies, pursuant to this Agreement. Interstate is not purchasing any other assets of the DOH Entities and is not a continuation of the DOH Entities, nor engaging in a continuation of the DOH Entities' businesses. Interstate shall not have any responsibility or liability with respect to any of the DOH Entities' other assets;

(xx) Interstate is not, and shall not be deemed to be, successors to the DOH Entities, or any of them, by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in this Agreement, the Plan, or otherwise. Interstate shall not assume, or be deemed to have assumed, any liabilities or other obligations of the DOH Entities.

(xxi) To the extent any Claimant may have any legal or equitable right to assert a Claim either directly against the Subject Insurance Policies, which policies are being acquired by Interstate pursuant to this Agreement, or indirectly by asserting such Claim against any DOH Entity, such Claims are deemed to be (a) "interests" as that term is used in Bankruptcy Code § 363(f); and (b) "Interests" herein; and

(xxii) The Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

### zz.  Settlement Payment Date

The term "**Settlement Payment Date**" means the day that is the later of (a) the Plan Effective Date; and (b) sixty (60) days after the Confirmation Order becomes a Final Order, *provided, however*, that if such date is not a Business Day, the Settlement Payment Date shall be the next Business Day.

### aaa.  Supplemental Settling Insurer Injunction

The term "**Supplemental Settling Insurer Injunction**" means an order of the Bankruptcy Court, effective as of the date the Trust receives the Settlement Amount, which states, *verbatim*:

### Supplemental Settling Insurer Injunction.

**Pursuant to sections 105(a) and 363 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including certain Settling Insurers' purchase of the applicable Settling Insurer Policies free and clear of all Interests pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Interests (including all debt holders, all equity holders, all**

Claimants, governmental, tax and regulatory authorities, lenders, trade and other creditors, Survivor Claimants, perpetrators and all other Persons holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, including (i) Claims relating to the Settling Insurer Policies, including Survivor Claims, Direct Action Claims, Indirect Claims, and Released Claims, (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims, and (iii) Extra-Contractual Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any Action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Interest against the Settling Insurers or Settling Insurer Policies, including:

a. commencing or continuing in any manner any Action against the Settling Insurers or the property of the Settling Insurers;

b. enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;

c. creating, perfecting, or enforcing, or seeking to do any of the preceding, any lien of any kind against the Settling Insurers or the property of the Settling Insurers;

d. asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Settling Insurers or the property of the Settling Insurers; and

e. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

The Supplemental Settling Insurer Injunction will be effective with respect to a Settling Insurer only as of the date that the Trust receives the Insurance Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. The Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Settling Insurer Policies, but against no other Person or thing; provided, however, nothing in this Supplemental Settling Insurer Injunction shall limit, or be deemed or otherwise interpreted to limit, the scope of the discharge or Channeling Injunction in favor of the Protected Parties. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.

bbb.  **Settling Insurers**

The term "**Settling Insurers**" means, collectively, Interstate, and all other insurers of the DOH Entities, which, after the Petition Date, settled Claims for insurance coverage brought against them by DOH, and which obtain the protection of the Supplemental Settling Insurer Injunction.

**ccc.** **Subject Insurance Policies**

The term "**Subject Insurance Policies**" means, collectively (i) all insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies issued on or before July 25, 1987, and providing insurance to any DOH Entity; *provided*, *however*, if a Subject Insurance Policy that is not listed in Attachment A was not issued on behalf of a DOH Entity (or such Person's Affiliates) but provides coverage to a DOH Entity, then it is a Subject Insurance Policy only to the extent it insures the DOH Entity.

**ddd.** **Termination Event**

The term "**Termination Event**" means

(i)     the Court has not entered the Approval Order by [DATE];

(ii)    the Court has not entered the Confirmation Order by [DATE];

(iii)   the Court has not entered the Bar Order by [DATE];

(iv)    the Approval Order, the Confirmation Order or the Bar Order fails to become a Final Order by [DATE];

(v)     the Court denies approval of this Agreement;

(vi)    the Court enters an order or grants such other relief that is inconsistent with this Agreement;

(vii)   the DOH files any plan of reorganization other than the Plan;

(viii)  the appointment of a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers in the Bankruptcy Case; or

(ix)    the Plan is amended in any manner that is inconsistent with the terms of this Agreement; *provided, however*, the deadlines set forth in (i) through (iv) of the foregoing may be extended by mutual written consent of the Parties.

**eee.** **Trust**

The term "**Trust**" means the trust to be established under the Plan, which will assume liability for, and be established, pursuant to the Plan and, if applicable, Bankruptcy Code § 105, to make distributions pursuant to the Plan, the Trust Agreement, and the Trust Distribution Plan, including payments to Survivor Claimants.

**fff.** **Trust Agreement**

The term "**Trust Agreement**" means, collectively, any agreement establishing the Trust and the requirements for its administration, and any agreement setting forth procedures for the Trust to make distributions pursuant to the Plan and Trust Distribution Plan, including payments to Survivor Claimants.

4893-8844-5002.1

24

### ggg.    Trust Distribution Plan

The term "**Trust Distribution Plan**" means the Trust Distribution Plan established under the Trust Agreement and the Plan, which governs the payment of Distributions.

### hhh.    Trustee

The term "**Trustee**" means the Person appointed to administer the Trust, in accordance with the terms of the Plan.

### iii.    Unknown Claims Representative

The term "**Unknown Claims Representative**" means Michael R. Hogan, who has been appointed by the Court to represent the interests of Unknown Survivor Claimants.

## 2.    Payment of the Settlement Amount

a.      This Agreement is effective on the Effective Date.  The occurrence of the Settlement Payment Date is a condition precedent to Interstate's payment of the Settlement Amount.

b.      On the Settlement Payment Date, in full and final settlement of all obligations under and relating to the Subject Insurance Policies, and in consideration of the sale of the Subject Insurance Policies to Interstate free and clear of all Interests of any Person, and the releases provided herein, Interstate shall pay the Settlement Amount in accordance with the payment instructions provided by the Trust.

c.      Upon the Trust's receipt of Interstate's payment of the Settlement Amount, the sale, assignment, and transfer of the Subject Insurance Policies to Interstate, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies.

d.      If, before the occurrence of the Settlement Payment Date, a DOH Entity other than DOH becomes a debtor in a bankruptcy case or insolvency Action, under the Bankruptcy Code or otherwise, and Interstate has not satisfied its payment obligation arising hereunder, then Interstate shall be excused from performance under this Agreement until such time as either (i) such DOH Entity obtains, subject to the limitations imposed by the Bankruptcy Code, and subject to the equitable powers of the court in which such Action is pending, an order from such court approving this Agreement under Bankruptcy Code § 363(b), (f), and (m), and Bankruptcy Rule 9019, authorizing the assumption by such DOH Entity (or any successor thereto) of this Agreement under Bankruptcy Code § 365 ("**Assumption**"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof; (ii) DOH obtains an order in the Action compelling the Assumption; or (iii) DOH obtains an order from the Court determining the equitable portion of the Settlement Amount allocable to any interest the DOH Entity subject to such bankruptcy case or insolvency Action may have in the Subject Insurance Policies.  Each DOH Entity agrees that in the event it files a bankruptcy or other insolvency Action, it will not present any Claim for payment under this Agreement or the Subject Insurance Policies to Interstate, until

Case 1:20-bk-00599-HWV    Doc 1492    Filed 01/13/23    Entered 01/13/23 17:14:22    Desc
Main Document    Page 142 of 260

the Assumption has been approved by an order of the applicable court and such order has become a Final Order or until its equitable share in the Settlement Amount has been established by order of the Court pursuant to clause (iii) above, and such order has become a Final Order. Interstate agrees to cooperate fully and provide commercially reasonable assistance to DOH and any DOH Entity in obtaining any of the orders contemplated in this Section 2(d).

**3.    Mutual Releases**

   **a.        By DOH Entities**

   (i)    Upon the Trust's receipt of the Settlement Amount, the Entities' Release shall become immediately effective.

   (ii)    It is the intention of the DOH Entities to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies and to assure Interstate its peace and freedom from such Interests and from all assertions of rights in connection with such Interests, *provided, however,* the Entities' Release does not release, and nothing in this Agreement shall affect, the right of the DOH Entities, or the Trust, as applicable, to assert and pursue Claims against and to collect from Insurers other than those released under the Entities Release, and no Claims are released with respect to such Persons.

   (iii)    Upon the Trust's receipt of the Settlement Amount, any and all rights, duties, responsibilities, and obligations of Interstate created by or in connection with the Subject Insurance Policies, are terminated. As of the Settlement Payment Date, the DOH Entities shall have no insurance coverage under the Subject Insurance Policies. The Entities' Release shall operate as though Interstate had never issued the Subject Insurance Policies.

   (iv)    Each DOH Entity signing this Agreement, is, among other things, (a) releasing all Released Claims, including Claims that it does not know or suspect to exist in its favor, which, if known by such DOH Entity, might have materially affected its settlement with Interstate, and (b) expressly waiving all rights it might have under any federal, state, local, or other law or statute that would in any way limit, restrict, or prohibit such general release.

   (v)    Except with respect to any material breach of any representation, warranty or covenant by Interstate set forth in this Agreement, each DOH Entity expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist. To the fullest extent permitted by applicable law, each DOH Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

   (vi)    Nothing in the foregoing shall release Interstate from its obligations under this Agreement, including the obligation to pay the Settlement Amount.

4893-8844-5002.1

26

**b. By Interstate**

(i)     At the same time the Entities' Release becomes effective, Interstate shall be deemed to remise, release, covenant not to sue, and forever discharge each DOH Entity from and against all Claims relating to the Subject Insurance Policies, which Interstate ever had, now have or hereinafter may have, from the beginning of time to the Settlement Payment Date.

(ii)    Each Person released under the Entities' Release shall reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies.

(iii)   Except with respect to any material breach of any representation, warranty or covenant by any DOH Entity set forth in this Agreement, Interstate expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist.  To the fullest extent permitted by applicable law, Interstate waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

**4.     Indemnification**

a.     This Section 4 is effective upon the Trust's receipt of the Settlement Amount. The Trust shall indemnify and hold harmless Interstate from and against any and all Channeled Claims; and the Reorganized Debtor shall indemnify Interstate from and against all Enjoined Claims except for the Channeled Claims.  These indemnifications include Claims made by Persons over whom the Trust and/or the Reorganized Debtor does not have control, including the DOH Entities, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who holds a Claim that the Trust and/or the Reorganized Debtor is indemnifying.

b.     Interstate shall have the right to defend, with counsel of their choice, all Claims identified under Section 4.a.  Interstate may begin the defense of any Claim upon receipt of such a Claim.  Interstate agrees to notify the Trust and/or the Reorganized Debtor, as applicable, promptly of Claims identified under Section 4.a. and of its choice of counsel.

c.     The Trust and/or Reorganized Debtor, as applicable, shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by Interstate in defending such Claims identified under section 4.a.  Interstate shall defend any such Claim in good faith. The indemnity obligations set forth in Section 4.a, hereof, to indemnify Interstate shall not exceed the amount of the Settlement Amount actually paid by Interstate. In defense of any such Claim, Interstate may settle or otherwise resolve a Claim with the prior consent of the Trust and/or Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.

**5.     Bankruptcy Obligations**

a.     DOH shall provide to Interstate an initial draft of the proposed form of Approval Order, Settlement Approval Findings and Conclusions, and Bar Order at least fourteen (14) days before DOH submits the foregoing for approval of this Agreement to the Court, so that Interstate may provide comments and suggestions.  In the event that DOH makes material revisions to any

4893-8844-5002.1

27

of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to Interstate. Interstate reserves the right to object to, *inter alia*, (i) any proposed order that does not satisfy all of the requirements of the definition of Approval Order set forth in Section 1.e, or (ii) any proposed findings and conclusions that do not satisfy all of the requirements of the definition of Settlement Approval Findings and Conclusions set forth in Section 1.yy, or the definition of Bar Order set forth in Section 1.k.

b. DOH shall provide to Interstate an initial draft of the proposed form of Confirmation Order, and Confirmation Findings and Conclusions, at least fourteen (14) days before DOH submits the foregoing to the Court, so that Interstate may provide comments and suggestions. In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to Interstate. Interstate reserves the right to object to, *inter alia*, any proposed order that does not satisfy all of the requirements of the definition of Confirmation Order set forth in Section 1.s, or any proposed findings of fact and conclusions of law that do not satisfy all the requirements of the definition of Confirmation Findings and Conclusions in Section 1.r.

c. DOH provided to Interstate a copy of the *Joint Chapter 11 Plan of Reorganization for the Diocese of Harrisburg* (the "**Joint Plan**") upon the filing of the Joint Plan. To the extent that the Joint Plan does not meet the requirements set forth in the definition of "Plan" set forth in Section 1.tt above, DOH shall modify such Joint Plan to assure that the filed plan of reorganization submitted to Court for confirmation comports with such definition, and Interstate shall have the right to approve all modifications that affect their rights or obligations under this Agreement. In the event that DOH makes material revisions to the filed plan of reorganization, then, as soon as possible, DOH shall provide a copy of such material revisions to Interstate. Interstate reserves the right to object to, *inter alia*, any proposed plan of reorganization that does not satisfy all of the requirements of the definition of Plan set forth in Section 1.tt. (a "**Non-Compliant Plan**"). If DOH proposes a Non-Compliant Plan, then Interstate may contest such plan, and DOH shall not request a hearing date on confirmation of a Non-Compliant Plan less than thirty (30) days after the date such plan is filed in the Court.

d. DOH will seek entry of the Confirmation Order, as set forth in Section 1.s., together with the Confirmation Findings and Conclusions, as set forth in Section 1.r., including any required findings and conclusions under the Bankruptcy Code.

e. DOH shall serve Bankruptcy Notice of the initial hearing to approve this Agreement and on confirmation of the Plan and the time for filing objections thereto. The proposed form of notice shall be submitted to Interstate for their review and comment no later than seven (7) days prior to the actual service of notice. If the initial hearing to approve this Agreement or to confirm the Plan is adjourned, DOH shall not be required to provide Bankruptcy Notice of such adjourned hearing and shall only be required to file a notice of such adjournment on the docket in the Bankruptcy Case and provide such other and further notice as the Court may direct.

f. In the event that any Person attempts to prosecute a Barred Claim, before the Effective Date, against Interstate, or any DOH Entity, then promptly following notice from Interstate or such DOH Entity, DOH shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code §§ 105(a) and/or 362(b), as applicable,

staying such Claims until the date that the Approval Order and Confirmation Order have each become a Final Order, or, alternatively, this Agreement is terminated under Section 8. However, if DOH is unable to obtain a stay of such Claim then Interstate may, to the extent feasible, and subject to the terms, conditions, and any applicable limits and retentions of the Subject Insurance Policies, defend such Claims and either settle them or litigate them to judgment, and the applicable DOH Entities shall fully assist and cooperate with Interstate in such defense. If after such a Claim is brought, and if:

(i)     the Effective Date occurs, then any payment by Interstate to resolve such Barred Claim, including defense costs paid to an insured's counsel, shall be deducted from the Settlement Amount, and Interstate shall pay the balance of the Settlement Amount; if the payments by Interstate equals or exceeds the Settlement Amount, then Interstate, shall automatically, and without further action by any Person, be relieved of any further obligations under this Agreement and entitled to all the benefits hereunder, including the Entities Release; or, alternatively,

(ii)     the Effective Date does not occur, before this Agreement is terminated under Section 8, then any amounts paid by Interstate shall be credited against its obligations, if any exist, under the Subject Insurance Policies.

6.     **Representations and Warranties**

a.     DOH represents and warrants that the notice required under the definition of Bankruptcy Notice includes all Claimants whose names and addresses are known to, or who are readily ascertainable by any Party.

b.     Each DOH Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation, subject in the case of DOH, to receiving Court approval of this Agreement.

c.     Interstate represents and warrants to DOH that (i) it has, and at all times prior to payment of the Settlement Amount will have, sufficient assets to pay the Settlement Amount in full; and (ii) it is not now, nor has it ever been, the subject of any bankruptcy or insolvency proceeding in any jurisdiction.

d.     Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

e.     Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity, and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

7.     **Reduction Clause.**

The Confirmation Order shall provide include the following, *verbatim*:

a.     **Litigation/Settlement Between an Alleged Insured or Abuse Claimant and Non-Settling Insurers**

(i)       The Channeling Injunction shall channel all Contribution Claims to the Trust.

(ii)      If, for any reason any court does not recognize the channeling of the Contribution Claims of Non-Settling Insurers to the Trust, or such Claims are not channeled for any reason, then the following shall apply:

(A)       Interstate shall retain its Contribution Claims, subject to the following provisions; *provided, however*, that:

(I)       Interstate shall not pursue any Contribution Claims against any Non-Settling Insurer: (A) that asserts a Contribution Claim solely against the Trust; (B) whose Contribution Claim is satisfied and extinguished entirely by the application of this paragraph 7.a.(ii)(A), or (C) that does not assert a Contribution Claim against them;

(II)      If a Non-Settling Insurer asserts its Contribution Claim only against the Trust, then Interstate shall assign any Contribution Claims they may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Contribution Claims against such Non-Settling Insurer;

(III)     If a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against Interstate, then Interstate shall release its Contribution Claims against such releasing Non-Settling Insurer.

(IV)      If a Non-Settling Insurer asserts a Contribution Claim against Interstate, and

(1)       the Trust fully indemnifies Interstate, then Interstate shall assign its Contribution Claims to the Trust; or

(2)       the Trust partially, but not fully, indemnifies Interstate for such Claim, then Interstate shall retain its Contribution Claims and may assert them against the Non-Settling Insurer asserting the Contribution Claim against Interstate. Any recovery by Interstate exceeding the amount necessary to satisfy the Trust's full indemnity obligation plus litigation costs shall be turned over to the Trust.

(B)       In any Action, including the Insurance Coverage Adversary Proceeding, involving a DOH Entity, the Reorganized Debtor, or the Trust (collectively, "**Alleged Insured**") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against Interstate, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that Interstate is liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("**Reduction Amount**"). In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where Interstate is not a party, such Alleged Insured or Abuse Claimant

shall obtain a finding from that court or arbitrator(s), as applicable, of the Reduction Amount before entry of judgment against such Non-Settling Insurer. In the event that such a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against Interstate shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed. Interstate shall be required to cooperate in good faith with DOH and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim. In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse Interstate its costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Court.

(C) If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Claims relating to Abuse, such agreement shall provide that such Non-Settling Insurer releases Contribution Claims against Interstate so long as Interstate releases its Contribution Claims against such Non-Settling Insurer. If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer has asserted, asserts, or could assert a Contribution Claim against Interstate, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount. In such event, the settling parties shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount. If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Contribution Claim by any Non-Settling Insurer against Interstate shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed. Interstate shall be required to cooperate in good faith with DOH and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim by a Non-Settling Insurer. In the event that the reduction eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse Interstate its costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Court.

b. **Application of the Reduction**

(i) To ensure that the reduction contemplated in this Section 7 is accomplished, Interstate shall be entitled to: (i) notice, pursuant to Section 18, within a reasonable time of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer that could give rise to the possibility of a Contribution Claim against Interstate, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations without objection by any party thereto, but only to the extent necessary to accomplish the reduction contemplated in this Section 7; (iii) the cooperation of the applicable Alleged Insured so that Interstate can assert this Section as a defense in any

Case 1:20-bk-00599-HWV    Doc 1492    Filed 01/13/23    Entered 01/13/23 17:14:22    Desc
Main Document      Page 148 of 260

Action against any of them for any Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award, or settlement reduction in order to protect Interstate from any Contribution Claim. The notice required above shall be given by (A) the Alleged Insured that is a party to such Action or settlement negotiations; or (B) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (C) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Survivor Claimant bound by the Plan.

(ii)     The Trust shall use commercially reasonable efforts to obtain, from all Settling Insurers, agreements similar to those contained in Section 7(a)(ii)(A)(III).

## 8.     <u>Termination of Agreement</u>

a.     The Parties may terminate this Agreement in writing upon mutual assent.

b.     Any Party may terminate this Agreement upon thirty (30) days' notice to the other Parties if a Termination Event occurs.

c.     In the event of termination pursuant to this Section 8, unless the Parties agree otherwise in writing, this Agreement shall be void *ab initio* and all Parties shall retain all of their Interests relating to the Subject Insurance Policies as if this Agreement never existed.

d.     If Interstate does not pay the Settlement, DOH, at its option, may by written notice to other parties to this Agreement, terminate this Agreement in its entirety.

## 9.     <u>Treatment of Perpetrators</u>

Nothing in this Agreement overrides the treatment in the Plan of individuals who perpetrated an act of Abuse that forms the basis for a Survivor Claim.

## 10.     <u>Reasonably Equivalent Value</u>

a.     This Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations;

b.     Based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of maintaining the Insurance Coverage Adversary Proceeding, the payments received by the DOH Entities pursuant to this Agreement constitute a fair and reasonable settlement of the Released Claims;

c.     The payments and other benefits received under this Agreement by the DOH Entities constitute reasonably equivalent value for the Entities' Release, indemnity, and other benefits received by Interstate under this Agreement; and

d.     Subject to the Trust's receipt of the Settlement Amount, this Agreement constitutes a full and final resolution of all issues in the Insurance Coverage Adversary Proceeding.

4893-8844-5002.1

## 11. Confidentiality

a.      Except as necessary to obtain approval of this Agreement in the Court, the Parties agree that all matters relating to the negotiation of this Agreement shall be confidential and are not to be disclosed except by order of court, or written agreement of the Parties, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of Interstate directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future, including any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons acting for such insurer.  This Agreement may also be disclosed, as required, to the Internal Revenue Service or other U.S. governmental authority that properly requires disclosure, or as otherwise required by law.  The Parties acknowledge and agree that a copy of this Agreement will be publicly filed on the docket and provided to parties in interest in the Bankruptcy Case, without obligation of confidentiality or restrictions on further disclosure.

b.      In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this section from a Party, such Party shall decline to provide the requested information on the ground that this Agreement restricts such disclosure.  In the event such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall promptly give written notice to the other Parties, and shall promptly provide copies of all notice papers, orders, requests, or other documents in order to allow each Party to take such protective steps as may be appropriate.  Notice shall be made under this paragraph to the persons identified in Section 18.

c.      Material protected by this section shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

## 12. Third-Party Beneficiaries

The Trust, and the Trustee are intended third-party beneficiaries of this Agreement.  Except as set forth in the preceding sentence, there are no other third-party beneficiaries of this Agreement.

## 13. Co-operation

The DOH Entities will undertake all reasonable actions to co-operate with Interstate in connection with its reinsurers, including responding to reasonable requests for information and meeting with representatives of reinsurers.  Furthermore, the Parties shall use their commercially reasonable efforts and cooperate as necessary or appropriate to achieve the objectives of this Agreement.

4893-8844-5002.1

14.     **Non-Prejudice and Construction of Agreement**

a.      This Agreement is intended to be and is a compromise between the Parties and neither this Agreement nor any provision hereof shall be construed as (i) an admission of coverage under the Subject Insurance Policies; (ii) an admission concerning the amount of a reasonable settlement of any Claim; (iii) an admission concerning the liability of or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages); or (iv) a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies.

b.      This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions.  Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement.  This Agreement is without prejudice to positions taken by Interstate with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers.  Except for the express references to the third-party beneficiaries in Section 12 of this Agreement, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

c.      This Agreement is the jointly drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed.  As such, no Party will assert that any ambiguity in this Agreement shall be construed against another Party.

d.      If any provision of the Plan, the Trust Agreement, or trust distribution procedures proposed thereunder conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence.  Neither the Plan nor the Trust Agreement shall be construed or interpreted to modify or affect any rights or obligations of Interstate under this Agreement.

15.     **No Modification**

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties.  Any change or modification of this Agreement that affects the rights of the Survivor Claimants or Trust shall require the consent of the Committee or Trustee, as applicable, which consent shall not be unreasonably withheld. Any attempted change or modification in violation of this Section shall be void *ab initio*.

16. **Waiver**

No waiver of any provision of this Agreement or of a breach of thereof shall be valid unless it is made in writing and signed by the Parties. The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

17. **Non-Assignment**

Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties.

18. **Execution**

There will be three signed originals of this Agreement.

19. **Governing Law**

This Agreement shall be governed by and shall be construed in accordance with the laws of Pennsylvania.

20. **Notices**

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent in writing to the Persons listed on Attachment C.

21. **Integration**

This Agreement, including the attachments, constitutes the entire Agreement between Interstate and the DOH Entities, with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, amongst the Parties with respect thereto. The Parties intend that this Agreement and the Plan shall be consistent in all respects, with no conflict or discrepancies between them.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

[Signature Pages Follow]

4893-8844-5002.1

35

Signed: _____

The Roman Catholic Diocese of Harrisburg

Name Printed: _____

Title: _____

Date: _____ 2022

4893-8844-5002.1

Signed: _____

Interstate Fire & Casualty Company

Name Printed: Adrea Tarver

Title: Claim Specialist III

Date: _____ 2023

# SCHEDULE OF ATTACHMENTS TO

# SETTLEMENT AGREEMENT AND RELEASE

| Attachment A | List of known Subject Insurance Policies |
|---|---|
| Attachment B | List of DOH Entities |
| Attachment C | Notice Names and Addresses |

4893-8844-5002.1

# ATTACHMENT A

## Known Subject Insurance Policies

| Policy No. / | Policy Period(s) |
|---|---|
| 183-152611 | July 25, 1978 to July 25, 1979 |
| 183-152611 | July 25, 1979 to July 25, 1981 |
| 183-152611 | July 25, 1980 to July 25, 1980 |
| 183-152611 | July 25, 1981 to July 25, 1982 |
| 183-0169210 | July 25, 1982 to July 25, 1983 |
| 83-0169210 | July 25, 1983 to July 25, 1984 |
| 83-0169210 | July 25, 1984 to July 25, 1985 |
| 83-0172317 | July 25, 1985 to July 25, 1986 |

And all other Policies issued by Interstate to or on behalf of DOH and DOH Entities prior to July 25, 1987, including Excess Property Only, Drop-Down, and Other.

**ATTACHMENT B**

**List of DOH Entities**

**ATTACHMENT C**

**NOTICE NAMES AND ADDRESSES**

DOH:

With copies to:

-and-

DOH Parishes:

Interstate Fire & Casualty Company

                                  Adrea Tarver
                                  Claim Specialist III
                                  Allianz Resolution Management
                                  Alliance Reinsurance America, Inc. (ARZA)
                                  P.O. Box 750039
                                  Petaluma, CA 94975-0039

                                  On behalf of Interstate Fire & Casualty Company

For Company Leader:

4893-8844-5002.1

With copies to:

Ralph M. Monico, Esquire
Burns White LLC
Burns White Center
48 26th Street
Pittsburgh, PA  15222

Harris Winsburg, Esquire
Parker, Hudson, Rainer & Dobbs, LLP
303 Peachtree Street NE
Atlanta, GA 30308

4893-8844-5002.1

# EXHIBIT E

**ZURICH SETTLEMENT AGREEMENT**

# SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter the "**Agreement**") is made this ____ day of ▮▮▮, ▮▮▮, by and between the Diocese of Harrisburg ("**DOH**")[1] and the other "**DOH Entities**", on the one hand, and Zurich American Insurance Company, successor by merger to Maryland Casualty Company ("**Zurich**") on the other hand. (The aforementioned parties are referred to hereinafter collectively as the "**Parties**" or individually as a "**Party**").

## WITNESSETH THAT:

WHEREAS, certain Persons, alleging injuries from "**Abuse**", asserted "**Survivor Claims**" against certain DOH Entities;

WHEREAS, certain DOH Entities incurred, and may incur in the future, liabilities, expenses, and losses arising out of the Survivor Claims;

WHEREAS, Zurich's predecessor Maryland Casualty Company issued certain policies (the "**Zurich Policies**"), allegedly providing insurance to the DOH Entities;

WHEREAS, the Zurich Policies listed on Attachment A, to the extent the existence and terms thereof are established, are property of DOH's bankruptcy estate;

WHEREAS, certain DOH Entities tendered "**Coverage Claims**" to Zurich to seek insurance coverage for the Survivor Claims;

WHEREAS, Zurich disputes the Coverage Claims;

WHEREAS, to address potential liabilities arising out of the Survivor Claims, on the "**Petition Date**," DOH filed the "**Bankruptcy Case**" in the "**Bankruptcy Court**";

WHEREAS, on February 19, 2020, DOH filed the "**Insurance Coverage Adversary Proceeding**," as an adversary proceeding in the Bankruptcy Court;

WHEREAS, Zurich is a named defendant in the Insurance Coverage Adversary Proceeding, and disputes the substantive allegations and Coverage Claims asserted against it in the Insurance Coverage Adversary Proceeding;

WHEREAS, on April 2, 2020, DOH filed the "**Mediation Request**";

WHEREAS, the Bankruptcy Court (i) entered the "**Mediation Order**" approving the Mediation Request, appointing the "**Mediator**"; and (ii) ordered the "**Mediation Parties**" to mediate the Survivor Claims and the Coverage Claims;

WHEREAS, pursuant to the Bankruptcy Court's order, no defendant filed an answer or otherwise responded in the Insurance Coverage Adversary Proceeding;

---

[1] Terms in bold, inside quotation marks, are defined in Section 1, Definitions.

30153178v.1

WHEREAS, whether or not they (i) were subject to the Survivor Claims; or (ii) asserted Coverage Claims against Zurich, the DOH Entities are settling with and releasing the "**Zurich Entities**" pursuant to this Agreement;

WHEREAS, it is the intention of the Parties that the DOH Entities shall sell, assign, and transfer the Zurich Policies to Zurich, and Zurich shall buy back the Zurich Policies and pay the "**Settlement Amount**" to the "**Trust**" which shall be administered and distributed as provided in the "**Plan**", the "**Trust Agreement**", and the "**Trust Distribution Plan**", including to make payments to the "**Channeled Claimants**";

WHEREAS, it is the intention of the Parties that any and all "**Interests**" in or to the Zurich Policies be extinguished, ended, and forever terminated;

WHEREAS, it is the intention of the Parties that (i) the DOH Entities shall (a) not retain any right, title, or Interest in or to the "**Zurich Policies**"; and (b) release the Zurich Released Parties from all "**Released Claims**"; and (ii) none of the Zurich Entities shall have any remaining duty or obligation of any nature whatsoever to any DOH Entity;

WHEREAS, DOH agrees to use commercially reasonable efforts to obtain the Supplemental Settling Insurer Injunction for the benefit of the "**Settling Insurers**," pursuant to the "**Plan**"; and

WHEREAS, subject to the Court entering the orders contemplated by this Agreement, upon the Trust's receipt of the Zurich Settlement Amount, each of the Zurich Released Parties will be protected by the "**Supplemental Settling Insurer Injunction**" and the "**Channeling Injunction**";

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without admission of liability or responsibility under the Zurich Policies, a full and final settlement that releases and terminates all Interests of the Zurich Entities, and the DOH Entities, with respect to the Zurich Policies, including all rights, obligations, and liabilities relating to the "**Barred Claims**" and the "**Enjoined Claims**," without prejudice to their respective positions on policy wordings or any other issues relating to the Insurance Coverage Adversary Proceeding, the Coverage Claims, or otherwise.

## AGREEMENTS:

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

1.    **Definitions**

The following definitions and the definitions used above apply to this Agreement as well as any exhibits or attachments hereto. Where the listed terms are further defined in the body of this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms. Each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other. The words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation," and

2

the phrase "relating to" means "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with." (The words "include," "includes," and "including," and the phrase "relating to" are not capitalized herein.) This Agreement incorporates all attachments hereto to the same extent as if fully set forth herein. All references to "Sections" are references to sections of this Agreement unless otherwise specified.

### a.    <u>Abuse</u>

The term "**Abuse**" means any (i) actual, alleged, or threatened sexual conduct, misbehavior, misconduct, abuse, or molestation, including "Sexual Abuse" as defined in 42 Pa.C.S. § 5533(b)(2)(ii); (ii) any sexual offense as laid out in Chapter 31 of Title 18 of the Pennsylvania Statutes; (iii) any other sexually related act, contact, or interaction, indecent assault and/or battery, rape, indecent or lascivious behavior, undue familiarity, harassment, pedophilia, or ephebophilia; (iv) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a non-consenting adult and another adult; (v) contacts or interactions of a sexual nature; or (vi) assault, battery, corporal punishment, or any other act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the person.

### b.    <u>Action</u>

The term "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

### c.    <u>Affiliates</u>

The term "**Affiliates**" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

### d.    <u>Agents</u>

The term "**Agents**" means all past and present employees, officers, directors, managing agents or other agents, shareholders, principals, teachers, staff, members, board members, administrators, priests, deacons, brothers, sisters, nuns, other members of a religious order, clergy, Persons bound by monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in each case in their capacities as such.

### e.    <u>Approval Order</u>

The term "**Approval Order**" means an order entered by the Court, upon a hearing following Bankruptcy Notice, containing all of the following provisions but no provision that is contrary to or inconsistent with the following provisions. The wording of the Approval Order shall be mutually acceptable to DOH and Zurich. The Approval Order shall contain provisions:

<div align="center">3</div>

(i)     finding that due and adequate notice of DOH's request for approval of this Agreement has been provided to all creditors and parties in interest in the Bankruptcy Case, including by finding that the Bankruptcy Notice described in Section 1.i. of this Agreement is reasonable and provides due process to all potential known and unknown holders of Claims;

(ii)    approving this Agreement in its entirety, pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy Rules 6004 and 9019;

(iii)   authorizing, subject to the occurrence of the Settlement Payment Date, the sale of the Zurich Policies to Zurich, free and clear of all Interests of all Persons, with all Interests in and to, and Claims against, the Zurich Policies being fully extinguished without reservation as to the Settling Insurers;

(iv)    ordering that, as of the date the Trust receives the Settlement Amount, all Claims against, and Interests in and to, the Zurich Policies be fully extinguished without reservation as to the Zurich Entities and the DOH Entities;

(v)     ordering that, as of the date the Trust receives the Settlement Amount, all Barred Claims and other Interests that any Person, including CMS (as defined herein), might have in, or against, the Zurich Policies, attach to the Settlement Amount;

(vi)    authorizing and directing the Parties to perform their respective obligations under this Agreement; and

(vii)   issuing the Bar Order, subject to, and effective upon, the occurrence of the Settlement Payment Date.

The Approval Order shall be accompanied by the separately entered Settlement Approval Findings and Conclusions.

**f.      Bankruptcy Case**

The term "**Bankruptcy Case**" means the bankruptcy case filed by DOH in the Bankruptcy Court, entitled *In re Roman Catholic Diocese of Harrisburg*, Case Number 20-00599-HWV.

**g.      Bankruptcy Code**

The term "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq*.

**h.      Bankruptcy Court**

The term "**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Pennsylvania or such other court of competent jurisdiction that properly exercises jurisdiction over part or all of the Bankruptcy Case, to the extent that the reference of part or all of the Bankruptcy Case is withdrawn.

### i. Bankruptcy Notice

The term "**Bankruptcy Notice**" means notice as required under Bankruptcy Rules 2002, 6004(a), and (c), and applicable local rules, sent to (i) all holders of Claims against the DOH Entities, including Survivor Claims, or their attorneys, if any, who are known to the DOH Entities; (ii) the Official Committee of Unsecured Creditors; (iii) the Unknown Claims Representative (once appointed by the Court); (iv) all insurers of the DOH Entities that provide coverage for or are alleged to provide coverage for Survivor Claims; (v) the Secretary of the Department of Health and Human Services; (vi) CMS; (vii) the United States Attorney for the Middle District of Pennsylvania; (viii) all Persons who, in the opinion of any Party to this Agreement, might reasonably be expected to be affected by the transactions contemplated herein; and (ix) all other Persons as directed by the Court. Notice shall also be given by publication (a) in the national editions of (i) *USA Today*; (ii) *National Catholic Reporter;* and (iii) *The National Catholic Register;* and (b) locally in (i) *The Catholic Witness*; (ii) *Gettysburg Times;* (iii) *Press Enterprise*; (iv) *The Sentinel*; (v) *Patriot-News*; (vi) *Public Opinion*; (vii) *LNP-Lancaster Online*; (viii) *Lebanon Daily News*; (ix) *The Sentinel*; (x) *The Daily Item*; (xi) *Perry County Times*; and (xiv) *York Daily Record*, or as the Court may otherwise direct.

### j. Bankruptcy Rules

The term "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

### k. Bar Order

The term "**Bar Order**" means an order, which shall automatically become effective on the Settlement Payment Date, barring, estopping, and permanently enjoining all Persons from asserting any Barred Claims against the Zurich Released Parties.

### l. Business Day

The term "**Business Day**" means any day that is not a Saturday, Sunday, or "legal holiday," in the United States or the Commonwealth of Pennsylvania.

### m. Channeling Injunction

The term "**Channeling Injunction**" means an order of the Court, effective as of the date the Trust receives the Settlement Amount, requiring all Channeled Claimants to assert their Channeled Claims against the Trust which states, *verbatim*:

**Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.**

**In consideration of the undertakings of the Protected Parties and the Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor, and to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as**

5

provided in sections 524 and 1141 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:

a. any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims;

b. any and all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:

(i). commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;

(ii). enforcing, attaching, collecting or recovering, or seeking to accomplish any of the preceding, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers;

(iii). creating, perfecting, or enforcing, or seeking to accomplish any of the preceding, any lien of any kind relating to any Channeled Claim against any of the Protected Parties or Settling Insurers, or the property of the Protected Parties or Settling Insurers;

(iv). asserting, implementing, or effectuating, any Channeled Claim of any kind against: (A) any obligation due any of the Protected Parties or Settling Insurers; (B) any of the Protected Parties or Settling Insurers; or (C) the property of any of the Protected Parties or Settling Insurers;

(v). taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; or

(vi). asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of the Protected Parties or Settling Insurers.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims provided in this section shall inure to the benefit of the Protected Parties and Settling Insurers. The Channeling Injunction will become

6

**effective with respect to each applicable Settling Insurer as of the date that the Trust receives the Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. In a successful Action to enforce the injunctive provisions of this Section 12.3 in response to a willful violation thereof, the moving party shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, from the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.**

     **n.**      <u>**Claim**</u>

The term "Claim" (a) has the meaning ascribed in § 101(5) of the Bankruptcy Code; and also means any past, present or (to the extent it arises prior to the Effective Date) future (b) claim, Action, Cause of Action, suit, debt, dues, sum of money, account, reckonings, bond, bill, specialty, assertion of right, complaint, cross-complaint, counterclaim, liability, obligation, right, request, allegation, mediation, litigation, direct action, administrative proceeding, lien, encumbrance, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured or unmatured, liquidated or unliquidated, direct, indirect, derivative or otherwise consequential, whether in law, equity, admiralty or otherwise, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise. A Person who alleges or alleged a Claim is a **"Claimant"**. The term "Claim" includes all of the following:

     **(i)**      **Barred Claims**

The term "**Barred Claims**" means all Claims enjoined by the Bar Order, which shall include all Direct Action, Indirect, Medicare, Released, and Survivor Claims.

     **(ii)**      **Channeled Claims**

The term "**Channeled Claims**" means any of the following Claims which shall be channeled to the Trust and have been or may be asserted against any of the DOH Entities or the Settling Insurers to the extent that such Claim, directly or indirectly, relates to the same injury, damages, facts or circumstances giving rise to a Survivor Claim, including each and every: (a) Survivor Claim; (b) Indirect Claim; (c) Direct Action Claim; (d) Contribution Claim; (e) Medicare Claims; and (f) Extra-Contractual Claims relating to

<div align="center">7</div>

the Claims listed in subsection (a)–(e) of this sentence; *provided, however,* that "**Channeled Claims**" shall not include: (i) a Claim against an individual who perpetrated an act of Abuse; or (ii) a Claim against any religious order, diocese (other than the Reorganized Debtor), or archdiocese.

### (iii) Contribution Claims

The term "**Contribution Claims**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money where such Insurer contends that it has paid more than its equitable or proportionate share of a Survivor Claim against a DOH Entity to the extent that such Claim, directly or indirectly, relates to the same injury, damages, facts or circumstances giving rise to a Survivor Claim (including an Unknown Survivor Claim); *provided, however,* "**Contribution Claims**" do not include any Claim for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, or reimbursement, or any other indirect or derivative recovery, that a Settling Insurer might have arising from the payment of any amounts under this Agreement.

### (iv) Coverage Claims

The term "**Coverage Claims**" means all Claims against any Zurich Entity under or relating to the Zurich Policies or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

### (v) Direct Action Claims

The term "**Direct Action Claims**" means the same as Survivor Claims, except that they are asserted against any Zurich Entity, instead of any DOH Entity or the Trust, for the recovery of insurance proceeds.

### (vi) Enjoined Claims

The term "**Enjoined Claims**" means all Claims enjoined by the Supplemental Settling Insurer Injunction, which shall include all Direct Action, Indirect, Released, Survivor, Contribution, Extra-Contractual, and Medicare Claims.

### (vii) Extra-Contractual Claims

The term "**Extra-Contractual Claims**" means all Claims against any of the Zurich Released Parties, in their capacity as Insurers, seeking any type of relief other than coverage or benefits under the Zurich Policies. "**Extra-Contractual Claims**" include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs, or any other type of relief, alleging, with respect to (i) any of the Zurich Policies; (ii) any Claim allegedly or actually covered under the Zurich Policies; or (iii) the conduct of the Zurich Released Parties with respect to (i) or (ii) any of the following: (a) bad faith; (b) failure to provide insurance coverage under any Zurich Policy; (c) failure or refusal to compromise and settle any Claim insured under any Zurich Policy; (d) failure to act in good faith;

8

30153178v.1

(e) violation of any covenant or duty of good faith and fair dealing; (f) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (g) violation of any unfair claims practices act or similar statute, regulation or code; (h) any type of misconduct; or (i) any other act or omission of any type for which the Claimant seeks relief other than coverage or benefits under a Zurich Policy. The term "**Extra-Contractual Claims**" includes all Claims relating to Zurich's (i) handling of any Coverage Claim under the Zurich Policies; (ii) conduct relating to the negotiation of this Agreement and the Plan; or (iii) conduct relating to the settlement of any Coverage Claim.

**(viii)  Indirect Claims**

The term "**Indirect Claims**" means Claims against a DOH Entity or a Settling Insurer, asserted by any Person that is not an Insurer (an "**Indirect Claim Claimant**"), for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any DOH Entity's actual or alleged liability, for any Claim against such Indirect Claim Claimant that relates to Abuse that took place in whole or in part prior to the Effective Date.

**(ix)  Medicare Claims**

The term "**Medicare Claims**" means any and all Claims against the Trust, any Settling Insurer, or any DOH Entity, brought or asserted by CMS, and/or any other agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA and pursuing Claims under MSP, relating to any payments in respect of any Survivor Claims, including Claims for reimbursement of payments made to Survivor Claimants who recover or receive any distribution from the Trust, and Claims relating to reporting obligations.

**(x)  Released Claims**

The term "**Released Claims**" means all Claims released by the DOH Entities pursuant to this Agreement.

**(xi)  Survivor Claims**

(A) The term "**Survivor Claims**" means all Claims, allowed or disallowed, for which any of the DOH Entities is or may be liable, relating to, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Effective Date. For the avoidance of doubt, the term "**Survivor Claims**" includes any Known Survivor Claim, Unknown Survivor Claim and Late-Filed Survivor Claim, regardless of whether such Survivor Claim is barred by any applicable statute of limitations as of the Filing Date or Effective Date, but does not include Contribution Claims, Indirect Claims, or Medicare Claims.

(B) The term "**Unknown Survivor Claim**" means any Survivor Claim relating to, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Effective Date, but neither filed nor deemed filed, in the Bankruptcy Case, nor

9

otherwise allowed by the Court by the Effective Date, and is held by an individual who was at the time of the Filing Date under a disability or other condition recognized by Pennsylvania law, or other applicable law suspending the running of the statute of limitation period, that would toll the statute of limitations on such Survivor Claim.

### o.    Claims Filing Deadline

The term "**Claims Filing Deadline**" means November 13, 2020, at 11:59 P.M. (prevailing Eastern Time).

### p.    CMS

The term "**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any other Agent or successor Person responsible for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

### q.    Committee

The term "**Committee**" means the Official Committee of Tort Claimants appointed in the Bankruptcy Case, as such committee may be constituted from time to time.

### r.    Confirmation Findings and Conclusions

The term "**Confirmation Findings and Conclusions**" means the findings of fact and conclusions of law required under §§ 1129(a), and, if applicable, 105(a) and 1129(b), of the Bankruptcy Code, which are to be contained within and entered as a part of the Confirmation Order, as necessary to confirm the Plan, including the following:

(i)    This Agreement is the fruit of long-term negotiations amongst the Parties, which began in July 2020, following the Bankruptcy Court's entry of the Mediation Order;

(ii)    The Settlement Amount provides good and valuable consideration to DOH's bankruptcy estate, and enables distributions to the Channeled Claimants;

(iii)    Potential liability for the Survivor Claims precipitated the filing of the Bankruptcy Case;

(iv)    This Agreement is therefore necessary to the Plan because it provides significant funding for the Plan;

(v)    The Zurich Policies are property of DOH's bankruptcy estate and are therefore subject to the *in rem* jurisdiction of the Court;

(vi)    The Channeled Claims are within the jurisdiction of the Court because they seek property of DOH's bankruptcy estate;

10

(vii)   Because it would be impractical to divide the Zurich Policies amongst DOH and the other DOH Entities, it was necessary for DOH to obtain the participation of the other DOH Entities in this Agreement;

(viii)   The DOH Entities, other than DOH, would not release their Interests in the Zurich Policies unless they obtained the benefits of the Channeling Injunction, because to do so would have left them exposed to Survivor Claims, whether or not such Claims be valid, and whether or not coverage exists under the Zurich Policies for such Claims;

(ix)   Therefore, the Channeling Injunction is necessary to this Agreement;

(x)   The Channeling Injunction is narrowly tailored because it only requires Channeled Claims to be brought against the Trust;

(xi)   The Settlement Amount is reasonable and fair consideration for the injunction of the Enjoined Claims, and for Zurich's alleged liability for Survivor Claims;

(xii)   The Settlement Amounts set forth in the Insurance Settlement Agreements provide good and valuable consideration to the Estate and its creditors that significantly increase funding under the Plan, enable enhanced distributions to Survivor Claimants that would not otherwise be available, and support the feasibility of the Plan. Such Settlement Amounts are fair consideration for the Supplemental Settling Insurer Injunction, the Channeling Injunction and the Bar Order and, therefore, are both fair to creditors and appropriate under 11 USC § 105(a);

(xiii)   The Coverage Claims are within the jurisdiction of the Bankruptcy Court because such Claims could enhance the estate;

(xiv)   Zurich required that DOH obtain the benefits of the Supplemental Settling Insurer Injunction, as a condition of entering into this Agreement and contributing the Settlement Amount;

(xv)   Therefore, the Supplemental Settling Insurer Injunction is necessary to this Agreement and the Plan; and

(xvi)   The Supplemental Settling Insurer Injunction is narrowly tailored because it only enjoins the Enjoined Claims against the Settling Insurers;

s.   **Confirmation Order**

The term "**Confirmation Order**" means an order entered by the Bankruptcy Court after a confirmation hearing upon Bankruptcy Notice confirming the Plan, in a form and substance as required by this Agreement, which order is a Final Order. The wording of the Confirmation Order shall be mutually acceptable to DOH and Zurich. The Confirmation Order shall contain all of the following provisions but no provision that is contrary to or inconsistent with this Agreement:

(i)   confirming the Plan;

30153178v.1

(ii)    specifically, and individually, ordering all Persons, as set forth in the Plan, to act or refrain from acting as specified in the Plan;

(iii)    incorporating, as of the date the Trust receives the Settlement Amount, the terms and provisions of the Bar Order as though fully set forth therein;

(iv)    ordering the Trustee to perform the obligations, if any, imposed upon the Trustee by this Agreement;

(v)    issuing the Channeling Injunction and the Settling Insurer Supplemental Injunction;

(vi)    discharging DOH from all Claims, including all Channeled Claims; and

(vii)    ordering all Channeled Claimants with pending state court Actions against any DOH Entity to dismiss such Actions and assert them against the Trust for resolution pursuant to the Trust Agreement.

The Confirmation Order shall also contain the  Confirmation Findings and Conclusions.

### t.    **Court**

The term "**Court**" means the Bankruptcy Court, or the District Court, as applicable.

### u.    **District Court**

The term "**District Court**" means the United States District Court for the Middle District of Pennsylvania.

### v.    **DOH**

The term "**DOH**" means The Diocese of Harrisburg, which is the diocesan corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5301, together with the public juridic person of the Roman Catholic Diocese of Harrisburg, as now constituted or as it may have been constituted.  The term "DOH" also applies anywhere the term "Reorganized Debtor" is used, and "Reorganized Debtor" applies anywhere the term "DOH" is used, as is necessary to effectuate the terms of the Agreement.  Furthermore, in the event of any Action naming any Affiliate or Agent of DOH, such Action shall be considered an Action against DOH, the insurance coverage for which is released pursuant to Section 4 hereof.

### w.    **DOH Entities**

The term "**DOH Entities**" means, in their capacity as such, DOH and its Entities.

The **"DOH Entities"** include each of the Persons set forth on Attachment B to this Agreement.  An individual who perpetrated an act of Abuse that forms the basis for a Survivor Claim is not a DOH Entity with respect to that Survivor Claim.

For the avoidance of doubt, notwithstanding any other provision of this Agreement, the DOH Entities include the DOH Parishes.

12

### x.     DOH Entity Insurer Policy

The term "**DOH Entity Insurer Policy**" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Plan Effective Date, which actually, allegedly, or potentially, insures any DOH Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Survivor Claim.

### y.     DOH Parishes

The term "**DOH Parishes**" means all past and present parishes of or in DOH, in their capacity as public juridic persons, together with each corresponding parish corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5511.

### z.     Effective Date

The term "**Effective Date**" means the day following the date on which all of the following have occurred: (i) all Parties have executed this Agreement; (ii) the Court has issued the Approval Order and the Settlement Approval Findings and Conclusions, and the Approval Order has become a Final Order; and (iv) the Court has issued the Confirmation Order and the Confirmation Findings and Conclusions, and the Confirmation Order has become a Final Order

### aa.     Entities

The term **"Entities"** means with respect to a specified Person: (i) its Affiliates; (ii) each of the foregoing Person's Agents; and (iii) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, administrators, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

### bb.     Entities' Release

The term "**Entities' Release**" means the following:  The remising, release, covenant not to sue, and permanent discharge by the DOH Entities and any subsequently appointed trustee or representative acting for any DOH Entity, without further act by any Person, from and against all Released Claims that any DOH Entity ever had, now has, or hereafter may have, from the beginning of time to the Effective Date, of: (1) the Zurich Released Parties; and (2) the respective heirs, executors, administrators, and reinsurers (as such) of any of the Persons identified in clause (1) hereof, in their capacities as such.

### cc.     Filing Date

The term "**Filing Date**" means February 19, 2020.

### dd.     Final Order

The term "**Final Order**" means an order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial,

<div align="center">13</div>

reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order. For the avoidance of doubt, if the Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("**Substantial Consummation**"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order.

### ee. Insurance Coverage Adversary Proceeding

The term "**Insurance Coverage Adversary Proceeding**" means the case entitled *The Roman Catholic Diocese of Harrisburg v. The Travelers Companies, et al.*, filed in the Bankruptcy Court, as Adversary Proceeding Number 20-00018.

### ff. Insurer

The term "Insurer" means a Person (including all of its predecessors in interest, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, a DOH Entity Insurer Policy, whether or not a regulated insurance company.

### gg. Interests

The term "**Interests**" means all Claims, including any "interests" as that term is used in section 363 of the Bankruptcy Code, and other rights of any nature, whether at law or in equity, including all interests or other rights under Pennsylvania or other applicable law.

### hh. Mediation

The term "**Mediation**" means the mediation by the Mediation Parties, as ordered by the Bankruptcy Court.

### ii. Mediation Parties

The term "**Mediation Parties**" means, collectively: (a) DOH; (b) each insurer named as a Defendant in the Insurance Coverage Adversary Proceeding; (c) the Committee; (d) state court counsel for Survivor Claimants; and (e) the *ad hoc* committee of parishes and other parties-in-interest, including schools or other non-debtor Catholic entities located within the territorial area decreed by the Roman Catholic Church as the "Diocese of Harrisburg", to the extent permitted or required by the Mediator.

30153178v.1

### jj.     **Mediation Order**

The term "**Mediation Order**" means the Agreed Order Referring Adversary Proceeding to Mediation, entered by the Bankruptcy Court in the Insurance Coverage Adversary Proceeding, on July 10, 2020, Doc. No. 84.

### kk.     **Mediation Request**

The term "**Mediation Request**" means the Request for Mediation filed by the DOH in the Insurance Coverage Adversary Proceeding.

### ll.     **Mediator**

The term "**Mediator**" means the Honorable Gregg W. Zive, United States Bankruptcy Judge.

### mm.     **Medicare**

The term "**Medicare**" means Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, enacted July 1, 1966, including all subsequent amendments thereto.

### nn.     **Medicare Beneficiary**

The term "**Medicare Beneficiary**" means any individual who has received or is eligible to receive benefits under Medicare and is the holder of a Channeled Claim.

### oo.     **Medicare Secondary Payor Act**

The term "**Medicare Secondary Payor Act**" or "**MSP**" means 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules, regulations or guidance issued in connection therewith or amendments thereto.

### pp.     **MMSEA**

The term "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSP.

### qq.     **Person**

The term "**Person**" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof; and any other individual or entity within the definitions of (i) "person" in

Section 101(41) of the Bankruptcy Code or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

**rr.** **Petition Date**

The term "**Petition Date**" means February 19, 2020.

**ss.** **Plan**

The term "**Plan**" means a plan of reorganization proposed by DOH, after good-faith consultation with the Zurich Entities, which (a) contains all of the following provisions, but no provision that is contrary to or inconsistent with this Agreement; (b) allows all of the acts and transactions under, and envisioned by, this Agreement to occur with binding legal effect; (c) does not materially and adversely affect the rights, duties, or interests of the DOH Entities or the Zurich Entities under this Agreement; (d) includes all papers, exhibits, attachments, appendices, or other documents filed with or in support of the Plan and necessary for its implementation, and any documents relating to the establishment and operation of the Trust; and (e) shall include the following provisions:

(i)     specifying the terms of this Agreement shall control in the event of any conflict with the Plan or the Confirmation Order;

(ii)     prohibiting DOH from continuing to pursue the Insurance Coverage Adversary Proceeding against Zurich, requiring DOH to dismiss all Claims against Zurich, in the Insurance Coverage Adversary Proceeding, with prejudice, within fourteen (14) days after the Plan Effective Date, and prohibiting any DOH Entity from asserting any Coverage Claims against the Zurich Released Parties;

(iii)     specifying that, as of the date the Trust receives the Settlement Amount, the Channeling Injunction and the Supplemental Settling Insurer Injunction shall be effective;

(iv)     establishing the Trust, appointing the Trustee, and binding both of them to perform those requirements imposed upon them by this Agreement;

(v)     describing the role of the Unknown Claims Representative and seeking the continued appointment of the Unknown Claims Representative to continue in his duties;

(vi)     specifying that, as of the date the Trust receives the Settlement Amount, the Channeled Claims shall be channeled to the Trust;

(vii)     denominating, as of the date the Trust receives the Settlement Amount, each of the Zurich Entities as Settling Insurers;

(viii)     requiring, as of the date the Trust receives the Settlement Amount, each Channeled Claimant receiving a payment from the Trust to sign a release of all Claims against the Zurich Entities, the Zurich Released Parties and the DOH Entities;

(ix)     and providing, *verbatim*:

16

(A)     It is the position of DOH that none of DOH Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("**HHS**") that none of the Trust, DOH Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the DOH Entities or Settling Insurers or payments by the Trust to Claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or written confirmation from HHS that none of the DOH Entities or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the DOH Entities and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the DOH Entities and Settling Insurers, and shall timely submit all reports that would be required to be made by any DOH Entity or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by a DOH Entity or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or any DOH Entity or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the DOH Entities and Settling Insurers, shall follow all applicable guidance published by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(B)     If the Trust is required to act as a reporting agent for any DOH Entity or Settling Insurer pursuant to Section 1.ss.(ix)(A), the Trust shall provide a written certification to each DOH Entity and Settling Insurer within twenty-one (21) days following the end of each calendar quarter, confirming that all reports to CMS required by Section 1.ss.(ix)(A). have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

(C)     With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however,* that the Trust may redact from such copies the Redacted Information. With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by any DOH Entity or Settling Insurer, provide each DOH Entity and

17

Settling Insurer copies of such resubmissions; *provided, however,* that the Trust may redact the Redacted Information. If the Trust is unable to remedy its noncompliance, the provisions of Section 1.ss.(ix)(G) shall apply.

(D)     If the Trust is required to act as a reporting agent for a DOH Entity or Settling Insurer pursuant to the provisions of Section 1.ss.(ix)(A), with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information in the possession or control of the Trust that may be necessary in the reasonable judgment of any DOH Entity or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment.  In the event any DOH Entity or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS.  All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

(E)     If the Trust is required to act as a reporting agent for any DOH Entity, or Settling Insurer pursuant to the provisions of Section 1.ss.(ix)(A), the Trust shall make the reports and provide the certifications required by Sections 1.ss.(ix)(A) and (B) until such time as such DOH Entity or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust.  Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 1.ss.(ix)(A), and if any DOH Entity or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 1.ss.(ix)(A) and (B).

(F)     Section 1.ss.(ix)(A) is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the DOH Entities and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any acts undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(G)     If CMS concludes that reporting done by the Trust in accordance with Section 1.ss.(ix)(A) is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any DOH Entity or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any DOH Entity or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to

18

Section 1.ss.(ix)(B), (C) or (D), or other credible information, then each DOH Entity and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information in its possession or control as the electing party may reasonably require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 1.ss.(ix)(A), without any redactions. The DOH Entities and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 1.ss.(ix) confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

(H)     Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 1.ss.(ix) until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under this Section 1.ss.(ix) to such Person for any penalty, interest, or sanction with respect to a Claim that may arise on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each DOH Entity and Settling Insurer for any failure to report payments to Medicare eligible Survivor Claimants on behalf of Persons who have timely supplied Medicare Reporting Numbers, if any exists.

(I)     Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trustee shall obtain in respect of any Channeled Claim a certification from the Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. If the Trust receives no such certification, the Trust may withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Survivor Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 1.ss.(ix) to each DOH Entity and Settling Insurer, and permit reasonable audits by such Persons, no more often than annually, to confirm the Trust's compliance with this Section 1.ss.(ix). For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 1.ss.(ix) regardless of whether any DOH Entity or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 1.ss.(ix)(G).

(J)     Compliance with the provisions of this Section 1.ss.(ix) shall be a material obligation of the Trust under the Plan, in favor of the DOH Entities and Settling Insurers under the Plan.

(K)     The Trust shall defend, indemnify, and hold harmless the DOH Entities and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or

19

potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under Section 1.ss.(ix).

(x)     The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing. The Trustee shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

### tt.     Plan Effective Date

The term "**Plan Effective Date**" means the effective date of the Plan, as noticed on the Bankruptcy Case docket.

### uu.     Redacted Information

The term "**Redacted Information**" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Survivor Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

### vv.     Reorganized Debtor

The term "**Reorganized Debtor**" means DOH, on and after the Plan Effective Date.

### ww.     Settlement Amount.

The term "**Settlement Amount**" means the sum of Two Million Four Hundred Fifty Thousand Dollars ($2,450,000.00), which Zurich shall pay pursuant to the terms of Section 2 hereof.

### xx.     Settlement Approval Findings and Conclusions

The term "**Settlement Approval Findings and Conclusions**" means findings of fact and conclusions of law pursuant to 11 U.S.C. §§ 363(b), (f), and (m) and Bankruptcy Rule 9019, entered concurrently with, the Approval Order, as necessary for the Court to approve this Agreement, including the following:

(i)     DOH demonstrated sound business reasons for the settlement of its Claims against Zurich in the Insurance Coverage Adversary Proceeding and the implementation of such settlement through the sale of the Zurich Policies to Zurich;

(ii)     The Parties mediated their disputes over the Survivor Claims and the Coverage Claims pursuant to the Mediation Order, beginning in July 2020;

20

(iii)    In the Mediation, the Parties negotiated extensively, at arms-length, and in good faith. Zurich is a purchaser in good faith of the Zurich Policies, within the meaning of Bankruptcy Code § 363(m), and is entitled to all of the protections of that statute;

(iv)    Zurich is a *bona fide* good faith purchaser of the Zurich Policies, for value;

(v)    The terms of the transactions contemplated by this Agreement, as well as the genesis and background of this Agreement, have been adequately disclosed to the Court;

(vi)    The terms and conditions of this Agreement (including the consideration to be realized by DOH's bankruptcy estate) are fair and reasonable;

(vii)    The transactions contemplated by this Agreement are in the best interests of the DOH's bankruptcy estate, its creditors and other stakeholders;

(viii)    The only potential holders of Interests in or against the Zurich Policies are the DOH Entities and Persons who hold Claims against the DOH Entities, whose Claims might be covered by the Zurich Policies;

(ix)    The DOH Entities are parties to this Agreement, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

(x)    The Barred Claims are subject to *bona fide* dispute, hence the Zurich Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

(xi)    All holders of Claims against the Zurich Policies could be compelled, in a legal or equitable Action, to accept a money satisfaction of such Claims, therefore the Zurich Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

(xii)    The compromises and settlements embodied in the Agreement have been negotiated in good faith, and are reasonable, fair, and equitable;

(xiii)    In light of:

      (A)    the probability of success in litigation;

      (B)    the likely difficulties in collection;

      (C)    the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

      (D)    the paramount interest of the creditors;

this Agreement is fair and equitable and within the range of reasonable settlement terms;

(xiv)    The Settlement Amount is fair, adequate, and reasonable consideration for (a) the sale by the DOH Entities and the buy-back by Zurich of the Zurich Policies; (b) the Release of the Zurich Released Parties; and (c) the Supplemental Settling Insurer Injunction;

30153178v.1

(xv)   This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission as to the existence or terms of any disputed policies, an admission of coverage under the Zurich Policies, an admission concerning the amount of a reasonable settlement of any claim, an admission concerning the liability or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages, nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the positions with respect to the interpretation and application of the Zurich Policies.  This Agreement does not, and is not intended to, set forth  the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to the positions taken by Zurich with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers;

(xvi)   DOH provided due and adequate notice of the (a) sale of the Zurich Policies; (b) terms and conditions of this Agreement; and (c) the hearing before the Court to approve this Agreement and the sale of the Zurich Policies, in accordance with Bankruptcy Rules 2002 and 6004 to all known and unknown Claimants, including by providing notice by publication to any Unknown Survivor Claimants;

(xvii)   It would be impractical to divide the Zurich Policies amongst the DOH Entities and the Survivor Claimants, therefore, to realize the value of the Zurich Policies for DOH's bankruptcy estate and the Survivor Claimants requires the sale of the Zurich Policies;

(xviii) The sale of the Zurich Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b);

(xix)   The sale of the Zurich Policies free and clear of the Interests of all Persons satisfies the requirements of Bankruptcy Code § 363(f);

(xx)   Zurich is repurchasing the Zurich Policies, pursuant to this Agreement.  Zurich is not purchasing any other assets of the DOH Entities and is not a continuation of the DOH Entities, nor engaging in a continuation of the DOH Entities' businesses.  Zurich shall not have any responsibility or liability with respect to any of the DOH Entities' other assets; and

(xxi)   Zurich is not, and shall not be deemed to be, a successor to the DOH Entities, or any of them, by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in this Agreement, the Plan, or otherwise.  Zurich shall not assume, or be deemed to have assumed, any liabilities or other obligations of the DOH Entities.

(xxii)  To the extent any Claimant may have any legal or equitable right to assert a Claim either directly against the Zurich Policies, which policies are being acquired by Zurich pursuant to this Agreement, or indirectly by asserting such Claim against any DOH Entity, such Claims are deemed to be (a) "interests" as that term is used in Bankruptcy Code § 363(f); and (b) "Interests" herein; and

(xxiii) The Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

30153178v.1

**yy.**     **Settlement Payment Date**

The term "**Settlement Payment Date**" means the day that is the later of (a) the Plan Effective Date; and (b) sixty (60) days after the Confirmation Order becomes a Final Order, *provided, however,* that if such date is not a Business Day, the Settlement Payment Date shall be the next Business Day.

**zz.**     **Supplemental Settling Insurer Injunction**

The term "**Supplemental Settling Insurer Injunction**" means an order of the Bankruptcy Court, effective as of the date the Trust receives the Settlement Amount, which states, *verbatim*:

**Supplemental Settling Insurer Injunction.**

**Pursuant to sections 105(a) and 363 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including certain Settling Insurers' purchase of the applicable Settling Insurer Policies free and clear of all Claims and Interests pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Claims or Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Survivor Claimants, perpetrators and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, including (i) Claims relating to the Settling Insurer Policies, including Survivor Claims, Direct Action Claims, Indirect Claims, and Released Claims, (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims, and (iii) Extra-Contractual Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against the Settling Insurers or Settling Insurer Policies, including:**

**a. commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise, against the Settling Insurers or the property of the Settling Insurers;**

**b. enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;**

**c. creating, perfecting, or enforcing, or seeking to do any of the preceding, any lien of any kind against the Settling Insurers or the property of the Settling Insurers;**

**d. asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Settling Insurers or the property of the Settling Insurers;**

23

e. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; and

f. Any and all Persons holding Interests or Claims of any kind arising under or related to the Settling Insurer Policies shall be permanently enjoined from pursuing such Interests or Claims against the Settling Insurers.

**The Supplemental Settling Insurer Injunction will be effective with respect to a Settling Insurer only as of the date that the Trust receives the Insurance Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. The Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Settling Insurer Policies, but against no other person or thing; provided, however, nothing in this Supplemental Settling Insurer Injunction shall limit, or be deemed or otherwise interpreted to limit, the scope of the discharge or Channeling Injunction in favor of the Protected Parties. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.**

aaa.  __Settling Insurers__

The term "**Settling Insurers**" means, collectively, the Zurich Entities, the Zurich Released Parties, and all other insurers of the DOH Entities, which, after the Petition Date, settle Claims for insurance coverage brought against them by any DOH Entity, and which obtain the protection of the Supplemental Settling Insurer Injunction.

bbb.  __Termination Event__

The term "**Termination Event**" means

(i)      the Court has not entered the Approval Order by March 31, 2023;

(ii)     the Court has not entered the Confirmation Order by March 31, 2023;

(iii)    the Court has not entered the Bar Order by March 31, 2023;

(iv)     the Approval Order, the Confirmation Order or the Bar Order fails to become a Final Order by May 1, 2023;

(v)      the Court denies approval of this Agreement;

(vi)     the Court enters an order or grants such other relief that is inconsistent with this Agreement;

(vii)    the DOH files any plan of reorganization other than the Plan;

30153178v.1

(viii) the appointment of a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers in the Bankruptcy Case; or

(ix) the Plan is amended in any manner that is inconsistent with the terms of this Agreement; *provided, however*, the deadlines set forth in (i) through (iv) of the foregoing may be extended by mutual written consent of the Parties.

**ccc.** **Trust**

The term "**Trust**" means the trust to be established under the Plan, which will assume liability for, and be established, pursuant to the Plan and, if applicable, Bankruptcy Code § 105, to make distributions pursuant to the Plan, the Trust Agreement, and the Trust Distribution Plan, including payments to Survivor Claimants.

**ddd.** **Trust Agreement**

The term "**Trust Agreement**" means, collectively, any agreement establishing the Trust and the requirements for its administration.

**eee.** **Trust Distribution Plan**

The term "**Trust Distribution Plan**" means the Trust Distribution Plan established under the Trust Agreement and which governs the payment of Trust Distributions.

**fff.** **Trustee**

The term "**Trustee**" means the Person appointed as Trustee to administer the Trust, in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

**ggg.** **Unknown Claims Representative**

The term "**Unknown Claims Representative**" means the Hon. Michael R. Hogan, the legal representative for holders of Unknown Survivor Claims, or any successor appointed by the Bankruptcy Court.

**hhh.** **Zurich**

The term "**Zurich**" means Zurich American Insurance Company, successor by merger to Maryland Casualty Company.

**iii.** **Zurich Bill of Sale**

The term "**Zurich Bill of Sale**" means a fully executed bill of sale evidencing the sale, assignment, and transfer of the Zurich Policies to Zurich free and clear of all Interests of all Persons, including the Survivor Claimants and the DOH Entities.

30153178v.1

### jjj.     Zurich Entities

The term "**Zurich Entities**" means Zurich and its Entities.

### kkk.     Zurich Released Parties

The term "**Zurich Released Parties**" means:

(i)     Zurich;

(ii)     The Zurich Entities, with respect to the subject matter of this Agreement;

(iii)     Any Person from time to time retained by or on behalf of Zurich to act as their claims handling agent and/or service provider, solely in such capacity;

(iv)     The past, present and future reinsurers, retrocessionaires and reinsurance intermediaries of Zurich, solely in such capacity; and

(v)     All past, present and future Affiliates and Agents of the Persons set forth in Sections 1.jjj.(i) to (iv) (inclusive), if any, solely in such capacity; and

(vi)     The respective heirs, executors, successors and assigns (including any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise), or equivalent appointee/s under relevant insolvency law), of any of the Persons identified in Sections 1.kkk.(i) through (v) (inclusive) above, solely in such capacity.

### lll.     Zurich Policies

The term "**Zurich Policies**" means (i) all alleged insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies to the extent issued by any Zurich Entity and providing insurance to any DOH Entity, *provided*, *however*, if a Zurich Policy that is not listed in Attachment A was not issued to a DOH Entity (or such Person's Affiliates) but provides coverage to a DOH Entity, then it is a Zurich Policy only to the extent it insures or allegedly insures a DOH Entity.

## 2.     Payment of the Settlement Amount

a.     This Agreement is effective on the Effective Date. The occurrence of the Settlement Payment Date is a condition precedent to Zurich's obligation to pay the Settlement Amount.

b.     On the Settlement Payment Date, in full and final settlement of all obligations under and relating to the Zurich Policies, and in consideration of the sale of the Zurich Policies to Zurich, free and clear of all Interests of any Person, and the releases provided herein, Zurich shall pay the Settlement Amount in accordance with the payment instructions to be provided by the Trust (which instructions shall be dated, be on the recipient's letterhead, and include direct contact information for a representative of the recipient who can confirm the instructions verbally via telephone), no less than twenty-one (21) days prior to the Settlement Payment Date.

26

c.      Upon the Trust's receipt of the Settlement Amount from Zurich, the sale, assignment, and transfer of the Zurich Policies to Zurich shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Zurich Policies.

d.      If, before the occurrence of the Settlement Payment Date, a DOH Entity other than DOH becomes a debtor in a bankruptcy case or insolvency Action, under the Bankruptcy Code or otherwise, and Zurich has not satisfied its payment obligation arising hereunder, then Zurich shall be excused from performance under this Agreement until such time as either (i) such DOH Entity obtains, subject to the limitations imposed by the Bankruptcy Code, and subject to the equitable powers of the court in which such Action is pending, an order from such court approving this Agreement under Bankruptcy Code § 363(b), (f), and (m), and Bankruptcy Rule 9019, authorizing the assumption by such DOH Entity (or any successor thereto) of this Agreement under Bankruptcy Code § 365 ("**Assumption**"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof; (ii) DOH obtains an order in the Action compelling the Assumption; or (iii) DOH obtains an order from the Court determining the equitable portion of the Settlement Amount allocable to any interest the DOH Entity subject to such bankruptcy case or insolvency Action may have in the Zurich Policies. Each DOH Entity agrees that in the event it files a bankruptcy or other insolvency Action, it will not present any Claim for payment under this Agreement or the Zurich Policies to Zurich until the Assumption has been approved by an order of the applicable court and such order has become a Final Order or until its equitable share in the Settlement Amount has been established by order of the Court pursuant to clause (iii) above, and such order has become a Final Order. Zurich agrees to cooperate fully and provide commercially reasonable assistance to DOH and any DOH Entity in obtaining any of the orders contemplated in this Section 2(d).

## 3.      Several Liability

The obligations of Zurich and of other Settling Insurers are several and not joint. The DOH Entities agree that Zurich shall not be liable for any settlement amount allocable to any other Person. Accordingly, Zurich agrees to pay only the Settlement Amount. No DOH Entity shall seek to recover from Zurich any amount in excess of the Settlement Amount. Upon the Trust's receipt of the Settlement Amount from Zurich, each DOH Entity shall be deemed to have released each of the Zurich Released Parties pursuant to Section 4 of this Agreement without further action by any Person.

## 4.      Mutual Releases

### a.      By DOH Entities

(i)      Upon the Trust's receipt of the Settlement Amount from Zurich, the Entities' Release in favor of the Zurich Released Parties shall become immediately effective for Zurich without further act by any Person.

(ii)     **DOH's Sale of Policies and Interests Pursuant to Section 363 of the Bankruptcy Code.** From and after the first day on which the Bankruptcy Orders are Non-Appealable Orders, the  Zurich hereby buys back the Zurich Policies that were issued or allegedly

27

issued to the DOH Entities and the DOH Entities' Interests in the other Zurich Policies, free and clear of all Interests of all Persons, including all Interests of the DOH Entities or any other Person claiming coverage by, through, or on behalf of any of the Diocese Entities, any insurer and any Survivor Claimant. This sale is pursuant to sections 363(b), (f), and (m) of the Bankruptcy Code. The Parties acknowledge and agree, and the Approval Order shall find and conclude, that: (a) Zurich is a good faith purchaser of the Zurich Policies and Interests within the meaning of section 363(m) of the Bankruptcy Code; (b) the consideration exchanged constitutes a fair and reasonable settlement of the Parties' disputes and of their respective rights and obligations relating to the foregoing Zurich Policies and Interests and constitutes reasonably equivalent value; (c) the releases in this Agreement and the policy buyback comply with the Bankruptcy Code and applicable non-bankruptcy laws; (d) upon the Bankruptcy Orders becoming Non-Appealable Orders, the foregoing Zurich Policies and Interests shall be terminated and of no further force and effect; (e) Zurich's payment of the Settlement Amounts in accordance with the Joint Plan as amended as required by this Agreement to Zurich's satisfaction constitutes Zurich's full and complete performance of any and all obligations under the foregoing Zurich Policies and with respect to the foregoing Interests, including any performance owed to the DOH Entities and exhausts all limits of liability of the foregoing Zurich Policies issued or allegedly issued to the DOH Entities and with respect to the foregoing Interests; (f) all Interests of the DOH Entities may have had, may presently have, or in the future may have in the Zurich Policies that were issued or allegedly issued to the DOH Entities and all Interests the DOH Entities have in the other Zurich Policies are released pursuant to the terms of this Agreement; (g) the DOH Entities meet the requirements to complete the sale of the Zurich Policies and Interests free and clear of any liens or other Interests; and (h) the DOH Entities accept the payment of the Settlement Amounts set forth in Section 1.ww. in accordance with the Joint Plan (as amended to Zurich's satisfaction) in full and complete satisfaction of all Zurich's past, present, and future obligations, including any obligations to any of the DOH Entities under such Zurich Policies or arising therefrom, as to any and all Claims for insurance coverage or policy benefits of any nature whatsoever arising out of or related in any way to such Zurich Policies, whether legal or equitable, known or unknown, suspected or unsuspected, fixed or contingent, and regardless of whether such claims arise from, relate to, or are in connection with the Channeled Claims or otherwise under the Zurich Policies.

(iii)   It is the intention of the DOH Entities to reserve no rights or benefits whatsoever under or in connection with the Zurich Policies and to assure the Zurich Released Parties their peace and freedom from such Interests and from all assertions of rights in connection with such Interests, *provided, however,* the Entities' Release does not release, and nothing in this Agreement shall affect, the right of the DOH Entities, or the Trust, as applicable, to assert and pursue, Claims against and to collect from Insurers other than those released under the Entities Release, and no Claims are released with respect to such Persons.

(iv)   Upon the Trust's receipt of the Settlement Amount, any and all rights, duties, responsibilities, and obligations of Zurich created by or in connection with the Zurich Policies, are terminated.  As of the Settlement Payment Date, the DOH Entities shall have no insurance coverage under the Zurich Policies.  The Entities' Release shall operate as though Zurich had never issued the Zurich Policies.

28

(v)     Each DOH Entity signing this Agreement, is, among other things, (a) releasing all Released Claims, including Claims that it does not know or suspect to exist in its favor, which, if known by such DOH Entity, might have materially affected its settlement with Zurich, and (b) expressly waiving all rights it might have under any federal, state, local, or other law or statute that would in any way limit, restrict, or prohibit such general release.

(vi)    Except with respect to any material breach of any representation, warranty or covenant by Zurich set forth in this Agreement, each DOH Entity expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist.  To the fullest extent permitted by applicable law, each DOH Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

(vii)   Nothing in the foregoing shall release Zurich from its obligations under this Agreement including the obligation to pay the Settlement Amount.

### b.     By Zurich

(i)     At the same time the Entities' Release becomes effective, Zurich shall be deemed to remise, release, covenant not to sue, and forever discharge each DOH Entity from and against all Claims relating to the Zurich Policies, which Zurich ever had, now have or hereinafter may have, from the beginning of time to the Settlement Payment Date.

(ii)    Each Person released under the Entities' Release shall reserve no rights or benefits whatsoever under or in connection with the Zurich Policies.

(iii)   Except with respect to any material breach of any representation, warranty or covenant by any DOH Entity set forth in this Agreement, Zurich expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist.  To the fullest extent permitted by applicable law, Zurich hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

### 5.     Indemnification

a.      This Section 5 is effective upon the Trust's receipt of the Settlement Amount. The Trust shall indemnify and hold harmless the Zurich Released Parties from and against any and all Channeled Claims; and the Reorganized Debtor shall indemnify the Zurich Released Parties from and against all Enjoined Claims except for the Channeled Claims. These indemnifications include Claims made by Persons over whom the Trust and/or the Reorganized Debtor does not have control, including the DOH Entities, former subsidiaries, predecessors in interest, sellers or purchasers of assets, or any other Person who holds a Claim that the Trust and/or the Reorganized Debtor is indemnifying.

29

b.    Zurich shall have the right to defend, with counsel of its choice, all Claims identified under Section 5.a.  Zurich may begin the defense of any Claim upon receipt of such a Claim.  Zurich agrees to notify the Trust and/or the Reorganized Debtor, as applicable, promptly of Claims identified under Section 5.a. and of its choice of counsel.

c.    The Trust, and/or Reorganized Debtor, as applicable, shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by Zurich in defending such Claims identified under section 5.a.  Zurich shall defend any such Claim in good faith.  The indemnity obligations set forth in Section 5.a, hereof, to indemnify Zurich shall not exceed the Settlement Amount actually paid by Zurich.  In defense of any such Claim, Zurich may settle or otherwise resolve a Claim with the prior consent of the Trust and/or Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.

6.    **Bankruptcy Obligations**

a.    DOH shall provide to Zurich an initial draft of the proposed form of Approval Order, Settlement Approval Findings and Conclusions, and Bar Order at least fourteen (14) days before DOH submits the foregoing for approval of this Agreement to the Court, so that Zurich may provide comments and suggestions.  In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to Zurich.  Zurich reserves the right to object to, *inter alia*, (i) any proposed order that does not satisfy all of the requirements of the definition of Approval Order set forth in Section 1.e, or (ii) any proposed findings and conclusions that do not satisfy all of the requirements of the definition of Settlement Approval Findings and Conclusions set forth in Section 1.xx, or the definition of Bar Order set forth in Section 1.k.

b.    DOH shall provide to Zurich an initial draft of the proposed form of Confirmation Order, and Confirmation Findings and Conclusions, at least fourteen (14) days before DOH submits the foregoing to the Court, so that Zurich may provide comments and suggestions.  In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to Zurich.  Zurich reserves the right to object to, *inter alia*, any proposed order that does not satisfy all of the requirements of the definition of Confirmation Order set forth in Section 1.s, or any proposed findings of fact and conclusions of law that do not satisfy all the requirements of the definition of Confirmation Findings and Conclusions in Section 1.r.

c.    DOH provided to Zurich a copy of the *Joint Chapter 11 Plan of Reorganization for the Diocese of Harrisburg* (the "**Joint Plan**") upon the filing of the Joint Plan. To the extent that the Joint Plan does not meet the requirements set forth in the definition of "Plan" set forth in Section 1.ss above, DOH shall modify such Joint Plan to assure that the filed plan of reorganization submitted to Court for confirmation comports with such definition, and Zurich shall have the right to approve all modifications that affect their rights or obligations under this Agreement.  In the event that DOH makes material revisions to the filed plan of reorganization, then, as soon as possible, DOH shall provide a copy of such material revisions to Zurich.  Zurich reserves the right to object to, *inter alia*, any proposed plan of reorganization that does not satisfy all of the requirements of the definition of Plan set forth in Section 1.ss. (a "**Non-Compliant Plan**").  If DOH proposes a Non-Compliant Plan, then Zurich may contest such plan, and DOH shall not

30

30153178v.1

request a hearing date on confirmation of a Non-Compliant Plan less than thirty (30) days after the date such plan is filed in the Court.

d.      DOH will seek entry of the Confirmation Order, as set forth in Section 1.s., together with the Confirmation Findings and Conclusions, as set forth in Section 1.r., including any required findings and conclusions under the Bankruptcy Code.

e.      DOH shall serve Bankruptcy Notice of the initial hearing to approve this Agreement and on confirmation of the Plan and the time for filing objections thereto. The proposed form of notice shall be submitted to Zurich for their review and comment no later than seven (7) days prior to the actual service of notice. If the initial hearing to approve this Agreement or to confirm the Plan is adjourned, DOH shall not be required to provide Bankruptcy Notice of such adjourned hearing and shall only be required to file a notice of such adjournment on the docket in the Bankruptcy Case and provide such other and further notice as the Court may direct.

f.      In the event that any Person attempts to prosecute a Barred Claim, before the Effective Date, against Zurich or any DOH Entity, then promptly following notice from such Zurich or DOH Entity, DOH shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code §§ 105(a) and/or 362(b), as applicable, staying such Claims until the date that the Approval Order and Confirmation Order have each become a Final Order, or, alternatively, this Agreement is terminated under Section 9. However, if DOH is unable to obtain a stay of such Claim then Zurich may, to the extent feasible, and subject to the terms, conditions, and any applicable limits and retentions of the Zurich Policies, defend such Claims and either settle them or litigate them to judgment, and the applicable DOH Entities shall fully assist and cooperate with Zurich in such defense. If after such a Claim is brought, and if:

(i)      the Effective Date occurs, then any payment by Zurich to resolve such Barred Claim, including defense costs paid to an insured's counsel, shall be deducted from the Settlement Amount, and Zurich shall pay the balance of its Settlement Amount; if the payment by Zurich to resolve such Barred Claim equals or exceeds its Settlement Amount, then Zurich, shall automatically, and without further action by any Person, be relieved of any further obligations under this Agreement and entitled to all the benefits hereunder, including the Entities Release; or, alternatively,

(ii)      the Effective Date does not occur, before this Agreement is terminated under Section 9, then any amounts paid by Zurich shall be credited against its obligations, if any exist, under the Zurich Policies.

7.      **Representations and Warranties**

a.      DOH represents and warrants that the notice required under the definition of Bankruptcy Notice includes all Claimants whose names and addresses are known to, or are readily ascertainable by any Party.

b.      Each DOH Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation, subject in the case of DOH, to receiving Court approval of this Agreement.

31

30153178v.1

c.      Zurich represents and warrants to DOH that (i) it has, and at all times prior to payment in full of the Settlement Amount will have, sufficient assets to pay the Settlement Amount in full; and (ii) it is not now, nor has it ever been, the subject of any bankruptcy or insolvency proceeding in any jurisdiction.

d.      Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

e.      Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity, and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

## 8.      **Judgment Reduction.**

a.      In connection with any Claim arising out of or related to a Channeled Claim, Enjoined Claim, or Claim otherwise released under this Agreement or under the Plan as to Zurich, brought by a DOH Entity, the Reorganized Debtor, or the Trust against any Person other than Zurich, which results in an adjudication on the merits, whether in court or another tribunal with jurisdiction, or in a binding arbitration award, that such other Person is liable to a DOH Entity, the Reorganized Debtor, or the Trust, and that such judgment or binding arbitration award includes sums which are allocable to Zurich under any Zurich Policies, and solely to the extent that Zurich is not fully indemnified for such judgment or award pursuant to Section 5 of this Agreement,  the DOH Entity, the Reorganized Debtor, and/or the Trust, as applicable, will agree to reduce the judgment or binding arbitration award against such other Person or take other steps as necessary in order to avoid such liability being imposed on Zurich.  Such a reduction in a DOH Entity's, the Reorganized Debtor's, or the Trust's judgment or binding arbitration award will be accomplished by subtracting from the judgment or binding arbitration award against any such Person the share of the judgment or binding arbitration award, if any, which is applicable to Zurich.

b.      To ensure that such a reduction is accomplished and the Zurich is protected, Zurich will be entitled to assert this paragraph as a defense in any Claim against them for any such portion of the judgment or binding arbitration award, and will be entitled to have the court or appropriate tribunal issue such orders as are necessary to effectuate the reduction to protect Zurich from liability for the judgment or binding arbitration award solely to the extent such judgment or award relates to Claims released under this Agreement or under the Plan.

c.      In the event a DOH Entity, the Reorganized Debtor, or the Trust settles any Claim related to or arising out of a Claim released under this Agreement or the Plan with any Person other than Zurich without Zurich's consent, the DOH Entity, the Reorganized Debtor, or the Trust (as applicable) agrees that it will not seek from Zurich any sums allocated to Zurich by such settlement.  The DOH Entities, the Reorganized Debtor, and the Trust further agree that they will use their reasonable efforts to obtain a release in favor of Zurich from any Person with which they settle any Claims relating to or arising out of Claims released under this Agreement.

d.      DOH, the Reorganized Debtor, and the Trust specifically agree to mold any recovery that may be awarded, or verdict and/or judgment that may be entered, and to take any other action as may be necessary, in connection with any Claim subject to this Section 8, to ensure

32

that Zurich shall never be obligated to pay to DOH, the Reorganized Debtor, or the Trust anything more than the Settlement Amount identified herein.

e.     To ensure that the reduction contemplated in this Section 8 is accomplished, the Zurich Entities shall be entitled to: (i) notice, pursuant to Section 19, within a reasonable time of the initiation of any future Action against or future settlement negotiations with any Person that could give rise to the possibility of a Claim against any Zurich Entity, or any allocation of liability or damages against any Zurich Entity, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations without objection by any party thereto, but only to the extent necessary to accomplish the reduction contemplated in this Section 8.

## 9.     Termination of Agreement

a.     The Parties may terminate this Agreement in writing upon mutual assent.

b.     Any Party may terminate this Agreement upon thirty (30) days' notice to the other Parties if a Termination Event occurs.

c.     In the event of termination pursuant to this Section 9, unless the Parties agree otherwise in writing, this Agreement shall be void *ab initio* and all Parties shall retain all of their Interests relating to the Zurich Policies as if this Agreement never existed.

d.     If Zurich does not pay the Settlement Amount, DOH, at its option, may by written notice to other parties to this Agreement, terminate this Agreement in its entirety. In the event of a termination, (i) Zurich shall not be a Settling Insurer; (ii) Zurich shall not receive the benefit of the Entities' Release, the Channeling Injunction, or the Supplemental Settling Insurer Injunction; (iii) this Agreement shall be void *ab initio*; and (v) the Parties shall retain all of their Interests relating to that portion of any insurance policies to the extent issued or subscribed by Zurich, as if this Agreement never existed.

## 10.     Treatment of Perpetrators

Nothing in this Agreement overrides the treatment in the Plan of individuals who perpetrated an act of Abuse that forms the basis for a Survivor Claim.

## 11.     Reasonably Equivalent Value

a.     This Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations;

b.     Based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of maintaining the Insurance Coverage Adversary Proceeding, the payments received by the DOH Entities pursuant to this Agreement constitute a fair and reasonable settlement of the Released Claims;

33

c.      The payments and other benefits received under this Agreement by the DOH Entities constitute reasonably equivalent value for the Entities' Release, indemnity, and other benefits received by the Zurich Released Parties under this Agreement; and

d.      Subject to the Trust's receipt of the Settlement Amount, this Agreement constitutes a full and final resolution of all issues in the Insurance Coverage Adversary Proceeding.

## 12.      **Confidentiality**

a.      Except as necessary to obtain approval of this Agreement in the Court, the Parties agree that all matters relating to the negotiation of this Agreement shall be confidential and are not to be disclosed except by order of court, or written agreement of the Parties, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of Zurich, and their retrocessionaires, directly or through intermediaries; (ii) in-house and outside counsel for any Party; (iii) outside auditors or accountants of any Party; (iv) representatives and agents of the Parties, and (v) as required, to the United States Internal Revenue Service or other U.S. federal or state governmental authority that properly requires disclosure, or as otherwise required by law.  The Parties acknowledge and agree that a copy of this Agreement will be publicly filed on the docket and provided to parties in interest in the Bankruptcy Case, without obligation of confidentiality or restrictions on further disclosure.

b.      In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this section from a Party, such Party shall decline to provide the requested information on the ground that this Agreement restricts such disclosure.  In the event such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the United States Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall promptly give written notice to the other Parties, and shall promptly provide copies of all notice papers, orders, requests, or other documents in order to allow each Party to take such protective steps as may be appropriate.  Notice shall be made under this paragraph to the persons identified in Section 20.

c.      Material protected by this section shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

d.      None of the Parties shall make any public statements or disclosures (i) regarding any other Party's rationale or motivation for negotiating or entering into this Agreement, or (ii) asserting or implying in any way that the Parties acted improperly or in violation of any duty or obligation, express or implied, in connection with any matter arising out of, or relating to, or in connection with the Zurich Policies or any other binder, certificate, or policy of insurance issued or allegedly issued by Zurich, with respect to any Claims against Zurich.

## 13.      **Co-operation**

a.      The DOH Entities will undertake all reasonable actions to co-operate with Zurich in connection with their reinsurers, including responding to reasonable requests for information

34

and meeting with representatives of reinsurers. Furthermore, the Parties shall use their commercially reasonable efforts and cooperate as necessary or appropriate to effect the objectives of this Agreement.

b.      If any action or proceeding of any type whatsoever is commenced or prosecuted by any person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

## 14.    <u>Non-Prejudice and Construction of Agreement</u>

a.      This Agreement is intended to be and is a compromise between the Parties and neither this Agreement nor any provision hereof shall be construed as (i) an admission of coverage under the Zurich Policies; (ii) an admission concerning the amount of a reasonable settlement of any Claim; (iii) an admission concerning the liability of or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages); or (iv) a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the Zurich Policies.

b.      This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions. Accordingly, this Agreement does not, and is not intended to, set forth the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to positions taken by Zurich with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers.

c.      By entering into this Agreement, none of the Parties has waived or shall be deemed to have waived any rights, obligations, or positions they have asserted or may in the future assert in connection with any matter outside the scope of this Agreement. No part of this Agreement, its negotiation, or its performance may be used in any manner in any action, suit, or proceeding as evidence of the rights, duties, or obligations of the Parties with respect to matters outside the scope of this Agreement. All actions taken and statements made by the Parties or by their representatives, relating to this Agreement or participation in this Agreement, including its development and implementation, shall be without prejudice or value as precedent and shall not be used as a standard by which other matters may be judged.

d.      This Agreement is the jointly drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed. As such, no Party will assert that any ambiguity in this Agreement shall be construed against another Party.

e.      If any provision of the Plan, the Trust Agreement, or trust distribution procedures proposed thereunder conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence. Neither the Plan nor the Trust Agreement shall be construed or interpreted to modify or affect any rights or obligations of Zurich under this Agreement.

35

f.     Unless the context of this Agreement otherwise requires: (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereto," "herein," "hereby," and derivative of similar words refer to this entire Agreement; and (iv) the words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation."

g.     References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

h.     The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Agreement when the stated intent is not achieved.

## 15.  **No Modification**

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties.  Any change or modification of this Agreement that affects the rights of the Survivor Claimants or Trust shall require the consent of the Committee or Trustee, as applicable, which consent shall not be unreasonably withheld. Any attempted change or modification in violation of this Section shall be void *ab initio*.

## 16.  **Waiver**

No waiver of any provision of this Agreement or of a breach thereof shall be valid unless it is made in writing and signed by the Parties. The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

## 17.  **Non-Assignment**

Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties.

## 18.  **Execution**

There will be two signed originals of this Agreement.

## 19.  **Governing Law**

This Agreement shall be governed by and shall be construed in accordance with the laws of Pennsylvania, except to the extent that the United States Bankruptcy Code applies and governs the rights and obligations of the Parties.

## 20.  **Notices**

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent in writing to the Persons listed on Attachment C.

36

21. __Integration__

   This Agreement, including the attachments, constitutes the entire Agreement between Zurich and the DOH Entities, with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, amongst the Parties with respect thereto. The Parties intend that this Agreement and the Plan shall be consistent in all respects, with no conflict or discrepancies between them.

   **IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

[Signature Pages Follow]

30153178v.1

Signed: _____

The Roman Catholic Diocese of Harrisburg

Name Printed: _____

Title: _____

Date: _____ 2023

30153178v.1

Signed: _____

Zurich American Insurance Company, successor by merger
to Maryland Casualty Company

Name Printed: _____

Title: _____

Date: _____ 2023

## SCHEDULE OF ATTACHMENTS TO

## SETTLEMENT AGREEMENT AND RELEASE

| | |
|---|---|
| Attachment A | List of Zurich Policies |
| Attachment B | List of DOH Entities |
| Attachment C | Notice Names and Addresses |

**ATTACHMENT A**

**Zurich Policies**

30153178v.1

**ATTACHMENT B**

**LIST OF DOH ENTITIES**

30153178v.1

**ATTACHMENT C**

**<u>NOTICE NAMES AND ADDRESSES</u>**

DOH:

With copies to:

-and-

DOH Parishes:

ZURICH:

30153178v.1

# EXHIBIT F

**LMI Settlement Agreement**

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (hereinafter the "**Agreement**") is made this ____ day of ____, 2023, by and between the Diocese of Harrisburg ("**DOH**")[1] and the other "**DOH Entities**", on the one hand, and certain Underwriters at Lloyd's, London, and certain London Market Insurance Companies (collectively, "**London Market Insurers**"), on the other hand. (The aforementioned parties are referred to hereinafter collectively as the "**Parties**" or individually as a "**Party**").

## WITNESSETH THAT:

WHEREAS, certain "**Persons**", alleging injuries from "**Abuse**", asserted "**Survivor Claims**" against certain DOH Entities;

WHEREAS, certain DOH Entities incurred, and may incur in the future, liabilities, expenses, and losses arising out of the Survivor Claims;

WHEREAS, each London Market Insurer severally subscribed the "**Subject Insurance Policies**", allegedly providing insurance to the DOH Entities;

WHEREAS, the Subject Insurance Policies listed on Attachment A are property of DOH's bankruptcy estate;

WHEREAS, certain DOH Entities tendered "**Coverage Claims**" to the London Market Insurers to seek insurance coverage for the Survivor Claims;

WHEREAS, the London Market Insurers dispute the Coverage Claims;

WHEREAS, to address potential liabilities arising out of the Survivor Claims, on the "**Petition Date**," DOH filed the "**Bankruptcy Case**" in the "**Bankruptcy Court**";

WHEREAS, on February 19, 2020, DOH filed the "**Insurance Coverage Adversary Proceeding**," as an adversary proceeding in the Bankruptcy Court;

WHEREAS, several London Market Insurers are named defendants in the Insurance Coverage Adversary Proceeding, and dispute the substantive allegations and Coverage Claims asserted against them in the Insurance Coverage Adversary Proceeding;

WHEREAS, on April 2, 2020, DOH filed the "**Mediation Request**";

WHEREAS, the Bankruptcy Court (i) entered the "**Mediation Order**" approving the Mediation Request, appointing the "**Mediator**"; and (ii) ordered the "**Mediation Parties**" to mediate the Survivor Claims and the Coverage Claims;

---

[1] Terms in bold, inside quotation marks, are defined in Section 1, Definitions.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

WHEREAS, pursuant to the Bankruptcy Court's order, no defendant filed an Answer or otherwise responded in the Insurance Coverage Adversary Proceeding;

WHEREAS, whether or not they (i) were subject to the Survivor Claims; or (ii) asserted Coverage Claims against London Market Insurers, the DOH Entities are settling with and releasing the "**LMI Entities**" pursuant to this Agreement;

WHEREAS, it is the intention of the Parties that the DOH Entities shall sell, assign, and transfer the Subject Insurance Policies to the London Market Insurers, and the London Market Insurers shall buy back the Subject Insurance Policies and pay the "**Settlement Amount**" to the "**Trust**", which shall be administered and distributed as provided in the "**Plan**", the "**Trust Agreement**", and the "**Trust Distribution Plan**", including to make payments to the "**Channeled Claimants**";

WHEREAS, it is the intention of the Parties that any and all "**Interests**" in or to the Subject Insurance Policies be extinguished, ended, and forever terminated;

WHEREAS, it is the intention of the Parties that (i) the DOH Entities shall (a) not retain any right, title, or Interest in or to the "**Subject Insurance Policies**"; and (b) release the LMI Entities from all "**Released Claims**"; and (ii) none of the LMI Entities shall have any remaining duty or obligation of any nature whatsoever to any DOH Entity;

WHEREAS, DOH agrees to use commercially reasonable efforts to obtain the Supplemental Settling Insurer Injunction for the benefit of the "**Settling Insurers**," pursuant to the "**Plan**"; and

WHEREAS, subject to the Court entering the orders contemplated by this Agreement, upon the Trust's receipt of the Settlement Amount, each of the LMI Entities will be protected by the "**Supplemental Settling Insurer Injunction**" and the "**Channeling Injunction**";

WHEREAS, by this Agreement, the Parties intend to adopt, by way of compromise, and without prejudice to or waiver of their respective positions in other matters, without further trial or adjudication of any issues of fact or law, and without London Market Insurers admission of liability or responsibility under the Subject Insurance Policies, a full and final settlement that releases and terminates all Interests of the LM Entities, and the DOH Entities, with respect to the Subject Insurance Policies, including all rights, obligations, and liabilities relating to the "**Barred Claims**" and the "**Enjoined Claims**," without prejudice to their respective positions on policy wordings or any other issues relating to the Insurance Coverage Adversary Proceeding, the Coverage Claims, or otherwise.

## <u>AGREEMENTS:</u>

NOW, THEREFORE, in full consideration of the foregoing and of the mutual agreements herein contained, and intending to be legally bound, the Parties agree as follows:

1.    <u>**Definitions**</u>

The following definitions and the definitions used above apply to this Agreement as well as any exhibits or attachments hereto. Where the listed terms are further defined in the body of

2

this Agreement, the definitions listed here nonetheless apply and shall serve to further explain the meaning of those terms.

a.    Each defined term stated in a singular form shall include the plural form, each defined term stated in plural form shall include the singular form, and each defined term stated in the masculine form or in the feminine form shall include the other.

b.    The words "include," "includes," or "including" shall be deemed to be followed by the words "without limitation," and the phrase "relating to" means "with regard to, by reason of, based on, arising out of, relating to, or in any way connected with." (The words "include," "includes," and "including," and the phrase "relating to" are not capitalized herein.)

c.    This Agreement incorporates all attachments hereto to the same extent as if fully set forth herein.

d.    All references to "Sections" are references to sections of this Agreement unless otherwise specified.

e.    Unless the context of this Agreement otherwise requires: the terms "hereto," "herein," "hereby," and derivatives of similar words refer to this entire Agreement.

f.    References to statutes shall include all regulations promulgated thereunder and references to statutes or regulations shall be construed as including all statutory and regulatory provisions regardless of whether specifically referenced in this Agreement.

g.    The use of the terms "intend," "intended," or "intent," when describing the intention of the Parties, as the case may be, shall not be construed to create a breach of this Agreement when the stated intent is not achieved.

**h.    <u>Abuse</u>**

The term "**Abuse**" means any (i) actual, alleged, or threatened, sexual conduct, misbehavior, misconduct, abuse, or molestation, including "Sexual Abuse" as defined in 42 Pa.C.S. § 5533(b)(2)(ii); (ii) any sexual offense as laid out in Chapter 31 of Title 18 of the Pennsylvania Statutes; (iii) any other sexually related act, contact, or interaction, indecent assault and/or battery, rape, indecent or lascivious behavior, undue familiarity, harassment, pedophilia, or ephebophilia; (iv) act that causes or allegedly causes sexually-related physical, psychological, or emotional harm, or any other contacts or interactions of a sexual nature, including any such contacts or interactions between a child and an adult, or a non-consenting adult and another adult; (v) contacts or interactions of a sexual nature; or (vi) assault, battery, corporal punishment, or any other act of physical, psychological, mental, or emotional abuse, humiliation, or intimidation. Abuse may occur whether or not this activity involves explicit force, whether or not it involves genital or other physical contact, and whether or not there is physical, psychological, or emotional harm to the person.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

### i.     Action

The term "**Action**" means any lawsuit, proceeding, or other action in a court, or any arbitration.

### j.     Affiliates

The term "**Affiliates**" means all past, present, and future Persons that control, are controlled by, or are under control with, another Person, including parents, subsidiaries, merged Persons, holding Persons, and acquired Persons, or any predecessor to such Person.

### k.     Agents

The term "**Agents**" means all past and present employees, officers, directors, managing agents or other agents, shareholders, principals, teachers, staff, members, board members, administrators, priests, deacons, brothers, sisters, nuns, or other members of a religious order, clergy, Persons bound by monastic vows, volunteers, attorneys, claims handling administrators, and representatives of a Person, in each case in their capacities as such.

### l.     Approval Order

The term "**Approval Order**" means an order entered by the Court, upon a hearing following Bankruptcy Notice, containing all of the following provisions but no provision that is contrary to or inconsistent with the following provisions.  The wording of the Approval Order shall be mutually acceptable to DOH and the London Market Insurers.  The Approval Order shall contain provisions:

> (i)     finding that due and adequate notice of DOH's request for approval of this Agreement has been provided to all creditors and parties in interest in the Bankruptcy Case, including by finding that the Bankruptcy Notice described in Section 1.i. of this Agreement is reasonable and provides due process to all potential known and unknown holders of Claims;

> (ii)    approving this Agreement in its entirety, pursuant to Bankruptcy Code §§ 363(b), (f), and (m) and, if applicable, 105(a), and Bankruptcy Rules 6004 and 9019;

> (iii)   authorizing, subject to the occurrence of the Settlement Payment Date, the sale of the Subject Insurance Policies to London Market Insurers, free and clear of all Interests of all Persons, with all Interests in and to, and Claims against, the Subject Insurance Policies being fully extinguished without reservation as to the Settling Insurers;

> (iv)    ordering that, as of the date the Trust receives the Settlement Amount, all Claims against, and Interests in and to, the Subject Insurance Policies be fully extinguished without reservation as to the LMI Entities and the DOH Entities;

> (v)     ordering that, as of the date the Trust receives the Settlement Amount, all Barred Claims and other Interests that any Person, including CMS (as defined herein), might have in, or against, the Subject Insurance Policies, attach to the Settlement Amount;

<div align="center">4</div>

(vi)     authorizing and directing the Parties to perform their respective obligations under this Agreement; and

(vii)    issuing the Bar Order, subject to, and effective upon, the occurrence of the Settlement Payment Date.

The Approval Order shall be accompanied by the separately entered Settlement Approval Findings and Conclusions.

### m.     Bankruptcy Case

The term "**Bankruptcy Case**" means the bankruptcy case filed by DOH in the Bankruptcy Court, entitled *In re Roman Catholic Diocese of Harrisburg*, Case Number 20-00599-HWV.

### n.     Bankruptcy Code

The term "**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*

### o.     Bankruptcy Court

The term "**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Pennsylvania or such other court of competent jurisdiction that properly exercises jurisdiction over part or all of the Bankruptcy Case, to the extent that the reference of part or all of the Bankruptcy Case is withdrawn.

### p.     Bankruptcy Notice

The term "**Bankruptcy Notice**" means notice as required under Bankruptcy Rules 2002, 6004(a), and (c), and applicable local rules, sent to (i) all holders of Claims against the DOH Entities, including Survivor Claims, or their attorneys, if any, who are known to the DOH Entities; (ii) the Official Committee of Unsecured Creditors; (iii) the "**Unknown Claims Representative**" (once appointed by the Court); (iv) all insurers of the DOH Entities that provide coverage for or are alleged to provide coverage for Survivor Claims; (v) the Secretary of the Department of Health and Human Services; (vi) CMS; (vii) the United States Attorney for the Middle District of Pennsylvania; (viii) all Persons who, in the opinion of any Party to this Agreement, might reasonably be expected to be affected by the transactions contemplated herein; and (ix) all other Persons as directed by the Court.  Notice shall also be given by publication (a) in the national editions of (i) *USA Today*; (ii) *National Catholic Reporter;* and (iii) *The National Catholic Register;* and (b) locally in (i) *The Catholic Witness*; (ii) *Gettysburg Times;* (iii) *Press Enterprise*; (iv) *The Sentinel*; (v) *Patriot-News*; (vi) *Public Opinion*; (vii) *LNP-Lancaster Online*; (viii) *Lebanon Daily News*; (ix) *The Sentinel*; (x) *The Daily Item*; (xi) *Perry County Times*; and (xiv) *York Daily Record*, or as the Court may otherwise direct.

### q.     Bankruptcy Rules

The term "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as may be amended from time to time.

5

### r.  Bar Order

The term "**Bar Order**" means an order, which shall automatically become effective on the Settlement Payment Date, barring, estopping, and permanently enjoining all Persons from asserting any Barred Claims against the London Market Insurers.

### s.  Business Day

The term "**Business Day**" means any day that is not a Saturday, Sunday, or legal holiday in the State of Pennsylvania or the United Kingdom.

### t.  Channeling Injunction

The term "**Channeling Injunction**" means an order of the Court, effective as of the date the Trust receives the Settlement Amount, requiring all Channeled Claimants to assert their Channeled Claims against the Trust, which states, *verbatim*:

**Channeling Injunction Preventing Prosecution of Channeled Claims Against Protected Parties and Settling Insurers.**

**In consideration of the undertakings of the Protected Parties and the Settling Insurers under the Plan, their contributions to the Trust, and other consideration, and pursuant to their respective settlements with the Debtor, and to further preserve and promote the agreements between and among the Protected Parties and Settling Insurers, and to supplement where necessary the injunctive effect of the discharge as provided in sections 524 and 1141 of the Bankruptcy Code, and pursuant to sections 105 and 363 of the Bankruptcy Code:**

**a. any and all Channeled Claims are channeled into the Trust and shall be treated, administered, determined, and resolved under the procedures and protocols and in the amounts established under the Plan and the Trust Agreement as the sole and exclusive remedy for all holders of Channeled Claims;**

**b. any and all Persons who have held or asserted, hold or assert, or may in the future hold or assert any Channeled Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, for the purposes of asserting, enforcing, or attempting to assert or enforce any Channeled Claim against the Protected Parties or Settling Insurers, including:**

**(i). commencing or continuing in any manner any action or other proceeding of any kind with respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers or against the property of any of the Protected Parties or Settling Insurers;**

**(ii). enforcing, attaching, collecting or recovering, or seeking to accomplish any of the preceding, by any manner or means, from any of the Protected Parties or Settling Insurers, or the property of any of the Protected Parties or Settling Insurers, any judgment, award, decree, or order with**

6

respect to any Channeled Claim against any of the Protected Parties or the Settling Insurers;

(iii). creating, perfecting, or enforcing, or seeking to accomplish any of the preceding, any lien of any kind relating to any Channeled Claim against any of the Protected Parties or Settling Insurers, or the property of the Protected Parties or Settling Insurers;

(iv). asserting, implementing, or effectuating, any Channeled Claim of any kind against: (A) any obligation due any of the Protected Parties or Settling Insurers; (B) any of the Protected Parties or Settling Insurers; or (C) the property of any of the Protected Parties or Settling Insurers;

(v). taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan; or

(vi). asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against an obligation due to any of the Protected Parties, the Settling Insurers, or the property of the Protected Parties or Settling Insurers.

The Channeling Injunction is an integral part of the Plan and is essential to the Plan's consummation and implementation. It is intended that the channeling of the Channeled Claims provided in this section shall inure to the benefit of the Protected Parties and Settling Insurers. The Channeling Injunction will become effective with respect to each applicable Settling Insurer as of the date that the Trust receives the Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. In a successful Action to enforce the injunctive provisions of this Section 12.3 in response to a willful violation thereof, the moving party shall be entitled to recover all costs and expenses incurred, including reasonable attorneys' fees, from the non-moving party, and such other legal or equitable remedies as are just and proper, after notice and a hearing.

u.    Claim

The term "Claim" (a) has the meaning ascribed in § 101(5) of the Bankruptcy Code; and also means any past, present or future (b) claim, Action, Cause of Action, suit, debt, dues, sum of money, account, reckonings, bond, bill, specialty, assertion of right, complaint, cross-complaint, counterclaim, liability, obligation, right, request, allegation, mediation, litigation, direct action, administrative proceeding, lien, encumbrance, indemnity, equitable indemnity, right of subrogation, equitable subrogation, defense, injunctive relief, controversy, contribution, exoneration, covenant, agreement, promise, act, omission, trespass, variance, damages, judgment, compensation, set-off, reimbursement, restitution, cost, expense, loss, exposure, execution, attorneys' fee, obligation, order, affirmative defense, writ, demand, inquiry, request, directive, obligation, proof of claim in a bankruptcy proceeding or submitted to a trust established pursuant to the Bankruptcy Code, government claim or Action, settlement, and/or any liability whatsoever, known or unknown, asserted or unasserted, foreseen or unforeseen, fixed or contingent, matured

7

or unmatured, liquidated or unliquidated, direct, indirect, derivative or otherwise consequential, whether in law, equity, admiralty or otherwise, whether compromised, settled or reduced to a consent judgment, that may exist now or hereinafter for property damages, compensatory damages (such as loss of consortium, wrongful death, survivorship, proximate, consequential, general and special damages), punitive damages, bodily injury, personal injury, public and private claims, or any other right to relief whether sounding in tort, contract, extra-contractual or bad faith, statute, strict liability, equity, nuisance, trespass, statutory violation, wrongful entry or eviction or other eviction or other invasion of the right of private occupancy, and any amounts paid in respect of any judgment, order, decree, settlement, contract, or otherwise. A Person who alleges or alleged a Claim is a **"Claimant"**. The term "Claim" includes all of the following:

(i)    **Barred Claims**

The term "**Barred Claims**" means all Claims enjoined by the Bar Order, which shall include all Direct Action, Indirect, Medicare, Released, and Survivor Claims.

(ii)   **Channeled Claims**

The term "**Channeled Claims**" means all of the Claims that shall be channeled to the Trust, including: (a) Survivor Claims; (b) Indirect Claims; (c) Direct Action Claims; (d) Contribution Claims; (e) Medicare Claims; and (f) Extra-Contractual Claims relating to the Claims listed in subsection (a)–(e) of this sentence; *provided, however*, that "**Channeled Claims**" shall not include: (i) a Claim against an individual who perpetrated an act of Abuse; or (ii) a Claim against any religious order, diocese (other than the Reorganized Debtor), or archdiocese.

(iii)  **Contribution Claims**

The term "**Contribution Claims**" means all Claims, most commonly expressed in terms of contribution, indemnity, equitable indemnity, subrogation, or equitable subrogation, or reimbursement, or any other indirect or derivative recovery, by an Insurer against any Settling Insurer for the payment of money, where such Insurer contends that it has paid more than its equitable or proportionate share of a Survivor Claim.

(iv)   **Coverage Claims**

The term "**Coverage Claims**" means all Claims against the London Market Insurers (or any of them) under or relating to the Subject Insurance Policies or the rights and obligations thereunder, or the breach thereof, including Claims seeking insurance coverage.

(v)    **Direct Action Claims**

The term "**Direct Action Claims**" means the same as Survivor Claims, except that they are asserted against any Settling Insurer, instead of any DOH Entity or the Trust, for the recovery of insurance proceeds.

(vi)   **Enjoined Claims**

8

The term "**Enjoined Claims**" means all Claims enjoined by the Supplemental Settling Insurer Injunction, which shall include all Direct Action, Indirect, Released, Survivor, Contribution Claims, and Extra-Contractual Claims that are not Channeled Claims.

**(vii) Extra-Contractual Claims**

The term "**Extra-Contractual Claims**" means all Claims against the London Market Insurers (or any of them), in their capacity as Insurers, seeking any type of relief other than coverage or benefits under the Subject Insurance Policies. "**Extra-Contractual Claims**" include Claims for compensatory, exemplary, or punitive damages, or attorneys' fees, interest, costs, or any other type of relief, alleging, with respect to (i) any of the Subject Insurance Policies; (ii) any Claim allegedly or actually covered under the Subject Insurance Policies; or (iii) the conduct of the London Market Insurers with respect (i) and/or (ii), any of the following: (a) bad faith; (b) failure to provide insurance coverage under any Subject Insurance Policy; (c) failure or refusal to compromise and settle any Claim insured under any Subject Insurance Policy; (d) failure to act in good faith; (e) violation of any covenant or duty of good faith and fair dealing; (f) violation of any state insurance codes, state surplus lines statutes or similar codes or statutes; (g) violation of any unfair claims practices act or similar statute, regulation or code; (h) any type of misconduct; or (i) any other act or omission of any type for which the Claimant seeks relief other than coverage or benefits under a Subject Insurance Policy. The term "**Extra-Contractual Claims**" includes all Claims relating to the London Market Insurers' (i) handling of any Coverage Claim under the Subject Insurance Policies; (ii) conduct relating to the negotiation of this Agreement and the Plan; or (iii) conduct relating to the settlement of any Coverage Claim.

**(viii) Indirect Claims**

The term "**Indirect Claims**" means Claims against a DOH Entity or a Settling Insurer, asserted by any Person that is not an Insurer (an "**Indirect Claim Claimant**"), for contribution, indemnity, equitable indemnity, subrogation, equitable subrogation, reimbursement, or any other indirect or derivative recovery, on account of, or with respect to, any actual or alleged liability for any Claim relating to Abuse that took place in whole or in part prior to the Plan Effective Date that a DOH Entity would have had, but for the entry of the bankruptcy discharge, the Channeling Injunction or the Supplemental Settling Insurer Injunction.

**(ix) Medicare Claims**

The term "**Medicare Claims**" means any and all Claims against the Trust, any Settling Insurer, or any DOH Entity, brought or asserted by CMS, and/or any other agent or successor Person charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA and pursuing Claims under MSP, relating to any payments in respect of any Survivor Claims, including Claims for reimbursement of payments made to Survivor Claimants, who recover or receive any distribution from the Trust, and Claims relating to reporting obligations.

9

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

**(x)   Released Claims**

The term "**Released Claims**" means any and all of the DOH Entities' Coverage Claims and Extra-Contractual Claims.

**(xi)   Survivor Claims**

(A) The term "**Survivor Claims**" means all Claims, allowed or disallowed, for which any of the DOH Entities is or may be liable, relating to, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Plan Effective Date. For the avoidance of doubt, the term "**Survivor Claims**" includes any Known Survivor Claim, Unknown Survivor Claim, and Late-Filed Survivor Claim, regardless of whether such Survivor Claim is barred by any applicable statute of limitations as of the Filing Date or Plan Effective Date, but does not include Contribution Claims, Indirect Claims, or Medicare Claims.

(B) The term "**Unknown Survivor Claim**" means any Survivor Claim relating to, in whole or in part, directly or indirectly, Abuse that took place in whole or in part prior to the Plan Effective Date, but neither filed nor deemed filed in the Bankruptcy Case, nor otherwise allowed by the Court by the Plan Effective Date, and is held by an individual who was at the time of the Filing Date under a disability or other condition recognized by Pennsylvania law, or other applicable law suspending the running of the statute of limitation period, that would toll the statute of limitations on such Survivor Claim.

**v.   CMS**

The term "**CMS**" means the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, located at 7500 Security Boulevard, Baltimore, MD 21244-1850 and/or any other Agent or successor Person responsible for monitoring, assessing, or receiving reports made under MMSEA for reimbursement of Medicare Claims.

**w.   Committee**

The term "**Committee**" means the Official Committee of Tort Claimants appointed in the Bankruptcy Case, as such committee may be constituted from time to time.

**x.   Confirmation Findings and Conclusions**

The term "**Confirmation Findings and Conclusions**" means the findings of fact and conclusions of law required under §§ 1129(a), and, if applicable, 105(a) and 1129(b), of the Bankruptcy Code, which are to be entered concurrently with the Confirmation Order, as necessary to confirm the Plan, including the following:

(i)   This Agreement is the fruit of long-term negotiations amongst the Parties, which began in July 2020, following the Bankruptcy Court's entry of the Mediation Order;

(ii)   The Settlement Amount provides good and valuable consideration to DOH's bankruptcy estate, and enables distributions to the Channeled Claimants;

10

(iii)    Potential liability for the Survivor Claims precipitated the filing of the Bankruptcy Case;

(iv)    This Agreement is therefore necessary to the Plan because it provides significant funding for the Plan;

(v)    The Subject Insurance Policies are property of DOH's bankruptcy estate and are therefore subject to the *in rem* jurisdiction of the Court;

(vi)    The Channeled Claims are within the jurisdiction of the Court because they seek property of DOH's bankruptcy estate;

(vii)    Because it would be impractical to divide the Subject Insurance Policies amongst DOH and the other DOH Entities, it was necessary for DOH to obtain the participation of the other DOH Entities in this Agreement;

(viii)    The DOH Entities, other than DOH, would not release their Interests in the Subject Insurance Policies unless they obtained the benefits of the Channeling Injunction, because to do so would have left them exposed to Survivor Claims, whether or not such Claims be valid, and whether or not coverage exists under the Subject Insurance Policies for such Claims;

(ix)    Therefore, the Channeling Injunction is necessary to this Agreement;

(x)    The Channeling Injunction is narrowly tailored because it only requires Channeled Claims to be brought against the Trust;

(xi)    The Settlement Amount is reasonable and fair consideration for the injunction of the Enjoined Claims, and for the London Market Insurers' liability for Survivor Claims;

(xii)    The Coverage Claims are within the jurisdiction of the Bankruptcy Court because such Claims could enhance the estate;

(xiii)    The London Market Insurers required that DOH obtain the benefits of the Supplemental Settling Insurer Injunction, as a condition of entering into this Agreement and contributing the Settlement Amount;

(xiv)    Therefore, the Supplemental Settling Insurer Injunction is necessary to this Agreement and the Plan; and

(xv)    The Supplemental Settling Insurer Injunction is narrowly tailored because it only enjoins the Enjoined Claims against the Settling Insurers;

**y.    <u>Confirmation Order</u>**

The term "**Confirmation Order**" means an order entered by the Bankruptcy Court after a confirmation hearing upon Bankruptcy Notice confirming the Plan, in a form and substance as required by this Agreement, which order is a Final Order. The wording of the Confirmation Order

11

shall be mutually acceptable to DOH and the London Market Insurers. The Confirmation Order shall contain all of the following provisions but no provision that is contrary to or inconsistent with this Agreement:

(i)      confirming the Plan;

(ii)     specifically, and individually, ordering all Persons, as set forth in the Plan, to act or refrain from acting as specified in the Plan;

(iii)    incorporating, as of the date the Trust receives the Settlement Amount, the terms and provisions of the Bar Order as though fully set forth therein;

(iv)    ordering the Trustee to perform the obligations, if any, imposed upon the Trustee by this Agreement;

(v)     issuing the Channeling Injunction and the Supplemental Settling Insurer Injunction;

(vi)    discharging DOH from all Claims, including all Channeled Claims; and

(vii)   ordering all Channeled Claimants with pending state court Actions against any DOH Entity to dismiss such Actions and assert them against the Trust for resolution pursuant to the Trust Agreement;

(viii)  including the Reduction Clause set forth in Section 8, below.

The Confirmation Order shall be accompanied by the separately entered Confirmation Findings and Conclusions.

z.      **DOH**

The term "**DOH**" means The Diocese of Harrisburg, which is the diocesan corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5301, together with the public juridic person of the Roman Catholic Diocese of Harrisburg, as now constituted or as it may have been constituted. The term "DOH" also applies anywhere the term "Reorganized Debtor" is used, and "Reorganized Debtor" applies anywhere the term "DOH" is used, as is necessary to effectuate the terms of the Agreement. Furthermore, in the event of any Action naming any Affiliate or Agent of DOH, such Action shall be considered an Action against DOH, the insurance coverage for which is released pursuant to Section 4 hereof.

aa.     **DOH Entities**

The term "**DOH Entities**" means, in their capacity as such, DOH and its Entities.

The "**DOH Entities**" include each of the Persons set forth on Attachment E to this Agreement. An individual who perpetrated an act of Abuse that forms the basis for a Survivor Claim is not a DOH Entity with respect to that Survivor Claim.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

bb.    **DOH Entity Insurer Policy**

The term "**DOH Entity Insurer Policy**" means any known or unknown contract, binder, certificate, or policy of insurance, in effect on or before the Plan Effective Date, which actually, allegedly, or potentially, insures any DOH Entity, or any of their predecessors in interest, successors, or assigns, with respect to any Survivor Claim.

cc.    **DOH Parishes**

The term "**DOH Parishes**" means all past and present parishes of or in DOH, in their capacity as public juridic persons, together with each corresponding parish corporation formed pursuant to 15 Pa. Stat. and Cons. Stat. Ann. § 5511.

dd.    **Effective Date**

The term "**Effective Date**" means the day following the date on which all of the following have occurred: (i) all Parties have executed this Agreement; (ii) the Court has issued the Approval Order and the Settlement Approval Findings and Conclusions, and the Approval Order has become a Final Order; and (iv) the Court has issued the Confirmation Order and the Confirmation Findings and Conclusions, and the Confirmation Order has become a Final Order

ee.    **Entities**

The term **"Entities"** means with respect to a specified Person: (i) its Affiliates; (ii) each of the foregoing Person's Agents; and (iii) each of the foregoing Persons' respective predecessors, successors, assignors, and assigns, whether known or unknown, administrators, and all Persons acting on behalf of, by, through, or in concert with them, in their capacities as such.

ff.    **Entities' Release**

The term "**Entities' Release**" means the following:  The remising, release, covenant not to sue, and permanent discharge by the DOH Entities and any subsequently appointed trustee or representative acting for any DOH Entity, without further act by any Person, from and against all Released Claims that any DOH Entity ever had, now has, or hereafter may have, from the beginning of time to the Effective Date, of: (1) the LMI Entities; and (2) the respective heirs, executors, administrators, and reinsurers (as such) of any of the Persons identified in clause (1) hereof, in their capacities as such.

gg.    **Equitas Entities**

The term "**Equitas Entities**" means Equitas Limited, Equitas Reinsurance Limited, Equitas Holdings Limited, Equitas Policyholders Trustee Limited, and any other Person from time to time in the Equitas Group.

13

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

**hh.** <u>**Filing Date**</u>

The term "**Filing Date**" means February 19, 2020.

**ii.** <u>**Final Order**</u>

The term "**Final Order**" means an order or judgment of the Bankruptcy Court that has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or other proceedings for a new trial, reargument or rehearing shall then be pending, or as to which any right to appeal, petition for *certiorari*, review, reargue, or rehear shall have been waived in writing in form and substance satisfactory to DOH and the London Market Insurers, and their counsel or, (b) in the event that an appeal, *writ of certiorari*, new trial, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not cause such order not to be a Final Order. For the avoidance of doubt, if the Plan is substantially consummated as defined in § 1101(2) of the Bankruptcy Code ("**Substantial Consummation**"), and any appeal of the Confirmation Order becomes equitably moot due to Substantial Consummation, the Confirmation Order shall be considered a Final Order as of the date that the order determining such appeal to be moot has become a Final Order.

**jj.** <u>**Insurance Coverage Adversary Proceeding**</u>

The term "**Insurance Coverage Adversary Proceeding**" means the case entitled *The Roman Catholic Diocese of Harrisburg v. The Travelers Companies, et al.*, filed in the Bankruptcy Court, as Adversary Proceeding Number 20-00018.

**kk.** <u>**Insurer**</u>

The term "Insurer" means a Person (including all of its predecessors in interest, successors, and assigns) that has, or is alleged to have, issued, subscribed any interest in, assumed any liability for, or underwritten any risk in, a DOH Entity Insurer Policy, whether or not a regulated insurance company.

**ll.** <u>**Interests**</u>

The term "**Interests**" means all Claims, including any "interests" as that term is used in 11 U.S.C. § 363 and other rights of any nature, whether at law or in equity, including all interests or other rights under Pennsylvania or other applicable law.

**mm.** <u>**Lloyd's Underwriters**</u>

The term "**Lloyd's Underwriters**" means:

14

(i)    All underwriters, members, or Names at Lloyds, London (including former underwriters, members, or Names) who through their participation in syndicates (including those identified on Attachment B) severally subscribed, each in his or her own proportionate share, one or more of the Subject Insurance Policies.  Lloyd's Underwriters shall also include all Underwriters, members, or Names at Lloyd's, London (including former underwriters, members, and Names), whether or not they participated in the syndicates identified in Attachment B, who, through their participation in syndicates (including those identified on Attachment B) severally subscribed any of the Subject Insurance Policies in favor of any DOH Entity: (a) the existence of which has not presently been established; or (b) the existence of which has been established but as to which identities of Names, members, or syndicates are presently unknown;

(ii)    All of the Agents of the Persons set forth in Section 1.hh.(i), and their respective predecessors and successors, if any, solely in such capacity; and

(iii)    All the respective heirs, executors, successors (including Equitas Insurance Limited ("**EIL**") to the extent EIL is a successor to any of the Persons identified in Section 1.hh.(i) with respect to the subject matter of this Agreement), assigns (including any administrator, receiver, trustee, personal representative, or equivalent appointee(s) under relevant insolvency law), reinsurers, and retrocessionaires (as such), of any of the Persons identified in Section 1.hh.(i), if any, solely in their capacity as such.

**(iv)**    For the avoidance of doubt, the Underwriter Third-Party Beneficiaries, who receive certain specified benefits under this Agreement, are not Lloyd's Underwriters for the purpose of this definition.

## nn.    **LMI Entities**

The term "**LMI Entities**" means the London Market Insurers and their Entities.

## oo.    **London Market Companies**

The term "**London Market Companies**" means the companies doing business in the London insurance market, which severally subscribed, each in its own proportionate share, to one or more of the Subject Insurance Policies (such insurers are identified in Attachment B to this Agreement).  "London Market Companies" shall also include those companies doing business in the London insurance market who subscribed any Subject Insurance Policies (a) the existence of which has not presently been established but which provided insurance to any DOH Entity; or (b) the existence of which has been established but the identity of such company as a subscribing insurer is not presently known.  As used herein, "London Market Companies" shall mean, in their capacities as such, the named corporate entity and all predecessors, successors, Affiliates, assigns, and pool companies as such.

## pp.    **London Market Insurers**

The term "**London Market Insurers**" means Lloyd's Underwriters and the London Market Companies.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

### qq.  **Mediation**

The term "**Mediation**" means the mediation by the Mediation Parties, as ordered by the Bankruptcy Court.

### rr.  **Mediation Parties**

The term "**Mediation Parties**" means, collectively: (a) DOH; (b) each insurer named as a Defendant in the Insurance Coverage Adversary Proceeding; (c) the Committee; (d) state court counsel for Survivor Claimants; and (e) the *ad hoc* committee of parishes and other parties-in-interest, including schools or other non-debtor Catholic entities located within the territorial area decreed by the Roman Catholic Church as the "Diocese of Harrisburg", to the extent permitted or required by the Mediator.

### ss.  **Mediation Order**

The term "**Mediation Order**" means the Agreed Order Referring Adversary Proceeding to Mediation, entered by the Bankruptcy Court in the Insurance Coverage Adversary Proceeding, on July 10, 2020, Doc. No. 84.

### tt.  **Mediation Request**

The term "**Mediation Request**" means the Request for Mediation filed by the DOH in the Insurance Coverage Adversary Proceeding.

### uu.  **Mediator**

The term "**Mediator**" means the Honorable Gregg W. Zive, United States Bankruptcy Judge.

### vv.  **Medicare**

The term "**Medicare**" means Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, enacted July 1, 1966, including all subsequent amendments thereto.

### ww.  **Medicare Beneficiary**

The term "**Medicare Beneficiary**" means any individual who has received or is eligible to receive benefits under Medicare and is the holder of a Channeled Claim.

### xx.  **Medicare Secondary Payor Act**

The term "**Medicare Secondary Payor Act**" or "**MSP**" means 42 U.S.C. § 1395y *et seq.*, or any other similar statute or regulation, and any related rules, regulations or guidance issued in connection therewith or amendments thereto.

16

### yy.     **MMSEA**

The term "**MMSEA**" means § 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P.L.110-173), which imposes reporting obligations on those Persons with payment obligations under the MSP.

### zz.     **Non-Settling Insurer**

The term "**Non-Settling Insurer**" means any Insurer that is not a Settling Insurer by the Plan Effective Date.

### aaa.     **Person**

The term "**Person**" means any individual or entity, including any corporation, limited liability company, partnership, general partnership, limited partnership, limited liability partnership, limited liability limited partnership, proprietorship, association, joint stock company, joint venture, estate, trust, trustee, personal executor or personal representative, unincorporated association, or other entity, including any federal, international, foreign, state, or local governmental or quasi-governmental entity, body, or political subdivision or any agency or instrumentality thereof; and any other individual or entity within the definitions of (i) "person" in Section 101(41) of the Bankruptcy Code or (ii) "entity" in Section 101(15) of the Bankruptcy Code.

### bbb.     **Petition Date**

The term "**Petition Date**" means February 19, 2020.

### ccc.     **Plan**

The term "**Plan**" means a plan of reorganization proposed by DOH, after good-faith consultation with the LMI Entities, which (a) contains all of the following provisions, but no provision that is contrary to or inconsistent with this Agreement; (b) allows all of the acts and transactions under, and envisioned by, this Agreement to occur with binding legal effect; (c) does not materially and adversely affect the rights, duties, or interests of the DOH Entities or the LMI Entities under this Agreement; (d) includes all papers, exhibits, attachments, appendices, or other documents filed with or in support of the Plan and necessary for its implementation, and any documents relating to the establishment and operation of the Trust; and (e) shall include the following provisions:

    (i)     specifying the terms of this Agreement shall control in the event of any conflict with the Plan or the Confirmation Order;

    (ii)     prohibiting DOH or the Trust from continuing to pursue the Insurance Coverage Adversary Proceeding against the London Market Insurers, requiring DOH and the Trust to dismiss all Claims against London Market Insurers in the Insurance Coverage Adversary Proceeding, with prejudice, within fourteen (14) days after the Plan Effective Date, and prohibiting any DOH Entity from asserting any Coverage Claims against LMI Entities;

17

(iii) specifying that, as of the date the Trust receives the Settlement Amount, the Channeling Injunction and the Supplemental Settling Insurer Injunction shall be effective;

(iv) establishing the Trust, appointing the Trustee, and binding both of them to perform those requirements imposed upon them by this Agreement;

(v) describing the role of the Unknown Claims Representative and seeking the continued appointment of the Unknown Claims Representative to continue in his duties;

(vi) specifying that, as of the date the Trust receives the Settlement Amount, the Channeled Claims shall be channeled to the Trust;

(vii) denominating, as of the date the Trust receives the Settlement Amount, each of the LMI Entities as Settling Insurers;

(viii) requiring, as of the date the Trust receives the Settlement Amount, each Channeled Claimant receiving a payment from the Trust to sign a release of all Claims against the LMI Entities and the DOH Entities;

(ix) and providing, *verbatim*:

(A) It is the position of DOH that none of DOH Entities, the Trust, or the Settling Insurers will have any reporting obligations in respect of their contributions to the Trust, or in respect of any payments, settlements, resolutions, awards, or other Claim liquidations by the Trust, under the reporting provisions of MSP or MMSEA. Prior to making any payments to any claimants, the Trust shall seek a statement or ruling from the United States Department of Health and Human Services ("**HHS**") that none of the Trust, DOH Entities, or Settling Insurers has any reporting obligations under MMSEA with respect to payments to the Trust by the DOH Entities or Settling Insurers or payments by the Trust to Claimants. Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or written confirmation from HHS that none of the DOH Entities or the Settling Insurers has any reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Trust or with respect to the contributions the DOH Entities and the Settling Insurers have made or will make to the Trust, the Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the DOH Entities and Settling Insurers, and shall timely submit all reports that would be required to be made by any DOH Entity or Settling Insurer under MMSEA on account of any Claims settled, resolved, paid, or otherwise liquidated by the Trust or with respect to contributions to the Trust, including reports that would be required if the payments to the Trust by a DOH Entity or Settling Insurer were determined to be made pursuant to "applicable plans" for purposes of MMSEA, or any DOH Entity or Settling Insurer were otherwise found to have MMSEA reporting requirements. The Trust, in its role as reporting agent for the DOH Entities and Settling Insurers, shall follow all applicable guidance published

18

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

by CMS to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(B)     If the Trust is required to act as a reporting agent for any DOH Entity or Settling Insurer pursuant to Section 1.xx.(ix)(A), the Trust shall provide a written certification to each DOH Entity and Settling Insurer within twenty-one (21) days following the end of each calendar quarter, confirming that all reports to CMS required by Section 1.xx.(ix)(A). have been submitted in a timely fashion, and identifying (a) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance; and (b) any payments to Medicare Beneficiaries that the Trust did not report to CMS.

(C)     With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; *provided, however,* that the Trust may redact from such copies the Redacted Information. With respect to any such reports, the Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS, resubmit such reports to CMS, and, upon request by any DOH Entity or Settling Insurer, provide each DOH Entity and Settling Insurer copies of such resubmissions; *provided, however,* that the Trust may redact the Redacted Information. If the Trust is unable to remedy its noncompliance, the provisions of Section 1.xx.(ix)(G) shall apply.

(D)     If the Trust is required to act as a reporting agent for a DOH Entity or Settling Insurer pursuant to the provisions of Section 1xx.(ix)(A), with respect to each Channeled Claim of a Medicare Beneficiary paid by the Trust and not disclosed to CMS, the Trust shall, upon request by any DOH Entity or Settling Insurer, promptly provide the last four digits of the claimant's Social Security number, the year of the claimant's birth and any other information in the possession or control of the Trust that may be necessary in the reasonable judgment of any DOH Entity or Settling Insurer to satisfy their obligations, if any, under MMSEA, as well as the basis for the Trust's failure to report the payment. In the event any DOH Entity or Settling Insurer informs the Trust that it disagrees with the Trust's decision not to report a Claim paid by the Trust, the Trust shall promptly report the payment to CMS. All documentation relied upon by the Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six (6) years following such determination.

(E)     If the Trust is required to act as a reporting agent for any DOH Entity, or Settling Insurer pursuant to the provisions of Section 1.xx.(ix)(A), the Trust shall make the reports and provide the certifications required by Sections 1.xx.(ix)(A) and (B) until such time as such DOH Entity or Settling Insurer determines, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation determinations made by the Trust or contributions to the Trust. Furthermore,

19

following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 1.xx.(ix)(A), and if any DOH Entity or Settling Insurer reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Trust shall promptly perform its obligations under Sections 1.xx.(ix)(A) and (B).

(F)     Section 1.xx.(ix)(A) is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that the DOH Entities and/or Settling Insurers have made payments pursuant to "applicable plans" within the meaning of MMSEA, or that they have any legal obligation to report any acts undertaken by the Trust or contributions to the Trust under MMSEA or any other statute or regulation.

(G)     If CMS concludes that reporting done by the Trust in accordance with Section 1.xx.(ix)(A) is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Trust, any DOH Entity or Settling Insurer a concern with respect to the sufficiency or timeliness of such reporting, or there appears to any DOH Entity or Settling Insurer a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 1.xx.(ix)(B), (C) or (D), or other credible information, then each DOH Entity and Settling Insurer shall have the right to submit its own reports to CMS under MMSEA, and the Trust shall provide to any Entity that elects to file its own reports such information in its possession or control as the electing party may reasonably require in order to comply with MMSEA, including the full reports filed by the Trust pursuant to Section 1.xx.(ix)(A), without any redactions. The DOH Entities and Settling Insurers shall keep any information they receive from the Trust pursuant to this Section 1.xx.(ix) confidential and shall not use such information for any purpose other than meeting obligations under MMSEA.

(H)     Notwithstanding any other provisions hereof, the Trust shall not be required to report as required by this Section 1.xx.(ix) until the Person on whose behalf the Trust is required to report shall have provided its Medicare Reporting Number, if one exists. Moreover, the Trust shall have no indemnification obligation under this Section 1.xx.(ix) to such Person for any penalty, interest, or sanction with respect to a Claim that may arise on account of such Person's failure timely to provide its Medicare Reporting Number, if one exists, to the Trust in response to a timely request by the Trust for such Medicare Reporting Number. However, nothing relieves the Trust from its reporting obligations with respect to each Person who provides the Trust with its Medicare Reporting Number. The Trust shall indemnify each DOH Entity and Settling Insurer for any failure to report payments to Medicare eligible Survivor Claimants on behalf of Persons who have timely supplied Medicare Reporting Numbers, if any exists.

(I)     Prior to remittance of funds to any Channeled Claimant or counsel therefor, the Trustee shall obtain in respect of any Channeled Claim a certification from the

20

Claimant that said Claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSP relating to such Channeled Claim. If the Trust receives no such certification, the Trust may withhold payment from any Claimant the funds sufficient to assure that all obligations owing or potentially owing under MSP relating to such Survivor Claim are paid to CMS. The Trust shall provide a quarterly certification of its compliance with this Section 1.xx.(ix) to each DOH Entity and Settling Insurer, and permit reasonable audits by such Persons, no more often than annually, to confirm the Trust's compliance with this Section 1.xx.(ix). For the avoidance of doubt, the Trust shall be obligated to comply with the requirements of this Section 1.xx.(ix) regardless of whether any DOH Entity or Settling Insurer elects to file its own reports under MMSEA pursuant to Section 1.xx.(ix)(G).

(J)     Compliance with the provisions of this Section 1.xx.(ix) shall be a material obligation of the Trust under the Plan, in favor of the DOH Entities and Settling Insurers under the Plan.

(K)     The Trust shall defend, indemnify, and hold harmless the DOH Entities and Settling Insurers from any Medicare Claims reporting and payment obligations relating to its payment of Channeled Claims, including any obligations owing or potentially owing under MMSEA or MSP, and any Claims related to the Trust's obligations under Section 1.xx.(ix).

(x)     The Social Security Administration may change (or may have already changed) its processes and/or procedures in a manner that is inconsistent with the foregoing. The Trustee shall make best efforts to comply meaningfully with the foregoing while adhering to the Social Security Administration's most recent processes, procedures, and requirements.

### ddd.   Plan Effective Date

The term "**Plan Effective Date**" means the effective date of the Plan, as noticed on the Bankruptcy Case docket.

### eee.   Redacted Information

The term "**Redacted Information**" means names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the Survivor Claimants, and the names of the guardians, conservators, and/or other personal representatives, as applicable.

### fff.   Reorganized Debtor

The term "**Reorganized Debtor**" means DOH, on and after the Plan Effective Date.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

### ggg. **Resolute**

The term "**Resolute**" means Resolute Management Services Ltd. (formerly known as Equitas Management Services Limited).

### hhh. **Settlement Amount**

The term "**Settlement Amount**" means the net sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00). Each London Market Insurer shall pay its several, respective, allocated share of the Settlement Amount pursuant to the terms of Section 2. Each London Market Insurer's respective, allocated, several share of the Settlement Amount is set forth on Attachment D.

### iii. **Settlement Approval Findings and Conclusions**

The term "**Settlement Approval Findings and Conclusions**" means findings of fact and conclusions of law pursuant to 11 U.S.C. §§ 363(b), (f), and (m) and Bankruptcy Rule 9019, entered concurrently with, the Approval Order, as necessary for the Court to approve this Agreement, including the following:

(i)     DOH demonstrated sound business reasons for the settlement of its Claims against LMI in the Insurance Coverage Adversary Proceeding and the implementation of such settlement through the sale of the Subject Insurance Policies to the London Market Insurers;

(ii)    The Parties mediated their disputes over the Survivor Claims and the Coverage Claims pursuant to the Mediation Order, beginning in July 2020;

(iii)   In the Mediation, the Parties negotiated extensively, at arms-length, and in good faith. London Market Insurers are purchasers in good faith of the Subject Insurance Policies, within the meaning of Bankruptcy Code § 363(m), and are entitled to all of the protections of that statute;

(iv)    LMI are *bona fide* good faith purchasers of the Subject Insurance Policies, for value;

(v)     The terms of the transactions contemplated by this Agreement, as well as the genesis and background of this Agreement, have been adequately disclosed to the Court;

(vi)    The terms and conditions of this Agreement (including the consideration to be realized by DOH's bankruptcy estate) are fair and reasonable;

(vii)   The transactions contemplated by this Agreement are in the best interests of the DOH's bankruptcy estate, its creditors and other stakeholders;

(viii)  The only potential holders of Interests in or against the Subject Insurance Policies are the DOH Entities and Persons who hold Claims against the DOH Entities, whose Claims might be covered by the Subject Insurance Policies;

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

(ix)   The DOH Entities are parties to this Agreement, and hence are deemed to have consented to the sale within the meaning of Bankruptcy Code § 363(f)(2);

(x)   The Barred Claims are subject to *bona fide* dispute, hence the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(4);

(xi)   All holders of Claims against the Subject Insurance Policies could be compelled, in a legal or equitable Action, to accept a money satisfaction of such Claims, therefore the Subject Insurance Policies may be sold free and clear of such Claims pursuant to § 363(f)(5);

(xii)   The compromises and settlements embodied in the Agreement have been negotiated in good faith, and are reasonable, fair, and equitable;

(xiii)   In light of:

      (A)   the probability of success in litigation;

      (B)   the likely difficulties in collection;

      (C)   the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

      (D)   the paramount interest of the creditors;

this Agreement is fair and equitable and within the range of reasonable settlement terms;

(xiv)   The Settlement Amount is fair, adequate, and reasonable consideration for (a) the sale by the DOH Entities and the buy-back by the London Market Insurers of the Subject Insurance Policies; (b) the Entities' Release; and (c) the Supplemental Settling Insurer Injunction;

(xv)   This Agreement is intended to be and is a compromise between the Parties and shall not be construed as an admission of coverage under the Subject Insurance Policies, an admission concerning the amount of a reasonable settlement of any claim, an admission concerning the liability or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages, nor shall this Agreement or any provision hereof be construed as a waiver, modification, or retraction of the positions with respect to the interpretation and application of the Subject Insurance Policies.  This Agreement does not reflect to upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement. This Agreement is without prejudice to the positions taken by the London Market Insurers with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers;

(xvi)   DOH provided due and adequate notice of the (a) sale of the Subject Insurance Policies; (b) terms and conditions of this Agreement; and (c) the hearing before the Court to approve this Agreement and the sale of the Subject Insurance Policies, in accordance

23

with Bankruptcy Rules 2002 and 6004 to all known and unknown Claimants, including by providing notice by publication to any Unknown Survivor Claimants;

(xvii) It would be impractical to divide the Subject Insurance Policies amongst the DOH Entities and the Survivor Claimants, therefore, to realize the value of the Subject Insurance Policies for DOH's bankruptcy estate and the Survivor Claimants requires the sale of the Subject Insurance Policies;

(xviii) The sale of the Subject Insurance Policies outside the ordinary course of business satisfies the requirements of Bankruptcy Code § 363(b);

(xix) The sale of the Subject Insurance Policies free and clear of the Interests of all Persons satisfies the requirements of Bankruptcy Code § 363(f);

(xx) The London Market Insurers are repurchasing the Subject Insurance Policies, pursuant to this Agreement. The London Market Insurers are not purchasing any other assets of the DOH Entities and are not a continuation of the DOH Entities, nor engaging in a continuation of the DOH Entities' businesses. The London Market Insurers shall not have any responsibility or liability with respect to any of the DOH Entities' other assets;

(xxi) The London Market Insurers are not, and shall not be deemed to be, successors to the DOH Entities, or any of them, by reason of any theory of law or equity or as a result of the consummation of the transactions contemplated in this Agreement, the Plan, or otherwise. The London Market Insurers shall not assume, or be deemed to have assumed, any liabilities or other obligations of the DOH Entities.

(xxii) To the extent any Claimant may have any legal or equitable right to assert a Claim either directly against the Subject Insurance Policies, which policies are being acquired by the London Market Insurers pursuant to this Agreement, or indirectly by asserting such Claim against any DOH Entity, such Claims are deemed to be (a) "interests" as that term is used in Bankruptcy Code § 363(f); and (b) "Interests" herein; and

(xxiii) The Agreement may be approved pursuant to Bankruptcy Rule 9019(a).

### jjj. Settlement Payment Date

The term "**Settlement Payment Date**" means the day that is the later of (a) the Plan Effective Date; and (b) sixty (60) days after the Confirmation Order becomes a Final Order, *provided, however*, that if such date is not a Business Day, the Settlement Payment Date shall be the next Business Day.

### kkk. Supplemental Settling Insurer Injunction

The term "**Supplemental Settling Insurer Injunction**" means an order of the Bankruptcy Court, effective as of the date the Trust receives the Settlement Amount, which states, *verbatim*:

### Supplemental Settling Insurer Injunction.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

Pursuant to sections 105(a) and 363 of the Bankruptcy Code, and in consideration of the undertakings of the Settling Insurers pursuant to the Insurance Settlement Agreements, including certain Settling Insurers' purchase of the applicable Settling Insurer Policies free and clear of all Claims and Interests pursuant to section 363(f) of the Bankruptcy Code, any and all Persons who have held, now hold, or who may in the future hold any Claims or Interests (including all debt holders, all equity holders, all Persons holding a Claim, governmental, tax and regulatory authorities, lenders, trade and other creditors, Survivor Claimants, perpetrators and all others holding Interests of any kind or nature whatsoever, including those Claims released or to be released pursuant to the Insurance Settlement Agreements) against any of the Settling Insurers, including (i) Claims relating to the Settling Insurer Policies, including Survivor Claims, Direct Action Claims, Indirect Claims, and Released Claims, (ii) the payment of any of the Claims identified in (i), including Contribution Claims and Medicare Claims, and (iii) Extra-Contractual Claims are hereby permanently stayed, enjoined, barred, and restrained from taking any action, directly or indirectly, to assert, enforce or attempt to assert or enforce any such Claim or Interest against the Settling Insurers or Settling Insurer Policies, including:

a. commencing or continuing in any manner any action or other proceeding, whether legal, equitable or otherwise, against the Settling Insurers or the property of the Settling Insurers;

b. enforcing, attaching, collecting, or recovering, or seeking to do any of the preceding, by any manner or means, any judgment, award, decree or order against the Settling Insurers or the property of the Settling Insurers;

c. creating, perfecting, or enforcing, or seeking to do any of the preceding, any lien of any kind against the Settling Insurers or the property of the Settling Insurers;

d. asserting or accomplishing any setoff, right of indemnity, subrogation, contribution, or recoupment of any kind against any obligation due to the Settling Insurers or the property of the Settling Insurers; and

e. taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan.

The Supplemental Settling Insurer Injunction will be effective with respect to a Settling Insurer only as of the date that the Trust receives the Insurance Settlement Amount pursuant to the terms of the applicable Insurance Settlement Agreement. The Supplemental Settling Insurer Injunction bars the above-referenced actions against the Settling Insurers and the Settling Insurer Policies, but against no other person or thing; provided, however, nothing in this Supplemental Settling Insurer Injunction shall limit, or be deemed or otherwise interpreted to limit, the scope of the discharge or Channeling Injunction in favor of the Protected Parties. The foregoing injunctive provisions are an integral part of this Plan and are essential to its implementation.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

**lll.**     **Settling Insurers**

The term "**Settling Insurers**" means, collectively, the LMI Entities, and all other insurers of the DOH Entities, which, after the Petition Date, settled Claims for insurance coverage brought against them by DOH, and which obtain the protection of the Supplemental Settling Insurer Injunction.

**mmm. Subject Insurance Policies**

The term "**Subject Insurance Policies**" means, collectively (i) all insurance policies listed in Attachment A hereto; and (ii) all known and unknown insurance policies to the extent subscribed by one or more of the London Market Insurers in their capacity as London Market Insurers on or before July 1, 1993, and providing insurance to any DOH Entity; *provided, however*, if a Subject Insurance Policy that is not listed in Attachment A was not subscribed on behalf of a DOH Entity (or such Person's Affiliates) but provides coverage to a DOH Entity, then it is a Subject Insurance Policy only to the extent it insures the DOH Entity.

**nnn.**     **Termination Event**

The term "**Termination Event**" means

(i)    the Court has not entered the Approval Order by [DATE];

(ii)    the Court has not entered the Confirmation Order by [DATE];

(iii)    the Court has not entered the Bar Order by [DATE];

(iv)    the Approval Order, the Confirmation Order or the Bar Order fails to become a Final Order by [DATE];

(v)    the Court denies approval of this Agreement;

(vi)    the Court enters an order or grants such other relief that is inconsistent with this Agreement;

(vii)    the DOH files any plan of reorganization other than the Plan;

(viii)    the appointment of a trustee under section 1104 of the Bankruptcy Code or an examiner with expanded powers in the Bankruptcy Case; or

(ix)    the Plan is amended in any manner that is inconsistent with the terms of this Agreement; *provided, however*, the deadlines set forth in (i) through (iv) of the foregoing may be extended by mutual written consent of the Parties.

**ooo.**     **Trust**

The term "**Trust**" means the trust to be established under the Plan, which will assume liability for, and be established, pursuant to the Plan and, if applicable, Bankruptcy Code § 105, to

26

make distributions pursuant to the Plan, the Trust Agreement, and the Trust Distribution Plan, including payments to Survivor Claimants.

### ppp.  Trust Agreement

The term "**Trust Agreement**" means any agreement establishing the Trust and the requirements for its administration.

### qqq.  Trust Distribution Plan

The term "**Trust Distribution Plan**" means the Trust Distribution Plan established under the Trust Agreement and attached to the Plan, which governs the payment of Trust Distributions.

### rrr.  Trustee

The term "**Trustee**" means the Person appointed as Trustee to administer the Trust, in accordance with the terms of the Plan, the Confirmation Order, and the Trust Agreement, or any successor appointed in accordance with the terms of the Plan, Confirmation Order, and the Trust Agreement.

### sss.  Underwriter Third-Party Beneficiaries

The term "**Underwriter Third-Party Beneficiaries**" means:

(i)     Resolute and the Equitas Entities;

(ii)    Equitas Insurance Limited to the extent it is not a successor to the Persons identified in Section 1.ooo.(i) with respect to the subject matter of this Agreement;

(iii)   Any Person from time to time retained by or on behalf of Lloyd's Underwriters to act as their claims handling agent and/or service provider, solely in such capacity;

(iv)    The past, present and future reinsurers and retrocessionaires of the Equitas Entities or any of them, including National Indemnity Company and any other Person from time to time controlled (whether directly or indirectly), by Berkshire Hathaway, Inc., that provides retrocessional reinsurance to any one or more of the Equitas Entities, solely in such capacity; and

(v)     All past, present and future Affiliates and Agents of the Persons set forth in Sections 1.ooo.(i) to (iv) (inclusive), if any, solely in such capacity; and

(vi)    The respective heirs, executors, successors and assigns (including any administrator, receiver, trustee, personal representative, liquidator (provisional or otherwise), or equivalent appointee/s under relevant insolvency law), of any of the Persons identified in Sections 1.ooo.(i) through (v) (inclusive) above, solely in such capacity.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

ttt.    **Unknown Claims Representative**

The term "**Unknown Claims Representative**" means Michael R. Hogan, who has been appointed by the Court to represent the interests of Unknown Survivor Claimants.

## 2.    **Payment of the Settlement Amount**

a.    This Agreement is effective on the Effective Date.  The occurrence of the Settlement Payment Date is a condition precedent to each London Market Insurer's several, respective obligation to pay its share of the Settlement Amount.

b.    On the Settlement Payment Date, in full and final settlement of all obligations under and relating to the Subject Insurance Policies, and in consideration of the sale of the Subject Insurance Policies to the London Market Insurers free and clear of all Interests of any Person, and the releases provided herein, the London Market Insurers shall pay their respective, several, shares of the Settlement Amount in accordance with the payment instructions provided by the Trust.

c.    Upon the Trust's receipt of each London Market Insurer's several, respective share of the Settlement Amount, the sale, assignment, and transfer of the Subject Insurance Policies to the London Market Insurers, shall be effective and binding, with the intent that no Person shall retain anything whatsoever with respect to the Subject Insurance Policies.

d.    If, before the occurrence of the Settlement Payment Date, a DOH Entity other than DOH becomes a debtor in a bankruptcy case or insolvency Action, under the Bankruptcy Code or otherwise, and any London Market Insurer has not satisfied its respective several payment obligation arising hereunder, then such London Market Insurer shall be excused from performance under this Agreement until such time as either (i) such DOH Entity obtains, subject to the limitations imposed by the Bankruptcy Code, and subject to the equitable powers of the court in which such Action is pending, an order from such court approving this Agreement under Bankruptcy Code § 363(b), (f), and (m), and Bankruptcy Rule 9019, authorizing the assumption by such DOH Entity (or any successor thereto) of this Agreement under Bankruptcy Code § 365 ("**Assumption**"), or in the event the insolvency case is proceeding under other law, shall obtain a similar order from the court overseeing the insolvency case approving this Agreement and confirming the binding effect thereof; (ii) DOH obtains an order in the Action compelling the Assumption; or (iii) DOH obtains an order from the Court determining the equitable portion of the Settlement Amount allocable to any interest the DOH Entity subject to such bankruptcy case or insolvency Action may have in the Subject Insurance Policies.  Each DOH Entity agrees that in the event it files a bankruptcy or other insolvency Action, it will not present any Claim for payment under this Agreement or the Subject Insurance Policies to any London Market Insurer, until the Assumption has been approved by an order of the applicable court and such order has become a Final Order or until its equitable share in the Settlement Amount has been established by order of the Court pursuant to clause (iii) above, and such order has become a Final Order.  The London Market Insurers agree to cooperate fully and provide commercially reasonable assistance to DOH and any DOH Entity in obtaining any of the orders contemplated in this Section 2(d).

28

## 3. Several Liability

The obligations of each London Market Insurer are several and not joint. The DOH Entities agree that no London Market Insurer shall be liable for any settlement amount allocable to any other Person. Accordingly, each identified London Market Insurer listed in Attachment B agrees to pay only its several, respective, allocated, share of the Settlement Amount, which amount is set forth in Attachment D, as applicable. No DOH Entity shall seek to recover from any individual London Market Insurer an amount in excess of its stated, several, respective, allocated share of the Settlement Amount, as set forth in Attachment D. Upon the Trust's receipt of the Settlement Amount, each DOH Entity shall be deemed to have released each of the LMI Entities pursuant to Section 4 of this Agreement without further action by any Person.

## 4. Mutual Releases

### a. By DOH Entities

(i)     Upon the Trust's receipt of the Settlement Amount, the Entities' Release shall become immediately effective. Those London Market Insurers entitled to the Entities' Release but not identified on Attachment B to this Agreement, namely, those London Market Insurers that subscribed a Subject Insurance Policy either not presently known, or known but to which the identity of the subscribers is not presently known, shall be entitled to all of the terms of the Entities' Release and to the Indemnity set forth in Section 5 upon the Trust's receipt of the Settlement Amount.

(ii)    It is the intention of the DOH Entities to reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies and to assure the LMI Entities their peace and freedom from such Interests and from all assertions of rights in connection with such Interests, *provided, however,* the Entities' Release does not release, and nothing in this Agreement shall affect, the right of the DOH Entities, or the Trust, as applicable, to assert and pursue Claims against and to collect from Insurers other than those released under the Entities Release, and no Claims are released with respect to such Persons.

(iii)   Upon the Trust's receipt of the Settlement Amount, any and all rights, duties, responsibilities, and obligations of the London Market Insurers created by or in connection with the Subject Insurance Policies, are terminated. As of the Settlement Payment Date, the DOH Entities shall have no insurance coverage under the Subject Insurance Policies. The Entities' Release shall operate as though the London Market Insurers had never subscribed the Subject Insurance Policies.

(iv)    The Entities' Release extends to all those (a) London Market Insurers that subscribed any of the Subject Insurance Policies; and (b) the Underwriter Third-Party Beneficiaries, all of which are third-party beneficiaries of the Entities' Release.

(v)     Each DOH Entity signing this Agreement, is, among other things, (a) releasing all Released Claims, including Claims that it does not know or suspect to exist in its favor, which, if known by such DOH Entity, might have materially affected its settlement with the London Market Insurers, and (b) expressly waiving all rights it might have under any

29

federal, state, local, or other law or statute that would in any way limit, restrict, or prohibit such general release.

(vi)    Except with respect to any material breach of any representation, warranty or covenant by the London Market Insurers set forth in this Agreement, each DOH Entity expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist. To the fullest extent permitted by applicable law, each DOH Entity hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

(vii)   Nothing in the foregoing shall release the London Market Insurers from their obligations under this Agreement, including the obligation to pay the Settlement Amount.

**b.      By the London Market Insurers**

(i)     At the same time the Entities' Release becomes effective, each London Market Insurer, and any subsequently appointed trustee or representative acting for such London Market Insurer shall be deemed to remise, release, covenant not to sue, and forever discharge each DOH Entity from and against all Claims relating to the Subject Insurance Policies, which each such London Market Insurer ever had, now have or hereinafter may have, from the beginning of time to the Settlement Payment Date.

(ii)    Each Person released under the Entities' Release shall reserve no rights or benefits whatsoever under or in connection with the Subject Insurance Policies.

(iii)   Except with respect to any material breach of any representation, warranty or covenant by any DOH Entity set forth in this Agreement, each London Market Insurer expressly assumes the risk that acts, omissions, matters, causes, or things may have occurred, which it does not know or does not suspect to exist. To the fullest extent permitted by applicable law, each London Market Insurer hereby waives the terms and provisions of any statute, rule or doctrine of common law which either: (a) narrowly construes releases purporting by their terms to release Claims in whole or in part based upon, arising from, or related to such acts, omissions, matters, causes or things; or (b) which restricts or prohibits the releasing of such Claims.

**5.      Indemnification**

a.      This Section 5 is effective upon the Trust's receipt of the Settlement Amount. The Trust shall indemnify and hold harmless each of the London Market Insurers from and against any and all Channeled Claims; and the Reorganized Debtor shall indemnify the London Market Insurers from and against all Enjoined Claims except for the Channeled Claims. These indemnifications include Claims made by Persons over whom the Trust and/or the Reorganized Debtor does not have control, including the DOH Entities, former subsidiaries, predecessors in

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

interest, sellers or purchasers of assets, or any other Person who holds a Claim that the Trust and/or the Reorganized Debtor is indemnifying.

b.      The London Market Insurers shall have the right to defend, with counsel of their choice, all Claims identified under Section 5.a. The London Market Insurers may begin the defense of any Claim upon receipt of such a Claim. The London Market Insurers agree to notify the Trust and/or the Reorganized Debtor, as applicable, promptly of Claims identified under Section 5.a. and of its choice of counsel.

c.      The Trust and/or Reorganized Debtor, as applicable, shall reimburse all reasonable and necessary attorneys' fees, expenses, costs, and amounts incurred by the London Market Insurers in defending such Claims identified under section 5.a. The London Market Insurers shall defend any such Claim in good faith. The indemnity obligations set forth in Section 5.a, hereof, to indemnify each London Market Insurer shall not exceed the respective portion of the Settlement Amount actually paid by each respective London Market Insurer. In defense of any such Claim, The London Market Insurers may settle or otherwise resolve a Claim with the prior consent of the Trust and/or Reorganized Debtor, as applicable, which consent shall not be unreasonably withheld.

d.      This indemnification and hold harmless undertaking (Sections 5.a., b., and c.) also extends to the benefit of the Underwriter Third-Party Beneficiaries, in their capacity as such, all of which are third-party beneficiaries of the terms of this indemnification and hold harmless undertaking.

6.      **Bankruptcy Obligations**

a.      DOH shall provide to the London Market Insurers an initial draft of the proposed form of Approval Order, Settlement Approval Findings and Conclusions, and Bar Order at least fourteen (14) days before DOH submits the foregoing for approval of this Agreement to the Court, so that the London Market Insurers may provide comments and suggestions. In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to the London Market Insurers. The London Market Insurers reserve the right to object to, *inter alia*, (i) any proposed order that does not satisfy all of the requirements of the definition of Approval Order set forth in Section 1.e, or (ii) any proposed findings and conclusions that do not satisfy all of the requirements of the definition of Settlement Approval Findings and Conclusions set forth in Section 1.eee, or the definition of Bar Order set forth in Section 1.k.

b.      DOH shall provide to each of the London Market Insurers an initial draft of the proposed form of Confirmation Order, and Confirmation Findings and Conclusions, at least fourteen (14) days before DOH submits the foregoing to the Court, so that the London Market Insurers may provide comments and suggestions. In the event that DOH makes material revisions to any of the foregoing documents, then, as soon as possible, DOH shall provide a copy of such material revisions to the London Market Insurers. The London Market Insurers reserve the right to object to, *inter alia*, any proposed order that does not satisfy all of the requirements of the definition of Confirmation Order set forth in Section 1.s, or any proposed findings of fact and conclusions of law that do not satisfy all the requirements of the definition of Confirmation Findings and Conclusions in Section 1.r.

31

c.      DOH provided to London Market Insurers a copy of the *Joint Chapter 11 Plan of Reorganization for the Diocese of Harrisburg* (the "**Joint Plan**") upon the filing of the Joint Plan. To the extent that the Joint Plan does not meet the requirements set forth in the definition of "Plan" set forth in Section 1.xx above, DOH shall modify such Joint Plan to assure that the filed plan of reorganization submitted to Court for confirmation comports with such definition, and London Market Insurers shall have the right to approve all modifications that affect their rights or obligations under this Agreement. In the event that DOH makes material revisions to the filed plan of reorganization, then, as soon as possible, DOH shall provide a copy of such material revisions to the London Market Insurers. The London Market Insurers reserve the right to object to, *inter alia*, any proposed plan of reorganization that does not satisfy all of the requirements of the definition of Plan set forth in Section 1.xx. (a "**Non-Compliant Plan**"). If DOH proposes a Non-Compliant Plan, then any London Market Insurers may contest such plan, and DOH shall not request a hearing date on confirmation of a Non-Compliant Plan less than thirty (30) days after the date such plan is filed in the Court.

d.      DOH will seek entry of the Confirmation Order, as set forth in Section 1.s., together with the Confirmation Findings and Conclusions, as set forth in Section 1.r., including any required findings and conclusions under the Bankruptcy Code.

e.      DOH shall serve Bankruptcy Notice of the initial hearing to approve this Agreement and on confirmation of the Plan and the time for filing objections thereto. The proposed form of notice shall be submitted to the London Market Insurers for their review and comment no later than seven (7) days prior to the actual service of notice. If the initial hearing to approve this Agreement or to confirm the Plan is adjourned, DOH shall not be required to provide Bankruptcy Notice of such adjourned hearing and shall only be required to file a notice of such adjournment on the docket in the Bankruptcy Case and provide such other and further notice as the Court may direct.

f.      In the event that any Person attempts to prosecute a Barred Claim, before the Effective Date, against any London Market Insurer, or any DOH Entity, then promptly following notice from such London Market Insurers or DOH Entity, DOH shall file a motion and supporting papers to obtain an order from the Bankruptcy Court, pursuant to Bankruptcy Code §§ 105(a) and/or 362(b), as applicable, staying such Claims until the date that the Approval Order and Confirmation Order have each become a Final Order, or, alternatively, this Agreement is terminated under Section 8. However, if DOH is unable to obtain a stay of such Claim then the London Market Insurers may, to the extent feasible, and subject to the terms, conditions, and any applicable limits and retentions of the Subject Insurance Policies, defend such Claims and either settle them or litigate them to judgment, and the applicable DOH Entities shall fully assist and cooperate with London Market Insurers in such defense. If after such a Claim is brought, and if:

(i)      the Effective Date occurs, then any payment by any London Market Insurers to resolve such Barred Claim, including defense costs paid to an insured's counsel, shall be deducted from the Settlement Amount, and such London Market Insurers shall pay the balance of their respective, several, shares of the Settlement Amount; if the payments by a London Market Insurer to resolve such Barred Claim equals or exceeds its respective, several, allocated share of the Settlement Amount, then such London Market Insurer, shall automatically, and without further action by any Person, be relieved of any further

32

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

obligations under this Agreement and entitled to all the benefits hereunder, including the Entities Release; or, alternatively,

(ii)     the Effective Date does not occur, before this Agreement is terminated under Section 9, then any amounts paid by the London Market Insurers shall be credited against their obligations, if any exist, under the Subject Insurance Policies.

## 7.     <u>Representations and Warranties</u>

a.     DOH represents and warrants that the notice required under the definition of Bankruptcy Notice includes all Claimants whose names and addresses are known to, or are readily ascertainable by any Party.

b.     Each DOH Entity represents and warrants that it has the authority to execute this Agreement as its binding and legal obligation, subject in the case of DOH, to receiving Court approval of this Agreement.

c.     Each London Market Insurer represents and warrants to DOH that (i) it has, and at all times prior to payment in full of its allocated portion of the Settlement Amount as reflected on Attachment D will have, sufficient assets to pay its allocated portion of the Settlement Amount in full; and (ii) it is not now, nor has it ever been, the subject of any bankruptcy or insolvency proceeding in any jurisdiction.

d.     Each Party represents and warrants that the Persons signing this Agreement on its behalf are authorized to execute this Agreement.

e.     Each individual signing this Agreement on behalf of a Party represents and warrants that he or she has the right, power, legal capacity, and authority to enter into this Agreement on behalf of such Party and bind such Party to perform each of the obligations specified herein.

## 8.     <u>Reduction Clause.</u>

The Confirmation Order shall provide include the following, *verbatim*:

### a.     **Litigation/Settlement Between an Alleged Insured or Abuse Claimant and Non-Settling Insurers**

(i)     The Channeling Injunction shall channel all Contribution Claims to the Trust.

(ii)     If, for any reason any court does not recognize the channeling of the Contribution Claims of Non-Settling Insurers to the Trust, or such Claims are not channeled for any reason, then the following shall apply:

(A)     The London Market Insurers shall retain their Contribution Claims, subject to the following provisions; *provided, however*, that:

(I)     The London Market Insurers shall not pursue any Contribution Claims against any Non-Settling Insurer: (A) that asserts a Contribution

<div align="center">33</div>

Claim solely against the Trust; (B) whose Contribution Claim is satisfied and extinguished entirely by the application of this paragraph 8.a.(ii)(A), or (C) that does not assert a Contribution Claim against them;

(II)    If a Non-Settling Insurer asserts its Contribution Claim only against the Trust, then the London Market Insurers shall assign any Contribution Claims they may hold against such Non-Settling Insurer to the Trust, and the Trust shall be free to assert such Contribution Claims against such Non-Settling Insurer;

(III)    If a Non-Settling Insurer releases its Contribution Claims, if any such exist, that it may have against a London Market Insurers, then such released London Market Insurers shall release its Contribution Claims against such releasing Non-Settling Insurer.

(IV)    If a Non-Settling Insurer asserts a Contribution Claim against any London Market Insurer, and

(1)    the Trust fully indemnifies the London Market Insurers, then the London Market Insurers shall assign their Contribution Claims to the Trust; or

(2)    the Trust partially, but not fully, indemnifies the London Market Insurers for such Claim, then the London Market Insurers shall retain their Contribution Claims and may assert them against the Non-Settling Insurer asserting the Contribution Claim against the London Market Insurers.  Any recovery by the London Market Insurers exceeding the amount necessary to satisfy the Trust's full indemnity obligation plus litigation costs shall be turned over to the Trust.

(B)    In any Action, including the Insurance Coverage Adversary Proceeding, involving a DOH Entity, the Reorganized Debtor, or the Trust (collectively, "**Alleged Insured**") or an Abuse Claimant, as applicable, and one or more Non-Settling Insurers, where a Non-Settling Insurer has asserted, asserts, or could assert any Contribution Claim against an LMI Entity, then any judgment or award obtained by such Alleged Insured or Abuse Claimant against such Non-Settling Insurer shall be automatically reduced by the amount, if any, that such LMI Entity is liable to pay such Non-Settling Insurer as a result of its Contribution Claim, so that the Contribution Claim is thereby satisfied and extinguished entirely ("**Reduction Amount**").  In any Action involving an Alleged Insured or Abuse Claimant against a Non-Settling Insurer, where such LMI Entity is not a party, such Alleged Insured or Abuse Claimant shall obtain a finding from that court or arbitrator(s), as applicable, of the Reduction Amount before entry of judgment against such Non-Settling Insurer.  In the event that such a reduction is not made as described above, then any Contribution Claim by any Non-Settling Insurer against any LMI Entity shall be reduced by the Reduction Amount, as determined

34

by the court or arbitrator(s) in which such Contribution Claim is filed. The London Market Insurers shall be required to cooperate in good faith with DOH and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim. In the event that application of the Reduction Amount eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse the LMI Entities their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Court.

(C)     If an Alleged Insured or Abuse Claimant and a Non-Settling Insurer enter into an agreement settling one or more Claims relating to Abuse, such agreement shall provide that such Non-Settling Insurer releases Contribution Claims against the London Market Insurers so long as the London Market Insurers release their Contribution Claims against such Non-Settling Insurer. If such settlement agreement fails to include such a release provision, and the Non-Settling Insurer has asserted, asserts, or could assert a Contribution Claim against an LMI Entity, then any settlement amount in such settlement agreement shall be deemed automatically reduced by the Reduction Amount. In such event, the settling parties shall obtain a finding from the applicable court or arbitrator(s) of the Reduction Amount. If (a) the settlement agreement was entered into without litigation or arbitration such that no judge or arbitrator can determine the Reduction Amount, or (b) such a reduction is not otherwise made as described above, then any Contribution Claim by any Non-Settling Insurer against any LMI Entity shall be reduced by the Reduction Amount, as determined by the court or arbitrator(s) in which such Contribution Claim is filed. The London Market Insurers shall be required to cooperate in good faith with DOH and/or the Trust to take commercially reasonable steps to defend against any Contribution Claim by a Non-Settling Insurer. In the event that the reduction eliminates the Non-Settling Insurer's Contribution Claim, then such Non-Settling Insurer shall fully reimburse the LMI Entities their costs and expenses, including legal fees, incurred in responding to the Contribution Claim Action, including all costs, expenses and fees incurred in seeking relief from the Court.

b.     **Application of the Reduction**

(i)     To ensure that the reduction contemplated in this Section 8 is accomplished, the LMI Entities shall be entitled to: (i) notice, pursuant to Section 19, within a reasonable time of the initiation of any future Action against or future settlement negotiations with any Non-Settling Insurer that could give rise to the possibility of a Contribution Claim against any LMI Entity, and periodic notices thereafter on at least an annual basis of the status of such Action or negotiations; (ii) the opportunity to participate in the Action or settlement negotiations without objection by any party thereto, but only to the extent necessary to accomplish the reduction contemplated in this Section 8; (iii) the cooperation of the applicable Alleged Insured so that the LMI Entities can assert this Section as a defense in any Action against any of them for any Contribution Claim; and (iv) have the court or appropriate tribunal issue such orders as are necessary to effectuate the judgment, award,

35

or settlement reduction in order to protect the LMI Entities from any Contribution Claim. The notice required above shall be given by (A) the Alleged Insured that is a party to such Action or settlement negotiations; or (B) if no Alleged Insured is such a party, the Non-Settling Insurer that is a party to such Action or settlement negotiations; or (C) if no Alleged Insured or Non-Settling Insurer is a party to such Action or settlement negotiations, the Survivor Claimant bound by the Plan.

(ii)     The Trust shall use commercially reasonable efforts to obtain, from all Settling Insurers, agreements similar to those contained in Section 8(a)(ii)(A)(III).

## 9.     Termination of Agreement

a.     The Parties may terminate this Agreement in writing upon mutual assent.

b.     Any Party may terminate this Agreement upon thirty (30) days' notice, pursuant to Section 21 hereof, to the other Parties if a Termination Event occurs.

c.     In the event of termination pursuant to this Section 9, unless the Parties agree otherwise in writing, this Agreement shall be void *ab initio* and all Parties shall retain all of their Interests relating to the Subject Insurance Policies as if this Agreement never existed; provided, however, that any amounts expended by the London Market Insurers pursuant to Section 6.f of this Agreement shall be credited against their obligations, if any, under the Subject Insurance Policies pursuant to their terms.

d.     If any London Market Insurers do not pay their allocated share of the Settlement Amount (each a "**Non-Paying Insurer**"), DOH, at its option, may by written notice, in accordance with Section 21 hereof, to other parties to this Agreement, either terminate this Agreement in its entirety or terminate this Agreement solely as it relates to such Non-Paying Insurer ("**Partial Termination**"). In the event of a Partial Termination, (i) such Non-Paying Insurer shall not be a Settling Insurer; (ii) such Non-Paying Insurer shall not receive the benefit of the Entities' Release, the Channeling Injunction, or the Supplemental Settling Insurer Injunction; (iii) the Subject Insurance Policies shall not include that portion of any insurance policies to the extent issued or subscribed by such Non-Paying Insurer; (iv) this Agreement shall be void *ab initio* solely as it relates to such Non-Paying Insurer; (v) the Settlement Amount shall be reduced by such non-paying London Market Insurer's allocated, several share of the Settlement Amount, as set forth on Attachment C; and (vi) the Parties shall retain all of their Interests relating to that portion of any insurance policies to the extent issued or subscribed by such Non-Paying Insurer, as if this Agreement never existed.

## 10.     Treatment of Perpetrators

Nothing in this Agreement overrides the treatment in the Plan of individuals who perpetrated an act of Abuse that forms the basis for a Survivor Claim.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

11. **Reasonably Equivalent Value**

      a.     This Agreement was bargained for and entered into in good faith and as the result of arms-length negotiations;

      b.     Based on their respective independent assessments, with the assistance and advice of counsel, of the probability of success, the complexity, the delay in obtaining relief, and the expense of maintaining the Insurance Coverage Adversary Proceeding, the payments received by the DOH Entities pursuant to this Agreement constitute a fair and reasonable settlement of the Released Claims;

      c.     The payments and other benefits received under this Agreement by the DOH Entities constitute reasonably equivalent value for the Entities' Release, indemnity, and other benefits received by the LMI Entities under this Agreement; and

      d.     Subject to the Trust's receipt of the Settlement Amount, this Agreement constitutes a full and final resolution of all issues in the Insurance Coverage Adversary Proceeding.

12. **Confidentiality**

      a.     Except as necessary to obtain approval of this Agreement in the Court, the Parties agree that all matters relating to the negotiation of this Agreement shall be confidential and are not to be disclosed except by order of court, or written agreement of the Parties, except that, provided recipients agree to keep such information confidential, this Agreement may be disclosed to: (i) reinsurers of the London Market Insurers directly or through intermediaries; (ii) outside auditors or accountants of any Party; (iii) representatives of a non-party insurer subscribing or allegedly subscribing one or more of the Subject Insurance Policies, which insurer is, has been or may become insolvent in the future, including any liquidators, provisional liquidators, scheme administrators, trustees, or similarly empowered Persons acting for such insurer. This Agreement may also be disclosed, as required, to the Inland Revenue, the Internal Revenue Service or other U.S. or U.K. governmental authority that properly requires disclosure, or as otherwise required by law. The Parties acknowledge and agree that a copy of this Agreement will be publicly filed on the docket and provided to parties in interest in the Bankruptcy Case, without obligation of confidentiality or restrictions on further disclosure.

      b.     In the event a private litigant, by way of document request, interrogatory, subpoena, or questioning at deposition or trial, attempts to compel disclosure of anything protected by this section from a Party, such Party shall decline to provide the requested information on the ground that this Agreement restricts such disclosure. In the event such private litigant seeks an order from any court or governmental body to compel such disclosure, or in the event that a court, government official, or governmental body (other than the Inland Revenue or Internal Revenue Service) requests or requires disclosure of anything protected by this paragraph, the Party from whom disclosure is sought shall promptly give written notice to the other Parties, and shall promptly provide copies of all notice papers, orders, requests, or other documents in order to allow each Party to take such protective steps as may be appropriate. Notice shall be made under this paragraph to the persons identified in Section 21.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

c.      Material protected by this section shall be deemed to fall within the protection afforded compromises and offers to compromise by Rule 408 of the Federal Rules of Evidence and similar provisions of state law or state rules of court.

## 13.    <u>Third-Party Beneficiaries</u>

The Underwriter Third-Party Beneficiaries, the Trust, and the Trustee are intended third-party beneficiaries of this Agreement.  Except as set forth in the preceding sentence, there are no other third-party beneficiaries of this Agreement.

## 14.    <u>Co-operation</u>

a.      The DOH Entities will undertake all reasonable actions to co-operate with the London Market Insurers in connection with their respective reinsurers, including responding to reasonable requests for information and meeting with representatives of reinsurers.  Furthermore, the Parties shall use their commercially reasonable efforts and cooperate as necessary or appropriate to effect the objectives of this Agreement.

b.      If any action or proceeding of any type whatsoever is commenced or prosecuted by any person not a Party to this Agreement to invalidate, interpret, or prevent the validation or enforcement, or carrying out, of all or any of the provisions of this Agreement, the Parties mutually agree, represent, warrant, and covenant to cooperate fully in opposing such action or proceeding.

## 15.    <u>Non-Prejudice and Construction of Agreement</u>

a.      This Agreement is intended to be and is a compromise between the Parties and neither this Agreement nor any provision hereof shall be construed as (i) an admission of coverage under the Subject Insurance Policies; (ii) an admission concerning the amount of a reasonable settlement of any Claim; (iii) an admission concerning the liability of or damages caused by the DOH entities with respect to any Survivor Claim (including the reasonableness of any such damages); or (iv) a waiver, modification, or retraction of the positions of the Parties with respect to the interpretation and application of the Subject Insurance Policies.

b.      This Agreement is the product of informed negotiations and involves compromises of the Parties' previously stated legal positions.  Accordingly, this Agreement does not reflect upon the Parties' views as to rights and obligations with respect to matters or Persons outside the scope of this Agreement.  This Agreement is without prejudice to positions taken by London Market Insurers with regard to other insureds, and without prejudice with regard to positions taken by any DOH Entity with regard to other insurers.  Except for the express references to the third-party beneficiaries in Section 13 of this Agreement, the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

c.      This Agreement is the jointly drafted product of arms'-length negotiations between the Parties with the benefit of advice from counsel, and the Parties agree that it shall be so construed.  As such, no Party will assert that any ambiguity in this Agreement shall be construed against another Party.

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

d.      If any provision of the Plan, the Trust Agreement, or trust distribution procedures proposed thereunder conflicts with or is inconsistent with this Agreement in any way whatsoever, then the provisions of this Agreement shall control and take precedence. Neither the Plan nor the Trust Agreement shall be construed or interpreted to modify or affect any rights or obligations of the London Market Insurers under this Agreement.

## 16.     No Modification

No change or modification of this Agreement shall be valid unless it is made in writing and signed by the Parties. Any change or modification of this Agreement that affects the rights of the Survivor Claimants or Trust shall require the consent of the Committee or Trustee, as applicable, which consent shall not be unreasonably withheld. Any attempted change or modification in violation of this Section shall be void *ab initio*.

## 17.     Waiver

No waiver of any provision of this Agreement or of a breach thereof shall be valid unless it is made in writing and signed by the Parties. The waiver by any Party of any of the provisions of this Agreement or of the breach thereof shall not operate or be construed as a waiver of any other provision or breach.

## 18.     Non-Assignment

Neither this Agreement nor the rights and obligations set forth in this Agreement shall be assigned without the prior written consent of the other Parties.

## 19.     Execution

There will be three signed originals of this Agreement.

## 20.     Governing Law

This Agreement shall be governed by and shall be construed in accordance with the laws of Pennsylvania.

## 21.     Notices

Unless another person is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent in writing to the Persons listed on Attachment F.

## 22.     Integration

This Agreement, including the attachments, constitutes the entire Agreement amongst the London Market Insurers and the DOH Entities, with respect to the subject matter hereof, and supersedes all discussions, agreements and understandings, both written and oral, amongst the Parties with respect thereto. The Parties intend that this Agreement and the Plan shall be consistent in all respects, with no conflict or discrepancies between them.

39

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

**IN WITNESS WHEREOF**, the Parties have executed this Agreement by their duly authorized representatives.

The London Market Insurers identified in Attachment B have respectively designated Clyde & Co US LLP, as their attorneys-in-fact for the limited purpose of executing this Agreement on their behalf with express authority to do so.

[Signature Pages Follow]

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

Signed: _____

The Roman Catholic Diocese of Harrisburg

Name Printed: _____

Title: _____

Date: _____ 2022

Signed: _____

On Behalf of Other DOH Entities Listed on Exhibit D

Name Printed: _____

Title: _____

Date: _____ 2022

Signed: _____

London Market Insurers

Name Printed: _____

Title: _____

Date: _____ 2022


Signed: _____

London Market Insurers

Name Printed: _____

Title: _____

Date: _____ 2022

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

## SCHEDULE OF ATTACHMENTS TO

## SETTLEMENT AGREEMENT AND RELEASE

| Attachment A | List of known Subject Insurance Policies |
|---|---|
| Attachment B | List of London Market Insurers |
| | |
| Attachment C | List of Solvent London Market Insurers allocated shares of the Settlement Amount |
| Attachment D | List of DOH Entities |
| Attachment E | Notice Names and Addresses |

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

# ATTACHMENT A

## Known Subject Insurance Policies

Package Policies:

| Policy No. / Security | Policy Period(s) |
|---|---|
| 74/16553/1 PNB10455V | July 25, 1974 to July 25, 1975 |
| SL 3042/SLC 5048 | July 25, 1975 to July 25, 1977 |
| SL 3235/SLC 5249 | July 25, 1977 to July 25, 1980 |
| SL 3711/SLC 5732 | July 25, 1980 to July 25, 1983 |
| ISL 3108/ICO 4066 | July 25, 1983 to July 25, 1986 |
| ISL 3580/ICO 5410 | July 25, 1986 to July 25, 1987 (*claims-made*) |
| ISL 3869/ICO 5535 | July 25, 1987 to July 25, 1988 (*claims-made*) |

Excess All Risks Casualty and Crime Coverage Policies:

| Policy No. / Security | Policy Period(s) |
|---|---|
| 74-16553-2 | July 25, 1974 to July 25, 1975 |
| SL 3238 | July 25, 1977 to July 25, 1980 |
| ISL 3109/ ICO 4067 | July 25, 1983 to July 25, 1986 |

Excess Broadform Liability Policies:

| Policy No. / Security | Policy Period(s) |
|---|---|
| SL 3439 | July 25, 1978 to July 25, 1981 |
| SL 3873/SLC 5881 | July 25, 1981 to July 25, 1983 |
| ISL 3110/ICO 4068 | July 25, 1983 to July 25, 1986 |
| ISL 3582 / ICO 5412 | July 25, 1986 to July 25, 1987 (*claims-made*) |

And all other Policies subscribed by London Market Insurers on behalf of DOH and DOH Entities prior to July 25, 1993, including Excess Property Only, Drop-Down, and Other.

**ATTACHMENT B**

**List of London Market Insurers**

1. Certain Underwriters at Lloyd's, London subscribing to Policy Nos. 74/16553; SL 3042; SL 3235; SL 3711; ISL 3108; ISL 3580; ISL 3869; 74-16553-2; SL 3238; ISL 3109; SL 3439; SL 3873; ISL 3110; ISL 3582; and all others issued prior to July 25, 1993.

2. Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Co Ltd.)

3. RiverStone Insurance (UK) Limited (successor in interest to Terra Nova Insurance Company Limited)

4. Sompo Japan Nipponkoa Insurance Company of Europe Limited (formerly known as the Yasuda Fire & Marine Insurance Company (U.K.) Ltd.)

5. Dominion Ins. Co. Ltd.

6. St. Katherine Insurance Co

7. Assicurazioni Generali T.S.

8. Taisho Marine & Fire Insurance Co.

9. Allianz International Insurance Co.

CORE/9990000.2173/178941582.1
DM3\9350092.1

CORE/9990000.2173/178941582.1
DM3\9350092.1

# ATTACHMENT C

## Solvent London Market Insurer Shares of the Settlement Amount

| London Market Insurer | Amount |
|---|---|
| Certain Underwriters at Lloyd's, London | $2,268,338.40 |
| Excess Insurance Company, Ltd. | $129,396.51 |
| Terra Nova Insurance Company, Ltd. | $67,590.05 |
| The Yasuda Fire & Marine Insurance Company | $34,670.04 |
| Dominion Insurance Company | $1.00 |
| St. Katherine Insurance Company PLC | $1.00 |
| Assicurazioni Generali, T.S. | $1.00 |
| Taisho Marine & Fire Insurance Co. (U.K.) Ltd. | $1.00 |
| Allianz International Insurance Co. (U.K Ltd.) | $1.00 |
| **Net to Solvent London Market Insurer** | **$2,500,000** |

CORE/9990000.2173/178941582.1
DM3\9350092.1

**ATTACHMENT D**

**LIST OF DOH ENTITIES**

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

# ATTACHMENT E

## <u>NOTICE NAMES AND ADDRESSES</u>

DOH:

With copies to:

-and-

DOH Parishes:

LONDON MARKET INSURERS

| | |
|---|---|
| For Resolute Management Services Limited: | Martin Futter, Esq. LLB (Hons)  PGDip (LPC) |
| | Account Manager<br>Resolute Management Services Ltd.<br>London Underwriting Centre<br>4th Floor, 8 Fenchurch Place<br>London EC3M 4AJ<br>England<br>Tel: +44 (0) 207 342 2455 |
| For Company Leader: | Mr. Steve Dodson<br>Head of Claims<br>Catalina Worthing Insurance Ltd f/k/a HFPI (as Part VII transferee of Excess Insurance Company Ltd and/or London & Edinburgh Insurance Company Ltd (as successor to London & Edinburgh General Insurance Company Ltd))<br>1 Alie St.<br>London E1 8DE<br>England<br>Tel: +44 (0) 207 265 5031 |
| With copies to: | Catalina J. Sugayan, Esq.<br>Clyde & Co US LLP |

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

55 West Monroe Street
Suite 3000
Chicago, IL 60603
Tel: 312.635.6917

Russell W. Roten, Esq.
Duane Morris LLP
865 South Figueroa Street
Suite 3100
Los Angeles, CA 90017-5450
Tel: 213.689.7439

CORE/4893-6345-2488.2/178941582.1
DM3\9350092.1

# **EXHIBIT G**

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**
**HARRISBURG DIVISION**

| | |
|---|---|
| In re: | |
| ROMAN CATHOLIC DIOCESE OF HARRISBURG, | Chapter 11 |
| Debtor.[1] | Case No. 1:20-bk-00599 (HWV) |

### ORDER APPROVING SETTLEMENT AGREEMENTS BY AND BETWEEN THE ROMAN CATHOLIC DIOCESE OF HARRISBURG AND SETTLING INSURERS

Upon consideration of the *Motion for an Order Approving Settlement Agreements with the Roman Catholic Diocese of Harrisburg's Insurer's* (Dkt. No. [_]) (the "***Motion***");[2] and upon consideration of the Settlement Agreements; and upon consideration of all pleadings related to the Motion; and based upon the record in this bankruptcy proceeding; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted in this order;

**THE COURT HEREBY FINDS AS FOLLOWS:**

A.     This Court has jurisdiction to consider the Motion and relief sought in the Motion in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Middle District of Pennsylvania.

B.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).

C.     Venue is appropriate in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The last four digits of the Debtor's federal tax identification number are: 4791. The Debtor's principal place of business is located at 4800 Union Deposit Road, Harrisburg, Pennsylvania 17111.
[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Plan (as applicable).

036905-08024/4873-4639-9812.7

1

D.      Due and sufficient notice of the Motion and relief sought in the Motion has been given in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and no other or further notice is necessary or required.

E.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion has been afforded to all creditors and parties in interest.

F.      The relief requested in the Motion and granted in this order is warranted under the circumstances and is in the best interests of the Debtor, the Debtor's estate, creditors, and all other parties in interest.

G.      The terms of the Settlements Agreements, as well as the genesis and background of the Settlement Agreements, have been adequately disclosed to the Court.

H.      Each of the Settlement Agreements reflects a compromise of the various claims and disputes among the Debtor, on the one hand, and each respective Settling Insurer, on the other hand, that is fair and in the best interests of the Debtor and the Debtor's estate and in no way is deemed to be an admission by the Settling Insurers of coverage, reasonable settlement, or liability under the respective Settling Insurer Policies.

I.      Each of the Settlement Agreements is the result of multiple years of mediation and arm's length negotiations, done in accordance with the Mediation Order, and permits the global resolution of myriad factually intense disputes and claims relating to Survivor Claims, the Settling Insurers, and the Settling Insurer Policies.

J.      The Settlement Agreements will permit the Debtor to avoid the uncertainty, delay, and cost involved in further litigation regarding Survivor Claims and applicability of coverage under the various Settling Insurer Policies and preserve the value of the Debtor's estate and maximize the amounts available to Survivors and other parties in interest.

K.      It is a reasonable exercise of the Debtor's business judgment to enter into, perform under, and consummate the Settlement Agreements, including the sale, conveyance, transfer and assignment of any and all interests the Debtor holds in the Settling Insurer Policies relating to each of Travelers, Zurich, Interstate, and LMI (collectively, the "***Sold Policies***"), pursuant to 11 U.S.C. § 363(b)(1) free and clear of liens, Claims (including, but not limited to, Survivor Claims), and Interests pursuant to 11 U.S.C.  § 363(f), as and to the extent provided for in each respective Settlement Agreement.

L.      The Settlement Agreements were negotiated and proposed without collusion and in good faith, from arms' length bargaining positions by the Debtor, Parishes, Schools, Related Non-Debtor Entities, and the Settling Insurers.

M.      Each of the Settling Insurers has conducted itself in good faith, including in connection with the sale, conveyance, transfer and assignment of any and all interests the Debtor holds in the Sold Policies, pursuant to 11 U.S.C. § 363(b)(1) free and clear of liens, Claims (including, but not limited to, Survivor Claims), and Interests pursuant to 11 U.S.C.  § 363(f), as and to the extent provided for in each respective Settlement Agreement.

N.      The consideration exchanged, including the settlement amount to be paid by each Settling Insurer, constitutes a fair and reasonable settlement of the parties' disputes and of their respective rights and obligations relating to the Settling Insurer Policies.

O.      The Settling Insurers are not successors to the Debtor, Parishes, Schools, or Related Non-Debtor Entities, by reason of any theory or law or equity, as a result of the consummation of the transactions contemplated within the Settlement Agreements.

P.      The Debtor has good and sufficient business justifications supporting entry into the Settlement Agreements, which are attached as **Exhibit A** through **Exhibit F** to the Motion.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The relief requested in the Motion is GRANTED as set forth in this order, pursuant to sections 363(b), (f), (m), 105(a) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9019.

2. Each of the Settlement Agreements is approved in its entirety, and the omission in this order of specific reference to any provision of any of the Settlement Agreements shall not impair or diminish the efficacy, propriety, or approval of the provision.

3. Any and all objections to the Motion or to the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections, are hereby overruled and denied.

4. The Parishes, Schools, and Related Non-Debtor Entities, to the extent they hold an interest in the Settling Insurer Policies, are deemed to have consented to the sale of the Sold Policies within the meaning of section 363(f)(2) of the Bankruptcy Code.

5. Without further order of this Court, the Debtor is authorized to: (a) enter into and perform the covenants, terms and conditions of each Settlement Agreement and grant the releases contained therein; and (b) undertake any remaining transactions contemplated or required by the Settlement Agreements.

6. With respect to Travelers, Zurich, Interstate, and LMI, the sale, conveyance, transfer and assignment of any and all interests of the Debtor in the respective Sold Policies is authorized and shall be free and clear of all Liens, Claims (including, but not limited to, Survivor Claims) and Interests of all Persons, pursuant to section 363 of the Bankruptcy Code. Upon the effective date of the applicable Settlement Agreement, without any further action being required, the applicable Settling Insurer shall be deemed to have purchased from the Debtor its Sold Policy or Sold Policies free and clear of all Liens, Claims (including, but not limited to, Survivor Claims)

and Interests of all Persons, pursuant to section 363(f) of the Bankruptcy Code, including Interests of the Debtor, Parishes, Schools, and Related Non-Debtor Entities, and other Persons claiming coverage by, through, or on behalf of the Debtor, Parishes, Schools, Related Non-Debtor Entities, any other insurer, and any entity holding a Claim (including, but not limited to, Survivor Claims) against any of the Debtor, Parishes, Schools, or Related Non-Debtor Entities.

7.     Each of Travelers, Zurich, Interstate, and LMI are entitled to the protections afforded by section 363(m) of the Bankruptcy Code, each having conducted themselves in good faith in connection with the Settlement Agreements and purchase of their respective Sold Policies.

8.     Upon the occurrence of the conditions contained in each Settlement Agreement and payment of the settlement amount by the respective Settling Insurer, all Interests the Debtor, Parishes, Schools, or Related Non-Debtor Entities may have had, may presently have, or in the future may have in the Settling Insurer Policies are released pursuant to the terms of the respective Settlement Agreement.

9.     This order shall not limit or preclude the entry or effectiveness of any injunctions and other protections that may be granted to protect the Settling Insurers in connection with or as a part of the Plan or any other chapter 11 plan in this chapter 11 proceeding and the order confirming the Plan.  The Settling Insurers shall be entitled to the benefit of any Channeling Injunction, Supplemental Settling Insurer Injunction, and any similar injunctions contained in the Plan.

10.     The Settlement Agreements and this order are binding upon the parties to each respective Settlement Agreement, the Debtor, any trust or trustee for the Debtor, its assets, or its liabilities, and shall survive the confirmation of any plan of reorganization of the Debtor.

11.     The Court shall retain jurisdiction to enforce the provisions of this order and the Settlement Agreements and to resolve any issue or dispute concerning the interpretation, implementation or enforcement of this Order and the Settlement Agreements, or the rights and duties of the parties hereunder or thereunder, including without limitation, (a) interpretation of the terms, conditions and provisions thereof, and (b) all issues and disputes arising in connection with the relief authorized herein.

Dated: _____, 2023

_____
Hon. Henry W. Van Eck
Chief United States Bankruptcy Judge